Civil Case No. **05-00014**

(Guam Superior Court Nos. CF 0317-97 & SP 0228-03;
Guam Supreme Court Nos. CRA 00-002 & WHC 04-001;
Ninth Circuit No. 01-70172; United States Supreme Court
No. 00-10126)

## DISTRICT COURT OF GUAM

------------

### RANDY IGNACIO CHARGUALAF,

Petitioner,

vs.

### ROBERT D. CAMACHO,
Director of Corrections,
Government of Guam,

Respondent,

and

### THE ATTORNEY GENERAL OF GUAM,

Additional Respondent.

------------

### EXCERPTS OF RECORDS

------------

**FILED**
DISTRICT COURT OF GUAM

MAY - 5 2005

MARY L.M. MORAN
CLERK OF COURT

### HOWARD TRAPP

Howard Trapp Incorporated
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

Attorney for petitioner

# INDEX

Excerpts of record in Supreme Court of Guam . . . . . . . . . . . . . . . . . . . 1

    Index to excerpts of record in Supreme Court of Guam . . . . . . . . . 1A

Opinion in *People of Guam vs. Randy Ignacio Chargualaf*,
    2001 Guam 01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

Order in *Randy Ignacio Chargualaf vs. People of the Territory
of Guam*, No. 01-70172 in the United States Court of Appeals
for the Ninth Circuit . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Petition for writ of habeas corpus in *In re Randy Ignacio Chargualaf,
petitioner, Robert D. Camacho, respondent*, No. WHC 04-001
in the Supreme Court of Guam . . . . . . . . . . . . . . . . . . . . . . . 215

Order in *In re Randy Ignacio Chargualaf vs. Robert D. Camacho*,
No. WHC 04-001 in the Supreme Court of Guam . . . . . . . . . . . . 245

Petition for rehearing in *In re Randy Ignacio Chargualaf vs. Robert D.
Camacho*, No. WHC 04-001 in the Supreme Court of Guam . . . . . 257

Order in *In re Randy Ignacio Chargualaf vs. Robert D. Camacho*,
No. WHC 04-001 in the Supreme Court of Guam . . . . . . . . . . . . 264

Mandate in *People of Guam vs. Randy Ignacio Chargualaf*,
No. CRA 00-002 in the Supreme Court of Guam . . . . . . . . . . . . 266

WHC 04- *DO 1*

## SUPREME COURT OF GUAM

------------

### In re RANDY IGNACIO CHARGUALAF

Petitioner,

vs.

**ROBERT D. CAMACHO,**
Director of Corrections
Government of Guam

Respondent.

------------

On Application for Writ of Habeas Corpus
to Director of Corrections

------------

### EXCERPTS OF RECORD

------------

**HOWARD TRAPP**

Howard Trapp Incorporated
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

do hereby certify that the foregoing
s a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam
Dated at Hagatña, Guam

FEB 0 8 2005

*Imelda B. Duenas*
Deputy Clerk, Supreme Court of Guam

do hereby certify that the foregoing
s a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam
Dated at Hagatña, Guam

Attorney for petitioner

FEB 2 3 2005

*Imelda B. Duenas*
Deputy Clerk, Supreme Court of Guam

1

# INDEX

Petition for writ of habeas corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Order to show cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Opposition to petition for writ of habeas corpus . . . . . . . . . . . . . . . . . 11

Transcript of proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Exhibit 1    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Exhibit 2    Letter from Randy Ignacio Chargualaf to
Honorable Alberto C. Lamorena of March
16, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Exhibit 3    Letter from Randy Chargualaf to Rawlen
Mantanona, Esq. of March 17, 1999 . . . . . . . . . . . . 68

Exhibit 4    Letter from Randy I. Chargualaf to Terry E.
Timblin, Esq. of April 28, 1999 . . . . . . . . . . . . . . . 70

Exhibit 5    Motion to Withdraw As Counsel for
Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Exhibit 6    Affidavit of Terry E. Timblin . . . . . . . . . . . . . . . . 78

Exhibit 7    Transcript of March 18, 1999 hearing on
Motion to Withdraw as Counsel by Rawlen
Mantanona and Transcript of May 6, 1999
hearing on Motion to Withdraw as Counsel
by TerryTimblin . . . . . . . . . . . . . . . . . . . . . . . . 85

Exhibit 8    Letter from Randy Ignacio Chargualaf to
Terry E. Timblin, Esq. of May 6, 1999 . . . . . . . . . . 101

Exhibit 9    Letter from Randy I. Chargualaf to
Honorable Alberto C. Lamorena, III of May
7, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Exhibit 10   Transcript of May 10, 1999 hearing on
Motion to Compel Discovery . . . . . . . . . . . . . . . . 103

Exhibit 11   Minute Entry of May 10, 1999 . . . . . . . . . . . . . . . 119

Exhibit 12    Judgment ................................ 121

Exhibit 13    Notice of Appeal ......................... 124

Exhibit 14    Opinion of Supreme Court of Guam ........... 125

Exhibit 15    Superior Court Docket Sheet ................ 152

Decision and order ...................................... 173

Docket sheet .......................................... 179

Certificate of Clerk of Superior Court of Guam ............... 182

HOWARD TRAPP INCORPORATED
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

Attorney for petitioner

SUPERIOR COURT OF GUAM

------------

**SP 0228-03**

RANDY IGNACIO CHARGUALAF,               (
                                        )
              Petitioner,               (
                                        )
        vs.                             (
                                        )
FRANK T. ISHIZAKI,                      (
Director of Corrections,                )
Government of Guam,                     (
                                        )
              Respondent.               (

Special Proceeding No.

PETITION FOR WRIT
OF HABEAS CORPUS

------------

## INTRODUCTION

This proceeding arises under 8 Guam Code Ann. ch. 135 (1995). (Pador v. Matanane, 653 F.2d 1277 (9th Cir. 1981).)

Petitioner is unlawfully imprisoned and restrained of his liberty by Frank Ishizaki, Director of Corrections, Government of Guam, at the Adult Correctional Facility, Mangilao, Guam.

Petitioner is confined under process of this Court. The proceeding resulting in the confinement is a criminal case. The case number is CF 0317-97.

The plea entered in the criminal case was not guilty. Trial was by jury. The date of the judgment for confinement is March 2, 2001. The judgment provides that petitioner is sentenced

to imprisonment for a term of 35 years.

An appeal was taken to the Supreme Court of Guam.

The judgment was affirmed.

Petitioner applied to the United States Court of Appeals for the Ninth Circuit for review of the decision of the Supreme Court of Guam by writ of certiorari.

The application was denied.

Thereafter petitioner applied to the Supreme Court of the United States for review of the case in the Ninth Circuit by writ of certiorari.

The application was denied.

No prior application has been made for writ of habeas corpus in regard to the detention and restraint complained of in this petition.

## GROUND FOR RELIEF

The illegality of the confinement consists in the ineffectiveness of defense counsel's representation of petitioner in the Supreme Court of Guam.

## SUPPORTING FACTS AND AUTHORITIES

Petitioner moved to substitute one appointed counsel for another. (CR 193 (motion to withdraw as counsel for defendant).)

The motion was denied. (RT 14 (filed June 2, 2003); RT 5 (filed Sept. 23, 2003).)

2

Petitioner's counsel did not argue to the Supreme Court of Guam that this Court erred in denying petitioner's motion to substitute counsel.

The failure of petitioner's counsel to argue to the Supreme Court of Guam that this Court erred in denying petitioners motion to substitute counsel requires that petitioner's conviction be vacated.

> The applicable standard
>
> for measuring a claim of ineffective assistance of appellate counsel is a two-prong test forth in _Strickland v. Washington_, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendants must prove that their counsel's performance fell below an objective standard of reasonableness and, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. _Id._ at 688, 694, 104 S.Ct. at 2065, 2068; _see Miller v. Keeney_, 882 F.2d 1428, 1433-1434 (9th Cir. 1989).

(_Morrison v. Estelle_, 981 F.2d 425, 427 (9th Cir. 1992), _cert. denied_, 113 S.Ct. 2367 (1993).)[1]

_____

[1] "The actual phrasing of the second prong in both _Strickland_ and _United States v. Birtle_, 792 F.2d 846 (9th Cir. 1986), is this: 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' _Birtle_, 792 F.2d at 849, quoting _Strickland_, 466 U.S. at 694, 104 S.Ct. at 2068. We did not make clear in _Birtle_ whether 'the proceeding' in question when evaluating appellate counsel's performance was the appeal or a potential second trial; that is, whether we should focus on whether there was a reasonable probability that the appellant would have won the appeal, or whether there was a reasonable probability that, once having obtained a reversal, the appellant would have prevailed at retrial. _Birtle_ concentrates on the appeal, so we assume that

3

3

Petitioner's counsel would have been successful in arguing to the Supreme Court of Guam that this Court erred in denying petitioner's motion to substitute counsel.

> An appellate court
>
> review[s] the denial of a motion for substitution of counsel for abuse of discretion. United States v. Corona-Garcia, 210 F.3d 973, 976 (9th Cir. 2000), cert. denied, 531 U.S. 898, 121 S.Ct. 231, 148 L.Ed.2d 165 (2000). In reviewing a denial of substitution of counsel, [the appellate court] consider[s] (1) the timeliness of the motion; (2) the adequacy of the trial court's inquiry; and (3) the extent of conflict created. Id.

(United States v. Nguyen, 262 F.3d 998, 1004 (9th Cir. 2001).)

(1) The timeliness of the motion.

Neither the timeliness of petitioner's motion nor the extent of resulting inconvenience or delay is dispositive. This Court did not indicate that timeliness was a consideration underlying its denial of petitioner's motion. Rather, it denied the request after concluding that petitioner's present counsel was competent. (RT 14 (filed June 2, 2003); RT 3-5 (filed Sept. 23, 2003).) It did not indicate that timing or delay affected its decision to deny the motion. (RT 14 (filed June 2, 2003); RT 3-5 (filed Sept. 23, 2003).) Because the timeliness of petitioner's request did not underlie the Court's exercise of its discretion to deny the request, it is not dispositive. (Nguyen, 262 F.3d at

---

the appeal is the relevant proceeding to consider." (Miller v. Keeney, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989).)

4

1004); <u>United States v. Walker</u>, 915 F.2d 480, 482-83 (9th Cir. 1990), <u>overruled on other grounds by United States v. Nordby</u>, No. 99-10191, slip op. at 11523 n.4 (9th Cir. Sep. 11, 2000); <u>see also</u> <u>United States v. Musa</u>, 220 F.3d at 1096, 1102 n.2 ("Although a district court has discretion to deny an untimely substitution of counsel motion, the court here did not base its denial of Musa's request on untimeliness grounds").)

(2) <u>The adequacy of this Court's inquiry.</u>

The Court's inquiry into petitioner's complaint was inadequate. Before a trial court can engage in a measured exercise of discretion, it must conduct an inquiry adequate to create a sufficient basis for reaching an informed decision. (<u>Nguyen</u>, 262 F.3d at 1004; <u>Musa</u>, 220 F.3d at 1102).) For an inquiry regarding substitution of counsel to be sufficient, a court should question the attorney and defendant privately and in depth. (<u>Nguyen</u> at 1004.) The Court did neither here. The Court focused on petitioner's counsel's competence. (RT 14 (filed June 2, 2003); RT 3-4 (filed Sept. 23, 2003).) The proper focus of such an inquiry is on the nature and extent of the conflict between defendant and counsel, not on whether counsel is legally competent. (<u>Walker</u>, 915 F.2d at 483.) It is settled that a court may not deny a substitution request simply because it thinks current counsel's representation is adequate. (<u>Musa</u>, 220 F.3d at 1102.) Even if a defendant's counsel is competent, a serious breakdown in

5[5]

communication can result in an inadequate defense.   (<u>Id.</u>)

(3) <u>The extent of conflict created.</u>

The conflict between petitioner and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense.   The conflict between petitioner and his counsel resulted in a total lack of communication:   .

> MR. TIMBLIN: . . . Your Honor, there's one item left to discuss but before we go any further, has Your Honor received any fax transmissions from Mr. Chargualaf?
>
> THE COURT: We got one on May 6th.
>
> MR. TIMBLIN: Okay, well, that's the one I'm looking at.   And if you notice, it -- again, this is Mr. Chargualaf's formal request for reconsideration of motion to withdraw.
>
> <u>I am filing a complaint to the Guam Bar Association Ethics Committee for ineffective assisted [sic] counsel.</u>
>
> We are now in a situation where if I stay in the case, I will also be litigating a claim in the Ethics Committee which I don't intend to be gentle about.   And I think this is kind of hopeless.   I know the Court's got a tough problem on its hands. . . .   But I just don't see where I can really proceed with this.

(RT 2 (filed Sept. 23, 2003).)   To compel one charged with grievous crimes to undergo a trial with counsel with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatever.   (<u>Schell v. Witek</u>, 218 F.3d 1017, 1025 (9th Cir. 2000)(en banc).)   "An irreconcilable conflict undermines confidence in trial proceedings and is

6

reversible error." (<u>United States v. Moore</u>, 159 F.3d 1154, 1161 (9th Cir. 1998).) This Court's denial of the motion to substitute counsel violated petitioner's Sixth Amendment right to counsel. (<u>Nguyen</u>, 262 F.3d at 1005).)

It could not be clearer that defense counsel would have been successful in arguing to the Supreme Court of Guam that this Court erred in denying petitioner's motion to substitute counsel. (<u>See</u> <u>Nguyen</u>, 262 F.3d at 1004-05 ("The District Judge's . . . denial of the motion to substitute counsel violated Nguyen's Sixth Amendment right to counsel. The judgment of conviction is REVERSED").)

### PRAYER FOR RELIEF

Wherefore petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

Dated, Hagåtña, Guam,

September 26, 2003.

_____
HOWARD TRAPP
For HOWARD TRAPP INCORPORATED
Attorney for petitioner

7

(PETITION FOR HABEAS CORPUS)
RANDY IGNACIO CHARGUALAF

## VERIFICATION

Mangilao, Guam)ss.:

I, Randy Ignacio Chargualaf, being first duly sworn, depose and say that I am the petitioner in the above-entitled proceeding: that I have read the foregoing petition and know the contents thereof; and that the same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 26, 2003, at Mangilao, Guam.

_____
RANDY IGNACIO CHARGUALAF

8

HOWARD TRAPP INCORPORATED
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

Attorney for petitioner



RECEIVED
OCT 31 2003
AG ....
GENERAL CRIMES DIV.

DOC Director's Ofc.
RECEIVED
11. 7. 03
JRClim

SUPERIOR COURT OF GUAM

------------

RANDY IGNACIO CHARGUALAF,               )   Case No. SP 0228-03
                                        )
          Petitioner,                   )
                                        )   ORDER TO SHOW CAUSE
               vs.                      )
                                        )
FRANK T. ISHIZAKI,                      )
Director of Corrections,                )
Government of Guam,                     )
                                        )
          Respondent.                   (

------------

On reading and filing the petition of Randy Ignacio Chargualaf,

IT IS ORDERED:

That Frank T. Ishizaki, Director of Corrections, Government of Guam, respondent, show cause before this Court, in Room _____ of the above-entitled Court, located at the Guam Judicial Center, 120 West O'Brien Drive, Hagåtña, Guam, on _DEC 0 5 2003_____, 2003, at $10:00$ A.M., why the said Randy Ignacio Chargualaf should not be discharged from the restraint and detention under which he is held and why all of the relief to which he may be entitled should not be granted.

9

That the written return is to be served and filed on or before ___DEC 0 3 2003___, 2003.

Dated, at Hagåtña, Guam, this _____ day of September, 2003.

Original Signed By:
HON. STEVEN S. UNPINGCO
_____
**HONORABLE**
Judge, Superior Court of Guam

I do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Superior Court of Guam
Dated at Hagatna, Guam

OCT 2 8 2003

Esther L.G. Pinaula
_____

2



1
2

3 **Office of the Attorney General**
**Douglas B. Moylan**
4 Attorney General of Guam
**General Crimes Division**
5 Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
6 Hagåtña, Guam 96910 ● USA
(671) 475-3406 ● (671) 477-3390 (Fax)
7 www.guamattorneygeneral.com ● law@mail.justice.gov.gu

8 Attorneys for the Government of Guam

9

## IN THE SUPERIOR COURT OF GUAM
10 ## HAGÅTÑA, GUAM

11

12 RANDY IGNACIO CHARGUALAF,    )    SPECIAL PROCEEDINGS NO. SP228-03
      )
13       Petitioner,    )
      )
14     vs.      )    OPPOSITION TO PETITION FOR
      )    WRIT OF HABEAS CORPUS
15 FRANK T. ISHIZAKI,    )
Director of Corrections,    )
16 Government of Guam,    )
      Respondent.    )
17 _____ )

18       Respondent Director of the Department of Corrections hereby opposes the Petition for Writ

19 of Habeas Corpus on the following grounds:

20       As a preliminary matter, it is important to note that this matter is not before the trial court on

21 any sort of review or remand. The defendant has been convicted and sentenced, and his conviction

and sentence have been appealed. They were affirmed at 2001 Guam 1. This is, rather, a collateral

22 attack on the conviction. It is a unique one – this Court is being asked to find that appellate

23 counsel's representation was deficient. However, not only is there no evidence that appellate

24 counsel's performance was deficient, but even if it were, neither this Court nor an appellate court

25 could disturb the conviction absent a showing of actual error.

26       Throughout the appeal, the issue of the denial of substitution of counsel was never raised.

27 Therefore, it is raised for the first time on collateral review rather than direct appeal. If the matter

had been raised to the appellate court in the first instance, Chargualaf's claim would be reviewed

28

Page 1
Opp. Pet. For Writ of Habeas Corpus - Chargualaf v. Ishizaki
Superior Court of Guam Spec. Proc. No. SP228-03

Case 1:05-cv-00014   Document 21   Filed 05/05/2005   Page 16 of 40

vnn:H:\PLEADIN1\SP228-03.wpd

1    by an appellate court for abuse of discretion. *United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001).

2    However, Chargualaf's lawyer chose not to raise it on appeal. See Brief of Appellant, Supreme

3    Court of Guam Case No. CRA00-002, filed August 25, 2000. So this is not the standard to be used

4    in this case.

5        When raised on collateral review, the standard of review of the denial of a motion to

6    substitute counsel is for actual prejudicial error. *Brecht v. Abrahamson* 113 S.Ct. 1710 (1993):

7    "Claimants are entitled to relief for trial error only if they can establish that 'actual prejudice'

    resulted." This standard has been used by the Ninth Circuit in habeas reviews as a standard which

8    leaves the Court in "grave doubt about whether a trial error of fedetal law had substantial and

9    injurious effect or influence in determining the jury's verdict." *Murtishaw v. Woodford*, 255 F.3d

10   926 (9th Cir 2001). Therefore, this Court cannot even review what happenned in the appeal unless

    it is in "grave doubt" as to the fairness of the trial in light of the error. Petitioners are not entitled

11   to habeas relief on trial error unless they can establish that the error resulted in actual prejudice.

12   *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

13        An examination of the record indicates that there was one problem that Chargualaf was

14   faxing the Court about. After a hearing on that difference of opinion, defense counsel continued to

15   represent the defendant meritoriously, throughout the appeal and even into the phase where he

16   petitioned for certiorari review from the Ninth Circuit. No irreconcilable conflict was ever revealed.

17   The defendant had had irreconcilable differences with his previous four lawyers, but failed to

18   demonstrate to the trial judge that his differences with this, his fifth lawyer, rose to the level of

    irreconcilability. Given the defendant's predilection for disagreeing with his lawyers, a possible

19   conflict is not sufficient to reach the level of irreconcilability required by the law.

20        The record reveals that Chargualaf had been assigned four lawyers prior to the designation

21   of Mr. Timblin to represent him: "He's had Mr. Bischoff, Mr. Williams, Mr. Gorman, Mr.

22   Mantanona..." Transcript of May 6, 1999, proceedings, p. 13 lines 1-2. At the first hearing where

23   Chargualaf brought up the unhappiness with his lawyer, he stated only that "I don't trust Mr. Timblin

24   in handling my case." Transcr. May 6, 1999, p. 13 lines 4-5. Mr. Chargualaf was apparently faxing

    the trial judge's chambers with the following note: "I am filing a complaint to the Guam Bar

25   Association Ethics Committe for ineffective assisted counsel." Transcript of May 10, 1999,

26   proceedings, p.2 lines 15-17. Mr. Timblin confessed his duty to defend his ethics in light of this

27   note, ("We are now in a situation where if I stay in the case, I will also be litigating a claim in the

28

Page 2
Opp. Pet. For Writ of Habeas Corpus - Document Maliaki   12   Filed 05/05/2005    Page 17 of 40
Superior Court of Guam Spec. Proc. No. SP228-03                         vnn:H:\PLEADIN1\SP228-03.wpd

Ethics Committee which I don't intend to be gentle about." Transcr. May 10, 1999, p. 2 lines 18-20.)
However, at neither the May 6, 1999, hearing, nor the May 10, 1999, hearing, did Mr. Timblin or
the defendant put any other disagreements on the record. There is no other evidence of a conflict of
interest.

Some examples of irreconcilable conflict of interest as approved by the Ninth Circuit have
been: persistent representations of irreconcilable differences to the Court *(United States v. Moore,*
159 F.3d 1154 (9th Cir. 1998), absolute refusal on the part of the defendant to communicate in any
manner whatsoever with counsel *(Brown v. Craven,* 424 F.2d 1166 (9th Cir. 1970), a stormy
relationship with quarrels, bad language, and counterthreats. *(United States v. Williams,* 594 F.2d
1258 (9th Cir. 1979). Neither the defendant nor the lawyer presented any evidence rising to the levels
required by the courts in finding an irreconcilable relationship between lawyer and client.

By the time that Mr. Timblin, Chargualaf's fifth lawyer, came forward with his motion to be
excused, it was not necessary for the trial court to go into an exhaustive colloquy about the extent
of the breakdown. There was enough of a record to know, first, that the defendant had a pattern of
irreconcilable differences with his lawyers, and second, that the only threat that this lawyer was the
threat of an ethics complaint. However, under Ninth Circuit law the threat of an ethics complaint,
alone, does not suffice to demonstrate an actual conflict. In *United States v. Moore,* 159 F.3d 1154
(9th Cir. 1998) the Court held that the defendant's mere threat of a malpractice suit never went
beyond the threat. The Court expressly declined to allow the defendant to thus manufacture a
conflict: "finding an actual conflict from a mere threat would allow defendants to manufacture a
conflict in any case." Moore at 1158.

The law thus prevents defendants from manufacturing their own conflicts of interest. Beyond
the threat that Mr. Chargualaf was going to file an ethics threat which never materialized, defense
counsel presented nothing that indicated any differences at all, much less irreconcilable differences.
There is nothing in this case which could leave this court with the "grave doubt" that the jury
proceedings would have been different had the trial court granted the motion to withdraw.

After denying his motion to withdraw, defense counsel proffered an alibi defense (Transcr.
May 10, 1999, at 9 ll. 5-6), suppression issues (Transcr. May 10, 1999, at 12) and in limine motions
(Transcr. May 10, 1999, at 14). This lawyer conscientiously proceeded to think of valid and well-
reasoned defense tactics, many of which required obvious communication with his client. This did
not have the hallmarks of an irreconcilable relationship.

Page 3
Opposition For Writ of Habeas Corpus - Chargualaf (Melchizeki) 13 Filed 05/05/2005   Page 18 of 40
Superior Court of Guam Spec. Proc. No. SP228-03                                    Vnn:H:\PLEADIN1\SP228-03.wpd

Most telling is the fact that even after Chargualaf was sentenced, he never brought up any problem he had with defense counsel, and he even stayed with Mr. Timblin throughout the appellate process. Mr. Chargualaf had many opportunities to bring such irreconcilable differences to the attention of the Court or counsel. No such references exist. It was not until well after the Guam Supreme Court affirmed the conviction and the Ninth Circuit denied certiorari that Chargualaf's differences with counsel sprang back into life. The time to remind the Court that there had been irreconcilable differences would have been on appeal. This claim is gone; it was never substantiated in the first instance and is less credible at this point, years after the trial and appellate proceedings.

So, while under *Nguyen*, the court must conduct an adequate colloquy if the defendant raises an issue about counsel's representation, in this case the defendant did not raise any particular issue. The inquiry need only be as comprehensive as the circumstances reasonably would permit. *King v. Rowland*, 977 F.2d 1354 (9th Cir. 1992) ("The record demonstrates that an extensive inquiry was not necessary.") The only issue that defendant raised was that he didn't like his first four lawyers and he planned to file an ethics complaint against this lawyer. The trial court properly found that the defendant himself was manufacturing issues with his counsel. Moreover, Chargualaf in fact never filed an ethics complaint, and in fact he stuck with this lawyer through the appeal and beyond.

In evaluating the competence of appellate counsel, reviewing courts will impose the same *Strickland v. Washington* standard as it would on trial courts. Chargualaf "must first establish that his counsel's representation fell below an objective standard of reasonableness.... considering all circumstances.... under the prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to do so, he must overcome a "strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making decisions." *Thompson v. Calderon*, 86 F.3d 1509, 1515 (9th Cir.1996). In the appellate context, not only must appellate counsel have failed to raise an issue, but that issue must be certain to have been a winning issue. "Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-- because she declined to raise a weak issue." *Miller v. Keeney* , 882 F.2d 1428 (9th Cir. 1989)). If the issue would not have led to a reasonable probability of reversal, it cannot be said to have been prejudicial.

In light of the record, it does not appear as if the irreconcilable differences of counsel would

Page 4
Opp. Pet. For Writ of Habeas Corpus - Chargualaf v. Ishizaki
Superior Court of Guam Spec. Proc. No. SP228-03

14    Filed 05/05/2005    Page 19 of 40

vnn:H:\PLEADIN1\SP228-03.WPD

1  have been a winning issue. There was no grounds for even believing that there were any
2  irreconcilable differences. In many instances, appellate counsel will fail to raise an issue because
3  she foresees little or no likelihood of success on that issue; "indeed, the weeding out of weaker issues
4  is widely recognized as one of the hallmarks of effective appellate advocacy." *Miller v. Keeney*, 882
   F.2d 1428 (9th Cir. 1989). "Like other mortals, appellate judges have a finite supply of time and
5  trust; every weak issue in an appellate brief or argument detracts from the attention a judge can
6  devote to the stronger issues, and reduces appellate counsel's credibility before the court." It was not
7  a winning issue on appeal, it is less so on collateral review.

8         For the foregoing reasons, Respondent Director of Department of Corrections and the People
9  of Guam urge this Court to deny the Petition for Writ of Habeas Corpus.

10        Respectfully submitted this 21st day of November, 2003.

11                              **OFFICE OF THE ATTORNEY GENERAL**
12                              DOUGLAS B. MOYLAN, Attorney General of Guam

13
14                              _____
                                **B. ANN KEITH**
15                              Assistant Attorney General, General Crimes Division

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 5
Opp. Pet. For Writ of Habeas Corpus - Chargualaf v. Ishizaki
Superior Court of Guam Spec. Proc. No. SP0234-02

15

1
2
3

# IN THE SUPERIOR COURT OF GUAM

5

6  RANDY IGNACIO CHARGUALAF,

7              Petitioner,

8            versus

9  FRANK T. ISHIZAKI, Director of Corrections,
   Government of Guam,

10

11              Respondent.

|  |  |
|--|--|
| ) | **SUPERIOR COURT CASE NO:** |
| ) | SP0228-03 |
| ) |  |
| ) | **PETITION FOR** |
| ) | **WRIT OF HABEAS CORPUS** |
| ) |  |
| ) | **December 5, 2003** |
| ) |  |
| ) |  |

12

13            **REPORTERS' TRANSCRIPT OF PROCEEDINGS**

14                        BEFORE:

15            **THE HONORABLE STEVEN S. UNPINGCO**
              JUDGE, SUPERIOR COURT OF GUAM

16

17                      A P P E A R A N C E S:

18   <u>For the Petitioner:</u>                    <u>For the Respondent:</u>

19   **HOWARD TRAPP, Esquire**                 **B. ANN KEITH, Esquire**
     HOWARD TRAPP INCORPORATED                ASSISTANT ATTORNEY GENERAL
20   Suite 200 Saylor Building                Office of the Attorney General
     139 Chalan Santo Papa                    Suite 2-200E Judicial Center Building
21   Hagåtña, Guam                            120 West O'Brien Drive
                                              Hagåtña, Guam

22

23

24                      

25

            *Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1      THE COURT:    Okay.  Good morning, Counsels.

2      MR. HOWARD TRAPP:   Good morning, Your Honor.

3      MS. B. ANN KEITH:   Good morning, Your Honor.

4      THE COURT:    Before the Court is a petition for

5  habeas corpus filed by the Defendant.  I understand that this

6  is a case that arises under Chapter 135 of Title 8.  And I

7  also understand that it is essentially your argument, Counsel

8  for the Defendant, that in this case the Defendant has been

9  unlawfully imprisoned or restrained, and the gist of your

10  assertion is that his attorney in the hearing before the

11  Supreme Court failed to propound the argument that the lower

12  court erred in denying his motion for a substitution of

13  counsel.

14      Is that basically your argument, Counsel Trapp?

15      MR. TRAPP:    Precisely correct, Your Honor.

16      THE COURT:    So you convince this Court that

17  essentially, number one, this is an appropriate relief, and,

18  of course, I've read *Strickland* which provides the standard,

19  and I also read *Nguyen* which provides the three factors that

20  the Court must determine in determining whether or not the

21  trial court has erred in denying a substitution of counsel.

22  I think it deals with the timeliness of the motion, the

23  adequacy of the court's inquiry.  -- And the third, the

24  extent of conflict.

25  ///

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1    So, Counsel, give me your most compelling argument
2 and convince this Court that I ought to grant your petition.
3    MR. TRAPP:   Before I do that, I am going to move
4 into evidence, we have lodged with the Clerk fifteen
5 exhibits.  We did that the other day so that we wouldn't take
6 up the Court's time in rifling them through them today.  And
7 I've also consulted with Counsel for the Respondent who's
8 been good enough to stipulate that they may all be received
9 in evidence as documents contained in this Court's file in
10 the case in question, which is 317-97 CF.
11    THE COURT:   Very well.
12    And so you are not objecting to the admission of
13 all these exhibits?
14    MS. KEITH:   No objection.
15    THE COURT:   Without objection.  Thank you.  That
16 saves me a lot of time.
17    MR. TRAPP:   Yes, Your Honor.
18    THE COURT:   -- Proceed, Counselor.
19    MR. TRAPP:   Okay.  I will also call Terry Timblin
20 to the stand because there's one issue that I have to address
21 that the Government has raised in their brief.
22    THE COURT:   I do understand.
23    Mr. Timblin?
24         *[Brief pause.]*
25 ///

1    THE COURT:   Okay, folks, this is basically a
2  summary hearing so, you know, there's no jury here, and if
3  you want to object on evidence, go ahead and make the record,
4  but I just want to move forward.  Okay?  All right.
5    MS. KEITH:   All right, Your Honor.
6    THE CLERK:   Good morning, Mr. Timblin.
7    THE WITNESS:   Good morning.
8    THE CLERK:   Please raise your right hand.
9  **Terrence Earl Timblin,** was called as a Witness by the
10    Petitioner, after having been duly sworn, testified on
11    his oath, as follows:
12    THE CLERK:   You do solemnly swear the testimony
13  you will give this Court will be the truth, the whole truth
14  and nothing but the truth, so help you God?
15    THE WITNESS:   I do.
16    THE CLERK:   Thank you.  Please be seated and state
17  your full name for the record.
18    THE WITNESS:   Terrence Earl Timblin.
19    THE CLERK:   Thank you.
20    THE COURT:   Good morning, Mr. Timblin.
21    THE WITNESS:   Good morning, Your Honor.
22    MR. TRAPP:   Before I ask Mr. Timblin any
23  questions, Your Honor, perhaps I should state that I
24  discussed Mr. Timblin as a witness with the Government.  I'm
25  going to ask him a few very limited questions and they may

1  not cross-examine -- they probably won't cross-examine him in
2  those areas because they will probably also call him too.
3              THE COURT:   Understood.
4              MR. TRAPP:   That's how we ... that's how we
5  decided to proceed.
6              THE COURT:   I appreciate the streamlining,
7  Mr. Trapp.
8              MR. TRAPP:   Thank you, Your Honor.
9              THE COURT:   Proceed.
10                  **DIRECT EXAMINATION**
11  **By Mr. Trapp:**
12      Q.   What is your full name, please?
13      A.   Terrence Earl Timblin.
14      Q.   Mr. Timblin, what is your occupation?
15      A.   Attorney.
16      Q.   And I believe that you were the attorney at one
17  time for the Respondent -- the Petitioner in this case,
18  Randy Ignacio Chargualaf in the case of People of Guam
19  against Chargualaf, which is CF317-97 in this Court.  Is that
20  right?
21      A.   I'm not sure about the case number, but otherwise
22  correct.
23      Q.   And I believe, if you would recall in a general
24  sort of a way that there was a hearing or two on ... on you
25  ///

1  being replace with other --  You were appointed Counsel;
2  right?

3      A.   Correct.

4      Q.   -- With you being replaced with other appointed
5  counsel at the request of your then client.  Is that right?

6      A.   Actually, I'm not sure whether it came from him or
7  I --  I made a motion to withdraw.  Whether it was at my
8  initiative or his initiative, I'm not sure exactly.

9      Q.   Okay, but you understand what I'm talking about?

10     A.   Yes.

11     Q.   Okay.  Now, the point that we are raising in this
12 petition for habeas corpus, we say that the failure --  Oh,
13 you were also his counsel throughout the rest of the case.
14 Is that right?

15     A.   Yes.  Including ...

16     Q.   -- From the time that you were first appointed?

17     A.   ... appeals to the Guam Supreme Court and petitions
18 to the Ninth Circuit and the U.S. Supreme Court.

19     Q.   Okay.  And I believe that the judgement of
20 conviction in this case was affirmed by the Guam Supreme
21 Court?

22     A.   Correct.

23     Q.   You petitioned timely to the Ninth Circuit and that
24 petition was denied.  Is that right?

25     A.   Correct.

1    Q.   And I believe -- I don't know if you appeared for

2 the -- for Mr. Chargualaf or whether you prepared it for him

3 to appear in *pro se,* but in any event there was a petition on

4 his behalf that you prepared for him at least that was filed

5 with the U.S. Supreme Court and that was denied also. Is

6 that right?

7    A.   That's correct. I prepared it as a *pro se* petition

8 'cause I'm not admitted in the Supreme Court and I couldn't

9 appear myself.

10    Q.   I see. But you followed it and you can say that it

11 was filed because you took that responsibility and you could

12 say that it was denied. Is that right?

13    A.   Yes.

14    Q.   Okay. Our point is, is we say, "The failure of

15 Petitioner's counsel...," that would be your own good self,

16 "...to argue to the Supreme Court of Guam that this Court

17 erred in denying Petitioner's motion to substitute counsel

18 required that Petitioner's conviction be vacated."

19    Now, let me ask you, the Government has raised a

20 point in their brief and they say that you chose not to raise

21 that point. Did you choose not to raise that point or is it

22 the case that you simply that you never considered that

23 point?

24    A.   I would say that I never considered that point.

25 ///

1    MR. TRAPP:   I have no further questions of the
2  witness.

3    THE COURT:   All right.  Counsel for the
4  Respondent?

5    MS. KEITH:   First, Your Honor, I noticed that
6  Mr. Martinez is still in the courtroom.  May he be excused?

7    MR. TRAPP:   I don't need him.

8    THE COURT:   You don't need him?  Neither do I.

9    MS. KEITH:   Thank you.

10    MR. TRAPP:   The Government doesn't need him.

11    MS. KEITH:   Second, I -- as Mr. Trapp has
12  noted,...

13    MR. TRAPP:   Well, hey, let ... let me --

14    MS. KEITH:   ... shall we take it that he will be
15  my witness?

16    MR. TRAPP:   -- Let me do this now.  If you'd
17  rather ask him questions on direct examination --

18    Do you mind me addressing Counsel, Your Honor?  May
19  I?

20    THE COURT:   (Response not audible.)

21    MR. TRAPP:   Okay.  -- On direct examination --  I
22  can just ... I can just rest right now and then -- he's on
23  the stand and you can go ahead with him as your witness.

24    MS. KEITH:   Either way, Your Honor.

25  ///

1    MR. TRAPP:    Well, I -- Well, if you have no
2  objection I'm going to say I rest as far as the evidence is
3  concerned.

4    MS. KEITH:    Okay.

5    THE COURT:    Okay.

6    MS. KEITH:    Then I'd like to ask Mr. Timblin, --

7              **DIRECT EXAMINATION**

8  **By Ms. Keith:**

9    Q.    So you mentioned to Mr. Trapp that you're not sure
10  whose initiative the motion to withdraw was filed on?

11    A.    Well, you know, it's been --

12    MR. TRAPP:    I'm going to object, Your Honor, and
13  let me explain my objection, and then if I'm overruled I'll
14  ask for a running objection.    I know this is not a jury
15  trial.    But my objection is this, I have put Mr. Timblin on
16  the stand to -- because the Government has raised a
17  legitimate question, in other words, did he consider this
18  question and choose not to use it 'cause he thought it was a
19  weaker one than the others, or did he simply overlook it,
20  because it makes a difference and that is an issue in this
21  case, but as to whatever happened in the Superior Court, I
22  respectfully submit to the Court it's irrelevant to this
23  inquiry because to pad out the record, to add anything to the
24  record is totally irrelevant because our point is only one
25  point and that is that Mr. Timblin did not raise this point

1   in the Supreme Court, and if he had raised it in the Supreme
2   Court, then we -- then Mr. Chargualaf would have won his
3   appeal and he would have gotten a new trial.  And we've
4   invited the Court's attention to a similar case like the
5   *Angoco* case.  And the record in the Supreme Court would have
6   been the record as it stands without any other further
7   explanations or anything of the sort, and it would have been
8   a direct appeal based upon the record.  The record is now --
9   of three one seven -- it's case number three one seven is
10  before this Court, and so the question is, taking that
11  record, would Mr. Timblin have prevailed?  Now, the
12  Government argues that -- the Government may argue, as
13  suggested in this brief, that, "Well, he was competent
14  counsel."  They want to show now what was the real
15  relationship between Mr. Chargualaf and Mr. Timblin, they
16  want to flesh all that out.  Wholly irrelevant.  None of
17  that -- none of that would have been before the Supreme
18  Court.
19          THE COURT:   How do you wish to address the
20  objection on relevance?  First of all, could you please
21  restate the question because I didn't really --
22          MS. KEITH:   Oh, okay.  I --
23          THE COURT:   Okay.  And then after you rephrase
24  the -- I'm sorry -- after you restate the question, address
25  ///

1 the issue of relevancy. What probative value does that line
2 of questioning have; okay? And then I'll make my ruling.
3     MS. KEITH: I had asked Mr. Timblin what he
4 recalled about the motion to withdraw that he filed when he
5 was first appointed to represent Mr. Chargualaf.
6     To address Mr. Trapp's argument, it is standard
7 case law that the reason that you bring a motion for
8 incompetent counsel in habeas is so that you can develop a
9 record, otherwise, it should have been brought up in
10 appellate review. About every year the Guam Supreme Court, a
11 case comes out saying, "Incompetence of counsel is something
12 that needs to be addressed in collateral review." It needs
13 to be addressed in a habeas so that we can flesh it out and
14 see what happened. Usually the record is insufficient on
15 appellate review to see what happened in the relationship,
16 and usually you need to take evidence, and the very reason
17 that we have these things in habeas motions and that they are
18 most successful in habeas motions is to develop the record of
19 the relationship between the parties. And while Mr. Trapp
20 brought up a valid point about choice, it is my intention to
21 simply develop a record regarding the relationship between
22 attorney and client throughout this case, and that's ...
23 that's why we have -- there's a U-E-K-I, I don't know how to
24 pronounce it -- that's a Supreme Court case that first said
25 you don't deal with incompetence of counsel issues in

1    appellate unless the record is completely complete.  Well, if
2    Mr. Trapp wants to go in the appellate record, then this
3    should have been brought up on appeal.

4            MR. TRAPP:   Excuse me.

5            THE COURT:   Let me just overrule the objection in
6    this case on the basis that there is relevance to the
7    question propounded by the Respondent.

8            You may continue.

9            MR. TRAPP:   Could I answer --?  Before you rule,
10   could I answer that, Your Honor?

11           THE COURT:   You'll get your opportunity.

12           Go ahead and proceed.

13           MS. KEITH:   All right.  Thank you.

14           MR. TRAPP:   No, I want to -- I wanted to answer
15   her objection to my ... to my objection.

16           THE COURT:   All right.  Go ahead.

17           MR. TRAPP:   -- Before Your Honor rules.

18           And that is, she's talking about incompetence of
19   counsel at the trial court level.  We're not alleging that at
20   all.  We're simply saying the record taken -- the record that
21   we have is the record that should have been before the
22   Supreme Court.  And she's --  And I can't believe that the
23   Government has actually said -- although we endorse it a
24   hundred percent -- is, "Well, if you wanted to raise that, it
25   should have been raised on appeal," which is exactly our

1  point.  And I would hope the Court will remember that the
2  Government said that.  Now, if the Court is going to allow
3  the Government to put in something that would not have been
4  before the Supreme Court at this time, then we would like to
5  have a running objection, that's so I don't have to keep
6  interrupting the proceeding.  But when the Government says
7  that an appellate court will often -- will often send a case
8  back down, or it will simply refuse to rule on the ... on the
9  ineffective assistance of counsel argument because there
10  isn't a complete record, it's invariably -- it's invariably
11  in a case where the problem was incompetence in the trial
12  court, and we're not alleging that because our case law, such
13  as the *Nguyen* case show that whether or not counsel was
14  competent or not isn't even the issue.  So I want to make it
15  clear that -- our objection so that the Court understands
16  where we're coming from here.  And no matter what Mr. Timblin
17  says about -- now about the relationship, about how well he
18  prepared for the trial or something, it's not something that
19  would have been before the Supreme Court, which is the only
20  issue here.
21          THE COURT:    I understand the arguments.  I believe
22  that your --  What you should ask this person, the witness on
23  the stand, is perhaps why he hasn't considered making the
24  argument.  -- Along those lines, ...
25          MS. KEITH:    And I'd like to --

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1        THE COURT:    ... but I do understand where
2   Mr. Trapp is coming from.

3        MS. KEITH:    I'd like to answer that.

4        THE COURT:    Well, then ...

5        MS. KEITH:    Briefly.

6        THE COURT:    ...then why don't you ask your
7   questions around that particular point?

8        MS. KEITH:    Okay.  I --   I would like to then --

9        THE COURT:    -- Because that's within the scope
10  of ... of your --

11       MR. TRAPP:    I have no objections to --

12       THE COURT:    I realize that.

13       MR. TRAPP:    -- I ... I believe that that is a
14  genuine issue.

15       THE COURT:    That's right.

16       MS. KEITH:    And, in fact, Your Honor, just
17  elucidating on what we've been saying --

18       THE COURT:    But question of competence, I tend to
19  agree with Mr. Trapp.

20       MS. KEITH:    Okay.  But may I point out that this
21  Court is being asked to almost put themself (sic) in the
22  position of an appellate court and look at the trial
23  proceedings and see if that had been error.  We have to make
24  a record of those trial proceedings because what Mr. Trapp is
25  saying is appellate counsel was incompetent because, "Hey, if

1  you were an appellate judge, look what you would have done.
2  You would have said this was a mistake." Well, we have to
3  make a record of those trial proceedings. You are being
4  asked to looked at what the court should have done vis-a-vis
5  the trial proceedings. And, you know, while I recognize that
6  the standard that it should have been raised on appeal is ...
7  is -- I know it's confusing, but this Court is being asked to
8  look at this as an appellate court, and that's why I said
9  this was unique. This is in fact different from *Angoco*
10 because in *Angoco* the error was trial counsel error
11 compounded by appellate counsel.
12        MR. TRAPP:   Excuse me.  It wasn't, Your Honor.
13        MS. KEITH:   I have the decision right here and I
14 am prepared --
15        THE COURT:   I'm going to read it again, but I've
16 read it.  Okay?  All right.
17        MS. KEITH:   Okay.
18        MR. TRAPP:   I'm sorry, Your Honor.
19        MS. KEITH:   -- Well, in any event, I'm going to --
20 Because this Court is being asked to look at a case that was
21 presented on appeal and to say, "Well, should Counsel Timblin
22 have raised this on appeal?" well you can't answer that
23 question unless you can honestly say, "Well, on appeal you
24 look at the trial court and was this an error at trial
25 court?" and that's why the People are interested in just

1  develop- -- it's really a short line of questioning really,
2  it's not -- but we think we do need to develop the trial
3  court because -- trial court record and we do need to -- he
4  calls it "padding the record," but that's exactly what a
5  habeas motion is for, it's so that whoever is reviewing it,
6  whether it's the trial court, appellate court, federal court,
7  can look and see more than what happened on the record.  And
8  because you will be asked to look at the trial court
9  proceedings, we'd like to just ... just ask about the
10 relationship at trial court.
11         MR. TRAPP:    Your Honor, please.
12         THE COURT:    Yes.
13         MR. TRAPP:    -- I still object to the relationship
14 at trial court, but I do agree with the Government a hundred
15 percent when they say that Your Honor is being asked to look
16 at this as if you were an appellate court and answer the
17 question, "Would this have won on appeal based upon the
18 record that was already made?"
19         THE COURT:    But then at the same time, it's now
20 down here in this court...
21         MR. TRAPP:    That's --
22         THE COURT:    ... and I am here entertaining your
23 habeas corpus petition.
24 ///
25 ///

Jeanette B. Roberto, Court Transcriber, Superior Court of Guam

1    MR. TRAPP:   Yes.   But the ... but the question is
2  what would the Supreme Court have done, and that's what Your
3  Honor is going to have to decide.

4    THE COURT:   I'm going to go ahead with my initial
5  overruling of the objection.   Let the record reflect that
6  it's a running objection.

7    And being that this is a hearing that's summary in
8  nature, I'm going to go ahead and allow you to question the
9  witness concerning that particular question that you have
10  just asked.   Please proceed.

11    MS. KEITH:   Thank you, Your Honor.

12    If I can recall my question.

13    Q.   (By Ms. Keith:)   I'd like to just, I guess, direct
14  our attention to the initial motion to withdraw as counsel.
15  You have testified that you weren't sure whose initiative it
16  was brought at.   Is it your recollection at that time that
17  there were irreconcilable differences?

18    A.   No, but as I said, it was -- I -- but what I
19  remember it is that Mr. Chargualaf sent the fax, I think
20  you -- it's part of the record about saying that he was
21  unhappy with me and he was gonna file a complaint with the
22  Ethics Committee.   Whether there was also a specific request
23  from Mr. Chargualaf that I withdraw, I wasn't sure.   I'm not
24  sure now, but basically the basis of my motion at the time
25  was that I felt there was a conflict of interest because if I

1  was going to have to defend myself against an ethics

2  complaint, I couldn't very well represent him in the criminal

3  case. And that was the basis of the motion. Other than

4  that, there was -- I don't recall any particular disagreement

5  as to how to handle the case beyond that.

6      Q.   Thank you. After the --

7           THE COURT:   Actually, I thought that question is

8  more --

9           Mr. Trapp, you don't want him to say that?

10 (Chuckles) --

11          MR. TRAPP:   I'm just reading my notes, Your Honor.

12     Q.   (By Ms. Keith:)   Well, other than the ethics

13 complaint, you are -- it is your testimony that there is

14 no -- there was no irreconcilable differences?

15     A.   No.

16     Q.   And after May 10th when the judge denied your

17 motion, did you proceed with representing counsel?

18     A.   I did.

19     Q.   And did you proceed to trial?

20     A.   Yes.

21     Q.   And is it your opinion as a lawyer that you did a

22 good job?

23          MR. TRAPP:   I -- (inaudible - interrupted) --

24          THE COURT:   Running objection is noted. Okay?

25 Very well.

1      Q.   (By Ms. Keith:)  If you'd --

2      A.   Yes, I did get a couple of acquittals out of it.

3 So, yeah, I thought I did about a good a job as could be

4 done.

5      Q.   After May 10th, did he ask you to withdraw at any

6 time?

7      A.   No.

8      Q.   Did you continue to represent this criminal

9 defendant on appeal?

10     A.   Yes.

11     Q.   Did he ask you to decline to represent him or to

12 withdraw from representing him at any time after that?

13     A.   No.

14     Q.   And did he ask you to petition to the Ninth

15 Circuit, or was that your decision?

16     A.   I be- --  He asked me to petition and I agreed with

17 that 'cause I thought the issue that I did -- the main issue

18 that I raised was very important and I more or less did it on

19 my own esteem, I guess.  I mean, he asked me to do it and I

20 did it, there was a -- a point or anything like that.

21     Q.   Mm-hm.  During the Ninth Circuit, did he ever ask

22 you to withdraw?

23     A.   No.

24 ///

25 ///

1    Q.   And you also testified that you prepared a Supreme

2 Court petition for him.  Did he ask you throughout the

3 Supreme Court proceedings to ever withdraw?

4    A.   No.

5    Q.   And do you know if Mr. Chargualaf, does he have any

6 legal training, to your knowledge?

7    A.   He's something of a jailhouse lawyer.  In fact, he

8 provided me with cases.  Again, the main issue is a

9 suppression issue about there was this traffic stop and how

10 far he could go in detaining him.  And Mr. Chargualaf

11 actually gave me a few cases that were, I think, actually

12 cited to the Supreme Court.

13    Q.   So other than the ethics complaint, you are

14 testifying that from your experience there were no

15 irreconcilable differences?

16    A.   No.

17    Q.   There were no --

18    A.   -- Or I am testifying that there were none, yes.

19    Q.   -- There were none.  Thank you.  And --

20    That's all I have, Your Honor.

21    THE COURT:  All right.  Very well.

22    Back to you, Counsel.

23    MR. TRAPP:  I have no further questions.

24    THE COURT:  Very well.

25    Thank you, Mr. Timblin.

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1    THE WITNESS:   Thank you, Your Honor.

2              *[The Witness is excused.]*

3    THE COURT:   Any other witnesses, Counsel for the

4 moving party, -- Petitioner?

5    MR. TRAPP:   I've already rested, Your Honor.

6    THE COURT:   All right.  All right.

7    MR. TRAPP:   I have no rebuttal witness.  If the

8 government does?

9    MS. KEITH:   No other witnesses, Your Honor.

10   THE COURT:   Okay.

11   Okay.  I've read your briefs.  Do you want to

12 summarize your arguments then, and then --

13   MR. TRAPP:   Yes, Your Honor.

14   THE COURT:   Okay.  I'll --

15   MR. TRAPP:   I know Your Honor prepares by reading

16 the briefs before the hearing and has better things to do

17 than to have me read the brief to your own good self, and so

18 I'm just going to make a few points and I will be brief.

19   THE COURT:   Please proceed.

20   MR. TRAPP:   I do have to --  I can't let go -- let

21 this go by that the Government said that the *Angoco* case was

22 not a case which was trial error and not appellate error.  On

23 page two of the opinion in that case -- let's see ... I'm

24 sorry -- page three says, *"Angoco thereafter initiated the*

25 *case at bar by filing a petition for writ of habeas corpus on*

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1  *the basis of ineffective assistance of appellate counsel."*

2         MS. KEITH:    Excuse me.  Can you say where this is?

3         MR. TRAPP:    Page three.

4         MS. KEITH:    Which ... which opinion?

5         THE COURT:    Did you say page three or page four?

6         MR. TRAPP:    Page three of the *Angoco* opinion.

7         MS. KEITH:    The Supreme Court or the lower court's

8  habeas opinion?

9         MR. TRAPP:    This is the Supreme Court opinion.

10         THE COURT:    Supreme Court.

11         MS. KEITH:    The Supreme Court.  Thank you.  Page

12  three.

13         THE COURT:    And so it's the appellate ineffective

14  assistance of counsel.

15         MR. TRAPP:    It says here --

16         THE COURT:    -- In the *Angoco* --

17         MR. TRAPP:    -- This ... this is a 2001 Guam 17 we

18  cited in our brief, yes.  And on page three it says, *"Angoco*

19  *thereafter initiated the case at bar by filing a petition for*

20  *writ of habeas corpus on the basis of ineffective assistance*

21  *of appellate counsel.  Trial court granted the writ.  This*

22  *appeal followed."*  And then the conclusion on page 13 is,

23  *"The failure of Angoco's counsel to raise the omitted*

24  *instruction argument in his appeal to the appellate division*

25  *was prejudicial error."*

1          MS. KEITH:    I am so sorry but I am reading from
2   the 2000 opinion.  Are we reading from a different opinion?
3   I'm reading from the opinion on appeal.
4          MR. TRAPP:    Well, let me say this, Your Honor.
5   There was two opinions and one of them had to do with ...
6   with his release pending appeal and is not the one on the
7   merits at all.
8          MS. KEITH:    I am sorry.  Can I approach Counsel?
9          THE COURT:    Yes.  Yes.  Okay.
10         MS. KEITH:    --  I just want to make sure we're
11  reading from the same --
12         THE COURT:    -- Just make sure.  But then for the
13  record, I'm definitely going to reserve and look and make
14  sure that --
15         MS. KEITH:    Am I reading from this?
16         MR. TRAPP:    Yeah, you're reading from the wrong
17  one.  Yeah.  You'll see that this is (inaudible -
18  indiscernible) --
19                    *[Brief pause.]*
20         MR. TRAPP:    This is something that came down after
21  we had won the appeal.  The case --  When the mandate came
22  down there was some questions about what were the
23  instructions to the -- the judge below as to his release
24  pending his trial or something like that.  This is not this
25  at all.

1        MS. KEITH:    Can you give me the date of that --
2   what you're reading from there?
3        MR. TRAPP:    The date July 12th, but the citation --
4   you get it off the Internet and it was 2001, 17.
5        MS. KEITH:    All right.
6        MR. TRAPP:    If I had an extra copy with me --
7   I'm sorry.
8        MS. KEITH:    Actually, Your Honor, I had it in my
9   materials.  I just ... I just accessed a different --
10       THE COURT:    All right.  Do you want to refer to
11  it?
12       MS. KEITH:    -- I have it.  Thank you.  We're ready
13  to proceed.
14       THE COURT:    Okay.  All right.  Okay.  He's on page
15  three right now and he's making the point.
16       MR. TRAPP:    I'm on page 13 and it says that,
17  *"Failure of Angoco's counsel to raise the omitted instruction*
18  *argument in his appeal to the appellate division was*
19  *prejudicial error."*  The defen- --  It happened that the
20  Supreme Court wasn't in existence at the time this was done.
21  -- This is the Supreme Court of Guam.  *"The trial court's*
22  *decision granted Angoco habeas corpus release is affirmed."*
23  Okay.  So it definitely was, an apparently the Government
24  simply is not really arguing about this but misstated this
25  because they're looking at the wrong decision.

1           MS. KEITH:    Your Honor, may I answer that very
2    quickly so that we can proceed?

3           MR. TRAPP:    Good.   Good.

4           MS. KEITH:    Here's the reason that I said that is
5    because after the issue came back to this Court -- actually
6    came back to Judge Bordallo's court who issued a decision
7    that said, and I'm quoting from Judge Bordallo's decision,
8    *"The Court agrees with Petitioner that appellate counsel was*
9    *constructively ineffective, but appellate counsel's omission*
10   *was unintentional because the trial counsel --"*   He merely
11   perpetuated trial counsel's error.   So that's why I raised
12   that issue is because the appellate error alleged in *Angoco*
13   was simply that the appellate counsel didn't -- perpetuated
14   trial court's error.   So that's why I said it here.   It says
15   appellate counsel's error was unintentional and that the
16   error alleged was by trial court.   That's the reason I
17   brought that up.

18           I'm ready to proceed.

19           MR. TRAPP:    Well, you do the math, Your Honor.   If
20   you'll take a look at that, you'll see that it has the same
21   posture as this case.

22           Now, I'm going to skip over a few things that we've
23   addressed.

24                          *[Brief pause.]*

25   ///

1    MR. TRAPP:    The Government says that whatever is

2  going on here -- and this really goes really to my objection

3  too -- that what Mr. Timblin fail to do was not prejudicial

4  to the Defendant in that case, the Petitioner in this case.

5  And my answer to that is, of course it is prejudicial.  I

6  mean, if we're right about this, it's prejudicial because he

7  would have gotten a new trial.  He's going to be doing 35

8  years, his whole conviction would have been set aside.  So,

9  of course, it is prejudicial.  I mean, if we're right it's

10 prejudicial, if we're wrong, we we're wrong.  But if we're

11 right that he should have raised it and if he had raised it,

12 he would have won based upon the record made at the time, it

13 would have been --  Of course it's highly -- it's highly

14 prejudicial.

15                    *[Brief pause.]*

16    MR. TRAPP:    It's interesting to note that the

17 Government in its brief says that, well -- it seems to think

18 that it's relevant that they say, "Oh, a number of times

19 there were a number of different people appointed before

20 Mr. Timblin was appointed."  And the quick answer to that is,

21 that's irrelevant.  I mean, each and every complaint and

22 request for substitute counsel has to be addressed because it

23 might be the twentieth request, maybe the first nineteen

24 were ... were -- even though they were granted were perhaps--

25 even though they were frivolous, if the twentieth request was

1 well taken, the same -- the same colloquy has to be had. You
2 can't just say, "Well, you only get one or two or three bites
3 at the apple," or whatever. But also the Court will note
4 that in the transcript, Exhibit 7, -- there is also a
5 transcript of the March 18th hearing on the motion to withdraw
6 as counsel by Rawlen Mantanona who was -- who you would see
7 from the transcript was the preceding counsel, and you can
8 see in that that Mr. Mantanona said that he wanted out for
9 various reasons because he had irreconcilable differences.
10 But, nevertheless, he said that Petitioner in this case
11 didn't him to go out. And if you look at the colloquy, he
12 never got chance to put in -- to put his two fists worth in
13 and to stick with the counsel that he's wanted to continue.
14 Mr. Mantanona got out. Whether it was well granted or not is
15 not the issue right here, but the point is that the -- my
16 client now is -- was satisfied -- maybe not with everything
17 that Mr. Mantanona did, maybe he was being a pest saying,
18 "Please do this" or "Please do that," but he did not want
19 Mr. Mantanona out, and Mr. Mantanona, as I recall from the
20 transcript, represented that to the Court. And the Court
21 simply said, "Okay." -- One comes in and one goes out. And
22 let me say this, that ... that in certain courtrooms of this
23 court, Your Honor, and ... and I don't even have any
24 experience with this particular problem before your own good
25 ///

1  self, but I had sat as an auditor and watched attorneys get
2  up and say, "Oh, I've got a conflict, I want out."
3  "Okay, you're out. So and so is in," or "Oh, I
4  want out for this reason."
5  "Okay, you're in, and you're out."
6  Sometimes the client is there, sometimes the client
7  isn't there, no colloquy is made. And I think it's very --
8  that this case has a broader implication than just whether or
9  not Mr. Chargualaf gets a new trial. I really think that
10  that has to be --
11  THE COURT: Well, is that what *Nguyen* said?
12  -- You've got to have that colloquy?
13  MR. TRAPP: Absolutely. And I haven't -- I really
14  haven't been hearing it very much. I just made that
15  observation.
16  I'll move on. I'm trying to skip some of the
17  things I've already mentioned.
18  *[Brief pause.]*
19  MR. TRAPP: Okay. The last point I wish to make
20  that I haven't made in my brief adequately I don't feel is
21  that the Government says that one of the points is that the
22  complaint has to be -- was the complaint persistent? In
23  other words, made at the time was it a persistent complaint?
24  And we have all these letters which are a part of the ... of
25  the Court's record, and we see persistent complaints. We

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1  don't see much -- if any, opportunity addressing the

2  Petitioner in Court, *ex parte* as is suggested by the Ninth

3  Circuit, and that is to say, you know, "Let's get the

4  attorney out here.  Let's see what the defendant's problem

5  is."  And none of that was done.  He's sort of the forgotten

6  party in all of this.

7          We submit, Your Honor.

8          THE COURT:    Okay.  In opposition?

9          MS. KEITH:    Yes, Your Honor.  I'm compelled to

10  raise that Petitioner's reply brief, if I'm not mistaken, was

11  filed a day late under 5(c) of the civil -- Rules of

12  Procedure for this Court, and I would just submit to the

13  Court -- its own discretion whether to take a reply brief

14  under advisement.

15          I would say initially we are not -- it's our

16  position that we're not necessarily proceeding under *Nguyen*

17  because *Nguyen* was a direct appeal, the adequacy of the

18  colloquy at trial level.  On direct appeal, you review that

19  for a different standard.  When you are in a habeas, you do

20  not review on an appellate standard, you review in a

21  standard --  And I provided it to the Court in the case of

22  *Schell versus Witek*.  And the standard is whether the error

23  violated the defendant's Constitutional Rights.  I would just

24  like to clarify that that while this Court is being asked to

25  perform an appellate function, it does not use the standard

1 of review set forth in *Nguyen* because this is not a direct

2 appeal. We must go under the standard of review in *Schell*

3 *versus Witek*. The error alleged must violate the defendant's

4 Constitutional Rights.

5     THE COURT: Well, isn't the entire gist of

6 Mr. Trapp's grounds for habeas corpus based on a

7 Constitutional Right which is ...

8     MS. KEITH: Yes.

9     THE COURT: ... effective assistance of counsel

10 pursuant to the Sixth Amendment?

11     MS. KEITH: I agree. Yes. So if the Court finds

12 that there was ineffective assistance of counsel under

13 *Strickland,* which means that there has to not only been the

14 first prong, but the second prong is it has to prejudice the

15 defendant. And I understand what Mr. Trapp is saying, he got

16 convicted, isn't that prejudicial enough? But in case law,

17 simple conviction is not prejudicial enough. You have to

18 have shown that the error actually contributed to the

19 conviction. And it's our position, of course, that the

20 evidence contributed to the conviction, not the lack of a

21 colloquy. But if I could address the lack of a colloquy,

22 we've presented some evidence to the Court that the only

23 conflict that there is a record of before this Court and

24 before the appellate court would have been that

25 Mr. Chargualaf threatened to make an ethical complaint. In

1 the case of *Moore,* which is found at 159 F3d 1154, says very

2 clearly that an ethical complaint alone is not sufficient to

3 allow a defendant to demonstrate an actual conflict. And I'm

4 quoting from that case, *"Finding an actual conflict from an*

5 *ethical threat would allow defendants to manufacture a*

6 *conflict in any case."* And so based on the *Moore* case,

7 because Mr. Timblin has said there was no other

8 irreconcilable difference, the lack of that conflict alone is

9 not enough to sustain this Court's actually overturning a

10 conviction based on an inadequate colloquy. In addressing

11 the adequacy of a colloquy, we're resting -- we've cited the

12 *King versus Rowland* case, which of course says that when a

13 defendant indicates dissatisfaction of counsel, the trial

14 court ordinarily must conduct a thorough inquiry in order to

15 discover whether the situation is depriving defendant of an

16 adequate defense. However, the inquiry need only be as

17 comprehensive as circumstances would reasonably permit. And

18 in this case that we've cited, the record demonstrated that

19 an extensive inquiry was not necessary, the judge listened to

20 the defendant's complaints in *King* just as Judge Lamorena

21 listened to the Defendant's complaints in this case. It was

22 faxed in to him. He asked a number of questions. He was

23 familiar with the Defendant's behavior and with the fact that

24 lack of communication between Defendant and plaintiffs was

25 most likely attributable to the Defendant -- Defendant and

*Jeanette B. Roberto. Court Transcriber. Superior Court of Guam*

Case 1:05-cv-00014    Document 46    Filed 05/05/2005    Page 11 of 42

1 Counsel.  I'm sorry.  I'm quoting from the *King versus*

2 *Rowland* case again, *"In addition, there is no indication in*

3 *the record that the strained relationship between defendant*

4 *and lawyer prevented the lawyer from doing his job properly."*

5 And I must say that I think Mr. Timblin demonstrated that

6 the -- if he had felt pressures from the strained

7 relationship, he did not indicate that it led him to do his

8 job any differently whatsoever.  And, also, the *King versus*

9 *Rowland* case goes on to say, *"The record of the defendant's*

10 *behavior strongly suggests that his attempt to remove his*

11 *lawyer was part of a general plan to delay and disrupt the*

12 *trial and prevent it from proceeding."*  Your Honor will have

13 a thorough record on the Defendant's behavior with his prior

14 lawyers.  I agree that not every lawyer needs to -- I mean,

15 just because a lawyer is disqualified doesn't mean the

16 defendant generated it, but I would ask the Court to review

17 the record in this instance and ... and see if there is any

18 evidence.  We submit there is evidence that Mr. Chargualaf

19 was delaying the proceedings because once Mr. Timblin was

20 allowed to remain, they went forward with a ... with a

21 legitimately fought trial.  Mr. Timblin, as he mentioned, he

22 got a couple of acquittals out of it.  He did a very good job

23 with no interference, no hostility from his client as he has

24 testified.  And the *King versus Rowland* case concludes that,

25 *"The trial judge did not err in failing to declare a mistrial*

1 *on the basis of a conflict."* Again, the -- *Nguyen* tells
2 us -- *Nguyen* timed the -- The facts in *Nguyen* were quite
3 different. There was an obvious time pressure, there was an
4 obvious -- they didn't weigh the defendant's rights in
5 relation to the court's pressure to go forward with the
6 trial. We don't have those facts here. *Nguyen* is completely
7 distinguishable on its facts. We submit that the *King-*
8 *Rowland* case the *Moore* case tell us that the colloquy need
9 only be as reasonable as circumstances permit, and that the
10 assertion of an ethical violation alone is simply not enough
11 to show irreconcilable differences. In my brief, I've ...
12 I've submitted three cases where there ... where there were
13 irreconcilable differences, there was shouting and screaming
14 that went on and on and on. I submit that there's just none
15 of that here. And, in fact, if you think of it, Mr. Timblin
16 cannot be expected to go before the Supreme Court. -- I
17 mean, the Petitioner is arguing that Mr. Timblin should have
18 gone before the Supreme Court and said, "The trial court
19 should have fired me. Now, I'm okay on appeal but the trial
20 court should have fired me. Our differences were
21 irreconcilable on May 10th. Now since then they've been
22 okay." I don't think that would have been a winning
23 argument, and that's why I urge the Court to look at the
24 record in this case. -- Mr. Timblin, I can't imagine that he
25 would go to the Supreme Court. He testified -- and I stand

1  corrected by Counsel -- that he did not choose not to raise
2  this, that it simply didn't occur to him, and I concede that
3  that is -- that's the case.  But I can't imagine why an
4  appellate counsel would go in front of a trial court -- I'm
5  sorry -- an appellate court and say, "I was incompetent then,
6  the trial court made a mistake but everything's fine since
7  then, and in fact it remained fine through the Ninth Circuit
8  appeal, through the cert to the Supreme Court."  I just don't
9  think it was a winning argument.  And for that reason, we ...
10 we ask the Court to review the record on that.  I don't think
11 Mr. Timblin, even if he had thought of it, could have -- with
12 a straight face -- raised that argument because he had a
13 decent relationship with the Defendant from May 10th onward.

14       Finally, I just want to point out some differences
15 in the *Angoco* case.  The *Angoco* case was taken to the Ninth
16 Circuit.  At the Ninth Circuit, the Ninth Circuit actually
17 said, "We are not going to rule on this case without
18 prejudice for the defendant to bring a habeas corpus motion
19 on the basis of this glaring error, the failure to address
20 the jury on lesser included offenses."  That was a pretty
21 clear error, it was clear to the Ninth Circuit, the Ninth
22 Circuit issued an opinion which telegraphed to the trial
23 court, "There was a mistake here.  We can't take it up on
24 appeal, but since it's incompetence of counsel it has to be
25 taken up on collateral review."  Judge Bordallo was very safe

1  when he issued an opinion saying, "Yes, this was incompetence
2  of counsel." In this case, Ninth Circuit denied cert and
3  there is -- the fact that the court didn't conduct the
4  colloquy that Mr. Chargualaf would have liked is not as
5  compelling a law that the Court didn't -- in *Angoco* that the
6  Court didn't instruct the jury on a lesser included offense.
7  Instructing the jury on a lesser included offense is a very,
8  very serious matter. The Supreme Court has since come out
9  with the pronouncement that every case that goes to a jury on
10 Guam must be instructed on lesser included offenses whether
11 defense asks for it or not. It's a very substantial point of
12 law that *Angoco* was compelled to -- that that case had to
13 have been overturned to get to that point. In this case, the
14 only alleged error at the trial court was insufficient
15 colloquy, it is not a compelling ground for reversal, and we
16 submit that the colloquy was reasonable under the
17 circumstances, the circumstances being that they only alleged
18 difference was an ethical threat, which under the law does
19 not suffice to bring automatic disqualification.

20          I have nothing further.

21          THE COURT:  All right.

22          You are the moving party, Counsel. This is your
23 petition.  I'll give you the opportunity to rebut.

24          MR. TRAPP:  Rule 5(c) I don't have it in front of
25 me.  It doesn't apply to criminal cases.  I think if we look

1  in the Appendix of Title 7 and look at the beginning it is
2  very clear that that only applies to civil cases in the first
3  place.  They say I'm a day late on my reply, and I guess
4  they're suggesting the Court not read it.  And I'm sure the
5  Court is aware of how many times have we come into court on
6  motions and the Government walks in with a brief fifteen
7  minutes before the hearing.  That's my experience.  In any
8  event, be that as it may, I don't know how relevant that is,
9  but I think that the Government makes that complaint with a
10 poor grace.  I was appearing --  I was in front of the Ninth
11 Circuit once and I -- and someone had filed the -- the
12 government had filed their ... their brief or their reply
13 brief or whatever, oh, a couple of days later, something of
14 the sort.  I remember it was heard over here in the PDN
15 building -- they were set up out here many years ago -- and I
16 complained about it and the presiding -- the judge that
17 presiding at the time looked over the bench and said,
18 "Mr. Trapp," he said, "What are you is anyone suggesting?
19 Are you suggesting that we don't read the brief, that we
20 don't get the benefit of everything that we can get the
21 benefit of, you know, to see -- to help us decide this case?
22 Are we to strike the brief and pretend that the cases in that
23 brief don't exist?"  I just dropped the argument.
24 (Indiscernible - inaudible) --
25 ///

1      Sixth Amendment.  And the Government hasn't asked
2  for a continuance in this case -- in this hearing today, Your
3  Honor.  Sixth Amendment, yes, the Sixth Amendment is the
4  constitutional provision which has to do with effective
5  assistance of counsel.  We have cited --   The Government
6  talks about certain cases.  Of course the Government doesn't
7  really address the Ninth Circuit cases that we have cited,
8  but if the Court looks at all the cases, I think that we're
9  in pretty good shape on the cases.  She says that my --   The
10  Government says that, yes, I'm saying he's prejudiced because
11  he got convicted in the Superior Court.  No, no, no, that's
12  not my argument at all.  The Government doesn't even
13  understand my argument.  My argument on prejudice is not that
14  he got convicted.  Okay, he got convicted, you know, I've
15  looked at that and I'm not raising anything about that, --
16  his getting convicted.  Okay.  I'm saying the prejudice is,
17  if ... if this had been argued in the ... in the Supreme
18  Court based upon the record that was available at the time to
19  counsel, the prejudice is he would have -- that Mr. Timblin
20  would have won the appeal and the remedy is that you see from
21  the cases that address this problem is to grant him a new
22  trial which would have done away with the conviction.  Would
23  he still have been re-convicted?  We don't know, he never got
24  the new trial.  But our point is not that he got convicted in
25  the ... in the Superior Court -- that's irrelevant.  I mean,

1  if he didn't get convicted we wouldn't be here today.  He got
2  convicted, the appeal was taken and a very important point on
3  the appeal -- I think the obvious point of the appeal would
4  have -- he would have prevailed as it did in the *Nguyen* case
5  where it was the only thing that I could find in the record.

6          The Government says that the only thing presented
7  is an -- that, whoops, he's going to make an ethical
8  complaint.  Well, if you look at all these letters, that's
9  not the only thing presented, but the point of this is -- the
10  point of this is, having brought that up, if it's true that
11  the only thing that he was -- that there was the problem was
12  the ethical complaint, then she can argue that, but we don't
13  know what the only thing was, and we don't know what the only
14  thing was because the colloquy -- nothing like the colloquy
15  that has to be made was even attempted.  It simply wasn't
16  even attempted.  So we never get to the point of the only
17  thing presented.  Who knows what would have been presented or
18  not presented if the colloquy had been made.  This thing
19  about ethical complaint and everything else in the letters
20  triggered the problem, it triggered the responsibility of the
21  Superior Court to do the colloquy, and it wasn't done.

22          The Government once again says, "Well, he didn't
23  complain about -- being on appeal, etcetera, etcetera,
24  etcetera."  Totally irrelevant.  -- And he might have had
25  the -- been the most competent attorney when the trial rolled

1 around, not relevant. The point is the record would have

2 allowed him to argue this on appeal and win.

3          Now, they say -- the Government suggests finally

4 that this was just a delaying tactic, delaying -- delaying

5 what? Delaying his eventual trial? I mean, I can't see why

6 there would be any benefit to delaying his trial, but be that

7 as it may, I hope I'm not mistaking myself, but as I recall--

8 and I don't -- I'm not paging through it right now -- my best

9 recollection is that when the Manglona -- Rawlen Mantanona --

10 I said Manglona before, Your Honor -- Rawlen Mantanona issue

11 that came up, that I think that Rawlen wanted to withdraw or

12 something, and I believe it's in the transcript

13 (indiscernible) and that Mr. Chargualaf said he didn't want

14 to delay the hearing because all this about Mr. Mantanona

15 getting out is going to mean more delay and he didn't want to

16 delay it. I believe that's in the transcript.

17          We submit.

18          THE COURT:   Very well.

19          I don't know why all these interesting cases come

20 before me, but I have to make a decision. So, Counsels, I'm

21 going to go ahead and order both of you to assist me as well.

22          And so we begin with you, Counsel for the

23 Petitioner. Please prepare a proposed order granting your

24 petition and stating your reasons why in this case

25 imprisonment or restraint is unlawful. Please provide

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1  authority as well as case citations, as well as your analysis

2  with regards to your position, as well as a proposed

3  judgement.

4       Counsel for the Government, I'm going to ask you to

5  do the same; a proposed order denying the petition stating

6  your reasons of course, as well as your analysis and a

7  citation of authorities that you will cite, as well as a

8  proposed judgement denying the petition for habeas corpus.

9       Okay?  I will make my decision as soon as I can.  I

10  will definitely make the decision within a period of -- what

11  is it?  What's the law now? -- A hundred and fifty days?

12       MR. TRAPP:    A hundred and eighty, I think, or --

13       THE COURT:    A hundred and fifty or a hundred

14  eighty?

15       MR. TRAPP:    I think it's six months.

16       THE COURT:    Six months, so --

17       MS. KEITH:    Your Honor, can we have a due date for

18  these proposed --

19       THE COURT:    Well, I was going to ask you, do you

20  want some time?

21       MR. TRAPP:    How about a three week due date, Your

22  Honor?

23       THE COURT:    That's fine.  As long as you won't

24  hold it against me.  (Chuckles) --

25       MS. KEITH:    Three weeks from today then?

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

1          THE COURT:    Okay?  So we'll give you the due date.
2  Okay?

3          MR. TRAPP:    I'll try to get it in --

4          THE COURT:    -- And remember, it's proposed.  Okay?
5  This is proposed from both parties.

6          MR. TRAPP:    Now, this is a proposed like a
7  decision and an accompanying order?

8          THE COURT:    That's correct.  That's right.

9          MR. TRAPP:    -- So there's like two different
10  documents?

11          THE COURT:    Right.  Right.

12          MR. TRAPP:    Very well.

13          THE COURT:    Yes.  Okay?  I don't want my kids to
14  starve if I don't make a decision within six months.

15          MR. TRAPP:    Very well, Your Honor.

16          THE COURT:    -- Thank you.

17          MS. KEITH:    Thank you.

18          THE BAILIFF:    All rise.

19          ** Whereupon proceedings concluded for the day. **

20

21

22

23

24

25

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

| INDEX | | | | |
|---|---|---|---|---|
| **WITNESSES** | | | | |
| **FOR THE PETITIONER:**<br>Direct Examination by Mr. Trapp:<br>Cross-Examination by Ms. Keith: | **DIRECT**<br>(Page) | **CROSS**<br>(Page) | **REDIRECT**<br>(Page) | **RECROSS**<br>(Page) |
| Terrence E. Timblin | 4 / 5 | n/a | n/a | n/a |
| **FOR THE RESPONDENT:**<br>Direct Examination by Ms. Keith:<br>Cross-Examination by Mr. Trapp: | **DIRECT**<br>(Page) | **CROSS**<br>(Page) | **REDIRECT**<br>(Page) | **RECROSS**<br>(Page) |
| Terrence E. Timblin | 9 | n/a | n/a | n/a |

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

# CERTIFICATE

I, Jeanette B. Roberto, do hereby certify that the foregoing pages, one through forty-three (43) inclusive, comprise the true and correct transcript of the Petition for Writ of Habeas Corpus heard in the following case:

Superior Court Case No. SP0228-03

RANDY IGNACIO CHARGUALAF, Petitioner,

versus

FRANK T. ISHIZAKI, Director of Corrections,

Government of Guam, Respondent.

heard before the Honorable Judge Steven S. Unpingco, on December 5, 2003, recorded on Tape Numbers T03-1727 and T03-1728.

This transcript of the proceedings indicated above was transcribed by me to the best of my knowledge, skill and ability.

Dated this 18th day of December, 2003.

JEANETTE B. ROBERTO

Jeanette B. Roberto, Court Transcriber, Superior Court of Guam

# Randy Ignacio Chargualaf vs. Frank T. Ishizaki

## Case No. SP 0228-03, Superior Court of Guam

| | |
|---|---|
| Exhibit 1 | Indictment |
| Exhibit 2 | Letter from Randy Ignacio Chargualaf to Honorable Alberto C. Lamorena of March 16, 1999 |
| Exhibit 3 | Letter from Randy Chargualaf to Rawlen Mantanona, Esq. of March 17, 1999 |
| Exhibit 4 | Letter from Randy I. Chargualaf to Terry E. Timblin, Esq. of April 28, 1999 |
| Exhibit 5 | Motion to Withdraw As Counsel for Defendant |
| Exhibit 6 | Affidavit of Terry E. Timblin |
| Exhibit 7 | Transcript of March 18, 1999 hearing on Motion to Withdraw as Counsel by Rawlen Mantanona and Transcript of May 6, 1999 hearing on Motion to Withdraw as Counsel by Terry Timblin |
| Exhibit 8 | Letter from Randy Ignacio Chargualaf to Terry E. Timblin, Esq. of May 6, 1999 |
| Exhibit 9 | Letter from Randy I. Chargualaf to Honorable Alberto C. Lamorena, III of May 7, 1999 |
| Exhibit 10 | Transcript of May 10, 1999 hearing on Motion to Compel Discovery |
| Exhibit 11 | Minute Entry of May 10, 1999 |
| Exhibit 12 | Judgment |
| Exhibit 13 | Notice of Appeal |
| Exhibit 14 | Opinion of Supreme Court of Guam |
| Exhibit 15 | Superior Court Docket Sheet |

(MISC\EXHIBITS.RandyChargualaf)

FILED

# IN THE SUPERIOR COURT OF GUAM

## TERRITORY OF GUAM

OF GUAM

<table>
<tr><td>

PEOPLE OF THE TERRITORY OF GUAM

vs.

RANDY IGNACIO CHARGUALAF,
DOB: 05/23/70
SSN: 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

CANDELARIA QUIDACHAY MENDIOLA aka "KANDI",
DOB: 02/28/75
SSN: 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

DON ALLEN BORJA MENDIOLA aka "KEILANI",
DOB: 05/18/79
SSN: 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

              Defendants.

</td><td>

CRIMINAL CASE NO. CF317-97

CHARGES:

1. ROBBERY
   (As a 2nd Degree Felony)

   Special Allegation:
   POSSESSION OF A DEADLY WEAPON IN THE COMMISSION OF A FELONY

2. ROBBERY BY COMPLICITY
   (2 Counts)
   (As a 2nd Degree Felony)

3. CONSPIRACY TO COMMIT ROBBERY
   (As a 2nd Degree Felony)

4. THEFT
   (As a Misdemeanor)

5. POSSESSION OF A FIREARM WITHOUT AN IDENTIFICATION CARD
   (As a Felony)

6. POSSESSION OF A CONCEALED FIREARM
   (As a Felony)

NOTICE OF PRIOR FELONY CONVICTION

</td></tr>
</table>

ATTORNEY GENERAL'S OFFICE - PROSECUTION DIVISION
2-200E Judicial Center Building
120 West O'Brien Drive
Agana, Guam 96910
Tel: (671) 475-3406 / Fax: (671) 477-3390

## INDICTMENT

THE SUPERIOR COURT TERRITORIAL GRAND JURY HEREBY CHARGES:

### FIRST CHARGE

On or about July 20, 1997, in the Territory of Guam, RANDY IGNACIO CHARGUALAF, in the course of committing a theft, knowingly

H:\INDICT\CHARGUAL.RI\smr



COPY

Superior Court of Justice
Plaintiff vs. Defendant
Case No. SP02-22-11
Court Order granted
for identification
Provided: DEC 05 2001
Date:

IGNACIO CHARGUALAF,"
CANDELARIA QUIDACHAY MENDIOLA aka "KANDI", and
DON ALLEN BORJA MENDIOLA aka "KEILANI
Criminal Case No. CF317-97

PAGE 2

was armed with and displayed what appeared to be a deadly weapon, that is, a handgun, while in the course of committing theft, in violation of 9 G.C.A. § 40.20(a)(3) and (b), as amended.

## Special Allegation

It is further alleged that in the commission of the above offense, the Defendant, RANDY IGNACIO CHARGUALAF unlawfully possessed a deadly weapon, that is, a handgun, in violation of 9 G.C.A. § 80.37.

## SECOND CHARGE

### First Count

On or about July 20, 1997, in the Territory of Guam, CANDELARIA QUIDACHAY MENDIOLA aka "Kandi" did intentionally aid RANDY IGNACIO CHARGUALAF in the commission of the offense of Robbery as contained in the First Charge, in violation of 9 G.C.A. §40.20(a)(3) and (b) and 4.60.

### Second Count

On or about July 20, 1997, in the Territory of Guam, DON ALLEN BORJA MENDIOLA aka "Keilani" did intentionally aid RANDY IGNACIO CHARGUALAF in the commission of the offense of Robbery as contained in the First Charge, in violation of 9 G.C.A. §40.20(a)(3) and (b) and 4.60.

## THIRD CHARGE

On or about July 20, 1997, in the Territory of Guam, RANDY IGNACIO CHARGUALAF, CANDELARIA QUIDACHAY MENDIOLA aka "KANDI", and DON ALLEN BORJA MENDIOLA aka "KEILANI" did

a)   agree with one or more other persons, to wit: each other, that they or one of them would engage in conduct which constituted the crime of Robbery;

H:\INDICT\CHARGUAL.RI\zmr

IGNACIO CHARGUALAF,
~ELARIA QUIDACHAY MENDIOLA aka "KANDI", and
DON ALLEN BORJA MENDIOLA aka "KEILANI"
Criminal Case No. CF317-97

PAGE 3

(b) intend to engage in, promote or assist in the conduct which constituted the crime of Robbery; and

(c) perform, or one of them performed an overt act in pursuant of the agreement, to wit: entering the residence of another and taking items at gun point.

in violation of 9 G.C.A. §§ 13.30, 43.20(a)(3) and (b).

### FOURTH CHARGE

On or about July 20, 1997, in the Territory of Guam, RANDY IGNACIO CHARGUALAF knowingly and unlawfully took movable property of another, namely, NOBUYO KAZUMI CERTEZA, that is, a purse and other items, with intent to deprive her thereof, the amount involved exceeding $50.00 but less than $500.00, in violation of 9 G.C.A. §§ 43.20(c) and 43.30(a).

### FIFTH CHARGE

On or about July 20, 1997, in the Territory of Guam, RANDY IGNACIO CHARGUALAF, knowingly possessed a firearm, specifically, a semi-automatic pistol, at a time when he did not have a firearms identification card in his possession, in violation of 10 G.C.A. §60106 and §60121(e).

### SIXTH CHARGE

On or about July 20, 1997, in the Territory of Guam, RANDY IGNACIO CHARGUALAF, knowingly carried a firearm, that is, a semi-automatic pistol, in his vehicle, in such a manner that it could not be seen by the naked eye, but was available for use by RANDY IGNACIO CHARGUALAF without having first received permission to so conceal said firearm, in violation of 10 G.C.A. §60109, §60108(e) and §60121(c).

H:\INDICT\CHARGUAL.RItmr

~NACIO CHARGUALAF,"
~LARIA QUIDACHAY MENDIOLA aka "KANDI", and
~N ALLEN BORJA MENDIOLA aka "KEILANI"
Criminal Case No. CF317-97

PAGE 4

## NOTICE OF PRIOR FELONY CONVICTION

The Government, pursuant to 8 G.C.A. § 55.40(a), alleges that the Defendant, RANDY IGNACIO CHARGUALAF, before the commission of all the offenses charged, was convicted of the crime of KIDNAPPING (As a 1st Degree Felony), TWO (2) COUNTS OF ROBBERY (As a 1st Degree Felony) and AGGRAVATED ASSAULT (As a 3rd Degree Felony), in Criminal Case No. CF295-87, in the Superior Court of Guam on or about June 29, 1988.

Dated this 31ST day of JULY, 1997.

CALVIN E. HOLLOWAY, SR.
ATTORNEY GENERAL

A TRUE BILL

By:

_____
DAVID M. MOORE
Assistant Attorney General

_____
FOREMAN OF THE TERRITORIAL
GRAND JURY

H:\INDICT\CHARGUALAF\mr

16, MARCH 1999

HONORABLE ALBERTO C LAMORENA
PRESIDING JUDGE
SUPERIOR COURT OF GUAM
GUAM JUDICIAL CENTER BUILDING
120 WEST O'BRIEN DRIVE
HAGATNA, GUAM 96910

RE: PEOPLE V. RANDY IGNACIO CHARGUALAF
CRIMINAL CASE NO. CF-0317-97

YOUR HONOR:

I AM THE DEFENDANT IN THE ABOVE-REFERENCED
CRIMINAL CASE. MY PRESENT COURT-APPOINTED COUNSEL IS
MR. RAWLEN MANTANONA.

ON 16, FEBRUARY 1999, MR MANTANONA FILED, ON
MY BEHALF, A MOTION TO SUPPRESS WHICH IS SCHEDULED
TO BE HEARD BY THE COURT ON 19 MARCH 1999. AT RE-
LEVANT TIMES, I HAVE DIRECTED MY ATTORNEY NOT TO
FURTHER DELAY MY CASE ANY LONGER AS IT IS.

ON 10, MARCH 1999, I WAS INFORMED BY MR. MAN-
TANONA THAT HE WISHED TO EXTEND OR CONTINUE THE HEAR-
ING DATE, DUE TO THE FACT THAT HE HAD A SCHEDULE TRIAL
THAT WAS GOING TO TAKE PLACE ON 22 MARCH 1999, IN
ANOTHER COURT ROOM. ALTHOUGH I OBJECTED TO ANY FURTHER
DELAYS, MR MANTANONA INSISTED ON POSTPONING MY HEARING
DATE, OR ELSE, HE WOULD WITHDRAW FROM MY CASE.

RECEIVED

MAR 17 1999

PRESIDING JUDGE
LAMORENA'S CHAMBER

Superior Court of Guam
Chargualaf V. Ishizaki
Case No. SP0223-04
PETITIONER's Exhibit 2
for identification
in Evidence DEC 05 2005
Date

LET THE RECORD SHOW THAT I HAVE NO WISHES OR ANY DESIRES TO TERMINATE THE SERVICE OF MR. MANTANONA. HOWEVER, I DO BELIEVE I HAVE A RIGHT TO HAVE THE MOTION TO SUPPRESS HEARD ON 18, MARCH 1999.

I AM WRITING THIS LETTER AFTER I HAD LEARNED THAT MY ATTORNEY HAD FILED A MOTION TO CONTINUE MY SCHEDULE HEARING DATE. I CALLED MY ATTORNEY ON 15, MARCH 1999, AND TOLD HIM I DID NOT WANT THE HEARING CONTINUED. MR. MANTANONA RETALIATED AND SAID THAT HE WAS GOING TO FILE A MOTION TO WITHDRAW AS MY COUNSEL IN THIS CASE.

AS I HAVE STATED, IT IS MY RIGHT TO HAVE MY MOTION TO SUPPRESS HEARD ON 18, MARCH 1999, AND I HEREBY REQUEST THE COURTS ASSISTANCE TO INSURE THAT THE HEARING ON MY MOTION TAKES PLACE AS SCHEDULED, WHETHER MR. MANTANONA IS REPRESENTING ME OR SOMEONE ELSE APPOINTED BY THE COURT. I DO NOT BELIEVE MR. MANTANONA HAS SUFFICIENT REASONS TO WITHDRAW AS MY COUNSEL, IN ANY EVENT.

I RESPECTFULLY REQUEST THE COURT TO INSURE MY RIGHTS TO A SPEEDY DISPOSITION OF MY CASE AND TO ORDER THAT MY MOTION TO SUPPRESS TAKES PLACE ON 18, MARCH 1999, AS SCHEDULED.

SINCERELY YOURS,

CF: ATTY: RAWLEN MANTANONA
AAS: THOMAS FISHER

MARCH 17, 1999

MR. RAWLEN MANTANONA
ATTORNEY AT LAW
414 W. SOLEDAD AVENUE STE 601B
HAGATNA, GUAM 96910

RECEIVED

MAR 17 1999

PR. SIDING JUDGE
LAMORENA'S CHAMBER
SUPERIOR COURT OF GUAM

FAX: 472-3668

RE: PEOPLE V. RANDY CHARGUALAF
CRIMINAL CASE NO. CF 0317-97

DEAR RAWLEN:

I HAVE JUST LEARNED FROM THE OFFICE OF THE CLERK
OF COURT FOR THE SUPERIOR COURT OF GUAM THAT A HEARING
HAS BEEN SCHEDULED ON 18 MARCH 99, AT 4:00 P.M. IN REFERENCE
TO THE ABOVE MENTIONED CASE.

PLEASE ALLOW THIS LETTER TO SERVE AS A FORMAL REQUEST
THAT I MAY BE PRESENT AT THIS HEARING.

THANK YOU FOR YOUR ATTENTION.

C.F: JUDGE ALBERTO C. LAMORENA
A.G. OFFICE

SINCERELY,

Superior Court of Guam
Plaintiff's Exhibit
Case No. SP0228-00
PETITIONER'S Exhibit
for identification
individual
Date                    DEC 1 5 2004

28 APR 99

MR. TERRY E. TIMBLIN
ATTORNEY-AT-LAW
SUITE 501C, GCIC BLDG.
414 W. SOLEDAD AVE.
HAGATNA, GUAM 96910

FAX: 477-4809

RE: CF317-97

DEAR MR. TIMBLIN:

THIS LETTER WILL CONFIRM OUR CONVERSATION
OF 27 APR 99.

AS I HAVE STATED TO YOU, YOU HAVE FAILED
TO EFFECTIVELY PROVIDE ME WITH AN ASSISTAN·
OF COUNSEL. I HAVE REQUESTED TO HAVE
WITNESSES CALLED SO THAT WE MAY BE ABLE
TO CROSS-EXAMINED THEM ON STAND. NOW, WE
HAVE A JUDGE WHO HAD RELIED HIS DECISION
AND ORDER BASED ON AN UNSWORN TESTIMON·
THIS UNSWORN TESTIMONY IS A VIOLATION OF
MY CONSTITUTIONAL RIGHTS. YOU ALLOWED THIS·
IS THIS HOW YOU ARE GOING TO REPRESENT
ME AT TRIAL?



Superior Court of Guam
Tarquan v. Barzaki
Case No. SP0226-04
PLAINTIFF'S Exhibit — 4
for identification
in evidence

YOU STATED THAT I HAD STIPULATED TO OFFICER SANTO TOMAS' REPORT CONCERNING MATCHING A DESCRIPTION OF A ROBBERY A DAY BEFORE. THAT IS NOT TRUE! WE STIPULATED IN OPEN COURT THAT FOR THE PURPOSE OF SANTO TOMAS' TESTIMONY, THAT A GUN HAD BEEN FOUND ON THE CURB. THE COURT TAPES WILL REVEAL THIS.

I WAS DENIED MY RIGHT TO CONFRONT AND CROSS-EXAMINE AN ADVERSE WITNESS STATING THAT I HAD FIT A DESCRIPTION OF A ROBBERY SUSPECT, WHOM YOU HAVE STATED ON YOUR MOVING PAPERS, AS SOMEONE WHO FITS THE DESCRIPTION OF "SEVERAL HUNDRED AND POSSIBLY THOUSANDS OF CHAMORRO MALE".

THERE ARE A LOT OF INCONSISTENT AND DISCREPENCY OF THE REPORTS ON MATCHING A DESCRIPTION OF A ROBBERY SUSPECT. YOU DID NOT RAISE ANY OF THESE ISSUES DURING THE SUPPRESSION HEARING.

YOU STATED ON YOUR CONVERSATION THAT I HAD STIPULATED TO THE CONSENT. AGAIN THIS IS NOT TRUE! IF YOU WOULD HAVE CALLED "KANDI" MENDIOLA TO THE STAND, THIS WOULD HAVE CONTRADICTED THE OFFICER TESTIMONY. YOU FAILED TO DO THIS.

(2)

ON OUR CONVERSATION, I REQUESTED YOU
TO SUBMIT A "SECOND MOTION TO SUPPRESS"
BASED ON THE FACT THAT AN UNSWORN TESTIMONY
WAS USED BY THE COURT YOU HAVE DISCOURAGED
ME NOT TO DO SO. EVEN AFTER I HAD MENTIONED
TO YOU A VIOLATION OF THE SIXTH AMENDMENT
" CONFRONTATION CLAUSE". I HAVE EVERY RIGHT
TO CROSS-EXAMINE AND CONFRONT AN ADVERSE
WITNESS. YOU WANT ME TO GIVE-UP THAT RIGHT!

THUS SO FAR, THE GOVERNMENT HAS COME
UP WITH THREE DIFFERENT THEORY OF PROBABLE
CAUSE, FIRST, THE GOVERNMENT CLAIMS THAT
PROBABLE CAUSE AROSE BECAUSE OF NERVOUSNESS
SECOND, JUST BECAUSE THE DOOR WAS
"DAMAGE" AND I HAD GREAT DIFFICULTY
EXITING MY VEHICLE, THE GOVERNMENT CLAIMS
I WAS IN NON-COMPLIANCE WHEN ORDERED
TO EXIT THE VEHICLE. THIRD, THEY CLAIM NOW
THAT IT WAS THE DESCRIPTION OF A ROBBERY
SUSPECT THAT GAVE PROBABLE CAUSE. ARE WE
GOING THROUGH A MULTIPLE CHOICES OF
PROBABLE CAUSE?

THE JUDGE JUST IGNORED A PREVIOUS RULING
MADE ON PEOPLE V. PARAGES. IF OFFICER
DAWSON HAD REASON TO BELIEVE THAT A
WEAPON WAS ON A DOOR PANEL AND AFTER
SEARCHING THE DOOR PANEL FINDING NO

( 3 )

WEAPON, THEN THE SEARCH SHOULD HAVE STOP. IN ESSENCE, THE "COURT ALLOWED THE POLICE OFFICER TO GO ON A FISHING EXPEDITION."

IN CLOSING, YOU ALSO STATED TO ME THAT YOU ARE THE ATTORNEY IN THIS CASE AND I AM ONLY THE DEFENDANT. IF THAT'S THE CASE, THEN I CAN NO LONGER TRUST YOU TO REPRESENT ME IN THIS CRIMINAL PROCEEDINGS JUST BECAUSE I DID NOT FINISH HIGH SCHOOL AND DID NOT ATTEND LAW SCHOOL MEANS THAT I CANNOT ACTIVELY PARTICIPATE IN MY DEFENSE.

PLEASE INFORM ME AS SOON AS YOU HAVE SUBMITTED YOUR MOTION TO WITHDRAW AS COURT-APPOINTED COUNSEL.

SINCERELY,

RANDY I. CHARGUALAF

C.F: CLERK OF COURT
      SUPERIOR COURT OF GUAM

GUAM BAR ASSOCIATION
ETHICS COMMITTEE

(4)

TERRY E. TIMBLIN
Attorney at Law
Suite 501C, GCIC Bldg.
414 W. Soledad Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-1389
Facsimile: (671) 477-4809

Attorney for Defendant

## IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM | ) | CASE NO. CF0317-97 |
| Plaintiff, | ) | |
| vs. | ) | MOTION TO WITHDRAW AS COUNSEL FOR DEFENDANT |
| RANDY IGNACIO CHARGUALAF | ) | |
| Defendant, | ) | |

TO: Attorney General of Guam, Prosecution Division

Please take notice that on the ____ day of **MAY 0 6 1999**, 1999 at 3:00 P.M., in the Superior Court of Guam, the undersigned will move to withdraw as counsel for Defendant. This Motion is supported by the Memorandum of Points and Authorities and the Affidavit of Terry E. Timblin filed herewith.

### MEMORANDUM OF POINTS AND AUTHORITIES

Rules 1.16(a)(1) and 1.16(a)(3) of the Guam Rules of Professional Conduct provide that counsel may terminate representation when the representation will result in a violation of the Rules or when he is discharged.

As indicated by the Affidavit of Terry E. Timblin, submitted herewith, Defendant has indicated that he wishes to discharge the undersigned. It further indicates that Defendant is apparently going to submit a complaint to the Ethics Committee which would create a conflict of interest. In this instance, counsel was appointed by the Court and can only be removed by the Court. This request is therefore submitted to the discretion of the Court.

RECEIVED
CMO
APR 2 9 1999

Superior Court of Guam
Marquardt v. Ishizaki
Special No. SP0228-03
PETITIONER'S Exhibit
for Identification
In evidence _____ Date: 05 2005
Date:

DATED: 4/29/99

TERRY E. TIMBLIN, Attorney for
Defendant

TERRY E. TIMBLIN
Attorney at Law
Suite 501C, GCIC Bldg.
414 W. Soledad Ave.
Hagåtña, Guam 96910
Telephone:    (671) 477-1389
Facsimile:    (671) 477-4809

Attorney for Defendant

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM | CASE NO. CF0317-97 |
| Plaintiff, | |
| vs. | AFFIDAVIT OF TERRY E. TIMBLIN |
| RANDY IGNACIO CHARGUALAF | |
| Defendant, | |

I, Terry E. Timblin, hereby declare under penalty of perjury as follows:

1.      I am the attorney of record for Defendant in the above matter and I make this Affidavit in support of my Motion to Withdraw as Counsel.

2.      On April 26, 1999, I received a copy of Judge Lamorena's Decision and Order denying Defendant's Motion to Suppress. On that date, I delivered a copy of the Decision and Order to Defendant.

3.      On April 27,1999, I received a call from Defendant in which he indicated that he was "disappointed" at how the hearing went. He stated that Officer Santo Tomas should have been called as a witness and cross-examined. When asked what he should have been cross-examined about, Defendant indicated that this would have established a contradiction between his version of events and that of Officer Dawson in that Officer Santo Tomas had drawn a connection between the Bulletin about the previous day's robbery and Defendant and Candalaria Mendiola while Officer Dawson had not. I explained to Defendant that there was no

RECEIVED
CWK
APR 2 9 1999
1:05 pm
Prosecution Div.



Superior Court of Guam
Inarajan [...] v. Ishizaki
Case No. SP0223-01
PETITIONER'S Exhibit ___ 60
for Identification
Evidence      DEC 10 6 2001
Date:

contradiction as both indicated that Officer Santo Tomas informed Officer Dawson of the perceived connection at the scene of the stop.

4. Defendant than asserted that I should have called Mendiola as a witness to contradict Officer Dawson's testimony that Defendant had consented to the search of his vehicle. The issue of consent was discussed during the preparation for this Motion and I had advised Defendant that the best and probably only means of contradicting Officer Dawson was for Defendant to testify himself that he not consented. Defendant declined to do so stating that he felt that the assertion that any consent was vitiated by an illegal detention was sufficient. At neither this time nor any other time prior to April 27, 1999 did Defendant claim that Mendiola would testify that he not consented. In Mendiola's written statement, she neither confirms nor contradicts whether consent was given and there was no other indication that she might have been of help.

5. I informed Defendant that I did not agree with either of these objections and he then indicated that he would like to have a new lawyer.

6. On April 28, 1999, I received a fax transmission from Defendant, a copy which is attached hereto, in which he restates his objections and indicates at the end that a copy was to be sent to the Ethics Committee.

7. Based on the above, I believe that an irreconcilable conflict of interest now exists between myself and Defendant and that we would not be able to work together effectively to conduct a defense.

DATED: 4/29/99

_____
TERRY E. TIMBLIN

28 APR 99

MR. TERRY E. TIMBLIN
ATTORNEY-AT-LAW
SUITE 501C, GCIC BLDG.
414 W. SOLEDAD AVE.
HAGATNA, GUAM 96910

FAX: 477-4809

RE: CF317-97

DEAR MR. TIMBLIN:

THIS LETTER WILL CONFIRM OUR CONVERSATION
OF 27 APR 99

AS I HAVE STATED TO YOU, YOU HAVE FAILED
TO EFFECTIVELY PROVIDE ME WITH AN ASSISTAN-
OF COUNSEL. I HAVE REQUESTED TO HAVE
WITNESSES CALLED SO THAT WE MAY BE ABLE
TO CROSS-EXAMINED THEM ON STAND. NOW, WE
HAVE A JUDGE WHO HAD RELIED HIS DECISION
AND ORDER BASED ON AN UNSWORN TESTIMO-
THIS UNSWORN TESTIMONY IS A VIOLATION OF
MY CONSTITUTIONAL RIGHTS. YOU ALLOWED THIS
IS THIS HOW YOU ARE GOING TO REPRESENT
ME AT TRIAL?

You STATED THAT I HAD STIPULATED TO OFFICER SANTO TOMAS' REPORT CONCERNING MATCHING A DESCRIPTION OF A ROBBERY A DAY BEFORE. THAT IS NOT TRUE! WE STIPULATED IN OPEN COURT THAT FOR THE PURPOSE OF SANTO TOMAS' TESTIMONY, THAT A GUN HAD BEEN FOUND ON THE CURB. THE COURT TAPES WILL REVEAL THIS.

I WAS DENIED MY RIGHT TO CONFRONT AND CROSS-EXAMINE AN ADVERSE WITNESS STATING THAT I HAD FIT A DESCRIPTION OF A ROBBERY SUSPECT, WHOM YOU HAVE STATED ON YOUR MOVING PAPERS, AS SOMEONE WHO FITS THE DESCRIPTION OF "SEVERAL HUNDRED AND POSSIBLY THOUSANDS OF CHAMORRO MALE".

THERE ARE ALOT OF INCONSISTENT AND DISCREPENCY OF THE REPORTS ON MATCHING A DESCRIPTION OF A ROBBERY SUSPECT. YOU DID NOT RAISE ANY OF THESE ISSUES DURING THE SUPPRESSION HEARING.

You STATED ON YOUR CONVERSATION THAT I HAD STIPULATED TO THE CONSENT. AGAIN THIS IS NOT TRUE! IF YOU WOULD HAVE CALLED "KANDI" MENDIOLA TO THE STAND, THIS WOULD HAVE CONTRADICTED THE OFFICER TESTIMONY. YOU FAILED TO DO THIS.

(2)

ON OUR CONVERSATION, I REQUESTED YOU
TO SUBMIT A "SECOND MOTION TO SUPPRESS"
BASED ON THE FACT THAT AN UNSWORN TESTIMONY
WAS USED BY THE COURT YOU HAVE DISCOURAGED
ME NOT TO DO SO. EVEN AFTER I HAD MENTIONED
TO YOU A VIOLATION OF THE SIXTH AMENDMENT
"CONFRONTATION CLAUSE" I HAVE EVERY RIGHT
TO CROSS-EXAMINE AND CONFRONT AN ADVERSE
WITNESS. YOU WANT ME TO GIVE-UP THAT RIGHT!

THUS SO FAR, THE GOVERNMENT HAS COME
UP WITH THREE DIFFERENT THEORY OF PROBABLE
CAUSE, FIRST, THE GOVERNMENT CLAIMS THAT
PROBABLE CAUSE AROSE BECAUSE OF NERVOUSNES
SECOND, JUST BECAUSE THE DOOR WAS
"DAMAGE" AND I HAD GREAT DIFFICULTY
EXITING MY VEHICLE THE GOVERNMENT CLAIMS
I WAS IN NON-COMPLIANCE WHEN ORDERED
TO EXIT THE VEHICLE. THIRD, THEY CLAIM NOW
THAT IT WAS THE DESCRIPTION OF A ROBBERY
SUSPECT THAT GAVE PROBABLE CAUSE. ARE WE
GOING THROUGH A MULTIPLE CHOICES OF
PROBABLE CAUSE?

THE JUDGE JUST IGNORED A PREVIOUS RULING
MADE ON PEOPLE V. PARAGES. IF OFFICER
DAWSON HAD REASON TO BELIEVE THAT A
WEAPON WAS ON A DOOR PANEL AND AFTER
SEARCHING THE DOOR PANEL FINDING NO

(3)

WEAPON, THEN THE SEARCH SHOULD HAVE STOP. IN ESSENCE, THE "COURT ALLOWED THE POLICE OFFICER TO GO ON A FISHING EXPEDITION".

IN CLOSING, YOU ALSO STATED TO ME THAT YOU ARE THE ATTORNEY IN THIS CASE AND I AM ONLY THE DEFENDANT. IF THAT'S THE CASE, THEN I CAN NO LONGER TRUST YOU TO REPRESENT ME IN THIS CRIMINAL PROCEEDINGS JUST BECAUSE I DID NOT FINISH HIGH SCHOOL AND DID NOT ATTEND LAW SCHOOL MEANS THAT I CANNOT ACTIVELY PARTICIPATE IN MY DEFENSE.

PLEASE INFORM ME AS SOON AS YOU HAVE SUBMITTED YOUR MOTION TO WITHDRAW AS COURT-APPOINTED COUNSEL.

SINCERELY,

RANDY J. CHARGUALAF

C.F: CLERK OF COURT
SUPERIOR COURT OF GUAM


GUAM BAR ASSOCIATION
ETHICS COMMITTEE

(4)

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM | ) |
| | ) |
| Plaintiff, | ) Superior Court Case |
| | ) No. CF0317-97 |
| vs. | ) |
| | ) |
| RANDY I. CHARGUALAF, | ) |
| CANDELARIA Q. MENDIOLA, | ) |
| and DON A.B. MENDIOLA, | ) |
| | ) |
| Defendants. | ) |

## B E F O R E:

*The Honorable Alberto C. Lamorena, III*
Judge, Superior Court of Guam

| Date & Type of Proceeding | Page No. |
|---|---|
| March 18, 1999<br>*Motion to Withdraw as Counsel*<br>*by Rawlen Mantanona* | 2 - 11 |
| May 6, 1999<br>*Motion to Withdraw as Counsel*<br>*by Terry Timblin* | 12 - 16 |
| | |

Priscilla C. Torres ❖ Court Transcriber
Superior Court of Guam

Superior Court of Guam
Chargualaf v. Ishizaki
Case No. SP0228-04
PETITIONER'S Exhibit ___
For Identification
In Evidence _____
Date: _____

JUN 4 2

# IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM )  Superior Court Case
)  No. CF0317-97
)
Plaintiff, )
)
vs. )
)  **Motion to Withdraw**
RANDY I. CHARGUALAF, )  **As Counsel**
CANDELARIA Q. MENDIOLA, )  **(Mr. Mantanona)**
and DON A.B. MENDIOLA, )
)  March 18, 1999
Defendants. )
_____ )

## BEFORE:

*The Honorable Alberto C. Lamorena III*
Judge, Superior Court of Guam

## APPEARANCES:

### For the People:

*Tom Fisher, Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
Prosecution Division
Hagåtña, Guam

### For the Defendant:

*Rawlen Mantanona, Attorney at Law*
Hagåtña , Guam

Priscilla C. Torres  ❖  Court Transcriber
Superior Court of Guam

1    **THE BAILIFF:**  The Superior Court of Guam is now in

2  session.   The Honorable Alberto C. Lamorena III presiding.

3  Please be seated.

4    **THE COURT:**  Okay.  This is a *Motion to Withdraw,* CF0317-

5  97, **People of Guam vs. Randy Chargualaf.**  Okay, I'd just like

6  to inform both Counsels that, you know, the Court has been

7  receiving faxes from the Defendant.  And I think...

8    **MR. MANTANONA:**  Yes, Your Honor.  I know it's an improper

9  *ex parte* communication.

10    **THE COURT:**  Okay.  Just to remind both Counsels.  Okay?

11  There's no objections to that.

12    **MR. MANTANONA:**  Well, Your Honor, I object to my client

13  contacting the Court.  I think so does Mr. Fisher.  I think

14  the Court needs to admonish...

15    **THE COURT:**  Yes.  The Court does not want you to contact

16  us again because you do have legal counsel.  Okay?  That's

17  what they're there for.   Okay?   So,   from   now   on,

18  Mr. Chargualaf, you must not contact the Court or any officers

19  of the Court except for your lawyer.  Okay?  Mr. Mantanona,

20  this is your Motion.

21    **MR. MANTANONA:**  Yes, Your Honor.  I brought this matter

22  before the Court on a Motion to Withdraw.  And the Court has

23  seen   the   responses   from   my   client   in   its   *ex   parte*

24  communications.  And again, I apologize for those *ex parte*

25  communications, Your Honor.

1    But Counsel is of the opinion that, pursuant to
2  Rule 1.16(b)(5), that representation of this Defendant has
3  become unreasonably difficult and that is because of the
4  client. But the difficulty, of course, lies with the Counsel.
5  I'm making the motion to withdraw myself.

6    Your Honor, I'm making this motion based upon
7  conversations that I've had with my client and the fact that
8  I believe that communication and a trust breakdown has
9  occurred.

10    This Defendant has informed me that he doesn't know
11  whether I'm doing everything in the best interest for his case
12  and for himself. I've already filed I think five motions in
13  this matter. I think at least two of them are substantive and
14  dispositive. The Defendant is constantly second-guessing me
15  on whether to -- on what issues to raise and to -- what issues
16  to argue or how to argue these issues. The Defendant's
17  inferred -- I mean, infringes on my right and my ability to --
18  and questions my ability on how to manage this case.

19    Your Honor, this Defendant is obstinate at times. The
20  latest incident is now the matter of the motion hearing. He
21  wants his motion heard on the 18th. Initially when I talked
22  to this Defendant, he informed -- I talked to him; I told him
23  I have a trial with Mr. Fisher that's pending on the 22nd.
24  These are evidentiary matters that need to be done. There's
25  at least ten witnesses that we're going to call for the

1  several motions that we have pending; plus to argue these
2  motions, we're going to take at least three to five days. We
3  don't have the sufficient time to prepare and I need this time
4  to prepare for the current case. Defendant then begrudgingly
5  gave it to me, and then later called me back saying he doesn't
6  want it. He wants to go forward.

7      Your Honor, pursuant to the Professional Rules of
8  Responsibility Rule 1.2, those are decisions that are left to
9  the attorney. I'd like to present the Court this Rule, if I
10 may, and opposing Counsel and I'll also give one to the
11 Defendant.

12                    (Pause for Counsel)

13     **MR. MANTANONA:**  Your Honor, in a criminal case, the
14 lawyer shall abide by, pursuant to the Rule:

15           *...the     client's     decision     after*
16           *consultation with the lawyer as to the*
17           *plea to be entered; whether to waive his*
18           *jury trial; or whether the client will*
19           *testify.*

20 Your Honor, all the rest of the decisions are based upon --
21 are strategic decisions based -- and given to the defense
22 attorney in his role as an attorney for the defendant.

23     This Defendant is constantly second-chairing me;
24 constantly questioning my abilities; constantly trying to make
25 me do things that I can't do and I think that is -- that are

1  improper. And it's just led to this breakdown, Your Honor.

2  I do not feel that I can effectively represent this

3  Defendant anymore. I don't think that he trusts my ability,

4  though he states in his writings that he doesn't see this as

5  sufficient grounds. I think that there is, Your Honor. I

6  think we're heading into an area where we're going to argue

7  the substantive motions and put on evidence for those motions.

8  And I think that that's going to be a crucial stage. If this

9  breakdown goes into that area, there may be a question as to

10  ineffective assistance as counsel to the Defendant in this

11  matter.

12  As stated, I believe that Defendant has violated ex parte

13  communications. He's doing strategic -- he's trying to

14  infringe on strategic decisions that are the domain of

15  counsel. And as I stated, I think there is a basic breakdown

16  of trust and confidence in my ability to represent this

17  Defendant. And I think that that would be sufficient grounds

18  to make this case unreasonably difficult for me to represent

19  this Defendant further on, Your Honor. And I think that to

20  continue representing the Defendant will expose this Defendant

21  to a possible appeal issue.

22  **THE COURT:** Any objection on the motion, Mr. Fisher?

23  **MR. FISHER:** Yes, Your Honor. The People do object. If

24  it please the Court and Counsel?

25  Your Honor, as this Court knows, Mr. Chargualaf has been

1 through a number of counsel. Mr. Mantanona is just the latest
2 in a long run of counsel. But listening to Mr. Mantanona's
3 argument -- as well as reading Mr. Chargualaf's very well
4 written, although *ex parte,* communications with the Court --
5 it is the People's position that the only problem that is
6 presently indicated is that they came to a disagreement over
7 the scheduling of certain motions in the case. Essentially
8 what happened is they agreed to stipulate to move the motions
9 back and it sounds like the Defendant changed his mind. And
10 that's it. His letter, which is already part of the record
11 and which the Court is in receipt of, expresses very clearly
12 and unambiguously that the Defendant does not believe that his
13 attorney has sufficient reasons to withdraw as his counsel,
14 which must only mean that he continues to have faith in
15 Mr. Mantanona's representation of him. I think that if
16 Mr. Mantanona and his client have come to a disagreement, I'm
17 sure that that is not unusual in the representation of a
18 criminal defendant.

19    Nevertheless, all attorneys are bound to abide by their
20 client's wishes. That's the People's counsel as well as the
21 Defendant's counsel. We don't think that he has laid a
22 sufficient foundation to withdraw as counsel for this
23 gentleman.

24    I think, in this, that the People are in a slightly
25 different position but we are arguing Defendant is entitled to

1  Mr. Mantanona's able representation of him.    To allow
2  Mr. Mantanona off the case is going to impede the progress of
3  this case.  It's going to cause another defense attorney to
4  have to come in here and get up to speed.  And I think that
5  Mr. Chargualaf has made it clear that he wants to continue
6  with all deliberate speed in the prosecution of this case.
7  That is his right.  And we would ask Mr. Mantanona be kept on
8  this case and that we come very quickly to a criminal trial
9  setting. Thank you, Your Honor.

10       MR. MANTANONA:  May I respond?

11       THE COURT:  Yes.

12       MR. MANTANONA:  Your Honor, I've never made the point to
13  try to color this as a request by this Defendant.  It is a
14  motion brought upon by counsel as to my belief of the
15  unreasonably difficult representation of the Defendant.  It
16  has gotten difficult.  The Defendant calls my office daily.
17  He tries to converse with me as counsel.  This is not the
18  situation that is before this Court, Your Honor.  This client
19  is a defendant and it should be -- and a counsel should be
20  able to represent the Defendant in the proper manner.  The
21  Defendant is impeding that and Counsel requests to be removed
22  from this case.

23       THE COURT:  (Addressing Courtroom Clerk) Will you check
24  who was his lawyers before?  See how many lawyers.

25       MR. MANTANONA:    Your  Honor,  I  think  he's  had  Mark

1  Williams, Alex Gorman, and the Public Defender on a conflict.
2  So I don't think he's had...

3      MR. FISHER: Well, my records show he's also had Anita
4  Sukola, Your Honor.

5      THE COURT: No, Anita Sukola represents the Co-Defendant,
6  Carmelita (sic.) Mendiola.

7      MR. MANTANONA: I believe I'm only his third counsel.

8      THE COURT: I don't think the Public Defender because
9  Public Defender represents the other Co-Defendant.

10      MR. MANTANONA: That's correct, Your Honor.

11      THE COURT: What does he have?

12      MR. MANTANONA: I think, Your Honor, he's had myself,
13  Mr. Williams and Mr. Gorman.

14      THE COURT: Because the other Mendiola has Public
15  Defender. Right?

16          (Inaudible Response from Courtroom Clerk)

17      THE COURT: What's the status of the other Mendiola? Did
18  he plead guilty already?

19          (Inaudible Response from Courtroom Clerk)

20      THE COURT: How come this case is in front of me and
21  Judge Unpingco's handling the other two? What happened?

22          (Inaudible Response from Courtroom Clerk)

23      THE COURT: Judge Unpingco has taken the pleas on the
24  other Co-Defendants. Right?

25      MR. MANTANONA: Your Honor, as long as I've had the case,

1  you've been the trial judge on this matter.

2      THE COURT:   Well, let me see.   Who's his attorneys

3  before?   Let's see, you had Williams, Bischoff, Gorman, and

4  now Mantanona.

5                       (Pause for the Court)

6      THE COURT:   Well, I've got the Motion and the Court will

7  appoint Terry Timblin to represent this Defendant.

8      We'll set it for Further Proceedings for March 23rd.

9      MR. FISHER:   Your honor, prior to closing the hearing on

10 this matter, I'd ask the Court whether or not it would inquire

11 of the Defendant himself whether or not he has now asserted

12 his right to speedy trial based on the language of the letter

13 he submitted to the Court in which he says he respectfully

14 requests the Court to insure his rights to a "...*speedy*

15 *disposition of my case and (indiscernible)...*".

16     THE COURT:   The only time -- okay.   The *Ibanez* case --

17 the Ninth Circuit *Ibanez* case has ruled that if you're

18 appointed counsels in between, time tolls until the new

19 counsel can take over.   And at that time, the new counsel can

20 re-assert it or waive it.   So it tolls between that time where

21 Mr. Timblin can take the case.   So that's why we're setting it

22 for March 23rd at 4:00.

23     MR. FISHER:   Yes, Your Honor.   But my concern is that

24 this -- Mr. Mantanona's release is against the Defendant's

25 wishes.   I don't know.   I haven't read -- I'm not as familiar

1   with the *Ibanez* case as the Court is, of course, but that is

2   my concern.

3        **THE COURT:** Of course, it won't be in the best interest

4   of the Defendant if the attorney doesn't feel he can

5   adequately defend the Defendant.

6        **MR. FISHER:** That's true as well, Your Honor.

7        **THE COURT:** And Counsel's already informed the Court that

8   he cannot now, at this point, give the Defendant a hundred

9   percent of his commitment to you. And if he can't do that,

10   then, you know, you'll want an attorney that can do it.

11   Right? So, despite the Defendant's wishes, unless he's gone

12   to law school, the Court feels that he's lost the confidence

13   of his lawyer and I think the Court has to appoint another

14   lawyer for him in which he could at least get one hundred

15   percent. Okay?

16        **MR. FISHER:** Yes, Your Honor.

17        **MR. MANTANONA:** Thank you, Your Honor.

18        **THE COURT:** Okay. So March 23rd at 4:00 and we'll notify

19   Mr. Timblin.

20

21

22

23

24

25   ❖❖ **WHEREUPON PROCEEDINGS FOR 3-18-99 WERE COMPLETED** ❖❖

1
2
3
4

### IN THE SUPERIOR COURT OF GUAM

5   PEOPLE OF GUAM

Plaintiff,

vs.

RANDY I. CHARGUALAF,
CANDELARIA Q. MENDIOLA,
and DON A.B. MENDIOLA,

Defendants.

) Superior Court Case
)    No. CF0317-97
)
)
)
)
)
)   Motion to Withdraw
)     As Counsel
)    (Mr. Timblin)
)
)    May 6, 1999
)
)

11

## B E F O R E:

The Honorable Alberto C. Lamorena III
Judge, Superior Court of Guam

## A P P E A R A N C E S:

**For the People:**

Judy Hattori, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
Prosecution Division
Hagåtña, Guam

**For the Defendant:**

Terrance Timblin, Attorney at Law
Hagåtña, Guam

Priscilla C. Torres   ❖   Court Transcriber
Superior Court of Guam

1    THE COURT:    He's had Mr. Bischoff, Mr. Williams,

2  Mr. Gorman, Mr. Mantanona, and now you. What seems to be the

3  problem, Mr. Chargualaf?

4    THE DEFENDANT:    I don't trust Mr. Timblin in handling my

5  case.

6    THE COURT:    Well, that's the same reason you used for the

7  other ones.  Can you at least be more innovative?

8                    (No Response from Defendant)

9    MS. HATTORI:    Your Honor, I don't think any attorney,

10  besides probably God Himself, would be sufficient for this

11  Defendant.  He's gone through a number of attorneys.

12                    (Pause)

13    MS. HATTORI:    He's gone through a number of very

14  experienced attorneys, Your Honor -- former prosecutors also,

15  attorneys with years of experience.  And he still seems to

16  find all of them inadequate.  I don't believe appointing new

17  counsel would suffice for him.

18    THE COURT:    I have to agree with Ms. Hattori. All of the

19  lawyers I've appointed you have had long experience with

20  prosecution and defense.  You know?  What makes you an expert

21  as opposed to the long experience in their line of work,

22  Mr. Chargualaf?

23    MS. HATTORI:    If he doesn't like the ones the Court has

24  appointed, perhaps he can somehow get his family members to

25  get enough money together to hire someone he does like.  But

1 although defendants are entitled to representation from
2 counsel, they shouldn't be able to pick and choose the ones
3 they want. They have to take the court appointed ones and it
4 seems like he's just going to run the gambit until he finds
5 one that he's happy with. And that shouldn't happen in this
6 case, Your Honor. The Court has already exhausted a lot of
7 time on all these past attorneys, and each one has to start
8 from scratch and review the file. And it doesn't look like
9 he'll be happy with anyone.

10 THE COURT: You know, the lawyers I gave you have all had
11 experiences in prosecution -- almost all of them, anyway; and
12 also on defense. Mr. Timblin was a defense counsel for a long
13 time. And didn't you work for the Attorney General at one
14 time?

15 MR. TIMBLIN: Correct.

16 THE COURT: Right. So if anybody knows all the angles on
17 both sides, it's Mr. Timblin. Mr. Williams is another one I
18 appointed who used to be prosecutor at one time. Now, he's an
19 attorney as a defense counsel.

20 MR. HATTORI: Mr. Mantanona.

21 THE COURT: Mr. Mantanona's another one. You know? If
22 anybody knows prosecution the best and their angles, it's
23 these people. You know? And you, you just probably read a
24 few books and you think you know everything. I'll deny the
25 Motion on this one. I want to get -- I want to get -- either

/pct

1    we go to trial for this one or change of plea.  One or the

2    other.

3         THE CLERK:  Your Honor, he's scheduled for Monday.

4         THE COURT:  For trial?

5         MR. TIMBLIN:   No.   There's still a continued motion

6    hearing for...

7         THE COURT:  We still have motions? Okay.  We'll continue

8    motions on Monday, May 10th.  Right?  Okay?  Mr. Timblin is an

9    excellent lawyer.

10

11

12

13

14

15

16

17

18

19

20          ❖❖ WHEREUPON PROCEEDINGS WERE COMPLETED ❖❖

21

22

23

24

25

May 6, 1999 Motion to Withdraw As Counsel (Timblin)        /pct

# C E R T I F I C A T E

I, PRISCILLA C. TORRES, do hereby certify that the foregoing pages one through sixteen (16) inclusive, comprise the true and correct Transcript in accordance with **Requests for Transcripts** submitted to the Court Reporters Unit on May 28, 2003 in the matter of the **Motions to Withdraw** proceedings held before The Honorable Alberto C. Lamorena III on March 18, 1999 and May 6, 1999 respectively in:

PEOPLE OF GUAM

vs.

RANDY I. CHARGUALAF,

Superior Court Case No. CF0317-97

recorded on Tapes Number T99-0358 and T99-0613 respectively; and transcribed by me to the best of my knowledge and ability.

DATED this 2nd day of June, 2003.

Priscilla C. Torres

*Priscilla C. Torres*

6 MAY 99

TERRY E. TIMBLIN
ATTORNEY-AT LAW
SUITE 501C, GCIC BLDG.
414 W. SOLEDAD AVE.
HAGATNA, GUAM  96910

RE: CASE NO. CF0317-97

DEAR TERRY:

YOUR IMPRESSION TO ME AT THE COURT HEARING TODAY WAS NOT OF A PLEASANT
ONE.

I CANNOT SEE HOW WE CAN CONTINUE TO WORK TOGETHER. YOU MAY PROBABLY
BE AWARE BY NOW THAT I AM GOING TO FILE A COMPLAINT WITH THE GUAM BAR ASSOCIATION
ETHICS COMMITTEE OF YOUR DEFICIENCY OF NOT CALLING WITNESS TO TESTIFY DURING
MY SUPPRESSION HEARING. YOUR PERFORMANCE WAS VERY POOR WHICH ARE MY GROUNDS
FOR AN INEFFECTIVE ASSISTANCE OF COUNSEL. YOU ARE MERELY TRYING TO RAILROAD
ME INTO A CONVICTION.

MY NEXT HEARING DATE IS ON 10 MAY 1999. I DO NOT WISH TO HAVE YOUR RAILROAD
ME AGAIN. I FEEL THAT YOU ARE INCOMPETENT TO GO TRIAL WITH, AS YOUR RECORD
WILL SPEAK FOR ITSELF. HOW MANY OTHERS HAVE YOU HELPED THE GOVERNMENT PUT-AWAY?

I DO NOT WANT TO HAVE ANYTHING TO DO WITH YOUR REPRESENTATION. YOU SHOULD
HAVE SAID SOMETHING IN COURT TODAY TO HAVE DISMISSED YOURSELF. INSTEAD YOU
REMAINED SILENT AND THEN LAUGHED AT ME WHEN I GOT DENIED.

YOU WILL BE HEARING FROM THE ETHICS COMMITTEE SOON.

SINCERELY YOURS,

RANDY IGNACIO CHARGUALAF
c/o FDF
P.O. BOX 3236
HAGATNA, GUAM  96932

CF: PRESIDING JUDGE
    SUPERIOR COURT OF GUAM

    GUAM BAR ASSOCIATION
    ETHICS COMMITTEE

7 MAY 99

HONORABLE ALBERTO C. LAMORENA, III
PRESIDING JUDGE
SUPERIOR COURT OF GUAM
GUAM JUDICIAL CENTER BUILDING
HAGATNA, GUAM 96910

RE: PEOPLE v. RANDY I. CHARGUALAF
SUPERIOR COURT CASE NO. CF317-97
RECONSIDERATION ON DENIAL OF MOTION
TO WITHDRAW COURT-APPOINTED COUNSEL

YOUR HONOR:

PLEASE ALLOW THIS LETTER TO SERVE AS A FORMAL REQUEST FOR A RECONSIDERATION
FOR MOTION TO WITHDRAW COURT-APPOINTED COUNSEL ON THE ABOVE-REFERENCED MATTER.
THE BASIS ON THIS REQUEST TO WITHDRAW COUNSEL IS THAT WE CANNOT COMMUNICATE
ANY LONGER. I AM FILING A COMPLAINT TO THE GUAM BAR ASSOCIATION ETHICS COMMITTEE
FOR AN INEFFECTIVE ASSISTANT OF COUNSEL. I HAVE ASKED HIM TO PREPARE WITNESS
TO BE CALLED DURING MY SUPPRESSION HEARING AND HE FAILED TO DO SO. HIS PERFORMANCE
IS SO INEFFICIENT THAT IT RENDERS INEFFECTIVE COUNSEL.
AN ACCUSED HAS EVERY RIGHT TO CONFRONT AND CROSS-EXAMINE ANY ADVERSE
WITNESS AGAINST HIM. MR. TIMBLIN DID NOT CALL OFFICER SANTO TOMAS TO THE
STAND FOR CROSS-EXAMINATION. THUS, ALLOWING THE COURT TO USE AN UNSWORN TESTIMONY
AS A FACTOR IN MAKING ITS DECISION.
I HAD ASKED COURT-APPOINTED COUNSEL TO SUBMIT FOR A RECONSIDERATION OF
THE COURT'S DECISION, BUT REFUSES TO DO SO, STATING THAT HE WOULD LEAVE THIS
MATTER UP TO THE APPEALS COURT. I BELIEVE THAT I AM ENTITLE TO HAVE A RECONSIDERATION
BASED ON THE COURT'S DECISION TO USE AN UNSWORN TESTIMONY WHICH IS A VIOLATION
OF THE SIXTH AMENDMENT OF THE U.S. CONSTITUTION'S "CONFRONTATIONAL CLAUSE".
THE ISSUES INVOLVING THIS COURT ARE CONSTITUTIONAL ISSUES. THE COURT
IS MORE CONCERN IN OBTAINING A CONVICTION THEN PROTECTING THE RIGHTS OF A
DEFENDANT.
A COPY OF THIS LETTER WILL BE MADE TO THE GUAM BAR ASSOCIATION ETHICS
COMMITTEE AND THE SUPREME COURT OF GUAM.
THANK YOU FOR YOUR ATTENTION.

SINCERELY YOURS,

RANDY I. CHARGUALAF
DEFENDANT

CF: COURT-APPOINTED COUNSEL

PRESIDING JUDGE, SUPERIOR COURT OF GUAM

CHIEF JUSTICE, SUPREME COURT OF GUAM

FILED
SUPERIOR COURT
OF GUAM

2B3 SEP 23 AM 11: 50

CLERK OF COURT

BY:_____

# IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM | ) | Superior Court |
| | ) | Criminal Case No. |
| | ) | CF0317-97 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MOTION TO COMPEL |
| RANDY I. CHARGUALAF, | ) | DISCOVERY |
| | ) | |
| Defendant. | ) | May 10, 1999 |

**BEFORE:**

*The Honorable Alberto C. Lamorena III*
Judge, Superior Court of Guam

**APPEARANCES:**

**For the People:**

*Thomas J. Fisher, Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
Prosecution Division
Hagåtña, Guam

**For the Defendant:**

*Terrence E. Timblin, Attorney at Law*
McKEOWN VERNIER PRICE & MAHER
Hagåtña , Guam

COPY

Priscilla Castro Torres
Court Transcriber, Superior Court of Guam

103
Case 1:05-cv-00014    Document 2-9    Filed 05/05/2005    Page 26 of 46    Exhibit 10

1    THE BAILIFF: Superior Court of Guam is now in session.

2  The Honorable Alberto C. Lamorena III presiding.  Please be

3  seated.

4    THE COURT: Okay.  In **CF0317-97, People of Guam vs. Randy**

5  **Chargualaf.**  Okay, this is on Motions for the Court to

6  consider,  Motion  to  Compel  Discovery.      Has  that

7  (indiscernible) complied with, Mr. Timblin?

8    MR. TIMBLIN: Well, Your Honor, there's one item left to

9  discuss but before we go any further, has Your Honor received

10  any fax transmissions from Mr. Chargualaf?

11    THE COURT: We got one on May 6th.

12    MR. TIMBLIN: Okay, well, that's the one I'm looking at.

13  And if you notice, it -- again, this is Mr. Chargualaf's

14  formal request for reconsideration of motion to withdraw.

15        *I am filing a complaint to the Guam Bar*

16        *Association  Ethics  Committee  for*

17        *ineffective assisted counsel.*

18    We are now in a situation where if I stay in the case, I

19  will also be litigating a claim in the Ethics Committee which

20  I don't intend to be gentle about.  And I think this is kind

21  of hopeless.  I know the Court's got a tough problem on its

22  hands.  It may happen to the next lawyer -- the next one.  I

23  don't know.  But I just don't see where I can really proceed

24  with this.

25    MR. FISHER: Your Honor...

Case 1:05-cv-00014    Document 104   Filed 05/05/2005    Page 27 of 46

1    THE COURT: He faxed a copy to the Guam Ethics Committee.

2 Is that correct, Mr. Chargualaf?

3    THE DEFENDANT: Yes.

4    MR. FISHER: Your Honor, may the People be heard on this?

5    THE COURT: Yes.

6    MR. FISHER: Mr. Chargualaf is attempting to raise his

7 own conflict. He's lawyer shopping again. He shouldn't be

8 allowed to do so.

9    Additionally, Your Honor, I seem to recall that at the

10 last hearing, you instructed Mr. Chargualaf not to have

11 anymore communications ex parte with this Court. He's done so

12 again. We would ask that he be ordered once again to stop and

13 be held in contempt for this latest communication, and that he

14 not be allowed to create his own conflict so he can get a

15 different lawyer. The People have a right to a speedy

16 resolution of this case just as Mr. Chargualaf does. We'd

17 like to continue, Your Honor.

18    THE COURT: He's the only Defendant -- right? -- among

19 the three Co-Defendants?

20    MR. FISHER: That's correct, Your Honor. The other --

21 they've been assigned different counsel.

22    THE COURT: Well, I don't see what basis left

23 (indiscernible) jurisdiction on this. Okay? And just because

24 he didn't call a witness for discretionary doesn't necessarily

25 mean that he's ineffective, you know. There are cases where

1  no witnesses were presented and the defendant still prevailed.

2  So, just because you don't introduce witnesses doesn't mean

3  you're going to win the case -- I mean, you're going to lose

4  the case.  And if you produce witnesses doesn't mean you're

5  going to win either.

6      And D.O.C. faxes things?  How did he get a fax?

7      **MR. FISHER:**  I don't know, Your Honor.

8      **THE COURT:**  Will you inquire whether D.O.C. can make an

9  investigation there?  Inmates are not supposed to fax anything

10  out to the public.

11      **MR. FISHER:**  Sure.

12      **THE COURT:**  The fax number on this one is 472-3911.  The

13  Court would like to move that the Prosecution be ordered to

14  investigate any improprieties at the Department of Corrections

15  by any personnel up there and to have anybody up there

16  investigate as a result of the laxity in their security.  I

17  don't think prisoners -- defendants -- the people up there --

18  the detainees should not be faxing things in and out.

19  Imagine, they'll be faxing things to witnesses.  Can you

20  imagine that?  That's a security breach.

21      **MR. FISHER:**  Yes, Your Honor.

22      **THE COURT:**  So I want you to report to this Court and I

23  want every responsible officer at the Department of

24  Corrections to be secluded and to be questioned by

25  investigations conducted by your Office.  It's a security

106

1  breach.  And this Court now is very concerned that if this
2  detainee can fax -- this man can fax messages to this Court,
3  how about other detainees who could be faxing threatening
4  messages to witnesses who may be testifying against them?  Do
5  you understand what I'm saying?

6      MR. FISHER:  I do, Your Honor.  Is the Court suggesting
7  that the People perhaps convene an investigatory Grand Jury?

8      THE COURT:  I think so.  Okay?

9      MR. FISHER:  Yes, Your Honor.

10     THE COURT:  I think you should investigate it.  There's
11  a crime being committed here.  Okay?

12     Okay, Mr. Timblin.  Do you wish to say anything else?

13     MR. TIMBLIN:  As to the Motion to Withdraw -- moving on
14  to the -- I have nothing to add on Motion to Withdraw.

15     THE COURT:  Okay, we'll move on with this case.  I'm
16  going to deny the Motion to Withdraw until the Ethics
17  Committee decides on what to do with this case.  If it denies
18  this, then we will continue on.  If it accepts it, then the
19  Court will reconsider.  Okay?

20     MR. TIMBLIN:  (Indiscernible)

21     THE COURT:  Maybe you can inquire, Mr. Fisher, on this
22  one too?  Okay?

23     MR. FISHER:  Yes, Your Honor.

24  ///

25  ///

1    THE COURT: We'll send a copy to Mr. Timblin to inquire
2  about the (indiscernible) complaint. Okay? This Court would
3  like...

4    MR. TIMBLIN: Well, Your Honor, there's...

5    THE COURT: Excuse me. Go ahead.

6    MR. TIMBLIN: Okay. The three remaining Motions, Your
7  Honor, of course I guess you want to discuss the Discovery?
8  There was an initial Motion -- a Request for Discovery and
9  Motion to Compel. And the Government complied with I think
10 three out of four items that were requested. They did object
11 to one item which involved statements by a gentleman by the
12 name of Joe Wusstig regarding a separate burglary committed by
13 the Co-Defendant in this case, Candy Mendiola. The Government
14 says this is not relevant. I believe it is relevant because
15 one of the things that might be argued is that there may have
16 been a robbery in this case which Candy Mendiola participated
17 in but it doesn't mean the Defendant participated in.    In
18 fact, she might be covering for somebody else. So I think
19 that if the Co-Defendant, who is -- who is going to be called
20 to testify against Mr. Chargualaf -- was off doing robberies
21 with somebody else, that gives them motive to falsify to cover
22 for somebody else. And I think -- therefore I ask that the
23 Government be required to turn this report over. This is...

24    THE COURT: A police report?

25    MR. TIMBLIN: Yes, a police report and the...

1        THE COURT:  Submitted by which police officer?

2        MR. TIMBLIN:  All I got is -- if you look at -- the

3   Government's Response was made on April 9th, '98.  It says

4   Item 4.  Let's see.  Okay.  The specific request was -- okay,

5   it says Item 4 of Mr. Williams, when he was on the case --

6   this is filed on March 30th '98.  Item Number 4:

7                *Discovery and inspection of statements in*

8                *the possession of Government made by one*

9                *Joe    Wusstig   involving   the   facts   and*

10               *circumstances of a burglary committed by*

11               *Co-Defendant  Candy  Mendiola  at  former*

12               *Lt. Governor Frank Blas's residence, or*

13               *any other crimes involving Co-Defendants*

14               *related by Mr. Wusstig.*

15  I believe it would be relevant toward establishing a motive

16  for her to implicate Mr. Chargualaf.  She's going to be one of

17  the star witnesses.

18       THE COURT:  Mr. Fisher?

19       MR. FISHER:  Your Honor, I'm having trouble making the

20  connection how a separate incident like this could provide

21  some sort of a basis for a cover up or an implication that

22  Candy Mendiola is implicating the Defendant in this case in

23  order to, I don't know, provide an alibi of some sort.  I'm

24  not quite sure I follow the theory from Mr. Timblin.

25       That  being  said,  Your  Honor,  I  don't  think  he's

1  established the materiality that makes...

2          THE COURT:  Is the report available?

3          MR. FISHER:  Do we have -- has Mr. Timblin provided a

4  police report number?

5          MR. TIMBLIN:  There's nothing mentioned in this

6  particular motion by Mr. Williams.  The Government did respond

7  to it, so I assume the Government...  This was David Moore

8  handled -- had it back then.

9          MR. FISHER:  Right.  I see our Response.  We just say

10  that it's -- you know, we asked for relevance and materiality.

11  If it is relevant and material, then we should -- we must

12  supply it.  But this is a separate case.

13          THE COURT:  What's the connection?

14          MR. TIMBLIN:  Well, as I said, it can easily -- the jury

15  could easily find that yes, a robbery committed by three

16  people, including Candy Mendiola, did take place as charged by

17  the Government.  But it doesn't mean that Mr. Chargualaf was

18  a third party.  And if she's out committing robberies with

19  other people, then it's possible that she was used to working

20  with somebody also and has covered up for them.  I think

21  that's something I'd be entitled to argue to the jury.

22          MR. FISHER:  Your Honor, we have not received a notice of

23  alibi as an affirmative defense.  And if that theory holds

24  true, that means that this Defendant was not at the scene.

25  And we've received no notice.

1    THE COURT: Have you given them a notice (indiscernible)?

2    MR. TIMBLIN: I'm sorry?

3    THE COURT: If you get the report, do you feel...?

4    MR. TIMBLIN: I would be a lot -- if the Court feels a
5    notice of alibi is required for this particular defense, or
6    whatever, I'll be happy to file it.

7    THE COURT: Okay. For now, I'll grant the motion to
8    require that the report be delivered to defense counsel. What
9    others on the Motion to Compel?

10   MR. FISHER: Your Honor, could we just ask for a police
11   report number so we can find this?

12   THE COURT: Okay. Can you get a detailed submitted
13   report?

14   MR. TIMBLIN: Well, I'll get back to you and see what I
15   can find. I'll try to work with...

16   THE COURT: Work this out with Mr. Williams. Okay?

17   MR. TIMBLIN: All right, I shall.

18   THE COURT: What other...?

19   MR. TIMBLIN: Motions?

20   THE COURT: Yes. On the compel.

21   MR. TIMBLIN: Okay. There's nothing else new. I'll
22   suspend the Motion to Compel.

23   THE COURT: Okay. Motion to Suppress Court
24   Identification.

25   MR. TIMBLIN: Okay, Your Honor. That one...

1      THE COURT:  Mr. Timblin?

2      MR. TIMBLIN:  Well, that one, we -- as we recall, the --

3 I guess the star witness for that one is the complaining

4 witness Mrs. Certeza.  She was here at the last hearing and

5 the Judge -- you -- ordered her to come back today.  And as

6 far as I know, she didn't come back.

7      THE COURT:  Is Ms. Certeza here?

8      MR. FISHER:  Your Honor, I haven't seen her.  I left a

9 message at my office asking them to tell her to come down if

10 she showed up.

11      THE COURT:  (Addressing Marshal)  Can you see if she's

12 out there?  What's her first name?

13      MR. TIMBLIN:  Nobuyao (ph.).

14          (Pause in Proceedings to Locate Witness)

15      THE MARSHAL:  No one out there, Your Honor.

16      MR. TIMBLIN:  Your Honor, I'd like to propose one of two

17 alternatives here.

18      THE COURT:  Bench warrant?

19      MR. TIMBLIN:  Well, one of the things -- all I'm going to

20 do, just like with Officer Dodd is simply to ask her to repeat

21 what she's already given us in statements in writing.  And I

22 was thinking if the Government agrees, I could just simply

23 submit the statements that I think are relevant with a little

24 (indiscernible) to saying well I think this supports my

25 position.  Mr. Fisher could then be given the opportunity to

1 submit any statements he thinks are relevant that I may have

2 missed and then say why not? And we could just get it done

3 that way. Either that or we've got to summons her in.

4     **THE COURT:** What's the other proposal?

5     **MR. TIMBLIN:** Well, either summons her in or we just

6 submit it on statements.

7     **THE COURT:** Mr. Fisher?

8     **MR. FISHER:** Your Honor, we think it's going to be

9 necessary for her actually to -- necessary for her to actually

10 come in because regardless of what her statements say, if she

11 can establish an independent recollection of this Defendant,

12 then her in-court identification is admissible under case law.

13 So the People's position is just submitting this on statements

14 is not really going to answer the question.

15     **THE COURT:** Well, I thought she was ordered to be here

16 today as your witness. When did you notify her to be here?

17     **MR. FISHER:** Your Honor, she was subpoenaed both by

18 myself and Mr. Timblin and, as Mr. Timblin related, the Court

19 told her to be here as well.

20     **MR. TIMBLIN:** Yeah. You personally told her to be here,

21 Your Honor.

22     **THE COURT:** Yes, I know that.

23     **MR. FISHER:** For whatever reason, she didn't show.

24 ///

25 ///

1    **THE COURT:** Okay. I'll put it on second call. Maybe she

2    might be late. If she doesn't come by the end of the day,

3    I'll have to...

4    **MR. TIMBLIN:** Your Honor, there's one more motion maybe

5    we could get out of the way also before we...

6    **THE COURT:** The Motion to Suppress, I'll drag that out?

7    **MR. TIMBLIN:** Yes.

8    **THE COURT:** Okay. Mr. Timblin?

9    **MR. TIMBLIN:** Okay. Your Honor, there's been -- there

10   was two motions made regarding bad acts by the previous

11   counsel. Unfortunately, they were a little vague as to what

12   -- what bad acts they were seeking to have suppressed. I have

13   gone through the record very careful, and I found several

14   items which I would ask be excluded that have been -- or,

15   again, a part of the report.

16   One is that when Mr. Chargualaf was arrested, he had in

17   his possession -- I guess in his wallet -- a clipping of his

18   previous conviction on another felony. And again, there's no

19   charge here like felony subsequent or anything like that, so

20   I'm asking that no reference in the Government's case-in-chief

21   -- I'm not getting into whether it's impeachable or anything

22   like that but not the case-in-chief -- no reference to his

23   prior convictions, and no reference to his newspaper clipping

24   in which the prior conviction was mentioned that was found on

25   him.

1    There was also drugs and drug paraphernalia found on the
2  Co-Defendant Candy Mendiola.  Again, I ask that there be no
3  mention of this because this is not, again, part of any charge
4  -- not one of the charges filed against Mr. Charqualaf.  And
5  I think that even if it being the Co-Defendant with the drugs,
6  it would kind of wash over on him.

7    Also, there was a statement made by one of the officers
8  saying that -- he says *"Where...?"* -- asked Mr. Charqualaf
9  *"Where is the ice?"* and Mr. Charqualaf's reported answer was
10 *"I don't have any but I wish I had"*.  Again, I would ask that
11 this be -- not -- be stricken.

12   And there was a quote/unquote *"suspected ice pipe"*.  I
13 don't know if there's any -- there may have been like a field
14 test done on it -- in a Fila bag at the Gold Motel which again
15 tested positive for amphetamines.  Again, there's no charge
16 pending against Mr. Charqualaf for amphetamines.

17   So I think that these items -- these bits of evidence
18 would be unduly prejudicial and would ask that they be
19 excluded in the Government's case-in-chief.

20   **MR. FISHER:**  Your Honor, the ice...

21   **THE COURT:**  Mr. Fisher?

22   **MR. FISHER:**  Yes, Your Honor.  The ice use is undoubtedly
23 -- and we will argue that that is motive for the home
24 invasion.  The fact that this ice was found at the hotel to
25 which they retreated afterwards is evidence of the motive.

1    Therefore, it is admissible under 404(b).

2        The Defendant in this case lacks standing to complain of

3    other bad acts by other persons who are not involved in his

4    trial.  As such, it's not 404(b) evidence at all.

5        As to the newspaper clipping found in his wallet, it's my

6    understanding from my reading of the discovery that the

7    Defendant actually used that clipping to identify himself with

8    police.   He said *"That's me"*.    As such, it's clearly

9    admissible as a statement against his own interest.  It's the

10   Defendant's own statement.  It's the *corpus delicti* -- all of

11   this evidence is the *corpus delicti*, and it should be allowed

12   in.    It is unduly or unfairly prejudicial, which is the

13   standard.

14       **THE COURT:**  (Indiscernible).

15       **MR. TIMBLIN:**   Well, again (indiscernible) -- plus the

16   only question of not -- unduly unfair.  The question is, is it

17   relevant?  And again, a newspaper clipping of a ten year old

18   conviction... -- I also might add that I've been through the

19   discovery too and there is no mention, that I recall, of

20   Mr. Charqualaf saying *"This is me.  Here's my clipping."*  It's

21   just simply they searched his wallet and they found the

22   clipping.  So, leave it at that.

23       **THE COURT:**  I'll take that under advisement as well.  Are

24   there any more pending motions, Mr. Timblin?

25   ///

1      MR. TIMBLIN: That's it except for this -- just the I.D.

2 motion.

3      THE COURT: Okay. On the motion for a court I.D., I'll

4 continue that to May -- January -- I mean June 4th -- I mean

5 May 15th at 10:00. It will give both Counsels a chance to

6 ready Ms. Certeza. If she doesn't show up, I'll issue a bench

7 warrant for her arrest.

8      MR. FISHER: Your Honor, is that a Friday?

9      THE COURT: Yes.

10      MR. FISHER: Okay, thank you.

11      THE COURT: That's at    (indiscernible - Defendant's

12 coughing drowns out the Court). Okay?

13

14

15

16

17

18

19

20          ❖❖ WHEREUPON PROCEEDINGS WERE COMPLETED ❖❖

21

22

23

24

25

# C E R T I F I C A T E

I, PRISCILLA C. TORRES, do hereby certify that the foregoing pages one through sixteen (16) inclusive, comprise the true and correct Transcript in accordance with a **Request for Transcript** submitted to the Court Reporters Unit on September 19, 2003 in the matter of the **Motions to Compel Discovery** proceeding held before The Honorable Alberto C. Lamorena III on May 10, 1999 in:

PEOPLE OF GUAM

vs.

RANDY I. CHARGUALAF,

Superior Court Case No. CF0317-97

recorded on Tape Number T99-0619; and transcribed by me to the best of my knowledge and ability.

DATED this 23rd day of September 2003.

*Priscilla C. Torres*

Priscilla C. Torres

TAPE NO: 99-6/8 | PAGE NO: 1 | COURT CONVENED AT: 3:00 _ AM X PM | DATE: 05 10 1999

F NT: JUDGE: ALBERTO C. LAMORENA III , Presiding Judge
CLERK: EVELYN CABRERA

CASE NUMBER: CF0317-97 | CASE TITLE:
PEOPLE OF THE TERRITORY OF GUAM
COUNSEL PRESENT: | VS.
PLAINTIFF: T. Fisher | RANDY I CHARGUALAF *
DEFENDANT: T. Lamullen |

PROCEEDINGS: _____ Mtn to compel discovery

| LOG NUMBER | DESCRIPTION |
|---|---|
| | -Case Called |
| 3779 | deft present w/atty |
| | to address ct. of fax received from |
| | deft. at this committee |
| | deft had faxed a copy to |
| | this committee. |
| 3600 | ctr - address ct. of clnt informed |
| | that no contact w/ clnt |
| | reg. contempt of court. |
| 4070 | ct = order PD to investigate if |
| | transmittal of fax by deft. |
| | & to subpoena officers of DOC |
| | if deft. into is fax transmittal. |
| | Investigate. |
| 4180 | ctr = none or add to mtn as withdraw. |
| 4230 | ct = deny mtn to withdraw till |
| | outcome of ct this committee. |

Matter continued to: _____ , 1999 At: _____ am/pm

# CONTINUATION SHEET

TAPE NO. _99-418_ PAGE NO. _2_    CASE NO. _CF317-97_    DATE _5/10/99_ 19___

| LOG NUMBER | DESCRIPTION |
|---|---|
| 4690 | _mtn to suppress_ |
| 4780 | _R.P = address of. br. statement in intry._ |
|  | _of witness anh._ |
|  | _reg. summons as summit in statement_ |
| 4940 | _J/w wit'ss be present —_ |
|  | _testify._ |
|  | _witness was informd_ |
| 4845 | _mtn to suppress. bail acts._ |
| 4970 | _De= address of._ |
| 5160 | _D.A = address of. di vis trial_ |
|  | _to be as evidence._ |
| 5200 | _J = under_ |
|  | _of= mtns for cont ord._ |
|  | _5/14/99 10a_ |

120

IN THE SUPERIOR COURT OF GUAM

OF GUAM

FILED
Rec'd
3/14/00

ALFREDO M. BORJA
CLERK OF COURT
BY_____

THE PEOPLE OF GUAM,  )
                     )
vs.                  )
                     )   CRIMINAL CASE NO. CF317-97
RANDY IGNACIO CHARGUALAF,  )
                     )   **J U D G M E N T**
          Defendant. )
                     )

On the 31st day of July, 1997, the People of Guam filed an indictment charging the Defendant, RANDY IGNACIO CHARGUALAF, with SECOND DEGREE ROBBERY (As a 2nd Degree Felony), in violation of 9 GCA §§40.20(a)(3) and (b), a SPECIAL ALLEGATION of Possession and Use of a Deadly Weapon in the Commission of Second Degree Robbery, in violation of 9 GCA §80.37, CONSPIRACY TO COMMIT SECOND DEGREE ROBBERY (As a 2nd Degree Felony), in violation of 9 GCA §§13.30, 40.20(a)(3) and (b), THEFT (As a Misdemeanor), in violation of 9 GCA §§43.20(c) and 43.30(a), POSSESSION OF A FIREARM WITHOUT AN IDENTIFICATION CARD (As a Felony), in violation of 10 GCA §§60106 and 60121(e), and POSSESSION OF A CONCEALED FIREARM (As a Felony), in violation of 10 GCA §§60109, 60108(e) and 60121(c). The People additionally filed a NOTICE OF PRIOR FELONY CONVICTION, pursuant to 8 GCA §55.40(a).

On the 6th day of August, 1997, came the attorney for the Government and the Defendant appeared with counsel, and the Defendant entered pleas of not guilty to the charges.

On the 9th day of November, 1999, after a trial by jury, the jury returned verdicts of guilty to the charges of SECOND DEGREE ROBBERY (As a 2nd Degree Felony), SPECIAL ALLEGATION of Possession

ATTORNEY GENERAL' FFICE - PROSECUTION DIVISION
2-200E Judicial Center Building
120 West O'Brien Drive
Agana, Guam 96910
Tel: (671) 475-3406 / Fax: (671) 477-3390

ORIGINAL

and Use of a Deadly Weapon in the Commission of Second Degree Robbery, CONSPIRACY TO COMMIT SECOND DEGREE ROBBERY (As a 2nd Degree Felony, and THEFT (As a Misdemeanor).

The Court accepted the verdicts of the jury, and based on these verdicts, JUDGMENTS OF GUILTY are hereby entered on the charges.

Sentencing was held on 1st day of February, 2000. Present at the sentencing were Assistant Attorney General Leonardo M. Rapadas appearing for the People, Defendant, RANDY IGNACIO CHARGUALAF, appearing with counsel, Terrence E. Timblin. After counsel and Defendant were afforded an opportunity to address the Court, the Court proceeded with sentencing.

WHEREFORE, IT IS HEREBY ORDERED as follows:

1. That for the offense of Second Degree Robbery (As a 2nd Degree Felony), the Defendant is sentenced to serve a period of ten (10) years incarceration at the Department of Corrections, Mangilao, Guam ("DOC");

2. That for the Special Allegation of Possession and Use of a Deadly Weapon in the Commission of Second Degree Robbery (As a 2nd Degree Felony), the Defendant is sentenced to serve a period of 25 years imprisonment at DOC, to be served consecutive to the sentence for the Second Degree Robbery charge imposed in paragraph 1 above;

3. That for the offense of Conspiracy to Commit Second Degree Robbery (As a 2nd Degree Felony), the Defendant is sentenced to serve a period of ten (10) years incarceration at DOC, to be served concurrent to the sentence for the Second Degree Robbery charge imposed in paragraph 1 above;

4.     That for the offense of Theft (As a Misdemeanor), the Defendant is sentenced to serve a period of one (1) year incarceration at DOC, to be served concurrent to the sentence for the Second Degree Robbery charge imposed in paragraph 1 above.

SO ORDERED, NUNC PRO TUNC, this _____ day of 29 FEB 2000 2000.

Original Signed By:
Hon. Alberto C. Lamorena. III
HONORABLE ALBERTO C. LAMORENA, III
PRESIDING JUDGE
SUPERIOR COURT OF GUAM

SUBMITTED BY:

LEONARDO M. RAPADAS
Assistant Attorney General

Dated:   2/25/00

APPROVED AS TO FORM:

TERRENCE E. TIMBLIN
Attorney for Defendant

Dated:   2/28/00

IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM | ) | CASE NO. CF0317-97 |
| Appellee, | ) | CRA0D-002 |
| | ) | |
| vs. | ) | NOTICE OF APPEAL |
| | ) | |
| RANDY IGNACIO CHARGUALAF | ) | |
| | ) | |
| Appellant, | ) | |

TO THE CLERK OF THE SUPERIOR COURT OF GUAM

Pursuant to the Rules of Appellate Procedure for the Supreme Court of Guam, notice of appeal is hereby given:

1)  This appeal is taken from the Judgment entered on March 9, 2000;

2)  Appellant was indicted for Second Degree Robbery as a Second Degree Felony, a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, Conspiracy to Commit Second Degree Robbery; Theft as a Misdemeanor, Possession of a Firearm Without an Identification Card, and Possession of a Concealed Firearm; and convicted of Second Degree Robbery as a Second Degree Felony, a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, Conspiracy to Commit Second Degree Robbery; and Theft as a Misdemeanor, on November 9, 1999;

3)  He was sentenced to 35 years incarceration and is not currently released on bail.

Dated this 14th day of March, 2000.

TERRY E. TIMBLIN
Attorney at Law
Suite 501C, GCIC Bldg.
414 W. Soledad Ave.
Hagåtña, Guam 96910
Telephone:(671) 477-1389
Facsimile: (671) 477-4809
Attorney for Appellant

FILED
SUPREME COURT
OF GUAM

Jan 16    12:30 PM '01

TERRY E. TIMBLIN
ATTORNEY-AT-LAW
1/16/01

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM
Plaintiff-Appellee

### vs.

## RANDY IGNACIO CHARGUALAF
Defendant-Appellant

## OPINION

### Cite as: 2001 Guam 01

Supreme Court Case No. CRA00-002
Superior Court Case No. CF0317-97

Appeal from the Superior Court of Guam
Argued and submitted on October 26, 2000
Hagåtña, Guam

Appearing for the Plaintiff-Appellee:
Angela M. Borzachillo
Assistant Attorney General
Office of the Attorney General
Prosecution Div.
Suite 2-200E, Guam Judicial Ctr.
120 W. O'Brien Dr.
Hagåtña, Guam 96910

Appearing for the Defendant-Appellant:
Terry E. Timblin, Esq.
Attorney at Law
Ste. 501C, GCIC Bldg.
414 W. Soledad Ave.
Hagåtña, Guam 96910

COPY
2001 Guam 01    Case 1:05-cv-00014    Document 42-15    Filed 05/05/2005    Page 2 of 45    Exhibit 14
125

BEFORE: BENJAMIN J.F. CRUZ, Chief Justice, PETER C. SIGUENZA, JR., Associate Justice, and JOHN A. MANGLONA, Designated Justice.

SIGUENZA, J.:

[1]     Randy Ignacio Chargualaf (hereinafter "Chargualaf") was convicted of Second Degree Robbery (as a Second Degree Felony) with a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, Conspiracy to Commit Robbery (as a Second Degree Felony), and Theft (as a Misdemeanor) after a jury trial in the Superior Court of Guam. Chargualaf appeals his convictions on the following grounds: (1) that the trial court erred when it denied his motion to suppress evidence on the ground that his Fourth Amendment rights were violated; (2) that the trial court erred when it refused to exclude the identification testimony of the victim; and (3) that the convictions should be overturned because the jury returned an inconsistent verdict. For the reasons set forth in this opinion, we reject each of these arguments and hereby affirm his convictions.

I.

[2]     At approximately 11:00 p.m. on July 20, 1997, Nobuyo Certeza (hereinafter "Certeza") was robbed at gunpoint in her home by three individuals, two males and one female.[1] The perpetrators took an envelope containing cash and Certeza's purse which contained her wallet and credit card.

[3]     At 9:45 a.m. on July 21, 1997, police officer Christopher Dawson (hereinafter "Dawson") of the Guam Police Department, while on routine patrol along Route 1, stopped a car driven by Chargualaf after he noticed that the vehicle had a cracked front windshield and a missing license

---

[1] One male was cross-dressed and thus appeared to Certeza to be a female.

126

plate. Candelaria Quidachay Mendiola (hereinafter "C. Mendiola") was the passenger. Dawson testified that Chargualaf looked particularly nervous upon being stopped. He then asked Chargualaf whether there were narcotics or weapons present in the car and Chargualaf said no. Dawson asked if he could search the vehicle and Chargualaf consented. Dawson then directed both Chargualaf and C. Mendiola to step out of the vehicle. At that point, Chargualaf pulled up the door panel and made furtive movements with his hands, out of Dawson's view. Chargualaf explained that he was trying to jimmy the lock to open the vehicle door. Dawson then opened the door from the outside at which point Chargualaf pulled the door shut. Dawson then drew his weapon, opened the door, and ordered Chargualaf to step in front of the car. Chargualaf complied. Unbeknownst to Dawson, Chargualaf had taken a pistol from the car. While Dawson was searching the car, Chargualaf placed the firearm on the ground at the front of the car where he was directed to stand. Dawson inspected the door panel and did not find anything. A back-up police officer, Santo Tomas, arrived and asked Chargualaf whether he had previously given permission to Dawson to search the car for firearms or drugs. Chargualaf answered in the affirmative.

[4]     Dawson also requested that C. Mendiola exit the car along with Chargualaf. Upon exiting the car, C. Mendiola carried a black pouch with her. Dawson searched the pouch after getting C. Mendiola's consent, and found a credit card with Japanese Kanji characters, drugs and drug paraphernalia. Santo Tomas then recognized both C. Mendiola and Chargualaf as matching the description of the suspects of the Certeza robbery the previous night. At around 10:00 a.m., Santo Tomas noticed the pistol on the ground at the front of the vehicle, he then drew his weapon and ordered Chargualaf to raise his hands. Dawson then searched Chargualaf's person and cuffed him.

*People v. Chargualaf*, Opinion

[5]     As a result of the above circumstances, Chargualaf was implicated in the Certeza robbery the previous night and was arrested. His room at the Golden Motel was searched which yielded additional evidence linking him with the crime. C. Mendiola was also arrested.

[6]     Following his arrest, the police officers took Chargualaf to the Tamuning police koban and, while there, Ms. Certeza arrived to identify the credit card found in C. Mendiola's black pouch. A police officer asked Ms. Certeza, "Is this the guy?" She replied that she did not remember. At that point Mr. Certeza, Ms. Certeza's husband, requested that his wife close her eyes and try to remember. Ms. Certeza then identified Chargualaf as being the perpetrator stating, "Yes, that's him."

[7]     At the koban, Chargualaf revealed that Don Allen Borja Mendiola (hereinafter "D. Mendiola") was a participant in the robbery. The police arrested D. Mendiola at his home later that day.

[8]     Chargualaf was indicted on July 31, 1997, and charged with one count of Second Degree Robbery (as a Second Degree Felony), a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, one count of Conspiracy to Commit Robbery (as a Second Degree Felony), one count of Theft (as a Misdemeanor), one count of Possession of a Firearm Without an Identification Card, and one count of Possession of a Concealed Firearm. Also charged in the Indictment were Co-Defendants, C. Mendiola and D. Mendiola.

[9]     Chargualaf filed a motion to dismiss and suppress the evidence obtained as a result of the traffic stop detention and arrest on Fourth Amendment grounds. Chargualaf also filed a motion to exclude the in-court identification testimony by Ms. Certeza. The lower court denied both motions. Prior to trial, the two co-Defendants entered into Plea Agreements whereby each pleaded guilty to

one count of Robbery in exchange for testimony against Chargualaf.

[10]   A jury trial was held on November 1-9, 1999.  The jury found Chargualaf guilty on the Second Degree Robbery, the Special Allegation, Conspiracy and Theft counts, and acquitted on the Possession of a Firearm Without an Identification Card and Possession of a Concealed Firearm counts.  The court sentenced Chargualaf on February 1, 2000, and filed its written judgment on March 9, 2000, which was entered on the docket on March 15, 2000.  Chargualaf filed a Notice of Appeal on March 15, 2000.

## II.

[11]   We have jurisdiction over this appeal pursuant to Title 8 GCA § 130.15(a) (1993) and Title 7 GCA §§ 3107 and 3108 (1994).

## III.

### A.  Fourth Amendment Search and Seizure

[12]   Chargualaf appeals the trial court's denial of his motion to suppress evidence.  He claims his Fourth Amendment right to be free from unreasonable searches and seizures was violated when Officer Dawson detained him and searched his vehicle, and that such violation warrants the exclusion of all evidence which resulted from the search and seizure.  We review a trial court's decision on a defendant's motion to suppress evidence *de novo.*  *People v. Hualde*, 1999 Guam 3, ¶ 19.  Where a motion to suppress is grounded on a Fourth Amendment violation, the issue of the lawfulness of a search or seizure is reviewed *de novo.*  *See People v. Manibusan*, 1990 WL 320756, **3 (D. Guam App. Div. Feb. 16, 1990) ("The court reviews findings of probable cause, exigent

*People v. Chargualaf,* Opinion

circumstances, and the overall lawfulness of a search *de novo*.") (citations omitted); *United States v. Botero-Ospina,* 71 F.3d 783, 785 (10th Cir. 1995).

[13]     We hold, as a matter of law, that Chargualaf's Fourth Amendment rights were not violated and the trial court's denial of his motion to suppress was therefore proper.

[14]     The Fourth Amendment protects against unreasonable searches and seizures and is made applicable to Guam via section 1421b(c) of the Organic Act of Guam. *See People v. Johnson,* 1997 Guam 9, ¶ 4. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security'." *Pennsylvania v. Mimms,* 434 U.S. 106, 108-09, 98 S.Ct. 330, 332 (1977) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)). Every search or seizure must be reasonable under the circumstances to pass muster under the Fourth Amendment. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996). A search or seizure made without a warrant is presumed to be unreasonable. *See Pennsylvania v. Strickler,* 757 A.2d 884, 888 (Pa. 2000) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). In the absence of a warrant, the police may lawfully conduct a search or seizure only if an exception to the warrant requirement applies. *See id.; see generally United States v. Woodrum,* 202 F.3d 1, *6 (1st Cir. 2000) (recognizing that reasonable suspicion of criminal activity and voluntary consent are two situations which justify the seizure of the person in an automobile absent a warrant) (citations omitted). Voluntary consent is a recognized exception to the warrant requirement. *See People v. Santos,* 1999 Guam 1, ¶ 33 (citations omitted).

//

//

130

[15]    In the instant case, Chargualaf gave consent to search his vehicle. Thus, the issue is whether Chargualaf's consent was valid.    If consent is given during either a lawful encounter or a lawful detention, as opposed to an illegal seizure, the validity of the consent turns on whether it was voluntarily given. *See Santos*, 1999 Guam at ¶¶ 33-34; *Strickler*, 757 A.2d at 888-889. Where the consent is given during an unlawful detention, all evidence that is the fruit of the search must be suppressed "absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus ensuring that the search is not an exploitation of the prior illegality, and of voluntariness." *Strickler*, 757 A.2d at 889 (citing *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1323, 1326 (plurality opinion)).

   i.  Illegal detention at time of consent

[16]    Our first inquiry is whether Chargualaf was illegally detained at the time he gave his consent. Chargualaf argues that while the initial detention for purposes of the traffic violation was valid, he was subsequently illegally detained when the police questioned him about the presence of drugs or weapons in the vehicle. He further argues that this illegal detention tainted his consent. We agree that the initial detention was valid; however, we disagree that Chargualaf was detained at the time he gave his consent.

   a.  Initial detention

[17]    It is clear that the act of pulling Chargualaf over for the traffic violation was a seizure. *See Whren*, 517 U.S. at 809-10, 116 S.Ct. at 1772 (citations omitted); *see also Woodrum*, 202 F.3d at *5 (citations omitted); *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (citation omitted). It is equally clear that this initial detention was reasonable and within the bounds of permissible action under the Fourth Amendment. "As a general matter, the decision to stop an

automobile [without a warrant] is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810, 116 S.Ct. at 1772 (citations omitted). Further, it is reasonable to stop a car where the police merely have reasonable suspicion to believe the driver has committed a traffic violation. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) ("We [ ] reaffirm that the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."); *cf. Mimms*, 434 U.S. at 109, 98 S.Ct. at 332 (stating that it is entirely proper to stop and detain a driver who violated a provision in the state motor vehicle code).

[18]    Here, the police stopped Chargualaf for a cracked front windshield and a missing front license plate. The parties do not dispute that the pull over constituted a valid detention.

### b. Continuing detention

[19]    The next inquiry is whether the initial detention for the traffic violation ended and, if so, whether Chargualaf was subjected to a subsequent detention. Officer Dawson's inquiry into whether Chargualaf possessed drugs or weapons, while constitutionally permissible, strongly indicates that the original investigation of the traffic violation ended. *See United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) (recognizing that the mere questioning of a detainee is neither a search nor a seizure but may indicate that the justification behind the initial detention has evaporated). At that point, Dawson was inquiring into illegal activities unrelated to the traffic violations.

[20]    Investigative questioning regarding criminal activity does not, in itself, implicate the Fourth Amendment. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324 (1983) (plurality opinion). The Fourth Amendment protects against unreasonable searches and seizures. Accordingly, the Fourth Amendment is only at issue where the police detain or seize an individual

while posing investigative questions. *See id.* Because, in this case, the police had ended its investigation into the traffic stop and initiated a new, albeit limited, investigation, we must determine whether Chargualaf was detained or was subjected to a second seizure when being questioned regarding the presence of drugs or weapons and while Chargualaf gave consent immediately following the investigation into drugs or weapons.

[21] A seizure occurs where a reasonable person would not believe he is free to leave. *See Manibusan*, 1990 WL 320756 at **4 (citing *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)); *see also People v. Cruz*, 1997 WL 208994, **3 (D. Guam App. Div. April 21, 1997). "A person is deemed to be seized for the purposes of the Fourth Amendment if a police officer has, by means of physical force or show of authority, restrained the person's freedom to walk away." *Cruz*, 1991 WL 208994 at **3 (citation omitted); *see also Woodrum*, 202 F.3d at *9. In determining whether a person was seized, a court views the totality of the circumstances. *See People v. Brownlee*, 713 N.E.2d 556, 564 (Ill. 1999). If the person would feel free to leave, then the continued presence of the person is not a seizure; rather, it is a consensual encounter with the police that does not implicate the Fourth Amendment. *See United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) (citing *Florida v. Bostick*, 501 U.S. 429, —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)); *Strickler*, 757 A.2d at 901, fn. 27.

[22] In *Strickler*, 757 A.2d 884, the court found that the defendant was not seized. The court recognized that in the context of a post-detention interaction, (i.e., after the initial lawful detention ends), "the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter is a significant factor suggesting a continued seizure under the Fourth Amendment." *Id.* at 899 (internal quotations and citations omitted). The *Strickler* court found that while the police

*People v. Chargualaf*, Opinion

did not tell the driver he was free to terminate the encounter, the defendant-driver was not subjected to a seizure because the police officer's actions and the tone of the encounter suggested that the driver was free to go. *Id.* at 900. Relevant factors included: the fact of returning the driver's documentation, the fact that the initial investigative detention was less intrusive than a normal traffic stop because the police did not have to order the driver out of the car as the driver was already outside the vehicle; there was no show of weapons or use of language or tone unwarranted under the circumstances; and the police told the driver he had a right to refuse to consent to the search. *Id.*

[23]    Circumstances illustrating a seizure are found in *Cruz*, 1997 WL 208994 at **5, where the defendant was stopped at a roadblock. The court found that assuming this initial seizure at the roadblock was constitutional, "any continuing seizure [beyond the reason for the roadblock] must be independently justified." *Id.* (citing *Terry*, 392 U.S. at 16). The court determined that the defendant was seized when further questioned because "her driver's license was never returned to her; she was unable to drive forward because the street was blocked by several cars, including a police car with its top lights flashing; . . . and she was surrounded by six law enforcement officers who were under instructions not to allow her to leave." *Id.*

[24]    In the present case, while Dawson held Chargualaf's driving documentation while questioning regarding the presence of drugs or weapons and while asking for consent to search, this fact, standing alone, does not amount to a seizure of Chargualaf. The overall circumstances of the encounter show that Chargualaf was not seized or detained at the time he gave his consent. Like *Strickler*, there is no showing in the record that Dawson was overly aggressive during the initial detention. Dawson did not pull out his firearm during the initial detention for the traffic violation

*People v. Chargualaf*, Opinion

or use language incommensurate with the circumstances. Chargualaf was also inside the vehicle at the time he consented. Unlike the defendant in *Cruz*, Chargualaf was not blocked into his parking spot by police cars, nor was he surrounded by police officers instructed to keep him at the scene. The absence of coercive behavior by the police objectively show that Chargualaf was free to end the encounter and proceed on his way. Absent other coercive behavior on the part of the police, we cannot say that a person does not feel free to leave by virtue of the fact that the officer held his license and registration. There is nothing exceptional about a person requesting the return of their documentation and leaving upon an officer's initiation of questions regarding matters outside the scope of the traffic violation.[2] The encounter between Chargualaf and Dawson was a mere consensual encounter and not a detention, thus, the Fourth Amendment is not implicated.[3]

ii. Voluntariness of consent

[25]    Having decided that Chargualaf was not seized or detained, the next inquiry is whether his consent was voluntary. The government has the burden to prove by a preponderance of the evidence that Chargualaf gave consent voluntarily, and voluntariness is determined from the totality of the circumstances. *See Santos*, 1999 Guam 1 at ¶¶ 33- 34; *Shabazz*, 993 F.2d at 438. Factors in determining voluntariness include: 1) whether the defendant was detained and the length of time of the questioning; 2) whether the defendant was threatened or intimidated by the police; 3) whether the defendant relied on misrepresentations or promises made by the police; 4) whether the person

---

[2] We note that a police officer's refusal to return the documents upon request is the type of coercive behavior that would likely lead to a finding that a seizure has been affected.

[3] So long as a driver fells free to leave, a police officer may asks questions regarding criminal activity absent reasonable suspicion. The police may question the driver about the presence of drugs or weapons or whether he has been drinking alcohol or possesses alcohol inside the vehicle. The driver is not required to answer such questions, *see Royer*, 460 U.S. at 497-98, 103 S.Ct. at 1324, just as surely he is not required to submit to a request to search.

was in custody or under arrest when the consent was given; 5) whether the person was in a public or a secluded place; and 6) whether the defendant objected to the search. *Santos*, 1999 Guam 1 at ¶ 36.

[26]   While finding that Chargualaf's consent was valid, the trial court wholly failed to determine whether such consent was voluntary. However, because the record is adequate, we proceed to determine whether the consent was voluntary viewing the totality of the circumstances. *Accord McSwain*, 29 F.3d at 562 (relying on a sufficient record of the proceedings below to make a determination of whether the defendant's consent was tainted by a preceding illegal detention notwithstanding that the trial court failed to make the analysis).

[27]   We find that in the totality of the circumstances, Chargualaf's consent was voluntary. First, Chargualaf was not detained at the time he consented and Dawson's questioning was only for a brief period.  Second, the record reveals that Dawson did not assert any coercive behavior when questioning Chargualaf and prior to asking for consent.  Third, Dawson did not make any representations regarding the consent to search, Dawson merely asked for consent and nothing more. Fourth, Chargualaf was not in custody or under arrest when he gave consent.  Finally, Chargualaf made absolutely no objections to the search, rather, he readily granted consent and even verified to a second officer, Santo Tomas, that he had given consent. Viewing all the circumstances, we hold that Chargualaf voluntarily gave consent and therefore find that the trial court did not err in denying Chargualaf's motion to suppress. *Cf. Soto*, 988 F.2d at 1558 (determining that consent was voluntary where only one police officer was present, the police officer did not unholster his weapon, did not use an insisting tone or manner or physically harass the defendant, the request for consent occurred on the shoulder of the highway and in public view, and the defendant's consent was

*People v. Chargualaf*, Opinion

unequivocal and specific).

## B. Inconsistent Verdicts

[28]    The jury found on the Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, and acquitted Chargualaf on the counts of Possession of a Firearm Without an Identification Card and Possession of a Concealed Firearm. Chargualaf asserts that the finding on the Special Allegation was inconsistent with the acquittals, thereby showing that the finding was based on insufficient evidence and must therefore be overturned. We disagree.

[29]    We review the issue of whether to set aside a conviction based on an inconsistent verdict *de novo*. *See People v. Angoco*, 1996 WL 875777, **6 (D. Guam. App. Div. Oct. 16, 1996) (citing *United States v. Hart*, 963 F.2d 1278 (9th Cir. 1992)); *see also United States v. Mitchell*, 146 F.3d 1338, 1342 (11th Cir. 1998) (recognizing that the issue of whether inconsistent verdicts render a conviction improper constitutes a question of law and is reviewed *de novo*).

[30]    A conviction generally may not be overturned solely on the ground that the jury reached an inconsistent verdict. *United States v. Powell*, 469 U.S. 57, 68-69, 105 S.Ct. 471, 479 (1984); *see also Angoco*, 1996 WL 875777 at **6 (holding that *Powell* requires the court to reject the appellant's claim that the conviction should be vacated due to an inconsistent verdict); *United States v. McCall*, 85 F.3d 1193, 1197-98 (6th Cir. 1996) (holding that even if the verdict was inconsistent, the conviction "remains 'insulated' from review") (citing *Powell*, 469 U.S. at 69, 105 S.Ct. at 479); *United States v. Birges*, 723 F.2d 666, 673 (9th Cir. 1984); *United States v. Torres*, 809 F.2d 429, 431-32 (7th Cir. 1987). The rationale behind the rule is set forth in *Powell*, wherein the court asserted:

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt" . . . . It is equally possible the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*Powell*, 469 U.S. at 64-65, 105 S.Ct. at 476 (internal citations omitted). Courts should accept the collective judgment of the jury and should refrain from delving into the jurors' thought processes. *See id.* 469 U.S. at 67, 105 S.Ct. at 478.

[31]    Inconsistent verdicts are not a bar to a conviction so long as there is sufficient evidence to support the guilty verdict. *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999) (citations omitted); *see also Birges*, 723 F.2d at 673 ("Inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support the guilty verdict.") (citations omitted); *Bates v. Maryland*, 736 A.2d 407, 416 (Md. Ct. Spec. App. 1999) (holding that one instance where an inconsistency will not be permitted is where "the evidence was insufficient to support the [ ] conviction."); *Mitchell*, 146 F.3d at 1345 ("[A]s long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count.").

[32]    In this case, we find no inconsistency in the jury's verdict. Chargualaf was indicted for possessing a concealed firearm and possessing a firearm without a license on or about the July 21, 1997 and for a Special Allegation of possessing a firearm in the commission of the robbery on or about July 20, 1997, in violation of section 80.37 of Title 9 of the Guam Code Annotated, which provides: "Whoever unlawfully possesses or uses a deadly weapon in the commission of a felony punishable under the laws of Guam shall, in addition to the punishment imposed for the commission

of such felony, be imprisoned for a term not less than five (5) years . . . ." Title 9 GCA § 80.37

(1996).

[33]    The jury's acquittal on the firearm charges is not inconsistent with the finding on the Special

Allegation that Chargualaf possessed a deadly weapon during the commission of the Certeza

robbery. The charges were for different offenses allegedly committed on different days. The jury

could have decided that Chargualaf did not possess and conceal the firearm recovered during the

July 21, 1997 traffic stop and still determine that Chargualaf possessed or used a deadly weapon

during the July 20, 1997 robbery.

[34]    In fact, we find there was sufficient evidence to make a finding on the Special Allegation.

Certeza and D. Mendiola both testified that Chargualaf wielded a firearm during the robbery. C.

Mendiola, who was also present during the robbery, testified that during the robbery Chargualaf was

holding an object and was waiving it around. This evidence supports a finding on the Special

Allegation that the defendant used a deadly weapon during the commission of the robbery. *See*

*Gieger*, 190 F.3d at 664. Therefore, the jury's finding on the Special Allegation will stand.


**C. In-Court Identification**

[35]    Chargualaf asserts that the trial court erred in denying his motion to suppress the in-court

identification by Ms. Certeza. He argues that the admission of the identification evidence was a

violation of his due process rights. A trial court's decision regarding the admission of an in-court

identification is reviewed for an abuse of discretion. *See United States v. Duran*, 4 F.3d 800, 803

(9th Cir. 1993). "A trial judge abuses his [or] her discretion [ ] when the decision is based on an

erroneous conclusion of law or where the record contains no evidence on which the judge could

have rationally based the decision." *Midsea Industrial Inc. v. HK Engineering, Ltd.*, 1998 Guam 14,

¶ 4 (citation omitted). We hold that the trial court properly admitted the in-court identification.

[36]     In determining the admissibility of an in-court identification, we must make two inquiries.

First, whether the defendant has proven that the pre-trial identification was unnecessarily suggestive,

and second, if so, whether the in-court identification was nevertheless sufficiently reliable viewing

the totality of the circumstances. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *see

also Burkett v. Fulcomer*, 951 F.2d 1431, 1448 (3d Cir 1991) ("The general inquiry is whether the

procedure was unnecessarily suggestive, and if so, whether its corrupting influence outweighs the

reliability of the identification testimony.") (citations omitted); *Ford v. Armontrout*, 916 F.2d 457,

459 (8th Cir. 1990); *Archuleta v. Kerby*, 864 F.2d 709, 711 (10th Cir. 1989); *Ponce v. Cupp*, 735

F.2d 333, 336 (9th Cir. 1984). If the defendant fails to show that the identification procedures were

impermissibly suggestive, or if the totality of the circumstances indicates that the identification was

sufficiently reliable, then there has been no due process violation by the admission of the

identification evidence. *Hill*, 967 F.2d at 230.

[37]     A pre-trial identification can be so suggestive that it taints the in-court identification. *See

United States v. Montgomery*, 150 F.3d 983, 991 (9th Cir. 1998) (quoting *United States v. Bagley*,

772 F.2d 482, 492 (9th Cir. 1985)). However, where an in-court identification is sufficiently

reliable, the identification is admissible notwithstanding that the identification was made pursuant

to an unnecessarily suggestive pre-trial identification procedure. *See id.* at 993; *see also Cossel v.

Miller*, 2000 WL 1511702, *5 (7th Cir. 2000) ("An in-court identification that follows an

impermissibly suggestive pre-trial identification is admissible if under the 'totality of the

circumstances' the in-court identification was reliable.") (citations omitted). A court may admit a

sufficiently reliable in-court identification without offending the defendant's right to due process. Determinations of reliability are case-specific, and are adjudged looking at the totality of the circumstances. *See Montgomery*, 150 F.3d at 993; *see also United States v. Brown*, 200 F.3d 700, 707 (10th Cir. 1999) ("The admission of an in-court identification testimony violates due process only when, under the totality of the circumstances, it was tainted by unnecessarily suggestive pretrial identification procedures creating a 'very substantial likelihood of misidentification'.") (citation omitted).

[38]   In the instant case, the trial court held that the pre-trial identification procedure at the koban was "unnecessarily suggestive".[4]   Because Chargualaf does not contest this finding, the only remaining issue is whether the trial court erred in determining that notwithstanding the suggestibility, the identification was sufficiently reliable so as to render admissible the in-court identification.

[39]   Courts consider five factors in determining whether an in-court identification is reliable. These are: "[1] the opportunity of the witness to view the criminal at the time of the incident; [2] the witness' degree of attention; [3] the accuracy of the witness' prior description of the defendant; [4] the level of certainty demonstrated by the witness at the [pre-trial identification]; and [5] the length of time between the crime and the [pre-trial identification]." *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972); *see also Ponce*, 735 F.2d at 337-38 (clarifying that in evaluating the

---

[4] Factors in the record that suggest that the pre-trial procedure was "suggestive" are that the defendant was the only person in the koban besides police officers and the victim and her husband, the encounter amounted to a show-up instead of a line-up, the encounter was at the police station, and Chargualaf was in police custody. *Cf. United States v. Brierton*, 699 F.2d 917, 924 (7th Cir. 1983) (acknowledging that because there was a show-up instead of a line-up, the identification was made in a police station, various high ranking police officers were present, the defendant was in a jail cell at the time of the identification, and the defendant was the only black man present, the identification procedure was highly suggestive).

*People v. Chargualaf*, Opinion

reliability of an in-court identification, the reviewing court must consider the witness' level of certainty at the *prior confrontation*, not the in-court identification, and the amount of time which elapsed between the crime and the *pre-trial identification*, not the in-court identification); *Brown*, 200 F.3d at 707; *Hill*, 967 F.2d at 230; *Cossel*, 2000 WL 1511702 at * 5; *Archuleta*, 864 F.2d at 711; *Ponce*, 735 F.2d at 336; *United States v. Brierton*, 699 F.2d 917, 924 (7th Cir. 1983). The court must determine whether the in-court identification was based upon the witness' recollection of the defendant from the time of the crime, rather than on the suggestive nature of the pretrial identification. *See United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988) (citation omitted); *Brierton*, 699 F.2d at 924–25 ("The propriety of admitting into evidence the identification testimony . . . depends, therefore, upon whether [the witness'] in-court identification was reliable, that is, based on a source independent of the police suggestion.") (footnote omitted). The government has the burden to prove, by clear and convincing evidence, that the in-court identification was not based upon the suggestive pre-trial identification procedure. *See Brierton*, 699 F.2d at 925 (citing *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967)).

[40] Whether an in-court identification is sufficiently reliable so as to warrant its admission is determined by weighing the *Biggers* factors against the corrupting effect of the suggestive pre-trial identification procedure. *See Ponce*, 735 F.2d at 337, 338 (applying this balancing test in analyzing the reliability of both a pre-trial and in-court identification); *see also Hill*, 951 F.2d at 459. If the identification is sufficiently reliable, then the court may properly admit the evidence because the reliability of the identification undercuts any substantial likelihood of irreparable misidentification. *See Armontrout*, 916 F.2d at 459 (using the *Biggers* reliability factors in determining that the confrontation between the rape victim and the defendant did not create a substantial likelihood of

*People v. Chargualaf*, Opinion

misidentification). "It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which [is] the basis of the exclusion of evidence. . . ." *Biggers*, 409 U.S. at 198, 93 S.Ct. at 381- 82 (1972).

[41]  Analyzing the first *Biggers* factor, the question is whether Ms. Certeza had a good opportunity to view Chargualaf during the robbery. At the hearing regarding the motion to suppress the in-court identification, Ms. Certeza testified that the three robbers entered her house at around 11:00 p.m., and remained in her home for about five to eight minutes. She testified that she got a good look at the three assailants. This amount of time is enough to get a good view of Chargualaf. Further, Ms. Certeza testified that during the incident the lights were bright because she was cooking dinner. Therefore, we find that Certeza had more than sufficient opportunity to view Chargualaf. *Cf. Archuleta*, 864 F.2d at 712 (determining that the identifying witness had ample opportunity to identify the defendant where the witness got a good look at the defendant's face even if only for a total observation time of two minutes) (citing other cases where an observation made in a matter of seconds was sufficient so long as the witness got a close-up look at the defendant) (citations omitted); *Cossel*, 2000 WL 1511702 at * 5 (determining that a ten-second observation of the defendant in moon and street lights satisfies the first factor).

[42]  Turning to the witness' degree of attention, Ms. Certeza was able to recall many events of the encounter, such as that the first entrant, a woman, asked her to use the phone, a second woman entered with her shoes on, and that Ms. Certeza asked her to take her shoes off. Further, she was able to recall that Chargualaf had a gun, wore certain colors of clothing and had a moustache. The ability to remember details like this is a demonstration of her focus during the encounter. *Cf. Archuleta*, 864 F.2d at 712 (recognizing that the ability to recall a number of descriptive details is

*People v. Chargualaf*, Opinion

sufficient to satisfy the second factor).

[43]   Next, the accuracy of the witness' prior identification of the defendant leads us to similarly

conclude that her in-court identification was reliable. As stated above, Ms. Certeza testified that she

described the only man of the three as Chamorro, holding a gun, wearing a hat, a dark green polo

shirt, and black pants, he had a moustache, black hair, and a tattoo.   While cross-examination

revealed that Ms. Certeza never mentioned Chargualaf's tattoo to the police, the general level of

description shows that Ms. Certeza was accurate in her description of Chargualaf. *Cf. id.* (holding

that the witnesses' identification was accurate where they described the victim as "a Spanish male

with dark hair and a moustache, wearing a black t-shirt with an emblem and blue jeans".)   The

failure to recall a detail like the tattoo is not dispositive here. *Cf. id.* (determining that in light of the

other details the witness was able to recall, the fact that the height was inaccurate and the failure to

recall tattoos "appears to be a minor error"); *see also Dodd v. Nix*, 48 F.3d 1071, 1074 (8th Cir.

1995) (holding that the victim's failure to describe a goatee and tattoos was not fatal to the reliability

determination where the description of the defendant was otherwise largely accurate) (citation

omitted).

[44]   Additionally, Certeza's level of certainty at the pretrial identification favors a finding that

her in-court identification was reliable. Ms. Certeza testified that the police asked her whether the

Chargualaf was "the guy"[5]   The record shows that Certeza initially responded that she did not

remember if Chargualaf was her attacker, but identified him after her husband told her to close her

eyes and think hard about it. Ms. Certeza testified that she identified Chargualaf at the police koban

---

[5] As a note, Ms. Certeza first testified that the police did not ask her to identify Chargualaf, however, she clarified that
the police in fact asked her whether Chargualaf was "him", in which she responded in the affirmative. Transcript, vol.
1, pp 53-55 ( Motion to Suppress Identification Hearing, May 14, 1999).

because she remembered his face, and not because the police suggested that Chargualaf was the robber. Although Ms. Certeza did not definitely identify Chargualaf at first sight, she has never identified anyone else as her attacker. *Cf. Archuleta*, 864 F.2d at 712 (rendering significant the fact that the witness was certain about the defendant's identity and that the identification remained "unequivocal at all times").

[45]   Finally, Ms. Certeza identified Chargualaf the day after the robbery. This is a relatively short amount of time and thus supports the conclusion that the in-court identification was reliable. *Cf. Montgomery*, 150 F.3d at 993 (implicitly finding that one year between the incident and the identification did not cut against reliability); *Ponce*, 735 F.2d at 337 (recognizing that in *Manson v. Brothwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2253 (1977), an identification made two days after the incident was "unobjectionable"); *Cossel*, 2000 WL 1511702 at *6 (determining that three years was too long).

[46]   The trial court pointed out many of the above factors in determining that the in-court identification was reliable. Thus, we cannot say that the court's finding of reliability by clear and convincing evidence was erroneous.

[47]   We further find that the in-court identification was sufficiently reliable so as to warrant its admission. Because the facts in this case favor a finding of reliability under each of the *Biggers* factors, the reliability of the identification outweighs the corrupting effect of the suggestive pre-trial identification procedure. The pre-trial identification procedure did not produce a substantial likelihood of misidentification. Accordingly, the lower court did not abuse its discretion in admitting the in-court identification.

//

## IV.

[48]   We find that there was no Fourth Amendment violation, that the jury in this case did not reach inconsistent verdicts, and that the in-court identification was sufficiently reliable. Accordingly, we AFFIRM the trial court's denial of the Appellant's motions to suppress the evidence and in-court identification and the judgment of conviction.


PETER C. SIGUENZA
_____
PETER C. SIGUENZA, JR.
Associate Justice


JOHN A. MANGLONA
_____
JOHN A. MANGLONA
Designated Justice

CRUZ, C.J., Dissenting:

[49]  Chargualaf was pulled over because his vehicle had a cracked windshield and was missing a license plate.  There is no question that this initial stop was a seizure and that it was constitutionally permissible.  *See e.g., Whren,* 517 U.S. at 809-810, 116 S.Ct. at 1772.  However, the Majority, while admitting that the initial traffic violation detention ended, finds that there was no new seizure of Chargualaf when Officer Dawson began questioning him on subject matter completely unrelated to the initial pull-over and that the subsequent exchange was merely a consensual encounter.  I do not agree.

[50]  I find that a second seizure occurred when Officer Dawson began to question Chargualaf on narcotics and weapons.  The test for whether a seizure has been effected involves a determination of whether, in the light of all surrounding circumstances, a reasonable person would have believed he was free to leave.  *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (citing *United States v. Mendenhall,* 466 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980)).  In this case, after the pull-over, Officer Dawson requested and was given Chargualaf's driver's license and vehicle registration.  These documents were never returned Chargualaf.  Officer Dawson informed Chargualaf of the reasons for the pull-over.  There is no indication from the record that Officer Dawson then told Chargualaf he was going to be issued a citation or a warning.  Instead, Officer Dawson then asked if there were any drugs or weapons in the vehicle.  Clearly, a reasonable person could have thought that the traffic stop was still in effect, that such questions were part of the stop, and that he was not free to leave.  This is especially true given that Officer Dawson had not returned Chargualaf's license and registration.  *See e.g., Soto,* 988 F.2d at 1557 (observing that a driver who is pulled over cannot drive away without a license and registration which are required by law to operate a motor vehicle on a public

road). Thus, the second seizure cannot be characterized as merely a consensual encounter during

which a police officer may generally ask questions of the individual without a reasonable suspicion.

*See Florida v. Bostick*, 501 U.S. 429, 433-435, 111 S.Ct. 2382, 2386 (1991).[6]

[51]     The question becomes whether the second seizure was constitutional. I believe it was not.

Officer Dawson testified that the reason he asked if there were drugs or weapons in the car was

because Chargualaf was more nervous than other drivers he had encountered in normal pull-overs.

This testimony offers little support. Concededly, Officer Dawson was within his authority to

question Chargualaf on weapons or to even ask him to alight from the vehicle if Officer Dawson

feared for his safety. *See Mimms*, 434 U.S. at 111, 98 S.Ct. at 333. However, Officer Dawson's

question regarding narcotics indicates that he was not merely motivated by fear, but that he was

investigating Chargualaf for other reasons.

[52]     The next inquiry is whether Officer Dawson had a reasonable and articulable suspicion that

criminal activity, namely the possession of illegal narcotics, was afoot. *See Johnson*, 1997 Guam

9, at ¶ 4 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Officer Dawson testified that his suspicions were

aroused by Chargualaf's nervousness and the presence of a large amount of household items in the

rear of the vehicle. However, nervousness, by itself, does not usually give rise to a reasonable

suspicion. *See Soto*, 988 F.2d at 1556 (citing *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991)

and finding that nervousness with other factors may give rise to a reasonable suspicion). Further,

I cannot see how the additional fact that household items were in the car can support a reasonable

suspicion. Under these   circumstances, I cannot find that Officer Dawson had a reasonable

---

[6] The same holds true for the initial detention for Chargualaf's traffic violations. This was also not a consensual encounter, it was a detention, the scope of which should have been tailored to its underlying justification and the length of which should have lasted no longer than necessary to effect the purpose of the stop. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325.

suspicion to question Chargualaf on narcotics. Thus, I must conclude that the second seizure of Chargualaf violated his Fourth Amendment right to be free from an unreasonable seizure.

[53]     Notwithstanding an illegal seizure, a subsequently given consent remains valid if it was voluntary in fact under the totality of the circumstances. *McSwain*, 29 F.3d at 562. Three factors annunciated by the United States Supreme Court are relevant in this analysis: 1) the temporal proximity of the illegal detention and consent; 2) any intervening circumstances; 3) the purpose and flagrancy of the office's unlawful conduct. *Brown v. Illinois*, 422 U.S. 590, 603-604, 95 S.Ct. 2254, 2261-2262 (1975) (citations omitted).

[54]     From his testimony, it appears that Officer Dawson asked for consent to search the vehicle immediately after Chargualaf denied having drugs or weapons in the car. Chargualaf gave his consent, and Officer Dawson asked him to step out of the vehicle. Mere moments passed between the time the illegal seizure occurred and the time Officer Dawson asked for consent. Almost no time passed by the time consent was given and no intervening circumstances occurred. I note that had Officer Santo Tomas arrived prior to Chargualaf's consent and identified the vehicle occupants as fitting the descriptions of persons involved in the Certeza robbery, then a valid intervening circumstance would have occurred sufficient to support a further search and the consent would have been valid. However, Officer Santo Tomas arrived after the occupants were ordered out of the vehicle and after the search had commenced. Thus, his identification of the occupants after the search began does not cure its illegality.

[55]     The flagrancy of Officer Dawson's conduct is clear as the initial stop was made strictly on the basis of a traffic violation and an investigation for narcotics ensued. That Chargualaf confirmed his consent to Officer Santo Tomas, offers no support. Officer Santo Tomas arrived at the scene

after Chargualaf gave his involuntary consent. Chargualaf's confirmation does nothing to validate the unconstitutional search.

[56]    I must find therefore that Chargualaf's consent was not voluntarily given and that any evidence flowing therefrom is fruit of the poisonous tree and should have been suppressed. Thus, I respectfully dissent.

BENJAMIN J.F. CRUZ
BENJAMIN J. F. CRUZ
Chief Justice

I do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court, Guam

Dated at Agana, Guam
1-16-2001

# PARTIES

RANDY IGNACIO CHARGUALAF

By: TERRY E. TIMBLIN
Attorney at Law
153 Martyr St., 1ˢᵗ Fl.
Hagåtña, Guam 96910

PEOPLE OF GUAM

By: ATTORNEY GENERAL OF GUAM
Suite 2-200E, Judicial Center Bldg.
120 West O'Brien Dr.
Hagåtña, Guam 96910

TYPE: CRIMINAL FELONY      STATUS: OPEN      STATUS DATE: 07/22/199'

PEOPLE OF THE TERRITORY OF GUAM    ) CASE NO: CF0317-97
                          )
          vs.                )
                          )

RANDY IGNACIO CHARGUALAF,        )
CANDELARIA QUIDACHAY MENDIOLA    )
aka "KANDI" and DON ALLEN BORJA    )
MENDIOLA aka "KEILANI",        )
                          )
          Defendants.        )
                          )
                          )

JUDGE      ------------------------------------------------------------
          PRESIDING JUDGE ALBERTO C LAMORENA III
ATTORNEYS  ------------------------------------------------------------
          TERENCE E TIMBLIN, ATTORNEY FOR CHARGUALAF, RANDY I
          . ASSOC DEF ADV., ATTORNEY FOR MENDIOLA, CANDELARIA Q
          , PUBLIC DEF., ATTORNEY FOR MENDIOLA, DON AB
          THOMAS J FISHER, ATTORNEY FOR THE PEOPLE
CHARGES    ------------------------------------------------------------
          CHARGUALAF, RANDY I
CHARGE     ROBBERY (2ND DEG .FEL)
CHARGE     SPECIAL ALLEGATION POSS. OF A DEADLY WEAPON
          IN THE COMMISSION OF A FELONY
CHARGE     CONSPIRACY TO COMMIT ROBBERY (2ND DEG FEL)
CHARGE     THEFT (MISD)
CHARGE     POSS. OF A FIREARM WITHOUT AN I.D. (FEL)
CHARGE     POSS. OF A CONCEALED FIREARM (FEL)
CHARGE     NOTICE OF PRIOR FELONY CONVICTION
          MENDIOLA, CANDELARIA Q
CHARGE     ROBBERY (THIRD DEGREE FELONY)
CHARGE     CONSPIRACY TO COMMIT ROBBERY (2ND DEG FEL)
          MENDIOLA, DON AB
CHARGE     ROBBERY BY COMPLICITY (2ND COUNT) (2ND DEG FEL)
CHARGE     GONSPIRACY TO COMMIT ROBBERY (2ND DEG FEL)

------------------------------------------------------------------------
  FILING   PROCEEDINGS
   DATE    COMMENT

03/12/1997 VOUCHER FOR COMPENSATION
          VOUCHER IN THE AMOUNT OF $457.50
          12/10/97
          PAYEE#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
          BY: TRACE INVESTIGATIONS
07/22/1997 MAGISTRATE
          COMPLAINT
07/22/1997 RECORDING LOG
          TAPE NO. 97-1433
          LOG NO. 855

FGM : CDR5005
DATE: 12/02/03

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PAGE: 2
TIME: 11:34:20

TYPE: CRIMINAL FELONY

STATUS: OPEN

STATUS DATE: 07/22/1997

------------------------------------------------------------------------

| FILING DATE | PROCEEDINGS COMMENT |
|---|---|

CANDELARIA QUIDACHAY MENDIOLA
07/22/1997 RECORDING LOG
TAPE NO. 97-1433
LOG. NO. 855
DON ALLEN BORJA MENDIOLA
07/22/1997 RECORDING LOG
TAPE NO. 97-1433
LOG NO. 855
RANDY IGNACIO CHARGUALAF
07/22/1997 COMMITMENT ORDER
RANDY IGNACIO CHARGUALAF
07/22/1997 COMMITMENT ORDER
DON ALLEN BORJA MENDIOLA
07/22/1997 RELEASE FROM CONFINEMENT
CANDELARIA QUIDACHAY MENDIOLA
07/24/1997 AFFIDAVIT OF SERVICE
07/24/1997 AFFIDAVIT OF SERVICE
07/24/1997 AFFIDAVIT OF SERVICE
07/24/1997 APPEARANCE BOND WITH CONDITIONS
SIGNED BY JUDGE JUDGE LAMORENA III
ON CANDELARIA MENDIOLA
07/24/1997 NOTICE OF COURT APPOINTED COUNSEL
TO WILLIAM BISCHOFF FOR RANDY CHARGUALAF
07/24/1997 NOTICE OF COURT APPOINTED COUNSEL
TO ATTY. ANITA SUKOLA FOR CANDELARIA
MENDIOLA
07/24/1997 NOTICE OF COURT APPOINTED COUNSEL
TO PUBLIC DEFENDER FOR DON MENDIOLA
07/29/1997 AFFIDAVIT OF SERVICE
07/29/1997 AFFIDAVIT OF SERVICE
07/29/1997 AFFIDAVIT OF SERVICE
07/31/1997 INDICTMENT
07/31/1997 SUMMONS
07/31/1997 SUMMONS
07/31/1997 SUMMONS
07/31/1997 RECORDING LOG
TAPE NO. 97-1098
LOG NO. 2117
RETURN OF GRAND JURY
08/04/1997 AFFIDAVIT OF SERVICE
08/04/1997 AFFIDAVIT OF SERVICE
08/04/1997 AFFIDAVIT OF SERVICE
08/04/1997 AFFIDAVIT OF SERVICE
08/05/1997 AFFIDAVIT OF SERVICE
08/05/1997 AFFIDAVIT OF SERVICE
08/05/1997 RECORDING LOG
TAPE NO. 97-869
LOG NO. 2479

PAGE: 3
DATE: 12/02/03
TIME: 11:34:20

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

TYPE: CRIMINAL FELONY

STATUS: OPEN

STATUS DATE: 07/22/1997

------------------------------------------------------------

| FILING | PROCEEDINGS |
| DATE | COMMENT |

RANDY CHARGUALAF
DON MENDIOLA
08/06/1997 AFFIDAVIT OF SERVICE
08/06/1997 RECORDING LOG
TAPE NO. 97-870
LOG NO. 2427
RANDY IGNACIO CHARGUALAF
08/07/1997 ASSERTION
OR WAIVER OF SPEEDY TRIAL
08/07/1997 ORDER
TO: COURT REPORTER'S UNIT-TO FURNISH
THE GRAND JURY TRANSCRIPT.
08/07/1997 RECORDING LOG
TAPE NO. 97-1202
LOG NO. 863
BAIL HEARING
08/14/1997 RECORDING LOG
OFF THE RECORD/CLERK CONDUCTS CRIMINAL
TRIAL SETTINGS PER COURTS INSTRUCTIONS
08/20/1997 RECORDING LOG
TAPE NO. 97-1447
LOG NO. 2700
CANDELARIA QUIDACHAY MENDIOLA
08/22/1997 RECORDING LOG
TAPE NO. 94-1493
LOG NO. 2310
RANDY CHARGUALAF
08/22/1997 RECORDING LOG
TAPE NO. 97-1493
LOG NO. 2310
DON A. MENDIOLA AKA KAELAUNI
08/27/1997 ASSERTION
OR WAIVER OF SPEEDY TRIAL
08/27/1997 ORDER
08/27/1997 NOTICE
OF COURT APPOINTMENT OF COUNSEL
MARK WILLIAMS, ESQ.
08/27/1997 MOTION
TO WITHDRAW, ORDER APPOINTING COUNSEL
08/29/1997 NOTICE
OF COURT APPOINTMENT OF COUNSEL
MARK WILLIAMS, ESQ.
09/02/1997 AFFIDAVIT OF SERVICE
09/03/1997 RECORDING LOG
TAPE NO. 97-1502
LOG. NO. 775
CANDELARIA QUIDACHAY MENDIOLA
09/04/1997 GRAND JURY TRANSCRIPT

TYPE: CRIMINAL FELONY              STATUS: OPEN              STATUS DATE: 07/22/1997

---

FILING     PROCEEDINGS
  DATE       COMMENT

            PROCEEDINGS ON 7-31-97
09/11/1997 NOTICE OF RESCHEDULED TRIAL SETTING HEARING
            HEARING 10/03/1997
09/15/1997 AFFIDAVIT OF SERVICE
09/15/1997 AFFIDAVIT OF SERVICE
09/15/1997 AFFIDAVIT OF SERVICE
09/24/1997 VOUCHER FOR COMPENSATION
            VOUCHER FOR COMPENSATION OF COURT
            APPOINTED COUNSEL
            NET AMOUNT: $410.00
            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
            SUBMITTED BY WILLIAM BISCHOFF
            RE: R.I. CHARGUALAF
09/24/1997 RECORDING LOG
            TAPE NO. 97-1510
            LOG NO.
            CANDERLARIA Q. MENDIOLA
09/26/1997 ORDER
            APPOINTING NON-LEGAL ASSISTANCE TO
            DEFENDANT BY WAY OF COURT-APPOINTED
            INVESTIGATOR
            SIGNED BY JUDGE MANIBUSAN
09/26/1997 ASSERTION
            OR WAIVER OF SPEEDY TRIAL
            BY: ANITA A. SUKOLA
09/29/1997 ORDER
            TO: COURT REPORTER'S UNIT
10/03/1997 RECORDING LOG
            TAPE NO. 97-1740
            LOG. NO. 295
            DEFT. CANDELARIA Q. MENDIOLA
10/03/1997 RECORDING LOG
            TAPE NO. 97-1740
            LOG. NO. 295
            DEFT. RANDY I. CHARGUALAF
10/03/1997 RECORDING LOG
            TAPE NO. 97-1740
            LOG. NO. 295
            DEFT. DON AB MENDIOLA
10/07/1997 ORDER
            CRIMINAL TRIAL SCHEDULING ORDER
10/09/1997 AFFIDAVIT OF SERVICE
10/09/1997 AFFIDAVIT OF SERVICE
10/16/1997 RECORDING LOG
            LOG NO. 1600
            DEFT. CANDELARIA Q. MENDIOLA
10/20/1997 VOUCHER FOR COMPENSATION
            VOUCHER DATED 9/30/97

PGM : CDKB005
DATE: 12/02/03

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PAGE:        5
TIME: 11:34:20

TYPE: CRIMINAL FELONY            STATUS: OPEN        STATUS DATE: 07/22/1997

------------------------------------------------------------------------

FILING      PROCEEDINGS
 DATE          COMMENT

              SUBMITTED BY M.WILLIAMS
              AMT. $390.50
              PAYEE NO. 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
10/24/1997 RECORDING LOG
              TAPE NO. 97-1267
              LOG NO. 2808
              DEFT. DON A. MENDIOLA AKA KAELAUNI
11/06/1997 WARRANT OF ARREST
              SIGNED BY JUDGE UNPINGCO
11/06/1997 VIOLATION OF RELEASE
              CONDITIONS AND BAIL REVOCATION
11/10/1997 PLEA AGREEMENT
11/10/1997 RELEASE FROM CONFINEMENT
11/10/1997 RECORDING LOG
              TAPE NO. 97-1756
              LOG NO. 2350
              DEFT. DON A. MENDIOLA AKA KAELAUNI
11/10/1997 WAIVER OF INDICTMENT
              DON ALLEN BORJA MENDIOLA AKA KAELAUNI
              AKA KAILANI
11/10/1997 INFORMATION
11/13/1997 RECORDING LOG
              TAPE NO. 97-1758
              LOG NO. 207
              BAIL MODIFICATION
11/13/1997 RECORDING LOG
              TAPE NO. 97-1945
              LOG NO. 1530
              DEFT. CANDELARIA Q. MENDIOAL
11/14/1997 RECORDING LOG
              LOG NO. 2330
              DEFT. DON A. MENDIOLA AKA KAELAUNI
              CONT. BAIL MODIFICATION
11/14/1997 BENCH WARRANT
              TO: DON A. MENDIOALA AKA KAEAUINI
11/20/1997 RECORDING LOG
              TAPE NO. 97-2063
              LOG NO. 2870
              DEFT. CANDELARIA Q. MENDIOLA
11/28/1997 APPEARANCE BOND WITH CONDITIONS
11/28/1997 ORDER
              SPECIFYING METHODS AND CONDITIONS OF
              RELEASE.
12/01/1997 RECORDING LOG
              RETURN WOA
              DEFT. DON A. MENDIOLA
12/22/1997 RETURN OF WARRANT SERVICE
12/22/1997 RECORDING LOG

----------------------------------------------------------------------

  FILING    PROCEEDINGS
   DATE      COMMENT

             TAPE NO. 97-2157
             LOG NO. 1040
             CANDELARIA MENDIOLA
12/22/1997 RELEASE FROM CONFINEMENT
             CANDELARIA Q. MENDIOLA
12/23/1997 AFFIDAVIT OF SERVICE
12/23/1997 RECORDING LOG
             TAPE NO. 97-2207
             LOG NO.100
             RETURN OF WARRANT
             CANDELARIA MENDIOLA
12/23/1997 RELEASE FROM CONFINEMENT
             CANDELARIA MENDIOLA
12/24/1997 AFFIDAVIT OF SERVICE
01/07/1998 PLEA AGREEMENT
             CANDELARIA QUIDACHAY MENDIOLA
01/07/1998 ABSTRACT ORDER OF PROBATION OFFICE
01/29/1998 VOUCHER FOR ATTORNEY CLAIM
03/03/1998 REQUEST
             REQUEST FOR DISCOVERY AND NOTICE
             RE: RANDY CHARGUALAF
             BY: MARK E. WILLIAMS
03/12/1998 VOUCHER FOR COMPENSATION
             VOUCHER IN THE AMOUNT OF $375.00
             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
             SUBMITTED BY M.E. WILLIAMS
             RE: RANDY CHARGUALAF
03/12/1998 VOUCHER FOR COMPENSATION
             VOUCHER
             A.A. SUKOLA
             $595.75
03/12/1998 VOUCHER FOR COMPENSATION
             VOUCHER
             M.E. WILLIAMS
             $270.50
03/12/1998 VOUCHER FOR COMPENSATION
             VOUCHER
             FILED BY TRACE INVESTIGATIONS
             EXPENSES;$236.25
             TOTAL:$236.25
03/13/1998 STIPULATION AND ORDER
             STIPULATION AND ORDER FOR DISCOVERY
             SUB BY ATTY. GEN.
04/07/1998 WITNESS LIST
             PEOPLE'S WITNESS LIST
             FILED BY:  ATTY GEN.'S OFFICE
04/08/1998 SPEED MEMO
             MOTION AND ORDER TO SUPPRESS EVIDENCE

--------------------------------------------------------------------------
  FILING    PROCEEDINGS
   DATE      COMMENT


              TO: MARK E. WILLIAMS
04/08/1998 WITNESS LIST
              ADDITIONAL PEOPLE'S WITNESS LIST
              FILED BY:  ATTY GEN.'S OFFICE
04/09/1998 OPPOSITION
              PEOPLE'S OPPOSITION TO DEFENDANT'S
              MOTION TO SUPPRESS EVIDENCE AND POINTS
              AND AUTHORITIES
              FILED BY:  ATTY GEN.'S OFFICE
04/09/1998 RESPONSE
              PEOPLE'S RESPONSE TO DEFENDANT'S MOTION
              FOR DISCOVERY AND INSPECTION
              RE: RANDY CHARGULAUF
              BY: DAVID M. MOORE
                ASSISTANT ATTY GENERAL
04/13/1998 WITNESS LIST
              ADDITIONAL PEOPLE'S WITNESS LIST
              FILED BY:  ATTY GEN'S OFFICE
04/14/1998 EXPARTE
              STIPULATION AND ORDER FOR TRANSPORTATION
              OF INMATE
              FILED BY:  ATTY GEN'S OFFICE
04/20/1998 NOTICE OF RESCHEDULED HEARING
              HEARING 05/08/1998
04/23/1998 AFFIDAVIT OF SERVICE
04/24/1998 AFFIDAVIT OF SERVICE
04/28/1998 AFFIDAVIT OF SERVICE
05/07/1998 NOTICE OF MOTION AND
              EXPARTE MOTION TO
              WITHDRAW AS COURT APPOINTED COUNSEL;L
              ORDER
05/07/1998 MEMO OF PTS AND AUTHS
              IN SUPPORT OF MOTION TO WITHDRAW:
              ORDER APPOINTING COUNSEL
05/07/1998 NOTICE OF COURT APPOINTED COUNSEL
              A. ALEXANDER GORMAN
              RE: RANDY CHARGUALAF
05/08/1998 AFFIDAVIT OF SERVICE
05/08/1998 RECORDING LOG
              MARK E WILLIAMS
              TAPE NO. 98-623
              LOG NO. 2710
              DEFT. RANDY I. CHARGUALAF
05/13/1998 RECORDING LOG
              TAPE NO. 547
              LOG NO. 4106
              DEFT. CANDELARIA Q. MENDIOLA
06/12/1998 RECORDING LOG

FGM : CDXBUUS
DATE: 12/02/03

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PAGE:        8
TIME: 11:34:20

TYPE: CRIMINAL FELONY          STATUS: OPEN          STATUS DATE: 07/22/1997

------------------------------------------------------------------------

FILING      PROCEEDINGS
 DATE           COMMENT

                 TAPE NO. 98-922
                 LOG NO. 3750
                 CRIMINAL TRIAL SETTING
                 DEFT. RANDY I. CHARGUALAF

06/18/1998 VOUCHER FOR COMPENSATION
                 VOUCHER
                 DATE:  4/13/98
                 LAW OFFICE OF MARK E. WILLIAMS
                 TOTAL AMT. $ 500.00

06/18/1998 VOUCHER FOR COMPENSATION
                 VOUCHER FOR COMPENSATION FOR
                 INVESTIGATOR
                 AMT: $338.75
                 SUBMITTED BY: TRACE INVESTIGATIONS

06/18/1998 VOUCHER FOR COMPENSATION
                 VOUCHER NO:3907
                 SUBMITTED BY TRACE INVESTIGATIONS, INC.
                 DATE:05/06/98
                 EXPENSES:$116.25
                 TOTAL:$116.25

07/13/1998 RECORDING LOG
                 TAPE NO. 98-632
                 LOG NO. 1388
                 SENTENCING
                 DEFT. DON A. MENDIOLA AKA KAELAUNI

07/27/1998 RECORDING LOG
                 WILLIAM C BISCHOFF
                 TAPE NO. 98-0903
                 LOG NO. 40
                 SENTENCING
                 DEFT. CANDELARIA Q. MENDIOLA

08/10/1998 VOUCHER FOR COMPENSATION
                 VOUCHER NO 5967
                 SUBMITTED BY ALEXANDER GORMAN
                 DATE:07/29/98
                 TIME SPENT IN CT:$165.00
                 TIME SPENT IN PREP:$360.00
                 EXPENSES:$63.50
                 TOTAL:$588.50

08/12/1998 REQUEST
                 REQUEST AND ORDER FOR INVESTIGATOR
                 SUBMTITED BY ALEXANDER GORMAN

08/17/1998 RECORDING LOG
                 MARK E WILLIAMS
                 CONTINUED F/P 8/18/98 3 PM

08/18/1998 ORDER
                 WILLIAM C BISCHOFF
                 ON RELEASE FROM CONFINEMENT

PGM : CDKB005   SUPERIOR COURT OF GUAM   PAGE:  9
DATE: 12/02/03    TERRITORY OF GUAM   TIME: 11:34:20

TYPE: CRIMINAL FELONY   STATUS: OPEN   STATUS DATE: 07/22/1997

```
-----------------------------------------------------------------------
```

FILING  PROCEEDINGS
 DATE   COMMENT

     DEFT. DON AB MENDIOLA
08/18/1998 RECORDING LOG
     ALBERTO C LAMORENA III
     PRESIDING JUDGE
     TAPE NO. 98-706/705
     LOG NO. 5796
     CONT. F/P
08/19/1998 AFFIDAVIT OF SERVICE
08/19/1998 ORDER
     ANITA A SUKOLA
     OF CONDITIONAL RELEASE
     DEFT. DON AB MENDIOLA
08/21/1998 RECORDING LOG
     A. ALEXANDER GORMAN
     TAPE NO. 98-1288
     LOG NO. 5010
     CRIMINAL TRIAL SETTING
09/08/1998 VOUCHER FOR COMPENSATION
     VOUCHER IN THE AMOUNT OF $512.50
     8/11/98
     PAYEE#66-0495995
     BY: ANITA SUKOLA
09/10/1998 NOTICE OF COURT APPOINTED COUNSEL
     TO RAWLEN MANTANONA, ESQ.
09/10/1998 ORDER
     ORDE AFTER HEARING SUBMITTED BY ATTORNEY
     ALEXANDER A. GORMAN
09/10/1998 MOTION
     RAWLEN M.T. MANTANONA
     EX-PARTE MOTION TO WITHDRAW AS COUNSEL:
     CERTIFICATE OF SERVICE
09/10/1998 NOTICE OF HEARING
     HEARING 09/18/1998
09/11/1998 AFFIDAVIT OF SERVICE
09/14/1998 AFFIDAVIT OF SERVICE
09/14/1998 NOTICE OF HEARING
     HEARING 10/13/1998
09/14/1998 AFFIDAVIT OF SERVICE
09/17/1998 AFFIDAVIT OF SERVICE
09/18/1998 RECORDING LOG
     CRIMINAL TRIAL SETTING 10/2/98 4PM
09/22/1998 AFFIDAVIT OF SERVICE
09/22/1998 AFFIDAVIT OF SERVICE
10/02/1998 NOTICE OF RESCHEDULED TRIAL SETTING HEARING
     HEARING 10/06/1998
10/06/1998 VOUCHER FOR COMPENSATION
     VOUCHER NO 4584
     SUBMITTED BY ALEXANDER GORMAN

--------------------------------------------------------------------------

  FILING      PROCEEDINGS
   DATE         COMMENT

              DATE:09/02/98
              TIME SPENT IN CT:$45.00
              TIME SPENT IN PREP:$95.00
              TOTAL:$140.00
10/06/1998 RECORDING LOG
              TAPE NO. 98-1650
              LOG NO. 1300
              CRIMINAL TRIAL SETTING
              DEFT. RANDY I. CHARGUALAF
10/08/1998 ORDER
              CRIMINAL TRIAL SCHEDULING ORDER
10/08/1998 AFFIDAVIT OF SERVICE
10/13/1998 RECORDING LOG
              TAPE NO. 98-1500
              LOG NO. 360
              SENTENCING
              DEFT. CANDELARIA Q. MENDIOLA
10/13/1998 AFFIDAVIT OF SERVICE
10/13/1998 AFFIDAVIT OF SERVICE
10/13/1998 AFFIDAVIT OF SERVICE
10/14/1998 AFFIDAVIT OF SERVICE
10/26/1998 NOTICE
              OF COURT APPOINTMENT OF COUNSEL
              RAWLEN MANTANONA
11/09/1998 VOUCHER FOR ATTORNEY CLAIM
01/28/1999 RECORDING LOG
              PTC 2/25/99 3PM
              3/4/99 2PM JST
02/05/1999 RECORDING LOG
              TAPE NO. 99-94
              LOG NO. 4480
              F/P RANDY I. CHARGUALAF
02/09/1999 NOTICE
              NOTICE OF MOTION; MOTION FOR CONTINUANCE
              OF TRIAL DATE; DECLARATION OF COUNSEL;
              MEMORANDUM OF POINTS AND AUTHORITIES IN
              SUPPORT OF MOTION
              SUBMITTED BY RAWLEN MANTANONA
              (RANDY CHARGUALF)
02/16/1999 SUPPLEMENTAL
              MOTION TO SUPPRESS BAD ACTS PURSUANT
              TO CODE 404(B), 403
              FILED BY RAWLEN MANTANONA
              (RANDY CHARGUALAF)
02/26/1999 RECORDING LOG
              TAPE NO. 99-100
              LOG NO. 611
03/04/1999 NOTICE OF RESCHEDULED HEARING

---------------------------------------------------------------------------

FILING      PROCEEDINGS
  DATE        COMMENT

                 HEARING 03/22/1999
03/09/1999  NOTICE OF MOTION AND
                 MOTION TO COMPEL DISCOVERY
                 SUBMITTED BY RAWLEN MANTANONA
                 (RANDY CHARGUALAF)
03/09/1999  AFFIDAVIT OF SERVICE
03/09/1999  NOTICE OF MOTION
                 ,MOTION TO SUPPRESS IN COURT
                 INDENTIFICATION
                 SUBMITTED BY RAWLEN MANTANONA
                 (RANDY CHARGUALAF)
03/09/1999  NOTICE OF MOTION
                 ,MOTION TO DISMISS AND TO SUPPRESSS
                 EVIDENCE, MEMORANDUM OF LAW
                 SUBMITTED BY RAWLEN MANTANONA
                 (RANDY CHARGUALAF)
03/10/1999  VOUCHER FOR COMPENSATION
                 VOUCHER IN THE AMOUNT OF $337.50
                 2/2/99
                 VOUCHER#05832
                 PAYEE#66-0530311
                 SUB BY: RAWLEN M.T. MANTANONA
03/12/1999  DECLARATION OF COUNSEL
                 FOR CONTINUANCE OF TRIAL
                 FILED BY MANTANONA LAW OFFICE
                 (RANDY CHARGUALAF)
03/16/1999  EXPARTE MOTION
                 TO SHORTEN TIME OF HEARING ON MOTION TO
                 WITHDRAW AS COUNSEL
                 BY: RAWLEN MANTANONA
03/16/1999  LETTER
                 FROM: DEFT. RANDY I. CHARGUALAF
                 TO: JUDGE LAMORENA
03/16/1999  RULE 9 STATEMENT
                 BY: RAWLEN MANTANONA
03/16/1999  DECLARATION OF COUNSEL
                 BY: RAWLEN MANTANONA
03/17/1999  LETTER
                 FAXED LETTER FROM DEFT.
                 RANDY I. CHARGUALAF TO: MR. RAWLEN
                                              MANTANONA
03/18/1999  STIPULATION AND ORDER
                 STIPULATION AND ORDER
                 SUBMITTED BY RAWLEN MANTANONA
03/18/1999  RESPONSE
                 PEOPLE'S RESPONSE TO DEFENDANT'S MOTION
                 TO COMPEL DISCOVERY
                 BY: THOMAS J. FISHCER

------------------------------------------------------------------------

   FILING    PROCEEDINGS
   DATE       COMMENT

03/18/1999 NOTICE
                NOTICE OF MOTION TO WITHDRAW AS COUNSEL
                SUB BY: RAWLEN MANTANONA
03/18/1999 RECORDING LOG
                TAPE NO. 99-358
                LOG NO. 1650
                DEFT. RANDY I. CHARGUALAF
03/22/1999 RECORDING LOG
                TAPE NO. 99-0184
                LOG NO. 6330
                DEFT. CANDELARIA MENDIOLA
03/23/1999 RECORDING LOG
                F/P: DEFT. RANDY I. CHARGUALAF
04/06/1999 NOTICE
                OF ADDITIONAL AUTHORITIES
                FILED BY TERRY TIMBLIN
                RANDY CHARGUALAF
04/07/1999 RESPONSE
                TO DEFENDANT'S MOTION TO DISMISS AND
                SUPPRESS EVIDENCE
                FILED BY AG'S OFFICE
                (RANDY CHARGUALAF)
04/07/1999 RESPONSE
                TO DEFENDANT'S MOTION TO SUPPRESS BAD
                ACTS
                FILED BY AG'S OFFICE
                (RANDY CHARGUALAF)
04/07/1999 SUPPLEMENTAL
                RESPONSE TO DEFENDANT'S MOTION TO
                SUPPRESS IN COURT IDENTIFICATION
                FILED BY AG'S OFFICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/08/1999 AFFIDAVIT OF SERVICE
04/12/1999 REPLY
                TO OPPOSITION TO MOTION TO DISMISS
                AND SUPPRESS EVIDENCE
                FILED BY TERRY TIMBLIN
                (RANDY CHARGUALA)
04/13/1999 RECORDING LOG
                TAPE NO. 99-602
                LOG NO. 2428
                DEFT. RANDY I. CHARGUALAF
04/23/1999 DECISION AND ORDER

--------------------------------------------------------------------------
   FILING    PROCEEDINGS
    DATE       COMMENT

                REGARDING DEFENDANT'S MOTION TO DISMISS
                AND SUPPRESS EVIDENCE
04/23/1999 SPEED MEMO
                TO: OFFICE OF THE A.G.-ATTY. T. TIMBLIN
04/23/1999 NOTICE OF ENTRY ON DOCKET
04/27/1999 AFFIDAVIT OF SERVICE
04/28/1999 AFFIDAVIT OF SERVICE
04/29/1999 AFFIDAVIT
                OF TERRY TIMBLIN
                FILED BY TERRY TIMBLIN
                (RANDY CHARGUALAF)
04/29/1999 MOTION
                TO WITHDRAW AS COUNSEL FOR DEFENDANT
                FILED BY TERRY TIMBLIN
05/03/1999 NOTICE OF HEARING
                HEARING 06/04/1999
05/06/1999 AFFIDAVIT OF SERVICE
05/06/1999 AFFIDAVIT OF SERVICE
05/06/1999 RECORDING LOG
                TAPE NO. 99-618
                LOG NO. 10
                MOTION TO WITHDRAW AS COUNSEL
                DEFT. RANDY I. CHARGUALAF
05/10/1999 RECORDING LOG
                TAPE NO. 99-618
                LOG NO. 3779
                MOTION TO COMPEL DISCOVERY
                DEFT. RANDY I. CHARGUALAF
05/14/1999 RECORDING LOG
                TAPE NO. 99-673
                LOG NO. 2390
                MTN
                DEFT. RANDY I. CHARGUALAF
06/11/1999 MOTION
                CANDELARIA MENDIOLA
                STIPULATED MOTION TO STAY SENTENCING
                SUBMITTED BY AG'S OFFICE
06/11/1999 NOTICE OF HEARING
                HEARING 08/16/1999
06/16/1999 AFFIDAVIT OF SERVICE
06/17/1999 AFFIDAVIT OF SERVICE
06/22/1999 VIOLATION
                REPORT
                FILED BY PROBATION OFFICE
                (DON MENDIOLA)
07/15/1999 DECISION AND ORDER
                REGARDING DEFENEDANT'S MOTION TO COMPEL
                DISCOVERY, MOTION TO SUPPRESS IN COURT

------------------------------------------------------------------------
  FILING    PROCEEDINGS
   DATE        COMMENT

            IDENTIFICATION AND MOTION TO SUPPRESS
            BAD ACTS
07/15/1999 SPEED MEMO
            TO: OFFICE OF THE A.G.-ATTYN. T. TIMBLIN
07/16/1999 NOTICE OF ENTRY ON DOCKET
            TO AG'S OFFICE/ATTORNEY TERRENCE TIMBLIN
            RE; D&O REGARDING DEFT. MOTION TO COMPEL
            DISCOVERY, MOTION TO SURPRESS IN COURT
            IDENTIFICATION AND MOTION TO SUPRESS BAD
            ACTS FILED 7-15-99.
07/19/1999 AFFIDAVIT OF SERVICE
07/19/1999 AFFIDAVIT OF SERVICE
07/30/1999 RECORDING LOG
            PJ ACLIII
            TAPE# 99-1236
            LOG# 3865
            CRIMINAL TRIAL SETTING
            DEFT. RANDY CHARGUALAF
08/02/1999 SCHEDULING ORDER
            CRIMINAL TRIAL SCHEDULING ORDER
            DEFT. RANDY CHARGUALAF
08/05/1999 AFFIDAVIT OF SERVICE
08/05/1999 AFFIDAVIT OF SERVICE
08/16/1999 RECORDING LOG
            JUDGE; SSU
            TAPE# 99-1144
            LOG# 860
            SENTENCING
            DEFT. CANDELERIA Q. MENDIOLA
08/20/1999 SUMMONS
            SUMMONS
            TO DON MENDIOLA
            SUMBITTED BY PROBATION OFFICE
09/15/1999 NOTICE OF HEARING
            HEARING 10/04/1999
09/17/1999 AFFIDAVIT OF SERVICE
09/17/1999 AFFIDAVIT OF SERVICE
09/17/1999 AFFIDAVIT OF SERVICE
09/29/1999 VIOLATION
            REPORT
            FILED BY PROBATION OFFICE
            (DON MENDIOLA)
09/29/1999 UNSIGNED DOCUMENT(S)
            SUMMONS
            TO DON MENDIOLA
            SUBMITTED BY PROBATION OFFICE
10/04/1999 RECORDING LOG
            TAPE NO. 99-1642

TYPE: CRIMINAL FELONY             STATUS: OPEN          STATUS DATE: 07/22/1997

--------------------------------------------------------------------------------
  FILING    PROCEEDINGS
   DATE       COMMENT

             LOG NO. 705
             RANDY I. CHARGUALAF
10/15/1999 DECLARATION
             IN SUPPORT OF WARRANT OF ARREST
10/15/1999 WARRANT OF ARREST
10/18/1999 RECORDING LOG
             TAPE NO. 99-1606
             LOG NO. 3285
             SENTENCING-FURTHUR PROCEEDING
10/18/1999 NOTICE OF RESCHEDULED TRIAL
             HEARING 11/01/1999
10/19/1999 VIOLATION
             REPORT
10/19/1999 RETURN OF WARRANT SERVICE
10/19/1999 VIOLATION
             REPORT
             FOR CANDELARIA Q. MENDIOLA
             FILED BY: VERNA L. REYES
10/19/1999 RECORDING LOG
             TERENCE E TIMBLIN
             TAPE NO. 99-1607
             LOG NO. 4843
             RETURN OF WARRANT
             CANDELARIA Q. MENDIOLA
10/19/1999 COMMITMENT ORDER
             ON CANDELARIA Q. MENDIOLA.
             COURT REVOKED DEFENDANT'S RELEASE
             TO BE HELD UNTIL SENTENCING.
             SIGNED BY JUDGE UNPINGCO.
10/21/1999 NOTICE OF HEARING
             HEARING 11/19/1999
             RAWLEN M.T. MANTANONA
10/26/1999 ORDER AFTER HEARING
             ORDER AFTER HEARING
             SUBMITTED BY AG OFFICE
10/26/1999 AFFIDAVIT OF SERVICE
10/27/1999 MOTION IN LIMINE
             FOR DEF. RANDY IGNACIO CHARGUALAF
             FILE BY TERRY E. TIMBLIN
10/27/1999 AFFIDAVIT OF SERVICE
10/28/1999 AFFIDAVIT OF SERVICE
10/29/1999 AFFIDAVIT OF SERVICE
10/29/1999 AFFIDAVIT OF SERVICE
11/01/1999 RECORDING LOG
             TAPE NO. 99-1775
             LOG NO. 1080
             MTN IN LIMINE
             RANDY I. CHARGUALAF

PGM : CDKB005
DATE: 12/02/03

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PAGE:      16
TIME: 11:34:20

TYPE: CRIMINAL FELONY          STATUS: OPEN          STATUS DATE: 07/22/1997

--------------------------------------------------------------------------------

FILING      PROCEEDINGS
DATE        COMMENT

11/01/1999 AFFIDAVIT OF SERVICE
11/03/1999 AFFIDAVIT OF SERVICE
11/03/1999 RECORDING LOG
              TAPE NO. 99-1776
              LOG NO. 2827
              JURY TRIAL DAY 1
              RANDY I. CHARGUALAF
11/03/1999 AFFIDAVIT OF SERVICE
11/04/1999 RECORDING LOG
              TAPE NO. 99-1779
              LOG NO. 3910
              JURY TRIAL 2
11/05/1999 RECORDING LOG
              TAPE NO. 99-1871
              LOG NO. 6310
              JURY INSTRUCTIONS
11/08/1999 RECORDING LOG
              TAPE NO. 99-1872
              LOG NO.2894
              JURY TRIAL DAY 3
              RANDY I. CHARGUALAF
11/08/1999 INDICTMENT
              RANDY IGNACIO CHARGUALAF
11/08/1999 JURY
              INSTRUCTIONS
11/09/1999 RECORDING LOG
              TAPE NO. 99-1875
              LOG NO. 175
              VERDICT
              RANDY I. CHARGUALAF
11/09/1999 VERDICT
11/15/1999 ABSTRACT ORDER OF PROBATION OFFICE
              VOUCHER FOR COMPENSATION OF COURT
              APPOINTED COUNSEL SUBMITTED BY
              MARK E. WILLIAMS
              AMOUNT CLAIMED:  787.50
11/18/1999 RECORDING LOG
              TAPE NO. 99-1827
              LOG NO. 2355
              FURTHER PROCEEDINGS RE: SENTENCING
              CANDELARIA Q. MENDIOLA
11/18/1999 COMMITMENT ORDER
              TO THE DEPARTMENT OF CORRECTIONS FOR
              DEFENDANT CANDELARIA Q. MENDIOLA
11/24/1999 AFFIDAVIT OF SERVICE
12/03/1999 AFFIDAVIT
              OF RANDY IGNACIO CHARGUALAF
12/03/1999 MOTION

---

FILING    PROCEEDINGS
DATE      COMMENT

          TO BE CONFINED AT THE AGAN DETENTION
          FACILITY PENDING APPEAL
          FOR DEF. RANDY IGNACIO CHARGAULAF
          FILED BY TERRY E. TIMBLIN
12/13/1999 COMMITMENT ORDER
          CANDELARIA QUIDACHAY MENDIOLA
          JUDGMENT
12/13/1999 NOTICE OF HEARING
          HEARING 02/15/2000
12/13/1999 JUDGMENT
          JUDGMENT
          FOR DEF. C.Q. MENDIOLA
          SUBMITTED BY AG PROSEC.
12/14/1999 RESPONSE
          PEOPLE'S RESPONSE TO DEF.'S MTN. TO BE
          CONFINED AT THE AGANA DETENTION FAC.
          PENDING APPEAL AND POINTS AND AUTH.
          BY: T. FISCHER
12/17/1999 RECORDING LOG
          TAPE NO. 99-1905
          LOG NO. 1864
          SENTENCING
          DON AB MENDIOLA
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
12/21/1999 AFFIDAVIT OF SERVICE
01/26/2000 PRESENTENCE INVESTIGATION
          FOR DEF. RANDY I. CHARGUALAF
02/01/2000 VOUCHER FOR COMPENSATION
          VOUCHER NO. 06555
          DATE: 3/2/99
          COURT TIME: 175.00
          PREP TIME: 1850.00
          TOTAL: 1925.00
          SUB BY RAWLEN MANTANONA
02/01/2000 VOUCHER FOR COMPENSATION
          VOUCHER NO 7284
          SUBMITTED BY MANTANONA LAW OFFICE
          DATE:04/05/99
          TOTAL:$312.50
02/01/2000 AFFIDAVIT OF SERVICE
02/01/2000 RECORDING LOG
          BEFORE JUDGE A.LAMORENA III

------------------------------------------------------------------------

FILING    PROCEEDINGS
  DATE       COMMENT

                FOR SENTENCING
                ON RANDY I. CHARGUALAF
02/01/2000 VOUCHER FOR COMPENSATION
                VOUCHER
                INVESTIGATOR'S FEES INC. NO. 76
                $108.75
02/01/2000 VOUCHER FOR COMPENSATION
                VOUCHER NO 8809
                SUBMITTED BY ANITA SUKOLA
                DATE:10/28/99
                TIME IN CT:$150.00
                TIME IN PREP:$237.50
                EXP:$4.00
                TOTAL:$391.50
02/14/2000 NOTICE OF RESCHEDULED HEARING
                HEARING 02/22/2000
                RESTITUTION
02/18/2000 RESTITUTION REPORT
                FOR DEF. C.Q. MENDIOLA
02/22/2000 RECORDING LOG
                BEFORE JUDGE S. UNPINGCO
                FOR CANDELARAIA Q. MENDIOLA
                TAPE#2K-0121 LOG#0910
02/22/2000 AFFIDAVIT OF SERVICE
02/22/2000 AFFIDAVIT OF SERVICE
02/23/2000 AFFIDAVIT OF SERVICE
02/25/2000 JUDGMENT
                JUDGMENT FOR DEFENDANT DON MENDIOLA
03/01/2000 AFFIDAVIT OF SERVICE
03/01/2000 AFFIDAVIT OF SERVICE
03/01/2000 AFFIDAVIT OF SERVICE
03/07/2000 RECORDING LOG
                BEFORE JUDGE STEVEN S. UNPINGCO
                FOR RESTITUTION HEARING
                FOR CANDELARAIA Q. MENDIOLA
                TAPE#00-128 LOG#3376
03/09/2000 JUDGMENT
                JUDGMENT
                FOR RANDY I. CHARGUALAF
03/10/2000 VOUCHER FOR COMPENSATION
                TIME IN CT.      $ 2280.00
                TIME IN PREP.    $ 3575.00
                TOTAL            $ 5855.00
03/10/2000 REPORT
                INFORMATIONAL REPORT RE: RESTITUTION FOR
                DON A.B. MENDIOLA
                BY SYLVINA C. CHARFAUROS
03/14/2000 AFFIDAVIT OF SERVICE

---

```
 FILING    PROCEEDINGS
  DATE      COMMENT
```

03/15/2000 DECLARATION OF MAILING
03/15/2000 NOTICE
03/15/2000 NOTICE OF APPEAL
         ON JUDGMENT ON DEFENDANT RANDY IGNACIO
         CHARGUALAF
03/15/2000 AFFIDAVIT OF SERVICE
03/15/2000 NOTICE
03/15/2000 NEOD & DECL
         DEFT:  RANDY CHARGUALAF
         TO:  AG'S-PROSECUTION
            ATTY. TERRENCE E. TIMBLIN
03/15/2000 AFFIDAVIT OF SERVICE
03/15/2000 AFFIDAVIT OF SERVICE
03/20/2000 ORDER
         ORDER
         SUBMITTED BY LAW OFFICE OF ANITA A.
         SUKOLA
04/24/2000 REPORTERS AFF IN SUPT OF MTN FOR ADD TIME TO FILE TRNSCPT ON APL
07/18/2000 CERTIFICATE OF RECORD
07/18/2000 DECLARATION OF MAILING
08/25/2000 DESIGNATION OF RECORD
         OF CLERK'S RECORD
         RE: RANDY CHARGUALAF
         SUB. BY TERRY TIMBLIN LAW OFF.
08/28/2000 NOTICE
         OF STATUS AND DISQUALIFICATION HRNG
09/22/2000 VOUCHER FOR ATTORNEY CLAIM
09/25/2000 DESIGNATION OF RECORD
         SUB BY: A.G.'S OFF.
01/19/2001 OPINION
         ACCORDINGLY, WE AFFIRM THE TRIAL CRT'S
         DENIAL OF THE APPELLANT'S MTNS TO
         SUPPRESS THE EVIDENCE AND IN-COURT
         IDENTIFICATION AND THE JUDGMENT OF
         CONVICTION.
02/16/2001 VOUCHER FOR ATTORNEY CLAIM
03/02/2001 JUDGMENT
         JUDGMENT: DEF.RANDY CHARGUALAF MOVED TO
         CHANGE PLEA OF NOT GUILTY TO THAT OF
         GUILTY OF THE OFFENSE OF ASSAULT(MISD.)
         IN CM1544-98;DEF. SHALL SRV.10DAYS AT
         DOC CONCURRENT TO SENTENCE IMPOSED IN
         CF317-97
03/12/2001 AFFIDAVIT OF SERVICE
         JUDGMENT
         RE RANDY CHARGUALAF
         03/08/01 SUPERIOR COURT OF GUAM
03/12/2001 AFFIDAVIT OF SERVICE

TYPE: CRIMINAL FELONY      STATUS: OPEN    STATUS DATE: 07/22/1997

---

  FILING   PROCEEDINGS
   DATE     COMMENT

```
                SRVD TERENCE TIMBLIN THRU VELMA MUNDO
03/12/2001 AFFIDAVIT OF SERVICE
                SRVD TERENCE TIMBLIN THRU VELMA MUNDO
05/03/2001 AFFIDAVIT OF SERVICE
                TYPE JUDGMENT
                SRV  SERVED
                TO   GUAM POLICE DEPARTMENT
                THRU HELEN EUSTAQUIO
                DATE 3/8/01
                BY   MAR82
05/03/2001 AFFIDAVIT OF SERVICE
                TYPE JUDGMENT
                SRV  SERVED
                TO   OFFICE OF THE ATTORNEY GENERAL
                THRU CONNIE
                DATE 3/8/01
                BY   MAR82
09/20/2001 AFFIDAVIT OF SERVICE
                JUDGMENT
02/12/2002 UNSIGNED DOCUMENT(S)
                VOUCHER
                TIME SPENT      $51.50
                NET CLAIMED     $51.50
                SUBMITTED BY RAWLEN MANTANONA
                66-0530311
02/12/2002 VOUCHER FOR ATTORNEY CLAIM
02/25/2002 VOUCHER FOR ATTORNEY CLAIM
05/06/2002 VOUCHER FOR ATTORNEY CLAIM
06/11/2002 MOTION TO WITHDRAW AS COUNSEL
                MOTION TO WITHDRAW FROM CASE AND ORDER
                CANDELARIA Q. MENDIOLA,
                                  DEFENDANT.
                A.D.A., P.C., IS APPOINTED COUNSEL FOR
                THE DEFT.
                SBMTTD BY: ANITA SUKOLA
                SIGNED BY: JUDGE S.S. UNPINGCO
06/11/2002 VOUCHER FOR COMPENSATION
                VOUCHER
                TIME PREP       $150.00
                EXPENSES        $10.00
                NET CLAIMED     $160.00
                SBMTTD BY:  ANITA SUKOLA
                66-0495995
                SIGNED BY:  JUDGE S.S. UNPINGCO
06/13/2002 NOTICE OF COURT APPOINTED COUNSEL
                ANITA A SUKOLA
06/13/2002 ATTORNEY EXCUSED
                ANITA A SUKOLA
```

TYPE: CRIMINAL FELONY          STATUS: OPEN          STATUS DATE: 07/22/1997

--------------------------------------------------------------------------

```
  FILING    PROCEEDINGS
   DATE        COMMENT

06/13/2002 NOTICE OF COURT APPOINTED COUNSEL
              . ASSOC DEF ADV.
06/13/2002 ATTORNEY APPOINTED
              . ASSOC DEF ADV.
07/24/2002 VOUCHER
              CRT VOUCHER
              CRT TIME          0.0
              PREPARATION       25.00
              REPRESENTATION    0.0
              TOTAL             25.00
              A.A. SUKOLA
              PAYEE 66-0495995
              SIGNED BY: JUDGE .S.S. UNPINGCO
11/21/2002 SUBSTITUTION OF COUNSEL
              SUBSTITUTION OF ATTORNEYS
              SUBMITTED BY HOWARD TRAPP
              SIGNED BY THE HONORABLE JUDGE ACLIII
05/28/2003 GRAND JURY TRANSCRIPT
              SUB.BY:PRISCILLA TORRES
06/02/2003 GRAND JURY TRANSCRIPT
09/23/2003 TRANSCRIPT
              RE: MOTION TO COMPEL DISCOVERY
              PROCEEDINGS OF 5/10/99
              BY: PRISCILLA C. TORRES
                  COURT TRANSCRIBER
```

1

**IN THE SUPERIOR COURT OF GUAM**

2

3

4 RANDY IGNACIO CHARGUALAF, )

5 Petitioner, )

6 )

7 vs. )

8 )

9 FRANK T. ISHIZAKI, Director of )
Corrections, Government of Guam, )

10 )

11 Respondent. )

12

**SPECIAL PROCEEDINGS
CASE NO. SP0228-03**

**DECISION AND ORDER**

RECEIVED
MAR 4 2004
HOWARD TRAPP

13 **INTRODUCTION**

14 The matter before the Court came on Petitioner Randy Ignacio Chargualaf's

15 ("Chargualaf") Petition for Writ of Habeas Corpus. On December 5, 2003 a hearing was held

16 before the HONORABLE JUDGE STEVEN S. UNPINGCO, who took the matter under

17 advisement. Attorney Howard Trapp appeared on behalf of Chargualaf while Assistant Attorney

18 General B. Ann Keith appeared on behalf of the Government. Having reviewed the parties'

19 briefs, oral arguments and the applicable law, the Court now issues the following Decision and

20 Order.

21 **BACKGROUND**

22 On July 31, 1997, Chargualaf was charged with Second Degree Robbery (As a 2nd

23 Degree Felony), Special Allegation of Possession and Use of a Deadly Weapon in the

24 Commission of Second Degree Robbery, Conspiracy to Commit Second Degree Robbery (As a

25 2nd Degree Felony), Theft (As a Misdemeanor), Possession of a Firearm without an Identification

26 Card (As a Felony) and Possession of a Concealed Firearm (As a Felony). On November 9,

27 1999, after a trial by jury, Chargualaf was found guilty of Second Degree Robbery (As a 2nd

28 Degree Felony), Special Allegation of Possession and Use of a Deadly Weapon in the

Commission of Second Degree Robbery, Conspiracy to Commit Second Degree Robbery (As a

Page 1 of 6 173

2nd Degree Felony) and Theft (As a Misdemeanor). Chargualaf was sentenced to serve a total of thirty five (35) years imprisonment at the Department of Corrections.

After his conviction, Chargualaf filed an appeal with the Supreme Court of Guam. The conviction was affirmed. Thereafter, Chargualaf applied for review of the Supreme Court of Guam's decision in the Ninth Circuit by writ of certiorari. The application was denied. Chargualaf then applied to the United States Supreme Court for review of the case in the Ninth Circuit by writ of certiorari. The application was also denied. Chargualaf now moves this Court *on writ* to grant his Petition for Writ of Habeas Corpus arguing that his confinement is illegal based the ineffective assistance of counsel in the Supreme Court of Guam.

## DISCUSSION

Essentially, Chargualaf argues that his conviction should be vacated based on his appellate attorney's failure to argue before the Supreme Court of Guam that the trial court erred in denying his trial counsel's motion to withdraw. At trial, Chargualaf was apparently not satisfied with his attorney's strategy and threatened to file an ethics complaint against him. Chargualaf asserts that the trial court failed to sufficiently inquire with him and his attorney privately concerning the substitution of counsel. The failure to conduct such an inquiry and the extent of conflict between Chargualaf and his attorney, according to Chargualaf, warrants the relief requested. Chargualaf asserts that the conflict resulted in a total lack of communication preventing an adequate defense. Chargualaf further argues in his Reply brief that it could not be clearer that defense counsel would have been successful in arguing on appeal that this Court erred in denying the motion to withdraw.

In opposition, the Government argues that based on Chargualaf's pattern of substituting attorneys, the attorney at issue was his fifth, and the fact that the only conflict raised at trial was the threat of an ethics complaint, the Court properly found that Chargualaf himself was manunfacturing issues with his counsel. The Government also points to several facts which indicate that there never was any substantial conflict between Chargualaf and his attorney warranting a substitution of counsel. These facts include the following: Chargualaf continued to have his court-appointed counsel represent him throughout the trial and appellate process, the

1  issue of a conflict between Chargualaf and his attorney was never again raised, and that
2  Chargualaf never followed through on his threat to file an ethics complaint. These facts,
3  according to the Government, demonstrate that there never was any real conflict and that if
4  appellate counsel raised the issue in the Supreme Court of Guam, it would not succeed.

5      In order for a writ of habeas corpus relief to be granted, the petition must state fully and
6  with particularity the facts on which relief is sought. Habeas relief is a strong remedy reserved
7  for serious matters rather than merely technical violations of rights. White v. Klitzkie, et al.,
8  1998 Guam 31 (Dec. 16, 1998). "Conclusory allegations made without any explanation of the
9  basis for the allegations do not warrant relief." People v. Duvall, 9 Cal. 4th 464, 465 (1995),
10 citing, People v. Karis, 46 Cal. 3d 612 (1988). "A habeas corpus petition must be verified, and
11 must state a prima facie case for relief. That is, it must set forth specific facts which, if true,
12 would require issuance of the writ. Any petition that does not meet these standards must be
13 summarily denied..." People v. Gonzalez, 51 Cal. 3d 1179 (1990).

14     As to Petitioner's claim of ineffective assistance of counsel, the Supreme Court of Guam,
15 in People v. Quintanilla, 1998 Guam 17, first addressed the issue of ineffective assistance of
16 counsel and adopted the bifurcated test established in Strickland v. Washington, 466 US 668
17 (1984). To prevail on a claim of ineffective assistance of counsel, one must prove two
18 components. First, the Petitioner must show that counsel's performance was so deficient that
19 counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth
20 Amendment." Strickland v. Washington, 466 US 668, 687 (1984). Second, the Petitioner must
21 prove prejudice by showing "there is a reasonable probability that, but for counsel's
22 unprofessional errors, the result of the proceeding would have been different." Id. at 694. The
23 purpose of this test is to determine "whether counsel's conduct so undermined the proper
24 functioning of the adversarial process that the trial cannot be relied upon as having a just result."
25 Id. at 686. This test will guide the court's review of Petitioner's claim that his trial counsel was
26 ineffective. In this particular case, it should also be noted that although Chargualaf failed to raise
27 the issue concerning the trial court's denial of the motion to withdraw until now, the Court finds
28 that such failure does not preclude the issue from being examined at this time. *See generally*

Page 1 of 6
175

Case 1:05-cv-00014    Document 2-5    Filed 05/05/2005    Page 7 of 45

Angoco v. Bitanga, 2001 Guam 17 (July 12, 2001).

The crucial inquiry here is whether the failure to raise the trial Court's denial of the motion to withdraw filed by Chargualaf's attorney warrants the issuance of the writ. After considering the factual circumstances of this case and the applicable law, the Court finds that even if Chargualaf's appellate counsel raised the withdrawal issue, there is no likelihood of success.

Under Strickland, a claim of ineffective assistance of counsel is analyzed using the two prong test mentioned above. When reviewing a trial court's denial of a motion to withdraw as counsel or a motion for substitution of counsel, the appellate court "focuses on three considerations...:first, [it is to] consider whether the district court's inquiry on the matter was adequate; second, [it is to] study the extent of the conflict between the defendant and his counsel; and third, [it is to] weigh the timeliness of the motion against any inconvenience or delay that would result from granting the motion." U.S. v. Corona-Garcia, 210 F.3d 973, 976 (9th Cir. 2000) (citations omitted). The standard of review is abuse of discretion. Id.

In this case, the trial court addressed the withdrawal issue during two separate hearings. The first on May 6, 1999 and the second on May 10, 1999. During the first hearing, which was specifically set to address the motion to withdraw, the Court asked Chargualaf what seemed to be the problem. In response, Chargualaf stated that he did not trust his attorney to handle his case. When asked by the Court to elaborate, Chargualaf did not respond. After noting that Chargualaf has gone through four lawyers and after explaining the experience of each of his attorneys, the Court denied the motion to withdraw as counsel. In denying the motion, the Court explained that the attorney representing Chargualaf, as well as the attorneys who previously represented him, knew prosecution from both angles and intimated that they knew more about the law than Chargualaf himself.

During the second hearing, which addressed a motion to compel discovery, Chargualaf's attorney asked the Court to revisit the issue of withdrawal. At this hearing the threat of an ethics complaint against Chargualaf's attorney was first discussed. When asked by the Court, Chargualaf stated that he faxed a copy of the letter containing his threat to the Ethics Committee.

1 After hearing arguments from both sides, the Court denied the motion but left open the
2 possibility of revisiting the issue again depending on what the Ethics Committee decides to do
3 about the alleged complaint. In fact, the Court stated that if the Ethics Committee accepted
4 Chargualaf's claim the Court would reconsider the motion to withdraw.

5 In sum, when the motion to withdraw came up, the Court asked Chargualaf to explain the
6 problems he was having with his attorney, gave Chargualaf the opportunity to expound on the
7 problems, asked Chargualaf's attorney about the problems, and considered the threat of an ethics
8 complaint made by Chargualaf. After considering these factors, the Court denied the motion
9 twice but still left the issue open depending on the results of the ethics complaint.

10 Based on the above, the Court finds that the trial court's inquiry regarding any problems
11 or conflicts between Chargualaf and his attorney was sufficient. Although the trial court did not
12 question Chargualaf and his attorney privately, the trial court did question each about the
13 problems they were having. When questioned, both Chargualaf and his attorney simply didn't
14 have much to say. The trial court took the time to address the motion on two occassions during
15 two separate hearings. At both hearings, the trial court considered the motion and conducted an
16 inquiry regarding the reasons Chargualaf wanted a new attorney. Although the inquiry was brief,
17 the trial court's inquiry was sufficient under the circumstances. *See* Hudson v. Rushen, 686 F.2d
18 826 (9th Cir. 1982); *see also* U.S. v. Smith, 282 F.3d 758 (9th Cir. 2002). Moreover, the trial
19 court had granted Chargualaf's four previous requests for new counsel. As the trial court noted,
20 Chargualaf used the same basis for each request. Therefore, the trial court was already aware of
21 Chargualaf's general displeasure with counsel and the basis for his substitution requests.
22 Furthermore, the trial court's inquiry was not focused on the competence of counsel. To the
23 contrary, the trial court asked Chargualaf about the problems he was having with his attorney and
24 not whether his attorney was competent. It wasn't until after Chargualaf explained that he
25 simply could not trust his attorney did the trial court explain that his appointed attorney was very
26 experienced and knew prosecution from both angles.

27 Turning to the extent of the conflict between Chargualaf and his attorney, the Court finds
28 that if such a conflict did exist, it was insufficient to warrant the substitution of new counsel.

1    The Court's conclusion is based on the several important facts. First, during both hearings,

2    neither Chargualaf nor his attorney informed the Court of any breakdown in communication. All

3    that was mentioned was Chargualaf's distrust of his attorney and the threat of an ethics

4    complaint. Second, after the motion was denied twice, Chargualaf and his attorney were able to

5    work together throughout the trial and appellate process. Third, the letters from Chargualaf to

6    the Court and to his attorney merely state that there is a breakdown in communication without

7    any support for such an assertion. At best, it appears that Chargualaf disagreed with his

8    attorney's trial strategy and tactics. However, such items are generally left for the attorney to

9    decide. *See* U.S. v. Franklin, 321 F.3d 1231 (9th Cir. 2003). Thus, it appears that no extensive

10   conflict existed.

11       Lastly, concerning the timeliness of the motion to withdraw, it appears that this issue was

12   not a concern for the trial court. The motion was made months before trial and before discovery

13   issues were resolved. Therefore, the Court need not address this particular factor.

14       Based on the above analysis, the Court finds that the trial court did not err when it denied

15   the motion to withdraw as counsel. Since the Court finds that denial was not an abuse of

16   discretion, the Court also finds that the failure to raise the denial at the Supreme Court of Guam

17   would have been unsuccessful. In short, the application of both Strickland and Corona-Garcia to

18   the facts of this case weigh in favor of denying the relief requested.

### CONCLUSION

20       Based upon the foregoing, Petitioner Randy Ignacio Chargualaf's Petition for Writ of

21   Habeas Corpus is hereby DENIED.

23   **SO ORDERED this** 27th **day of February, 2004.**

Original Signed By:
HON. STEVEN S. UNPINGCO

**HONORABLE STEVEN S. UNPINGCO**
**Judge, Superior Court of Guam**

TYPE: SPECIAL PROCEEDINGS           STATUS: CLOSED           STATUS DATE: 02/27/2004


RANDY IGNACIO CHARGUALAF,                    ) CASE NO: SP0228-03
                                             )
                PETITIONER(S),               )
                                             )
     VS.                                     )
                                             )
FRANK T. ISHIZAKI, Director of               )
Corrections, Government of Guam,             )
                                             )
                RESPONDENT(S).               )
                                             )
                                             )
_____)

JUDGE        -----------------------------------------------------------------
             JUDGE STEVEN S. UNPINGCO
ATTORNEYS    -----------------------------------------------------------------
             , ATTY.GEN., ATTORNEY FOR ISHIZAKI, FRANK T.
             HOWARD TRAPP, ATTORNEY FOR CHARGUALAF, RANDY I.

-----------------------------------------------------------------------------
  FILING    PROCEEDINGS
   DATE        COMMENT

09/26/2003 PETITION
             FOR WRIT OF HABEAS CORPUS
             SUBMITTED BY HOWARD TRAPP
09/26/2003 DOCKETING STATEMENT
             FILED BY HOWARD TRAPP INCORPORATED
09/26/2003 CASH REGISTER TRANS
             BOG,CKDTD 092603
09/29/2003 MEMORANDUM
             ON ISSUANCE OF OSC
             FILED BY H.TRAPP INCORP.
09/29/2003 ORDER TO SHOW CAUSE
             ORDER TO SHOW CAUSE
             DECEMBER 05, 2003 AT 10AM
             H.TRAPP INCORP.
09/30/2003 DECLARATION OF SERVICE
             RE   WRIT OF HABEAS CORPUS
             TO   FRANK T. ISHIZAKI, DIR.OF CORRECTION
                  ON 9/29/03.
                  LEAVING A COPY AT HIS OFFICE
             RE   ATTY. D.MOYLAN, AT HIS OFFICE ON
                  9/29/03.
                  FILED BY H.TRAPP INCORP.
10/17/2003 JUDGE ASSIGNMENT
             STEVEN S. UNPINGCO
             JUDGE
10/20/2003 NOTICE
             TO HOWARD TRAPP
             CASE IS ASSIGNED TO THE HONORABLE JUDGE

**179**

PGM : CDKB005
DATE: 6/24/04

SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PAGE: 2
TIME: 10:13:56

TYPE: SPECIAL PROCEEDINGS    STATUS: CLOSED    STATUS DATE: 02/27/2004

--------------------------------------------------------------------------

FILING     PROCEEDINGS
  DATE        COMMENT

              STEVEN UNPINGCO
11/07/2003 DECLARATION OF SERVICE
              OCTOBER 31, 2003
              SERVED ORDER TO SHOW CAUSE ON ATTORNEY
              GENERAL
              NOVEMBER 7, 2003
              SERVED ORDER TO SHOW CAUSE ON DIRECTOR
              OF CORRECTIONS
              HOWARD TRAPP INCORPORATED
11/21/2003 OPPOSITION
              TO PETITION FOR WRIT OF HABEAS CORPUS
              FILED BY OFFICE OF ATTY GENERAL
12/02/2003 REPLY
              REPLY TO OPPOSITION TO PETITION FOR
              WRIT OF HABEAS CORPUS
              SUBMITTED BY HOWARD TRAPP, ESQ.
12/03/2003 CASH REGISTER TRANS
12/03/2003 DECLARATION OF SERVICE
              VIRGINIA T. KILGORE SERVED THAT CERTAIN
              SUBPOENA DUCES TECUM, ADDRESSED TO
              RICHARD B. MARTINEZ CLERK OF COURT AND
              ISSUED IN THIS ACTION ON DEC. 03, 2003
              ON THE SAID RICHARD MARTINEZ BY
              DELIVERING A COPY THEREOF TO HIM
12/03/2003 SUBPOENA DUCES TECUM
              TO: RICHARD B. MARTINEZ, CLERK  OF COURT
              YOU ARE HEREBY COMMANDED TO APPEAR BEFOR
              THE SUPERIOR COURT ON THE 5TH DAY OF
              DECEMBER 2003 AT 10AM TO TESTIFY ON
              BEHALF OF PETITIONER IN THE ABOVE ENTITL
              ACTION AND BRING WITH YOU THE FILE AND
              ALL OTHER PAPERS AND RECORDS IN YOUR
              CONTROL AND POSSESSION CONCERNING THAT
              CERTAIN ACTION ENTITLED CASE NO CF317-97
12/05/2003 RECORDING LOG
              TAPE NO. 03-1727 THRU 03-1728
              LOG NO.  2129    END  1292
              ORDER TO SHOW CAUSE IN RE:
               PETITION FOR WRIT OF HABEAS CORPUS
              JUDGE UNPINGCO
              MATTER TAKEN UNDER ADVISEMENT, COUNSELS
              TO SUBMIT THEIR PORPOSED ORDERS.
12/18/2003 TRANSCRIPT
              TRANSCRIPT OF PETITION FOR WRIT OF
              HABEAS CORPUS HEARD ON 12-5-2003 FILED
              ON 12-18-2003.  TRANSCRIPT PPD BY J.
              ROBERTO, CRU.
12/19/2003 UNSIGNED DOCUMENT(S)

------------------------------------------------------------------------

FILING       PROCEEDINGS
  DATE          COMMENT

              ORDER
              SUBMITTED BY HOWARD TRAPP
12/19/2003 UNSIGNED DOCUMENT(S)
              DECISION
              SUBMITTED BY HOWARD TRAPP
12/26/2003 SUBMISSION
              OF PROPOSED FINDINGS OF FACT AND
              CONCLUSIONS OF LAW
              SUB BY: B. ANN KEITH-ATTY GENERAL-GEN
              CRIMES
02/27/2004 DECISION AND ORDER
              DECISION AND ORDER
              BASED UPON THE FOREGOING PETITIONER
              RANDY IGNACIO CHARGUALAFS PETITION FOR
              WRIT OF HABEAS CORPUS IS HEREBY DENIED
              SIGNED BY JUDGE UNPINGCO
02/27/2004 SPEED MEMO
              TO:OFFICE OF ATTY GENERAL
                 HOWARD TRAPP
              DECISION AND ORDER RENDERED ON FEB 27
              2004
02/27/2004 NEOD & DECL
              TO:OFFICE OF ATTY GENERAL
                 HOWARD TRAPP INC
              DECISION AND ORDER
03/18/2004 AFFIDAVIT OF SERVICE
              SERVED UPON ATTY. HOWARD TRAPP
              DOCUMENT SERVED: DECISION AND ORDER
03/18/2004 AFFIDAVIT OF SERVICE
              SERVED UPON ATTORNEY GENERAL OFFICE.
              DOCUMENT SERVED: DECISION AND ORDER

## CERTIFICATE OF CLERK
## OF SUPERIOR COURT OF GUAM

I do hereby certify that the foregoing pages numbered from 1 through 181 are full, true, and correct copies of the originals on file in the office of the Clerk of the Superior Court of Guam.

Dated at Hagåtña, Guam,

RICHARD B. MARTINEZ
Acting Clerk, Superior Court of Guam

182

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on Robert D. Camacho, Director of Corrections, Government of Guam, by leaving a copy thereof at his office at Building A111, Mariner Blvd, Tiyan, Guam, his last known address, with a person in charge thereof, on July 8, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on July 8, 2004.

_____
CHARLENE C. CRUZ

**183**

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on the Honorable Douglas B. Moylan, Attorney General of Guam, by leaving a copy thereof at his office at the Guam Judicial Center, Suite 2-200E, 120 West O'Brien Drive, Hagåtña, Guam, his last known address, with a person in charge thereof, on July 8, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on July 8, 2004.

_____
CHARLENE C. CRUZ

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM
Plaintiff-Appellee

### vs.

## RANDY IGNACIO CHARGUALAF
Defendant-Appellant

## OPINION

## Cite as: 2001 Guam 01

: do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam
Dated at Hagåtña, Guam

FEB 0 8 2005

Deputy Clerk, Supreme Court of Guam

Supreme Court Case No. CRA00-002
Superior Court Case No. CF0317-97

Appeal from the Superior Court of Guam
Argued and submitted on October 26, 2000
Hagåtña, Guam

Appearing for the Plaintiff-Appellee:
Angela M. Borzachillo
Assistant Attorney General
Office of the Attorney General
Prosecution Div.
Suite 2-200E, Guam Judicial Ctr.
120 W. O'Brien Dr.
Hagåtña, Guam 96910

Appearing for the Defendant-Appellant:
Terry E. Timblin, Esq.
Attorney at Law
Ste. 501C, GCIC Bldg.
414 W. Soledad Ave.
Hagåtña, Guam 96910



**ORIGINAL**

BEFORE: BENJAMIN J.F. CRUZ, Chief Justice, PETER C. SIGUENZA, JR., Associate Justice, and JOHN A. MANGLONA, Designated Justice.

**SIGUENZA, J.:**

**[1]**    Randy Ignacio Chargualaf (hereinafter "Chargualaf") was convicted of Second Degree Robbery (as a Second Degree Felony) with a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, Conspiracy to Commit Robbery (as a Second Degree Felony), and Theft (as a Misdemeanor) after a jury trial in the Superior Court of Guam. Chargualaf appeals his convictions on the following grounds: (1) that the trial court erred when it denied his motion to suppress evidence on the ground that his Fourth Amendment rights were violated; (2) that the trial court erred when it refused to exclude the identification testimony of the victim; and (3) that the convictions should be overturned because the jury returned an inconsistent verdict. For the reasons set forth in this opinion, we reject each of these arguments and hereby affirm his convictions.


**I.**

**[2]**    At approximately 11:00 p.m. on July 20, 1997, Nobuyo Certeza (hereinafter "Certeza") was robbed at gunpoint in her home by three individuals, two males and one female.[1] The perpetrators took an envelope containing cash and Certeza's purse which contained her wallet and credit card.

**[3]**    At 9:45 a.m. on July 21, 1997, police officer Christopher Dawson (hereinafter "Dawson") of the Guam Police Department, while on routine patrol along Route 1, stopped a car driven by Chargualaf after he noticed that the vehicle had a cracked front windshield and a missing license

---

[1] One male was cross-dressed and thus appeared to Certeza to be a female.

plate. Candelaria Quidachay Mendiola (hereinafter "C. Mendiola") was the passenger. Dawson testified that Chargualaf looked particularly nervous upon being stopped. He then asked Chargualaf whether there were narcotics or weapons present in the car and Chargualaf said no. Dawson asked if he could search the vehicle and Chargualaf consented. Dawson then directed both Chargualaf and C. Mendiola to step out of the vehicle. At that point, Chargualaf pulled up the door panel and made furtive movements with his hands, out of Dawson's view. Chargualaf explained that he was trying to jimmy the lock to open the vehicle door. Dawson then opened the door from the outside at which point Chargualaf pulled the door shut. Dawson then drew his weapon, opened the door, and ordered Chargualaf to step in front of the car. Chargualaf complied. Unbeknownst to Dawson, Chargualaf had taken a pistol from the car. While Dawson was searching the car, Chargualaf placed the firearm on the ground at the front of the car where he was directed to stand. Dawson inspected the door panel and did not find anything. A back-up police officer, Santo Tomas, arrived and asked Chargualaf whether he had previously given permission to Dawson to search the car for firearms or drugs. Chargualaf answered in the affirmative.

[4]     Dawson also requested that C. Mendiola exit the car along with Chargualaf. Upon exiting the car, C. Mendiola carried a black pouch with her. Dawson searched the pouch after getting C. Mendiola's consent, and found a credit card with Japanese Kanji characters, drugs and drug paraphernalia. Santo Tomas then recognized both C. Mendiola and Chargualaf as matching the description of the suspects of the Certeza robbery the previous night. At around 10:00 a.m., Santo Tomas noticed the pistol on the ground at the front of the vehicle, he then drew his weapon and ordered Chargualaf to raise his hands. Dawson then searched Chargualaf's person and cuffed him.

**[5]** As a result of the above circumstances, Chargualaf was implicated in the Certeza robbery the previous night and was arrested. His room at the Golden Motel was searched which yielded additional evidence linking him with the crime. C. Mendiola was also arrested.

**[6]** Following his arrest, the police officers took Chargualaf to the Tamuning police koban and, while there, Ms. Certeza arrived to identify the credit card found in C. Mendiola's black pouch. A police officer asked Ms. Certeza, "Is this the guy?" She replied that she did not remember. At that point Mr. Certeza, Ms. Certeza's husband, requested that his wife close her eyes and try to remember. Ms. Certeza then identified Chargualaf as being the perpetrator stating, "Yes, that's him."

**[7]** At the koban, Chargualaf revealed that Don Allen Borja Mendiola (hereinafter "D. Mendiola") was a participant in the robbery. The police arrested D. Mendiola at his home later that day.

**[8]** Chargualaf was indicted on July 31, 1997, and charged with one count of Second Degree Robbery (as a Second Degree Felony), a Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, one count of Conspiracy to Commit Robbery (as a Second Degree Felony), one count of Theft (as a Misdemeanor), one count of Possession of a Firearm Without an Identification Card, and one count of Possession of a Concealed Firearm. Also charged in the Indictment were Co-Defendants, C. Mendiola and D. Mendiola.

**[9]** Chargualaf filed a motion to dismiss and suppress the evidence obtained as a result of the traffic stop detention and arrest on Fourth Amendment grounds. Chargualaf also filed a motion to exclude the in-court identification testimony by Ms. Certeza. The lower court denied both motions. Prior to trial, the two co-Defendants entered into Plea Agreements whereby each pleaded guilty to

one count of Robbery in exchange for testimony against Chargualaf.

[10]    A jury trial was held on November 1-9, 1999. The jury found Chargualaf guilty on the Second Degree Robbery, the Special Allegation, Conspiracy and Theft counts, and acquitted on the Possession of a Firearm Without an Identification Card and Possession of a Concealed Firearm counts. The court sentenced Chargualaf on February 1, 2000, and filed its written judgment on March 9, 2000, which was entered on the docket on March 15, 2000. Chargualaf filed a Notice of Appeal on March 15, 2000.

## II.

[11]    We have jurisdiction over this appeal pursuant to Title 8 GCA § 130.15(a) (1993) and Title 7 GCA §§ 3107 and 3108 (1994).

## III.

### A. Fourth Amendment Search and Seizure

[12]    Chargualaf appeals the trial court's denial of his motion to suppress evidence. He claims his Fourth Amendment right to be free from unreasonable searches and seizures was violated when Officer Dawson detained him and searched his vehicle, and that such violation warrants the exclusion of all evidence which resulted from the search and seizure. We review a trial court's decision on a defendant's motion to suppress evidence *de novo*. *People v. Hualde*, 1999 Guam 3, ¶ 19. Where a motion to suppress is grounded on a Fourth Amendment violation, the issue of the lawfulness of a search or seizure is reviewed *de novo*. *See People v. Manibusan*, 1990 WL 320756, **3 (D. Guam App. Div. Feb. 16, 1990) ("The court reviews findings of probable cause, exigent

circumstances, and the overall lawfulness of a search *de novo*.") (citations omitted); *United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995).

[13]    We hold, as a matter of law, that Chargualaf's Fourth Amendment rights were not violated and the trial court's denial of his motion to suppress was therefore proper.

[14]    The Fourth Amendment protects against unreasonable searches and seizures and is made applicable to Guam via section 1421b(c) of the Organic Act of Guam. *See People v. Johnson*, 1997 Guam 9, ¶ 4. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security'." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S.Ct. 330, 332 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)). Every search or seizure must be reasonable under the circumstances to pass muster under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996). A search or seizure made without a warrant is presumed to be unreasonable. *See Pennsylvania v. Strickler*, 757 A.2d 884, 888 (Pa. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). In the absence of a warrant, the police may lawfully conduct a search or seizure only if an exception to the warrant requirement applies. *See id.; see generally United States v. Woodrum*, 202 F.3d 1, *6 (1st Cir. 2000) (recognizing that reasonable suspicion of criminal activity and voluntary consent are two situations which justify the seizure of the person in an automobile absent a warrant) (citations omitted). Voluntary consent is a recognized exception to the warrant requirement. *See People v. Santos*, 1999 Guam 1, ¶ 33 (citations omitted).

//

//

[15]    In the instant case, Chargualaf gave consent to search his vehicle. Thus, the issue is whether Chargualaf's consent was valid.    If consent is given during either a lawful encounter or a lawful detention, as opposed to an illegal seizure, the validity of the consent turns on whether it was voluntarily given. *See Santos,* 1999 Guam at ¶¶ 33-34; *Strickler,* 757 A.2d at 888-889. Where the consent is given during an unlawful detention, all evidence that is the fruit of the search must be suppressed "absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus ensuring that the search is not an exploitation of the prior illegality, and of voluntariness." *Strickler,* 757 A.2d at 889 (citing *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1323, 1326 (plurality opinion)).

### i. Illegal detention at time of consent

[16]    Our first inquiry is whether Chargualaf was illegally detained at the time he gave his consent. Chargualaf argues that while the initial detention for purposes of the traffic violation was valid, he was subsequently illegally detained when the police questioned him about the presence of drugs or weapons in the vehicle. He further argues that this illegal detention tainted his consent. We agree that the initial detention was valid; however, we disagree that Chargualaf was detained at the time he gave his consent.

### a. Initial detention

[17]    It is clear that the act of pulling Chargualaf over for the traffic violation was a seizure. *See Whren,* 517 U.S. at 809-10, 116 S.Ct. at 1772 (citations omitted); *see also Woodrum,* 202 F.3d at *5 (citations omitted); *United States v. McSwain,* 29 F.3d 558, 561 (10th Cir. 1994) (citation omitted). It is equally clear that this initial detention was reasonable and within the bounds of permissible action under the Fourth Amendment. "As a general matter, the decision to stop an

automobile [without a warrant] is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. at 1772 (citations omitted). Further, it is reasonable to stop a car where the police merely have reasonable suspicion to believe the driver has committed a traffic violation. *See United States v. Lopez-Soto,* 205 F.3d 1101, 1104-05 (9th Cir. 2000) ("We [ ] reaffirm that the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."); *cf. Mimms,* 434 U.S. at 109, 98 S.Ct. at 332 (stating that it is entirely proper to stop and detain a driver who violated a provision in the state motor vehicle code).

[18]   Here, the police stopped Chargualaf for a cracked front windshield and a missing front license plate. The parties do not dispute that the pull over constituted a valid detention.

### b. Continuing detention

[19]   The next inquiry is whether the initial detention for the traffic violation ended and, if so, whether Chargualaf was subjected to a subsequent detention. Officer Dawson's inquiry into whether Chargualaf possessed drugs or weapons, while constitutionally permissible, strongly indicates that the original investigation of the traffic violation ended. *See United States v. Shabazz,* 993 F.2d 431, 436 (5th Cir. 1993) (recognizing that the mere questioning of a detainee is neither a search nor a seizure but may indicate that the justification behind the initial detention has evaporated). At that point, Dawson was inquiring into illegal activities unrelated to the traffic violations.

[20]   Investigative questioning regarding criminal activity does not, in itself, implicate the Fourth Amendment. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324 (1983) (plurality opinion).   The Fourth Amendment protects against unreasonable searches and seizures. Accordingly, the Fourth Amendment is only at issue where the police detain or seize an individual

## 193

while posing investigative questions. *See id.* Because, in this case, the police had ended its investigation into the traffic stop and initiated a new, albeit limited, investigation, we must determine whether Chargualaf was detained or was subjected to a second seizure when being questioned regarding the presence of drugs or weapons and while Chargualaf gave consent immediately following the investigation into drugs or weapons.

[21] A seizure occurs where a reasonable person would not believe he is free to leave. *See Manibusan*, 1990 WL 320756 at **4 (citing *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)); *see also People v. Cruz*, 1997 WL 208994, **3 (D. Guam App. Div. April 21, 1997). "A person is deemed to be seized for the purposes of the Fourth Amendment if a police officer has, by means of physical force or show of authority, restrained the person's freedom to walk away." *Cruz*, 1991 WL 208994 at **3 (citation omitted); *see also Woodrum*, 202 F.3d at *9. In determining whether a person was seized, a court views the totality of the circumstances. *See People v. Brownlee*, 713 N.E.2d 556, 564 (Ill. 1999). If the person would feel free to leave, then the continued presence of the person is not a seizure; rather, it is a consensual encounter with the police that does not implicate the Fourth Amendment. *See United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir. 1993) (citing *Florida v. Bostick*, 501 U.S. 429, ---, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)); *Strickler*, 757 A.2d at 901, fn. 27.

[22] In *Strickler*, 757 A.2d 884, the court found that the defendant was not seized. The court recognized that in the context of a post-detention interaction, (i.e., after the initial lawful detention ends), "the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter is a significant factor suggesting a continued seizure under the Fourth Amendment." *Id.* at 899 (internal quotations and citations omitted). The *Strickler* court found that while the police

did not tell the driver he was free to terminate the encounter, the defendant-driver was not subjected to a seizure because the police officer's actions and the tone of the encounter suggested that the driver was free to go. *Id.* at 900. Relevant factors included: the fact of returning the driver's documentation, the fact that the initial investigative detention was less intrusive than a normal traffic stop because the police did not have to order the driver out of the car as the driver was already outside the vehicle; there was no show of weapons or use of language or tone unwarranted under the circumstances; and the police told the driver he had a right to refuse to consent to the search. *Id.*

[23]    Circumstances illustrating a seizure are found in *Cruz*, 1997 WL 208994 at **5, where the defendant was stopped at a roadblock. The court found that assuming this initial seizure at the roadblock was constitutional, "any continuing seizure [beyond the reason for the roadblock] must be independently justified." *Id.* (citing *Terry*, 392 U.S. at 16). The court determined that the defendant was seized when further questioned because "her driver's license was never returned to her; she was unable to drive forward because the street was blocked by several cars, including a police car with its top lights flashing; . . . and she was surrounded by six law enforcement officers who were under instructions not to allow her to leave." *Id.*

[24]    In the present case, while Dawson held Chargualaf's driving documentation while questioning regarding the presence of drugs or weapons and while asking for consent to search, this fact, standing alone, does not amount to a seizure of Chargualaf. The overall circumstances of the encounter show that Chargualaf was not seized or detained at the time he gave his consent. Like *Strickler*, there is no showing in the record that Dawson was overly aggressive during the initial detention. Dawson did not pull out his firearm during the initial detention for the traffic violation

or use language incommensurate with the circumstances. Chargualaf was also inside the vehicle at the time he consented. Unlike the defendant in *Cruz*, Chargualaf was not blocked into his parking spot by police cars, nor was he surrounded by police officers instructed to keep him at the scene. The absence of coercive behavior by the police objectively show that Chargualaf was free to end the encounter and proceed on his way. Absent other coercive behavior on the part of the police, we cannot say that a person does not feel free to leave by virtue of the fact that the officer held his license and registration. There is nothing exceptional about a person requesting the return of their documentation and leaving upon an officer's initiation of questions regarding matters outside the scope of the traffic violation.[2] The encounter between Chargualaf and Dawson was a mere consensual encounter and not a detention, thus, the Fourth Amendment is not implicated.[3]

### ii. Voluntariness of consent

[25]     Having decided that Chargualaf was not seized or detained, the next inquiry is whether his consent was voluntary. The government has the burden to prove by a preponderance of the evidence that Chargualaf gave consent voluntarily, and voluntariness is determined from the totality of the circumstances. *See Santos*, 1999 Guam 1 at ¶¶ 33- 34; *Shabazz*, 993 F.2d at 438. Factors in determining voluntariness include: 1) whether the defendant was detained and the length of time of the questioning; 2) whether the defendant was threatened or intimidated by the police; 3) whether the defendant relied on misrepresentations or promises made by the police; 4) whether the person

---

[2] We note that a police officer's refusal to return the documents upon request is the type of coercive behavior that would likely lead to a finding that a seizure has been affected.

[3] So long as a driver fells free to leave, a police officer may asks questions regarding criminal activity absent reasonable suspicion. The police may question the driver about the presence of drugs or weapons or whether he has been drinking alcohol or possesses alcohol inside the vehicle. The driver is not required to answer such questions, *see Royer*, 460 U.S. at 497-98, 103 S.Ct. at 1324, just as surely he is not required to submit to a request to search.

was in custody or under arrest when the consent was given; 5) whether the person was in a public or a secluded place; and 6) whether the defendant objected to the search. *Santos*, 1999 Guam 1 at ¶ 36.

[26]    While finding that Chargualaf's consent was valid, the trial court wholly failed to determine whether such consent was voluntary. However, because the record is adequate, we proceed to determine whether the consent was voluntary viewing the totality of the circumstances. *Accord McSwain*, 29 F.3d at 562 (relying on a sufficient record of the proceedings below to make a determination of whether the defendant's consent was tainted by a preceding illegal detention notwithstanding that the trial court failed to make the analysis).

[27]    We find that in the totality of the circumstances, Chargualaf's consent was voluntary. First, Chargualaf was not detained at the time he consented and Dawson's questioning was only for a brief period. Second, the record reveals that Dawson did not assert any coercive behavior when questioning Chargualaf and prior to asking for consent. Third, Dawson did not make any representations regarding the consent to search, Dawson merely asked for consent and nothing more. Fourth, Chargualaf was not in custody or under arrest when he gave consent. Finally, Chargualaf made absolutely no objections to the search, rather, he readily granted consent and even verified to a second officer, Santo Tomas, that he had given consent. Viewing all the circumstances, we hold that Chargualaf voluntarily gave consent and therefore find that the trial court did not err in denying Chargualaf's motion to suppress. *Cf. Soto*, 988 F.2d at 1558 (determining that consent was voluntary where only one police officer was present, the police officer did not unholster his weapon, did not use an insisting tone or manner or physically harass the defendant, the request for consent occurred on the shoulder of the highway and in public view, and the defendant's consent was

unequivocal and specific).

## B. Inconsistent Verdicts

[28]  The jury found on the Special Allegation of Possession and Use of a Deadly Weapon in the Commission of a Felony, and acquitted Chargualaf on the counts of Possession of a Firearm Without an Identification Card and Possession of a Concealed Firearm. Chargualaf asserts that the finding on the Special Allegation was inconsistent with the acquittals, thereby showing that the finding was based on insufficient evidence and must therefore be overturned. We disagree.

[29]  We review the issue of whether to set aside a conviction based on an inconsistent verdict *de novo*. *See People v. Angoco*, 1996 WL 875777, **6 (D. Guam. App. Div. Oct. 16, 1996) (citing *United States v. Hart*, 963 F.2d 1278 (9th Cir. 1992)); *see also United States v. Mitchell*, 146 F.3d 1338, 1342 (11th Cir. 1998) (recognizing that the issue of whether inconsistent verdicts render a conviction improper constitutes a question of law and is reviewed *de novo*).

[30]  A conviction generally may not be overturned solely on the ground that the jury reached an inconsistent verdict. *United States v. Powell*, 469 U.S. 57, 68-69, 105 S.Ct. 471, 479 (1984); *see also Angoco*, 1996 WL 875777 at **6 (holding that *Powell* requires the court to reject the appellant's claim that the conviction should be vacated due to an inconsistent verdict); *United States v. McCall*, 85 F.3d 1193, 1197-98 (6th Cir. 1996) (holding that even if the verdict was inconsistent, the conviction "remains 'insulated' from review") (citing *Powell*, 469 U.S. at 69, 105 S.Ct. at 479); *United States v. Birges*, 723 F.2d 666, 673 (9th Cir. 1984); *United States v. Torres*, 809 F.2d 429, 431-32 (7th Cir. 1987). The rationale behind the rule is set forth in *Powell*, wherein the court asserted:

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt" . . . . It is equally possible the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*Powell*, 469 U.S. at 64-65, 105 S.Ct. at 476 (internal citations omitted). Courts should accept the collective judgment of the jury and should refrain from delving into the jurors' thought processes. *See id.* 469 U.S. at 67, 105 S.Ct. at 478.

[31] Inconsistent verdicts are not a bar to a conviction so long as there is sufficient evidence to support the guilty verdict. *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999) (citations omitted); *see also Birges*, 723 F.2d at 673 ("Inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support the guilty verdict.") (citations omitted); *Bates v. Maryland*, 736 A.2d 407, 416 (Md. Ct. Spec. App. 1999) (holding that one instance where an inconsistency will not be permitted is where "the evidence was insufficient to support the [ ] conviction."); *Mitchell*, 146 F.3d at 1345 ("[A]s long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count.").

[32] In this case, we find no inconsistency in the jury's verdict. Chargualaf was indicted for possessing a concealed firearm and possessing a firearm without a license on or about the July 21, 1997 and for a Special Allegation of possessing a firearm in the commission of the robbery on or about July 20, 1997, in violation of section 80.37 of Title 9 of the Guam Code Annotated, which provides: "Whoever unlawfully possesses or uses a deadly weapon in the commission of a felony punishable under the laws of Guam shall, in addition to the punishment imposed for the commission

of such felony, be imprisoned for a term not less than five (5) years . . . ." Title 9 GCA § 80.37 (1996).

[33]    The jury's acquittal on the firearm charges is not inconsistent with the finding on the Special Allegation that Chargualaf possessed a deadly weapon during the commission of the Certeza robbery. The charges were for different offenses allegedly committed on different days. The jury could have decided that Chargualaf did not possess and conceal the firearm recovered during the July 21, 1997 traffic stop and still determine that Chargualaf possessed or used a deadly weapon during the July 20, 1997 robbery.

[34]    In fact, we find there was sufficient evidence to make a finding on the Special Allegation. Certeza and D. Mendiola both testified that Chargualaf wielded a firearm during the robbery. C. Mendiola, who was also present during the robbery, testified that during the robbery Chargualaf was holding an object and was waiving it around. This evidence supports a finding on the Special Allegation that the defendant used a deadly weapon during the commission of the robbery. *See Gieger*, 190 F.3d at 664. Therefore, the jury's finding on the Special Allegation will stand.

## C. In-Court Identification

[35]    Chargualaf asserts that the trial court erred in denying his motion to suppress the in-court identification by Ms. Certeza. He argues that the admission of the identification evidence was a violation of his due process rights. A trial court's decision regarding the admission of an in-court identification is reviewed for an abuse of discretion. *See United States v. Duran*, 4 F.3d 800, 803 (9th Cir. 1993). "A trial judge abuses his [or] her discretion [ ] when the decision is based on an erroneous conclusion of law or where the record contains no evidence on which the judge could

have rationally based the decision." *Midsea Industrial Inc. v. HK Engineering, Ltd.*, 1998 Guam 14, ¶ 4 (citation omitted). We hold that the trial court properly admitted the in-court identification.

[36]   In determining the admissibility of an in-court identification, we must make two inquiries. First, whether the defendant has proven that the pre-trial identification was unnecessarily suggestive, and second, if so, whether the in-court identification was nevertheless sufficiently reliable viewing the totality of the circumstances. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *see also Burkett v. Fulcomer*, 951 F.2d 1431, 1448 (3d Cir 1991) ("The general inquiry is whether the procedure was unnecessarily suggestive, and if so, whether its corrupting influence outweighs the reliability of the identification testimony.") (citations omitted); *Ford v. Armontrout*, 916 F.2d 457, 459 (8th Cir. 1990); *Archuleta v. Kerby*, 864 F.2d 709, 711 (10th Cir. 1989); *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984). If the defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification was sufficiently reliable, then there has been no due process violation by the admission of the identification evidence. *Hill*, 967 F.2d at 230.

[37]   A pre-trial identification can be so suggestive that it taints the in-court identification. *See United States v. Montgomery*, 150 F.3d 983, 991 (9th Cir. 1998) (quoting *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985)). However, where an in-court identification is sufficiently reliable, the identification is admissible notwithstanding that the identification was made pursuant to an unnecessarily suggestive pre-trial identification procedure. *See id.* at 993; *see also Cossel v. Miller*, 2000 WL 1511702, *5 (7th Cir. 2000) ("An in-court identification that follows an impermissibly suggestive pre-trial identification is admissible if under the 'totality of the circumstances' the in-court identification was reliable.") (citations omitted). A court may admit a

sufficiently reliable in-court identification without offending the defendant's right to due process. Determinations of reliability are case-specific, and are adjudged looking at the totality of the circumstances. *See Montgomery*, 150 F.3d at 993; *see also United States v. Brown*, 200 F.3d 700, 707 (10th Cir. 1999) ("The admission of an in-court identification testimony violates due process only when, under the totality of the circumstances, it was tainted by unnecessarily suggestive pretrial identification procedures creating a 'very substantial likelihood of misidentification'.") (citation omitted).

[38]    In the instant case, the trial court held that the pre-trial identification procedure at the koban was "unnecessarily suggestive".[4] Because Chargualaf does not contest this finding, the only remaining issue is whether the trial court erred in determining that notwithstanding the suggestibility, the identification was sufficiently reliable so as to render admissible the in-court identification.

[39]    Courts consider five factors in determining whether an in-court identification is reliable. These are: "[1] the opportunity of the witness to view the criminal at the time of the incident; [2] the witness' degree of attention; [3] the accuracy of the witness' prior description of the defendant; [4] the level of certainty demonstrated by the witness at the [pre-trial identification]; and [5] the length of time between the crime and the [pre-trial identification]." *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972); *see also Ponce*, 735 F.2d at 337-38 (clarifying that in evaluating the

---

[4] Factors in the record that suggest that the pre-trial procedure was "suggestive" are that the defendant was the only person in the koban besides police officers and the victim and her husband, the encounter amounted to a show-up instead of a line-up, the encounter was at the police station, and Chargualaf was in police custody. *Cf. United States v. Brierton*, 699 F.2d 917, 924 (7th Cir. 1983) (acknowledging that because there was a show-up instead of a line-up, the identification was made in a police station, various high ranking police officers were present, the defendant was in a jail cell at the time of the identification, and the defendant was the only black man present, the identification procedure was highly suggestive).

reliability of an in-court identification, the reviewing court must consider the witness' level of certainty at the *prior confrontation*, not the in-court identification, and the amount of time which elapsed between the crime and the *pre-trial identification*, not the in-court identification); *Brown*, 200 F.3d at 707; *Hill*, 967 F.2d at 230; *Cossel*, 2000 WL 1511702 at * 5; *Archuleta*, 864 F.2d at 711; *Ponce*, 735 F.2d at 336; *United States v. Brierton*, 699 F.2d 917, 924 (7th Cir. 1983). The court must determine whether the in-court identification was based upon the witness' recollection of the defendant from the time of the crime, rather than on the suggestive nature of the pretrial identification. *See United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988) (citation omitted); *Brierton*, 699 F.2d at 924-25 ("The propriety of admitting into evidence the identification testimony . . . depends, therefore, upon whether [the witness'] in-court identification was reliable, that is, based on a source independent of the police suggestion.") (footnote omitted). The government has the burden to prove, by clear and convincing evidence, that the in-court identification was not based upon the suggestive pre-trial identification procedure. *See Brierton*, 699 F.2d at 925 (citing *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967)).

[40]    Whether an in-court identification is sufficiently reliable so as to warrant its admission is determined by weighing the *Biggers* factors against the corrupting effect of the suggestive pre-trial identification procedure. *See Ponce*, 735 F.2d at 337, 338 (applying this balancing test in analyzing the reliability of both a pre-trial and in-court identification); *see also Hill*, 951 F.2d at 459. If the identification is sufficiently reliable, then the court may properly admit the evidence because the reliability of the identification undercuts any substantial likelihood of irreparable misidentification. *See Armontrout*, 916 F.2d at 459 (using the *Biggers* reliability factors in determining that the confrontation between the rape victim and the defendant did not create a substantial likelihood of

## 203

misidentification). "It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which [is] the basis of the exclusion of evidence. . . ." *Biggers*, 409 U.S. at 198, 93 S.Ct. at 381- 82 (1972).

[41] Analyzing the first *Biggers* factor, the question is whether Ms. Certeza had a good opportunity to view Chargualaf during the robbery. At the hearing regarding the motion to suppress the in-court identification, Ms. Certeza testified that the three robbers entered her house at around 11:00 p.m., and remained in her home for about five to eight minutes. She testified that she got a good look at the three assailants. This amount of time is enough to get a good view of Chargualaf. Further, Ms. Certeza testified that during the incident the lights were bright because she was cooking dinner. Therefore, we find that Certeza had more than sufficient opportunity to view Chargualaf. *Cf. Archuleta*, 864 F.2d at 712 (determining that the identifying witness had ample opportunity to identify the defendant where the witness got a good look at the defendant's face even if only for a total observation time of two minutes) (citing other cases where an observation made in a matter of seconds was sufficient so long as the witness got a close-up look at the defendant) (citations omitted); *Cossel*, 2000 WL 1511702 at * 5 (determining that a ten-second observation of the defendant in moon and street lights satisfies the first factor).

[42] Turning to the witness' degree of attention, Ms. Certeza was able to recall many events of the encounter, such as that the first entrant, a woman, asked her to use the phone, a second woman entered with her shoes on, and that Ms. Certeza asked her to take her shoes off. Further, she was able to recall that Chargualaf had a gun, wore certain colors of clothing and had a moustache. The ability to remember details like this is a demonstration of her focus during the encounter. *Cf. Archuleta*, 864 F.2d at 712 (recognizing that the ability to recall a number of descriptive details is

sufficient to satisfy the second factor).

[43]    Next, the accuracy of the witness' prior identification of the defendant leads us to similarly conclude that her in-court identification was reliable. As stated above, Ms. Certeza testified that she described the only man of the three as Chamorro, holding a gun, wearing a hat, a dark green polo shirt, and black pants, he had a moustache, black hair, and a tattoo.  While cross-examination revealed that Ms. Certeza never mentioned Chargualaf's tattoo to the police, the general level of description shows that Ms. Certeza was accurate in her description of Chargualaf. *Cf. id.* (holding that the witnesses' identification was accurate where they described the victim as "a Spanish male with dark hair and a moustache, wearing a black t-shirt with an emblem and blue jeans".)  The failure to recall a detail like the tattoo is not dispositive here. *Cf. id.* (determining that in light of the other details the witness was able to recall, the fact that the height was inaccurate and the failure to recall tattoos "appears to be a minor error"); *see also Dodd v. Nix*, 48 F.3d 1071, 1074 (8th Cir. 1995) (holding that the victim's failure to describe a goatee and tattoos was not fatal to the reliability determination where the description of the defendant was otherwise largely accurate) (citation omitted).

[44]    Additionally, Certeza's level of certainty at the pretrial identification favors a finding that her in-court identification was reliable. Ms. Certeza testified that the police asked her whether the Chargualaf was "the guy"[5]  The record shows that Certeza initially responded that she did not remember if Chargualaf was her attacker, but identified him after her husband told her to close her eyes and think hard about it. Ms. Certeza testified that she identified Chargualaf at the police koban

---

[5] As a note, Ms. Certeza first testified that the police did not ask her to identify Chargualaf, however, she clarified that the police in fact asked her whether Chargualaf was "him", in which she responded in the affirmative. Transcript, vol. 1, pp 53-55 ( Motion to Suppress Identification Hearing, May 14, 1999).

because she remembered his face, and not because the police suggested that Chargualaf was the robber. Although Ms. Certeza did not definitely identify Chargualaf at first sight, she has never identified anyone else as her attacker. *Cf. Archuleta*, 864 F.2d at 712 (rendering significant the fact that the witness was certain about the defendant's identity and that the identification remained "unequivocal at all times").

[45]    Finally, Ms. Certeza identified Chargualaf the day after the robbery. This is a relatively short amount of time and thus supports the conclusion that the in-court identification was reliable. *Cf. Montgomery*, 150 F.3d at 993 (implicitly finding that one year between the incident and the identification did not cut against reliability); *Ponce*, 735 F.2d at 337 (recognizing that in *Manson v. Brothwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2253 (1977), an identification made two days after the incident was "unobjectionable"); *Cossel*, 2000 WL 1511702 at *6 (determining that three years was too long).

[46]    The trial court pointed out many of the above factors in determining that the in-court identification was reliable. Thus, we cannot say that the court's finding of reliability by clear and convincing evidence was erroneous.

[47]    We further find that the in-court identification was sufficiently reliable so as to warrant its admission. Because the facts in this case favor a finding of reliability under each of the *Biggers* factors, the reliability of the identification outweighs the corrupting effect of the suggestive pre-trial identification procedure. The pre-trial identification procedure did not produce a substantial likelihood of misidentification. Accordingly, the lower court did not abuse its discretion in admitting the in-court identification.

//

## IV.

[48]    We find that there was no Fourth Amendment violation, that the jury in this case did not reach inconsistent verdicts, and that the in-court identification was sufficiently reliable. Accordingly, we **AFFIRM** the trial court's denial of the Appellant's motions to suppress the evidence and in-court identification and the judgment of conviction.

PETER C. SIGUENZA

**PETER C. SIGUENZA, JR.**
**Associate Justice**

JOHN A. MANGLONA

**JOHN A. MANGLONA**
**Designated Justice**

**CRUZ, C.J., Dissenting:**

[49]    Chargualaf was pulled over because his vehicle had a cracked windshield and was missing a license plate.   There is no question that this initial stop was a seizure and that it was constitutionally permissible. *See e.g., Whren,* 517 U.S. at 809-810, 116 S.Ct. at 1772.   However, the Majority, while admitting that the initial traffic violation detention ended, finds that there was no new seizure of Chargualaf when Officer Dawson began questioning him on subject matter completely unrelated to the initial pull-over and that the subsequent exchange was merely a consensual encounter. I do not agree.

[50]    I find that a second seizure occurred when Officer Dawson began to question Chargualaf on narcotics and weapons. The test for whether a seizure has been effected involves a determination of whether, in the light of all surrounding circumstances, a reasonable person would have believed he was free to leave. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (citing *United States v. Mendenhall,* 466 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980)). In this case, after the pull-over, Officer Dawson requested and was given Chargualaf's driver's license and vehicle registration. These documents were never returned Chargualaf. Officer Dawson informed Chargualaf of the reasons for the pull-over. There is no indication from the record that Officer Dawson then told Chargualaf he was going to be issued a citation or a warning. Instead, Officer Dawson then asked if there were any drugs or weapons in the vehicle. Clearly, a reasonable person could have thought that the traffic stop was still in effect, that such questions were part of the stop, and that he was not free to leave. This is especially true given that Officer Dawson had not returned Chargualaf's license and registration. *See e.g., Soto,* 988 F.2d at 1557 (observing that a driver who is pulled over cannot drive away without a license and registration which are required by law to operate a motor vehicle on a public

road). Thus, the second seizure cannot be characterized as merely a consensual encounter during which a police officer may generally ask questions of the individual without a reasonable suspicion. *See Florida v. Bostick*, 501 U.S. 429, 433-435, 111 S.Ct. 2382, 2386 (1991).[6]

[51]     The question becomes whether the second seizure was constitutional. I believe it was not. Officer Dawson testified that the reason he asked if there were drugs or weapons in the car was because Chargualaf was more nervous than other drivers he had encountered in normal pull-overs. This testimony offers little support. Concededly, Officer Dawson was within his authority to question Chargualaf on weapons or to even ask him to alight from the vehicle if Officer Dawson feared for his safety. *See Mimms*, 434 U.S. at 111, 98 S.Ct. at 333. However, Officer Dawson's question regarding narcotics indicates that he was not merely motivated by fear, but that he was investigating Chargualaf for other reasons.

[52]     The next inquiry is whether Officer Dawson had a reasonable and articulable suspicion that criminal activity, namely the possession of illegal narcotics, was afoot. *See Johnson*, 1997 Guam 9, at ¶ 4 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Officer Dawson testified that his suspicions were aroused by Chargualaf's nervousness and the presence of a large amount of household items in the rear of the vehicle. However, nervousness, by itself, does not usually give rise to a reasonable suspicion. *See Soto,* 988 F.2d at 1556 (citing *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991) and finding that nervousness with other factors may give rise to a reasonable suspicion). Further, I cannot see how the additional fact that household items were in the car can support a reasonable suspicion. Under these  circumstances, I cannot find that Officer Dawson had a reasonable

---

[6] The same holds true for the initial detention for Chargualaf's traffic violations. This was also not a consensual encounter, it was a detention, the scope of which should have been tailored to its underlying justification and the length of which should have lasted no longer than necessary to effect the purpose of the stop. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325.

suspicion to question Chargualaf on narcotics. Thus, I must conclude that the second seizure of Chargualaf violated his Fourth Amendment right to be free from an unreasonable seizure.

[53]     Notwithstanding an illegal seizure, a subsequently given consent remains valid if it was voluntary in fact under the totality of the circumstances. *McSwain*, 29 F.3d at 562. Three factors annunciated by the United States Supreme Court are relevant in this analysis: 1) the temporal proximity of the illegal detention and consent; 2) any intervening circumstances; 3) the purpose and flagrancy of the office's unlawful conduct. *Brown v. Illinois*, 422 U.S. 590, 603-604, 95 S.Ct. 2254, 2261-2262 (1975) (citations omitted).

[54]     From his testimony, it appears that Officer Dawson asked for consent to search the vehicle immediately after Chargualaf denied having drugs or weapons in the car. Chargualaf gave his consent, and Officer Dawson asked him to step out of the vehicle. Mere moments passed between the time the illegal seizure occurred and the time Officer Dawson asked for consent. Almost no time passed by the time consent was given and no intervening circumstances occurred. I note that had Officer Santo Tomas arrived prior to Chargualaf's consent and identified the vehicle occupants as fitting the descriptions of persons involved in the Certeza robbery, then a valid intervening circumstance would have occurred sufficient to support a further search and the consent would have been valid. However, Officer Santo Tomas arrived after the occupants were ordered out of the vehicle and after the search had commenced. Thus, his identification of the occupants after the search began does not cure its illegality.

[55]     The flagrancy of Officer Dawson's conduct is clear as the initial stop was made strictly on the basis of a traffic violation and an investigation for narcotics ensued. That Chargualaf confirmed his consent to Officer Santo Tomas, offers no support. Officer Santo Tomas arrived at the scene

after Chargualaf gave his involuntary consent. Chargualaf's confirmation does nothing to validate the unconstitutional search.

**[56]** I must find therefore that Chargualaf's consent was not voluntarily given and that any evidence flowing therefrom is fruit of the poisonous tree and should have been suppressed. Thus, I respectfully dissent.

BENJAMIN J.F. CRUZ
_____
**BENJAMIN J. F. CRUZ**
**Chief Justice**

## IV.

[48]    We find that there was no Fourth Amendment violation, that the jury in this case did not reach inconsistent verdicts, and that the in-court identification was sufficiently reliable. Accordingly, we **AFFIRM** the trial court's denial of the Appellant's motions to suppress the evidence and in-court identification and the judgment of conviction.

PETER C. SIGUENZA, JR.
**Associate Justice**

JOHN A. MANGLONA
**Designated Justice**

after Chargualaf gave his involuntary consent. Chargualaf's confirmation does nothing to validate the unconstitutional search.

[56]   I must find therefore that Chargualaf's consent was not voluntarily given and that any evidence flowing therefrom is fruit of the poisonous tree and should have been suppressed. Thus, I respectfully dissent.

BENJAMIN J. F. CRUZ
Chief Justice

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

APR 1 6 2001

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| RANDY IGNACIO CHARGUALAF, | No. 01-70172 |
| Petitioner, | |
| | No. CRA 00-002 |
| v. | Supreme Court of Guam |
| THE PEOPLE OF THE TERRITORY OF GUAM, | ORDER |
| Respondent. | |

Before: SNEED, KOZINSKI and RYMER, Circuit Judges

The petition for a writ of certiorari to review a final decision of the Supreme Court of Guam is denied.

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Supreme Court of Guam
Dated at Hagatna, Guam

FEB 0 8 2005

Deputy Clerk, Supreme Court of Guam

S:\MOATT\Panelord\4.9.01\ak3\01-70172a.wpd

214

WHC 04-$OO4$

# SUPREME COURT OF GUAM

----------

## In re RANDY IGNACIO CHARGUALAF,

Petitioner,

## ROBERT D. CAMACHO,
Director of Corrections,
Government of Guam,

Respondent.

----------

On Application for Writ of Habeas Corpus
to Director of Corrections

----------

## PETITION FOR WRIT OF HABEAS CORPUS
## AND MEMORANDUM OF POINTS AND AUTHORITIES

----------

### HOWARD TRAPP

Howard Trapp Incorporated
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

Attorney for petitioner

i do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam
Dated at Hagatna, Guam

FEB 2 3 2005

Imelda B. Duenas
Deputy Clerk Supreme Court of Guam

215

# CONTENTS

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ground for relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Supporting facts and authorities . . . . . . . . . . . . . . . . . . . . . . . . 3

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :. 15

Prayer for relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :. 15

Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Statement of related cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Appendix: Decision and Order . . . . . . . . . . . . . . . . . . . . . . . following 17

i

# AUTHORITIES

## Cases

*Angoco v. Bitanga*, 2001 Guam 17,
   *cert. denied*, No. 01-71305 (9th Cir. Sep. 18, 2002) . . . . . . . . . . . .   4

*Borja v. Bitanga*, 1998 Guam 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

*Miller v. Keeney*, 882 F.2d 1428 (9th Cir. 1989) . . . . . . . . . . . . . . . . .   4

*Morrison v. Estelle*, 981 F.2d 425 (9th Cir. 1992),
   *cert. denied*, 508 U.S. 920 (1993) . . . . . . . . . . . . . . . . . . . . . . .   4

*Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . .  14

*United States v. Guma*, 29 Fed.Appx. 480 (9th Cir. 2002) . . . . . . . . . .  8-9

*United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998) . . . . . . . . . . . . .  14

*United States v. Musa*, 220 F.3d 1096 (9th Cir. 2000),
   *cert denied*, 531 U.S. 999 (2000) . . . . . . . . . . . . . . . . . . . . . . .  5, 6

*United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001) . . . . . .  4-5, 5, 14, 15

*United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) . . . . . . . . . . . . .  5

*United States v. Walker*, 915 F.2d 480 (9th Cir. 1990) . . . . . . . . . . . . . .  5, 6

## Other authorities

9th Cir. R.:

   36-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

   36-3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

   36-3(b)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*Webster's New World College Dictionary* (4th ed. 1999) . . . . . . . . . . . .   8

WHC 04-

SUPREME COURT OF GUAM

----------

In re RANDY IGNACIO CHARGUALAF,

Petitioner,

ROBERT D. CAMACHO,
Director of Corrections,
Government of Guam,

Respondent.

----------

On Application for Writ of Habeas Corpus
to Director of Corrections

----------

PETITION FOR WRIT OF HABEAS CORPUS
AND MEMORANDUM OF POINTS AND AUTHORITIES

----------

TO THE HONORABLE CHIEF JUSTICE AND ASSOCIATE JUSTICES OF THE
SUPREME COURT OF GUAM:

JURISDICTION

This proceeding arises under 8 Guam Code Ann. ch. 135. *(Borja v. Bitanga,* 1998 Guam 29 ¶ 13.)

THE CASE

Petitioner is unlawfully imprisoned and restrained of his liberty by Robert D. Camacho, Director of Corrections, Government of Guam, at the Adult Correctional Facility, Mangilao, Guam.

Petitioner is confined under process of the Superior Court of Guam. (Excerpts of R. 121-23.) The proceeding resulting in the confinement is a criminal case. (Excerpts of R. 60-64.) The case number is CF 0317-97. (Excerpts of R. 121.)

The plea entered in the criminal case was not guilty. (Excerpts of R. 121.) Trial was by jury. (Excerpts of R. 121.) The date of the judgment for confinement is March 9, 2000. (Excerpts of R. 169.) The judgment provides that petitioner is sentenced to imprisonment for a term of 35 years. (Excerpts of R. 122-23.)

An appeal was taken to this Court. (Excerpts of R. 124.)

The judgment was affirmed. (Excerpts of R. 126-46.)

Petitioner applied to the United States Court of Appeals for the Ninth Circuit for review of the decision of this Court by writ of certiorari. (Excerpts of R. 21.)

The application was denied. (Excerpts of R. 21.)

Thereafter petitioner applied to the Supreme Court of the United States for review of the case in the Ninth Circuit by writ of certiorari. (Excerpts of R. 22.)

The application was denied. (Excerpts of R. 22.)

A prior application for writ of habeas corpus in regard to the detention and restraint complained of in this petition was made in the superior court. (Excerpts of R. 1-8.) The superior court issued an order to show cause why petitioner should not be discharged and that a written return be served and filed.

2

(Excerpts of R. 9-10.) An opposition to the petition was served and filed by the attorney general. (Excerpts of R. 11-15.) The superior court heard proof against and in favor of petitioner's imprisonment. (Excerpts of R. 16-172.) The petition was denied. (Excerpts of R. 173-78.) A true copy of the decision on the petition in the superior court is annexed hereto.

## GROUND FOR RELIEF

The illegality of the confinement consists in the ineffectiveness of defense counsel's representation of petitioner in this Court.

## SUPPORTING FACTS AND AUTHORITIES

Petitioner moved to substitute one appointed counsel for another. (Excerpts of R. 75-80.)

The motion was denied. (Excerpts of R. 98, 107.)

Petitioner's counsel did not argue to this Court that the superior court erred in denying petitioner's motion to substitute counsel. (Excerpts of R. 22.)

The failure of petitioner's counsel to argue to this Court that the superior court erred in denying petitioners motion to substitute counsel requires that petitioner's conviction be vacated.[1]

---

[1] The attorney general concedes that "[t]he time to remind the Court that there had been irreconcilable differences would have been on appeal." (Excerpt of R. 14.) Also, the attorney general suggests that the failure to argue that the superior court erred in denying petitioner's motion to substitute counsel was a strategic choice. (Excerpts of R. 14-15.) This, however, is not true. According to petitioner's counsel, "I never considered that point." (Excerpts of R. 22.)

3

The applicable standard

> for measuring a claim of ineffective assistance of appellate counsel is a two-prong test forth in *Strickland v. Washington*, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendants must prove that their counsel's performance fell below an objective standard of reasonableness and, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 688, 694, 104 S.Ct. at 2065, 2068; *see Miller v. Keeney*, 882 F.2d 1428, 1433-1434 (9th Cir. 1989).

(*Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992), *cert. denied*, 508 U.S. 920

(1993); *accord, Angoco v. Bitanga*, 2001 Guam 17 ¶8, *cert. denied*, No. 01-71305

(9th Cir. Sep. 18, 2002).)[2]

Petitioner's counsel would have been successful in arguing to this Court

that the superior court erred in denying petitioner's motion to substitute counsel.

> An appellate court

> review[s] the denial of a motion for substitution of counsel for abuse of discretion. *United States v. Corona-Garcia*, 210 F.3d 973, 976 (9th Cir. 2000), *cert. denied*, 531 U.S. 898, 121 S.Ct. 231, 148 L.Ed.2d 165 (2000). In reviewing a denial of substitution of counsel, [the

---

[2] "The actual phrasing of the second prong in both *Strickland* and *United States v. Birtle*, 792 F.2d 846 (9th Cir. 1986), is this: 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Birtle*, 792 F.2d at 849, quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. We did not make clear in *Birtle* whether 'the proceeding' in question when evaluating appellate counsel's performance was the appeal or a potential second trial; that is, whether we should focus on whether there was a reasonable probability that the appellant would have won the appeal, or whether there was a reasonable probability that, once having obtained a reversal, the appellant would have prevailed at retrial. *Birtle* concentrates on the appeal, so we assume that the appeal is the relevant proceeding to consider." (*Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989).)

4

appellate court] consider[s] (1) the timeliness of the motion; (2) the adequacy of the trial court's inquiry; and (3) the extent of conflict created. *Id.*

(*United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001).)

(1) *The timeliness of the motion.*

Neither the timeliness of petitioner's motion nor the extent of resulting inconvenience or delay is dispositive. The superior court did not indicate that timeliness was a consideration underlying its denial of petitioner's motion. Rather, it denied the request after concluding that petitioner's present counsel was competent. (Excerpts of R. 98, 105-07.) It did not indicate that timing or delay affected its decision to deny the motion. (Excerpts of R. 98, 105-07.) Because the timeliness of petitioner's request did not underlie the superior court's exercise of its discretion to deny the request, it is not dispositive. (*Nguyen*, 262 F.3d at 1004; *United States v. Walker*, 915 F.2d 480, 482-83 (9th Cir. 1990), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000); *see also United States v. Musa*, 220 F.3d 1096, 1102 n.2 (9th Cir. 2000)("Although a district court has discretion to deny an untimely substitution of counsel motion, the court here did not base its denial of Musa's request on untimeliness grounds"), *cert denied*, 531 U.S. 999 (2000).)

(2) *The adequacy of the superior court's inquiry.*

The superior court's inquiry into petitioner's complaint was wholly inadequate. Before a trial court can engage in a measured exercise of discretion, it must conduct an inquiry adequate to create a sufficient basis for reaching an

5

informed decision. (*Nguyen*, 262 F.3d at 1004; *Musa*, 220 F.3d at 1102).) For an inquiry regarding substitution of counsel to be sufficient, a court should question the attorney and defendant privately and in depth. (*Nguyen* at 1004.) The superior court did neither here. It focused on petitioner's counsel's competence. (Excerpts of R. 98, 105-06.) The proper focus of such an inquiry is on the nature and extent of the conflict between defendant and counsel, not on whether counsel is legally competent. (*Walker*, 915 F.2d at 483.) It is settled that a court may not deny a substitution request simply because it thinks current counsel's representation is adequate. (*Musa*, 220 F.3d at 1102.) Even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense. (*Id.*)

The following was the superior court's inquiry in its entirety:

> THE COURT: . . . What seems to be the problem, Mr. Chargualaf?

> THE DEFENDANT: I don't trust Mr. Timblin in handling my case.

(Excerpts of R. 97.) Other than this, the superior court did nothing more than ask rhetorical questions and lecture petitioner on his own incompetence:

> THE COURT: Well, that's the same reason you used for the other ones. Can you at least be more innovative?

> (No response from Defendant)

> . . . .

> THE COURT: . . . All of the lawyers I've appointed you have had long experience with prosecution and defense. You know? What makes you an expert as opposed to the long experience in their line of work,

6

Mr.Chargualaf?

. . . .

THE COURT: You know, the lawyers I gave you have all had experiences in prosecution -- almost all of them, anyway; and also on defense. Mr. Timblin was a defense counsel for a long time. And didn't you work for the Attorney General at one time?

MR. TIMBLIN: Correct.

THE COURT: Right. So if anybody knows all the angles on both sides, it's Mr. Timblin. Mr. Williams is another one I appointed who used to be prosecutor at one time. Now, he's an attorney as a defense counsel.

. . . .

THE COURT: Mr. Mantanona's another one. You know? If anybody knows prosecution the best and their angles, it's these people. You know? And you, you just probably read a few books and you think you know everything.

(Excerpts of R. 97-98.) Petitioner had been warned not to communicate with the

judge:

THE COURT: . . . The Court does not want you to contact us again because you do have legal counsel. Okay? That's what they're there for. Okay? So, from now on, Mr. Chargualaf, you must not contact the Court or any officers of the Court except for your lawyer.

(Excerpts of R. 87.)

The attorney general contends that "it was not necessary for the trial

court to go into an exhaustive colloquy about the extent of the breakdown."

(Excerpts of R. 13.) That it was not necessary for the trial court to engage in an

7

exhaustive colloquy [3] about the extent of the breakdown, however, is incorrect. The failure to engage in an exhaustive colloquy about the extent of the breakdown is clearly reversible error:

> [B]ecause the district court rejected Guma's request to discharge trial counsel without an adequate inquiry, we reverse and remand for a new trial.
>
> A district court's denial of a motion for substitution of counsel is reviewed for abuse of discretion. *United States v. Corona-Garcia*, 210 F.3d 973, 976 (9th Cir.), *cert. denied*, 531 U.S. 898, 148 L. Ed. 2d 165, 121 S. Ct. 231 (2000). Although Guma is not entitled to the lawyer of his choice, "if the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates [his] Sixth Amendment right to effective assistance of counsel." *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998).
>
> We consider three factors when evaluating whether a defendant was wrongly denied the opportunity to substitute counsel: 1) whether the district court's inquiry was adequate; 2) the extent of the conflict between the defendant and counsel; and 3) the timeliness of the motion weighed against any incon-venience or delay that would result from granting the motion. *Corona-Garcia*, 210 F.3d at 976.
>
> The district court provided Guma with an opportunity to elaborate on his request, but did not ask any questions of either Guma or his counsel. As confirmed at oral argument, Government counsel was not excused from the room and the district court did not hold an ex parte hearing to evaluate Guma's request. Unfortunately, the district judge provided no reason on the record to support his denial of Guma's request for substitution of counsel.

---

[3] "Exhaustive" means "leaving nothing out." (*Webster's New World College Dictionary* 498 (4th ed. 1999).) "Colloquy" means "a conversation, esp. a formal discussion; conference." (*Id.* at 288.)

**225**

In light of several recent decisions of this Court, we conclude that the court's inquiry was inadequate. In *United States v. Adelzo-Gonzalez*, we reversed a conviction where "the district court asked only open-ended questions and put the onus on defendant to articulate why the appointed counsel could not provide competent representation." 268 F.3d 772, 778 (9th Cir. 2001). *See also United States v. Nguyen*, 262 F.3d 998, 1002-05 (9th Cir. 2001)(reversing conviction where the district court refused to grant a full ex parte hearing in response to a request to substitute counsel); *United States v. Musa*, 220 F.3d 1096, 1098, 1102-03 (9th Cir.)(vacating sentence where district court denied request to substitute counsel "without inquiry"), *cert. denied*, 531 U.S. 999, 148 L. Ed. 2d 469, 121 S.Ct. 498 (2000).

The district court's inquiry into Guma's request to substitute counsel was inadequate in light of our case law. Because we are reversing his conviction and remanding for a new trial with new defense counsel, we do not reach Guma's arguments regarding his sentence. They are now moot.

REVERSED and REMANDED.

(*United States v. Guma*, 29 Fed.Appx. 480, 481-82 (9th Cir. 2002)(unpublished[4])(footnote omitted).)

---

[4] That is to say, not published in the *Federal Reporter*. *Guma* is, however, otherwise available. Besides 29 Fed. Appx. 480, it is also published at 2002 WL 105141 and 2002 U.S. App. LEXIS 1484.

An "unpublished" disposition of the Ninth Circuit is "not *binding* precedent." (9th Cir. R. 36-3(a)(emphasis added).) This, however, does not mean it is not *persuasive* precedent. There is no proscription against citing an "unpublished" Ninth Circuit disposition of the Ninth Circuit to *this* Court. (9th Cir. R. 36-3(b)("Unpublished dispositions . . . of [the Ninth Circuit] may not be cited to or by the Courts of this circuit").) Furthermore, it cannot be overlooked that 9th Cir. R. 36-3(b)(iii) provides that "unpublished" dispositions and orders of the Ninth Circuit "may be cited to the [Ninth Circuit] . . . in order to demonstrate *the existence of a conflict* among opinions, dispositions, or orders of the Ninth Circuit." (Emphasis added.)

226[9]

(3) *The extent of conflict created.*

The conflict between petitioner and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense. This is clearly demonstrated by the following:

Copy to Clerk of Court of Letter from Randy I. Chargualaf to Terry E. Timblin of April 28, 1999:

> This letter will confirm our conversation of 27 Apr 99.
>
> As I have stated to you, you have failed to effectively provide me with an assistance of counsel. I have requested to have witnesses called so that we may be able to cross-examined them on stand. Now, we have a judge who had relied his decision and order based on an unsworn testimony. This unsworn testimony is a violation of my constitutional rights. You allowed this. Is this how you are going to represent me at trial?
>
> You stated that I had stipulated to Officer Santo Tomas' report concerning matching a description of a robbery a day before. That is not true! We stipulated in open court that for the purpose of Santo Tomas' testimony, that a gun had been found on the curb. The court tapes will reveal this.
>
> I was denied my right to confront and cross-examine an adverse witness stating that I had fit a description of a robbery suspect, whom you have stated on your moving papers, as someone who fits the description of "several hundred and possibly thousands of Chamorro male."
>
> There are a lot of inconsistent and discrepancy of the reports on matching a description of a robbery suspect. You did not raise any of these issues during the suppression hearing.
>
> You stated on your conversation that I had

10

stipulated to the consent. Again this is not true! If you would have called "Kandi" Mendiola to the stand, this would have contradicted the officer testimony. You failed to do this.

On our conversation, I requested you to submit a "second motion to suppress" based on the fact that an unsworn testimony was used by the court. You have discouraged me not to do so. Even after I had mentioned to you a violation of the Sixth Amendment "Confrontation Clause." I have every right to cross-examine and confront an adverse witness. You want me to give-up that right!

. . . .

In closing, you also stated to me that you are the attorney in this case and I am only the defendant. If that's the case, then I can no longer trust you to represent me in this criminal proceedings just because I did not finish high school and did not attend law school means that I cannot actively participate in my defense.

Please inform me as soon as you have submitted your motion to withdraw as court-appointed counsel.

(Excerpts of R. 70-74.)

Affidavit of Terry E. Timblin:

1.     I am the attorney of record for Defendant in the above matter and I make this Affidavit in support of my Motion to Withdraw as Counsel.

2.     On April 26, 1999, I received a copy of Judge Lamorena's Decision and Order denying Defendant's Motion to Suppress. On that date, I delivered a copy of the Decision and Order to Defendant.

3.     On April 27, 1999, I received a call from Defendant in which he indicated that he was "disappointed" at how the hearing went. He stated that Officer Santo Tomas should have been called as a witness and cross-examined. When asked what he should have been cross-examined about, Defendant indicated that this

11

would have established a contradiction between his version of events and that of Officer Dawson in that Officer Santo Tomas had drawn a connection between the Bulletin about the previous day's robbery and Defendant and Candalaria Mendiola while Officer Dawson had not. I explained to Defendant that there was no contradiction as both indicated that Officer Santo Tomas informed Officer Dawson of the perceived connection at the scene of the stop.

4.      Defendant than asserted that I should have called Mendiola as a witness to contradict Officer Dawson's testimony that Defendant had consented to the search of his vehicle. The issue of consent was discussed during the preparation for this Motion and I had advised Defendant that the best and probably only means of contradicting Officer Dawson was for Defendant to testify himself that he not consented. Defendant declined to do so stating that he felt that the assertion that any consent was vitiated by an illegal detention was sufficient. At neither this time nor any other time prior to April 27, 1999 did Defendant claim that Mendiola would testify that he not consented. In Mendiola's written statement, she neither confirms nor contradicts whether consent was given and there was no other indication that she might have been of help.

5.      I informed Defendant that I did not agree with either of these objections and he then indicated that he would like to have a new lawyer.

6.      On April 28, 1999, I received a fax transmission from Defendant . . . in which he restates his objections and indicated at the end that a copy was to be sent to the Ethics Committee.

7.      Based on the above, I believe that an irreconcilable conflict of interest now exists between myself and Defendant and that we would not be able to work together effectively to conduct a defense.

(Excerpts of R. 78-80.)

Copy to Presiding Judge of Letter from Randy Ignacio Chargualaf to

12

Terry E. Timblin of May 6, 1999:

> Your impression to me at the court hearing today was not of a pleasant one.

> I cannot see how we can continue to work together. You may probably be aware by now that I am going to file a complaint with the Guam Bar Association ethics committee of your deficiency of not calling witness to testify during my suppression hearing. Your performance was very poor which are my grounds for an ineffective assistance of counsel. You are merely trying to railroad me into a conviction.

> My next hearing date is on 10 May 1999. I do not wish to have your railroad me again. I feel that you are incompetent to go trial with, as your record will speak for itself. How may others have you helped the government put-away?

> I do not want to have anything to do with your representation. You should have said something in court today to have dismissed yourself. Instead you remained silent and then laughed at me when I got denied.

> You will be hearing from the Ethics Committee soon.

(Excerpts of R. 101.)

Letter from Randy I. Chargualaf to Honorable Alberto C. Lamorena III of May 7, 1999:

> Please allow this letter to serve as a formal request for a reconsideration for motion to withdraw court-appointed counsel on the above referenced matter.

> The basis on this request to withdraw counsel is that we cannot communicate any longer. I am filing a complaint to the Guam Bar Association Ethics Committee for an ineffective assistant of counsel. I have asked him to prepare witness to be called during my suppression hearing and he failed to do so. His performance is so

13

inefficient that it renders ineffective counsel.

> An accused has every right to confront and cross-examine any adverse witness against him. Mr. Timblin did not call Officer Santo Tomas to the stand for cross-examination. Thus, allowing the court to use an unsworn testimony as a factor in making its decision.

> I had asked court-appointed counsel to submit for a reconsideration of the court's decision, but refuses to do so, stating that he would leave this matter up to the appeals court. I believe that I am entitled to have a reconsideration based on the court's decision to use and unsworn testimony which is a violation of the Sixth Amendment of the U.S. Constitution's *"Confrontational Clause"*.

> The issues involving this Court are constitutional issues. The court is more concern in obtaining a conviction then protecting the rights of a defendant.

> A copy of this letter will be made to the Guam Bar Association Ethics Committee and the Supreme Court of Guam.

> Thank you for your attention.

(Excerpts of R. 102.)

There is no evidence to the contrary. To compel one charged with grievous crimes to undergo a trial with counsel with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatever. (*Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000)(en banc).) "An irreconcilable conflict undermines confidence in trial proceedings and is reversible error." (*United States v. Moore*, 159 F.3d 1154, 1161 (9th Cir. 1998).) The superior court's denial of the motion to substitute counsel violated petitioner's Sixth Amendment right to counsel. (*Nguyen*, 262 F.3d at 1005.)

14

## CONCLUSION

Petitioner is unlawfully imprisoned and restrained of his liberty. The illegality of the confinement consists in the ineffectiveness of defense counsel's representation of petitioner in this Court. It could not be clearer that defense counsel would have been successful in arguing to this Court that the superior court erred in denying petitioner's motion to substitute counsel. (*See Nguyen*, 262 F.3d at 1004-05 ("The District Judge's . . . denial of the motion to substitute counsel violated Nguyen's Sixth Amendment right to counsel. The judgment of conviction is REVERSED").)

## PRAYER FOR RELIEF

Petitioner prays that the Court grant him all relief to which he may be entitled in this proceeding.

Dated, Hagåtña, Guam,

July 6, 2004.

HOWARD TRAPP
For HOWARD TRAPP INCORPORATED
Attorney for petitioner

15

## VERIFICATION

I, Randy Ignacio Chargualaf, declare that I am the petitioner in the above-entitled proceeding; that I have read the foregoing petition and know the contents thereof; and that the same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 6, 2004, at Mangilao, Guam.

RANDY IGNACIO CHARGUALAF

## STATEMENT OF RELATED CASES

No other case in this Court is deemed related.

Dated, Hagåtña, Guam,

July 6, 2004.

HOWARD TRAPP
For HOWARD TRAPP INCORPORATED
Attorney for petitioner

17

APPENDIX

# IN THE SUPERIOR COURT OF GUAM

|  |  |
|---|---|
| RANDY IGNACIO CHARGUALAF,<br><br>        Petitioner,<br><br>vs.<br><br>FRANK T. ISHIZAKI, Director of<br>Corrections, Government of Guam,<br><br>        Respondent. | **SPECIAL PROCEEDINGS<br>CASE NO. SP0228-03**<br><br>**DECISION AND ORDER** |

RECEIVED
MAR 4 2004
HOWARD TRAPP

## INTRODUCTION

The matter before the Court came on Petitioner Randy Ignacio Chargualaf's ("Chargualaf") Petition for Writ of Habeas Corpus. On December 5, 2003 a hearing was held before the HONORABLE JUDGE STEVEN S. UNPINGCO, who took the matter under advisement. Attorney Howard Trapp appeared on behalf of Chargualaf while Assistant Attorney General B. Ann Keith appeared on behalf of the Government. Having reviewed the parties' briefs, oral arguments and the applicable law, the Court now issues the following Decision and Order.

## BACKGROUND

On July 31, 1997, Chargualaf was charged with Second Degree Robbery (As a 2nd Degree Felony), Special Allegation of Possession and Use of a Deadly Weapon in the Commission of Second Degree Robbery, Conspiracy to Commit Second Degree Robbery (As a 2nd Degree Felony), Theft (As a Misdemeanor), Possession of a Firearm without an Identification Card (As a Felony) and Possession of a Concealed Firearm (As a Felony). On November 9, 1999, after a trial by jury, Chargualaf was found guilty of Second Degree Robbery (As a 2nd Degree Felony), Special Allegation of Possession and Use of a Deadly Weapon in the Commission of Second Degree Robbery, Conspiracy to Commit Second Degree Robbery (As a

**236**

1  2nd Degree Felony) and Theft (As a Misdemeanor). Chargualaf was sentenced to serve a total of

2  thirty five (35) years imprisonment at the Department of Corrections.

3  After his conviction, Chargualaf filed an appeal with the Supreme Court of Guam. The

4  conviction was affirmed. Thereafter, Chargualaf applied for review of the Supreme Court of

5  Guam's decision in the Ninth Circuit by writ of certiorari. The application was denied.

6  Chargualaf then applied to the United States Supreme Court for review of the case in the Ninth

7  Circuit by writ of certiorari. The application was also denied. Chargualaf now moves this Court *on writ*

8  to grant his Petition for Writ of Habeas Corpus arguing that his confinement is illegal based the

9  ineffective assistance of counsel in the Supreme Court of Guam.

10  ### DISCUSSION

11  Essentially, Chargualaf argues that his conviction should be vacated based on his

12  appellate attorney's failure to argue before the Supreme Court of Guam that the trial court erred

13  in denying his trial counsel's motion to withdraw. At trial, Chargualaf was apparently not

14  satisfied with his attorney's strategy and threatened to file an ethics complaint against him.

15  Chargualaf asserts that the trial court failed to sufficiently inquire with him and his attorney

16  privately concerning the substitution of counsel. The failure to conduct such an inquiry and the

17  extent of conflict between Chargualaf and his attorney, according to Chargualaf, warrants the

18  relief requested. Chargualaf asserts that the conflict resulted in a total lack of communication

19  preventing an adequate defense. Chargualaf further argues in his Reply brief that it could not be

20  clearer that defense counsel would have been successful in arguing on appeal that this Court

21  erred in denying the motion to withdraw.

22  In opposition, the Government argues that based on Chargualaf's pattern of substituting

23  attorneys, the attorney at issue was his fifth, and the fact that the only conflict raised at trial was

24  the threat of an ethics complaint, the Court properly found that Chargualaf himself was

25  manunfacturing issues with his counsel. The Government also points to several facts which

26  indicate that there never was any substantial conflict between Chargualaf and his attorney

27  warranting a substitution of counsel. These facts include the following: Chargualaf continued to

28  have his court-appointed counsel represent him throughout the trial and appellate process, the

issue of a conflict between Chargualaf and his attorney was never again raised, and that Chargualaf never followed through on his threat to file an ethics complaint. These facts, according to the Government, demonstrate that there never was any real conflict and that if appellate counsel raised the issue in the Supreme Court of Guam, it would not succeed.

In order for a writ of habeas corpus relief to be granted, the petition must state fully and with particularity the facts on which relief is sought. Habeas relief is a strong remedy reserved for serious matters rather than merely technical violations of rights. White v. Klitzkie, et al., 1998 Guam 31 (Dec. 16, 1998). "Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief." People v. Duvall, 9 Cal. 4th 464, 465 (1995), citing, People v. Karis, 46 Cal. 3d 612 (1988). "A habeas corpus petition must be verified, and must state a prima facie case for relief. That is, it must set forth specific facts which, if true, would require issuance of the writ. Any petition that does not meet these standards must be summarily denied..." People v. Gonzalez, 51 Cal. 3d 1179 (1990).

As to Petitioner's claim of ineffective assistance of counsel, the Supreme Court of Guam, in People v. Quintanilla, 1998 Guam 17, first addressed the issue of ineffective assistance of counsel and adopted the bifurcated test established in Strickland v. Washington, 466 US 668 (1984). To prevail on a claim of ineffective assistance of counsel, one must prove two components. First, the Petitioner must show that counsel's performance was so deficient that counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 US 668, 687 (1984). Second, the Petitioner must prove prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The purpose of this test is to determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having a just result." Id. at 686. This test will guide the court's review of Petitioner's claim that his trial counsel was ineffective. In this particular case, it should also be noted that although Chargualaf failed to raise the issue concerning the trial court's denial of the motion to withdraw until now, the Court finds that such failure does not preclude the issue from being examined at this time. *See generally*

Angoco v. Bitanga, 2001 Guam 17 (July 12, 2001).

The crucial inquiry here is whether the failure to raise the trial Court's denial of the motion to withdraw filed by Chargualaf's attorney warrants the issuance of the writ. After considering the factual circumstances of this case and the applicable law, the Court finds that even if Chargualaf's appellate counsel raised the withdrawal issue, there is no likelihood of success.

Under Strickland, a claim of ineffective assistance of counsel is analyzed using the two prong test mentioned above. When reviewing a trial court's denial of a motion to withdraw as counsel or a motion for substitution of counsel, the appellate court "focuses on three considerations...:first, [it is to] consider whether the district court's inquiry on the matter was adequate; second, [it is to] study the extent of the conflict between the defendant and his counsel; and third, [it is to] weigh the timeliness of the motion against any inconvenience or delay that would result from granting the motion." U.S. v. Corona-Garcia, 210 F.3d 973, 976 (9th Cir. 2000) (citations omitted). The standard of review is abuse of discretion. Id.

In this case, the trial court addressed the withdrawal issue during two separate hearings. The first on May 6, 1999 and the second on May 10, 1999. During the first hearing, which was specifically set to address the motion to withdraw, the Court asked Chargualaf what seemed to be the problem. In response, Chargualaf stated that he did not trust his attorney to handle his case. When asked by the Court to elaborate, Chargualaf did not respond. After noting that Chargualaf has gone through four lawyers and after explaining the experience of each of his attorneys, the Court denied the motion to withdraw as counsel. In denying the motion, the Court explained that the attorney representing Chargualaf, as well as the attorneys who previously represented him, knew prosecution from both angles and intimated that they knew more about the law than Chargualaf himself.

During the second hearing, which addressed a motion to compel discovery, Chargualaf's attorney asked the Court to revisit the issue of withdrawal. At this hearing the threat of an ethics complaint against Chargualaf's attorney was first discussed. When asked by the Court, Chargualaf stated that he faxed a copy of the letter containing his threat to the Ethics Committee.

1  After hearing arguments from both sides, the Court denied the motion but left open the
2  possibility of revisiting the issue again depending on what the Ethics Committee decides to do
3  about the alleged complaint. In fact, the Court stated that if the Ethics Committee accepted
4  Chargualaf's claim the Court would reconsider the motion to withdraw.

5      In sum, when the motion to withdraw came up, the Court asked Chargualaf to explain the
6  problems he was having with his attorney, gave Chargualaf the opportunity to expound on the
7  problems, asked Chargualaf's attorney about the problems, and considered the threat of an ethics
8  complaint made by Chargualaf. After considering these factors, the Court denied the motion
9  twice but still left the issue open depending on the results of the ethics complaint.

10     Based on the above, the Court finds that the trial court's inquiry regarding any problems
11 or conflicts between Chargualaf and his attorney was sufficient. Although the trial court did not
12 question Chargualaf and his attorney privately, the trial court did question each about the
13 problems they were having. When questioned, both Chargualaf and his attorney simply didn't
14 have much to say. The trial court took the time to address the motion on two occassions during
15 two separate hearings. At both hearings, the trial court considered the motion and conducted an
16 inquiry regarding the reasons Chargualaf wanted a new attorney. Although the inquiry was brief,
17 the trial court's inquiry was sufficient under the circumstances. *See* Hudson v. Rushen, 686 F.2d
18 826 (9th Cir. 1982); *see also* U.S. v. Smith, 282 F.3d 758 (9th Cir. 2002). Moreover, the trial
19 court had granted Chargualaf's four previous requests for new counsel. As the trial court noted,
20 Chargualaf used the same basis for each request. Therefore, the trial court was already aware of
21 Chargualaf's general displeasure with counsel and the basis for his substitution requests.
22 Furthermore, the trial court's inquiry was not focused on the competence of counsel. To the
23 contrary, the trial court asked Chargualaf about the problems he was having with his attorney and
24 not whether his attorney was competent. It wasn't until after Chargualaf explained that he
25 simply could not trust his attorney did the trial court explain that his appointed attorney was very
26 experienced and knew prosecution from both angles.

27     Turning to the extent of the conflict between Chargualaf and his attorney, the Court finds
28 that if such a conflict did exist, it was insufficient to warrant the substitution of new counsel.

The Court's conclusion is based on the several important facts. First, during both hearings, neither Chargualaf nor his attorney informed the Court of any breakdown in communication. All that was mentioned was Chargualaf's distrust of his attorney and the threat of an ethics complaint. Second, after the motion was denied twice, Chargualaf and his attorney were able to work together throughout the trial and appellate process. Third, the letters from Chargualaf to the Court and to his attorney merely state that there is a breakdown in communication without any support for such an assertion. At best, it appears that Chargualaf disagreed with his attorney's trial strategy and tactics. However, such items are generally left for the attorney to decide. *See* U.S. v. Franklin, 321 F.3d 1231 (9th Cir. 2003). Thus, it appears that no extensive conflict existed.

Lastly, concerning the timeliness of the motion to withdraw, it appears that this issue was not a concern for the trial court. The motion was made months before trial and before discovery issues were resolved. Therefore, the Court need not address this particular factor.

Based on the above analysis, the Court finds that the trial court did not err when it denied the motion to withdraw as counsel. Since the Court finds that denial was not an abuse of discretion, the Court also finds that the failure to raise the denial at the Supreme Court of Guam would have been unsuccessful. In short, the application of both Strickland and Corona-Garcia to the facts of this case weigh in favor of denying the relief requested.

## CONCLUSION

Based upon the foregoing, Petitioner Randy Ignacio Chargualaf's Petition for Writ of Habeas Corpus is hereby DENIED.

SO ORDERED this _27th_ day of February, 2004.

Original Signed By:
HON. STEVEN S. UNPINGCO

**HONORABLE STEVEN S. UNPINGCO**
**Judge, Superior Court of Guam**

I hereby certify that the foregoing is a full, true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagåtña, Guam

FEB 27 2004

Deputy Clerk, Superior Court of Guam

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on Robert D. Camacho, Director of Corrections, Government of Guam, by leaving a copy thereof at his office at Building A111, Mariner Blvd, Tiyan, Guam, his last known address, with a person in charge thereof, on July 8, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on July 8, 2004.

CHARLENE C. CRUZ

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on the Honorable Douglas B. Moylan, Attorney General of Guam, by leaving a copy thereof at his office at the Guam Judicial Center, Suite 2-200E, 120 West O'Brien Drive, Hagåtña, Guam, his last known address, with a person in charge thereof, on July 8, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on July 8, 2004.

_____
CHARLENE C. CRUZ

244

FILED
SUPREME COURT
OF GUAM

Oct 4 2 [ ] '04

# IN THE SUPREME COURT OF GUAM

In re RANDY IGNACIO,
CHARGUALAF,

　　　　　Petitioner,

vs.

ROBERT D. CAMACHO, Director of
Corrections, Government of Guam

　　　　　Respondent.

Supreme Court Case No. WHC04-001

**ORDER**

On July 8, 2004, Petitioner Randy Ignacio Chargualaf filed a Petition for Writ of Habeas Corpus ("the Petition") in this court, arguing that his confinement is illegal based on the denial of his right to effective assistance of counsel during the appellate process. On July 23, 2004, Chargualaf filed a motion to have this court order the Office of the Attorney General ("the AG's Office") file a response to the Petition. The AG's Office filed an Opposition to Petition on July 29, 2004. This court then ordered the AG's Office to file a response by August 11, 2004. The Answer to the Petition was timely filed by the AG's Office.

## APPELLATE JURISDICTION

The instant proceeding is brought under this court's original jurisdiction. We have held that:

> Section 3107 [of Title 7 Guam Code Annotated] provides the Supreme Court of Guam with original jurisdiction over matters generally characterized as writ proceedings, including mandamus, prohibition and injunction. While a habeas corpus proceeding is not specifically enumerated, the 'similar' remedies language of section 3107 provides this court with the basis to hear habeas proceedings using its original jurisdiction.

*Borja v. Bitanga*, 1998 Guam 29, ¶ 11. We further recognized that "[p]etitioners do not have the right to appeal the denial of their petitions for habeas corpus," *id.* at ¶ 12, but must instead "file a new petition with this court after exhausting his remedies at the trial court level." *Id.* at ¶ 13. In this case, Chargualaf had unsuccessfully sought a writ of habeas corpus in the Superior Court, and

1 now properly files the instant Petition with this court.[1] Title 7 GCA § 3107 (2000), *amended by*
2 P.L. 27-31 (Oct. 31, 2003). *See also People v. Root*, 1999 Guam 25, ¶ 14 ("[A]n ineffective
3 assistance of counsel claim . . . is more properly brought as a writ of habeas corpus").

### FACTUAL AND PROCEDURAL BACKGROUND

5 Chargualaf was indicted on July 31, 1997. Petitioner's Excerpts of Record ("ER"), p. 60-64
6 (Indictment).[2] After the magistrate's hearing on July 22, 1997, Attorney William Bischoff was
7 appointed on July 24, 1997 to represent Chargualaf. ER, p. 153 (Notice of Court Appt'd Counsel,
8 Superior Court docket sheet). A series of withdrawals and substitutions then followed.[3]

9 In a March 16, 1999 letter, Chargualaf informed the court that he disagreed with Attorney
10 Rawlen Mantanona's intent to continue a hearing scheduled for March 18, 1999, and stated that
11 Mantanona intended to withdraw from the case despite Chargualaf having "no wishes or any desires
12 to terminate" him. ER, p. 65 (Mar. 16, 1999 letter). At the March 18, 1999 hearing, Mantanona
13 made an oral motion to withdraw, explaining Chargualaf's conduct as "trying to infringe on
14 strategic decisions that are the domain of counsel" as indicating "a basic breakdown of trust and

---

16 [1] The AG's Office has queried whether Guam Rule of Appellate Procedure Rule 4(a) applies to this writ
17 proceeding. We have stated in *Borja v. Bitanga*, 1998 Guam 29, that upon the Superior Court's denial of writ of habeas corpus, a new petition be filed in this court. *Id.* at ¶ 12-13. The instant proceeding is a new writ petition and is not bound
18 by the filing requirements of GRAP Rule 4. *See* Guam R. App. P. 24 (governing writs of mandamus, prohibition and other extraordinary writs); Guam R. App. P. 25 (governing writs of habeas corpus). However, we have held that section
19 135.74 of Title 8 of the Guam Code Annotated allows appeals by the AG's Office "from a final order of the Superior Court of Guam upon the return of a writ of habeas corpus . . . only when a writ is granted discharging a defendant after
20 conviction." *Borja*, 1998 Guam 29 at ¶ 12 (citation omitted). In such a case, the appeal would have to be filed in accordance with GRAP Rule 4(a), which states, "an appeal may be taken in a civil case . . . thirty (30) days from the date
21 of entry of judgment." Guam R. App. P. 4(a).

22 [2] The charges included: Robbery (As a 2nd Degree Felony), Conspiracy to Commit Robbery (As a 2nd Degree Felony), Possession of a Firearm without a ID Card (As a Felony), Possession of a Concealed Firearm (As a
23 Felony), and Theft (As a Misdemeanor). Petitioner's Excerpts of Record ("ER"), p. 60-64 (Indictment). Chargualaf was also charged with a Special Allegation of Possession of a Deadly Weapon in the Commission of a Felony in connection
24 with the Robbery Charge. ER, p. 60-64.

25 [3] On August 27, 1997, William Bischoff apparently filed a motion to withdraw, which was granted, and Attorney Mark Williams was then appointed to represent Chargualaf. ER, p. 154 (Mot. to Withdraw/Order Appointing
26 Counsel/Notice of Court Appointment of Counsel, Superior Court docket sheet). On May 7, 1998, Williams filed a motion to withdraw, which was granted, and Attorney A. Alexander Gorman was then appointed. ER, p. 158 (Notice
27 of Mot. and Ex Parte Mot. to Withdraw as Court Appt'd Counsel/Notice of Court Appt'd Counsel, Superior Court Docket Sheet). Gorman apparently requested and was granted a withdrawal, because Attorney Rawlen Mantanona was
28 appointed to represent Chargualaf on October 26, 1998. ER, pp. 160-61 (Notice of Court Appt'd Counsel, Superior Court docket sheet).

# 246

1  confidence in [Mantanona's] ability to represent [Chargualaf]" ER, p. 90 (Tr. of Hr'g on Mot. to
2  Withdraw as Counsel, Mar. 18, 1999). Attorney Terry Timblin was then appointed to represent
3  Chargualaf. ER, pp. 94-95 (Tr. of Hr'g on Mot. to Withdraw as Counsel, Mar. 18, 1999).

4  On April 29, 1999, Timblin filed a motion to withdraw as counsel, and the motion was
5  discussed at a May 6, 1999 hearing. ER, pp. 96-100 (Tr. of Hr'g on Mot. to Withdraw as Counsel,
6  May 6, 1999). At the May 6, 1999, the court noted that four attorneys had already been appointed
7  to represent Chargualaf, and asked:

8  | The Court: | What seems to be the problem, Mr. Chargualaf?

9  | The Defendant: | I don't trust Mr. Timblin in handling my case.

10 | The Court: | Well that's the same reason you used for the other ones. Can
   | | you at least be more innovative?
11

   (No Response from Defendant)
12

13 ER, pp. 97 (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 6, 1999).[4]

14 After the hearing, Chargualaf sent a letter to Timblin, stating he would file a complaint with

15 the Guam Bar Ethics Committee. ER, p. 101 (May 6, 1999 letter). Chargualaf also sent a "formal

16 request for a reconsideration for motion to withdraw court-appointed counsel"[5] to the court,

   indicating he could no longer communicate with his attorney. The letter refers to Timblin's refusal
17
   to call a certain witness during the suppression hearing, and reiterated his intent to file an ethics
18
   complaint. ER, p. 102 (May 6, 1999 letter).
19

   The issue of withdrawal was again discussed during the May 10, 1999 hearing. ER, pp. 103-
20
   07 (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 10, 1999). Timblin referred to Chargulaf's
21
   May 6, 1999 letter and argued that there was a conflict in representing Chargualaf, while at the same
22

23
   ───────────────
      [4] Other than this statement by the trial court, no other document in this proceeding reveal the reasons for the
24 withdrawals sought by court-appointed attorneys Bischoff, Williams, or Gorman.

25    [5] Chargualaf states this letter is a "formal request" to reconsider the Motion to Withdraw, and does not refer
   to the motion as one for substitution of counsel. ER, p. 102 (May 6, 1999 letter). Here, we will assume, without
26 deciding, that the Motion to Withdraw is tantamount to a motion for substitution counsel *United States v. Franklin*, 321
   F.3d 1231, 1237 (9th Cir. 2003) (where the court "[a]ssum[ed], without deciding, that [defense counsel's] request to
27 withdraw was tantamount to a motion for substitution . . . ."). In light of the trial court's substitution of counsel on four
   previous occasions, it is apparent that Chargulaf expected to receive a new court-appointed attorney if Timblin's motion
28 had been granted. Moreover, we note that the parties and the trial court treat the motion as one for substitution of
   counsel. *See* note 6, *infra*.

1  time facing the possibility of defending against Chargulaf's ethics complaint. ER. p. 104 (Tr. of
2  Hr'g on Mot. to Withdraw as Counsel, May 10, 1999). After further argument, the court asked
3  Timblin if he "wish[ed] to say anything else" regarding the motion, but Timblin declined. ER, p.
4  107 (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 10, 1999). Chargualaf was present at the
5  hearing, but was not asked any questions. Timblin's Motion to with Withdraw was denied, but the
6  court indicated he may reconsider if the Ethics Committee decided to proceed with Chargualaf's
7  complaint. (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 10, 1999). Chargualaf never filed
8  a complaint. ER, p. 175 (Feb. 27, 2004 Decision & Order, p. 3).

9       The case proceeded to a jury trial, and on November 9, 1999, the jury found Chargualaf
10  guilty of the Robbery charge and the special allegation, and the Conspiracy and Theft charges. ER,
11  p. 173-74 (Feb. 24, 2004 Decision & Order). On February 1, 2000, Chargulaf was sentenced to a
12  thirty-five years term of imprisonment. ER, p. 173-74 (Feb. 27, 2004 Decision & Order); ER, p.
13  168 (Superior Court docket sheet). Chargualaf filed an appeal to this court, which affirmed the
14  conviction. *See People v. Chargualaf*, 2001 Guam 1. Chargualaf unsuccessfully sought review
15  at the Ninth Circuit Court of Appeals and the United States Supreme Court. ER, p. 174 (Feb. 27,
16  2004Decision & Order). Timblin represented Chargualaf during the appeal to this court and the
17  Ninth Circuit, and prepared a petition which Chargualaf presented *pro se* to the United States
18  Supreme Court. ER, p. 22 (Transcript ("Tr.") of *Habeas* Hr'g, Dec. 5, 2003, p. 7)

19       On September 26, 2003, Chargualaf, through new counsel Howard Trapp, filed a Petition
20  for Writ of Habeas Corpus in the Superior Court of Guam. ER, pp. 1-10 (Petition for Writ of
21  Habeas Corpus). The AG's Office, on behalf of Respondent Frank T. Ishizaki, then-Director of
22  Corrections, filed an opposition on November 21, 2003. ER, pp. 11-15 (Opposition). A hearing
23  on the petition was held on December 5, 2003, before Superior Court Judge Steven S. Unpingco,
24  who denied the petition. ER, pp. 16-58 (Tr. of *Habeas* Hr'g, Dec. 5, 2003); ER, pp. 173-78.
25  Chargualaf then filed the instant Petition.

26                                **DISCUSSION**

27       Chargualaf argues that Timblin was ineffective as appellate counsel for failing to argue that

28

1 the trial court erred in denying the motion to substitute counsel.[6] Chargualaf maintains that the trial
2 court failed to conduct an adequate inquiry and improperly denied the motion, which ultimately
3 resulted in a violation of his right to effective assistance of trial counsel, as he and his attorney were
4 "embroiled in an 'irreconcilable conflict.'" *United States v. McClendon*, 782 F.2d 785, 789 (9th
5 Cir. 1986) (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir 1970)).

6 　　　In *Angoco v. Bitanga*, 2001 Guam 17, we stated that a claim of ineffective assistance of
7 appellate counsel is evaluated under the two-prong test adopted from *Strickland v. Washington*, 466
8 U.S. 668, 104 S. Ct. 2052 (1984). *Angoco*, 2001 Guam 17 at ¶ 8; *see also Morrison v. Estelle*, 981
9 F.2d 425, 427 (9th Cir. 1992) (stating that the *Strickland* test is "[t]he standard for measuring a
10 claim of ineffective assistance of appellate counsel"). The two-prong *Strickland* test "by necessity
11 requires review of both fact and law. Thus, to clarify the standard, we adopt that [test] set forth by
12 the Ninth Circuit Court of Appeals: '[a] claim of ineffective assistance of counsel is a mixed
13 question of law and fact that is reviewed de novo.'" *Angoco*, 2001 Guam 17 at ¶ 7. Thus,
14 Chargualaf must show first, that his attorney's performance was deficient; second, that the deficient
15 performance prejudiced his appeal.

16 **A. Was there deficient conduct by the attorney?**

17 　　　High deference is given when reviewing an attorney's performance, and we have stated that
18 "[w]here counsel consciously decides to omit a defense or pursue a certain argument, such conduct
19 is deliberate strategy, and a choice of strategy that backfires is not the equivalent of ineffective
20 assistance of counsel." *Angoco*, 2001 Guam 17 at ¶ 9. However, in *Angoco*, we further stated that
21 the first prong of deficient performance is met when the failure to raise an argument "was not
22 tactical or trial strategy" but simply that the attorney "never even considered" the argument. *Id.* at
23 ¶ 10. In *Angoco*, appellate error was the attorney's failure to argue that the trial court erred in

24

25 　　　[6] Although Chargualaf now argues that the trial court erred with regard to the motion to substitute counsel,
Timblin actually filed a Motion to Withdraw as Counsel. ER, p. 75-80 (Mot. to Withdraw and Affidavit). In fact,
26 throughout the habeas proceedings before Judge Unpingco, both Trapp and the prosecutor treated Timblin's motion as
one seeking substitution of counsel. *See* ER, pp. 1-8 (Petition); pp. 11-15 (Opposition). There was an apparent
27 assumption that if withdrawal were granted, the judge would have appointed a new attorney, as he had done so upon
granting four previous motions to withdraw. The February 27, 2004 Decision and Order similarly does not distinguish
28 between the motions, and adopted the same test when reviewing the denial of either "a motion to withdraw as counsel
or a motion for substitution of counsel." ER, p. 176 (Feb. 27, 2004 Decision & Order, p. 4).

**249**

1  omitting jury instructions on lesser-included offenses. *Id.* Angoco's appellate attorney stated
2  during the *habeas* proceeding that the jury instruction issue "[n]ever crossed [his] mind." *Id.*

3  Here, Chargualaf argues that Timblin erred in failing to raise, as an appellate issue, the trial
4  court's error in denying the motion to substitute counsel. During the *habeas* proceeding,
5  Chargualaf's new attorney Trapp questioned Timblin, as follows:

> Q (by Mr. Trapp):  Our point is, is we say, "The failure of Petitioner's counsel
> . . . to argue to the Supreme Court of Guam that this Court
> erred in denying Petitioner's motion to substitute counsel
> required that Petitioner's conviction be vacated."
>     Now, . . . Did you choose not to raise that point or is
> it the case that you simply that you never considered that
> point?

> A (by Mr. Timblin):  I would say that I never considered that point.

11  ER, p. 22 (Tr. of *Habeas* Hr'g, Dec. 5, 2003). Here, the omission was not due to the attorney's
12  "choice of strategy that backfire[d]." *Angoco*, 2001 Guam 17 at ¶ 9. Rather, Timblin stated that
13  the issue was not raised because he "never considered that point." ER, p. 22 (Tr. of *Habeas* Hr'g,
14  Dec. 5, 2003). Based on our prior holding in *Angoco*, we conclude Chargualaf has satisfied the first
15  prong of the *Strickland* test.

16  **B. Did the deficient conduct prejudice the defense?**

17  This prong "requires a determination of whether there is a reasonable probability that the
18  omitted argument could have resulted in a reversal of his conviction." *Angoco*, 2001 Guam 17 at
19  ¶ 11. Here, the omitted argument was whether the trial court erred in denying Chargualaf's motion
20  to substitute counsel. Thus, considering the second prong requires reviewing the trial court's ruling
21  on Chargualaf's motion to substitute. The Ninth Circuit Court of Appeals generally applies the
22  following three-factor test when determining whether the trial court abused its discretion in ruling
23  on a motion to substitute: "(1) the adequacy of the court's inquiry into the defendant's complaint,
24  (2) the extent of conflict between the defendant and counsel, (3) the timeliness of the motion and
25  the extent of resulting inconvenience or delay." *United States v. Gonzalez*, 113 F.3d 1026, 1028
26  (9th Cir. 1997). Each factor is examined below.

27  **1. Adequacy of the inquiry**

28  Chargualaf argues the inquiry conducted by the trial court was "wholly inadequate" because

1 the court did not conduct a private and in-depth inquiry to determine the nature and extent of the
2 conflict between Timblin and Chargualaf. Petition, p. 5. Instead, the trial court focused only on
3 Timblin's competence. Petition, p. 5-6.

4 To rule on the motion, the trial court must have "a sufficient basis for reaching an informed
5 decision." *McClendon*, 782 F.2d at 789. Moreover, the court "ha[s] a duty to make further
6 inquiries" to "help it understand the extent of the breakdown" between the defendant and his
7 attorney. *United States v. Moore*, 159 F.3d 1154, 1160 (9th Cir. 1998).

8 It is error when the trial court fails to make any inquiry at all. *United States v. Musa*, 220
9 F.3d 1096, 1102 (9th Cir. 2000); *United States v. Torres-Rodriguez*, 930 F.2d 1375, 1381 (9th Cir.
10 1991), *rev'd on other grounds by Bailey v. United States*, 516 U.S. 137, 116 S. Ct. 501 (1995). It
11 is also error when "the court ha[s] at least tentatively made its decision before it held the hearing
12 on the motion [to substitute counsel]." *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir.
13 1995), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999).

14 The nature of the court's questioning also affect the adequacy of the inquiry. Inquiries were
15 deemed inadequate where the court's questions were "minimal" and the defendant and his attorney
16 were not questioned "privately and in depth," *Moore*, 159 F.3d at 1160; where the court asked
17 "only a few cursory questions, did not question them privately, and did not interview any
18 witnesses," *United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2000); and where the court asked
19 only open-ended questions and put the onus on defendant" to explain objections to the appointed
20 attorney. *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001). Nevertheless,
21 convictions have been affirmed even when the inquiry was not private; that is, when the court's
22 questioning was not conducted *in camera* or in an *ex parte* proceeding, but occurred with both the
23 defendant and his attorney present. *See, e.g., Franklin*, 321 F.3d 1231; *United States v. George*, 85
24 F.3d 1433 (9th Cir. 1996); *United States v. Castro*, 972 F.2d 1107 (9th Cir. 1992); *McClendon*, 782
25 F.2d 785.

26 Clearly, no single factor determines the sufficiency or insufficiency of a court's inquiry. We
27 keep in mind that the court's "sufficient basis for reaching an informed decision" may arise simply
28 from the defendant's "description of the problem and the judge's own observations." *McClendon*,

1   782 F.2d at 789. Moreover, "[t]he inquiry need only be as comprehensive as the circumstances

2   reasonably would permit." *Marcus v. Fairman*, No. C 98-1169 CAL PR, 2000 WL 335700, at *6

3   (N.D.Cal., Mar. 14, 2000); *see McClendon*, 782 F.2d at 786 (inquiry sufficient consisted only of

4   "some discussion"); *Castro*, 972 F.2d at 1109 (inquiry sufficient where court "specifically

5   questioned [the defendant] why he wanted new counsel."); *Franklin*, 321 F.3d at 1239 (inquiry

6   sufficient where court asked general, open-ended questions of the defendant). We pay particular

7   heed to the circumstances when, despite the court's attempts to obtain more information, neither

8   the defendant nor his attorney provides detail, then "[u]nder these circumstances, . . . the district

9   court conducted an inquiry which was as extensive as can reasonably be expected and on which was

10   fully adequate." *United States v. Corona-Garcia*, 210 F.3d 973, 977 (9th Cir. 2000).

11        Chargualaf here argues that the inquiry was insufficient as the court did not question

12   Chargualaf and Timblin separately and in depth. Petition, p. 6. He relies specifically on the May

13   6, 1999 Motion to Withdraw hearing, where the trial court only asked Chargualaf "[w]hat seemed

14   to be the problem" with Timblin and noted that Chargualaf had already been appointed four

15   previous attorneys. ER, pp. 97 (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 6, 1999).

16   However, we note that Chargualaf did not respond to the court's request for clarification. In this

17   situation, we find guidance in *Corona-Garcia*, where the court's inquiry was deemed sufficient

18   when, despite the court's questions, neither the defendant nor his attorney presented information

19   regarding breakdown in the relationship. 210 F.3d at 977.

20        Thus, we decline to accept Chargualaf's argument regarding the court's inquiry, as doing

21   so would create a bright line rule wherein the court's failure to separately question the defendant

22   and his attorney, question witnesses, and ask "specific and targeted questions" would automatically

23   render the court's inquiry inadequate. *Adelzo-Gonzalez*, 268 F.3d at 778. Other cases reveal that

24   there is no such bright line rule which elevates procedural defects of the trial court into a *per se*

25   finding that the inquiry is inadequate.

26        In retrospect, the trial court could, and should, have asked specific questions regarding

27   Chargualaf's complaints; after all, it has a duty to make such inquiries. *See Moore*, 159 F.3d at

28   1160; *see also* note 4, *supra*. Yet under these circumstances, where there is a pattern of substituting

1  attorneys based on Chargualaf's claims of distrust, it can be concluded that the trial court
2  "conducted an inquiry which was as extensive as can reasonably be expected and one which was
3  fully adequate." *Corona-Garcia*, 21 F.3d at 977. Thus, this factor weighs against granting the
4  petition.

5      **2. Extent of the conflict**

6      We next ask whether the trial court evaluated the extent of the conflict between Chargualaf
7  and Timblin. Chargualaf argues that he and Timblin were embroiled in such an irreconcilable
8  conflict that there was a "total lack of communication" and thus, implicitly argues that he was
9  unconstitutionally denied his right to effective trial counsel. Petition, pp. 10, 14.

10     As proof of the conflict, Chargualaf relies on an April 28, 1999 letter to Timblin which
11 revealed Chargualaf's disagreement with Timblin's decision not to call witnesses and not to raise
12 certain issues during a suppression hearing. ER, p. 72 (April 28, 1999 letter). The letter states
13 Chargualaf "can no longer trust" Timblin, and a copy was forwarded to the Ethics Committee. ER,
14 p. 74 (April 28, 1999 letter). Chargualaf also points to Timblin's Affidavit supporting his Motion
15 to Withdraw, Timblin states his belief that an irreconcilable conflict existed. ER, p. 80 (Affidavit
16 of Terry E. Timblin). Finally, Chargualaf relies on a May 6, 1999 letter to Timblin, which stated
17 "I cannot see how we can continue to work together." ER, p. 101 (May 6, 1999 letter). Although
18 he threatened to file a complaint with the Ethics Committee, Chargualaf never did so.

19     Contrary to Chargualaf's assertion, he has not shown that an extensive conflict, and we are
20 not persuaded that Chargualaf's claims rise to the level of "a serious breach of trust and a significant
21 breakdown in communication that substantially interfered with the attorney-client relationship."
22 *Adelzo-Gonzalez*, 268 F.3d at 779. Chargualaf makes only a bare claim that he didn't trust Timblin.
23 However, courts have found a breakdown of the attorney-client relationship caused by much more
24 egregious behavior. *See, e.g., Adelzo-Gonzalez*, 268 F.3d at 779 (court-appointed attorney "had
25 threatened to sink [the defendant] for 105 years so that [he] wouldn't be able to see [his] wife and
26 children'" and had "expressly called [the defendant] a liar on two separate occasions); *Frazer v.*
27 *United States*, 18 F.3d 778, 783 (9th Cir. 1994) (attorney called the defendant a "stupid nigger son
28 of a bitch" and threatened not to perform well if the defendant insisted on going to trial); *Moore*,

1 159 F.3d at 1159 (defendant threatened attorney, saying, "I know how to fix you, you son of a bitch.

2 I'll sue you for malpractice . . . [and] they will raise your insurance so high you'll go back to

3 washing cars.").

4 　　　In comparison to these cases, Chargualaf's claim is only an "unpersuasive, chimerical"

5 argument that falls short of demonstrating an irreconcilable conflict with Timblin. *Corona-Garcia*,

6 210 F.3d at 977. Rather, it appears that "the main source" of the conflict "centered around defense

7 and litigation tactics." *Franklin*, 321 F.3d at 1239. In addition, Chargualaf's threat of a malpractice

8 suit does not create a conflict of interest. *Moore*, 159 F.3d at 1158 (stating a conflict of interest was

9 not created where the defendant's "threat of a malpractice suit never went beyond the threat to file

10 a claim"). Thus, this factor also weighs against granting the Petition.

11 　　　**3. Timeliness of the motion**

12 　　　It does not appear that the trial court considered the timeliness of the motion and extent of

13 any inconvenience or delay that would result from granting the motion. Because the timing of

14 Timblin's motion was not raised during either the May 6, 1999 or the May 10, 1999 hearings, our

15 ability to evaluate this factor was severely curtailed.

16 　　　However, the trial court could have reasonably determined that Chargualaf's complaints

17 about his attorneys were made "for the purpose of delay," *George*, 85 F.3d at 1439, and therefore,

18 an inference could be drawn that Chargualaf's "behavior strongly suggest[ed] that his attempt to

19 remove [his attorney] was part of a general plan to delay and disrupt the trial and prevent it from

20 proceeding." *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992). While it would have been

21 helpful if the trial court had expressly considered the timing of Timblin's motion, after reviewing

22 both the Chargualaf's arguments and the documents filed with the Petition, it cannot be concluded

23 that the court erred in failing to consider this factor before denying the motion. The delay of trial

24 proceedings was evident if Timblin were to withdraw, and the court was well aware that four other

25 attorneys had already been substituted, resulting in the proceedings spanning a period of over

26 eighteen months. Thus, this factor weighs against granting Chargualaf's petition.

27 　　　**4. Other factors may be considered by the court.**

28 　　　The Ninth Circuit has very recently recognized that these three factors "do not comprise an

1     exclusive list" when considering a motion to substitute counsel. *United States v. Prime*, 363 F.3d

2     1028, 1036 n.4 (9th Cir. 2004). Therefore, we may look at other factors in reviewing the denial of

3     the motion to substitute.

4         In *Prime*, the Ninth Circuit recognized that defendant "ha[d] already gone through two

5     attorneys at public expense" and that "a strong inference could be drawn that this motion was

6     brought for purposes of delay." *Id.* at 1036. The same is true in the case at bar, as Chargualaf had

7     "already gone through" four other attorneys. There is also a "strong inference" of that the motion

8     was brought to delay proceedings, because it would take time for a new attorney to be appointed

9     and then become familiar with the case. The docket sheet from the Superior Court reflects that the

10     substitution of attorneys had already resulted in delaying the proceedings, which is apparent in the

11     eighteen-month time period between the appointment of Bischoff in July 1997 to the appointment

12     of Timblin in March 1999. Moreover, the trial court recognized that Chargualaf's distrust was the

13     "same reason [he] used" in requesting substitution of his other court-appointed attorneys, ER, pp.

14     97 (Tr. of Hr'g on Mot. to Withdraw as Counsel, May 6, 1999), perhaps with the exception of

15     Mantanona, who withdrew because Chargualaf's behavior made it unreasonably difficult for him

16     to represent Chargualaf. ER, p. 92 (Tr. of Hr'g on Mot. to Withdraw as Counsel, Mar. 18, 1999).

17         Additionally, any breakdown in communication was prompted by Chargualaf, and his

18     disagreement with Timblin's decisions not to call certain witnesses for the motion for suppression

19     of evidence and not to file a second motion to suppress evidence. ER, pp. 70-74 (Chargualaf's

20     April 28, 1999 letter to Timblin). However, litigation tactics are decisions for the defense attorney.

21     *See United States v. Smith*, 282 F.3d 758, 763 (9th Cir. 2002) ("Litigation tactics are decisions

22     generally left to defense counsel."); *Corona-Garcia*, 210 F.3d at 977 n.2 ("[T]rial tactics are clearly

23     within the realm of powers committed to the discretion of defense counsel . . . ."); *United States v.*

24     *Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) ("[A]ppointed counsel, and not his client, is in

25     charge of the choice of trial tactics and the theory of defense."). Moreover, courts have refused to

26     substitute counsel where the alleged breakdown in the attorney-client relationship were created by

27     defendant's behavior. *See, e.g., United States v. Roston*, 986 F.2d 1287, 1292-1293 (9th Cir. 1993)

28     (holding that "any breakdown in communication between [the defendant] and his current attorney

Page 11 of 12

1 was completely controlled by [the defendant].""); *George*, 85 F.3d at 1438 (finding that defendant's
2 complaints "were frivolous or caused by his own antics," and stating "[w]e do not require a district
3 court to inquire into a defendant's repeated complaints when they are clearly brought for the
4 purpose of delay."). Here, too, the reason for the breakdown was within Chargualaf's control.

5 Because a court is not limited to the three factors when evaluating a motion for substitution,
6 we also consider the "strong inference" that the motion was brought for delay, the fact that four
7 other court-appointed attorneys had already been substituted, and that the reason for any alleged
8 breakdown in communication was Chargualaf's disagreement with Timblin's trial strategy.
9 Therefore, even though the trial court "might have made a more thorough inquiry," the judge
10 nonetheless had "a sufficient basis for reaching an informed decision." *McClendon*, 782 F.2d at
11 789. Thus, the trial court's denial of the motion to substitute was not "clearly against the logic and
12 effect of the facts as are found," and it cannot be concluded that the trial court abused its discretion
13 in denying the motion to substitute. *People v. Tuncap*, 1998 Guam 13, ¶ 12 (quoting *Int'l Jensen,*
14 *Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)).

15 After applying the three-part test and weighing other factors, we conclude that the trial court
16 did not err in denying Timblin's motion. Thus, because the trial court did not err, Chargualaf has
17 failed to satisfy the second *Strickland* prong, as there is no "reasonable probability" that raising this
18 argument on appeal could have resulted in a reversal of his conviction. Accordingly, as Chargualaf
19 has not demonstrated that he received ineffective assistance of appellate counsel, the Writ for
20 Habeas Corpus is hereby **DENIED.**
21 **SO ORDERED,** this _____ day of October, 2004.

22

23
Frances Tydingco-Gatewood                    **Robert J. Torres**
24
FRANCES TYDINGCO-GATEWOOD                    ROBERT J. TORRES
25 Associate Justice                          Associate Justice

*F.* **Philip Carbullido**
26

27
F. PHILIP CARBULLIDO
Chief Justice                                OCT 04 2004
28

do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Supreme Court of Guam Dated at Hagatna, Guam

Page 12 of 12

256

WHC 04-001

# SUPREME COURT OF GUAM

FILED
SUPREME COURT
OF GUAM

Oct 1   3 33 PM '04

In re RANDY IGNACIO CHARGUALAF,

Petitioner,

ROBERT D. CAMACHO,
Director of Corrections,
Government of Guam,

Respondent.

On Application for Writ of Habeas Corpus
to Director of Corrections

# PETITION FOR REHEARING

## HOWARD TRAPP

Howard Trapp Incorporated
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone (671) 477-7000

Attorney for petitioner

I do hereby certify that the foregoing
is a full, true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam.
Dated at Hagatna, Guam.

FEB 2 5 2005

257

WHC 04-001

SUPREME COURT OF GUAM

---

In re RANDY IGNACIO CHARGUALAF,

Petitioner,

ROBERT D. CAMACHO,
Director of Corrections,
Government of Guam,

Respondent.

---

On Application for Writ of Habeas Corpus
to Director of Corrections

---

PETITION FOR REHEARING

---

Randy Ignacio Chargualaf respectfully petitions the Court to grant a rehearing of this appeal, and in support of this petition, represents to the Court as follows:

The Court "note[s] that Chargualaf did not respond to the court's request for clarification. In this situation, we find guidance in *Corona-Garcia*, where the court's inquiry was deemed sufficient when, despite the court's questions, neither the defendant nor his attorney presented information regarding breakdown in the relationship. 210 F.3d at 977." (Order 8 (filed Oct. 4, 2004).)

The Court has overlooked three things. First, the Court has overlooked the fact that the following was the superior court's inquiry in its entirety:

THE COURT: . . . What seems to be the problem, Mr. Chargualaf?

THE DEFENDANT: I don't trust Mr. Timblin in handling my case.

(Excerpts of R. 97.) Secondly, the Court has overlooked the fact that the superior court did nothing more than ask intimidating questions of petitioner and lecture him on his own incompetence:

> THE COURT: Well, that's the same reason you used for the other ones. Can you at least be more innovative?
>
> (No response from Defendant)
>
> . . . .
>
> THE COURT: . . . All of the lawyers I've appointed you have had long experience with prosecution and defense. You know? What makes you an expert as opposed to the long experience in their line of work, Mr.Chargualaf?
>
> . . . .
>
> THE COURT: You know, the lawyers I gave you have all had experiences in prosecution -- almost all of them, anyway; and also on defense. Mr. Timblin was a defense counsel for a long time. And didn't you work for the Attorney General at one time?
>
> MR. TIMBLIN: Correct.
>
> THE COURT: Right. So if anybody knows all the angles on both sides, it's Mr. Timblin. Mr. Williams is another one I appointed who used to be prosecutor at one time. Now, he's an attorney as a defense counsel.
>
> . . . .

2

THE COURT: Mr. Mantanona's another one. You know? If anybody knows prosecution the best and their angles, it's these people. You know? And you, you just probably read a few books and you think you know everything.

(Excerpts of R. 97-98.) Third, the Court overlooked the fact that Chargualaf had been ordered never to contact the superior court again: "THE COURT: Yes. The Court does not want you to contact us again because you do have legal counsel. Okay? That's what they're there for. Okay? So, from now on, Mr. Chargualaf, you must not contact the Court or any officers of the Court except for your lawyer. Okay?" (Excerpts of R. 87.)

The foregoing matters affect the fairness, integrity, and public reputation of the proceedings in the superior court and should not be countenanced by this Court.

Wherefore Chargualaf prays that a rehearing be granted and that on rehearing granted this Court's order of October 4, 2004, be withdrawn and Chargualaf's petition for writ of habeas corpus granted.

Dated, Hagåtña, Guam,

October 7, 2004.

HOWARD TRAPP
Attorney for petitioner

(Appeal.Sup.Ct.\PetforRehrg.RChargualaf)

3

## DECLARATION OF SERVICE

I, Dee Ramon, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on Robert D. Camacho, Director of Corrections, Government of Guam, by leaving a copy thereof at his office at Building A111, Mariner Blvd, Tiyan, Guam, his last known address, with a person in charge thereof, on October 18, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on October 18, 2004.

DEE RAMON

## DECLARATION OF SERVICE

I, Dee Ramon, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on the Honorable Douglas B. Moylan, Attorney General of Guam, by leaving a copy thereof at his office at the Guam Judicial Center, Suite 2-200E, 120 West O'Brien Drive, Hagåtña, Guam, his last known address, with a person in charge thereof, on October 18, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on October 18, 2004.

DEE RAMON

## IN THE SUPREME COURT OF GUAM

In re RANDY IGNACIO,                    )
CHARGUALAF,                             )        Supreme Court Case No. WHC04-001
                                        )
            Petitioner,                 )
                                        )
        vs.                             )
                                        )
ROBERT D. CAMACHO, Director of          )        **ORDER**
Corrections, Government of Guam         )
                                        )
            Respondent.                 )
_____)

This matter comes before the court pursuant to a Petition for Rehearing filed by Petitioner Randy Ignacio Chargualaf on October 18, 2004. Chargualaf's Petition was filed pursuant to Rule 31 of the Guam Rules of Appellate Procedure.

Under Rule 31, this court may grant a petition for rehearing if the court has "overlooked or misapprehended points of law or fact" in its original consideration of the matter. Guam R. App. P. 31.

In his Petition, Chargualaf first argues the court overlooked matters of fact regarding the trial court's inquiry on the motion to substitute, which is one factor considered as part of the three-prong test a court applies when determining whether the trial court abused its discretion in ruling on such a motion. *See United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir. 1997). He asserts that this court overlooked the limited nature of the court's questioning, and that the court asked only intimidating questions of Chargualaf. Contrary to Chargualaf's assertion, the October 4, 2004 Order denying habeas relief analyzed the trial court's inquiry in light of the well-settled rule that a court's "sufficient basis for reaching an informed decision" in deciding a motion to substitute may arise simply from the defendant's "description of the problem and the judge's own observations." *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986).

1     Chargualaf next argues that this court overlooked regarding the trial court's verbal

2 instruction, during a March 18, 1999 hearing, that Chargualaf not contact the court. The trial court's

3 verbal order arose after receiving *ex parte* communication from Chargualaf. Thus, in light of the

4 court's concern that other improper *ex parte* communications could be made, the court also

5 instructed the prosecutor to conduct an investigatory grand jury regarding the ability of detainees to

6 send such improper communications. Discussion of the verbal order was omitted as irrelevant to

7 Chargualaf's original *habeas corpus* action alleging ineffective assistance of counsel. The instant

8 Petition for Rehearing does not articulate how the trial court's verbal order preventing *ex parte*

9 communication is relevant to the claim of ineffective assistance of counsel.

10     Having considered the arguments presented, the court finds that it has neither overlooked nor

11 misapprehended any arguments of law or fact in denying Chargualaf's Petition for Writ of Habeas

12 Corpus. Guam R. App. P. 31. Accordingly, Chargualaf's Petition for Rehearing is hereby **DENIED.**

13     **SO ORDERED** this __5th__ day of **NOV**. 2004.

14

15 

16 ROBERT J. TORRES          FRANCES TYDINGCO-GATEWOOD
    Associate Justice             Associate Justice

17

18 F. PHILIP CARBULLIDO
    Chief Justice

19

20

21 I do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Supreme Court of Guam.
Dated at Hagatna, Guam

NOV 05 2004

Dep. Imelda B. Duenas
Deputy Clerk, Supreme Court of Guam

22

23

24

25

26

27

28



**IN THE SUPREME COURT OF GUAM**

| | |
|---|---|
| PEOPLE OF GUAM, ) | Supreme Court Case No. CRA00-002 |
| Plaintiff-Appellee, ) | Superior Court Case No. CF0317-97 |
| ) | |
| vs. ) | |
| ) | **MANDATE** |
| RANDY IGNACIO CHARGUALAF, ) | |
| Defendant-Appellant. ) | |

APPEAL from the Superior Court of Guam and the subsequent filing for Certiorari by the Appellant, Randy Ignacio Chargualaf, to the United States Court of Appeals for the Ninth Circuit.

THIS CAUSE came before this court on October 26, 2000. The Appellant's Petition for Writ of Certiorari to the Ninth Circuit was **DENIED.** The denial was filed on April 16, 2001 by the Ninth Circuit. The Supreme Court of Guam did not receive a copy of the Order filed April 16, 2001 from the Ninth Circuit. The appellant upon the decision of the Ninth Circuit, filed a Petition for Writ of Certiorari to the United States Supreme Court in which the Petition was **DENIED** on October 1, 2001. The Supreme Court of Guam did not receive a copy of the Order filed October 1, 2001, from the United States Supreme Court. These aforementioned decisions having recently come to the attention of this court, the mandate of this court is herein issued.

ON CONSIDERATION THEREOF, it is now hereby ordered and adjudged by this court that the trial court's denial of the Appellant's motion to suppress the evidence and in-court identification and the judgment of conviction is **AFFIRMED.**

Dated this 23rd day of January, 2004.

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Supreme Court of Guam. Dated at Hagatna, Guam

FEB 0 8 2005

RECEIVED
JAN 23 2004
HOWARD TRAPP
INCORPORATED

2 0 0 4 0 2 0 9

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on Robert D. Camacho, Director of Corrections, Government of Guam, by leaving a copy thereof at his office at Building A111, Mariner Blvd, Tiyan, Guam, his last known address, with a person in charge thereof, on May 5, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on May 5, 2005.

CHARLENE C. CRUZ

# DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am a secretary employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on the Honorable Douglas B. Moylan, Attorney General of Guam, by leaving a copy thereof at his office at 247 West O'Brien Drive, Hagåtña, Guam, his last known address, with a person in charge thereof, on May 5, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Hagåtña, Guam, on May 5, 2005.

CHARLENE C. CRUZ