(ccc)

HOWARD TRAPP INCORPORATED
200 Saylor Building
139 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone 477-7000

Attorney for petitioner

FILED
DISTRICT COURT OF GUAM
AUG 18 2006
MARY L.M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

------------

| | | |
|---|---|---|
| RANDY IGNACIO CHARGUALAF, | ( | Civil Case No. 05-00014 |
| | ) | |
| Petitioner, | ( | ADDITIONAL DOCUMENT/ PORTION OF RECORD |
| | ) | |
| vs. | ( | |
| | ) | |
| ROBERT D. CAMACHO, Director of Corrections, Government of Guam, and THE ATTORNEY GENERAL OF GUAM, | ( ) ( ) | |
| | ( | |
| Respondents. | ) | |

------------

Petitioner provides to the Court, herewith, those items which are described in paragraph 68 of the order of April 19, 2006, but which were not already a part of the record in this proceeding.

Dated, Hagåtña, Guam

August 17, 2006.

HOWARD TRAPP
For HOWARD TRAPP INCORPORATED
Attorney for Petitioner

(DOCUMENTS/AffidavitRChargualaf)

ORIGINAL

## DECLARATION OF SERVICE

I, Charlene C. Cruz, declare that I am an administrative assistant employed in the office of Howard Trapp, Esq., the attorney for petitioner herein, and that I served the document to which this declaration is annexed on Marianne Woloschuk, Esq., Assistant Attorney General, the attorney for respondents herein, by leaving a copy at the Office of the Attorney General, The Justice Building, 287 West O'Brien Drive, Hagåtña, Guam, Ms. Woloschuk's last known address, with a person in charge thereof, on August 18, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2006, at Hagåtña, Guam.

CHARLENE C. CRUZ

IN THE SUPERIOR COURT OF GUAM
TERRITORY OF GUAM

PEOPLE OF THE TERRITORY OF GUAM )
vs.
RANDY CHARGUALAF,
Defendant.

CRIMINAL CASE NO. CF0317-97

JURY SELECTION MINUTES

DATE: NOVEMBER 1, 1999

CAUSE CALLED FOR TRIAL = RECORDING TAPE AND LOG NUMBER: 99-1775 1320

PRESENT: PRESIDING JUDGE ALBERTO C. LAMORENA, III 1450 - side bar.

RANDY CHARGUALAF, DEFENDANT

TERRY TIMBLIN, ESQ., ATTORNEY FOR DEFENDANT

TOM FISHER, ESQ., ATTORNEY FOR GOVERNMENT

EVELYN SANTOS, COURTROOM CLERK

PROSPECTIVE JURORS SWORN. VOIR DIRE AND SELECTION OF JURORS.

THE FOLLOWING JURORS ARE IMPANELED AND SWORN TO TRY THE CAUSE:

| | NAME | JUROR # |
|---|---|---|
| 1. | Anthony Cruz | 828 |
| 2. | Ronaldo [illegible] | 774 |
| 3. | [illegible] | 784 |
| 4. | Claire Young | 892 |
| 5. | [illegible] | 824 |
| 6. | [illegible] | 802 |
| 7. | [illegible] Aguon | 860 |
| 8. | Claire [illegible] Desoto | 809 |
| 9. | [illegible] | 790 |
| 10. | Maria Ramos | 773 |
| 11. | [illegible] Aguon | 759 |
| 12. | [illegible] | 801 |

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagatna, Guam

AUG 17 2006

Benny O. Cruz
Deputy Clerk, Superior Court of Guam

BY ORDER OF THE COURT, THE FOLLOWING ALTERNATES ARE SELECTED & SWORN:

| | NAME | JUROR # |
|---|---|---|
| 1. | Pacita Mendiusan | 728 |
| 2. | Dorothy Madden | 884 |

FILED
SUPERIOR COURT
OF GUAM

2004 NOV 10 AM 10: 45

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM, | SUPERIOR COURT CASE NO: CF317-97 |
| vs. | TRANSCRIPT OF PROCEEDINGS |
| RANDY I. CHARGUALAF, et al., | Jury Selection |
| Defendants. | November 1, 1999 |

Before: THE HONORABLE ALBERTO C. LAMORENA, III
Presiding Judge, Superior Court of Guam
Hagåtña, Guam

APPEARANCES:

For the People:
Office of the Attorney General
By: Thomas Fisher, Assistant Attorney General
Hagåtña, Guam

For the Defendant :
Terrence Timblin, Esquire
Hagåtña, Guam

COPY

THE COURT: CF317-97, People of Guam versus Randy Ignacio Chargualaf. Defendant is present in court with his attorney, Mr. Timblin; People represented by Mr. Fisher.

I think there's a motion in limine filed by defense counsel on October 27th?

MR. TIMBLIN: That's correct. I apologize for the late notice on this but I just didn't receive this until again last week. If you'll indicate, the previous attorney, Mark Williams, I guess spoke with Mrs. Certeza. She did sign what's been called a waiver of prosecution, although we understand that doesn't prevent the Government from going forward, obviously, but it does make reference to her not wishing to testify and that she would like to settle a case by basically having $5,000.00 paid to her.

Now, obviously she has every right in the world to file like her own civil suit against Mr. Chargualaf should she wish, but I think as far as attempting to profit out of a prosecution, which is basically the Government, the Plaintiff, that I think that does indicate a monetary motive on our part to participate in this case at all, and I think that could go to her credibility and I, therefore, would like to again cross-examine her about that and bring it to the jury's attention.

THE COURT: Mr. Fisher?

MR. FISHER: Your Honor, I think Mr. Timblin's point on

this issue is well taken. There's a (indiscernible-inaudible) that she did file, so we're not opposing the motion in limine, but we would like to ask to allowed to amend our witness to include Mr. Williams.

THE COURT: Okay. Now, it hasn't been presented to the jury, so the Court will permit you to add Mr. Williams. Attorney Mark Williams; right?

MR. FISHER: Yes, Your Honor.

THE COURT: ...to the list. And you'll add Ms. Certeza?

MR. TIMBLIN: Well--

THE COURT: She's being called anyway, right?

MR. FISHER: She is being called, Your Honor.

MR. TIMBLIN: She'll be called, obviously. She's kind of a star witness.

THE COURT: Do you have your amended witness list or... How about you, Mr. Timblin, do you intend to...

MR. TIMBLIN: The only one I intend to call right now would be Benjamin Certeza, the husband of the (indiscernible-inaudible) witness.

THE COURT: Who's on the prosecution's?

MR. TIMBLIN: He's on the Government witness list, but Mr. Fisher indicated he wasn't planning on calling him.

MR. FISHER: Your Honor, let me present the Court with our witness list, together with the two additional

Case 1:05-cv-00014 Document 16-2 Filed 08/18/2006 Page 4 of 42

witnesses.

THE COURT: Okay, and I'll add Mr. Mark Williams on it, if you don't mind.

MR. FISHER: Thank you, Your Honor.

THE COURT: Okay. Which witness list should I read? All of it, then?

MR. FISHER: Your Honor, we would ask out of caution that the Court do read the entire witness list for the People, although we only anticipate calling about ten of these. As the Court is aware, sometimes things come up in trial that make it necessary to call others.

THE COURT: And yours is only Mr. Benjamin Certeza; right?

MR. TIMBLIN: Correct, Your Honor.

THE COURT: Okay. You know if you're calling Mr. Bascon he can't sit on the -- Your investigator; right? Do you have him on your witness list?

MR. FISHER: No, Your Honor. Mr. Duarte is...

THE COURT: Is Mr. Bascon going to testify? His name is on the list.

MR. FISHER: No, Your Honor-- Oh, I see. No, Your Honor.

THE COURT: No?

MR. FISHER: As far as I know.

THE COURT: So I can take him out?

MR. FISHER: Please.

THE COURT: And I'll add -- basically no one; right?

MR. FISHER: We would just ask for Mr. Williams.

THE COURT: Oh, Mr. Williams will be the only one added to it, then.

Okay, any other motions before we have the jury come in?

MR. TIMBLIN: No, Your Honor.

THE COURT: Okay. We'll recess. We'll bring the potential jurors in and we'll begin jury selection. The court is in recess.

(Off the record; recess taken)

(Back on the record)

THE MARSHAL: All rise. The Honorable Alberto C. Lamorena the Third presiding. All jurors please remain standing.

THE CLERK: Raise your right hand.

(Jurors comply)

THE CLERK: You and each of you do solemnly swear that you will truly answer such questions as shall be put to you touching your qualifications to serve as trial jurors, so help you God.

THE JURY: I do.

THE COURT: Please be seated.

Okay, good morning to all of you.

THE JURY: Good morning.

THE COURT: Good morning. Welcome to the Superior Court of Guam.

Ladies and gentlemen, you're here for the purpose of jury selection. It is my duty as the trial judge to select a jury in this case. This is the People of Guam versus Randy Ignacio Chargualaf, Criminal Case No. CF317-97.

I'm asking you a number of questions, and the sole purpose for those questions is to select a fair and impartial jury. Okay? So, when I ask questions, please try to listen as carefully as possible, even though the question is not addressed to you, so we can expedite the matter this morning. Okay?

The Defendant in this case is Randy Ignacio Chargualaf. He has been charged as follows.

On the first charge of robbery as a second degree felony, that:

> On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, in the course of committing a theft, knowingly was armed with and displayed what appeared to be a deadly weapon, that is, a handgun, while in the course of committing theft, in violation of 9 GCA §40.20(a)(3) and (b) as amended.

On the special allegation, it is further alleged that:

In the commission of offense, the Defendant, Randy Ignacio Chargualaf, unlawfully possessed a deadly weapon, that is, a handgun, in violation of 9 GCA §80.37.

On the charge of conspiracy to commit robbery:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, a) agreed with one or more persons --

Could I have both counsels come forward?

(Counsel approach the bench)

(Side bar conference)

THE COURT: On the third charge, I'll have to read the names --

MR. TIMBLIN: I'm sorry?

THE COURT: I'll have to read the names of all the defendants because it's conspiracy.

MR. TIMBLIN: (Indiscernible-inaudible) conspiring. I think you have to, yeah.

THE COURT: Hm-hm. Just to let both of you know, okay? Okay.

MR. TIMBLIN: Yes.

MR. FISHER: Okay.

(Side bar conference concluded)

THE COURT: Okay. On the charge of conspiracy to commit robbery, which is a second degree felony, that:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, Candelaria Quidachay Mendiola, also known as Kandi, and Don Allan Borja Mendiola, also known as Keilani, did:

a) agree with one or more persons, to wit, each other, that they or one of them would engage in the conduct which constituted the crime of robbery;

b) intend to engage and promote or assist in the conduct which constituted the crime or robbery; and

c) perform, or one of them perform, an overt act in pursuant of the agreement, to wit, entering the residence of another and taking items at gunpoint, in violation of 9 GCA §13.30, 40.20(a)(3) and (b).

On the charge of theft as a misdemeanor, that:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly and unlawfully took the movable property of another, namely, Nobuyo Kazumi Certeza, that is, a purse and other items, with intent to deprive her thereof, the amount involved exceeding Fifty Dollars ($50) but less than Five Hundred ($500), in violation of 9 GCA §43.20(c) and 43.30(a).

On the charge of possession of a firearm without an identification card, which is a felony, that:

On or about July 21st, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly possessed a firearm, specifically, a semiautomatic pistol, at a time when he did not have a firearms identification card in his possession, in violation of 10 GCA §60106 and 60121(e).

On the charge of possession of a concealed firearm as a felony, that:

On or about July 21st, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly carried a firearm, that is, a semiautomatic in his vehicle in such a manner that it could not be seen by the naked eye, but was available for use by Randy Ignacio Chargualaf without having first received permission to so conceal such firearm, in violation of 10 GCA §60109, 60108(e) and 60121(c).

Okay. In this Indictment, the Defendant has entered a plea of not guilty and is now before this Court for a trial.

A Defendant in a criminal action is presumed to be innocent until the contrary is proven. And in case of reasonable doubt, whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the People of Guam the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows. It is not mere possible doubt, because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is the state of the case which, after the entire comparison and consideration of all the evidence leaves the minds of the juror in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

The fact the Defendant is in this courtroom for a trial for the charges that have been made against him is no evidence whatsoever of his guilt.

The jurors are to consider only evidence properly received in this courtroom in determining the guilt or innocence of the Defendant.

The Defendant has been arraigned and has pled not guilty, which is a complete denial, making it necessary for the People, acting through the Attorney General's Office, to prove beyond a reasonable doubt the case against the Defendant. Until and unless that is done, the presumption of innocence will prevail.

Okay. The Defendant in this case is Randy Ignacio Chargualaf.

Mr. Chargualaf, can you, please, stand up so that all the jurors can see you?

(Defendant complies)

Case 1:05-cv-00014 Document 16-2 Filed 08/18/2006 Page 11 of 42

THE COURT: Does anybody know Randy Ignacio Chargualaf?

(To the Defendant) Do you have a family, Chamorro name?

THE DEFENDANT: (Inaudible response)

THE COURT: Okay. Turn around so the jurors here can see you. Then can you come this way, sir, and then the jurors here can see you as well? Can you go through this way?

(Defendant complies)

THE COURT: Okay, if you haven't seen him, please raise your hand, so everybody knows who he is.

(To a Juror) Do you see him?

JUROR: (Inaudible response)

THE COURT: (To the Defendant) Okay. You may have a seat.

Everybody seen Mr. Chargualaf?

(Affirmative response)

THE COURT: Okay, does anybody know Mr. Chargualaf personally or any members of his immediate family? We'll start here. Anybody know Mr. Chargualaf? This side?

(Negative response)

Okay, let the record reflect that no one knows Mr. Randy Ignacio Chargualaf or the family in this case.

The Prosecutor -- I'm sorry -- the Defense Counsel in this case is Mr. Terry Timblin. Does anybody

know Mr. Terry Timblin personally, or did he represent you in any capacity as an attorney, or did he represent somebody that sued you?

Okay. Mr. Timblin, can you just come this way, sir?

(Mr. Timblin complies)

THE COURT: Okay, anybody know Mr. Timblin? We'll start with this side.

You can have a seat, Mr. Timblin.

(Negative response)

THE COURT: None? Okay.

On this side, none?

How about this side? Okay, none. Come forward.

Is there room here? Have some of the jurors sit back. Sit over there.

Your name and Jury Number?

THE JUROR: 99-0732, Corina Gutierrez.

THE COURT: 732?

JUROR NO. 732: Yeah.

THE COURT: Okay. And how do you know Mr. Timblin?

JUROR NO. 732: He represented my boyfriend and I for -- Well, yeah, actually he represented my boyfriend in a -- it was a custody case. I don't really remember, in 1995 maybe, or -4, very briefly.

THE COURT: So he was your lawyer?

JUROR NO. 732: Very briefly. Not -- Actually he was my boyfriend's lawyer. But we were in a...

THE COURT: Okay, are you still with your boyfriend now?

JUROR NO. 732: Yeah.

THE COURT: Okay. So, we'll excuse you, ma'am. Okay, thank you very much.

(Juror No. 732 excused)

THE COURT: Okay, anybody else?

(Negative response)

THE COURT: Okay, no one else.

Okay, the Prosecutor in this case is Mr. Tom Fisher. Anybody know Mr. Tim Fisher?

(Mr. Fisher stands)

THE COURT: Okay, thank you, Mr. Fisher.

We'll start with this side. Okay, ma'am, please come forward.

THE JUROR: Your Honor, I'm a (indiscernible-inaudible) witness --

THE COURT: Come forward.

THE JUROR: So I know Mr. Fisher.

THE COURT: Just come forward. We have to put you on the record. Your name and Jury Number.

THE JUROR: My name is Mirta Walters.

THE COURT: And number.

THE JUROR: 783.

THE COURT: Okay. And how do you know Mr. Fisher?

JUROR NO. 783: Well, we work for the Attorney General. I work as the victim witness--

THE COURT: Oh, you're an Attorney General employee? Okay--

JUROR NO. 783: No--

THE COURT: We'll excuse you.

JUROR NO. 783: Ayuda Services. Thank you.

THE COURT: We'll excuse you. Thank you very much.

JUROR NO. 783: Thank you, Your Honor.

(Juror No. 783 excused)

THE COURT: Okay, anybody else here? Okay, please come forward.

Your name and Juror number, sir.

THE JUROR: 724.

THE COURT: Okay, and your name?

THE JUROR: James Manglona.

THE COURT: Okay.

JUROR NO. 724: Mr. Fisher lives down the street from me. And I see him--

THE COURT: Do you socialize with him a lot?

JUROR NO. 724: Once in a while.

THE COURT: You like barbecue and...

JUROR NO. 724: Before.

THE COURT: Have a few Diet Pepsi's together after five, or Diet Coke?

JUROR NO. 724: Before?

THE COURT: Hmm?

JUROR NO. 724: Before.

THE COURT: Okay. Before? Not now?

JUROR NO. 724: Not now. I don't know if he still lives down there.

THE COURT: Okay. Knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 724: I don't think so.

THE COURT: Okay, we'll excuse you. Thank you very much.

(Juror No. 724 excused)

THE COURT: Okay, anybody else know Mr. Fisher? Your name and Juror number, sir?

THE JUROR: 875, and I do work for the Attorney General's Office.

THE COURT: You do? What is your...

JUROR NO. 875: As an investigator.

THE COURT: Okay, you're excused, then.

(Juror No. 875 excused)

THE COURT: Okay, anybody else? Any employees of the Attorney General's Office here?

(Negative response)

THE COURT: Okay. The other one is Mr. Duarte. Anybody know Mr. Duarte or any members of his immediate family? He's an investigator for the Attorney General's Office. Okay, I saw two -- Anybody on this side first? Okay, there were some people that raised their hand. Okay, please come forward, state your name and juror number and how you know Mr. Duarte.

THE JUROR: Jury Number 859, Emsley, Beatrice. Mr. Duarte's daughter and I were close friends in school.

THE COURT: Okay. Were or...

JUROR NO. 859: Were, past.

THE COURT: Okay, have you seen her lately?

JUROR NO. 859: No.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 859: No.

THE COURT: Okay. You're excused. Thank you.

JUROR NO. 859: Thank you.

(Juror No. 859 excused)

THE COURT: Anybody else?

THE JUROR: My number is 99-830, Celina Castro Quidachay.

THE COURT: 830?

JUROR NO. 830: Yes.

THE COURT: Okay.

JUROR NO. 830: Mr. Duarte's daughter is my niece.

THE COURT: Okay. So, he's your cousin?

JUROR NO. 830: His wife.

THE COURT: Oh, his wife.

JUROR NO. 830: Ex-wife, yeah.

THE COURT: Okay. Knowing that, could you still be fair and impartial?

JUROR NO. 830: No.

THE COURT: If you sat as a member of the jury?

JUROR NO. 830: No, I can't.

THE COURT: Okay. You're excused. Thank you.

(Juror No. 830 excused)

THE COURT: Anybody else? How about this side?

(Negative response)

Okay, I'm going to be giving a list of people that may be called as witnesses in this case. If you know these individuals, please let the Court know and how you know these individuals. Okay? So, I'll go as slow as possible so everybody can hear the names. Okay?

The following individuals may be called in this trial: Officer Jerome E.D. Santo Tomas of the Guam Police Department, Officer Helen C. Vibar of the Guam Police Department, Officer Christopher S. Dawson of the Guam Police Department, Officer Mercy B. Grino of the Guam Police Department, Officer James G. Santos of the Guam Police

Department, Officer Junell B. Sicad of the Guam Police Department, Officer Richard A. Cress of the Guam Police Department, Officer Vincent D.C. Nueva of the Guam Police Department, Officer Joseph P. Leon Guerrero of the Guam Police Department, Officer John S. Tyquiengco of the Guam Police Department, Jose T. Garrido from the Guam Territorial Detention Center, the Guam Police Records Custodian, the Guam Police Property Custodian, Nobuyo Kazumi Certeza of Tumon, Don Allen Borja Mendiola of Tamuning, Candelaria Quidachay Mendiola of Harmon, Benjamin Certeza of Tumon, Officer Albert J. Balajadia of the Guam Police Department, Steve B. Chargualaf of the Guam Police Department, Officer Jesse J. Mendiola of the Guam Police Department, Officer Cristobal N. Castro, Jr. of the Guam Police Department, Officer Joaquin M. Mesa of the Guam Police Department, Cynthia Guerrero of Tumon and Attorney Mark Williams.

Okay. Anybody know any of these individuals on this side? Okay, please come forward. Again, state your name and Jury Number, who you know and how do you know this individual. Okay?

Okay, your name and Jury Number, ma'am.

THE JUROR: Fe Nueva, 0865, I know two of the officers.

THE COURT: You're not related to this person named Nueva, too?

JUROR NO. 865: Yes, that's my brother. And Mercy

Grino is my cousin's wife.

THE COURT: So, you're still close with your brother?

JUROR NO. 865: Yes.

THE COURT: Not to assume anything.

(Laughter)

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 865: No, sir.

THE COURT: Okay, we'll excuse you. Thank you.

JUROR NO. 865: Thank you.

THE COURT: What was your Juror number again? I'm sorry.

JUROR NO. 865: 0865.

THE COURT: 865, okay. Thank you.

(Juror No. 865 excused)

Next, please. Again just state your name for the record and your Jury Number, okay?

THE JUROR: My name is Joe Quinata, Juror Number 895. I'm not certain, but Chris Castro, Jr. might be a cousin of mine. If he is from Inarajan, then he might be my cousin. I don't know him personally--

THE COURT: Yeah, I think so. From Malojloj.

JUROR NO. 895: Yes.

THE COURT: You're probably right. Right, from Malojloj. Okay, knowing that, can you still be fair and

impartial if you sat as a member of this jury?

JUROR NO. 895: Yes.

THE COURT: Okay, you can stay. Thank you very much.

Okay, next. Again, ma'am, just for the record, state your name and Juror number.

THE JUROR: Patricia Baleto, number 793. Okay, Sicad and Tyquiengco or Tydingco, and Kin Mesa, those are real good friends of my husband's at work.

THE COURT: What does your husband do?

JUROR NO. 793: GPD.

THE COURT: Oh, he's an officer?

JUROR NO. 793: Yeah.

THE COURT: He's active police? He's an officer of the Police Department?

JUROR NO. 793: Right.

THE COURT: Okay. Okay, knowing that, can you still be fair and impartial if you sat as a member of the jury?

JUROR NO. 793: I don't think so.

THE COURT: Okay, we'll excuse you. Thank you very much.

(Juror No. 793 excused)

Next, please. Again, ma'am, state your name and Jury Number for the record.

THE JUROR: Milagros Aquino, 941. I know Mr. Kin Mesa, he's my uncle; that's my dad's cousin, first cousin.

THE COURT: Let me see. Your dad's uncle and first cousin?

JUROR NO. 941: No, that's my dad's first cousin and he's my uncle.

THE COURT: Oh. Oh, okay. Do you see each other a lot?

JUROR NO. 941: Yes, we communicate most of the time.

THE COURT: Constantly, huh?

JUROR NO. 941: Yes.

THE COURT: Okay. Knowing that, can you still be fair and impartial if you sat as a witness *[sic.]* in this jury?

JUROR NO. 941: No, sir.

THE COURT: Okay, we'll excuse you. Thank you very much.

(Juror No. 941 excused)

Next, please. Again for the record, state your name and your jury number.

THE JUROR: My name is Rosita S. Aguon, Juror No. 837. I know Vincent Nueva. He's a very -- his sister is very close friend of my daughter, and he's --

THE COURT: The one that just left?

JUROR NO. 837: No, --

THE COURT: Another sister?

JUROR NO. -- the officer. Oh, his sister--

THE COURT: Because his sister here was --

JUROR NO. 837: -- another sister.

THE COURT: Another sister, okay.

JUROR NO. 837: Yeah. And he's a boyfriend of my niece.

THE COURT: Oh, okay. Knowing that, can you still be fair and impartial if you sat a member of the jury?

JUROR NO. 837: (Inaudible response)

THE COURT: No? Okay, we'll excuse you. Thank you very much.

JUROR NO. 837: Okay.

(Juror No. 837 excused)

THE COURT: Anybody else on this side?

(Negative response)

THE COURT: Okay, how about the middle? Okay, please come forward. Again, state your name and juror number. Okay, sir, you can go that way and, ma'am, you an go that way. Okay.

THE JUROR: Leon Guerrero, Joseph, 879. I grew up with Santo Tomas, and Officer Dubar *[sic.]* is my first cousin.

THE COURT: Who?

JUROR NO. 879: Officer Dubar, Helen Dubar?

THE COURT: Oh, Vibar. Is it Vibar?

JUROR NO. 879: Yeah.

THE COURT: Okay. Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 879: (Inaudible response)

THE COURT: Okay, we'll excuse you. Thank you very much.

(Juror No. 879 excused)

THE COURT: Okay. Your name, ma'am, and juror number.

THE JUROR: 702, Salas, Geraldine. Now I remember Randy. We went to school together. We kind of grew up too.

THE COURT: Okay, when's the last time you saw him?

JUROR NO. 702: Back in high school, about ten --

THE COURT: Okay. Can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 702: (Inaudible response)

THE COURT: Okay, we'll excuse you. Thank you very much.

JUROR NO. 702: Thank you.

(Juror No. 702 excused)

THE COURT: Okay, ma'am, your name and juror number just for the record.

THE JUROR: My name is Marcie P. Aguigui. I live five blocks down from Chris Castro. I believe we're related somehow.

THE COURT: Okay, could you still be fair and impartial if you sat as a member of this jury?

THE JUROR: Yes.

THE COURT: Okay, you could stay. What is your name

again?

THE JUROR: Marcie Paulino Aguigui.

THE COURT: Number. Juror number.

THE JUROR: 874.

THE COURT: Okay, 874. Okay, thank you very much. You can stay.

Okay, I'm trying to go back and forth. Okay, your name and juror number, ma'am.

THE JUROR: Gloria Mantanona, 794, and I know Candalaria Mendiola. We grew up together and we went to school together.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 794: Yeah.

THE COURT: Okay. Are you very close, or you just grew up together?

JUROR NO. 794: No, we just grew up together, but --

THE COURT: Okay, so you don't --

JUROR NO. 794: Yeah.

THE COURT: -- see each other all the time; right? You don't go to her parties and...

JUROR NO. 794: Uh-uh.

THE COURT: You just know that she's there?

JUROR NO. 794: Yeah.

THE COURT: Okay, you can stay, then. Thank you very

much.

Okay, next. Sir, name and your number for the record.

THE JUROR: Raymond J. Unpingco. Juror 12. Jesse Mendiola is a close personal friend of mine.

THE COURT: Okay. Very close?

JUROR NO. 12: Last time I saw him was a couple months ago.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 12: No.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 12 excused)

THE COURT: Okay, next.

THE JUROR: Melvin Lucero, 816. Mercy Grino is a friend of mine from high school. Officer Mercy Grino.

THE COURT: When did you graduate?

JUROR NO. 816: '92. I think she graduated '91.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 816: No.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 816 excused)

Next, sir. Name and juror number.

THE JUROR: Joseph Pellicani, 826. I know Officers

Grino and Balajadia.

THE COURT: Okay, how do you know them?

JUROR NO. 826: I used to work with Officer Grino and Officer Balajadia from the gym.

THE COURT: Gold's Gym?

JUROR NO. 826: Yes.

THE COURT: Okay. You still train over there?

JUROR NO. 826: I do. Yes, sir.

THE COURT: Oh, okay. Okay, knowing that, could you still be fair and impartial if you sat as a member of the jury?

JUROR NO. 826: Yes.

THE COURT: Okay, you could stay. Thank you.

Any more? Okay, from this side, anybody know any of the witnesses? Okay, please come forward. Okay, we're done with this group; right?

Okay, come up, sir. Okay, just for the record, you name and jury number.

THE JUROR: Anthony Cruz, 828. I know Officer Chris Castro; he's my second cousin's cousin, first cousin.

THE COURT: Your second cousin's first cousin?

JUROR NO. 828: First cousin, yes. (Chuckles)

(Laughter)

THE COURT: That's like a tongue twister; right? Okay.

JUROR NO. 828: And he's from Malojloj.

Case 1:05-cv-00014 Document 16-2 Filed 08/18/2006 Page 27 of 42

THE COURT: Do you see each other a lot?

JUROR NO. 828: No, just my second cousin.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of the jury?

JUROR NO. 828: Hmm, I think so.

THE COURT: Okay, you could stay. Thank you.

Okay, next. Ma'am, just for the record, your name and jury number.

THE JUROR: My name is Lorie Denusta, number 734. Officer Richard A. Cress is my brother.

THE COURT: Did I mention his name?

JUROR NO. 734: Yeah.

THE COURT: Oh, Cress, C-R-E-S-S. Okay, knowing that, can you still be fair and impartial?

JUROR NO. 734: No.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 734 excused)

Okay. Next, please. State your name and juror number, ma'am.

THE JUROR: Antoinette Cruz, 792. I know --

THE COURT: 792?

JUROR NO. 792: 792. I know Candy and I know Officer Santos.

THE COURT: Okay, how do you know these two individuals?

JUROR NO. 792: Candy used to bowl -- we used to bowl in the same league, and I know Officer Santos' mom, we're co-workers.

THE COURT: Did you win the league, or...?

JUROR NO. 792: No. Unfortunately, no.

(Laughter)

THE COURT: You're just there for the fun; right?

JUROR NO. 792: Yeah.

THE COURT: Not for the spirit of competition?

JUROR NO. 792: Uh-huh.

THE COURT: Okay. Knowing that, can you still be fair and impartial if you sat as a member of the jury?

JUROR NO. 792: No.

THE COURT: Okay. You're excused. Thank you very much.

(Juror No. 792 excused)

Next, please. Your name and juror number, sir, for the record.

THE JUROR: Joe Villagomez, Petite Juror 745.

THE COURT: Okay. Who do you know?

JUROR NO. 745: I know Officer James Santos, he's been friends of the family for many years.

THE COURT: Okay. Do you still see each other personally?

JUROR NO. 745: Every once in a while.

THE COURT: Okay. Knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 745: No, Your Honor.

THE COURT: Okay. You're excused. Thank you very much.

(Juror No. 745 excused)

Okay. Anybody else?

(Negative response)

Okay, the next question is a more personal question, so we'll probably go side bar on this one, okay, so you can tell us.

Okay. This is a felony charge. Has any -- or anybody close to you, such as any members of your immediate family or any people you consider close, like friends or close relatives, or you, have been charged for a felony such as robbery or theft or possession of firearms of any type, or been a witness, a victim, or do you have very personal feelings about guns in general or robbery cases in general? Okay, we'll start with this side.

Okay, can I have both attorneys come?

(Brief pause)

MR. TIMBLIN: Judge, can I move these out of the way?

THE COURT: Yes. We still have those things? When can we dispose of...

(Brief pause)

Okay, your name and juror number, ma'am.

(Following jurors step up to the microphone for side bar)

THE JUROR: Ellen Wells, Juror No. 778. My brother-in-law, John Wells, was involved in a felony with a firearm, and I was in Judge Maraman's court couple of months ago.

THE COURT: For that thing?

JUROR NO. 778: Hm-hm, because we were supposed to be third party custodian for my brother-in-law.

THE COURT: Okay. He's still being charged for (indiscernible-inaudible)?

JUROR NO. 778: It's -- it's done.

THE COURT: It's resolved?

JUROR NO. 778: Uh-huh.

THE COURT: Okay. Okay, knowing that, can you still be fair and impartial?

JUROR NO. 778: No, I don't.

THE COURT: Okay, you're excused. Thank you very much.

JUROR NO. 778: Thank you.

(Juror No. 778 excused)

Next, please.

THE COURT: Hi. Just for the record, you name and juror number.

THE JUROR: My name is Jessica Kadiasang, my number is 838.

THE COURT: Okay.

JUROR NO. 838: My family has been a victim of violent crime. My uncle was murdered several years ago and it's unsolved.

THE COURT: Okay. But this is not a murder trial but a robbery, but --

JUROR NO. 838: Hm-hm, but --

THE COURT: -- can you still be fair and impartial--

JUROR NO. 838: Oh, yeah.

THE COURT: ...if you sat as part of this jury? Okay.

MR. FISHER: Your Honor, can I follow up?

THE COURT: Yes.

MR. FISHER: Okay. Is there anything about the Attorney General's Office investigation of the murder that bothers you?

JUROR NO. 838: No. I think they did everything they could.

MR. FISHER: Could I ask what your uncle's name is?

JUROR NO. 838: Juan Mesa.

MR. FISHER: Juan Mesa. A long time ago?

JUROR NO. 838: Yeah, it was a long time ago.

THE COURT: (To Mr. Timblin) Do you have any questions?

MR. TIMBLIN: (Inaudible response)

THE COURT: Okay. You could stay, ma'am.

That's one of those unsolved mysteries.

Your name and jury number.

THE JUROR: Quinata, Joe. Juror 895. My nephew's currently serving time at DOC for, I guess, possession of a firearm. I'm not the extent of, you know, the whole thing but he's currently serving time up there.

THE COURT: Okay. So, you can still be fair and impartial if you sat as a member of this jury?

JUROR NO. 895: I could. The only question I have is, I guess, in his sentence, I'm not sure the sentence, really, you know, and the crime that he committed compared to some other folks (indiscernible-inaudible). But, you know...

THE COURT: Yeah, the sentence shouldn't concern you.

JUROR NO. 895: Okay.

THE COURT: But you could still be fair and impartial and listen to all the facts of this case?

JUROR NO. 895: Yeah.

THE COURT: Okay, you could stay.

MR. FISHER: Is your nephew Rudy Quinata?

JUROR NO. 895: No.

MR. FISHER: Could I ask your nephew's name?

JUROR NO. 895: It's Kenneth Mariano.

MR. FISHER: Okay. Thank you, sir.

THE COURT: Next, please. Okay, your name and juror number.

THE JUROR: Juror 729.

THE COURT: 729?

JUROR NO. 729: Yeah.

THE COURT: And your name?

JUROR NO. 729: Violeta Rivera.

THE COURT: Okay.

JUROR NO. 729: My brother has been a victim of shooting here at the Century Plaza, and we were -- somebody got into my house just a year ago. Somebody burglarize my house.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 729: No.

THE COURT: Okay, you're excused. Thank you very much.

JUROR NO. 729: Okay.

(Juror No. 729 excused)

THE COURT: Next, please. Okay, name and juror number for the record.

THE JUROR: Francine Terlaje, 0847.

THE COURT: Okay.

THE JUROR: My brother was -- went to jail for murdering his wife with a handgun.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 847: No.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 847 excused)

Next, please. Okay, name and juror number for the record.

THE JUROR: Esteban T. Cruz. Esteban T. Cruz.

THE COURT: Your number?

THE JUROR: 708. Arnold Duarte is a close friend of mine.

THE COURT: Who?

JUROR NO. 708: Arnold Duarte.

THE COURT: How come you didn't say anything when I...

JUROR NO. 708: Well...it's my second time.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 708: No.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 708 excused)

Next, please.

THE JUROR: June P. Brennan, 788. I've been a victim of burglary.

THE COURT: Okay. So, can you be fair and impartial if you sat --

JUROR NO. 788: I don't think so.

THE COURT: You're excused. Thank you.

JUROR NO. 788: Thank you.

(Juror No. 788 excused)

THE COURT: Okay. Next, please. Name and juror

number, please.

THE JUROR: Phil Protasio, 748. Twenty-five years ago I was charged with third degree burglary.

THE COURT: Okay. (Indiscernible-inaudible)?

JUROR NO. 748: Never went to court.

THE COURT: Okay, you were never convicted?

JUROR NO. 748: Never convicted.

THE COURT: Knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 748: No problem.

THE COURT: Okay, is that yes?

JUROR NO. 748: Yes.

THE COURT: Okay. You could stay.

Next, please. Name and jury number.

THE JUROR: Jesseth Mae Garcia, Jury Number 885.

THE COURT: Okay.

JUROR NO. 885: I had two experiences with burglary. One was, our car was broken into, and --

THE COURT: So you were a victim.

JUROR NO. 885: Yes, sir. And the second one, my sister's car was stolen off the apartment complex we were living in.

THE COURT: Okay. Knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 885: No, sir, I don't believe I can.

 THE COURT: We'll excuse you. Thank you very much.

(Juror No. 885 excused)

Next, please. Okay, name and juror number, please.

THE JUROR: Elizabeth D. Castro, 886.

THE COURT: I'm sorry?

THE JUROR: 886.

THE COURT: Okay.

JUROR NO. 886: My brother and cousin were both arrested for rioting and use of weap-- or use of guns.

THE COURT: When was this?

JUROR NO. 886: Few...maybe '97, I think.

THE COURT: You were charged or you--

JUROR NO. 886: Not me; my brother and my cousin.

THE COURT: Oh. Were they ever convicted?

JUROR NO. 886: My -- my cousin was; my brother, they -- it didn't go to trial.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 886: I believe so.

THE COURT: Okay, you can stay. Thank you.

MR. FISHER: Your Honor, could I follow up?

THE COURT: Yes.

MR. FISHER: Anything about the way the Attorney General's Office handled makes you mad?

JUROR NO. 886: No.

MR. FISHER: Okay. All right. Thank you.

THE COURT: Next, please--

(To Mr. Timblin) Any questions? Do you have any questions (indiscernible-inaudible)?

MR. TIMBLIN: (Indiscernible-inaudible).

THE COURT: (To next juror) Okay, name and jury number, please.

THE JUROR: 861, Desmond Cura. I have a first cousin that's been convicted of robbery, and I believe I know Officer Santo Tomas.

THE COURT: I'm sorry?

JUROR NO. 861: I believe I know Officer Santo Tomas.

THE COURT: Okay, could you still be fair and impartial?

JUROR NO. 861: Okay, we'll excuse you. Thank you.

(Juror No. 861 excused)

Next, please. Name and jury number, please.

THE JUROR: Bernadette Perez, 834. My nephew, at least I think he's still inside, robbed a hotdog stand, and he was also involved on that murder (indiscernible-inaudible).

THE COURT: (Indiscernible-inaudible)?

JUROR NO. 834: (Inaudible) Aldan.

THE COURT: Okay, knowing that, can you still be fair and impartial?

Case 1:05-cv-00014 Document 16-2 Filed 08/18/2006 Page 38 of 42

JUROR NO. 834: No.

THE COURT: Okay, we'll excuse you. Thank you very much.

JUROR NO. 834: Okay.

(Juror No. 834 excused)

THE COURT: Next, please. Your name and jury number.

THE JUROR: 820.

THE COURT: Your name?

JUROR NO. 820: Evelyn Rapolla.

THE COURT: Okay, and who do you know?

JUROR NO. 820: I have relatives, and my brother.

THE COURT: Was what?

JUROR NO. 820: Burglarized in the owner's property.

THE COURT: I'm sorry? He was --

JUROR NO. 820: Robbery--

THE COURT: He was burglarized? Okay, (indiscernible-inaudible) --

JUROR NO. 820: He was convicted.

THE COURT: -- convicted? Okay.

JUROR NO. 820: Hm-hm.

THE COURT: Is he still in prison?

JUROR NO. 820: (Inaudible response)

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 820: No, I don't think so.

THE COURT: What was your number again? I'm sorry.

JUROR NO. 820: 820.

THE COURT: Okay, you're excused. Thank you very much.

(Juror No. 820 excused)

Next, please. Your name and jury number, please.

THE JUROR: 874, Marcie Paulino Aguigui.

THE COURT: Okay.

JUROR NO. 874: The question is possession of a firearm?

THE COURT: Yes, or any kind of firearm violations.

JUROR NO. 874: Well, my brother and my brother-in-law got arrested for firearm.

THE COURT: How long ago was this?

JUROR NO. 874: Long time. And my neighbors, shooting each other, killing each other. So...

THE COURT: Okay.

JUROR NO. 874: And it does do a great--

THE COURT: You've been charged for firearm?

JUROR NO. 874: Oh, not me.

THE COURT: Oh, okay.

JUROR NO. 874: My brother-in-law and my brother.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 874: I don't think so.

THE COURT: Okay, you're excused. Thank you.

(Juror No. 874 excused)

Next, please. May I (indiscernible-inaudible)?

THE JUROR: 738.

THE COURT: And name?

JUROR NO. 738: Diana Calvo. In January '98, my neighbor shot our dog with a shotgun, and I filed charges. There was no action taken 'cause it's a low priority, but the officer who took my statement indicated that people who have a permit can use weapons if they believe they're in danger. And in this case, I didn't believe that my dog was posing -- was going to be a danger to the neighbor; second, he was shot on our property, and I just feel that the use of weapons is just use of force and power over those that don't have any ability to defend themselves.

THE COURT: So, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 738: No.

THE COURT: Okay, we'll excuse you. Thank you very much.

JUROR NO. 738: All right.

(Juror No. 738 excused)

THE COURT: Next, please. Your name and juror number, please.

THE JUROR: Tessie San Nicolas, 797. My brother was charged with theft of a stolen vehicle.

THE COURT: And how old was he?

JUROR NO. 797: When he was a minor about couple of years ago, but that he's in Agana Lockup now.

THE COURT: Okay, knowing that, can you still be fair and impartial --

JUROR NO. 797: Yes, I can.

THE COURT: You can?

JUROR NO. 797: That's okay.

MR. FISHER: Your brother was arrested for car theft?

JUROR NO. 797: Yeah.

MR. FISHER: Did the Attorney General's Office handle the case?

JUROR NO. 797: No, not that I--

MR. FISHER: Okay, was it Family Division? He was a juvenile?

JUROR NO. 797: He was a juvenile. Now he's in jail now awaiting a trial.

MR. FISHER: Okay, is this also for the car theft?

JUROR NO. 797: Yeah.

MR. FISHER: Okay. I work for the AG's Office, Prosecution. So, is there anything about what the AG's were doing with the case involving your brother that makes you mad so you won't be able to give me a fair shake?

JUROR NO. 797: Oh, no. I don't -- I don't even know anything about it, so...

MR. FISHER: Okay.

THE COURT: Okay. You can stay. Thank you very much.

Okay. Next, please. Your name and juror number, please.

THE JUROR: 743, Lam. My brother--

THE COURT: First name?

JUROR NO. 743: Justin.

THE COURT: Justin Lam?

JUROR NO. 743: Yeah. My brother-in-law who lives with us was arrested for unregistered firearm.

THE COURT: How long ago was this?

JUROR NO. 743: He's on parole right now.

THE COURT: Oh, okay. Is he (indiscernible-inaudible)?

JUROR NO. 743: Yeah.

THE COURT: Okay, knowing that, can you still be fair and impartial if you sat as a member of this jury?

JUROR NO. 743: I'm not really sure. It has to do with firearms.

THE COURT: Okay. It has to. Okay, we'll excuse you, then. Thank you.

(Juror No. 743 excused)

Next, please.

THE JUROR: Lorie--

THE COURT: We need your number.

THE JUROR: Loriann Mantanona, 794. My dad was

convicted of murder, and it was supposed to be robbery, but he end up plea bargain.

THE COURT: Okay, knowing that, can you still --

JUROR NO. 794: Yeah, 'cause --

THE COURT: -- be fair and impartial?

JUROR NO. 794: No, because it was when I was a child when it happened, so it didn't affect me.

THE COURT: Okay, so you could be fair and impartial?

JUROR NO. 794: Yeah.

THE COURT: Okay.

MR. FISHER: Ma'am, is your father still in jail?

JUROR NO. 794: He's coming out for parole next year.

MR. FISHER: Okay, good. What's your father's name?

JUROR NO. 794: Frankie Cruz.

MR. FISHER: Frankie Cruz. Okay.

I work for the AG's Office; we prosecute people. Does that -- Can you be fair to me, even though we convicted your father?

JUROR NO. 794: Hm-hm, 'cause I -- it happened when I was a kid, so it didn't really...

MR. FISHER: Okay. Do you think your father was, from what you remember now, that your father was unfairly convicted?

JUROR NO. 794: (indiscernible-inaudible) remember I wasn't in (indiscernible-inaudible) part of the

(indiscernible-inaudible).

MR. FISHER: Okay. Okay, thank you very much.

THE COURT: Okay. You can stay. Thank you.

Next, please. Okay, your name and juror number.

THE JUROR: My name is Peter Aguon, 803. Yeah, I do a lot of clinics with Sanctuary and DYA clinics for Calvo's and the Guam Major League for Say No To Drugs, don't carry illegal firearms, all this -- child abuse. I do a lot of stuff like that and I really don't...

THE COURT: Okay, knowing that, can you still be fair and impartial --

JUROR NO. 803: I don't think so.

THE COURT: Okay, you're excused. Thank you very much.

JUROR NO. 803: Thank you.

(Juror No. 803 excused)

THE COURT: Next, please. Your name and juror number, sir.

THE JUROR: Pete Ojeda, 0755.

THE COURT: 0755.

JUROR NO. 755: I didn't know when to ask this, but is this boy from Agana Heights?

THE COURT: Is he from Agana Heights?

MR. TIMBLIN: I think (indiscernible-inaudible).

THE COURT: Can you ask him?

JUROR NO. 755: And his mother works at Sunny

Wholesale? Because, you know, so many kid--

MR. TIMBLIN: I'm sorry? The mother works what?

JUROR NO. 755: At Sunny Wholesale?

MR. TIMBLIN: Sunny Wholesale?

JUROR NO. 755: Yeah. (Indiscernible-inaudible) the family for a long time but they just grew up so fast.

(Brief pause; Mr. Timblin consults with Defendant)

MR. TIMBLIN: Yes to both questions.

THE COURT: Okay.

JUROR NO. 755: I couldn't sit on this one.

THE COURT: Okay, you're excused, then.

JUROR NO. 755: Thank you.

THE COURT: Thank you very much.

(Juror No. 755 excused)

Next, please. Your name and juror number.

THE JUROR: Armando J. Perez, 871.

THE COURT: Okay.

JUROR NO. 871: As I'm one of Jahova's Witnesses, and my bible training (indiscernible-inaudible) will not allow me to make a decision based on facts and any type of crime that is involved with gun.

THE COURT: Why?

JUROR NO. 871: We have strong belief that the use of a guns would be -- would not be (indiscernible-inaudible).

THE COURT: Okay, we'll excuse you. Thank you.

(Juror No. 871 excused)

Next, please.

MR. FISHER: The use of gun would not be what?

THE COURT: (Indiscernible-inaudible).

MR. FISHER: (Indiscernible-inaudible), okay.

(Next juror steps up)

THE JUROR: 800.

THE COURT: 800?

JUROR NO. 800: Yeah.

THE COURT: Very easy. Okay, your name?

JUROR NO. 800: Anthony Brub.

THE COURT: Okay.

JUROR NO. 800: One of my aunties was murdered, and I just...

THE COURT: Who was that?

JUROR NO. 800: Bernice.

THE COURT: Was she shot?

JUROR NO. 800: She was.

THE COURT: Okay, knowing that, can you still be fair and impartial?

JUROR NO. 800: No.

THE COURT: Okay, we'll excuse you. Thank you.

(Juror No. 800 excused)

THE COURT: Anybody else?

(Negative response)

MR. FISHER: Your Honor, before Mr. Timblin and I sit down, are you going to allow us to do a voir dire?

THE COURT: No, (indiscernible-inaudible).

(Brief pause)

THE COURT: Okay, the next question I'm going to ask: How many of you have served on a jury before, criminal or civil? Okay, we'll start with this side. Okay. All those who raised their hands, please stand up.

Okay, just for the record, we'll start with you, ma'am, in the black blouse. State your name, your jury number, and if you sat on a criminal or civil case. And can you tell whether or not you received the conviction; was it guilty, not guilty? You can just stay where you are. Just speak loud.

THE JUROR: My name is Editha Pallejo, my jury number is 785. I served before.

THE COURT: Was it -- A jury trial; right?

JUROR NO. 75: Yeah.

THE COURT: How many people were there, six or 12? Was the whole place filled up?

JUROR NO. 75: The first one was nine...nine, and then the other one was 12.

THE COURT: Okay. Okay, so, was there a conviction? Did you come up guilty or not guilty?

JUROR NO. 75: The first one was -- pleaded guilty, and

the second one was...

THE COURT: Were you together?

JUROR NO. 75: Yeah.

THE COURT: Okay.

JUROR NO. 75: He was...

THE COURT: They pleaded guilty? You didn't decide?

JUROR NO. 75: Yeah, the first one was -- she plead guilty.

THE COURT: You didn't decide?

JUROR NO. 75: We did not decide.

THE COURT: The second one?

JUROR NO. 75: The second one was... we -- we have our deliberation.

THE COURT: And what was your verdict?

JUROR NO. 75: The verdict was...he was...

THE COURT: Was it guilty or not guilty?

UNKNOWN SPEAKER: It was multiple cases. There's...

THE COURT: Okay, so some guilty, some not? Okay.

Okay, the lady next to you.

THE JUROR: Melva Leon Guerrero, 863. We had just completed a trial Friday, last week, on a civil case and we found the defendant not guilty.

THE COURT: Is it civil or criminal?

JUROR NO. 863: What was it? Criminal.

THE COURT: Criminal?

Case 1:05-cv-00014 Document 16-3 Filed 08/18/2006 Page 7 of 42

JUROR NO. 863: (Chuckling) Excuse me. Criminal.

THE COURT: Okay.

JUROR NO. 863: We just -- we just completed Friday last week.

THE COURT: Okay. Okay, you can have a seat.

Next, please. Juror number and--

THE JUROR: Joseph Pellicani, 826. I was on the same trial, criminal.

THE COURT: Okay, and that was guilty? Okay.

JUROR NO. 826: No, it was not guilty.

THE COURT: Not guilty, okay. You can have a seat.

The lady behind you.

THE JUROR: Clara Aguon, 860. Criminal, not guilty.

THE COURT: Not guilty. Okay.

The lady behind you in the brown.

THE JUROR: Priscilla Taitague, number 801. It was a criminal and it was guilty.

THE COURT: Okay. The person in white, the man in the white shirt.

THE JUROR: My name is Tony Toledo, Jury Number 836. I serve on a jury last Friday, it's a criminal and it's not guilty. And the one before that is like what she says, some--

THE COURT: Mixed?

JUROR NO. 836: Yeah.

THE COURT: Halo halo; right? It's mixed?

(Laughter)

THE COURT: Okay, next.

THE JUROR: Vincent Blas, 798. It was a criminal court, criminal case, and I was with the other -- that multiple...

THE COURT: Okay, so it's mixed, okay.

JUROR NO. 798: Yeah.

THE COURT: Okay, we got all of you, huh?

Okay, this gentleman over there with the goatee.

THE JUROR: Matthew Blas, Juror No. 777. It was also with her; it was a mixed.

THE COURT: Okay. Thank you very much. You may sit down.

How about this side? Okay, we'll start with the lady in the white shirt, white blouse.

THE JUROR: Rosita Manibusan, Jury 728. I sat in a criminal case in August and it was a guilty.

THE COURT: Okay. Thank you.

Name and jury number.

THE JUROR: (indiscernible-inaudible) Fernandez, 786. I sat on one of the criminal cases in the same mix.

THE COURT: Okay. Thank you very much.

Okay, the gentleman with the brown Polo.

THE JUROR: Jesse Iriarte, 700. I sat on a criminal

about two months ago.

THE COURT: You could stay where you are, as long as you speak loud, okay?

JUROR NO. 700: It was guilty -- I mean not guilty.

THE COURT: Okay.

THE JUROR: Carlina Marquez, 742. Criminal.

THE COURT: Do you know the verdict?

JUROR NO. 742: Guilty.

THE COURT: Okay. Thank you very much.

And the gentleman with the overalls.

THE JUROR: Robert Davis, 740. I sat in the same one she did.

THE COURT: Okay, and it was guilty?

JUROR NO. 740: (Inaudible response)

THE COURT: Thank you.

The gentleman next to him.

THE JUROR: Ronaldo Agsalud, 774. The same.

THE COURT: Okay. No wonder you're all sitting together. Okay.

(Laughter)

THE JUROR: Claire Hongyee, Juror Number 898. I sat on a criminal case and found him not guilty.

THE COURT: Not guilty, okay.

And the lady in the brown.

THE JUROR: Lucy Atenta, 784. I sat in the grand jury.

THE COURT: Okay. And the lady next to you.

THE JUROR: Alicia Aguon, 759. Criminal.

THE COURT: Okay. Thank you very much.

Okay, all of you that sat on a jury -- and this includes also those who never sat in a jury before, okay, especially those -- the first instruction -- those who sat in a jury, of course the Judge gave you instructions; right? He told you that must follow the instructions I give you according to the laws of Guam and then apply the facts that you hear in the courtroom to the laws that -- the jury instructions that we give to you. Okay?

I'm going to ask you to erase whatever you learned from the other trials. Try a clean slate, okay? And ignore all the jury instructions that you heard from other trials and just follow the jury instructions I give you here in this courtroom. Okay? So, let's just say if you are selected a juror in this case, okay, and you're back there deliberating, and you're debating on some evidence and then one of you says, "Well, you know, I sat on other Judges jury before and, you know, Judge Lamorena, I don't think gave the right instruction because the other Judge gave a different instruction." Okay. Whether you agree with my instructions or not, or you think it is not what you heard before, you must follow my instructions and no instructions from other juries. Do you understand that? Okay? Any problems with

that?

(Inaudible response by the Jury)

Okay, this applies to everybody, too. The jury instructions I give you, no matter whether you agree with or not, is what you should follow. I know all of you have your own opinions about what the law ought to be, but we're trying to apply what the law is now. Okay? So, regardless of what your opinion of what the law ought to be, can all of you come out with a decision, a verdict, based on the jury instructions I gave you and not what your beliefs are? Okay, anybody have any problems with that?

(Inaudible response by the Jury)

THE COURT: (To counsel) Okay. Can both of you just come up here?

(Side bar conference held)

THE COURT: How long is this trial for; just two days? Two, three days?

MR. FISHER: (Indiscernible-inaudible) Court's schedule.

THE COURT: (Indiscernible-inaudible) arraignments, probably 8:30 in the morning.

MR. FISHER: Yes, (indiscernible-inaudible).

THE COURT: Yes.

MR. FISHER: (indiscernible-inaudible)? Not unless you want to do it (indiscernible-inaudible).

MR. TIMBLIN: (indiscernible-inaudible).

THE COURT: Yes.

MR. FISHER: (Indiscernible-inaudible).

THE COURT: Okay.

(End of side bar conference)

THE COURT: Okay, this jury will take about three to four days. Anybody going on a trip in the next couple days, like within this week, off-island? On medical reasons or vacation? We usually ask this question during the summer time. We still have about five or six people raise their hands because they have a planned vacation, okay. But I guess it's not the summer time, this is work time, okay. So, no problems?

Okay, come forward. Okay, name and juror number, ma'am.

THE JUROR: Arlene Marquez, 742. I have a death in the family, my mom's sister.

THE COURT: Okay, when is your funeral?

JUROR NO. 742: The body's coming in on Wednesday, this week.

THE COURT: Oh, this Wednesday? Okay, I'm going to excuse you, then, for the reason of the funeral. Okay.

(Juror No. 742 excused)

THE COURT: Okay, your name and juror number, sir.

THE JUROR: Robert Davis, 740. My wife and I own a

small welding business and she's currently off-island and it's going to be really hard to pull this off (indiscernible-inaudible).

THE COURT: And when will she be back?

JUROR NO. 740: Three weeks.

THE COURT: So you're all by yourself; you don't have anybody else to manage it for you?

JUROR NO. 740: We got eight guys, but we have no foreman, just me and her handling (indiscernible-inaudible).

THE COURT: So if your wife was present, it wouldn't be any problem?

JUROR NO. 740: No. It makes it hard on her, but... One of us could get by, but two of us being out it will fall apart pretty quick.

THE COURT: Okay, we'll put you on hold, okay? Let's see what happens here.

Okay. Anybody, else? Okay, ma'am?

THE JUROR: Can I just stay here?

THE COURT: No, we have to put everything on the record in case it gets appealed.

THE JUROR: Oh. Melva Leon Guerrero, 863. I have a medical appointment on Thursday, (indiscernible-inaudible).

THE COURT: What time is --

JUROR NO. 863: 2:00, I have --

THE COURT: Huh?

JUROR NO. 863: 2:00 in the afternoon.

THE COURT: (To the clerk) How's my appearance (indiscernible-inaudible)?

THE CLERK: You only have 10:00 o'clock.

THE COURT: (To the juror) How long is this medical appointment?

JUROR NO. 863: Oh, I don't know. It's...

THE COURT: How many of you have medical appointments? Just to find out, because I don't want to -- there's a lot of people here.

(To another juror) And when is your medical appointment?

THE JUROR: Friday, Your Honor.

ANOTHER JUROR: Thursday afternoon.

THE COURT: Okay. How about -- I'll put you like the other juror?

JUROR NO. 863: On hold. Okay.

THE COURT: Okay, 860--

And what is your number, sir?

THE JUROR: 895.

THE COURT: 895.

(To another juror) And your number?

THE JUROR: 868.

THE COURT: Okay. I'll put you four on hold, okay? Anybody else?

(Negative response)

Okay, I think we got everything.

Okay, we're going to select a jury now, okay? When your name is called just, please, come forward, okay?

Yes, sir?

THE JUROR: I have my med-- My name is Ramon Villaruz, Juror Number 839, and --

THE COURT: What was number?

THE JUROR: Ramon Villaruz.

THE COURT: No, your jury number.

THE JUROR: Jury number is 839. I have my appointment every Friday--

THE COURT: Medical appointment as well?

JUROR NO. 839: Yeah.

THE COURT: Okay, we'll put you on hold, okay?

JUROR NO. 839: (Indiscernible-inaudible).

(Brief pause)

(Clerk begins to call names; jurors approach)

THE CLERK: Juror Number 889, David Kenmore.

Juror Number 700, Jesse Iriarte.

Juror Number 797, Tessie San Nicolas.

Juror Number 892, Clare Young.

Juror Number 882, Catherine Tydingco.

Juror Number 802, Dickzel Aldaca.

Juror Number 791, Jovita Parayno.

Juror Number 805, Claire DeSoto.

Juror Number 836, Tony Toledo.

Juror Number 873, Maria Ramos.

Juror Number 898, Claire Hongyee.

And Juror Number 801, Priscilla Taitague.

THE COURT: Okay, we'll start with Juror Number 1. Please state your name, your Jury Number, what you do, if you're married, what your spouse does, where you live, and have you had law enforcement training. Just stand up.

THE JUROR: My name is David Kenmore, and I work at Guam Shipyard, retired from the Navy, and I live in Inarajan, and my wife's the Librarian over at the Guam Library.

THE COURT: Law enforcement training?

THE JUROR: No law enforcement training, just military training.

THE COURT: Okay. And your jury number?

THE JUROR: 0889.

THE COURT: Okay. Thank you very much. You may sit down.

Okay, Juror Number 2. Same thing: your name, your juror number, what you do--

THE JUROR: My name is Jesse Iriarte, 700. I work with U.S. Department Agriculture, and I'm from Tamuning.

THE COURT: Are you married?

JUROR NO. 700: No, sir.

THE COURT: Okay, law enforcement training?

JUROR NO. 700: No.

THE COURT: Okay, you may sit down.

Juror Number 3.

(To Juror 700) Thank you very much.

THE JUROR: Tessie San Nicolas, 797. I'm a student at UOG, single.

THE COURT: Okay, single. And where do you live?

JUROR NO. 797: I live in Mongmong, and I have no law enforcement training.

THE COURT: Okay. Thank you very much. You may sit down.

Okay, Juror Number 4.

THE JUROR: I'm Clare Young, Juror Number 892. I'm single, and I'm working at DFS in the cosmetics department right now.

THE COURT: Okay, and where do you live?

JUROR NO. 892: Barrigada.

THE COURT: Law enforcement training?

JUROR NO. 892: No.

THE COURT: Okay, you may sit down. Thank you very much.

Juror Number 5.

THE JUROR: Catherine B. Tydingco, 882. I'm the

Program Coordinator at the Special Ed Division; I am married.

THE COURT: And what does your husband do?

JUROR NO. 882: My husband operates the American Bakery, and --

THE COURT: Okay. Where do you reside?

JUROR NO. 892: -- I don't have any training-- Barrigada.

THE COURT: Okay, you may step down. Thank you very much.

Juror Number 6.

THE JUROR: My name is Dickzel Aldaca, Juror 802. I work at Outrigger Front Office. My wife is a teacher at Yigo Elementary, and no law enforcement training.

THE COURT: Okay. And you live in Yigo, too?

JUROR NO. 802: Oh, no. I live in Dededo.

THE COURT: Okay, thank you very much. You may sit down.

Juror Number 7.

THE JUROR: I'm Jovita Parayno, I'm living in Yigo. I'm housekeeping.

THE COURT: And your husband -- Are you married, ma'am?

THE JUROR: Yes.

THE COURT: What does your husband do?

THE JUROR: Uh, no job from now.

THE COURT: Okay. And law enforcement training?

THE JUROR: No.

THE COURT: Okay, you may sit down. Thank you very much.

Juror Number 8.

THE JUROR: My name is Claire DeSoto. I'm an Administrative Assistant. I'm married; my husband works as a Quarantine Officer for the Department of Agriculture. I have two children, I live in Yigo, and I have no law enforcement training.

THE COURT: Okay. Thank you very much. You may sit down.

Juror Number 9.

THE JUROR: Tony Toledo, Jury Number 836. I'm a taxi driver; my wife doesn't work; I live in Dededo; no law enforcement training.

THE COURT: Okay. Thank you very much. You may sit down.

Juror Number 10.

THE JUROR: Maria Ramos, Juror Number 873. I'm married; work for Liberty House; my husband works for Westin Resort; no law enforcement training.

THE COURT: And what village do you live, ma'am?

JUROR NO. 873: Dededo.

THE COURT: Okay. Thank you very much. You may sit

down.

Juror Number 11.

THE JUROR: My name is Claire Hongyee, Juror Number 898. I'm unemployed; I'm a widow of two children and I'm from Upper Tumon.

THE COURT: Okay. Law enforcement training?

JUROR NO. 898: No.

THE COURT: Okay, you may sit down. Thank you very much.

And Juror Number 12.

THE JUROR: Priscilla Taitague, Jury Number 801. I retire from the Attorney General's Office, and I'm from Talofofo; I'm a widow.

THE COURT: Okay, and law enforcement training?

JUROR NO. 801: No.

THE COURT: Okay, you may sit down. Thank you very much.

Okay, by law, the counsels have what we call preemptory challenges, okay? They have that right under the law, so please don't take it personal if you're excused by them, okay? It's nothing personal on you.

Okay, Mr. Timblin, your first preemptory challenge.

MR. TIMBLIN: Could I have a moment, Your Honor?

(Brie pause)

MR. TIMBLIN: We'll pass, Your Honor.

THE COURT: Okay.

Mr. Fisher, your first preemptory?

MR. FISHER: Yes, thank you, Your Honor. Your Honor, the People would thank and excuse Juror Number 9, Jury Number 836. I think it's Mr. Toledo.

THE COURT: Okay, Juror Number 9, you're excused. Thank you very much.

(Juror No. 836 excused)

THE CLERK: Juror Number 785, (indiscernible-inaudible).

(Juror approaches)

THE COURT: Okay. Just stand up. Your name, your jury number, what you do, if you're married what your spouse does, where you live and have you had law enforcement training.

THE JUROR: My name is Evita Polejo, I'm Jury Number 785. I live in Yigo, and I'm married; my husband is working in the PI.

THE COURT: Okay. Law enforcement training?

JUROR NO. 785: No, no.

THE COURT: Okay. You may sit down. Thank you very much.

Okay, Mr. Timblin, still your first preemptory.

MR. TIMBLIN: Your Honor, again we will pass.

THE COURT: Okay. Mr. Fisher, your second.

MR. FISHER: Thank you, Your Honor. The People thank and excuse Juror No. 785.

Thank you, ma'am.

THE COURT: Okay, 785, you're excused. Thank you.

(Juror No. 785 excused)

THE CLERK: Juror Number 748, Phillip (indiscernible-inaudible).

(Juror approaches)

THE COURT: Okay, sir, same questions.

THE JUROR: Phillip Protasio, I'm a teacher; I live in Barrigada; I have no law enforcement background; and I'm single.

THE COURT: And Juror Number?

THE JUROR: 748.

THE COURT: Okay. Thank you very much. You may sit down.

Okay, Mr. Timblin, your first preemptory still.

MR. TIMBLIN: Again, pass, Your Honor.

THE COURT: Pass? Okay.

Mr. Fisher, your third.

MR. FISHER: Thank you, Your Honor. The People thank and excuse Juror Number 748.

THE COURT: Okay, Mr. Portasio, thank you very much. You're excused, 748.

(Juror No. 748 excused)

THE CLERK: Juror Number 794, Gloria Mantanona.

(Juror approaches)

THE COURT: Okay, same questions. Do you remember them? Okay, your name, your jury number, what you do, if you're married what your spouse does, where you live and have you had law enforcement training.

THE JUROR: Loriann Mantanona, 794. I'm single and I work as a cashier at PayLess, and no law enforcement.

THE COURT: Okay, thank you. You may sit down.

Okay, Mr. Timblin, still your first preemptory.

MR. TIMBLIN: Again, pass, Your Honor.

THE COURT: Mr. Fisher, your -- I guess your fourth.

MR. FISHER: Your Honor, the People thank and excuse Juror No. 794.

THE COURT: Okay, number 9, Juror Number 9, you're excused.

(Juror No. 794 excused)

THE CLERK: Juror Number 740, Robert Davis.

(Juror approaches)

THE COURT: Okay, Juror Number 9, just again for the record, okay?

THE JUROR: Robert Davis, Juror Number 740. My wife and I own a small welding business; we live in Yigo; I have

no law enforcement training.

THE COURT: Okay. Thank you. You may sit down.

Okay, Mr. Timblin, still your first preemptory. You wish to exercise?

MR. FISHER: Your Honor, prior to Mr. Timblin exercising or not exercising, the Court had indicated that this gentleman was going to be put on hold based on his work.

THE COURT: On call. Well, yes, but...

Go ahead, Mr. Timblin.

MR. TIMBLIN: Your Honor, the Defendant will thank and excuse Juror Number 1.

THE COURT: Okay, Juror Number 1, you're excused. Thank you very much.

(Juror 1 excused)

THE CLERK: Juror Number 782, Leo Okamura.

THE COURT: Okay, sir, just for the record, state your name, your Juror Number.

THE JUROR: My number is 782. My name is Leo Okamura. I doing restaurant, and I publishing Japanese newspaper.

THE COURT: Okay. And you're married, sir?

JUROR NO. 782: Yes.

THE COURT: What does your wife do?

JUROR NO. 782: Wife help in my restaurant.

THE COURT: Okay. And where do you live?

JUROR NO. 782: Tamuning.

THE COURT: Law enforcement training?

JUROR NO. 782: No.

THE COURT: Okay. You may sit down. Thank you very much.

Okay, I guess we'll start with you, Mr. Timblin. Do you wish to exercise your second preemptory?

MR. TIMBLIN: Yes, Your Honor. We would thank and excuse Juror Number 1.

THE COURT: Juror Number 1, you're excused. Thank you very much.

(Juror excused)

THE CLERK: Juror Number 868, Esther Abuan.

(Juror approaches)

THE JUROR: 868, Esther Abuon. I work at First Hawaiian Bank as a merchant teller. My husband works at Guam Power Authority at Tango.

THE COURT: Okay, you're married? Single?

JUROR NO. 868: Yeah, I said-- (Chuckles)

THE COURT: Yeah, okay. Where do you live? I'm sorry.

JUROR NO. 868: I live in Yigo.

THE COURT: And law enforcement training?

JUROR NO. 858: Uh, no.

THE COURT: Okay. You may sit down. Thank you very much.

Let's see. Okay, Mr. Timblin, you're a little bit behind. Do you wish to exercise your third preemptory?

MR. TIMBLIN: Your Honor, the Defendant would thank and excuse Juror Number 9.

THE COURT: Okay, Juror Number 9, you're excused. Thank you very much.

(Juror excused)

THE CLERK: Juror Number 886, (inaudible) Castro.

(Juror approaches)

THE JUROR: 886, Elizabeth DeCastro. I'm a teacher at Saint Paul Christian School; I live in Yigo; I'm single and I have no law enforcement training.

THE COURT: Okay. Thank you very much. You may sit down.

Maybe I'll ask you, Mr. Timblin, since you're -- Your fourth preemptory; do you wish to exercise?

MR. TIMBLIN: Your Honor, we'll thank and excuse Juror Number 11.

THE COURT: Okay, Juror Number 11, you're excused. Thank you very much. 898.

(Juror No. 898 excused)

THE CLERK: Juror Number 839, Ramon Villaruz.

THE JUROR: My name is Ramon Villaruz, Jr., Jury Number 839, and I'm working with Citi Hills Company, that's Guam Plaza Hotel, Accounting Department, Accounts Receivable;

and my wife is teacher in Agueda Middle School.

THE COURT: Okay, and where do you live?

JUROR NO. 839: I live in the village of Harmon.

THE COURT: And law enforcement training?

JUROR NO. 839: No law enforcement.

THE COURT: You may be seated. Thank you very much.

Mr. Timblin, your fifth preemptory.

MR. TIMBLIN: We will thank excuse Juror Number 7.

THE COURT: Juror Number 7, that's Number 791. You're excused. Thank you very much.

(Juror No. 791 excused)

THE CLERK: Juror Number 777, Matthew Blas.

(Juror approaches)

THE JUROR: Matthew Blas, Juror Number 777. I work for GovGuam Credit Union as a Marketing Manager, and I have no security...

THE COURT: No law enforcement?

JUROR NO. 777: No law enforcement.

THE COURT: Married, single?

JUROR NO. 777: Single.

THE COURT: And where do you live?

JUROR NO. 777: Barrigada.

THE COURT: Okay. Thank you. You may be seated.

Okay, Mr. Timblin, exercising your sixth.

MR. TIMBLIN: Your Honor, we thank and excuse Juror

Number 7.

THE COURT: Juror Number 7, you're excused. That's 777.

(Juror No. 777 excused)

MR. FISHER: Your Honor, does the Government have two more preemptories left?

THE COURT: Yes. But we're trying -- Mister -- He wasn't exercising his initially, so... Be patient, Mr. Fisher. You'll get your turn. We're just trying to let Mr. Timblin catch up a little bit, if he wishes to exercise them.

MR. FISHER: Certainly.

THE CLERK: Juror Number 717, Jesse Aguon.

(Juror approaches)

THE JUROR: My name is Jesse Aguon, number is 717; single; (indiscernible-inaudible) Golf Club; and no enforcement training.

THE COURT: And where do you live, sir?

JUROR NO. 717: Yona.

THE COURT: Okay, you may sit down. Thank you very much.

Okay, Mr. Timblin, your seventh preemptory.

MR. TIMBLIN: We'll pass, Your Honor.

THE COURT: Okay, your fifth.

Okay, before we do that, I'd like to excuse Number 11, okay, since we have more than enough jurors.

839, okay, we'll excuse you. (Indiscernible-inaudible).

(Juror No. 839 excused)

THE CLERK: Juror Number 759, Anicia Aguon.

(Juror approaches)

THE COURT: Okay.

THE JUROR: 759, Anicia Aguon, I'm married, I'm working at Guam Hilton.

THE COURT: And what does your husband do?

JUROR NO. 759: Unemployed.

THE COURT: Okay, and where do you live, ma'am?

JUROR NO. 759: Sinajana.

THE COURT: And law enforcement training?

JUROR NO. 759: No.

THE COURT: Okay. You may be seated. Thank you very much.

Okay, Mr. Timblin, exercising your seventh preemptory, if you wish to do it.

MR. TIMBLIN: Pass, Your Honor.

THE COURT: Okay, Mr. Fisher, your fifth.

MR. FISHER: Your Honor, the People would thank and excuse Juror Number 9 which is Juror Number 886.

THE COURT: Okay, Juror Number 886, you're excused.

Thank you very much.

(Juror No. 886 excused)

THE CLERK: Juror Number 790, Nelia Galarpe.

(Juror approaches)

THE COURT: Okay, same questions, Juror Number 9.

THE JUROR: Number 790, my name is Nelia Galarpe. I -- I retire from Bank of Hawaii.

THE COURT: Are you married, ma'am?

JUROR NO. 790: Yes.

THE COURT: What does your husband do?

JUROR NO. 790: Retired also.

THE COURT: Okay, where do you live?

JUROR NO. 790: Agat.

THE COURT: And law enforcement training?

JUROR NO. 790: No.

THE COURT: Okay, you may be seated. Thank you very much. That was a no. Okay.

Okay, Mr. Timblin, still your seventh preemptory.

MR. TIMBLIN: Your Honor, we'd thank and excuse Juror Number 2.

THE COURT: Okay, Juror Number 2 excused. That's Juror Number 700. Thank you very much.

(Juror No. 700 excused)

THE CLERK: Juror Number 774, Ronald (indiscernible-inaudible).

(Juror approaches)

THE JUROR: My name is Ronaldo Agsalud, 774. I work at front desk at Hotel (indiscernible-inaudible), and I'm also on the process of joining USMC, United States Marine Corp on OCS program.

THE COURT: And you're married, single?

JUROR NO. 774: I'm single.

THE COURT: Okay, and where do you live, sir?

JUROR NO. 774: Yigo.

THE COURT: And law enforcement training?

JUROR NO. 774: Not yet.

THE COURT: None yet. Okay. You may be seated. Thank you very much.

Okay, Mr. Timblin, exercising your eighth preemptory.

(Brief pause)

MR. TIMBLIN: Pass, Your Honor.

THE COURT: Okay, Mr. Fisher, your sixth and last.

MR. FISHER: Your Honor, the People would thank Juror Number 3, Jury 797.

THE COURT: Okay, 797, you're excused. Thank you very much.

(Juror No. 797 excused)

THE CLERK: Juror Number 784, Lucy Atenta.

(Juror approaches)

THE COURT: Okay, Juror Number 3, again, your name, your jury number, et cetera.

THE JUROR: Lucy Atenta, Jury Number 784. I work at Marshall S. Sablan Elementary School.

THE COURT: Okay. You're married?

JUROR NO. 784: Yes.

THE COURT: And what does your husband do?

JUROR NO. 784: Works at the Shell Gorco Company.

THE COURT: Okay. And where do you live, ma'am?

JUROR NO. 784: Santa Rita.

THE COURT: And law enforcement training?

JUROR NO. 784: No.

THE COURT: Okay, you may be seated. Thank you very much.

Okay, Mr. Timblin, your eighth preemptory. You wish to exercise?

MR. TIMBLIN: Your Honor, we'd thank and excuse Juror Number 7.

THE COURT: Okay, Juror Number 7, you're excused.

(Juror excused)

THE CLERK: Juror Number 860, Clara Aguon.

THE JUROR: My name is Clara Aguon, 860. My husband retired from Andersen; I live in Ordot, and I have four kids.

THE COURT: Are you working or housewife?

JUROR NO. 860: Yes, I'm working for DOE.

THE COURT: And law enforcement training?

JUROR NO. 860: No.

THE COURT: Okay, you may be seated. Thank you very much.

Okay, Mr. Timblin, exercising your ninth preemptory.

MR. TIMBLIN: Your Honor, we'd thank and excuse Juror Number 5.

THE COURT: Okay, Juror Number 5. Yes, you. Thank you very much. You're excused.

(Juror excused)

THE CLERK: Juror Number 895, Joseph Quinata.

(Juror approaches)

THE JUROR: Your Honor, my--

THE COURT: You can stand up.

THE JUROR: My name is Joe Quinata, Juror 895. I work for the federal government; my wife is working for the Credit Bureau of Guam.

THE COURT: Where do you live?

JUROR NO. 895: Tamuning.

THE COURT: And law enforcement training?

JUROR NO. 895: No, sir.

THE COURT: Okay, there were two people that wanted to be excused. Juror Number 5, I'll excuse you, and Juror

Number 1, okay? So, I'll excuse both of you, okay?

(Two jurors excused)

THE COURT: And we'll pull two more jurors in.

THE CLERK: Juror Number 828, Anthony Cruz. And Juror Number 824, Perla Aquino.

(Jurors approach)

THE COURT: Okay, we'll start with you, Juror Number 1.

THE JUROR: Okay, my name is Anthony Cruz, 828. I work for (indiscernible) as storekeeper; I'm single, and I have no law enforcement training.

THE COURT: And where do you live, sir?

JUROR NO. 828: In Yona.

THE COURT: Okay, you may be seated. Thank you very much.

And Juror Number 5.

THE JUROR: I'm Perla Aquino, Jury 824. I'm a widow, I live in Yigo, and I'm not working.

THE COURT: Okay, law enforcement training, ma'am?

JUROR NO. 824: No.

THE COURT: Okay, you may be seated. Thank you very much.

Okay, that was 863. You're the one, right, that has a medical excuse? You're the one? Okay, so I got everybody.

///

Okay, Mr. Timblin, your tenth and last preemptory, if you wish to exercise it.

MR. TIMBLIN: Pass, Your Honor.

THE COURT: Okay, the Court has a full jury complement. Do you want two, or... Two is good?

MR. TIMBLIN: I think probably at least two, yes.

MR. FISHER: For alternates, Your Honor? At least two.

THE COURT: Okay, we'll have two, then. Okay.

THE CLERK: Juror Number 798, Vincent Blas. And Juror Number 762, Louis Ross.

(Jurors approach)

MR. FISHER: What was the second alternate's number, Your Honor?

THE COURT: 762.

Okay, we'll start with Alternate Number 1, same question.

THE JUROR: Vincent Blas, I work for the Guam Power Authority. I'm married, she works for Department of Labor, Government of Guam, and I live in Mangilao.

THE COURT: Law enforcement training?

THE JUROR: No law enforcement.

THE COURT: And Juror Number?

THE JUROR: Oh, I'm sorry: 798.

THE COURT: Okay. 790 or 798?

JUROR NO. 798: 798.

THE COURT: Okay, you may be seated. Thank you very much.

And Alternate Number 2, same question.

THE JUROR: Louis Ross, Talofofo, I work at Bank of Hawaii, 762 is my number and my wife is a bartender.

THE COURT: Okay, and law enforcement training?

JUROR NO. 762: None.

THE COURT: Okay, you may be seated. Thank you very much.

MR. TIMBLIN: Your Honor, if I may. I do believe I am acquainted with this gentleman over at Number 2, Mr. Louis -- I believe his wife does tend bar at Jan Z's, a restaurant at the Marina in Agat. We're only very slightly acquainted but I'm acquainted with her.

THE COURT: The wife? Okay, we'll excuse you, Alternate Number 2.

(Juror Number 762 excused)

Thank you very much, Mr. Timblin.

(To the clerk) Pick another one.

THE JUROR: Juror Number 826, Joseph Pellicani.

(Juror approaches)

THE JUROR: Joseph Pellicani, 826. I live in Agana Heights, I work at Duty Free Shoppers, no law enforcement training.

THE COURT: Single or married?

JUROR NO. 826: Single.

THE COURT: Okay, you may be seated. Thank you very much.

Okay, Mr. Fisher, exercising your one and only preemptory.

MR. FISHER: Your Honor, the People would thank and excuse Juror Number 798.

THE COURT: Okay, Alternate Number 1, you're excused. Thank you very much.

(Juror No. 798 excused)

THE CLERK: Juror Number 728, Rosita Manibusan.

(Juror approaches)

THE JUROR: My name is Pacita Manibusan, 0728. I'm a Pharmacy Technician at Guam Memorial Hospital; my husband is Adrian, he works at F.B. Leon Guerrero, and we're from Talofofo.

THE COURT: Law enforcement training?

JUROR NO. 728: No.

THE COURT: Okay, you may sit down. Thank you very much.

Okay, Mr. Timblin, exercising your one and only preemptory.

MR. TIMBLIN: Your Honor, we'll thank and excuse Juror Number 826.

THE COURT: Okay, Alternate Number 2, you're excused.

Thank you very much.

(Juror No. 826 excused)

THE CLERK: Juror Number 863, Melva Leon Guerrero.

THE COURT: Okay, just put on the record that I'll excuse her. Okay?

THE JUROR: I'm Melva Leon Guerrero, 863. I work for the U.S. Postal Service. I am married; my husband also works for the U.S. Postal Service, and I have no training.

THE COURT: And where do you live, ma'am?

JUROR NO. 863: Asan, Guam.

THE COURT: Okay. We'll excuse you. Okay? So...

(Juror No. 863 excused)

THE CLERK: Juror Number 884, Dorothy (inaudible).

(Juror approaches)

THE JUROR: Dorothy Madden, number 884. I live in Dededo, my husband works for Department of Corrections, I'm a Treasury cashier for the Government of Guam.

THE COURT: Okay, and law enforcement training

JUROR NO. 884: No law enforcement.

THE COURT: And where do you live?

JUROR NO. 884: Dededo.

THE COURT: Okay, you may be seated. Thank you.

Okay, any problems?

(Inaudible response by Counsel)

THE COURT: Okay. Okay, we have a jury. We're not

going to begin until Wednesday, though, okay? So, we'll start at 8:30, Wednesday. I'd like to ask you to please be prompt. I know that this trial is not as prominent as others, but you never know what the news media is going to report, so I'd like to advise you, now that you're members of this panel, until -- well, you're members of this panel but you're not empaneled yet until we swear you in Wednesday -- that you not listen to any news reports concerning this story. I'd like to now admonish you that you not discuss this case with anyone, including those close to you, and if anybody should try to discuss this case with you, please let me know immediately. Okay?

What I'll do is -- we'll adjourn until 8:30 -- Those who have not been picked, I want you to stay. We'll get your jury numbers, okay, just in case, since the flu seems to be very predominant this part of the year, that might be -- a couple of our jurors might be -- You know, I never know -- I don't wish it upon you, but in case, you know, you report in ill or something, we still have some alternates that are still avai-- I mean jurors that were not selected. Okay, so before you leave -- I won't excuse you, but leave your name and Jury Number, those who weren't picked, just in case we need you, okay, to replace the 14 that were just selected. Okay?

///

So, again, all of you are now in this panel. We'll begin at 8:30, Wednesday, November the 3rd. Okay?

The Court stands adjourned.

THE BAILIFF: All rise.

*** * WHEREUPON PROCEEDINGS CONCLUDED * ***

CF0317-97/11-1-99/mbp

# C E R T I F I C A T E

I, MARY BENAVENTE PANGELINAN, do hereby certify that the foregoing pages one through 83, inclusive, comprise the true and correct transcript of the Jury Selection proceedings had in Criminal Case No. **CF0317-97, People of Guam versus Randy Ignacio Chargualaf**, heard on November 1, 1999, recorded on Tape Nos. T99-1775 and T99-1776; and transcribed to the best of my knowledge, skills and ability.

DATED this 9th day of August, 2006.

[signature]
MARY BENAVENTE PANGELINAN

CF0317-97/11-1-99/mbp

**SUPERIOR COURT OF GUAM**
**MINUTE ENTRY**

| | | | | | |
|---|---|---|---|---|---|
| TAPE NO: | 99-1776 | PAGE NO: 1 | COURT CONVENED AT: | 8:30 X AM _ PM | DATE: 11 03 1999 |

PRESENT: JUDGE: ALBERTO C . LAMORENA III , Presiding Judge
CLERK: EVELYN SANTOS

CASE NUMBER: CF0317-97

CASE TITLE: PEOPLE OF THE TERRITORY OF GUAM VS. RANDY I CHARGUALAF *

COUNSEL PRESENT:
PLAINTIFF: T. Fisher
DEFENDANT: T. Tenorio

PROCEEDINGS: Jury Trial Day (1)

| LOG NUMBER | DESCRIPTION |
|---|---|
| 2827 | -Case Called deft present w/atty |
| 2840 | sworn in jurors |
| 3616 | ct giving instructions. |
| 4405 | p/a= opening statement |
| 5500 | d/a - opening statement |
| 5495 | [illegible] Cortez witness pwt 1 |
| 6160 | ~~[illegible]~~ |
| 6190 | p/a= direct exam pw# N. Cortez |
| 6356 | exhibit #25 for identification |
| 6400 | move to admit ~~[illegible] exhibit~~ |
| | p/a= |
| 6590 | p/a= cont. direct exam N. Cortez |
| 99-1777 | p/a= move #22+23 into evidence |
| 10 | |
| 20 | ct ~~admits #22+23 into evidence~~ |

Matter continued to: , 1999 At: am/pm

241

Case 1:05-cv-00014 Document 16-4 Filed 08/18/2006 Page 1 of 29

| TAPE NO. 99-1777 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYN ~~CABRERA~~ SANTOS/ JESSICA CRUZ |
|---|---|
| | CASE NO. CF 312-97 Randy I. [illegible] |
| | PAGE NO. 2 DATE: 11/13 , 1999 |

| LOG NO. | DESCRIPTION |
|---|---|
| 0 | jurors viewing photo #22 + 23 exhibit |
| | |
| 250 | p/A = cont. direct exam PW# N. Certeza. |
| 265 | showing of diagrams exhibit #25 |
| | - of pointing - |
| | |
| 390 | p/A = cont. direct exam PW#1 N. Certeza. |
| | |
| 440 | exhibit #21 for identification |
| 460 | p/A = move to admit # 21 into evidence |
| | non objection - |
| 470 | ~~admit ... into evidence~~ |
| 485 | jurors view exhibit #21 |
| 505 | p/A cont. direct exam N. Certeza. |
| 580 | witness identify deft. |
| 810 | p/A: cont. direct exam N. Certeza. |
| 886 | exhibit ~~#H~~ #13, #14 for identification. |
| 1004 | ~~move exhibit #13, #14 into evidence~~ |
| 1023 | ~~p/A: admit into evidence~~ |
| 1030 | p/A = cont. direct exam PW#1 N. Certeza |
| 1085 | exhibit #26, ~~[illegible]~~, 28 for identification |
| 1480 | exhibit A for identification |
| 1710 | |
| 1720 | ct. break 15 mins. |

| TAPE NO. 99-1777 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYNCABRERA/ JESSICA CRUZ<br>CASE NO. CF317-97 P. Chargualaf<br>PAGE NO. 3 DATE: 11/3, 1999 |
|---|---|
| LOG NO. | DESCRIPTION |
| 3040 | ct= case called |
| | |
| 3069 | [crossed out] |
| | |
| 3395 | deft shows tattoos on both arms. |
| 3400 | D/A= cont. cross exam. |
| | exhibit A for identification |
| | |
| 4040 | P/A= re-direct exam PW#1 D. Cortez |
| 4460 | [crossed out] |
| 4800 | [crossed out] |
| | |
| 4805 | Vince Valenzuela PW#2 |
| | |
| 4880 | Vincent Valenzuela sworn in |
| | |
| 4590 | [crossed out] |
| 4620 | side bar |
| 5005 | P/A= cont. direct exam. DD. Valenzuela |
| 5400 | exhibit # 15, 16, 17, 18, 19, 20, for |
| | Identification |
| 5475 | non [illegible] |
| 5880 | [crossed out] |
| | |

| TAPE NO. 99-1777 | JUDGE: ALBERTO C. LAMORENA,III  CLERK: EVELYNCABRERA/ JESSICA CRUZ<br>CASE NO. CF317-97 P. Chargualaf<br>PAGE NO. 4  DATE: 11/3, 1999 |
|---|---|
| LOG NO. | DESCRIPTION |
| 5620 | p/A = cont. direct exam of Valenzuela |
| | |
| 5760 | d/A = cross exam off. valenzuela. |
| 5890 | side bar |
| 6050 | cf. |
| 6146 | Christopher S. Dawson |
| 6155 | p/A = direct exam. Off. Dawson. |
| 6310 | exhibit 4, 6, 7 for identification |
| 6365 | [illegible] |
| 6370 | p/A = cont. direct exam off. Dawson. |
| 6520 | in court identification of def |
| 6840 | p/A cont. direct exam off. Dawson. |
| 99-1778 | |
| 10 | p/A = cont. direct exam off. Dawson. |
| 70 | in court demonstration. |
| 250 | p/A = cont. direct exam off. Dawson. |
| 330 | exhibit # 24 for identification. |
| 600 | side bar |
| 700 | p/A = cont. direct exam off. Dawson. |
| 850 | [illegible] |
| 876 | [illegible] |
| 890 | p/A = cont. direct exam off. Dawson |
| | demonstration of diagram. |
| 1110 | p/A = cont. direct exam. off. Dawson |

| TAPE NO. 99-1778 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYN ~~CABRERA/~~ JESSICA CRUZ<br>CASE NO. CF317-97<br>PAGE NO. 5 DATE: 11/3/99, 19 |
|---|---|
| LOG NO. | DESCRIPTION |
| 1000 | p/a ~~move #~~ [illegible] into evidence |
|  | ~~Ct= admit [illegible]~~ |
| 1020 | p/a= admitting of exhibit #1 |
| 1250 | p/a= cont. direct exam Off. Dawson- |
|  |  |
| 1900 | D/A= cross exam. Off. Dawson. |
| 2137 | demonstration w/ Off. Dawson |
|  | of deft. in vehicle |
| 2225 | D/A= cont. cross exam Off. Dawson. |
| 2950 | p/a= re direct exam Off. Dawson |
| 2990 | exhibit #29 for identification |
| 3060 | exhibit #2 for identification |
| 3106 | p/a= move to admit exhibit #2 |
|  | ~~[illegible]~~ |
| 3110 | p/a= cont. re-direct exam Off. Dawson |
| 3220 | Jerome Santo Tomas |
| 3280 | ~~side bar~~ sworn in Off. Santo Tomas |
| 3288 | side bar |
| 3330 | p/a= direct exam. Off. Santo Tomas. |
| 3700 | exhibit #5 for Identification |
|  | #8 exhibit for I.D. |
| 3870 | ct= deny exhibit #8 |
|  | ~~admit [illegible] into evidence~~ |
| 4100 | exhibit #24 for Identification |

| TAPE NO. 99-1778 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYNCABRERA/JESSICA CRUZ CASE NO. CF 317-97 R. Chargualaf PAGE NO. 6 DATE: 11/3/99 , 19 |
|---|---|
| LOG NO. | DESCRIPTION |
| 4125 | p/A = move exhibit # 24 into evidence |
| | ~~[illegible] admit exhibit # 24~~ |
| | ~~[illegible]~~ |
| 4140 | p/A = cont. direct exam Off. Santo Tomas |
| 4730 | D/A = cross exam Off. Santo Tomas |
| 5440 | p/A = re-direct exam - Off. Santo Tomas |
| 5650 | exhibit # 1 for Identification. |
| 5720 | p/A = move exhibit # 1 into evidence |
| | non objections |
| | Ct ~~admit exhibit # 1 into evidence~~ |
| 5760 | D/A = re-cross exam Off. Santo Tomas |
| 5850 | ct = side bar |
| | jurors view exhibits. |
| 6476 | p/A = Off. R. Cruz. Pw# 4 |
| | Richard A. Cruz |
| | |
| 6540 | p/A = direct exam Off. Cruz. |
| 99-1779 | |
| 3 | p/A = cont. direct exam Off. Cruz. |
| 885 | D/A = cross exam Off. Cruz |
| 473 | p/A = re-direct exam Off Cruz. |
| 510 | ct break for day. |
| | |
| | |

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at: Hagåtña, Guam
AUG 17 2006
Benny G. Cruz
Deputy Clerk, Superior Court of Guam

FILED
SUPERIOR COURT
OF GUAM

2006 AUG 17 AM 8:09

CLERK OF COURT
BY:________

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM,<br><br>vs.<br><br>RANDY IGNACIO CHARGUALAF, et al.,<br><br>Defendants. | SUPERIOR COURT CASE NO: **CF0317-97**<br><br>EXTRACT OF PROCEEDINGS<br><br>Opening Statements / Jury Trial<br><br>November 3, 1999 |

Before: THE HONORABLE ALBERTO C. LAMORENA, III
Presiding Judge, Superior Court of Guam
Hagåtña, Guam

APPEARANCES:

For the People:
Office of the Attorney General
By: Thomas Fisher, Assistant Attorney General
Hagåtña, Guam

For the Defendant :
Terrence Timblin, Esquire
Hagåtña, Guam



THE COURT: Everybody else can sit down. I want the Jury to stand up so we can...

THE CLERK: Raise your right hand.

(Jurors stand to be sworn)

THE CLERK: You and each of you do solemnly swear that you will truly try such issues in the case of People of Guam against Randy I. Chargualaf and a true verdict therein render according to the law and evidence, so help you God?

THE JURY: I do.

THE COURT: We'll take a five-minute recess, okay?

(Off the record)

(Back on the record)

THE BAILIFF: The Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena the Third presiding.

Please be seated. The jurors remain standing.

THE COURT: No, no.

THE BAILIFF: No?

THE COURT: The jury was already sworn.

(To the Jury) Sit down.

They already got sworn in. I'm a new bailiff.

Okay. Good morning, ladies and gentlemen. You are now jurors in this case, and I want to take a few minutes to tell you something about your duties and your responsibilities as jurors, and to give you some

instructions. At the end of this trial I'll give you more detailed instructions. Those instructions will control your deliberations.

It will be your duty to decide from the evidence what the facts are.

You, and you alone, are the Judges of the facts. You will hear the evidence and decide what the facts are, and then apply those facts to the law which I will give to you. That is how you will reach your verdict.

In doing so, you must follow the law, whether you agree with it or not.

The evidence will consist of the testimony of witnesses, documents, and other things received into evidence as exhibits and any facts on which the lawyers may agree, or which I instruct you to accept.

You should not take anything I may say or do during this trial as indicating what I think of the evidence or what your verdict should be.

This is a criminal case brought by the People of Guam, charging the Defendant, Randy Ignacio Chargualaf, as follows:

On the first charge of robbery as a second degree felony, that:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, in the course of

committing a theft, knowingly was armed with and displayed what appeared to be a deadly weapon, that is, a handgun, while in the course of committing theft, in violation of 9 GCA §40.20(a)(3) and (b) as amended.

On the special allegation, it is further alleged that:

In the commission of the above offense, the Defendant, Randy Ignacio Chargualaf, unlawfully possessed a deadly weapon, that is, a handgun, in violation of 9 GCA §80.37.

On the next charge of conspiracy to commit robbery as a second degree felony, that:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, Candelaria Quidachay Mendiola, also known as Kandi, and Don Allan Borja Mendiola, also known as Keilani, did:

a) agree with one or more other persons, to wit, each other, that they or one of them would engage in the conduct which constituted the crime of robbery;

b) intend to engage and promote or assist in the conduct which constituted the crime of robbery; and

c) perform, or one of them perform, an overt act in pursuant of the agreement, to wit, entering the residence of another and taking items at gunpoint,

Case 1:05-cv-00014 Document 16-4 Filed 08/18/2006 Page 10 of 29

in violation of 9 GCA §13.30, 43.20(a)(3) and (b).

On the next charge of theft as a misdemeanor, that:

On or about July 20th, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly and unlawfully took the movable property of another, namely, Nobuyo Kazumi Certeza, that is, a purse and other items, with intent to deprive her thereof, the amount involved exceeding Fifty Dollars ($50) but less than Five Hundred ($500), in violation of 9 GCA §43.20(c) and 43.30(a).

On the next charge of possession of a firearm without an identification card, as a felony, that:

On or about July 21st, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly possessed a firearm, specifically, a semiautomatic pistol, at a time when he did not have a firearms identification card in his possession, in violation of 10 GCA §60106 and 60121(e).

On the next charge of possession of a concealed firearm, that:

On or about July 21st, 1997, in the Territory of Guam, Randy Ignacio Chargualaf, knowingly carried a firearm, that is, a semiautomatic pistol in his vehicle in such a manner that it could not be seen by the naked

eye, but was available for use by Randy Ignacio Chargualaf without having first received permission to so conceal such firearm, in violation of 10 GCA §60109, §60108(e) and §60121(c).

Those are the charges against the Defendant, and he has pled not guilty.

The Indictment is simply the description of the charges made by the Government against the Defendant. It is not evidence of anything.

The Defendant has pled not guilty to the charge and is presumed innocent unless and until proven guilty beyond a reasonable doubt.

A defendant has the right to remain silent. He never has to prove his innocence or present any evidence.

The following things are not evidence, and you must not consider them as evidence in this case in deciding the facts: 1) Statements or arguments of the attorneys are not evidence; questions and objections of the attorneys are not evidence; testimony that I instruct you to disregard are not evidence; and anything you may have seen or heard when the Court was not in session, even if you saw or heard what is done or said by one of the parties or witnesses, is not evidence.

There are two types of evidence. Evidence may be direct or circumstantial. Direct evidence is testimony by a

witness about what the witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, it is proof of one of more facts from which one can find another fact. By way of an example, let's assume you woke up this morning and you saw the sidewalk was wet. You may find from that fact that it had rained during the night. However, other evidence, such as a turned on garden hose may explain the water on the sidewalk, therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidnece in the light of your reason, experience and common sense.

You are to consider both direct and circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

There are rules of evidence which control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks it is not permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, the question must be answered or the exhibit received. If I sustain the objection, the question cannot be answered, nor the exhibit cannot be received.

///

CF0317-97/11-3-99/mbp

Whenever I sustain an objection to a question, you must ignore the question and you must not guess what the answer might have been.

Sometimes I might order that evidence be stricken from the record, and that you disregard or ignore the evidence. That means that when you are deciding this case, you must not consider the evidence which I told you to disregard.

In deciding the facts of this case, you may have to decide which witnesses to believe, which witnesses not to believe. You may believe everything a witness may say, part of it or even none of it.

In deciding what to believe, you may consider a number of factors, including the following: 1) the witness' ability to see or hear or know or know the things that the witness testified to; 2) the quality of the witness' memory; 3) the witness' manner while testifying; 4) whether witness had an interest in the outcome of the case or any motive, bias or prejudice; 5) whether witness is contradicted by anything the witness may have said or wrote before the trial, or by other evidence; and 6) how reasonable was the the witness' testimony when considered in the light of other evidence which you believe.

From time to time during this trial it may become necessary for me to talk with the attorneys out of the

hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess. Please understand that while you are waiting we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the Rules of Evidence and to avoid confusion and error. We will, of course, do what we can to keep the number and length of these conferences to a minimum.

I may not always grant an attorney's request for a conference. Do not consider my granting or denying that request for a conference as any indication of my opinion of the case or what your verdict should be.

I will now say a few words about your conduct as jurors.

First, do not talk to anyone about this case or about anyone who has anything to do with it until this case has ended and you have decided its verdict and dismissed by the Court.

Second, do not talk with anyone else about this case or about anyone who has anything to do with it until this trial is over and you have been discharged as jurors. Anyone else includes your members of your family and your friends. You may tell them that you are a juror, but don't tell them anything about the case until after you have been

discharged by the Court.

Third, do not let anyone talk to you about this case or about anyone who has anything to do with it. If someone should try to talk to you, please report it to me immediately.

Fourth, do not read any news stories or articles or listen to any radio or television reports about this case, or about anyone who has anything to do with it.

Fifth, do not do any research, such as consulting dictionaries or any other reference materials, and do not make any investigations about this case on your own.

Sixth, if you need to communicate with me, simply give a signed note to one of the marshals and they will give it to me.

And seventh, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

The trial will now begin. First, each side may make an opening statement.

An opening statement is not evidence; it is simply an outline to help you understand what the parties expect the evidence will show.

A party is not required to make an opening statement.

CF0317-97/11-3-99/mbp

The Government will then present the evidence and counsel for the Defendant may cross-examine.

Following the Government's case, the Defendant may present evidence and the Government's counsel may cross-examine.

After all the evidence has been presented, the attorneys will make their closing arguments to summarize and interpret the evidence for you, and I will then instruct you as to the law.

After that, you will go to the jury room to deliberate on your verdict.

Okay. Mr. Fisher, would you like to give your opening statement at this time to the Jury?

MR. FISHER: Thank you, Your Honor.

May it please the Court, Counsel.

Good morning, ladies and gentlemen.

THE JURY: Good morning.

MR. FISHER: You may recall from the voir dire the day before yesterday my name is Tom Fisher, and I'm appearing on behalf of the People in this case. And my job over the next few days is to put on evidence of the Defendant's guilt. And we believe that the evidence that we will present over the next few days will convince each of you beyond a reasonable doubt of Randy Chargualaf's guilt.

///

The facts in this case, we believe, are simple. It involves a robbery. And what happened was Randy Chargualaf with two other people, on the 20th of July, 1997, went down to an apartment complex in Tumon, the Kitacho Apartments, and these two other people, followed by the Defendant, walked up to the apartment, knocked on the door, entered the door -- or entered the apartment and pulled a gun on the lady who was in the apartment lobby.

In a nutshell, that's what the evidence is going to present. But I want to go get this white board and I'm going to write down some names, because you're going to be hearing these names quite a bit through the course of this trial. So, if you'd give me just a minute, I'll set this up.

(Sets up board)

Now, you heard a number of times the Judge has read, I guess two times to you, the Indictment in the case. And as you know by now, the Defendant's name is Randy Chargualaf.

Just a couple of minutes ago I mentioned to you that he went into this apartment with two other people, and these other people's name, and you're going to be hearing from them, is Candelaria Mendiola, and the other person's name is Don Mendiola.

///

About 9:00 o'clock in the evening on July 20th, Randy and Candelaria were at the Golden Motel, and about 9:00 o'clock they left, and they were driving around in a black Nissan Sentra, and during the course of the trial you'll be seeing a number of photographs, that this is the Nissan Sentra. And they went and they picked up Don Mendiola.

Don Mendiola also goes by the name of Keilani. And he is a transvestite. They picked Keilani up and one of them in the car -- I believe the evidence is going to show that it's the Defendant -- said "Let's go macking" -- M-A-C-K-I-N-G, I think, is how you spell it. What that means is stealing or robbing from somebody. And they drive around for a little bit and they go down to this apartment complex that is behind the Acanta Mall in Tumon. And the Defendant, the evidence will show, has an idea on how to carry out this robbery. So, he mentions or tells Don and Kandi to go up and just (makes knocking sound) knock on the door and ask for help. And that's what they do.

They knock on the door. A lady who's also going to testify for you and her name is Nabuyo Certeza. She lives in -- I think the apartment number is 105. They knock on the door and Don and Kandi say to her, "We need help. Could we use the phone?" And this lady says, "Yes, you can", and she allows them to come in to use the phone.

Case 1:05-cv-00014 Document 16-4 Filed 08/18/2006 Page 19 of 29

And right after they come through the door, the Defendant follows them through the door and the Defendant's got a gun in his hand -- this, by the way, we've checked it, is unloaded -- and points the gun at Mrs. Certeza and demands money from her. Mrs. Certeza, obviously, is frightened to death and she says, "I don't have any money", and he's yelling at her, "Give me money. Give me money." And they go into the master bedroom where the Defendant rips through her dresser drawer and finally Mrs. Certeza locates an envelope, about a hundred and some odd dollars, and the Defendant takes it. Also, they get information from Mrs. Certeza that her husband will be home in just 15 to 20 minutes. So, these robbers, the Defendant, Candelaria and Don, they have to leave, and so they do, they take off and they go back to the Golden Motel. When they get to the Golden Motel, they sit there and they go through the loot and see what it was that they were able to get from Mrs. Certeza.

One of the things they got from Mrs. Certeza is this purse. It's got kind of a pattern on it, and you will see this in evidence, and they root through this and they don't really find anything. I guess they found probably credit card and a few things like that. And they got this money. Well, they root through all this stuff to find what they've got, and that's basically it for the night.

Case 1:05-cv-00014 Document 16-4 Filed 08/18/2006 Page 20 of 29

July 21st, 1997, is Liberation Day, and there's a parade, of course, that day. And about 12:00 o'clock, Officer Shane Dawson, GPD, is driving himself along Marine Drive that area up by AK, pretty close to Paul's Plaza, and behind him he sees a Nissan Sentra. And you'll be able to look at all these pictures. But among other things, this Nissan Sentra doesn't have a front license plate. It's required to have a front license plate. So, what he does, is if he drops -- this Sentra is behind him, so what he does is he slows down and he drops back, and the Sentra passes him. He goes over to the right lane and pulls them over. So, they drive into Paul's Plaza, and he's just doing a routine traffic stop. And while he's doing the traffic stop, he noticed that the Defendant here who's driving the car, and sitting also in the car with him is Candelaria Mendiola. At this time, they've already dropped Don Mendiola off the night before. So, it's just the two of them who are in the car, but Officer Dawson notes that the Defendant's very nervous. And we believe that he will tell you that like anybody when you get pulled over at a traffic stop, probably everybody is a little bit nervous, but the Defendant is more nervous than is normal. And this makes Officer Dawson a little bit nervous, so he calls for backup.

And Jerome Santo Tomas backs him up, he pulls in too -- Jed, Jerome Santo Tomas, pulls up. And while they

are doing...

Let me back up just a little bit. Before Jed Santo Tomas gets there, he asks -- Shane Dawson asks the Defendant to get out of the car. Defendant initially said, "Okay, sure. Fine." And he's complying. But he pretends like he's trying to open the door to his Nissan and it's busted, so he's, you know, kind of mess around with the mechanics inside the door. And Shane Dawson is telling him to get out of the car, and he's acting like he's trying to get out of the car, and then Dawson, being nervous isn't, you know, he's wondering what's up with this, he reaches over to help him open the door, and he gets the door open for him. And immediately the Defendant slams him. This really makes Officer Dawson nervous. And about this time is when Jed Santo Tomas pulls up, and they had both passengers, the Defendant and Candelaria, get out of the car, and Jed moves the Defendant and Candelaria over towards the front of the car. And we believe the evidence is going to show you that the car was parked here, and you can see in this photograph there are some curb, these little yellow barriers, he moves into the front of the car, and a few minutes later, Officer Santo Tomas looks down and he notices a gun right next to the Defendant. And the gun is laying on the curb; you'll see pictures of it as well.

///

CF0317-97/11-3-99/mbp

Well, they arrest them. Prior to coming over there, though, of course Mrs. Certeza -- and you'll hear this in evidence -- had reported this robbery at her house. So the police are on alert, they're looking for these people who busted into this house with a gun, and they are briefed on it, police officers are briefed on it the morning before they start their rounds. So, they learn about this, and Officer Santo Tomas notices that the Defendant and Candelaria Mendiola matched the description of the Defendant -- excuse me -- the description of persons who robbed Mrs. Certeza, so they get arrested.

Just briefly, a brief outline, those are the facts of the case. We are going to prove beyond a reasonable doubt that this Defendant busted into her house and robbed Ms. Certeza at gunpoint and we're going to prove that he had that gun and it was concealed, and he didn't have a firearms ID at the time, all of which is required, and that he is guilty beyond a reasonable doubt. And the evidence that we're going to be presenting to you are these people.

Candelaria Mendiola is going to talk to you about her involvement in the crime. Don Mendiola is also going to talk to you about his involvement in the crime, and both of these people are going to talk about their involvement in this crime with the Defendant in the case.

///

Mrs. Certeza is going to tell you about her involvement in the crime, and she is going to tell you that the person that you see sitting in this courtroom over to your left is the person who pointed the gun at her and took her money.

And we are going to physically tie him to the crime. And here's how we're planning on doing that. Officer Dawson got information that that purse that I just showed you a picture of was at the Golden Motel in the dumpster behind the motel. So they went over there and they searched it and, sure enough, they found the purse. Inside the purse is the passport of Mrs. Certeza, the victim in the case.

Ms. Certeza was -- the money they robbed from her was in an envelope, a white envelope, and that envelope was found on the Defendant. And that was her money. And the reason she knows it is because written on the front of the envelope is "Taitague Sales." And the evidence will show that when they got to the police station to identify it, the envelope was upside down, and she identified that. She said, "That's my envelope with money in it. It's got "Taitague Sales" on it. Turned it over, sure enough, it had "Taitague Sales" on it. She identified it without even knowing or without even seeing that "Taitague Sales" was written on it.

So, physically he's going to be tied to this robbery. And people are going to come in and tell you that he is the robber. Well, we think that after you'd seen the evidence, and we submit to you that after you've seen the evidence, you will be convinced beyond a reasonable doubt of his guilt.

And we are going to ask you to deliberate, and deliberate careful on this. And we're going to ask you to come back and find him guilty of what he has, in fact, done.

So, thank you very much in advance for listening to the evidence that we're going to be putting on.

Thank you very much.

THE COURT: Thank you very much, Mr. Fisher.

Mr. Timblin, would you like to make an opening statement at this time?

MR. TIMBLIN: Yes, Your Honor.

May it please the Court, Mr. Fisher, ladies and gentlemen. Again, good morning. My name is Terry Timblin, representing the Defendant, Randy Chargualaf.

Now, I want to keep this as simple as possible. (Indiscernible-inaudible) issues so I can tell you right off I do agree with quite a bit of what Mr. Fisher said about what happened, but obviously I don't agree with his conclusion or we wouldn't be here today.

///

In any criminal case, the Government has to prove beyond a reasonable doubt basically two things: one, that a criminal offense against -- the laws of Guam has been committed by somebody, and secondly, that the person on trial for that offense is the one that committed it.

As to the first charge, at least as to robbery and theft charges on July 20th, 1997, the evidence certainly will show that a robbery took place, it certainly will show that it was conducted by Don Mendiola and Candelaria Mendiola. There will be reasonable doubt as to whether Randy Chargualaf participated in this. And as to the robbery and gun charges on July 21st, 1997, there'll be no direct evidence as to his possession of the gun, and I believe there's reasonable doubt there.

And Mr. Fisher pointed out you're going to hear from three eyewitnesses who claim to have -- that Mr. Chargualaf committed these offenses. Those are Candelaria Mendiola and Don Mendiola. You will learn during the course of the trial that they were charged in this case too. Serious charges (indiscernible-inaudible) first degree robbery. After they got charged, they had lawyers appointed, they enter into what's called a plea agreement -- you've probably heard about this -- and they agreed to plead guilty to one charge of what's called third degree robbery, which is a much lower charge and much lower maximum

sentence. Obviously, what sentence they get probably (indiscernible-inaudible) in their minds on how well they perform during this trial. In other words, basically they are just trying, in a sense, to save their own skin.

Now, as to Nabuyo Certeza, certainly she was victimized by a robbery, no question about it. But you're going to have some problems probably with her too, and one is that she had a very difficult time identifying Mr. Chargualaf as the robber. In fact, she didn't identify him until after there were some very strong hints given to her by the Guam Police Department and her husband about who he was. In fact this was -- I was writing in the textbook how much (indiscernible-inaudible) got the identifications in Exhibit A.

So the evidence will show (indiscernible-inaudible) discussions that Ms. Certeza also has a bit of an interest in this case beyond just testifying as a citizen, that is, she hopes to essentially -- or she can hope, at least, to personally profit from it. You'll hear about a statement that she made previously, which states, and I quote, "I would like to settle this case based on a payment of immediate financial compensation paid directly to me." So, in other words, of those three eyewitnesses -- (indiscernible-inaudible) police saw any of this (indiscernible-inaudible) other than the gun on the ground

as they arrested Mr. Chargualaf. All three of these witnesses are severely tainted. So, I believe that, again -- (indiscernible-muffled by coughing) all the evidence (indiscernible-inaudible) made fully aware of the motivations of these witnesses that you will find that, yes, there probably was a robbery committed, but there is reasonable doubt that Mr. Chargualaf committed it and that he possessed a weapon, (indiscernible-inaudible) firearm the following day, and that I think after all of this you will find that he is -- render a verdict of not guilty.

Thank you.

THE COURT: Okay. Thank you, Mr. Timblin.

Okay. Your first witness, Mr. Fisher.

** **END OF REQUESTED PORTION** **

C E R T I F I C A T E

I, MARY BENAVENTE PANGELINAN, do hereby certify that the foregoing pages one through 23, inclusive, comprise the true and correct transcript (Extract) of the Opening Statements and Day 1 of the Jury Trial had in Criminal Case No. **CF0317-97, People of Guam versus Randy Ignacio Chargualaf**, heard on November 3, 1999, recorded on Tape No. T99-1776 (LR2827-LR6160); and transcribed to the best of my knowledge, skills and ability.

DATED this 16th day of August, 2006.

MARY BENAVENTE PANGELINAN

CF0317-97/11-3-99/mbp

2? JUL 17 PM 2:55
ALFREDO M. BORLAS
CLERK OF COURT

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **PEOPLE OF GUAM**<br>Plaintiff-Appellee,<br>vs.<br>**RANDY IGNACIO CHARGUALAF,**<br>Defendant-Appellant. | Supreme Court Case **No. CRA00-002**<br>Superior Court Case **No. CF0317-97**<br>**Excerpt of Trial - Day 1**<br>November 3, 1999<br>**VOLUME II of IV** |

**BEFORE:**

*The Honorable Alberto C. Lamorena, III*
Judge, Superior Court of Guam

**APPEARANCES:**

**For the People:**

*Thomas J. Fisher, Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
Prosecution Division
Hagåtña, Guam

**For the Defendant:**

*Terrence E. Timblin, Attorney at Law*
Hagåtña , Guam

*Priscilla Castro Torres & Linda Perez Camacho*
*Court Transcribers, Superior Court of Guam* 

[redacted]

**THE COURT:** Thank you, Mr. Timblin. Your first witness, Mr. Fisher? Do you need this easel here?

**MR. FISHER:** No, Your Honor. I'll move it.

**THE COURT:** Okay.

**MR. FISHER:** (Addressing Marshal) Could we have Certeza? Your Honor, the People call Noboyo Certeza.

(Pause for Witness to be called)

(Witness Assumes Stand)

*Noboyo Certeza*

*called as a witness by The People, after having been first duly sworn, testified on her oath as follows:*

**THE CLERK:** Please be seated and state your full name.

**THE WITNESS:** My name is Noboyo Certeza.

**THE COURT:** Okay. Please be seated. Okay, Mr. Fisher, you may proceed.

**MR. FISHER:** Thank you, Your Honor.

*Direct Examination*

*by Mr. Fisher:*

**Q** Good morning, Ms. Certeza.

**A** Good morning.

**Q** I'm going to ask you to try and remember to speak up so everybody in the Jury can hear you. Okay?

**A** Okay.

**Q** Mrs. Certeza, where are you currently living?

A Excuse me?

Q Where do you live now?

A I live in Mangilao.

Q How long have you been in Mangilao?

A Just a couple weeks.

Q Could you tell the Jury where you were living before that?

A In Tumon.

Q Do you remember your address in Tumon?

A Yes.

Q Could you tell the Jury what that was?

A Behind Acanta Mall, going to the road, Jones -- Tun Joaquin Santos Street, Kitacho (ph.) Apartment, living 105.

Q And how long did you live in Kitacho Apartments?

A About four and a half years.

Q I'd like to bring your attention back to 1997.

A Okay.

Q And were you living in Kitacho Apartments in 1997?

A Yes, I do. I did.

Q Were you living with someone?

A With my husband.

Q Ma'am, what is your husband's name?

A My husband name is Benjamin Certeza.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving one of the People's Exhibits?

**THE COURT:** Yes, You may.

**MR. FISHER:** Thank you.

Q (By Mr. Fisher) Now, Mrs. Certeza, I'm going to show you what has been marked Prosecution Exhibit 25 for identification.

A Um-hmm. Yes, sir.

Q Could you have a look at that, please?

(Witness Examines Exhibit)

A Okay.

Q Could you tell us what that is?

A This is my apartment before used to live -- inside, how the room was.

Q Does that show how the rooms were?

A Yes.

Q And is it marked correctly for bedroom and living room and things like that?

A Yes.

Q Okay. Now -- all right.

**MR. FISHER:** Your Honor, at this time, the People will offer 25 for identification into evidence.

**MR. TIMBLIN:** No objection.

**THE COURT:** Okay. There being no objections, Exhibit 25 will be admitted into evidence for the Jury's consideration.

**MR. FISHER:** All right. Thank you, Your Honor.

Q (By Mr. Fisher) Ma'am, in a little bit, I'm going to ask you to use this to show things to the Jury. Okay?

A Okay.

Q But, in just a couple minutes. I want to take your attention back to

July 20th of 1997. Were you at home that night?

**A** Yes, I was.

**Q** Did anything strange or anything unusual happen that night?

**A** Yes.

**Q** Could you explain to the Jury what happened?

**A** That night, my husband normally come home about 11:00 after he drive a bus. I was cooking that night, prepare for dinner.

**Q** Do you remember what time that was?

**A** About 10:00. And I heard some -- some strange noise outside.

**Q** Could you describe the noise to the Jury?

**A** Somebody was running outside. And I crack the kitchen window and I look outside. Two people went upstairs, running to the upstairs.

**Q** And what, if anything, happened next?

**A** And somebody knock my door -- front door -- and said *"Is this the [something] residence?"* That I don't remember what the name but -- and then I said *"No"*.

**Q** Did you open the door?

**A** That time, I didn't open the door.

**Q** What happened?

**A** Then they went upstairs. They came back right after, about two minutes later after they knock the door.

**Q** Okay. And do you remember what happened next?

**A** And they came back knocking my door and ask me for *"I need your help. Can I use the telephone?"*

*///*

Q Could you describe these people? Do you remember what they looked like?

A Then I -- I heard -- I heard like a little child voice and so I opened the door.

Q And how many people did you see when you opened the door?

A Two people.

Q Do you remember, were they men? Were they women?

A One woman, like a little child; and one man.

Q Was there anything unusual about the man?

A Yes. No. That I -- that was woman, but he was -- she was very tall.

Q Okay.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving two photographs?

**THE COURT:** Yes.

**MR. FISHER:** Thank you.

Q (By Mr. Fisher) Ma'am, I'm going to show you what's been marked Prosecution Exhibit 22 and Prosecution Exhibit 23 for identification.

**MR. FISHER:** And I'll show those to the Opposing Counsel, Your Honor.

(Witness Examines Exhibit)

A Yes?

Q Ma'am, I'm showing you 22 for identification and 23 for identification. Do you recognize those people?

A Yes, I do.

Q Who are they?

A These two was the one came to the house.

**Q** Are they the ones who came to your house and knocked on the door that night?

**A** Yes.

**Q** Thank you.

**MR. FISHER:** Your Honor, at this time, I'd ask permission to publish 22 and-- I'd move 22 and 23 for identification into evidence and ask permission to publish.

**MR. TIMBLIN:** No objection.

**THE COURT:** There being no objection, People's Exhibits 22 and 23 will be admitted into evidence for the Jury's consideration.

**MR. FISHER:** Thank you, Your Honor.

(Pause for Exhibits to be Published to Jury)

**Q** (By Mr. Fisher) Now, ma'am, after you had asked -- or, after they had asked to use the telephone, what happened next? Did you let them into your apartment?

**A** Yes. Actually, the telephone was not in the living room. It was in the bedroom. Then I -- I run to the bedroom, grab the telephone, and I came back to living room.

**Q** Okay. And I'm going to -- now, you've already seen this, of course -- this is 25 for identification -- or, excuse me, this is actually 25. And you said that this is a diagram that shows your apartment?

**A** Yes.

**MR. FISHER:** Your Honor, if I can, I'd like to move this forward so all the members of the Jury can see it?

**THE COURT:** Yes. Do you want the witness to step down too?

**MR. FISHER:** Yes, please.

(Witness Leaves Stand)

**MR. FISHER:** Your Honor, may I ask if all members of the Jury can see 25?

**THE COURT:** Can everybody see the Exhibit? Okay, they all say yes.

**Q** (By Mr. Fisher) Mrs. Certeza, if you would have a look at 25, this picture of your apartment?

**A** Um-hmm.

**Q** Where were you when you heard the knock on your door?

**A** I was in the kitchen, standing here (indicating on Exhibit).

**Q** Okay. And your testimony was that these two people that we saw pictures of asked to use the phone?

**A** Yes.

**Q** And using that picture, could you tell the Jury what you did?

**A** I opened this door but the telephone was in this master bedroom.

**MR. FISHER:** And Your Honor, she is indicating the master bedroom as well as the front door to the apartment.

**Q** (By Mr. Fisher) If you would go ahead, ma'am?

**THE COURT:** Is she writing it down?

**MR. FISHER:** No, she's not, Your Honor. She's just pointing.

**THE COURT:** Oh, okay.

**A** And I -- when they asked me for telephone, I -- I run to the master bedroom, grab the telephone, and came back to the kitchen.

**Q** Now, when you returned to the kitchen, what kind -- what kind of telephone was this? Was this a cellular phone?

**A** No. It's a -- that one has a cord.

**Q** A cord?

A Um-hmm.

Q Okay. Was it a long cord?

A Yes, it was a long cord.

Q What happened?

A And when I came out bringing the telephone, then one small child lady was over here (indicating).

Q And you're indicating with your finger--

A I was right here. I try and grip the telephone but the big tall woman was inside by shoes.

Q Okay, now, you had indicated that one of the ladies was inside the living room?

A Already.

Q And the other one was near the front door?

A Um-hmm.

Q You said that she was "by shoes"?

A Yes.

Q What do you mean by that?

A Because our house, nobody -- we take off the shoes. That's why I was mad and I told the lady *"Don't step by the shoes in this house. Take off the shoes, please."*

Q What happened next?

A And all of a sudden, one man came over to the house by a gun.

Q Okay. All right, if you can go sit down again, please?

(Witness Resumes Stand)

Q You said that a man came to the house?

A Yes.

Q Could you describe that for the Jury, please?

A Right after I told the lady take off the shoes, please, and the man came over into the house. He slapped the door -- front door.

Q I'm sorry? Could you--?

A Slap the front door to close it. And he had gun pointed at me.

Q Okay.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving People's 21 for identification?

**THE COURT:** Yes.

**MR. FISHER:** And Your Honor, I'm showing People's 21 for identification to Opposing Counsel.

(Witness Examines Exhibit)

Q (By Mr. Fisher) Ma'am, this is Prosecution Exhibit 21 for identification. Would you look at that, please?

A Yes.

Q do you recognize the person in that photograph?

A Yes, I do.

Q Who is that person?

A This is the man had gun and point at me.

**MR. FISHER:** Your Honor, at this time, the People would move People's 21 for identification into evidence and ask that it be published?

**MR. TIMBLIN:** No objections.

**THE COURT:** Any objects, Mr. Timblin? There being no objections, the Exhibit will be offered for the Jury's consideration, No. 21.

**MR. FISHER:** Thank you, Your Honor.

(Pause for Exhibit to be Published to Jury)

**Q** (By Mr. Fisher) Ma'am, when that person came in your house -- when that man came in with the gun, what happened next?

**A** He point to my stomach. Then, actually, that time, I was seven month pregnant.

**Q** I'm sorry?

**A** I was seven month pregnant that time. He point my stomach by gun.

**Q** Did he say anything to you?

**A** Yes. He said *"Give me the money"*.

**Q** And what did you do?

**A** I said *"I don't have money"*.

**Q** Now, when he was pointing the gun at you, do you know where the other two people were?

**A** They were trying to look for something or researching the house -- inspecting the house. Keep moving around.

**Q** Okay. And what happened?

**A** And I said *"I don't have money".*

**Q** Now, when he was pointing the gun at you, which room of your house were you in?

**A** I was in the kitchen.

**Q** Did you always stay in the kitchen, or did you go other places? Did you go in the bedroom or the living room?

**A** Yes. I went to bedroom. And I open the drawer and I gave him one envelope.

Case 1:05-cv-00014 Document 16-5 Filed 08/18/2006 Page 11 of 40

Q Do you remember what was in the envelope?

A The $127 bills.

Q That's $127.00?

A Yes.

Q Did you ever see the envelope again?

A Means?

Q Did you ever see the envelope again?

A Yes, I did. At the--

Q Where did you see it?

A Police station.

Q Could you describe the envelope?

A Taitague Sales.

Q Now, you just said Taitague Sales. Was that written on it, or--?

A It was printed in the -- on the envelope.

Q Now, when you gave him the $127 in the envelope, did he still have the gun?

A Yes, he had.

Q What happened after that?

A He told me to bend down.

Q And what did you do?

A And I was holding my puppy which is toy poodle. And I bend down on the floor.

Q And what happened next?

A And I heard some noise that they looking for something or they crashing -- I shouldn't say crashing, but, you know, something; researching the

house. Right after that, I don't hear any noise and I slap -- I heard a slapping the door. And I wait for about three, four minutes, I don't hear any noise. Then I came back to the living room. Nobody was there.

**Q** Now, when you were told to bend down, what room were you in?

**A** I was in the master bedroom in front of closet.

**Q** That night, were there lights on in your house?

**A** Yes.

**Q** And could you see the people who were in your house?

**A** Yes.

**Q** The man who was holding the gun, do you see him in the courtroom today?

**A** Yes, I do.

**Q** Could you tell us where he is sitting?

**A** He is sitting in front of me.

**Q** Could you describe some clothing he is wearing?

**A** Now, he's wearing the white shirt with the blue line.

**MR. FISHER:** Your Honor, we would ask the Court take note of an in-court identification of the Defendant?

**THE COURT:** Okay. So ordered. The witness has identified the Defendant.

**Q** (By Mr. Fisher) Ma'am, is that the man who held the gun to you and robbed you?

**A** Yes.

**Q** Could you describe the gun? Do you remember anything about what it looked like?

**A** No.

**Q** After you heard the door slam, what did you do?

**A** I called my husband work. I called the police station.

**Q** And when you called the police, did they come to your house?

**A** Yes.

**Q** What happened?

**A** They asked me what happened. And I wrote a statement. And I didn't realize until everything over, my purse was missing because policeman was asking me to show them my I.D. card. I trying to look for it. Then I -- I told my husband and the policeman *"My purse is missing"*.

**MR. FISHER:** Your Honor, at this time, may I approach for the purpose of retrieving some Prosecution exhibits?

**THE COURT:** Yes.

**MR. FISHER:** Thank you.

**Q** (By Mr. Fisher) Ma'am, I'm going to show you what has been marked Prosecution Exhibit 11 for identification.

**MR. FISHER:** And I've shown that to Mr. Timblin.

(Witness Examines Exhibit)

**A** Yes?

**Q** Okay. Could you have a look at that?

**A** Yes. That's mine.

**Q** And I'm also going to show you what has been marked Prosecution Exhibits 13 and 14 for identification.

**MR. FISHER:** And I'll show it to Mr. Timblin.

**Q** (By Mr. Fisher) And would you have a look at these photographs, please?

(Witness Examines Exhibits)

Q Do you recognize what it is -- the picture is in Prosecution Exhibit 11?

A Yes. This is my card -- credit card -- and my purse.

Q Okay. And I'll ask you about that one too. In Prosecution Exhibit 13 for identification, do you recognize that?

A Yes.

Q What does Prosecution Exhibit 13 -- what's it a picture of?

A This is my passport.

Q Does it show anything else besides your passport?

A My purse, wallet, handkerchief.

Q Okay. And I'll also show you Prosecution Exhibit 14 for identification. What does that show?

A My purse, wallet, passport, driver's license in Japan, and handkerchief.

Q Okay. And by looking -- is that your passport and your purse that was stolen from you that night?

A Yes.

Q What about that credit card that you identified?

A Yes. It was in the wallet.

Q Okay. And do those pictures look like the purse and the passport and the credit cards looked that day?

A Yes.

**MR. FISHER:** Your Honor, at this time, the People would move Prosecution Exhibits 11, 12 (sic.), and 13 for identification into evidence.

**THE COURT:** Any objections, Mr. Timblin?

**MR. TIMBLIN:** No objections.

**THE COURT:** Okay. So ordered.

**MR. FISHER:** Thank you, Your Honor. I think I might have said 13. 13, 14, and 11, Your Honor.

**THE COURT:** 13, 14, and 11?

**MR. FISHER:** 13, 14, and 11.

**THE COURT:** So ordered. Submitted into evidence for the Jury's consideration.

**MR. FISHER:** Thank you. And may I go ahead and publish these?

**THE COURT:** Yes. Can we just wait until later?

**MR. FISHER:** Okay.

**THE COURT:** Because it takes a long time.

**MR. FISHER:** Yes, sir.

**Q** (By Mr. Fisher) On that day, where was your passport? Did you keep it in your purse?

**A** Yes, I did. In the blue wallet, always.

**Q** What happened after the police spoke to you that night? Did you ever go visit the police? Did you ever go to the station?

**A** Yes. Next day.

**Q** What happened at the police station?

**A** They called me up and asked me to identified my card. Then I went there. I identified my card -- which is credit card, the one I had. He asked me to write the name by Japanese -- in Japanese -- and I wrote it in piece of paper. And it was my credit card.

**Q** Is that the credit card that we have a picture of?

A Yes.

Q And what happened next?

A When I went there, one man was inside of the police koban station.

Q Was that a policeman or someone else?

A No. Someone else.

Q What happened?

A And that was him, the one pointed at me by gun.

Q Was the man -- the man in the police station was the one who pointed the gun at you?

A Yes.

Q Is that the same man you pointed to earlier just a few minutes ago?

A Yes.

Q Are you certain?

A Yes, I am.

Q When you first saw that man in the police koban, could you identify him?

A Yes, I did.

Q Did you have any trouble?

A First time, yes.

Q Why?

A I was on shock.

Q But are you certain that that was the man?

A Yes, I did.

Q What happened after you left the koban?

///

Case 1:05-cv-00014 Document 16-5 Filed 08/18/2006 Page 17 of 40

**A** About in front of Payless, we pass by one policeman and he told my husband *"We found your purse. So we let you know to come down again."* Right after we went home, the policeman called us up to come down.

**Q** And come down where?

**A** To the police station near the Pacific Star Hotel.

**Q** Okay. And did you do that?

**A** Yes.

**Q** What happened?

**A** Then I -- we went there -- down there. Then I identify my -- my purse, and wallet, my I.D. in my wallet, or the purse.

**Q** Are those pictures that you saw--

**A** Yes.

**Q** --are those pictures of that?

**A** Um-hmm.

**Q** What happened with your purse, and your wallet, and your credit card?

**A** I don't understand.

**Q** Did you get your purse back? Did someone give it back to you?

**A** Yes.

**Q** What about the credit card? Did they give that back to you?

**A** That day, I don't remember.

**Q** Okay.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving Prosecution Exhibits 26, 27, and 28?

**THE COURT:** Yes.

**MR. FISHER:** Your Honor, actually, I've just retrieved 26 and 28 which I'm showing to Defense Counsel.

**Q** (By Mr. Fisher) Ma'am, this is Prosecution Exhibit 28 for identification. And this is Prosecution Exhibit 26 for identification, which are GPD Evidence Property Custody receipts. Do you see your name anywhere written?

**A** Yes, I do. Written.

**Q** Do you recognize -- did you write that?

**A** Yes, I did.

**Q** Is part of it written in Japanese language?

**A** Um-hmm. Yes.

**Q** You're the one who wrote that?

**A** Yes.

**Q** What happened after you came back to the koban and you got your purse back?

**A** I identified the money and the envelope.

**Q** How did you identify the money and the envelope?

**A** Because I put in the one envelope which is written in print by Taitague Sales. And I put all one dollars bills -- small bills -- and I put ten together and folded middle.

**Q** And were you sure that that was your money?

**A** Yes. It -- yes.

**Q** Were you sure that that was your envelope?

**A** Yes.

**MR. FISHER:** And Your Honor, may I approach for the purpose of retrieving I think it's been marked as Defense Exhibit A?

**THE COURT:** Yes.

**MR. TIMBLIN:** Actually, it's 1.

**MR. FISHER:** Okay.

Q (By Mr. Fisher) Ma'am, I'm going to show you what's been marked Defense Exhibit A for identification. Could you look at that? It's two pages.

(Long Pause for Witness to Examine Exhibit)

A Yes?

Q Did you have a chance to read those?

(Inaudible Response)

Q Did you sign those?

A Yes, I did.

Q Okay. And if I could just retrieve A for identification from you?

(Witness Complies)

Q Now, ma'am, I'm going to -- Defense Exhibit A for identification, is it two pages?

A Yes.

Q Looking at the first page -- the top page – could you tell us who typed that -- wrote that up for you?

A My husband.

Q And now, I'd like you to look in the upper left corner.

A Um-hmm.

Q Who printed that for you?

A Mark Williams.

Q Mark Williams?

A Um-hmm.

Q And I'd like to take your attention to the second page.

A Um-hmm.

Q Is that your signature?

A Yes, that's my signature.

Q Are you the one who wrote that?

A Yes.

Q Okay. Did anyone else help you write it?

A Yes. My husband helped me.

Q Is it true that in Defense Exhibit A, it's a letter from you and you're saying you want to settle the case for money?

A No.

Q What does it say?

A I'm sorry to say I don't understand that much English, the different words. But I talked to my husband about this case. Yes, I was very nice woman to open the door; somebody asked for the telephone. But in Japan, if somebody needs help, we help. We don't hesitate to let people use telephone.

Q But on this letter, did you say that you wanted money?

A Of course, we want money. Not for this, for our family.

Q Why did you want money?

A 'Cause if he get out from jail without anything and he won't work. If he's staying in jail -- because I heard he was in jail for a long time -- how he's gonna learn about the life?

Q Okay. Now, you've talked to this Jury for, I guess, maybe forty minutes or so. Did you tell the truth?

A Yes.

**Q** Did you tell them the truth?

**A** Yes, I do.

**Q** Are you here today because you want money?

**A** No.

**MR. FISHER:** All right. Your Honor, I have no further questions. Thank you very much.

**THE COURT:** How long will your cross-examination take?

**MR. TIMBLIN:** Your Honor, probably just twenty minutes.

**THE COURT:** Why don't we take a ten minute recess, okay?

**THE BAILIFF:** All rise.

(Court Stands in Brief Recess - Off the Record)

(Court Reconvenes - Back on Record)

**THE BAILIFF:** Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena III presiding. Please be seated.

**THE COURT:** Okay. **CF0317-97, People of Guam vs. Randy Ignacio Chargualaf.** Just for the record, the Defendant is present in Court with his attorney, Mr. Timblin. The People are represented by Mr. Fisher. All twelve Jurors are present and two Alternates.

I'd like to remind you Ms. Certeza that you're still under oath. Okay?

(Inaudible Response from Witness)

**THE COURT:** Okay, Mr. Timblin. On Cross?

**MR. TIMBLIN:** Thank you, Your Honor. May I approach the witness and the diagram, please?

**THE COURT:** Yes, you may. You want the diagram up front?

**MR. TIMBLIN:** No. I think I can work from here.

**THE COURT:** Can the Jury see it from that far away?

(Inaudible Response from Jurors)

**THE COURT:** Okay. They all say yes.

*Cross-Examination*

*by Mr. Timblin:*

**Q** Mrs. Certeza, is it--? I believe you testified that you were in the kitchen when the two females -- or the people you thought were both females -- first came in?

**A** Yes.

**Q** And you indicated that I believe the first, the "little girl" came in first or the other one?

**A** The little girl came in first.

**Q** And then the tall one came in?

**A** Yes.

**Q** And then the tall one was wearing shoes and you didn't like that. Is that correct?

**A** Yes.

**Q** So, they were both in the kitchen at that time?

**A** Yes.

**Q** And it was then that the third person came in with a gun. Is that correct?

**A** Yes.

**Q** Okay. Now, you testified that he pointed the gun at you and then he -- he took you back to the master bedroom here. Is that right?

**A** Yes.

Q He asked you for money?

A Yes.

Q And then he told you to bend over. Is that correct?

A Yes.

Q And this was why you were in the master bedroom?

A Yes.

Q And then this person left?

A Yes.

Q Okay. And then you heard some -- like people rummaging around and then silence?

A Yes.

Q Okay. Now, from the time that the person came in with a gun until you bent down -- well, first of all, could you see him -- see this person when you were bending over?

A No.

Q You were looking at the floor, I take it?

A Yes.

Q So, from the time that this person came with a gun until you bent over and couldn't see him anymore, can you tell us how many seconds, or minutes, or whatever, passed?

A About three, four minutes -- 'till five.

Q Four minutes?

A Three, four, five minutes. I cannot tell exactly.

Q Okay. Well, you said he asked you for money, or he said *"Give me the money"*. Right?

Case 1:05-cv-00014 Document 16-5 Filed 08/18/2006 Page 24 of 40

A Yes.

Q And how long did it take you to get this money?

A He asked me the question *"Are you living by yourself?"*

Then I said *"No. My husband – with my husband."*

*"When your husband coming back?"*

*"It's almost time to come home. Maybe about -- in about ten to fifteen minutes."*

And he say *"Give me money."*

Q Is that it for your conversation?

A Yes.

Q Okay. Thank you. Now, I believe after these people left, you called the police. Is that right?

A Would you please speak more slowly?

Q I'm sorry. After the three people left your house--

A Yes.

Q --and you couldn't hear them anymore, did you then call the police?

A I called LamLam Tour.

Q That's where your husband works?

A Yes.

Q Okay. To your knowledge, did he call the police or did somebody call the police?

A I – I don't remember.

Q Did a police officer arrive at your house that night after this happened?

A Yes.

Q Okay. Now, do you recall, did the police officer ask you to describe

these three people?

**A** Yes.

**Q** Now, as to the person with the gun, is it correct that you described this person as wearing, I believe, a green polo shirt?

**A** Polo shirt.

**Q** And this is a kind of short sleeve?

**A** Yes.

**Q** In the description that you gave to the police officer, did you mention anything about the person with the gun having tattoos?

**A** No.

**Q** Okay.

**MR. TIMBLIN:** At this point, I would ask Mr. Chargualaf to raise his arms. And may the Court -- may the record reflect, Your Honor, that Mr. Chargualaf does have a rather extravagant set of tattoos on both his left and right arm?

**THE COURT:** Okay. Let the record reflect that Mr. Chargualaf, the Defendant, has tattoos on both arms.

**MR. TIMBLIN:** Thank you.

**Q** (By Mr. Timblin) I believe you testified that the person with the gun pointed the gun at your stomach. Is that correct?

**A** Yes.

**Q** Did the gun touch your stomach, or just--?

**A** No.

**Q** How close did it come?

**A** It was this much close (indicating).

///

Q Okay. I believe about six to eight inches, for the record. So he was standing very close to you. If the gun was six to eight inches away from you, he was very near you?

A Yes.

Q Okay. Now, you told Mr. Fisher about going to the police station the next day. Do you recall the first time you went to the police station? Are we talking about a koban, the small police station, or the regular Precinct station, if you know?

A Close from hotel -- Palace Hotel.

Q Palace Hotel?

A Or Onward. Nearby Oka Payless.

Q Okay. So, this is I think the one they call a koban. Is that right?

A Yes, I--

Q It's a pretty small building, isn't it?

A Yes.

Q How many rooms were in the building?

A I don't know how many rooms. But I went inside form the front door. They have the wall and has a -- like a door or we can go inside. And they have a window, like this big (demonstrating).

Q Okay. So, there was a room you walked into first. Then there was a wall with a window in it, and another room?

A Yes.

Q Okay. Now, did you -- the person -- did you see a person that you identified as this person that robbed you sitting in that room?

A Yes.

///

Q Now, you told Mr. Fisher that you were having a difficult time for the first time. You were unable to say that that person was the person who robbed you. Is that right?

A Yes.

Q At any time, did a police officer -- any police officer -- say to you *"Is that the person, ma'am?"* or something like that?

A No.

Q Did not?

A No.

Q Was your husband with you?

A Yes. My husband was with me.

Q Does your husband ever ask you--? Okay. Did -- was your husband there when you first said you couldn't -- you weren't sure about identifying him? Your husband was with you?

A Yes.

Q Did your husband ever say to you something like *"Try to concentrate"*.

A Yes. He said *"Close your eyes. Try to remember."*

Q Okay. And then after that, you then said *"That's him"*?

A Yes. I said *"That's him"*.

Q At any time before or after this, did the police ever show you a series, like, say, of photographs, say, including Mr. Chargaualaf and some other people, to see if you could pick him out of the photographs?

A No.

Q Did they ever--? Do you know what a lineup is, by any chance, ma'am?

**A** I'm sorry?

**Q** Do you know what a lineup--? It's kind of a slang term in the States.

**A** No. I don't know.

**Q** Okay.

**MR. TIMBLIN:** Is Exhibit 1 still in here?

**MR. FISHER:** Which one's that?

**MR. TIMBLIN:** The Defense Exhibit.

**MR. FISHER:** I believe so.

**MR. TIMBLIN:** Oh, here it is.

**Q** (By Mr. Timblin) Now, you talked to Mr. Fisher from about Defense Exhibit A. Do you recall looking at this before?

**A** Yes, I do.

**Q** Okay. Could you just read this paragraph and then read your letter, please, for the Jury?

**A** Means by voice?

**Q** I'm sorry?

**A** Means to read--?

**Q** Yeah. To read out loud to the Jury, you know, this and then your letter -- the letter that you wrote.

(Witness Complies)

*I, Noboyo Certeza, am victim in the above captioned case like to settle this case based on a payment of immediately financial compensation directly to me and I do not wish to testify in this case. I strongly feel this would resolve this case in the best interest of myself*

*and my family and along with the confinement the defendant has already served would be an appropriate punishment and more effective justice in this case.*

Q And would you read the letter on the next page?

(Witness Complies)

*Dear Sir:*

*I am the victim in the above captioned case. As the victim, I feel that it would be appropriate to seek permanent and direct monetary compensation from the defendant in my case for the anxiety and emotional distress suffered by myself and my family. I'd like to propose the Government to settle this matter directing a prompt and immediate payment for me and avoid the additional distress and anxiety to testify in this case, as well as any further delays. I do not wish to testify in this case and strongly feel that it would be in our best interest and would accomplish more effective justice for my family to require an immediate payment from the defendant. Based on our feelings, I'd like to have this case resolved by requiring the direct payment of $1,000 lump sum payment immediately prior to being released, and additional $5,000 payable over the next twelve months. I feel that this would more appropriately compensate us for our suffering in this case since we have no interest in testifying and then we could get on*

*with our lives and avoid the additional stress of testifying and the delay of our wish to return this to our normal life. Thank you very much.*

**Q** Thank you. Now, I understand that English is not your first language--

**A** Oh, sorry.

**Q** --but did you understand what that says?

**A** Yes, I do.

**Q** Okay. You were able to read it and fully understand it?

**A** Yes.

**Q** Now, Mr. Fisher showed you some pictures of some property you got back, like the credit card, and your purse, and your passport. You got that back the next day or two after this happened. Is that right?

**A** Yes.

**Q** You also mentioned that there was, I believe, $127 in cash taken?

**A** Yes.

**Q** Did you ever get that back?

**A** No.

**MR. TIMBLIN:** Thank you. No further questions.

**THE COURT:** Mr. Fisher, on Redirect?

**MR. FISHER:** Yes, thank you, Your Honor.

## *Redirect Examination by Mr. Fisher:*

**Q** Ma'am, who actually thought up that letter? Do you know what I mean?

**A** Not really.

**Q** Who--? This letter that you just read to the Jury, did your husband write this?

**A** Yes.

**Q** But you signed it?

**A** Yes, I signed it.

**Q** Now, I'm going to ask you to look at the second paragraph of the letter.

**A** Okay.

**Q** You say *"based on our feelings"*. Correct?

**A** Yes.

**Q** When you said -- well, who wrote that? Who wrote those words *"based on our feelings"*? Is that you or your husband?

**A** My husband wrote this but I explained to him how I feel.

**Q** Okay. Now, you mentioned some $8,000 and then $5,000 over twelve months. Correct?

**A** Yes.

**Q** Did anyone promise to give you money?

**A** No.

**Q** Did you lie or tell any false story to the Jury for money?

**A** No.

**Q** Is what you testified to earlier, is that the truth?

**A** Yes. I didn't wanna testify, but it's true.

**Q** Why didn't you want to testify?

**A** Because I was very depressed. If I have picture, how much I don't know lost weight in couple weeks after this happened.

Q What made you depressed, do you know? Was it what happened to you?

A Yes.

Q How about today? How do you feel today?

A Even still now, I'm shaking. My mouth is dry. I just cried outside because of what happened. It's really hit me hard.

Q And I'm going to ask you this again. That man sitting over there, did he point a gun at you that night?

A Yes, he did.

Q And that was in your apartment?

A Yes.

**MR. FISHER:** Just one moment, Your Honor.

(Pause for Prosecutor)

**MR. FISHER:** Your Honor, I have no further questions. Thank you.

**THE COURT:** Any other questions on cross, Mr. Timblin?

**MR. TIMBLIN:** Your Honor, I would move Defense Exhibit A into evidence.

**THE COURT:** Is that Exhibit A or 1?

**THE CLERK:** Exhibit A.

**THE COURT:** Okay. Defense Exhibit A, no objections?

**MR. FISHER:** No objections.

**THE COURT:** Okay. Will be moved into evidence for the Jury's consideration. Okay, Ms. Certeza-- (Addressing Defense Counsel) No other cross?

**MR. TIMBLIN:** No other cross, Your Honor.

**THE COURT:** Ms. Certeza, you may step down. Thank you very much.

**THE WITNESS:** Thank you very much.

(Witness is Excused)

**THE COURT:** Your next witness, Mr. Fisher?

**MR. FISHER:** Your Honor, the People call Officer Vincent Nueva.

(Pause for Witness to be Called)

*Vincent DelaCruz Nueva*

*called as a witness by The People, after having been first duly sworn, testified on his oath as follows:*

**THE CLERK:** Please be seated and state your full name.

**THE WITNESS:** My name is Vincent DelaCruz Nueva.

**THE COURT:** Okay. You may proceed, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor.

*Direct Examination*

*by Mr. Fisher:*

**Q** Sir, where are you currently employed?

**A** I'm currently employed with the Guam Police Department.

**Q** Officer, how long have you been with the Guam Police Department?

**A** Seven years.

**Q** Where are you attached within the Guam Police Department?

**A** I'm assigned to the Criminal Investigation Section.

**Q** Officer, I'd like to take your attention back to July of 1997. Were you with the Guam Police Department on that date?

**A** Yes.

**Q** To what Division or Section were you attached then?

**A** I was assigned to the Tamuning Precinct, Mountain Bike Unit.

**Q** Sir, I'd like you to focus on or about July 20th of 1997. Did you

respond to a report of a robbery in the Tumon area?

**A** Yes.

**Q** Do you recall where in Tumon that was?

**A** It was on No. 105 Kitacho Apartments, Tumon.

**Q** What happened when you got there?

**A** I met with a female named Noboyo Certeza.

**Q** Now, do you recall what time that was?

**A** That's approximately 10:22 p.m.

**Q** Officer, as a result of responding, did you make a police report of any sort?

**A** Yes.

**Q** Now, why did you write a police report?

~~**A** Mrs. Certeza stated that she was robbed.~~

**MR. TIMBLIN:** Your Honor, object to the hearsay.

**MR. FISHER:** Your Honor, I'll move on.

**THE COURT:** Okay. The last statement will be stricken from the record -- okay? -- and the Jury will not consider it in their deliberations. You may proceed, Mr. Fisher.

**Q** (By Mr. Fisher) Sir, in the normal course of your business as a police officer, do you make police reports?

**A** Yes.

**Q** And in your police reports, do you tend to record the information accurately?

**A** Yes.

**Q** Now, you met with Ms. Certeza that night. Did you have an

opportunity to observe her?

A Yes.

Q Could you describe for the jury how Ms. Certeza appeared?

A Mrs. Certeza appeared frightened. When I attempted to speak with her, she stuttered. Her lips were trembling; her hands were trembling.

Q Was there anything else?

A No. That the -- she just trembled when asked questions.

Q Now, did you speak to Ms. Certeza about her report?

A Yes.

Q And approximately what time was that?

A Approximately 10:30 p.m.

**MR. FISHER:** Your Honor, may Counsel approach?

**THE COURT:** Okay, Officer Nueva, can you please step down for a second?

(Side Bar Ensues)

**THE COURT:** Yes?

**MR. FISHER:** Your Honor, I'm going to ask Officer Nueva to tell the Jury what it was Mrs. Certeza reported to him; over a hearsay objection is the reason I asked to approach the court. I believe it comes in as an excited utterance. We've established that it occurred within twenty minutes and that she was excited. We also believe it comes in as non-hearsay under §801(d)(1)(B) consistent. We believe that Mr. Timblin is in the course of establishing an improper motive for bias based on the letter speaking about the $8,000 to $5,000. And we also think that it comes in as non-hearsay as an excited utterance.

**MR. TIMBLIN:** Okay, I would again renew my hearsay objection. First of all, she's had twenty minutes to calm down. And again, the police reports themselves

are almost, you know, are excluded as basically -- it's not a rule, but it's basically excluded as hearsay.

**MR. FISHER:** But we're going to ask for -- just to ask him orally but we're not going to attempt to introduce it.

**MR. TIMBLIN:** But I haven't -- the point is, I haven't impeached her. I haven't said anything, like, you know, *"Isn't it true that you said nothing happened?"*, or something like that. And if I'd said that, of course, then of course he'd say it would be consistent with what she says today, but I haven't impeached her at all. I've just simply established a motive for possible falsification.

**MR. FISHER:** Your Honor, I think it's true. I think that they will express an (indiscernible) towards that using fabrication of improper evidence. We also think that we've laid an adequate foundation for an excited utterance under §803.

**MR. TIMBLIN:** I will stand on objection. It's just -- again, it's--

**THE COURT:** I'll overrule the objection.

**MR. TIMBLIN:** Overruled?

**THE COURT:** Overruled.

(Side Bar Concludes)

**THE COURT:** You may have your seat back, Officer Nueva. You may proceed, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor.

**Q** (By Mr. Fisher) Sir, what is it that Mrs. Certeza told you had happened?

**A** She said at approximately 10:05 p.m., July 20, 1999 (sic.), she heard a knock on her front door of her apartment. She answered *"Who's there?"* A female replied *"I'm looking for Lou"*. Ms. Certeza replied back *"No. Nobody by that*

*name here."* The female replied back *"I need your help. May I use your phone?"* Ms. Certeza opened the front door and the female walked in. She was accompanied by another female.

**Q** Did she tell you anything else about what had happened that night?

**A** Yes. She instructed both females to stay by the door while she retrieved the phone in the master bedroom.

**Q** And did she tell you what happened after she retrieved the phone in the master bedroom?

**A** When she returned back with the phone, she observed a male individual inside her apartment.

**Q** Do you know or do you recall whether or not she described that male individual?

**A** Yes.

**Q** Do you recall what the description is?

**A** Yes.

**Q** Could you tell the Jury?

**A** Ms. Certeza described the male as being possibly local, approximately five foot eight (5'8"), medium build, dark hair, wearing a baseball cap, moustache, also wearing a green colored shirt, unknown colored pants were short.

**Q** What did she say happened?

**A** She stated the male individual pointed a dark colored gun at her at which time he stated *"Bend down. Don't move. Give me the money."*

**Q** Did she tell you whether or not she complied with these orders?

**A** Yes.

**Q** What did she say?

**A** She told the male individual she didn't have any money.

**Q** And what happened after that according to Mrs. Certeza?

**A** The male individual then stated to her *"If you lie, I'm going to shoot you"*.

**Q** Then what happened?

**A** Mrs. Certeza then ran into the master bedroom and later returned with an envelope containing $120 in cash.

**Q** And what happened next?

**A** The male individual then asked her if she had any jewelry. Ms. Certeza told him she didn't have any jewelry; only fake jewelry. The male individual then followed Ms. Certeza to the master bedroom where he began ransacking a dresser which was located in the southwest corner of the master bedroom.

**Q** Okay. Do you know, or did she report to you, whether or not he looked -- he found anything or took anything?

**A** No.

**Q** Did she tell you anything else?

**A** She stated the male individual told her to stay in the room and not go anywhere.

**Q** And then what happened, according to her?

**A** According to Ms. Certeza, the male individual left the room and walked back towards the living room area.

**Q** Do you recall if she told you anything was taken from her other than $120?

**A** Yes.

Case 1:05-cv-00014 Document 16-5 Filed 08/18/2006 Page 39 of 40

Q What's that?

A A brown colored canvas purse.

Q Did you at any time ever inspect the apartment, look around it?

A Yes.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving several photographs?

**THE COURT:** Yes.

**MR. FISHER:** Thank you.

(Pause for Prosecutor)

**MR. FISHER:** Your Honor, I've retrieved what has been marked Prosecution Exhibit 15 for identification; Prosecution Exhibit 16 for identification; Prosecution Exhibit 17 for identification; Prosecution Exhibit 18 for identification; Prosecution Exhibit 19 for identification; and Prosecution Exhibit 20 for identification. And I'll show those to Mr. Timblin.

**MR. TIMBLIN:** I've seen them so I have no objections.

**MR. FISHER:** May I approach the witness, Your Honor?

**THE COURT:** Yes.

Q (By Mr. Fisher) Sir, would you look at these exhibits for identification?

(Witness Examines Exhibits)

Q Have you had an opportunity to look at those photographs?

A Yes.

Q Do you recognize what is depicted in those photographs?

A Yes.

Q And do they fairly and--? Do you recognize that from seeing that area the night of 20 July 1997?

A Yes.

Q Do they fairly and accurately depict what it was you saw that evening?

A Yes.

Q Where were these photographs taken?

A No. 105 Kitacho Apartments, Tumon.

Q Is that the same apartment that you reported to?

A Yes.

**MR. FISHER:** Your Honor, at this time, the People would move Prosecution Exhibits 20, 19, 18, 17, 16, and 15 for identification into evidence.

**THE COURT:** Any objections?

**MR. TIMBLIN:** No objections.

**THE COURT:** Okay. So ordered.

**MR. FISHER:** Thank you, Your Honor.

Q (By Mr. Fisher) Sir, could you describe what the Prosecution Exhibit -- what this is a picture of, No. 20?

A This is a picture taken of Mrs. Certeza's master bedroom.

Q And, sir, No. 19?

A Same picture taken of Ms. Certeza's master bedroom.

Q And No. 18, please?

A It's also a same picture taken of Ms. Certeza's master bedroom.

Q Does that depict the dresser?

A Yes.

Q Is that the one that she told you was ransacked?

A Yes.

Q 17, please? Can you tell us what that is?

A This is a picture of Mrs. Certeza's living room couch.

Q And No. 16, please?

A This is a picture of Mrs. Certeza's living room.

Q And finally, No. 15?

A This is a picture of the door of No. 105 Kitacho Apartments.

Q All right, sir. Thank you very much.

**MR. FISHER:** Your Honor, may I publish these photos?

**THE COURT:** How many of them?

**MR. FISHER:** There's, I think, five.

**THE COURT:** Okay. What don't we do it later, okay?

**MR. FISHER:** All right.

**THE COURT:** Towards the end of the trial so that the--

**MR. FISHER:** Okay, sir.

**THE COURT:** Because there are a lot of them.

**MR. FISHER:** Yes, sir. (Addressing Witness) Thank you, sir. (Addressing Court) Your Honor, I have no further questions.

**THE COURT:** Any questions of Officer Nueva, Mr. Timblin?

**MR. TIMBLIN:** Yes, Your Honor.

*Cross-Examination*

*by Mr. Timblin:*

Q Officer Nueva, did -- when she described this person with the gun to you, did she mention anything about this person having tattoos?

A No.

///

///

**Q** I believe you testified that she did give you -- she stated that she did observe this person ransacking her bedroom? Did she say she was there present when this happened?

**A** No. No.

**Q** Okay. How did she know that he -- that her – how did she know that somebody was ransacking her bedroom?

**A** According to Ms. Certeza, while she was in her master bedroom, she heard sounds -- what sounded to her as someone moving paper or furniture around by the living room area.

**Q** Okay. It wasn't in the master bedroom?

**A** No.

**MR. TIMBLIN:** No further questions.

**THE COURT:** Any other questions of Officer Nueva, Mr. Fisher?

**MR. FISHER:** No thank you, Your Honor.

**THE COURT:** Okay, Officer Nueva, you may step down. Thank you very much.

**THE WITNESS:** Thank you, Your Honor.

(Witness is Excused)

**MR. FISHER:** Your Honor, may Counsel approach?

**THE COURT:** In the meantime, while we're discussing, can you just--? Do it one picture at a time so that, you know, each Juror will pass it on as you finish. Then just pass it on to the next Juror.

(Side Bar Ensues)

///

///

**MR. FISHER:** Your Honor, the next witness is Officer Dawson. I had to let him go about a half hour ago to return his patrol car and he's heading back down. I'm not sure if he's going to--

**THE COURT:** So, we have a few minutes to kill?

**MR. FISHER:** He might be out there. I'm just not real sure.

**THE COURT:** Can you check if he's out there?

**MR. FISHER:** Okay.

(Pause for Bailiff to Look for Witness)

**THE COURT:** Who's your next witness?

**MR. FISHER:** Officer Dawson and then I've got the rest lined up to return at 1:30.

**THE COURT:** (Addressing Bailiff) Paul?

**MR. FISHER:** He was on duty all evening and had to return his patrol car. He's been here this morning.

**THE COURT:** Okay. Well, is there any officers out there besides--?

**MR. FISHER:** No. Santo Tomas, sir, I don't think is going to be here until this afternoon.

(Witness Located - Side Bar Concludes)

*Christopher Shane Dawson*

*called as a witness by The People, after having been first duly sworn, testified on his oath as follows:*

**THE CLERK:** Please be seated and state your full name.

**THE WITNESS:** Christopher Shane Dawson.

**THE COURT:** Okay. You may proceed, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor.

*Direct Examination*

*by Mr. Fisher:*

Q Officer Dawson, where are you currently employed?

A With the Guam Police Department.

Q And, sir, how long have you been with the Guam Police Department?

A Six and a half years.

Q Officer, could you tell the Jury where you're currently assigned?

A I'm at the Tamuning-Tumon Precinct.

Q And, sir, I'd like to take your attention back to 1997. Were you with the Guam Police Department at that time?

A Yes, I was.

Q And, in particular, on July 21st of 1997, were you on duty with the Guam Police Department?

A Yes, I was.

Q Sir, I'd like to take your attention, then, to the morning of July 21st, 1997. Did you pull over an automobile in Paul's Plaza area?

A Yes, I did.

Q Can you tell the Jury why you did that?

A The vehicle was traveling slightly behind me. I noticed in my rear view mirror that the front windshield was cracked and there's no front license plate on the vehicle.

Q Do you remember what the vehicle looked like?

A It was a black sedan.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving some Exhibits?

**THE COURT:** Yes.

**MR. FISHER:** Thank you. Your Honor, I've retrieved Prosecution Exhibits 4, 6, and 7 for identification and I'm showing those to Mr. Timblin.

**MR. TIMBLIN:** No objections.

**MR. FISHER:** May I approach the witness, Your Honor?

**THE COURT:** Yes, you may.

**Q** (By Mr. Fisher) Officer Dawson, I'm going to show you 4 -- People's 4, 6, and 7 for identification. Would you look at those, please?

(Witness Examines Exhibits)

**Q** Could you tell the Jury what those pictures are?

**A** Pictures of the vehicle I pulled over on the morning in question.

**Q** Is that the vehicle you pulled over?

**A** Yes, it is.

**Q** What's depicted in the photograph, does that appear to be the vehicle as it appeared the morning of the 21st?

**A** Yes, sir.

**MR. FISHER:** Your Honor, at this time, the People would move People's 4, 6, and 7 for identification into evidence.

**THE COURT:** Any objections, Mr. Timblin?

**MR. TIMBLIN:** No objections.

**THE COURT:** Okay. So ordered.

**Q** (By Mr. Fisher) Now, why is it you pulled over the vehicle?

**A** No front license plate and cracked windshield.

**Q** And where did you pull it over?

///

A Well, I noticed the vehicle about by Atkins Kroll traveling southbound on Route 1, but I actually pulled it over into the parking lot of the Paul's Tailoring at the intersection of 1 and ITC.

Q Now, did that vehicle come to a stop?

A Yes, it did.

Q Now, you've just looked at 4, 6, and 7. Is that where the vehicle stopped?

A Yes, it is.

**MR. FISHER:** Your Honor, I'd ask permission to publish these.

**THE COURT:** Okay. We'll do it later after Officer Dawson completes his testimony.

**MR. FISHER:** Yes, sir.

Q (By Mr. Fisher) What happened when you pulled the vehicle over?

A I called it in. It's normal. I approached the driver; requested for his driver's license and registration.

Q And do you know whether or not there was -- was it only one person in the car?

A No. There was two.

Q Where were they seated in the car?

A The driver was the Defendant, Mr. Chargualaf and the front -- front right passenger was a Ms. Candelaria Mendiola.

Q Now, you just testified that the driver was the Defendant, Mr. Chargualaf.

A Yes, sir.

Q Are you sure of that?

A I'm positive.

**MR. FISHER:** Your Honor, for the record, in-court identification of the Defendant.

**THE COURT:** So ordered.

Q (By Mr. Fisher) What happened when you approached the vehicle?

A I requested for the driver's license and registration for the vehicle and I informed Mr. Chargualaf for the reason of the pull over, and he began to get his paperwork together and stuff. I noticed he was a little nervous at that time.

Q Did you have an opportunity to observe him?

A Yes, I did.

Q What is it that makes you say if he was a little nervous?

A When I started talking to him, I asked him his name, date of birth, stuff like that. And he was kind of stuttering and real hesitant about speaking. I noticed he was kind of like looking around my shoulder, you know, like, beyond where I was at, like as if somebody might be watching over, or something.

Q In your course of duties with the Guam Police Department, have you pulled over--? How many people would you estimate you've pulled over?

A Probably about five thousand (5,000).

Q Do you think--? Is it normal for people who are pulled over to be nervous?

A A little bit.

Q Was there anything, based on your personal experience and observation of pulling people over, anything unusual that you noted?

A Well, sometimes, you know, they'll stutter a little bit or they'll kind of hesitate when they talk. But when his hand was shaking like a leaf, and when he

began to look around me, like, you know, maybe somebody was either behind me that was approaching me from behind, or something, I started to become suspicious of, you know, his actions.

Q Do you know--? Did you ever identify who it was who was in the car with him?

A Yes.

Q Who's that?

A Candelaria Mendiola.

Q Now, you asked for his paperwork. What do you mean by that?

A His driver's license, vehicle registration, proof of insurance.

Q And did he give you those things?

A Yes, he did.

Q What happened next?

A I was kind of concerned for my safety so I called for a backup unit, and also requested from Mr. Chargualaf if there were any weapons or narcotics inside the vehicle.

Q Now, you said you called for backup. Did anyone respond?

A Yes. Officer Judd Santo Tomas, and later, Mercy Grino.

Q Based on your experience as a Guam Police Department officer, and your own you prosecute your business, is it normal for you to call for backup?

A Not unless I'm concerned for my safety.

Q Now, after you had asked about narcotics or weapons, what happened?

///

///

A He stated there wasn't anything in the vehicle for any weapons, you know, for my safety. And --

Q -- Now, what... I'm sorry. Go ahead.

A And he agreed.

Q Was he still in the car?

A Yes, he was. He was in the driver's seat.

Q How about Candelaria Mendiola?

A She was still in the passenger's seat.

Q And he agreed to the search?

A Yes, sir.

Q What happened?

A I...I knew Officer Santo Tomas was going to shortly arrive thereafter, so I requested for him and Ms. Mendiola to step out of the vehicle and to the front --

Q -- When you say him, were you referring to the defendant?

A Yes, Mr. Chargualaf. And I requested for them to step out of the vehicle and proceed to the front of the vehicle.

Q And what happened next?

A Mr. Chargualaf reached over with his right hand and place it on the window that was down, on the rail of the window, and he took his right hand and

stuck it inside the paneling of the door.

**Q** Officer, this vehicle, how far off the ground would you say he was seated?

**A** Maybe, like, three feet.

**MR. FISHER:** Your Honor, may I ask the witness to step down for purposes of an in-court demonstration?

**THE COURT:** Okay. Officer Dawson, you may step down.

(Witness Complies.)

**THE COURT:** Where do you want him to stand, the middle of the courtroom?

**MR. FISHER:** Yes, sir.

(Witness Complies.)

**Q** (By Mr. Fisher) Officer, I'm going to roll this chair, this grey chair, right into the well of the court. Now, I'm going to have a seat here. Could you tell me whether or not this is approximately...

**A** Approximately, yes.

**Q** ...how high the defendant was? How many feet off the ground would you say I was?

**A** Maybe about two (inaudible).

**Q** Two, two and a half? You got to speak up a little bit, sir, because --

**A** -- Oh, I'm sorry.

**THE COURT:** Can you get...can you just grab the

microphone there, Officer? Can you just...

(Brief Pause.)

**Q** (By Mr. Fisher) Again, sir, how...would you just estimate for the jury how high off the ground that is?

**A** About two, two and a half feet.

**Q** Now, sir, I would like you to imagine that I am the defendant in the driver's seat.

**A** Okay.

**Q** Did you approach...when you approached the car, where did you place yourself?

**A** I was standing slightly behind the driver so I can observe all his actions and...

**Q** Could you describe for the record as well as for the jury how far behind me you are?

**A** Approximately where I am now, about a foot behind you and to your left side.

**Q** To the left side. And...all right. Sir, now I'm going to ask you to demonstrate for the jury what it was the defendant did.

**A** Okay.

**Q** All right. Could you do that?

**A** Yes.

**Q** All right. Sir.

**A** When I requested for him to step out of the

vehicle, he took his right hand and where the rail is for the window, he placed his right hand on top of that, and then reached inside the panel. The corner of the panel was loose to the vehicle. So he reached inside of there and I heard some...some, like, metal clinking inside.

Q Now, could you see this action?

A No. I can only see that he had placed his hand underneath that panel in the door.

Q Okay. So you saw him actually put his hand down there?

A Yes.

Q Okay. What happened next?

A I inquired what he was doing and he stated that the lock was messed up in the car that he had to jimmy it to get it open. So I attempted to help Mr. Chargualaf by opening the car door from the outside.

Q And when you did that, what, if anything, happened?

A The door opened automatically and Mr. Chargualaf pulled it shut with his right arm that was resting on the window sill.

Q Now, Officer, are you certain that you were able to open that door?

A Yes, sir.

Q That it did swing open?

A Yes, sir.

Q And you say Mr. -- Your testimony was Mr. Chargualaf pulled it closed?

A That is correct.

Q Based on your observations of that, did he use force to pull it closed?

A Yes, he did.

Q What happened next?

A I demanded him out of the vehicle and I once again, I opened the door.

Q And then can you tell us what happened?

A Yes. He got out of the vehicle and him and Ms. Mendiola, they proceeded to the front of the vehicle. And I immediately made a check of the area that he was fumbling with underneath there to see --

Q -- I'm sorry. By this time, they had gotten out of the car?

A Yes, and to the front of the vehicle.

Q Sir, you can return to the witness chair.

(Witness Complies.)

(Brief Pause.)

Q You said earlier that you had called for back-up. Had any other police officers arrived at

this time?

**A** Not at that point.

**Q** They got out of the car, and your testimony was they went to the front of the car?

**A** That's correct.

**Q** Can you tell us what happened next?

**A** The area that he's fumbling where the door was, I pulled it back to see if there's any weapons inside there, and there wasn't at that time.

**Q** And what did you do next?

**A** I was waiting for Officer Santo Tomas, which right about the time I finished checking the door, he arrived and...and then I briefed him as to what had transpired up to that point.

**Q** Okay. Now, could you tell us what happened after that?

**A** Officer Santo Tomas, when I was explaining to him what happened, he showed me the flier that we had received in briefing that morning, basic description of the person that were involved in the robbery in the Tumon area.

**Q** Had you yourself actually seen that flier?

**A** Prior to.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving a prosecution exhibit?

**THE COURT:** Yes.

(Brief Pause.)

**MR. FISHER:** Excuse me just a moment, Your Honor.

(Brief Pause.)

**MR. FISHER:** Your Honor, I apologize for the delay. I was trying to find Prosecution 24.

(Brief Pause.)

**THE COURT:** Is that a picture?

**MR. FISHER:** It's a piece of paper, Your Honor.

(Brief Pause.)

**MR. FISHER:** Thank you, Your Honor. Your Honor, I've retrieved Prosecution Exhibit No. 24 for identification in which I'm showing to Mr. Timblin.

**Q** (By Mr. Fisher) Sir, this is 24 for identification. Would you have a look at that?

(Witness Complies.)

**Q** Can you tell us what that is?

**A** This is the APB bulletin that they had given to us in briefing that morning.

**Q** Is that a photocopy of that?

**A** Yes, it is.

**Q** Does that appear to be an accurate photocopy of that?

**A** To my recollection, yes.

**Q** Okay. So what happened?

A Then I became suspicious of, you know, possibly they were involved and that might have been the reason for Mr. Chargualaf's actions when I pulled him over. And I informed Officer Santo Tomas that Mr. Chargualaf had agreed to allow me to search the vehicle for any weapons or narcotics.

Q And did you do so?

A After Officer Santo Tomas also asked Mr. Chargualaf a second time to make sure he was a willing party and to which he did stated, you know, it was all right.

Q Sir, how many languages do you speak?

A Almost three.

Q What are those languages?

A I speak English, Japanese, and a little Korean.

Q Are you familiar with the Japanese way of writing?

A Yes, I am.

Q What is that called?

A There's three different forms. There's kanji, hirogana and katakana.

Q Which of those three forms are you familiar with?

A All three.

Q What happened?

A Well, when I began the search of the vehicle, I noticed Ms. Mendiola had left her purse inside the vehicle in the passenger seat in which she had taken with her a black pouch, a small black pouch.

Q Could you describe...I know you just described it a small black pouch, but is it one of those things people have on their waist?

A Yeah, like a waist pouch. And I became suspicious of that.

Q Why?

A Females usually will always keep their purse with them and, you know, if there's a second handbag or something, then they'll carry it. But the primaries, you know, on my experience, is they always carry their purse.

Q Okay. And so what did you do?

A I inquired from Ms. Mendiola if there were any weapons or narcotics inside the bag to which she stated no. And I requested if I could search it for any weapons at that time and she stated, "Sure," and she handed me the bag. And I opened it up and as soon as I opened it, I immediately noticed a card with a katakana inscription on the front.

Q Katakana, is that one of those...is that one

of the ways of Japanese writing?

**A** Yes, it is. It's the primary one for people's names.

**MR. FISHER:** Your Honor, at this time, may counsel approach?

**THE COURT:** Yes. Officer Dawson, can you step down, please?

(Witness Complies.)

(Side Bar Conference.)

**MR. FISHER:** I wanted to...Mr. Timblin informed me he will object to evidence of the ice use. I believe with the credit card, they also found a little plastic thing containing at least --

**THE COURT:** -- (Indiscernible) (indiscernible) of that, has he?

**MR. FISHER:** No, not...Randy hadn't...and this is from Candy Mendiola.

**MR. TIMBLIN:** This was in Candelaria. I would believe it's totally irrelevant. Obviously the card is relevant. This is not...just gives the...that... the whole thing, this is an ice thing, you know, and it...really irrelevant.

**THE COURT:** (Indiscernible) prejudicial.

**MR. TIMBLIN:** Basically, yes. I'd say they...

**THE COURT:** Prejudicial. What's...

**MR. TIMBLIN:** Way outweighs any relevant --

**THE COURT:** (Indiscernible - simultaneous speakers).

**MR. FISHER:** Well, this is just what was found in the purse. I wanted to bring it to the court's attention before I ask --

**MR. TIMBLIN:** -- Well, he could have found ten cents in the purse, but it wouldn't be relevant.

**THE COURT:** What's the credit card?

**MR. FISHER:** It's Ms. Certeza's credit card.

**MR. TIMBLIN:** Well, the credit card, I agree that's relevant. This is not.

**THE COURT:** Okay. I'll deny Exhibit 12 because it's highly prejudicial. I don't see the probative matter.

**MR. FISHER:** What about Officer Dawson? I'm going to ask him what he found in the pouch and I'd like to caution him that this is the court's ruling as well not to mention the ice --

**THE COURT:** -- Why don't you bring him forward.

(Officer Dawson Summoned to Bench.)

(Brief Pause.)

**THE COURT:** Okay. I'd like to inform you that Defense Exhibit 12 has been denied for exhibit, so that you don't mention anything...

**THE WITNESS:** No problem.

**THE COURT:** ...about the ice that you found in the pouch, okay?

**THE WITNESS:** Okay.

**THE COURT:** But other items you can mention.

**THE WITNESS:** Okay.

**MR. FISHER:** Don't mention the ice when I ask you about the pouch.

**THE WITNESS:** Okay.

**MR. FISHER:** Okay?

**THE WITNESS:** Okay.

**MR. FISHER:** Thank you, Your Honor.

**THE COURT:** You sit back here. That's it.

(End of Side Bar Conference.)

**Q** (By Mr. Fisher) Officer Dawson, you were mentioning the pouch?

**A** Yes, sir.

**Q** And did you...I'm sorry if you testified to this. Did you ask to look at it?

**A** Yes, I did.

**Q** What was Ms. Mendiola's response?

**A** When I inquired about the card that I had located, she stated that she found it and she was planning on turning it in to the police department.

**Q** Did she tell you where she found it?

**A** I don't recall.

**MR. FISHER:** Your Honor, at this time, I would request to approach for the purposes of retrieving the photo of the credit card.

**THE COURT:** Yes.

(Brief Pause.)

**Q** (By Mr. Fisher) Sir, I'm going to show you what's been admitted as Prosecution Exhibit 11. Would you have a look at that, please?

(Witness Complies.)

**Q** Can you tell us what that is?

**A** It's a Jack's Boutique Voice credit card.

**Q** Have you ever seen that credit card which is...you see that photo?

**A** Yes. This is the one that I pulled out of Ms. Candelaria's pouch.

**Q** Can you read to whom that credit card was issued?

**A** I'm familiar with the language, but I cannot read everything.

**Q** Okay. Is there anything...do you see anything printed in English?

**A** Just the Jack's card, the Jack's Boutique Voice. That's it.

**MR. FISHER:** Okay. Your Honor, we'll...I'll

approach for the purpose of retrieving the card, the photo of the card.

(Brief Pause.)

**Q** And that card was on Ms. Mendiola?

**A** It was in the pouch that she was carrying.

**Q** What happened next?

**A** We began our search of the...well, at that time, Ms. Grino had arrived. Officer Grino, and I requested for her to search the pouch further, and...

**Q** Do you know if she did?

**A** Yes, she did.

**Q** Was Officer Santo Tomas, was he still on the scene?

**A** Yes, sir.

**Q** Were you able to see him?

**A** Yes. He was observing Mr. Chargualaf at the time.

**Q** Can you tell us or tell the jury what it was you saw?

**A** At that time, I saw Officer Santo Tomas draw his firearm at that time, and pointed at Mr. Chargualaf and telling him to get down on the ground and lay with his hands flat on the ground.

**MR. FISHER:** Okay. Your Honor, with the court's permission, I'd like to use this white board.

**THE COURT:** Yes. How long is your direct going to take?

**MR. FISHER:** Probably another --

**THE COURT:** -- It's...another twenty minutes?

**MR. FISHER:** -- twenty minutes or so.

**THE COURT:** Okay. Is it a good time to break?

**MR. FISHER:** Yes, sir.

**THE COURT:** Okay. Why don't we take a luncheon break, recess. Again, I'd like to remind the jurors not to discuss this case with anyone, not to listen to any reports about this case, and not to do any independent research about this case.

We'll adjourn until...we'll come back at 1:45, okay? The court stands in adjournment.

*(Whereupon Court Recesses.)*

*(Back on the Record.)*

**THE COURT:** People of Guam versus Randy Ignacio Chargualaf, CF317-97. For the record, good afternoon. All twelve jurors are present, two alternates; defendant is present in court with his attorney, Mr. Timblin; Mr. Fisher is present representing the People.

I'd like to remind you, Officer Dawson, that you're still under oath, okay?

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. You may continue on your direct, Mr. Fisher.

**MR. FISHER:** Thank you, sir.

**Q** (By Mr. Fisher) Officer, before we took a break for lunch, I believe you told the jury that you saw Officer Santo Tomas in front of the vehicle?

**A** That is correct.

**Q** And this was at Paul's Plaza?

**A** That is correct.

**Q** Sir, if I were to give you a red pen, do you think you can just draw a rough diagram of the car as well as the buildings at Paul's Plaza?

**A** Sure.

**MR. FISHER:** Okay. May I, Your Honor?

**THE COURT:** Yes. Do you want to put the easel in the front?

**MR. FISHER:** Yes, sir.

(Brief Pause.)

**Q** (By Mr. Fisher) And, sir, I put this easel in front. I'm going to give you a red pen.

Your Honor, I'm doing this for demonstrative purposes and don't intend to introduce the easel as evidence.

**THE COURT:** Okay.

**(Witness Testifies and Demonstrates from Easel Board.)**

A Basically, Paul's Tailoring is...is this. And there's --

Q -- Could you write Paul's?

(Witness Complies.)

A Okay. And out in front of Paul's, is a... here is like a sidewalk. Okay. And then there's like parking stalls, okay. And then each of the parking stalls, there's like another little concrete... a little parking curb.

Q Can you write curb on one of those?

A Yeah.

(Brief Pause.)

A Curb. And then the vehicle is parked not totally in. There's a few feet away from the area there facing this direction.

Q And could you write car or vehicle in that?

(Witness Complies.)

Q Okay. Sir, does that diagram that you've drawn, does that depict where the car that's in the photo was?

A Yes.

Q And because we're recording this and you're kind of standing away from (indiscernible), maybe (indiscernible).

(Brief Pause.)

Q Okay. What did you see happen between the defendant and Officer Santo Tomas?

A Okay. I was standing approximately in this area right here.

Q Could you write a "D" for Dawson?

A Okay. I was here. Mr. Chargualaf was up towards the front of the vehicle right here.

Q And could you, like, put a "C"?

A C.

Q Okay.

A Okay. Officer Santo Tomas was here on the sidewalk. And...and I observed Officer Santo Tomas draw his firearm on Mr. Chargualaf. I didn't know what was going on at the time. And he told Mr. Chargualaf to lay down on the ground and, you know, not to move.

Q Okay.

A And he told me to secure Mr. Chargualaf with handcuffs and pat him down for weapons.

Q Did you do that?

A Yes, I did.

Q Okay. Did you find any weapons?

A Not on him, no.

Q Okay. Thank you, sir. You can go ahead and resume your seat.

(Witness Returns to Witness Stand.)

**Q** Officer Dawson, what happened next?

**A** Officer Santo Tomas...after I secured Mr. Chargualaf, Officer Santo Tomas told me that he had located a firearm in between the sidewalk and the curb directly in front of the vehicle.

**Q** Did you ever see that firearm?

**A** Yes, I did.

**MR. FISHER:** Your Honor, may I approach for the purpose of retrieving a photograph?

**THE COURT:** Yes.

**MR. FISHER:** Thank you.

(Brief Pause.)

**Q** (By Mr. Fisher) Sir, I'm going to show you what has been marked Prosecution Exhibit 9 for identification which I'm showing to Mr. Timblin. And, Officer, could you have a look at 9 for identification, please?

**A** Yes, sir.

**Q** And do you recognize what is depicted there?

**A** It appears to be the same firearm that I saw the same day in question.

**Q** Does it appear to be in the position it was when you saw it?

**A** Yes, sir.

**Q** And is that over at Paul's?

**A** Yes, sir.

**MR. FISHER:** Your Honor, at this time, the People will offer 9 for identification into evidence, ask the words "for identification" be stricken.

**THE COURT:** Any objections?

**MR. TIMBLIN:** No objection.

**THE COURT:** Okay. So ordered.

**MR. FISHER:** And, Your Honor, if I may retrieve, I believe it is People's 1, People's 1 for identification. Mr. Timblin.

**Q** (By Mr. Fisher) Sir, would you have a look at that? That's a handgun, isn't it?

**A** Yes, it is.

**Q** Could you compare the handgun that you see in People's 9 with the one you are holding? By the way, that is unloaded. People's 1 for identification.

**A** Appears to be the same one.

**Q** All right. Thank you. And I'll go ahead and retrieve People's 1 for identification as well as Prosecution 9.

(Brief Pause.)

**Q** What happened next?

**A** I then took Mr. Chargualaf to the patrol vehicle and I verbally informed him of his Miranda

rights, Constitutional rights.

Q Okay. Did you ever speak to him?

A Yes. I inquired about the firearm to which he claimed he had no knowledge of.

Q What happened after that?

A Officer Grino had informed me that she had spoke to Ms. Mendiola about the firearm and she had stated that --

**MR. TIMBLIN:** -- Objection; hearsay.

**MR. FISHER:** Your Honor, it's not offered for the truth; merely, the impact on the listener and what they did subsequently with the gun.

**THE COURT:** Overruled.

Q (By Mr. Fisher) What happened, sir?

A She informed me that Ms. Mendiola had saw -- or she had seen Mr. Chargualaf place the firearm in front of the vehicle, at which time, I inquired from Mr. Chargualaf if he had a proper firearms I.D. card.

Q And what was his response, if any, sir?

A He didn't have any; no registration for the firearm, no firearms I.D. card.

Q And was that information that he gave you?

A That is correct.

Q That's the defendant?

A Yes, sir.

Q What did you do next, Officer?

A I then informed him that he was under arrest for the possession of the firearm and without firearms I.D. card and no firearm registration and a concealed firearm.

Q Did you ever discover in the course of your investigation where the defendant was living?

A Living?

Q Living on that day.

A Oh, yes. At the Golden Motel in Tamuning. When we conducted a search, we had located a key for the hotel inside the vehicle.

Q Now, based on that knowledge, did you do anything?

A Yes. I...I informed Mr. Chargualaf I suspected him of the robbery and I had inquired if it would be okay to search the hotel room in reference to that since he did state that that's where he was currently residing.

Q And what was his response?

A He gave me permission to.

Q What happened next?

A We later went to the hotel, made a check of the hotel. I located a baseball cap, some miscellaneous jewelry.

Q All right. And where...do you recall where at the hotel it was you located these things?

A It was in the hotel room. The exact positioning, I don't recall.

Q Was there any other place at the Golden Motel that you searched?

A Later on in the afternoon, I did.

Q And where was that?

A That was the trash bin located behind the hotel.

Q Why is there...why did you go to the trash bin?

A Well, after we had taken everybody to the precinct, Officer Grino had informed me that after the robbery had happened, they had ditched the purse in the trash bin located behind the Golden Motel.

Q Okay. And based on that information, what, if anything, did you do?

A Well, I proceeded down, made a check of the trash bin, in which located...I located a multi-colored brown purse.

Q Can you tell the jury where the Golden Motel is located at?

A On Route 14 or in Tamuning. It's the best way. Like, if you're coming from I.T.C. towards Tumon

before you get to the loop, it's on the left hand side. There's, like, Dado's Video and DeJima area, right around in there.

**Q** Okay. And what, if anything, did you discover in the dumpster?

**A** I located a purse. It was, like, a brown leather with some multi-colored markings on it and inside of the purse, I located several documents belonging to Ms. Noboyo Certeza.

**MR. FISHER:** Your Honor, may I approach --

**THE COURT:** Yes.

**MR. FISHER:** -- for the purpose of retrieving some photographs? Thank you.

(Brief Pause.)

**MR. FISHER:** Your Honor, I retrieved Prosecution's Exhibit 14 and 13, which I think have already been admitted into evidence.

**THE COURT:** Yes.

**Q** (By Mr. Fisher) Sir, I'm going to show you Prosecution Exhibit 14 and 13. Could you identify what's depicted in this?

**A** Yes. This the purse I located in the dumpster with a Japanese driver's license and the passports that I found for Ms. Certeza.

**Q** Okay.

(Brief Pause.)

Q After...or prior to doing the search in the trash bin, did you ever pat down the defendant in this case?

A Yes, I did.

Q What, if anything, did you find?

A I located in one of his pockets, it was a white envelop that had, like, miscellaneous money that was wrapped up inside of it. Plus, in another pocket, he had some separate cash that was just, like, folded up in his pocket.

Q Okay. Could you describe the envelop, please?

A It was a white paper envelop. It was slightly torn open so you can kind of see inside. You could see the bills were wrapped. On the front was a marking Taitague Sales, if I remember correctly. It was in green ink.

Q Okay. Now, I'd like to focus in the afternoon of the 21st of July. Did you ever see the victim in this case, Ms. Noboyo Certeza?

A Yes, sir.

Q Where did you see her?

A At the Tamuning Precinct.

Q What happened when you saw her?

**A** When I saw her, I was going to relinquish the property as far as the purse and the original credit card that we had located earlier in the evening -- earlier in the morning, excuse me. I didn't know that the envelop was her property, so it was sitting on the table faced down and when she came in to sign for the purse, she looked at the envelop and she says, "That's my money." And she says, you know, the bills, the way that they were wrapped, she explained and, you know, but I know that she saw it, so I didn't think too much of it until she says, "If you turn it over, it says Taitague Sales on the front," and when I did turn it over to check, sure enough, it did say that.

**Q** Okay. Sir, so based on your recollections, the words Taitague Sales were not visible?

**A** No, not at all when it was faced down.

**MR. FISHER:** And, Your Honor, if I may, I'd like to approach for the purpose of retrieving some custody records.

**THE COURT:** Yes.

**MR. FISHER:** Thank you. And, Your Honor, I've retrieved Prosecution Exhibits 28 and 26 for identification. I'm showing those to Mr. Timblin.

(Brief Pause.)

**MR. FISHER:** If I may approach the witness, Your

Honor?

**THE COURT:** Yes, you may.

**Q** (By Mr. Fisher) Sir, I'm showing you 26 and 28. Are those GPD chain of custody reports?

**A** Yes, sir.

**Q** Do you see your name written anywhere on those?

**A** Yes, on the confiscating officer's list.

**Q** What do those documents show was confiscated?

**A** In the first one, there was the Jack's Boutique credit card that was relinquished by Ms. Candelaria Mendiola.

**Q** And do you know what eventually happened to that Jack's Boutique credit card?

**A** Yes. It was photographed and released back to Ms. Certeza.

**Q** What does the other document show?

**A** The other document is a custody receipt for the aforementioned purse that I had located in the trash bin behind the Golden Motel.

**Q** And it's identified there?

**A** Yes, sir.

**Q** Do you recall...what did you do with the money after she identified the envelop?

**A** Officer Santo Tomas, since I had a larger

amount of confiscations and I was handling Mr. Chargualaf, he took care of the confiscation of the...the money in the envelop.

**Q** Okay. All right. And just a couple more questions, sir, and, Your Honor, I'm going to retrieve Prosecution Exhibit 11.

(Brief Pause.)

**Q** And, sir, is this...again, is that the photograph of the credit card?

**A** Yes, it is.

(Brief Pause.)

**MR. FISHER:** Thank you very much, Officer. Your Honor, I have no further questions.

**THE COURT:** Mr. Timblin, on cross examination?

**MR. TIMBLIN:** Thank you, Your Honor.

**CROSS EXAMINATION**

**BY MR. TIMBLIN:**

**Q** Officer, I believe you indicated that you... Mr. Chargualaf first came to your attention because he was driving a car that had a cracked windshield and a missing front plate, is that correct?

**A** That is correct.

**Q** Okay. And then you further indicated that after you pulled him over for this, you asked for his license and registration?

**A** That is correct.

**Q** Did he produce a valid Guam driver's license?

**A** Yes, he did.

**Q** Did he produce a registration that matched up with the vehicle?

**A** Yes, he did.

**Q** Is it normally then standard procedure, sir, that once she's produced the registration and license, to write him a ticket and send him on his way?

**A** Well, until I start feeling fear for my personal safety, then our standard procedures are... we alter them a little bit to secure any weapons that might be in the vehicle or on the person to...you know, for officer safety.

**Q** Of the five thousand stops that you made in your career, sir, how many times have you gone beyond just writing a ticket and sending him on the way?

**A** Maybe, like, three or four hundred.

**Q** So what is the standard procedure if you find yourself...if you find yourself in concern, feeling concerned for your safety, what do you normally do?

**A** Well, there's not a written standard procedure.

**Q** What do you normally do?

**A** Well, if I feel fear for my safety, I'll...

usually I'll call for back-up and request to search the vehicle or pat the person down for any weapons.

Q Okay.

A And depending on their response is where I go from there.

Q And are you aware that under certain circumstances, you do have the power to detain somebody briefly and to do a pat-down for weapons?

A That is correct.

Q And when you first ask Mr. Chargualaf to exit the vehicle, did you pat him down?

A Not at that time, no.

Q Okay. And the first time you saw a gun was when you saw it laying on the curb later on?

A That is correct.

Q And then obviously if you hadn't patted him down, you wouldn't know for sure whether or not he had the gun on his person, would you?

A That is correct.

Q Now, again, we're dealing with a traffic (indiscernible), correct?

A (No audible response.)

Q Okay. So can you tell us what does having a cracked windshield and a missing front plate have to do with whether somebody might have guns or weapons in

the vehicle?

**A** It was Mr. Chargualaf's reactions when I talk to him. He was very nervous and just the way that he's reacting was above and beyond the normal nervousness of a person I pull over.

**Q** And that caused you to ask him about drugs, I guess?

**A** That gave me reasonable suspicion to believe that there was further crime being conducted that I was unaware of at the time, yes.

**Q** Now, as to...can we have the chair back briefly?

**THE COURT:** You want Officer Dawson to step down?

**MR. TIMBLIN:** Yes.

**THE COURT:** Officer, please, step down.

**THE WITNESS:** Okay.

(Witness Complies.)

**Q** (By Mr. Timblin) If you would have a seat and again pretend that, I guess, you are Mr. Chargualaf. (Indiscernible) (indiscernible) on direct examination.

Where...at what...you were about to get right here, roughly about a foot behind him?

**A** That is correct.

**Q** And where is the window level would you say?

**A** About so...almost (indiscernible).

**Q** The shoulder to (indiscernible)?

**A** Well, I don't know. It is about shoulder (inaudible).

**Q** I see. Okay. And does the car kind of like curve in a little bit like this for the roof?

**A** The vehicle?

**Q** Yes, the vehicle; shape of the vehicle (inaudible), (inaudible) (inaudible).

**A** A little bit.

**Q** Okay. So if you stood behind him, you could pretty much see where (indiscernible) inside?

**A** Until he leaned over like this, was reaching under, then I could not see any longer because his body was blocking my view as to where his hand was and what he was doing.

**Q** Did you see him reach under a...the door panel?

**A** Yes.

**Q** You could see that?

**A** I can see when he first reached in and then he leaned over like this (demonstrating), and then I could no longer see.

**Q** I see. And...okay. Thank you. Resume your...

(Witness Complies.)

**Q** I believe you indicated that you may have... you also reached under the panel at some point, too?

**A** After he exited the vehicle.

**Q** Okay. And what did you find, if anything, under there?

**A** Nothing.

**Q** Was there any kind of grease or anything from mechanism that got on their hands from --

**A** -- No.

**Q** May I approach the board?

**THE COURT:** Yes.

**Q** Officer, I'm going to show you what's been marked as Government Exhibit 9 again. This (indiscernible) show a gun against a parking curb, is that correct?

**A** That is correct.

**Q** Okay. Does it show what side of the curb is it facing, is it facing toward the car, is it facing toward the Paul's Plaza Building, if you know?

**A** According to this picture, you cannot... it's hard to tell. It's not clear in the photograph which side is which.

**Q** All right. So can you tell us which side, (indiscernible) maybe go to the board and tell us

where the gun was.

**A** Okay.

**Q** (To the Prosecutor) Would you (indiscernible) view?

**MR. FISHER:** No.

**THE WITNESS:** Right against the curb directly in front of the vehicle.

(Brief Pause.)

**Q** (By Mr. Timblin) Now, at what point did you learn from...okay. First off, you didn't...you hadn't seen this flier about the robbery the night before, had you?

**A** No. I had seen it in briefing that morning.

**Q** Okay. You hadn't made a connection at that point, though?

**A** Not until Officer Santo Tomas had told me.

**Q** Okay. Now, when was that, at what point in this proceeding did Officer Santo Tomas say, "Hey, this matched."?

**A** When did he mention the flier?

**Q** Yes. At what point while this was going on?

**A** Oh, this was when he first arrived. He noticed that Ms. Candelaria Mendiola, kind of young, Mr. Chargualaf, fit the brief description that was given. And when I told him about the reactions of

Mr. Chargualaf when I asked for a driver's license and stuff, he stated that they might possibly be the people involved. And then when I reviewed the flier, they basically fit the similar description to the people in the flier.

**Q** And you believe they were similar?

**A** What's that?

**Q** Do you believe they were similar, these two?

**A** Similar, yes.

**Q** Okay. I'm showing you what's been marked as Government's Exhibit No. 24. Could you just read the description of the suspects that was on here?

**A** Sure. Female Guamanian, 12 to 15 years of age, slim build, shoulder length black hair, black blouse with silver linings on sleeves, black shorts. Female Caucasian, 30 plus years, 5'6", medium build, dirty blonde hair, white shirt, black shoes, unknown pants. Male Guamanian, 30 years, 5'8", medium build, mustache, black hair, black baseball cap, light green shirt.

**Q** Now, first of all, there's a description for three people. There was no female Caucasian present, was there?

**A** No.

**Q** Okay. Now, there's a description of a black

baseball cap. Was Mr. Chargualaf wearing a black baseball cap?

**A** Not at the time, no.

**Q** To your knowledge, was he wearing a light green shirt?

**A** I don't recall.

**Q** So basically you had a young Chamorro female and a thirty something Chamorro male and you felt those match the description?

**A** I guess that it is a bit...it is very brief description and, yes, they did fit the profile for the people that were mentioned.

**Q** And how many other Chamorro couples, do you think, would fit the description?

**A** Traveling together? A percentage. I wouldn't say a large percentage, but a percentage.

**Q** So for sure nothing unusual?

**A** (No audible response.)

**THE COURT:** Was that a yes or no? Was that a question?

**MR. TIMBLIN:** Yes, that was, yes.

**Q** (By Mr. Timblin) So there was nothing unusual about that in itself?

**A** No.

(Brief Pause.)

Q Now, I believe you testified about your curiosity about Candelaria Mendiola leaving her purse in the car, but getting...taking the bag out with her, is that correct?

A That is correct.

Q Where was she when you asked her to look into the bag?

A She was on the sidewalk to...if you're looking at the picture, on the left side of the vehicle.

Q (Indiscernible).

A Or, that...that was later.

Q When?

A 'Cause I had...originally, I had Mr. Chargualaf here, Ms. Mendiola here, okay? And when I was making a check of the vehicle, Officer Santo Tomas and Ms. Mendiola over here on the sidewalk. And I believe Mr. Chargualaf was in the same spot. He had separated the two so they wouldn't talk. And that's when I noticed the bag was here, so I went over here and inquired from her.

Q Okay. So by...before you got to talking with her about this bag, she had already got out of the car, come around here, stood there for a while, walked over here?

A That's correct.

Q Okay. And you weren't watching her the entire time, were you?

A No.

Q You were kind of busy with Mr. Chargualaf looking into the vehicle?

A That is correct.

Q Okay. Thank you. And the credit card that you found, this Jack card, that was in her bag?

A That is correct.

Q No indications of Mr. Chargualaf's possession?

A Nope.

Q And is it correct that Mr. Chargualaf denied any knowledge of the credit card and the pistol when you found him?

A That is correct.

Q You indicated that you learned that Mr. Chargualaf was residing at the Golden Motel. Did you also determine whether or not Candelaria Mendiola had been residing there, too?

A Mr. Chargualaf said he was staying...that he was staying there. I inquired whose hotel room it was and to which he stated it was his. I did not inquire if Ms. Candelaria was staying there or had been there,

no, I did not.

Q You don't know one way or the other (indiscernible)?

A No.

Q So it's also correct that the envelop, the one with Taitague Sales on it, with the money, you did not handle that, is that correct?

A I had removed it from his pocket, but I was not the confiscating officer.

Q What did you do -- how long did you have it in your possession, from when to when?

A Maybe about ten minutes at the most.

Q And what did you do, how did you dispose of it; who did you give it to?

A When I patted down Mr. Chargualaf, I took everything he had. If there was a...you know, anything of value, I place it all on the table so it could all be inventoried. And...

Q Well, let me back up. You say ten minutes. There's only ten minutes from the time you... What you did is pat down at the station or --

A -- Yeah, at the station when I did a full pat down on him.

Q I see. So you took it out, put it on the table, and Officer Santo Tomas had... You also you

indicated you found some other money in another pocket?

A Yes, sir.

Q How much was that?

A I believe it's somewhere around a hundred and twenty dollars maybe.

Q And what happened to that, if you know?

A That should have been confiscated along with the envelop, the Taitague Sales.

Q Did you confiscate it?

A No, I did not.

Q Do you know if somebody else did?

A It should have been with that, with the Taitague Sales. All that money that was supposed to be confiscated was supposed to be all in one...I put it all together 'cause, like I said, I didn't know if Mr. Chargualaf owned it. I didn't...I didn't --

Q -- I understand. But to your knowledge, do you know what happened to it?

A It was confiscated.

Q By somebody?

A Yeah.

Q Do you know who?

A I believe Officer Santo Tomas.

Q Getting back to the chair, although, please,

stay seated...

**A** Okay.

**Q** ...you said that Mr. Chargualaf was reaching at the door that...in the door panel. Was the door closed while this was all going on?

**A** Yes.

**Q** Okay. So doesn't the door panel kind of go below the seat on any vehicle?

**A** He bent it.

**Q** He what?

**A** He bent it.

**Q** How much space was there between the seal where the door panel rubber would be when it was manufactured and the slide of the seat?

**A** I don't recall. Average is about six to eight inches maybe.

**Q** Eight inches. You're saying he managed to bend the whole thing up and actually...you know, bend it up and then between the seat and...

**A** Yes.

**Q** ...and somehow he was also able to get his hand down there?

**A** Yes.

(Brief Pause.)

**MR. TIMBLIN:** Thank you. No further questions.

**THE COURT:** On redirect, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor. I'm going to retrieve Prosecution Exhibit 28 for identification.

(Brief Pause.)

**MR. FISHER:** And I'm going to show the officer what is going to be marked Prosecution Exhibit 29 for identification and I'll show that to Mr. Timblin.

(Brief Pause.)

**REDIRECT EXAMINATION**

**BY MR. FISHER:**

**Q** And, sir, I'm going to approach you with Prosecution 29 for identification.

**UNIDENTIFIED SPEAKER:** That'll be now 29.

**Q** 29. Sir, what is that?

**A** This is the...some of the stuff that was confiscated at the Golden Motel.

**Q** Does your name appear anywhere on there?

**A** Yes, sir.

**Q** Sir, do you...by looking at Prosecution 29 for identification, does it indicate that you ceased or took a hat of any sort?

**A** Yes. It was a black baseball cap.

**Q** Does it have any markings on it according to the...

**A** Yes. No Fear.

**MR. FISHER:** And, Your Honor, if I may approach to retrieve Prosecution Exhibit No. 2 for identification and I'll show that to Mr. Timblin.

**THE COURT:** Yes. Okay.

(Brief Pause.)

**Q** (By Mr. Fisher) Sir, this is Prosecution Exhibit 2 for identification. What is that?

**A** This is the hat that I confiscated during that...at the hotel.

**Q** Does it have any writing on it?

**A** Yes.

**Q** What color is it?

**A** It's black.

**Q** What does the writing say?

**A** No Fear.

**Q** And is that hat in the same or substantially the same condition it was in when you got it from the hotel?

**A** Yes.

**Q** And whose room at the Golden Motel was it?

**A** Mr. Chargualaf's.

**Q** All right.

**MR. FISHER:** Your Honor, at this time, the People would move 2 for identification into evidence.

**THE COURT:** Any objections, Mr. Timblin?

**MR. TIMBLIN:** (No audible response.)

**THE COURT:** So ordered.

**MR. FISHER:** Thank you.

**Q** (By Mr. Fisher) Officer, based on your training and experience, are you allowed to ask a person to step out of a car during a traffic stop?

**A** Yes.

(Brief Pause.)

**Q** I'd like to ask you just a couple more questions in follow-up to Mr. Timblin's on the door panel. You said that it was bent up?

**A** Yes.

**Q** Sir, have you worked on cars?

**A** Sometimes, yes.

**Q** Do you have an opinion as to...are you familiar with the Nissan Sentra automobile brand?

**A** Yes, I am.

**Q** Do you have an opinion or do you know for Nissan Sentra models what that door frame...what do you call that material, the siding or...

**A** The panel?

**Q** The panel. What is it made of?

**A** Usually it's like a press board. It's real pliable. The reason is because it has to fit the curve of the door and, you know, what, speakers or

whatever else is behind it.

**Q** So is it flexible material in your opinion?

**A** Very.

**MR. FISHER:** Thank you. I have no further questions.

**THE COURT:** Any other questions on cross?

**MR. TIMBLIN:** No recross.

**THE COURT:** Okay. Officer Dawson, you may step down. Thank you very much.

**THE WITNESS:** Thank you, sir.

(Witness Excused.)

**THE COURT:** Your next witness, Mr. Fisher.

**MR. FISHER:** Your Honor, the People call Officer Jerome Santo Tomas.

(Brief Pause. Awaiting Witness.)

**THE CLERK:** Raise your right hand. You do solemnly swear that the testimony you'll give this court and jury in this case now on trial shall be the truth, the whole truth and nothing but the truth, so help you God?

**THE WITNESS:** I do.

**THE FOREPERSON:** Please, be seated and state your full name.

**MR. TIMBLIN:** Your Honor, may we approach the bench?

**THE WITNESS:** Jerome Edward Duenas Santo Tomas.

**THE COURT:** Okay. Officer, can you, please, just step down for a second? Thank you.

(Witness Excused.)

**THE COURT:** Yes?

**MR. TIMBLIN:** Just as a precautionary measure, I believe this is the witness, according to his report, he says that he once asked Mr. Chargualaf, "Where is the ice?" And Mr. Chargualaf said, "I don't have any. Boy, I sure wish I did." I believe that's one of the (indiscernible) excluded on my motion so we're not going to get into that, I trust.

**MR. FISHER:** Right. I've already cautioned him we're not talking about any ice that --

**THE COURT:** -- Okay.

**MR. TIMBLIN:** Okay. (Inaudible.)

(End of Side Bar Conference.)

**THE COURT:** Okay. Have a seat, Officer.

(Witness Complies.)

**THE COURT:** Okay. You may proceed, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor.

JEROME E. D. SANTO TOMAS,

called as a witness by the People, being first duly sworn, testified on his oath as follows:

//

**DIRECT EXAMINATION**

**BY MR. FISHER:**

Q Sir, where are you currently employed?

A Guam Police Department.

Q And how long have you been with the Guam Police Department?

A I was hired December 31st, 1991.

Q Sir, were you with the Guam Police Department in June of 1997 -- or excuse me, July of 1997?

A Yes, sir.

Q What division or section were you attached to?

A I was assigned at CATT, Tamuning/Tumon Precinct.

Q Is that the Crimes Against Tumon Tourists Section?

A Yes.

Q I'd like to refocus your attention on July 21st of 1997. Were you on duty that day?

A Yes, I was.

Q And, sir, did you assist an Officer Dawson in a traffic pull-over at Paul's Plaza Center area?

A Yes, sir.

Q And was that here on Guam?

A Yes, sir.

**Q** And you did respond?

**A** Yes, sir.

**Q** What did you see...if you will tell the jury, please, what it was you saw when you responded?

**A** When I got there, Officer Dawson was searching the vehicle, a black Nissan Sentra. As a female individual was standing outside the driver door, which was closed, Officer Dawson was leaning in the open passenger door with the defendant. He was standing directly behind him.

**Q** Okay. If I ever show you a photograph, do you think you would recognize the car?

**A** Yes, sir.

**MR. FISHER:** And, Your Honor, with the court's permission, I will retrieve certain photographs.

**THE COURT:** Yes.

(Brief Pause.)

**Q** (By Mr. Fisher) And, Officer, I'm going to show you what's been marked Prosecution Exhibits 4, 6, and 7. Would you have a look at those, please?

(Brief Pause.)

**Q** Do you recognize what's depicted in those pictures?

**A** Yes. This would be the vehicle that Officer Dawson was searching.

**Q** Were you in a patrol car that day?

**A** No, sir.

**Q** What were you riding, if anything?

**A** A GPD issued police motorcycle.

**Q** Now, after you arrived at the scene and you saw the defendant, the female and Officer Dawson, what happened when you got there?

**A** When I got there, I was -- I asked Officer Dawson exactly what was going on. He was apparently searching the vehicle for weapons and/or drugs. At that time, I asked if he obtained consent for that search from the driver. I asked who was the driver. Mr. Chargualaf said that he was.

**Q** And did he...did this individual tell you he was?

**A** Yes.

**Q** Do you see that person in the courtroom today?

**A** Yes, sitting on the defendant table.

**Q** Can you describe his shirt for us, please?

**A** A black and white shirt, diamond...diamond pattern on the front.

**MR. FISHER:** And, Your Honor, we'd ask that the court take note of an in-court identification.

**THE COURT:** Okay. So ordered.

**Q** (By Mr. Fisher) Okay. And what was it that the defendant told you?

**A** Yes, that he was in fact the driver and that a search was given.

**Q** Okay.

**A** I asked him -- I then in turn asked him if I could search.

**Q** And what was his response?

**A** Go for it.

**Q** And did you do so?

**A** Yes, sir.

**Q** And were you...did he search the inside of the car?

**A** Yes, sir.

**MR. FISHER:** All right. And, Your Honor, if I can, I'll retrieve some more photographs?

**THE COURT:** Yes.

(Brief Pause.)

**MR. FISHER:** And, Your Honor, I have retrieved Prosecution Exhibit 8 for identification and Prosecution Exhibit 5 for identification and I'll show this to Mr. Timblin.

**Q** (By Mr. Fisher) Sir, I'm going to show you Prosecution Exhibit 8 for identification. Can you identify that?

A Yes.

Q What is that?

A It's a jewelry box.

Q And do you know where that photograph was taken?

A This is as it was sitting inside the front of the vehicle. These jewelry boxes were found in the back of the passenger seat.

Q Okay. And was that the same car that we were just talking about?

A Yes, sir.

Q And, Officer, if I can, I'm going to back up a little bit and show you Prosecution Exhibit 5 for identification. What's that?

A That's his vehicle and my bike.

Q Does that photograph fairly and accurately depict the scene as it was that early afternoon on the 21st of July?

A Yes. If you can even look in this photo, you can see my reflection in the window.

Q Okay. And, sir, I'd like to go back... I'm sorry. I forgot what...I think it was eight. Yes, Prosecution's 8 for ID. Was that -- does that fairly and accurately depict that jewelry box and where it was located in the car on that afternoon?

**A** Ye -- this was taken...the jewelry box itself?

**Q** Huh-hum.

**A** Was found behind the passenger seat. This was after it was searched.

**Q** Okay. Do you know why that...is that the same jewelry box that was in the car?

**A** Yes.

**Q** Do you know why it is now on the chair there?

**A** Yes. This was after the search, after we had searched the jewelry box itself.

**Q** Okay. But is that the jewelry box?

**A** Yes, sir.

**Q** And is that inside the car?

**A** Yes, sir.

**MR. FISHER:** Your Honor, at this time, the People would offer 5 and 8 for identification into evidence and ask that the words "for identification" be stricken.

**THE COURT:** Any objections, Mr. Timblin?

**MR. TIMBLIN:** I would object to the one about the jewelry box on relevancy grounds, but the other one, no.

**THE COURT:** What's the grounds for the jewelry box?

**MR. TIMBLIN:** So far no relevancy whatsoever for this jewelry box.

**THE COURT:** What's the relevancy?

**MR. FISHER:** Your Honor, it shows the interior of the car where the search took place. It's the *corpus delicti*. This is where the individuals were found when the initial search took place.

**MR. TIMBLIN:** And I guess it doesn't add or subtract anything. I'm just saying I don't see what the jewelry box has to do with anything.

**THE COURT:** What's the relevancy of the jewelry box?

**MR. FISHER:** May I approach, Your Honor?

(Brief Pause.)

**THE COURT:** You haven't answered the question.

**MR. FISHER:** Your Honor, it shows the interior of the car where they did the search.

**THE COURT:** Has it been established who owns it?

**MR. FISHER:** No, sir. It was just in the car.

**THE COURT:** What's the other one? Let me see.

(Brief Pause.)

**THE COURT:** Okay. The court will deny Exhibit 8 then, lack of relevancy; and admit 5, okay?

**MR. FISHER:** (Indiscernible).

(Brief Pause.)

Q (By Mr. Fisher) And, Officer, are you the one who actually conducted the search of the interior?

A I along with Officer Dawson.

Q What, if anything, did you notice what was going on while you're doing the search? Did you look around?

A Yes, sir. When I first got there, the female, Candelaria, later identified as Candelaria, appeared very nervous. Mr. Chargualaf, while we were searching the vehicle, kept on pacing up and down between...on the adjacent stall from the front end of the vehicle to the back end of the vehicle. Both of them appeared very nervous. As for why, I couldn't figure it out right then and there.

Q What were these things that suggested to you that they were nervous?

A That the...their inability to remain still, them having to constantly move up and down.

Q And in response to seeing that, did you do anything?

A I'm sorry?

Q Did you do anything when you saw them acting nervous?

A Yes. I inquired as to why they were so nervous. No real excuse was provided.

**Q** Did you direct them...to the best of your recollection, did you direct them to do anything?

**A** Not at that time, no.

**Q** What happened next?

**A** After I asked Mr. Chargualaf for the search and not finding any weapons, I got up and I was watching Officer Dawson complete his search.

**Q** Okay. And then what happened?

**A** At that time, that's when I realized that the two had fit the description of a flier of two suspects of three of an incident the night before.

**Q** Do you recall where you learned of that incident?

**A** There was a flier that was passed out that... upon reporting for duty summarizing a home invasion robbery.

**MR. FISHER:** All right. Your Honor, may I approach for the purpose of retrieving Prosecution Exhibit 24?

**THE COURT:** Yes.

(Brief Pause.)

**Q** (By Mr. Fisher) And, sir, I'm going to show you what's been marked 24 for identification. Would you have a look at that, please?

(Witness Complies.)

**Q** And could you tell the jury whether or not you recognize that?

**A** Yes.

**Q** What is that?

**A** This is the flier that I just mentioned.

**Q** And is that the one that you saw on the 21st?

**A** Yes, sir.

**MR. FISHER:** Your Honor, at this time, the People would offer Prosecution Exhibit 24 for identification into evidence.

**THE COURT:** Any objection?

**MR. TIMBLIN:** No, no objection.

**THE COURT:** So ordered.

**Q** (By Mr. Fisher) Could you read 24, please, to the jury?

**A** Yes, sir.

(Witness Reads as Follows.)

*The header: Tumon/Tamuning Precinct Wanted Bulletin. Reference to home invasion robbery Case No. 97-17453. Dated July 20, 1997.*

*Location of the event was 105 Katetsu Apartments in Tumon, the rear side of Alcanta Mall at 10:05 P.M.*

*MO, mode of operandi: Entry is gained using the emergency distress play. Suspect number*

*one knocked asking for help when the victim opened the door. Suspects one and two then asked to use the telephone. Victim went to get the telephone and upon her return -- or and upon return, noticed suspect three holding a black color firearm. While all suspects were inside, suspect three instructed the victim to give the money in which one hundred and twenty dollars was relinquished. Suspects' identification. The first suspect, female Guamanian, 12 to 15 years of age, slim build, shoulder length black hair, black blouse with silver lining on sleeves and black shorts. The second suspect, female Caucasian, 30 plus years, 5-6, medium build, dirty blonde hair, white shirt, black shoes, boots, unknown pants. The third suspect, male Guamanian, 30 plus years, 5'8", medium build, mustache, black hair, black baseball cap, and light green shirt.*

**Q** Now, based on that information you had received and the fact that you had seen this flier, what, if anything, did you do?

**A** I...once I realized that the two had fit the description of the two in this flier, I announced

this to Officer Dawson when, immediately after announcing that, that was audible now, immediately after announcing that, both of Candelaria and Mr. Chargualaf immediately looked at each other. And right after that, they looked at my feet.

**Q** All right. And where were you standing at this time?

**A** Basically on top of the gun that I had found.

**Q** Okay. What happened?

**A** Right when they looked at my feet, I looked down and I saw a gun -- or a gun right there up against the curb.

**Q** All right. And, sir, I'm going to show you a photograph.

(Brief Pause.)

**MR. FISHER:** Your Honor, if I can, I'd like to retrieve Photo No. 9.

**THE COURT:** Yes.

**Q** (By Mr. Fisher) And, sir, I'm going to show you a photograph, People's 9. Do you recognize that?

**A** That will be the gun that I was talking about.

**Q** Does that appear to be in the position it was at when you were...when you first saw it?

**A** Yes, sir.

**Q** What happened next?

**A** Right after that, seeing this, I drew my weapon, instructed Mr. Chargualaf to get on to the ground. He said, "What was going on?" I repeated my instructions. I also instructed Officer Grino to secure the female. After both parties were secured, it was at this time that I advised Mr. Chargualaf of his rights and inquired...and after he indicated to me that he understood his rights, I inquired as to where he got the gun. He denied -- or, I'm sorry. He then in turn questioned me as to...or, "Is this why I'm handcuffed? I've never seen that." Or, "It's not mine. I don't know where that gun came from."

**Q** Okay. And, sir, I'd like to...well, after he had said that, what did you police officers do?

**A** I'm sorry?

**Q** What did you police officers do after he said that?

**A** It was after that that I went and I advised Ms. Candelaria of her rights.

**Q** Did you know Candelaria's last name?

**A** I remember her name as Candy at that time. Her name is Mendiola now or what I remember now.

Q Okay. Officer, I'd like to take your attention to later in the afternoon of the 21st. Did you ever go into the home of an individual named Don Mendiola?

A Yes, sir.

Q Why did you do that?

A It was pointed out by Candelaria as being the residence where Keilani otherwise known as Don had resided at.

Q All right. And do you recall when Candelaria had pointed that out to you?

A Later on that afternoon, yes.

Q Okay. Did you go there by yourself?

A No. I was there with Officer Cress.

Q What happened?

A After she pointed the residence out...well, she was being driven by Officer Grino. After she pointed the residence out, we knocked on the door. It was answered. We requested to speak to Don. I went up to Don. I asked him if he knew the reason why we were there.

Q And what, if any, response did he make?

A He goes, "Yeah, I was with Randy last night."

Q Did he tell you anything else about that

last night?

**A** Yes. After he indicated that he was with Randy, I advise him of his rights. He stated that he understood them.

**MR. TIMBLIN:** Your Honor, I'll object. The rest of this is hearsay.

**MR. FISHER:** Your Honor, this statement is against penal interest.

**THE COURT:** Overruled.

**Q** (By Mr. Fisher) Sir, what, if anything, else did he say about that night?

**A** That he was with Randy and Candy and they had macked somebody that night or the night before.

**Q** What's that word you used, sir?

**A** Macked. That was the word that Don had used, macked.

**Q** Do you know what mack means?

**A** Street slang for rob.

**Q** Okay. And, sir, I'm going to show you Prosecution Exhibits 22 and 21 which I think have already been admitted. And I'll ask you if you recognize the individuals in that.

**A** Yes. This would be Mr. Chargualaf and Candy Mendiola.

**Q** Okay. All right. Do they look...on the

date of these pictures, do they look -- is that the way they look that day...

**A** Yes, sir.

**Q** ...you saw them? Okay. Your Honor, at this time, I have no further questions of Officer Santo Tomas, but I would like to publish these pictures we've been speaking about.

**THE COURT:** Okay. We'll do it later when he's done, okay? Mr. Timblin?

**CROSS EXAMINATION**

**BY MR. TIMBLIN:**

**Q** Officer Santo Tomas, again, referring again...do you have the Exhibit 24, the flier, in front of you there?

**A** Yes, sir.

**Q** Okay. And again, you see it refers to three suspects including a female Caucasian?

**A** Yes, sir.

**Q** Okay. And there was no female Caucasian present at the time, was there?

**A** At which time, sir?

**Q** Okay. There was no female Caucasian, to your knowledge there, when you backed up Officer Dawson that day?

**A** No, only the Guamanian female.

Q Okay. And did Mr. Chargualaf, was he wearing a black baseball cap?

A That I don't remember, sir.

Q Do you recall what color his shirt was, if you know?

A I'm trying...I was trying to recall that. I do believe upon initial confrontation, he was shirtless.

Q Shirtless. Okay. So he wasn't wearing a light green shirt that night?

A Like I said, upon initial confrontation, I do believe he was shirtless.

Q I see. Okay. May I approach the draw -- the diagram?

**THE COURT:** Yes, you may.

(Brief Pause.)

Q Maybe we could ask...sir, (indiscernible) getting a black pen. We could have a different color, red (indiscernible).

(Brief Pause.)

Q (Inaudible) marker.

**UNIDENTIFIED SPEAKER:** Black marker.

(Brief Pause.)

**THE COURT:** You want the officer to step down?

**MR. TIMBLIN:** Yes, I'd ask him --

**THE COURT:** -- Why don't you put the easel in the middle here so the jurors can see it. Officer, can you step down, please?

(Witness Complies.)

(Brief Pause.)

**Q** (By Mr. Timblin) Officer, I'd like to (indiscernible) back to when you first arrived at the scene. I wonder if you could mark in this black marker a C for where Mr. Chargualaf was, an M for where Ms. Mendiola was.

**A** When I first got there, this would have been an open door. (Inaudible).

**Q** Okay. So Mr. Chargualaf was standing by the passenger door?

**A** Yes, sir.

**Q** And Ms. Mendiola was over here behind the driver's door?

**A** Yes, sir.

**Q** Also you made mention or referred to seeing a gun. Where was the gun?

**A** When I first saw it?

**Q** When you first saw it, yes.

(Witness Indicates.)

**Q** So it was on this stall, not in front of this stall?

**A** No. It was right here (indicating).

**Q** Okay. So...and this was between the little parking curb and in the sidewalk at Paul's?

**A** Yes.

**Q** Okay. It was not in front of the vehicle, the (indiscernible), the Nissan?

**A** (No audible response.)

**Q** And what was Ms. Mendiola doing when you first got there?

**A** She was pacing back and forth (inaudible).

**Q** What was Mr. Chargualaf doing?

**A** Standing directly behind Officer Dawson.

**Q** Was he pacing?

**A** It was Officer Dawson that was searching the vehicle.

**Q** No, no. How about Mr. Chargualaf, was he pacing or not?

**A** On my arrival, he started to.

**Q** Started to.

**MR. FISHER:** I'm sorry. I didn't hear the answer.

**MR. TIMBLIN:** He started to.

**MR. FISHER:** Okay.

**MR. TIMBLIN:** Okay. Thank you. Go ahead (inaudible).

(Brief Pause.)

**Q** (By Mr. Timblin) Excuse me, Officer. And... Okay. You pointed out where you saw the gun. Could you also tell us where Mr. Chargualaf was standing and where Ms. Mendiola was standing when you saw the gun?

**A** When I spotted the gun, they were both on the passenger -- or the driver's side of the car.

**Q** The driver's side, okay, the left side?

**A** The driver's side of the car.

**Q** Did you testify earlier, sir, that they were looking at you in a certain way or looking at you nervously?

**A** Yes, sir.

**Q** Okay. But they were...I'm sorry. So they're on the driver's side. You're over here (indicating), is that right?

**A** Yes, sir.

**Q** Okay. And could you see (indiscernible) were the car between you? Was the car between you?

**A** I'm sorry?

**Q** Was the car between you and them?

**A** Yes, sir.

**Q** Okay. And --

**A** -- Well, they were further up towards the

front of the vehicle on the driver's side of the car.

**Q** They were both here?

**A** Well, not right in front of the vehicle, but closer towards the hood area, not directly in front of it.

**Q** I see. Could somebody standing where they're standing have seen what was space between the parking curb and the sidewalk?

**A** Well, the direct line aside is what you're saying?

**Q** (Indiscernible)?

**A** Yes, sir. From where I was standing, I could see their faces.

**Q** You could see their faces. Okay. Could somebody looking back toward you see what was between that curb and the sidewalk?

**A** No.

**Q** Could not.

(Brief Pause.)

**Q** Later on, did you...were you involved in confiscating any property taken from Mr. Chargualaf's possession?

**A** Yes.

**Q** What all was that?

**A** Money.

Q How much money and how many different packets or how (indiscernible)?

A I'm going to need to see a custody receipt.

Q From your recollection, how much money, if you know? If you can recall, how much was it and was it more than one packet?

A I don't understand your question.

Q Okay. Do you recall whether you saw any money taken from Mr. Chargualaf that was in an envelop?

A Like I said, I'm going to have to see a custody receipt.

Q You have no recollection at all?

A I remember confiscating money from him, yes, I do.

Q And where did you put the money and what did you do with it?

A It would have been stored -- or wrapped and packaged -- or it would have been packaged and sent to property section.

Q Okay. And that's what you assumed happened in this case?

A That's what happened.

Q Okay.

(Brief Pause.)

**MR. TIMBLIN:** Thank you. No further questions.

**THE COURT:** Any questions on redirect, Mr. Fisher?

**MR. FISHER:** Yes, sir. Thank you.

**REDIRECT EXAMINATION**

**BY MR. FISHER:**

**Q** Officer, I'm getting little confused. Where was the defendant and Ms. Mendiola when they looked down at your feet and saw the firearm?

**A** They were on the driver's side. I had instructed...right before I saw it or right before I realized that the two had fit the description of the two given, I had instructed Off... or Mr. Chargualaf to go to the other side of the car 'cause I was wonder...or I didn't feel too comfortable with him directly behind Officer Dawson.

**Q** Why is that?

**A** Officer safety. I don't like that.

**Q** Okay. And what did he do when you instructed him?

**A** He went on the other side of the vehicle.

**Q** Could you just come down and point out?

(Witness Complies.)

**A** He was standing, like I said earlier, directly behind Officer Dawson.

Q Okay. And was that where he was when you say you -- or when you saw the firearm?

A No. I had instructed him just prior to that to go to the other side of the vehicle.

Q Okay. And did he do that?

A Yes, sir.

Q Well, where were they when you noticed the firearm?

A On this side of the vehicle.

Q Okay. And is that where you drew the M and the C or wrote the Mendiola or the M for Mendiola?

A Oh, they were up around here towards the front portion of the vehicle.

Q Okay. That's my question. How did...how were they able to look at your feet?

A By looking on the direction of my feet.

Q Okay.

A Like, towards my feet. When I indicated that they had fit the description --

Q -- You got to speak up a little bit, so...

A When I had indicated to Officer Dawson that they had fit the description of the flier given, they both looked at each other and then immediately after that, looked towards the direction of my feet.

Q Okay.

A When I saw their eyes divert, I look down and that's where I saw the gun.

Q All right. Okay. And thank you, Officer. Just I guess one or two more follow-ups. Sir, I have retrieved what is Prosecution 9 for identification. Could you have a look at that? And that is unloaded.

A Yes, sir.

Q Does that...could you...have you seen that before?

A Yes, sir.

Q Okay. Where did you see it?

A Right there on the curb or on that parking stall divider.

Q Okay. What did you do with that when you... are you the one who seized it?

A Yes, sir. I have my initials here.

Q Okay. On the gun itself?

A Yes, sir.

Q Okay. And, sir, do you see your initials anywhere on this, the --

A -- Yes, sir, all over it.

Q Okay. And that's the bag that Prosecution 1 for identification was in and that is the gun you seized?

A Yes, sir.

**MR. FISHER:** Your Honor, at this time, the People would offer Prosecution Exhibit 1 for identification into evidence.

**THE COURT:** Any objections?

**MR. TIMBLIN:** No objection.

**THE COURT:** So ordered.

(Brief Pause.)

**MR. FISHER:** Thank you very much, Officer. I have no further questions.

**THE COURT:** Any questions on recross, Mr. Timblin?

(Brief Pause.)

**RECROSS EXAMINATION**

**BY MR. TIMBLIN:**

**Q** Officer, can you tell us if you remember where Officer Dawson was when you first saw the gun?

**A** He was by the vehicle, by the passenger side or...yes, by the passenger side of the vehicle.

**Q** Towards the front door or back door, whereabouts?

**A** The passenger door.

**Q** Passenger door.

**A** The open passenger door.

**Q** All right. And...

(Brief Pause.)

**MR. TIMBLIN:** Thank you. No further questions.

**THE COURT:** Any other questions, Mr. Fisher?

**MR. FISHER:** No thank you, Your Honor.

**THE COURT:** Okay. Officer Santo Tomas, you may step down. Thank you.

(Witness Excused.)

**MR. FISHER:** Your Honor, can we go ahead and publish some of these pictures?

**THE COURT:** Yes. We need to have side bar here while we publish the pictures.

(Brief Pause.)

**THE COURT:** Give it to them one by one, okay, so... This one here, this gun?

**MR. FISHER:** Yes.

**THE COURT:** (Indiscernible) --

**MR. FISHER:** -- There's no need to pass that around. It's unloaded. I had A.J. check it.

(Side Bar Conference.)

**THE COURT:** How many more witnesses do you have?

**MR. FISHER:** I've got five, six witnesses. A lot of them are pretty --

**THE COURT:** -- (Indiscernible) short?

**MR. FISHER:** I'm sorry?

**THE COURT:** Is the next one short?

**MR. FISHER:** Actually --

**THE COURT:** -- A few minutes?

**MR. FISHER:** No, I don't think so. I've got... might be...it might...yes, Officer Cress, I think, might be pretty short.

**THE COURT:** Okay.

**MR. FISHER:** And then I've got two long --

**MR. TIMBLIN:** -- (Indiscernible).

**MR. FISHER:** I've got two long ones and then a number of short ones. They're co-defendants.

**THE COURT:** Who's going to be next; Cress?

**MR. FISHER:** Santo Tomas. I think it's --

**THE COURT:** It's already, like, 3:15. You'll probably get one more.

**MR. FISHER:** I think I'll go ahead... Can I have just a second? Let me ask A.J. real quick.

(Brief Pause.)

**MR. TIMBLIN:** This will be our last witness of the day, do you know?

**THE COURT:** Because we have arraignments.

(Brief Pause.)

**MR. FISHER:** We have a short one (inaudible), Officer Cress.

**THE COURT:** (Inaudible).

(Brief Pause.)

**THE COURT:** Yes.

(End of Side Bar Conference.)

(Pause.)

**THE COURT:** Your next witness, Mr. Fisher?

**MR. FISHER:** Yes. Thank you, Your Honor. The People call Officer Richard Cress.

(Brief Pause. Awaiting Witness.)

**THE CLERK:** Raise your right hand. You do solemnly swear that the testimony you will give this court and jury in this case now on trial shall be the the truth, the whole truth and nothing but the truth, so help you God?

**THE WITNESS:** I do.

**THE FOREPERSON:** Please, be seated and state your full name.

**THE WITNESS:** Richard Allen Cress.

**THE COURT:** Okay. You may proceed, Mr. Fisher.

**MR. FISHER:** Thank you, Your Honor.

RICHARD A. CRESS,

called as a witness by the People, being first duly sworn, testified on his oath as follows:

**DIRECT EXAMINATION**

**BY MR. FISHER:**

**Q** Officer, you're with the Guam Police Department?

**A** Yes, sir.

Q How long have you been with GPD?

A Since April, 1992.

Q Sir, I'd like to take your attention to July 21st, 1997. Were you on duty with Guam Police Department that day?

A Yes, sir.

Q Sir, did you assist Officer Santo Tomas in the investigation of a robbery in the Tumon area?

A Yes, sir.

Q And, sir, did you assist Officer Santo Tomas in picking up a Mr. Don Mendiola?

A Yes, sir.

Q Could you tell the jury what happened?

A I was at Tamuning Precinct and Officer Santo Tomas tells me that they have a third suspect relative to a robbery that had occurred and her name is Mr. Don Mendiola and he lives up at Tumon Heights trailer park area, and asked if I could go with him to pick up the suspect.

Q And did you do so?

A Yes, sir.

Q What happened?

A We went up to the trailer park. We knocked on the door. A female individual answered the door. We asked if Mr. Mendiola was there. We asked if we

go inside and look for her. She said, "Yes." We went inside...I went inside to the bedroom on the right side. If you're looking at the trailer park in front of you to the right, the bedroom, and Mr. Mendiola was...referred to as Keilani was laying inside the closet asleep, at which time, I woke her up.

**Q** Okay. While you were able to wake her up then?

**A** Yes, sir.

**Q** What did you do next?

**A** I informed her that we're doing an official investigation and I asked her presence down to Tamuning Police Station, which she agreed to come down for further investigation.

**Q** At this point, to your recollection had either yourself or Officer Santo Tomas spoken about any of the details of this case?

**A** No, sir.

**Q** And to your recollection, nobody had spoken about the details of this case to Mr. Mendiola?

**A** No, sir.

**Q** What happened next?

**A** As we escorted her out of the residence, as soon as we exit the door, she says, "Okay. I was

with those two," at which time, we stopped. Officer Santo Tomas advised Keilani of her Constitutional rights, which she acknowledged.

**Q** What was it she said? I'm sorry. The door was slamming then.

**A** She says, "Okay. I was with you two -- those two."

**Q** And nobody had spoken to her yet?

**A** No, sir.

**Q** What happened next?

**A** We then read her rights, she acknowledged. We put her in the car and we started to transport her. We decided to transport her to Tumon Koban in order to keep the three individuals separated. Then on the tran -- while transporting there, she asked us if we got the black gun from Randy.

**Q** Officer, I'd like to take your attention just a little bit forward in time. Did you ever see Mr. Randy Chargualaf that afternoon?

**A** Yes, sir.

**Q** Where did you see him?

**A** At Tamuning Police Station. I was sitting at the table when Officer Dawson was reading him his rights.

**Q** And so how many people were at the table?

**A** Me, Dawson and Randy Chargualaf.

**Q** What, if anything, happened?

**A** Excuse me?

**Q** What happened?

**A** While I was sitting down at the table, Officer...as far as I could recollect, Officer Dawson read him his rights. He waived it and when Officer Dawson started to inquire about the situation, he says he doesn't know what he's talking about. He has no idea what he's talking about.

**Q** Did you ever speak to Mr. Randy Chargualaf?

**A** During that time or in that...through the course of the day?

**Q** At that time when you were with Officer Dawson.

**A** No, sir.

**Q** Did you ever -- at that time, I just want to focus on that time, sir, when the three of you were together. Was there a time later on when the three of you were together?

**A** Yes, sir.

**Q** What happened then?

**A** That was after I went back to Tamuning Precinct after interviewing Keilani and I informed Officer Dawson that we have the third party involved.

Q Okay. And who was present at this conversation?

A Me, Officer Dawson and Randy.

Q Is that Randy Chargualaf?

A Yes, sir.

Q Sir, do you see Randy Chargualaf in the room today?

A Off my recollection, my...

Q Yes, from your recollection.

A From my memory, I...I can't actually say 'cause I didn't interview him and I don't. It's been two years.

Q Okay. So you hadn't met him before?

A I couldn't...no, sir.

Q What happened?

A What happened was when I informed Officer Dawson that we picked up the third individual, Officer Dawson made a comment. I corrected him on this comment.

Q Okay. You go ahead, sir. What was that comment?

A The exact, what he said, I need to...can I refer to my reports?

Q Did you bring it down?

A No, sir.

**Q** If I...and you did make a report?

**A** Yes, sir.

**Q** If I were to show you the report, do you think it would help you to remember the comment?

**A** Yes, sir.

**THE COURT:** Can we identify the report just for...

**MR. FISHER:** I haven't had it marked, Your Honor. This is the one that Officer Cress did write. I can have it marked.

**THE COURT:** Okay. Why don't we just have it identified right, for record purposes.

**MR. FISHER:** Yes, sir.

(Brief Pause.)

**Q** (By Mr. Fisher) And, Officer, I'm going to go ahead and hand you Prosecution 30 for identification, which is also discovery pages 90 through 96. Sir, go ahead and have a look through there.

**A** Yes, sir. Thank you.

(Brief Pause.)

**A** Okay. You would like to know the comment that Officer Dawson made?

**Q** Yes, sir. What was --

**A** -- He goes, he says, "Who? The faggot?" I

then corrected him on not to be calling a faggot and stuff like that.

Q Well, what happened after that?

A And then I go...I turn to Mr. Chargualaf and say, "What's his name," and then at which time he tells me the name is Keilani.

Q Okay. And he told you the name of this person that Officer Dawson had called a faggot was Keilani?

A Yes, sir.

Q Now, you had been participating in the investigation throughout the day?

A Only from the time that Officer Santo Tomas asked for my assistance.

Q Now, are you and Officer Santo Tomas, you're the ones who picked up Don Mendiola also known and Keilani?

A Yes, sir.

Q At this time, had you identified or told Mr. Chargualaf that you had picked up Keilani or Don Mendiola?

A No, sir.

Q What happened next, sir?

A From the time I transported Keilani down or towards the end?

**Q** After this conversation.

**A** Okay. After this comment, I then...I then asked Mr. Chargualaf...wait, what's her name. Just a minute.

(Brief Pause. Witness Reviews Report.)

**A** Oh. I then asked, later on, time went by, then I asked Mr. Chargualaf, "Was there any money found in the purse?" And then he says, "No," then he does a funny facial expression and then goes, "I don't know."

(Brief Pause.)

**MR. FISHER:** All right, sir. Thank you, sir. I have no further questions. I'll go ahead and retrieve 30. Mr. Timblin may want you to refer to it, so I'll just leave it here.

**THE COURT:** Mr. Timblin, any questions on cross?

**MR. TIMBLIN:** Thank you, Your Honor.

**CROSS EXAMINATION**

**BY MR. TIMBLIN:**

**Q** Officer Cress, you indicated that there was...when you went to the trailer to arrest Don Mendiola, was a female individual there?

**A** Yes, sir.

**Q** Did you ever get this female's identity?

**A** No, sir.

Q Did you ask?

A I do not recall. I'm sorry.

Q Okay. Was anybody else in the trailer?

A There...I believe there's another female sleeping in the room on the other side of the house.

Q So there were at least...apparently three people in the trailer?

A Yes, sir.

Q And did you attest to the identity of this other --

A -- I cannot recall, sir.

Q Okay. Now, where exactly did you take Don Mendiola to the precinct?

A To Tumon Koban.

Q Tumon Koban.

A Yes, sir.

Q Now, was Mr. Chargualaf there when you brought in Don Mendiola?

A No, sir. Tamuning Precinct is located up by Palace Hotel, and Tumon is located by Parc...I mean, --

Q -- Okay. So you took Don Mendiola to kob...

A Koban. Tumon Koban, yes, sir.

Q And then you went up later on to precinct?

A Yes.

Q Okay. What caused you to say to Mr. Chargualaf, "I got the other person involved in the case."?

A I never did that, sir.

Q You didn't?

A No, sir.

Q Okay. Do you have your report there, sir?

A Yes, sir.

Q Would you refer to...I believe that is page 5 you marked up at the top also marked as page 95 of the discovery?

A Oh. Okay. Then I stand corrected. I informed Officer Randy Chargualaf that I got the other person.

Q You did.

A Instead of Officer Dawson, yes, sir.

Q Okay. Now, prior to that time, he denied everything, is that correct?

A Yes, sir, as far as I could recall.

Q So basically this was kind of red herring to say, "Ah, ha, we got him," you know, even though he already denied it?

A Excuse me?

Q This was kind of red herring to throw it out basically that this, you know, after he denies it and

you say, "By the way, we got your co-conspirator."?

**A** I don't un -- what's red herring, sir?

**Q** Okay. Well, basically,...weren't you basically pulling a bit of a trick, in other words, saying that, "Ah, ha, by the way, we got the guy you did the robbery with," and hoping he's going to...

**A** No. I just informed him that we had the third person involved.

**Q** Okay. But the question obviously assumes when you're asking that or telling that that he was involved, is that right?

**A** I'm not here to make that assumption, sir.

**Q** You didn't make any assumption; you're saying that when he --

**A** -- At that point in time, I know he was denying it. I was informed that there's three people involved and this was one of them. Okay. He denied knowing anything about the incident which Officer Dawson was talking about, yes.

**Q** Okay. So despite his denial, you said, "By the way, we got your co-conspirator," or whatever.

**A** I informed him that we had the third party involved.

**MR. TIMBLIN:** No further questions.

**THE COURT:** Any other questions on redirect,

Mr. Fisher?

**MR. FISHER:** Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FISHER:

**Q** Sir, as a follow-up to Mr. Timblin's question, as you just testified, after denying, the defendant then said that the third party was Keilani?

**A** Yes, sir.

**Q** And you hadn't told him who the third party was?

**A** No, sir.

**Q** To your knowledge, nobody else had told him who the third party was?

**A** No, sir.

**Q** But he just said Keilani?

**A** Yes, sir.

**MR. FISHER:** Thank you, Your Honor. No further questions.

**THE COURT:** Any other questions, Mr. Timblin?

**MR. TIMBLIN:** (No audible response.)

**THE COURT:** None? Is that a yes or no?

**MR. TIMBLIN:** None.

**THE COURT:** Okay. Officer Cress, you may step down. Thank you very much.

(Witness Excused.)

**THE COURT:** Okay. We'll take a break for today. Again, I'd like to remind the jurors that you're not supposed to discuss this case with anyone, not to read any news reports about this case. If anybody should try to approach you about this case, please, let me know immediately. Do not do any independent investigations on your own and, lastly, keep an open mind until you've heard all the evidence in this case, the arguments of both counsels, the instructions of this court and, of course, the views of your fellow jurors.

This court will adjourn until 8:45 tomorrow morning.

****(*WHEREUPON PROCEEDINGS CONCLUDED.*)****

# I N D E X

| WITNESSES | DIRECT Page | CROSS Page | REDIRECT Page | RECROSS Page |
|---|---|---|---|---|
| **NOBOYO CERTEZA** | | | | |
| By:Mr. Fisher | 2 | | 31 | |
| By:Mr. Timblin | | 23 | | — |
| | | | | |
| **VINCENT DELA CRUZ NUEVA** | | | | |
| By:Mr. Fisher | 34 | | — | |
| By:Mr. Timblin | | 42 | | — |
| | | | | |
| **CHRISTOPHER SHANE DAWSON** | | | | |
| By:Mr. Fisher | 45 | | 91 | |
| By:Mr. Timblin | | 77 | | — |
| | | | | |
| **JEROME SANTO TOMAS** | | | | |
| By:Mr. Fisher | 96 | | 118 | |
| By:Mr. Timblin | | 111 | | 121 |
| **RICHARD CRESS** | | | | |
| By:Mr. Fisher | 124 | | 136 | |
| By:Mr. Timblin | | 132 | | — |

| THE PEOPLE'S EXHIBITS: | IDENTIFIED Page | ADMITTED Page |
|---|---|---|
| **No. 25:** Layout of victim's apartment in Tumon | 4 | 4 |
| **No. 22:** Photo of Co-Defendant who broke into victim's apartment | 6 | 7 |
| **No. 23:** Photo of Co-Defendant who broke into victim's apartment | 6 | 7 |

# I N D E X

| THE PEOPLE'S EXHIBITS: | IDENTIFIED Page | ADMITTED Page |
|---|---|---|
| **No. 11:** Photo of victim's credit card | 15 | 16 |
| **No. 13:** Photo of victim's passport and contents of purse | 15 | 16 |
| **No. 14:** Photo of victim's passport and contents of purse | 15 | 16 |
| **No. 26:** GPD Custody Receipts | 19 | --- |
| **No. 20:** Photo of victim's master bedroom | 41 | 41 |
| **No. 19:** Photo of victim's master bedroom | 41 | 41 |
| **No. 18:** Photo of victim's master bedroom | 41 | 41 |
| **No. 17:** Photo of couch in victim's apartment living room | 42 | 41 |
| **No. 16:** Photo of victim's apartment living room | 42 | 41 |
| **No. 15:** Photo of victim's door | 42 | 41 |
| **Nos. 4, 6, & 7:** Photos of Defendant's vehicle pulled over by Officer Dawson 7-21-97 | 46 | 46 |
| **No. 24:** APB Bulletin | 56 | 105 |
| **No. 9:** Photo of firearm | 68 | --- |
| **No. 28:** Chain of Custody Reports | 76 | --- |
| **No. 29:** List of confiscated items | 91 | --- |
| **No. 2:** Hat | 92 | 93 |
| **No. 8:** Photo of jewelry box | 99 | Denied |
| **No. 5:** Photo of Defendant's vehicle & Officer Santo Tomas's motorcycle | 100 | 102 |
| **THE DEFENDANT'S EXHIBITS:** | **IDENTIFIED Page** | **ADMITTED Page** |
| **Exhibit No. A:** 2-page letter written by Mrs. Certeza | 20 | 33 |

# C E R T I F I C A T E

We, PRISCILLA C. TORRES and LINDA P. CAMACHO, do hereby certify that the foregoing pages one (1) through one hundred forty (140) inclusive, comprise the true and correct Transcript on Appeal of the **Excerpt of Jury Trial - Day 1** proceedings had in:

**PEOPLE OF GUAM vs. RANDY IGNACIO CHARGUALAF**

**CF0317-97**

before The Honorable Alberto C. Lamorena III on November 3, 1999; recorded on Tapes Number T99-1776, T99-1777, T99-1778 & T99-1779; and transcribed by us to the best of our knowledge and ability.

DATED this 14th day of July, 2000.

Priscilla C. Torres

Linda P. Camacho



SUPERIOR COURT OF GUAM
MINUTE ENTRY

TAPE NO: 99-7779 | PAGE NO: 1 | COURT CONVENED AT: 8:45 X AM _ PM | DATE: 11 04 1999

PRESENT: **JUDGE:** ALBERTO C . LAMORENA III , Presiding Judge
**CLERK:** EVELYN C. SANTOS

CASE NUMBER: CF0317-97

CASE TITLE:
PEOPLE OF THE TERRITORY OF GUAM
VS.
RANDY I CHARGUALAF *

COUNSEL PRESENT:
**PLAINTIFF:** T. Fisher.
**DEFENDANT:** T. Tomlin

**PROCEEDINGS:** Jury Trial (2)

| LOG NUMBER | DESCRIPTION |
|---|---|
| 3910 | -Case Called deft present w/atty. |
| | Off. Merry C Grino. sworn in. |
| 4000 | p/A - direct exam. M. Grino |
| 4170 | exhibit # 11 for Identification |
| 4286 | In court Identification of deft. |
| 4300 | p/A = cont. direct exam c Off. Grino. |
| 4520 | D/A = cross exam Off. Grino. |
| 5230 | p/A = re-direct exam Off. Grino. |
| 5587 | D/A - re - cross exam Off. Grino. |
| 5690 | Don A. Mendiola - |
| 5890 | Don Allen Mendiola - sworn in. |
| 5895 | p/A - direct exam D. Mendiola |
| 5985 | In court Identification of deft |
| 5990 | p/A = cont. direct exam D. Mendiola |
| 0340 | exhibit 7 for Identification |
| | Matter continued to: , 1999 At: am/pm |

248

| TAPE NO. 99-1871 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYNCABRERA/JESSICA CRUZ<br>CASE NO. CF 317-97 R. Charfauros<br>PAGE NO. 1 DATE: 11/5/99 , 19 |
|---|---|
| LOG NO. | T. Fisher DESCRIPTION T. Tenorio |
| | |
| 6310 | Jury Instructions. |
| | |
| | ct: [illegible] called |
| | review of jury instructions. |
| | w/ both counsels. |
| | defense make move |
| | |
| | ct= approve |
| 6490 | p/A- objects on lesser included |
| | ct= include 3rd robbery as |
| | lesser included. as part of |
| | instruction. |
| 6700 | amendments. 4F. 4G. 7A 7E |
| 99-1872 | |
| 10 | ct-cont. SP out |
| 115 | p/A=move to amend on conspiracy |
| | charge citation. |
| | ct= move to amend. |
| | |
| | fax |
| 170 | X/A=address court of witness |
| | |
| | |

243

| TAPE NO. | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYNCABRERA/JESSICA CRUZ |
|---|---|
| 99-1779 | CASE NO. CF317-97 |
| | PAGE NO. 8 DATE: 11/4/99 , 19 |

| LOG NO. | DESCRIPTION |
|---|---|
| 6355 | p/A = cont. direct exam D. Mendiola |
| | |
| 99-1780 | p/A = cont. direct exam D. Mendiola |
| 3 | |
| 250 | p/A = move ex [illegible] + 3 into [illegible] |
| 255 | ~~ct = [illegible]~~ |
| | ~~# [illegible]~~ |
| 260 | p/A = cont. direct exam D. Mendiola |
| 436 | d/A = cross exam D. Mendiola |
| 656 | side bar. |
| 700 | ct - 15 min recess. |
| 2275 | back in session |
| | |
| 0300 | p/A -- direct exam C. Mendiola. |
| 2990 | exhibit #18 for identification & 16 |
| 3140 | p/A = cont. direct exam C. Mendiola. |
| 3190 | ct = reconsider motion to hold deft as |
| | hostile witness |
| 3030 | p/A = cont. direct exam C. Mendiola |
| | |
| 3725 | exhibit #31 for identification |
| 3800 | d/A = object to exhibit #31. |
| 3805 | p/A = cont. direct exam C. Mendiola. |
| 4483 | p/A = side bar. |

| TAPE NO. 99-1780 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYNCABRERA/JESSICA CRUZ CASE NO. CF317-97 PAGE NO. 3 DATE: 11/4, 19 99 |
|---|---|
| LOG NO. | DESCRIPTION |
| 4640 | D/A = cross exam C. Mendiola |
| 4980 | p/a = re-direct C. Mendiola. |
| 5419 | D/A = re-cross exam C. Mendiola |
| 5470 | D/A - request - C. Mendiola kept in court house |
| 5500 | D/A = side bar |
| 5700 | p/A = move # 31 into evidence. |
| 5740 | [illegible] S |
| 5880 | p/A = direct exam. [illegible] |
| 6279 | exhibit #26 + #27 #28 for identification |
| 6490 | move # 25 + 26 + 27 + 28 |
| | non objection = admit |
| 6578 | p/a - |
| 6555 | ct - recess lunch break till 2:00 pm |
| 6576 | ct - case called back in session |
| 6627 | Off. Grino - |
| 6740 | p/A = direct exam Off. Grino |
| 99-1781 | |
| 10 | p/A = cont. direct exam Off. Grino |
| 288 | D/A = cross exam. Off. Grino |
| 340 | p/A = re-direct Off. Grino. |
| 370 | John Iyoguenzo Off. GPD |
| 394 | Off. John Iyoguenzo - Off. GPD |
| 400 | p/A = direct exam Off. Iyoguenzo. |
| 576 | firearm forensic expert. |

| TAPE NO. 99-1871 | JUDGE: ALBERTO C. LAMORENA,III CLERK: EVELYN [illegible]/JESSICA CRUZ<br>CASE NO. CF317-97<br>PAGE NO. 4 DATE: 11/4/99, 19 |
|---|---|
| LOG NO. | DESCRIPTION |
| 590 | p/a = cont. direct exam off. Zygonenko [illegible] |
| | exhibit #1 for identification. |
| 800 | d/a = cross exam off. Zygonenko. |
| 866 | p/a = re-cross exam off. Zygonenko |
| | exhibit #18 for identification |
| 900 | p/a = 10 in motion [illegible] |
| 925 | ~~ct = non-objection admit [illegible]~~ |
| 936 | p/a = side bar |
| 1000 | p/a = people rest. |
| 1020 | d/a = mtn |
| 1025 | ct = excuse jurors. |
| 1090 | p/a = address ct. of Mr. Certeza. |
| 1106 | d/a = mtn move for judgment of acquittal. |
| | #5 #6 |
| 1330 | p/a = address ct. of charges |
| | of mtn made by defense. |
| 1715 | d/a = address ct. |
| 1810 | p/a = address ct. |
| 1890 | ct = deny mtn. |
| 1950 | ct = adjourn till 1:30pm 11-5-99 |
| 2045 | ct = address jurors. adjourn till 1:30pm 11-5-99. |
| 2140 | ct = address parties. |
| | |
| | |

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagatna, Guam
AUG 17 2006
Benny O. Cruz
Deputy Clerk, Superior Court of Guam

FILED
SUPERIOR COURT
2000 JUL 17 PM 2: 56
ALFREDO M. BORLAS
CLERK OF COURT

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM,<br>Plaintiff-Appellees,<br>vs.<br>**RANDY IGNACIO CHARGUALAF,**<br>Defendant-Appellant. | SUPERIOR COURT CASE NO. CF0317-97<br><br>SUPREME COURT CASE NO. **CRA00-002**<br><br>Jury Trial - Day Two<br>November 4, 1999<br><br>**VOLUME III** |

*Before the Honorable Alberto C. Lamorena III*
Presiding Judge, Superior Court of Guam
Hagatna, Guam

## APPEARANCES

For the Plaintiff-Appellee:

Office of the Attorney General
John F. Tarantino
Attorney General

*by Thomas J. Fisher*
Assistant Attorney General
2-200E Judicial Center Building
120 West O'Brien Drive
Hagatna, Guam 96932
475-3406

For the Defendant-Appellant:

Law Offices of Terrence E. Timblin

*by Terrence E. Timblin*
Attorney-at-Law
Suite 501C, GCIC Building
414 West Soledad Avenue
Hagatna, Guam 96932
477-1389

COPY

THE BAILIFF: Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena III presiding. Draw near and give your attention and you shall be heard. God save Guam and this honorable Court.

Please be seated.

THE COURT: CF317-97, People of Guam vs. Randy Ignacio Charqualaf. Good morning.

UNIDENTIFIABLE SPEAKER: Good morning, Your Honor.

THE COURT: Okay. All 12 jurors are present, two alternates. Mr. Fisher's representing the People, he's present, and defendant with his attorney, Mr. Timblin, is present.

Your next witness, Mr. Fisher.

MR. FISHER: Yes, Your Honor. The People call Officer Mercy Grino.

(Brief pause.)

THE CLERK: Raise your right hand.

*Mercy Grino,*
*called as a witness by the People,*
*having been first duly sworn, testified on her oath as follows:*

THE CLERK: Please be seated and state your full name.

THE WITNESS: Mercy Grino.

THE COURT: Okay. Mr. Fisher, you may proceed.

MR. FISHER: Thank you, Your Honor.

\\\

Direct Examination

by Mr. Fisher:

Q Officer, are you currently with the Guam Police Department?

A Yes, sir.

Q How long have you been with the Guam Police Department?

A Since August '90 -- '95.

Q I'm sorry?

A August '95.

Q Were you on duty with the Guam Police Department in July of 1997?

A Yes, sir.

Q Did you assist in a pullover at Paul's Plaza?

A Yes, sir.

Q And could you tell us, do you recall what time of day it was that you assisted?

A About 9:55 in the morning, sir.

Q Okay. That was 9:55 in the morning?

A Yes, sir.

Q What happened when you got there?

A When I arrived at Paul's Plaza, I noted Officer Dawson and Office Santo Tomas searching a black Nissan Sentra, license plate No. Agana Heights 367, and two individuals, a male and a female, who were sitting by the

 sidewalk area of the building.

Q Did you ever learn the identify to the male and the female?

A Yes, sir.

Q Do you recall what that is?

A One was Randy Chargualaf, and the other one was Candelaria Mendiola.

Q What did you do after you observed the male and female?

A I was requested by Officer Dawson to pat-down the female individual for any weapons or drugs.

Q And did you do so?

A Yes, sir.

Q And what's the female's name?

A Candelaria Mendiola.

Q What was the result of your pat-down?

A I requested to search the weight -- black waist pouch she had in her possession, to which she gave me consent, and while searching the pouse -- I mean, the pouch -- I located a plastic card with a Japanese nick -- hierogly- -- or, I'm sorry -- Japanese writing on it.

MR. FISHER: Okay.

Your Honor, may I approach for the purpose of retrieving a photograph?

THE COURT: Yes.

MR. FISHER: Thank you.

(Brief pause.)

MR. FISHER: Your Honor, I've retrieved Prosecution Exhibit 11, which I'm showing to (indiscernible).

(Brief pause.)

Q BY MR. FISHER: Ma'am, I've handed you a picture which is People's 11. Can you identify that?

A Yes, sir, this is the card I found in Ms. Mendiola's purse, or pouch.

Q Now did you speak to Mrs. Mendiola, or Ms. Mendiola?

A Yes, I did.

Q Okay. And what, if anything, did she say?

A She -- When I asked her where she got the card, she informed me that she found it in the parade.

Q Okay. (Indiscernible.)

A At the parade ground in East Agana.

Q Now was this July 21, 1997?

A Yes, sir.

Q What parade was she referring to?

A The liberation parade.

Q What happened next?

A About the time I was asking her where she got the card, I noted Officer Santo Tomas extract his weapon and point it in the direction of Mr. Chargualaf.

Q Do you see Mr. Chargualaf in the courtroom today?

A Yes, I do.

Q And where is he?

A He's seated at the defendant's table wearing a checkered shirt.

MR. FISHER: Okay. Thank you.

Your Honor, for the record, an in-court identification of the defendant by the testifying witness.

THE COURT: So ordered.

MR. FISHER: Thank you.

Q What happened next?

A Officer Santo Tomas ordered me to secure both Ms. Mendiola and Mr. Chargualaf.

Q And did you do so?

A Yes, sir.

Q Did you notice anything about the area?

A Yes. Officer Santo Tomas then pointed out the pistol that was hidden -- or that was leaning against the parking curb.

MR. FISHER: Okay.

Your Honor, may I approach for the purpose of retrieving People's 1?

THE COURT: Yes, you may.

MR. FISHER: And I'm showing People's 1 to defense counsel.

(Brief pause.)

Q BY MR. FISHER: Officer Grino, I've handed you People's 1. Would you agree that this is a handgun?

A Yes, sir.

Q Does that resemble the gun that you saw, pointed out to you by Officer Santo Tomas?

A Yes, sir.

Q Following that, did you speak to Ms. Mendiola again?

A Yes, I did.

Q What, if anything, did you learn from her?

A After Officer Santo Tomas had read her her rights, we -- she -- informed us that the pistol belonged to Mr. Chargualaf, and that they had it the night before.

Q I'd like to focus your attention on -- Did you ask her about a purse?

A I'm sorry?

Q Did you ever ask her about a purse, or did she ever tell you about one?

A Yes, she did.

Q What was it she told you about it?

A She stated that they had -- the night before, they had entered a Japanese lady's residence where Ms. -- or I'm sorry -- Kaelauni -- had entered and -- pretending to need help, and they entered the residence. Once they

were in the residence, Mr. Chargualaf pointed the pistol at the Japanese lady who was there.

Q Did Ms. Mendiola ever tell you whether or not anything was taken --

A Yes.

Q -- from the apartment?

A They took a purse and a coin purse.

Q Did she ever tell you what had happened to the purse?

A Yes. As soon as they got to their motel room, and I believe when they left in the morning, they threw the purse in a trash receptacle by Golden Motel.

Q Now did you ever tell anybody else this information about the purse being in the trash at Golden Motel?

A Yes, I informed Officer Santo Tomas, Officer Dawson, and Officer Cress.

MR. FISHER: All right. Thank you very much, Officer.

I have no further questions.

THE COURT: Mr. Timblin, any questions on cross?

MR. TIMBLIN: Your Honor, can we bring back the easel, and I believe the chart that you drew yesterday?

THE COURT: The one Officer Dawson drew?

MR. TIMBLIN: Yes.

(Brief pause.)

Cross-Examination

by Mr. Timblin:

Q Officer Grino, would you mind stepping down to the (indiscernible)?

A (No audible response.)

Q Okay. You had testified you received a call, a radio call to assist in a pullover; is that correct?

A Yes, sir.

Q And this all took place at Paul's Plaza in Tamuning?

A Yes, sir.

Q Okay. And assuming that this is the main building, Paul's Plaza, this is the sidewalk, this would be the Nissan Sentra, could you tell us where when you first arrived was Ms. Mendiola and Mr. Chargualaf, and if you could put a C and an M where they were, and just mark with this marker, please.

A Yes. Oops. Ms. Mendiola was seated right about here, in this general area.

Q Would you put a C for her there?

A And Mr. Chargualaf was here.

Q I'm sorry, an M. I'm sorry, for her sign, and a C for Mr. Chargualaf?

A Okay.

Q Okay. And they were sitting there?

A Yes.

Q Okay. And was anybody at anytime pacing?

A I don't recall, sir.

Q Okay. Did anybody appear to be -- either of them appear to be nervous, if you recall at all?

A I believe Ms. Mendiola.

Q Ms. Mendiola appeared to be nervous?

A Yes.

Q Okay. Did you notice, was she wearing or carrying this pouch you talked about?

A She was holding onto it.

Q She was holding onto it, okay. And Mr. Chargualaf wasn't holding anything, or carrying any kind of container himself, was he?

A No, sir.

Q Okay. I believe you also testified that Officer Dawson requested that you pat down Candy Mendiola for the possibility of weapons; is that correct

A Yes, sir.

Q Now is this before or after Officer Santo Tomas pulled a gun on Mr. Chargualaf?

A This was before.

Q Before. So at that time nobody had any suspicion that there was a gun, or any danger there as far as you knew?

A Yes.

MR. TIMBLIN: Okay. Thank you.

(Witness resumes stand.)

Q BY MR. TIMBLIN: Is it routine procedure in a case like this, if you've had suspicions, or you feel you're in some kind of danger to pat down individuals for weapons?

A Yes, sir.

Q Okay. Now when the gun was discovered, was Mr. Chargualaf and Ms. Mendiola, were they still sitting, or where were they at?

A I believe -- may I refer to my police report?

Q Please do.

(Brief pause.)

THE WITNESS: I don't recall what Mr. Chargualaf was doing at the time, but at that time I was with Ms. Mendiola.

Q BY MR. TIMBLIN: Okay. So you don't know what Mr. Chargualaf was doing or where he was?

A I believe he was in the general area, in front of the vehicle.

Q Okay. Where were you and Ms. Mendiola when --

A We were off to the side, in front of Paul's -- Paul's store.

Q Well, I mean, were you near the car, away from

the car?

A Away from the car.

Q Away from the car. On the sidewalk? in the parking lot?

A We were in the sidewalk area.

Q Sidewalk. And you were still talking with Candy about what's in the pouch?

A Yes, sir.

Q Okay. And then you saw Officer Santo Tomas draw his gun; is that correct?

A I'm sorry?

Q You saw Officer Santo Tomas draw his gun then?

A Yes, sir.

Q Okay. Did you see any gun at that time?

A Only after he pointed it up.

Q Okay. And where was the gun?

A It was leaning on a parking curb.

MR. TIMBLIN: Okay.

May I approach the witness?

THE COURT: Yes.

(Brief pause.)

Q BY MR. TIMBLIN: And showing you government's Exhibit 9, does this appear to be where the gun was, or sort of where the gun was?

A Yes, sir.

Q Okay. Now you could see all we have is a yellow parking curb and some asphalt on either side?

A Uh-huh.

Q So was this gun on the side toward Paul's Plaza and the sidewalk, or facing toward the parking lot and the street?

A Towards the building.

Q Toward the building. And which parking slot was it in, if you recall? Was it next to the Nissan Sentra, or (indiscernible) refer again.

Referring you to Government's Exhibit No. 4, which shows the Nissan Sentra and (indiscernible) some parking stalls there --

A Uh-huh.

Q -- between which parking stall was it, was it one of these, the one in front, the one in front of the Sentra --

A Uh-huh?

Q -- or where, if you know?

A I don't remember, sir. I was on the side of the building. I only saw it when they directed it to my attention. I didn't recall which parking curb it was.

Q Okay. So you could see here there's the yellow parking curb, parking curb, and there's obviously presuming, one in front of the --

A Yes.

Q -- Nissan. You're not sure which one it was?

A No.

Q And it was, you say, that you talked to Candy, and she claimed that the gun was Randy's; is that correct?

A Yes, sir.

MR. TIMBLIN: No further questions.

THE COURT: Any questions on redirect, Mr. Fisher?

MR. FISHER: Yes, Your Honor.

Redirect Examination

by Mr. Fisher:

Q Officer, this event happened about 27 months ago, over two years ago?

A Yes, sir.

Q And you referred earlier, in response to one of Mr. Timblin's questions, about a police report, correct?

A Yes, sir.

Q And you brought your police report with you?

A Yes, I did.

Q Am I correct in saying that police officers sometimes make reports to help them in their memory?

A Yes, sir.

Q Mr. Timblin asked you a question about where Mr. Chargualaf was when Officer Santo Tomas took his weapon out?

A Yes, sir.

Q Is that a detail that you might have reported in your police report?

A No, sir.

Q Could I see the police report you brought with you?

A Yes, sir.

MR. FISHER: Thank you very much.

(Brief pause.)

MR. FISHER: And, Your Honor, may I approach Mr. Timblin for the purpose of showing him this police report?

THE COURT: Yes.

MR. FISHER: Thank you.

(Brief pause.)

Q BY MR. FISHER: And, Officer, I'm going to go ahead and hand back to you your police report, and in the lower right-hand corner there's what's marked 37?

A Yes, sir.

Q And could I refer you to the first five or six lines or so of your police report?

A Yes, sir.

Q And could you just read that silently to yourself?

(Brief pause.)

THE WITNESS: Yes, sir.

Q BY MR. FISHER: Okay. Were you able to read that?

A Yes, sir.

Q Now did you write down on your police report where Mr. Chargualaf was, the defendant was, when Officer Santo Tomas drew his weapon?

A Yes, sir.

Q Now after reading that report does that help you remember?

A Yes, sir.

Q Okay. Where was Mr. Chargualaf, the defendant --

A He was --

Q -- when Officer Santo Tomas drew his weapon?

A He was by the driver's side door of the Nissan Sentra.

Q Okay. And when did you write your police report?

A A few hours after this incident.

Q Okay. Do you know, or do you have an opinion as to whether or not your memory was better then, or is better now?

A It's better then.

Q Then?

A Yes.

Q Do you believe that your report is accurate?

A Yes, sir.

Q Based on your review of your police report, did that help you to recollect --

A Yes, sir.

Q -- where he was?

If I were to show you that easel again, do you think you could point out where Mr. Chargualaf was, this --

A At --

Q -- mat that's up here?

A At what time, sir?

Q When Officer Santo Tomas pulled his weapon?

A Yes, sir.

Q Okay. I'm going to just turn it around. You don't have to -- well, I'll just ask you to step over a little bit so you can show the jury. And I'm using the easel that we've been talking about the last couple of days, and there's a vehicle pointed out here, Paul's Tailoring, and a sidewalk.

A Uh-huh.

Q And if you could just point?

A It's (indiscernible) here.

Q Okay. Could you put your finger -- the general area is kind of big there.

A (Indiscernible.)

Q Okay. And you've put your finger at an area

approximately between -- I think this is a C, and a D next -- on the left-hand side of the vehicle, correct?

A Yes, sir.

Q Okay. Is that the driver's side?

A Yes, sir.

Q Okay. Thank you. The two other police officers, were they there when you arrived?

A Yes, sir.

MR. FISHER: Your Honor, I have no further questions. Thank you.

THE COURT: Anymore questions, Mr. Timblin, on recross?

MR. TIMBLIN: Yes, Your Honor, if I could drag this out one more time.

But please remain seated.

Recross-Examination

by Mr. Timblin:

Q Okay. You've testified now where Mr. Chargualaf was when Officer Santo Tomas pulled his gun out, so why don't you step over here real quick and point out where you and -- You said Candy was with you, I believe, right?

A Yes.

Q So where were you and Candy?

A In this area.

Q On the sidewalk?

A Yes.

Q And this is at least, maybe, like two spots. Okay. We've got the Sentra here, and then we got a kind of empty space, and then another space here.

A Yes.

Q So about, maybe, two slots over, on the sidewalk?

A Yes.

MR. TIMBLIN: Okay. No further questions.

THE COURT: Any other questions on redirect?

MR. FISHER: No. Thank you, Your Honor.

THE COURT: Officer Grino, you may step down. Thank you very much.

MR. FISHER: Your Honor, we'd ask that Officer Grino remain in the courthouse until released.

THE COURT: Okay. Officer Grino, remain in the courthouse until you're dismissed by the Court.

THE WITNESS: Yes, sir.

THE COURT: Your next witness, Mr. Fisher?

MR. FISHER: Yes, Your Honor. The People call Mr. Don Allen Mendiola.

(Brief pause.)

THE CLERK: Raise your right hand.

*Don A. Mendiola,*

*called as a witness by the People,*

*having been first duly sworn, testified on his oath as follows:*

THE CLERK: Please be seated. State your full name.

THE WITNESS: Don Allen Mendiola.

THE COURT: Okay. You may proceed, Mr. Fisher.

MR. FISHER: Thank you, Your Honor.

Direct Examination

by Mr. Fisher:

Q Mr. Mendiola, do you know a Randy Chargualaf?

A Yes, I do.

Q Okay. Sir, could I ask you to kind of move forward, because all the jurors need to hear what you're saying. Okay?

A Yes, I do.

Q And when did you first meet Mr. Chargualaf?

A May of '97.

Q Do you see Mr. Chargualaf in the courtroom today?

A Yes, I do.

Q Okay. And could you tell us where he is seated?

A (Indiscernible.)

Q Could you describe a piece of clothing he's wearing?

A Checkerboard plaid shirt.

MR. FISHER: And, Your Honor, we'd ask the court to take note of an in-court identification by the witness?

THE COURT: Okay. So ordered.

Q BY MR. FISHER: Sir, I'd like to take your

 attention back to July of 1997, and in particular I'd like to talk to you about July 20 of 1997. Okay?

A (No audible response.)

Q Did you see the defendant that day?

A Yes, I did.

Q Where did you see him?

A In the front of my place.

Q And where was your place at?

A The mobile home at Tamuning.

Q Could you tell the jury what time it was that you saw him?

A Around eight o'clock.

Q Okay. In the morning, or nighttime?

A Evening.

Q Was he with anyone, that you remember?

A Candelaria.

Q Do you know Candelaria's last name?

A Min -- Mendiola.

Q Were they driving, or walking, or --

A They were driving.

Q What happened when you saw them?

A They asked me if I can go with them.

Q I'm sorry?

A They asked me if I can go with them.

Q Okay. And when they asked if you could go with

them, what did you do?

A I said yeah.

Q And what happened?

A Then we went.

Q Okay. Could you tell the jury where it was that you went?

A Tamuning.

Q Where in Tamuning did you go?

A Next to the -- a bank down in -- I don't know the name.

Q Okay. I'm going to ask you to speak up, okay, because it might be hard for some of these people to hear you.

A Okay.

Q (Indiscernible.)

Okay?

A Okay.

Q Now when you saw the defendant and Candelaria, did the defendant say anything in particular to you?

A "You want to go do a hit?"

Q Okay. And do you have an opinion as to what he meant by that?

A Yeah.

Q Could you tell the jury what that is?

A Robbing.

Q And did you then get in the car?

A Yes, I did.

Q Okay. And tell the jury what it was that you, the defendant, and Candelaria did?

A We went to this place, and we knocked on the door to use to the phone, and --

Q Do you remember where that place is?

A I don't know the name of the place.

Q How about the village itself?

A Tamuning. I mean, Tumon.

Q Is that here on Guam?

A Yes, it is.

Q Who was driving the car?

A Randy.

Q And can you tell us where all of you were seated in the car?

A In the front seat.

MR. FISHER: Your Honor, may I approach for the purpose of retrieving the photograph?

THE COURT: Yes.

(Brief pause.)

MR. FISHER: And, Your Honor, I've received Prosecution Exhibit 7, which I'm showing to the defense counsel.

Q Mr. Mendiola, I want you to have a look at that

photograph. Do you recognize that?

A Yes, I do.

Q What is that?

A It's a Nissan Sentra that belongs to Randy.

Q Okay. Is that the Nissan Sentra you were using?

A Yes, it was.

Q And your testimony a few minutes ago was that Randy was driving?

A Yes. Yes, I did.

Q Whose idea, if you recall, was it to go to the apartment?

A Randy.

Q And tell us what happened?

A We went to the apartment, and we went ins- -- we were looking for -- we were supposed to knock on the door and -- so we can use the phone.

Q Did you three have a plan?

A Already, yeah.

Q I'm sorry?

A Yes, we did.

Q Can you tell us what the plan was?

A The plan was for me and Randy to go inside -- me and Candy to go inside the -- the house, and use the telephone.

Q Okay. Whose idea was this?

A Randy's.

Q And what was the purpose of going to use the telephone?

A So me and Candelaria can enter while Randy comes in.

Q Okay. And tell us what happened when you got to the apartment?

A We went around, we were looking for a place, and we found a room, and then we knocked on the door, and then we asked the lady can we come in.

Q Okay. Could you describe that lady, the best you remember?

A She's short, and she's Asian.

Q Okay. And did you go in the apartment?

A Yes, we did.

Q Who went in first?

A Me.

Q And then what happened -- or who came in next?

A Then Candy.

Q And when you got in there, would you tell the jury what happened when you got into the apartment?

A We asked to use the phone.

Q And then?

A And then she went to go get the phone in the room area.

Q Okay.

A Then she came outside, and then Randy came inside.

Q Okay. Now how do you know Randy came inside?

A Because the door closed behind us.

Q Okay. Did you see Randy inside?

A Yes.

Q I'm sorry?

A Yes, I did.

Q What, if anything, was Randy carrying?

A A gun.

Q What did he do with the gun?

A He faced it to the lady.

Q Okay. Could you describe that for the jury, please?

A It was a old, gray pistol.

MR. FISHER: Okay.

Your Honor, may I approach for the purpose of retrieving People's 1?

THE COURT: Yes.

Q BY MR. FISHER: Sir, I'm going to show you what's been marked as People's 1. It's a handgun. Does that look like the handgun that you saw him holding?

A Yes.

Q Where was the lady in the apartment when this

happened?

A Inside her room.

MR. FISHER: Okay.

Your Honor, if I can retrieve a People's exhibit here?

THE COURT: Yes.

Q BY MR. FISHER: Mr. Mendiola, I'm showing you what has been marked Prosecution Exhibit 25, which has been identified as the apartment --

A Uh-huh.

Q -- the lady owned. Could you show this, could you point out to the jury where you were when you came in, and where the lady was when you saw the defendant pointing the gun at her?

A (Indiscernible.)

Q Okay. And you indicated an area a little bit down and to the left of the K in the word "kitchen"?

A Yeah.

Q Did the defendant say anything to the lady?

A "Where's the money, bitch?"

Q Okay. Did she respond?

A Yes, she did.

Q Could you tell us what happened?

A She said she didn't have any money.

Q Okay. And if you would please, tell the jury

what happened after this?

A They went inside the bedroom, while me and Candy was in the kitchen.

Q Okay. And when you said, "They went inside the bedroom," can you tell us who "they" are?

A The fe- -- the lady and Randy.

Q What happened next?

A Me and Candy went into this one room, and Randy and the lady was in the other side, and we found a purse inside, then we brought it to the livingroom.

Q I'm sorry?

A We brought it to the livingroom.

MR. FISHER: Okay.

And, Your Honor, may I approach for the purpose of retrieving a couple more photographs?

THE COURT: Yes.

MR. FISHER: Your Honor, I've retrieved Prosecution's 13 and 14, which I'm showing to defense counsel, and if I may approach the witness?

THE COURT: (No audible response.)

Q BY MR. FISHER: Sir, I've got two pictures that were already marked 13 and 14. Do you recognize what is depicted in the pictures?

A Yes, I do.

Q Okay. What is that?

A That belongs to the -- that lady.

Q Okay. But can you tell the jury what it is that you see?

A A purse.

Q Okay. Is that the purse that you all had in the apartment that night?

A Yes, it was.

Q Now your testimony a few minutes ago was that you and Candy took the purse into the livingroom; did I understand that?

A Yes.

Q Okay. What happened next?

A We heard the lady say her father's coming. I mean, her husband's coming.

Q And when this was happening, where was the defendant?

A Inside the room with her.

Q Okay. Is that the bedroom, or the livingroom, or --

A In the bedroom.

Q Then what happened?

A And then when we heard -- she said her husband's coming, I got nervous, and then I said, "Let's go. We'll go get out of here."

Q Okay. And did you leave?

A Yes, we did.

Q What happened after that?

A Randy was behind us.

Q Okay. And then what did you do?

A We got in the car, and then we went -- we went to Golden Motel.

Q Okay. Which is that?

A Golden Motel in Tamuning.

Q Why did you go to the Golden Motel?

A So we can go to Randy and Candelaria's place.

Q From what you remember, is that where they were staying?

A Yes.

Q What did you do at the Golden Motel?

A We were checking out the purse.

Q And what happened?

A And then I had a -- We didn't find anything. I -- I asked for coin poi- -- coin purse, so I can get me a pack of cigarettes.

Q Okay. Where did you get this coin purse?

A From that purse.

Q Okay. It was inside?

A It was inside, yeah.

MR. FISHER: Your Honor, may I approach for the purpose of retrieving Prosecution Exhibit 3 for

identification?

THE COURT: Yes.

MR. FISHER: Thank you.

(Brief pause.)

MR. FISHER: And, Your Honor, I'm showing Prosecution Exhibit 3 for identification to Mr. Timblin for his inspection.

May I approach the witness, Your Honor?

THE COURT: Yes, you may.

Q BY MR. FISHER: Sir, I just retrieved from the table there, Prosecution Exhibit 3 for identification. Could you examine that? You could open it, if you want to.

Do you recognize that?

A Yes, I do. Yes, I do.

Q And what is that?

A The coin purse that I got from the -- the hand purse.

Q Does it look like it did two years ago when you got it?

A Yes, it does.

MR. FISHER: Your Honor, at this time the People would offer three for identification into evidence.

THE COURT: Any objections?

MR. TIMBLIN: No objection.

THE COURT: There being no objections, so ordered.

(People's Exhibit 3 admitted into evidence.)

Q BY MR. FISHER: And that came out of the purse in the picture?

A Yes.

Q Were you staying at the Golden Motel also?

A No, I wasn't.

Q What happened after you and Candy and the defendant looked through the purse?

A We went to Thrifty's. We -- I told them to drop me home because I needed to go out.

Q Okay. And did they do that?

A Yeah, but before then we went to Thrifty's so I can get me a pack of cigarettes.

Q Okay. I wanted to ask you another question about the gun and when you were in the apartment.

A Uh-huh.

Q To your recollection when was the first time you saw the defendant holding the gun in the apartment?

A Right when he closed the door behind us.

Q All right. And that does look like the gun he was holding?

A Yes, it does.

Q Mr. Mendiola, you have an agreement with the attorney general's office, don't you?

A Yes, I do.

Q Okay. And isn't it true that you pled guilty to third degree robbery in this incident?

A Yes, I did.

Q What's the deal that you got with the AGs?

A To testify against Randy.

Q Okay. And if you testify against Randy, did we tell you that we would do something for you?

A Yes, you guys did.

Q Okay. And what is that?

A To get me in probation, or to not let me go to jail, or something.

Q Okay. And are you supposed to testify truthfully?

A Yes.

Q What would happen, according to your understanding, if you got on the stand today and lied?

A There'll be no agreement.

Q And what could happen to you?

A It can ru- -- get me in a position I don't want to be in.

Q And what's that?

A Going back to jail, and being with Randy.

Q Okay. Is your understanding that you could go to jail for three years, or even more than three years?

A Yes.

Q Okay. So you made a deal with our office to tell the truth?

A Yes.

Q Are you telling the truth?

A Yes, I am.

Q Sir, that night -- Just a couple of follow-up questions. That night, do you recall whether or not the defendant was wearing anything on his head?

A No.

Q Okay. You don't recall?

A No.

MR. FISHER: Your Honor, I have no further questions. Thank you.

THE COURT: Mr. Timblin, on cross?

Cross-Examination

by Mr. Timblin:

Q Mr. Mendiola, on the plea agreement, did you understand that the charges you've pled guilty to is third degree robbery?

A Yes.

Q And you understand that the maximum penalty, the most you can get for that is three years in jail?

A Yes, I do.

Q Do you understand that you of course were charged

before with, I believe, first degree robbery; is that correct?

A Yes, I did.

Q All right. And --

A Yes, I was.

Q -- did your lawyer -- You have a lawyer, don't you?

A Yes, I do.

Q And who is that?

A Terry Long.

Q Okay. Did Mr. Long tell you how much time you could get on the charge that you were originally charged with, first degree?

A I'd say about eight years.

Q Eight years. Okay. And you very much do not want to go to jail, do you?

A No, I don't.

Q Now did you personally, when you were in the apartment, did you take anything from this lady's apartment?

A Yes, we did.

Q What was that?

A A hand purse.

Q A what?

A A hand purse.

Q Was it that hand purse that Mr. Fisher showed you, or another one?

A This one.

Q This one. Okay. So you didn't find that -- Okay. So are you showing me now the --

THE COURT: That's Exhibit 3, right?

MR. TIMBLIN: Okay.

THE COURT: Okay. The witness is showing Mr. Timblin Exhibit 3.

Q BY MR. TIMBLIN: So looking at Exhibit 3, sir, you didn't find this purse out of this purse, right?

A Yes, I did. That's why it's not in that picture.

Q Oh. But you took the purse?

A No, me and Candy both did it. Candy held onto it.

MR. FISHER: Your Honor, if I may interject. Exhibit 3 is the small one.

MR. TIMBLIN: (Indiscernible) thirteen.

Q So you and Candy took this purse --

A Uh-huh.

Q -- Exhibit 3?

A Yes, we did.

Q Okay. And in that purse was the --

A Coin purse.

Q -- yellow small coin purse you just showed us

here?

A Yes.

Q And you took that?

A Yes, I did.

Q Mr. Mendiola, at some point you described what happened that night. Were you arrested for this offense?

A That evening?

Q At some time? Were you arrested at anytime?

A No. I was arrested the next day, in the afternoon.

Q Okay. And where did this take place?

A The trailer park in Ypao, Ypao Road.

Q This is where you live?

A Yes, it -- Yeah.

Q Do you have any roommates there?

A Yes, I do.

Q How many?

A We had about three.

Q How long had you known Candelaria Mendiola before this happened?

A I'd say about three weeks to a month.

Q Had you known Randy before that?

A Yes, I did.

Q How long?

A Same time.

Q Okay. And at that time this took place, I take it, we've had testimony you were basically dressed as a female; is that correct?

A Yes, I was. I'm a cross dresser.

MR. TIMBLIN: No further questions.

THE COURT: Any other questions on redirect, Mr. Fisher?

MR. FISHER: No, thank you, Your Honor.

THE COURT: Okay. Mr. Mendiola, you may step down. Thank you very much.

MR. FISHER: May we approach, Your Honor?

THE COURT: Yes.

*(Conference held at bench follows.)*

THE COURT: This is where you're going to break?

MR. FISHER: Yes, sir, because I want to call Candy up.

THE COURT: If you want, we could recess and do the change of pleas.

MR. FISHER: Okay.

THE COURT: The --

MR. FISHER: (Indiscernible.)

THE COURT: I'll have the marshals (indiscernible).

MR. FISHER: Okay.

THE COURT: Okay? Does she have (indiscernible)?

MR. FISHER: I don't know. She might be in her

jumper.

THE COURT: (Indiscernible.)

MR. TIMBLIN: We're still going to do her this morning, though, Candy?

THE COURT: Yeah, I think we could finish it this morning.

*(End bench conference.)*

THE COURT: Okay. The Court will take a 15-minute recess, okay?

THE BAILIFF: All rise.

*(Recess.)*

THE BAILIFF: The Superior Court of Guam is now in session. The honorable Alberto C. Lamorena III, presiding. Draw near and give your attention and you shall be heard. God save Guam and this honorable Court.

Please be seated.

THE COURT: Okay. Your next witness, Mr. Fisher.

MR. FISHER: Yes, thank you, Your Honor. The People call Ms. Candelaria Mendiola.

THE CLERK: Raise your right hand.

*Candelaria Quidachay Mendiola,*
*called as a witness by the People,*
*having been first duly sworn, testified on her oath as follows:*

THE CLERK: Please be seated and state your full name.

THE WITNESS: Candelaria Quidachay Mendiola.

THE COURT: Mr. Fisher, you may proceed.

MR. FISHER: Thank you.

Direct Examination

by Mr. Fisher:

Q Ms. Mendiola, do you know a person named Randy Chargualaf?

A Yes.

Q Do you see Mr. Randy Chargualaf in the courtroom today?

A Yes.

Q Could you tell us where he is sitting, and could you describe one piece of clothing that he's wearing?

A His brown pants.

Q And where is he seated?

A On the right.

MR. FISHER: Your Honor, the People would ask the Court to take note of an in-court identification.

THE COURT: Okay. So ordered.

Q BY MR. FISHER: Ma'am, how long have you known Randy Chargualaf?

A Maybe, like, a year.

Q Okay. A year?

A Yes.

Q From today?

A Yes.

Q Now did you know Randy Chargualaf in 1997?

A Yes.

Q Is that more than one year?

A It's a year from the time that we were involved with that thing.

Q Oh, okay. So before that thing you'd only known him one year?

A Yes.

Q Okay. Ma'am, are you currently -- today, you're at the Hagatna lockup?

A No.

Q Okay. Is that why you're wearing an orange jumpsuit?

A Yes, sir.

Q Okay. Why are you at the lockup?

A Because I didn't go to my court hearing.

Q Did a judge then lock you up?

A Yes.

Q I asked you to testify in court today, didn't I?

A Yes.

Q And do you and I, the attorney general's office and yourself, do we have an agreement, a deal?

A Yes, to show up on -- to go to your office.

Q Yes, ma'am. Okay. Now this thing that you were talking about a few minutes ago?

A Uh-huh?

Q Did you plead guilty to robbery?

A Not guilty.

Q Okay. You pled not guilty to robbery?

A I signed a guilty paper.

Q Okay. And when you signed the guilty paper, did you have a lawyer?

A Yes.

Q Could you tell the jury what the lawyer's name is?

A Anita Sukola.

Q Do you see Ms. Anita Sukola in the courtroom today?

A Yes.

Q Okay. Where is she?

A On my left.

Q Okay. And is Ms. Sukola wearing the black suit on your left?

A Yes.

Q Now when you signed the guilty paper, did the attorney general promise you something?

A No.

Q Okay. Have you been sentenced, or did a judge tell you to go to jail for, you know, a certain amount of time --

A No.

Q -- for that?

A No.

Q Okay. Not yet?

A Not yet.

Q Okay. And earlier do you remember when the Court made you promise to tell the truth?

A Yes.

Q Okay. Did you have an agreement with the attorney general to tell the truth?

A Yes.

Q Okay.

A Not -- not really an agreement, but I was told to go in and talk to you guys, right? Is that something similar to it?

Q Yes, ma'am. And today did we ask you to come and talk to the jury?

A Yes.

Q Did we ask you to tell the truth?

A Yes.

Q Okay. All right.

I want to talk to you about a few years ago, July of 1997?

A Uh-huh.

Q Okay?

A (No audible response.)

Q And then I want to talk about July 20 of 1997. It's been more than two years ago?

A Okay.

Q Okay?

A (No audible response.)

Q Did you see Randy Chargualaf on that day?

A On July --

Q July 20?

A Yes.

Q Okay. Did you see him that night?

A Yes.

Q Could you tell us where you saw him?

A At the room?

Q Okay. Where was that room?

A Golden.

Q Is that Golden Hotel?

A Yes.

Q Did you leave that hotel room with Randy Chargualaf?

A Yes.

Q Can you tell the jury where you went?

A Down to Tamuning.

Q Did you go only with Randy, or was someone else with you?

A With Randy.

Q Did anyone else go?

A Later on.

Q Could you tell us about that?

A We picked up Kaelauni.

Q Is Kaelauni her real name, or --

A "Don," they call her. I mean, Don is her name, but Kaelauni is her -- nickname?

Q Okay. And Don's a male?

A Yes.

Q Okay. Do you remember where you picked Kaelauni, or Don? Do you remember where you picked him?

A Tamuning.

Q What did you do?

A We went to pick her up, and we headed down towards Tumon.

Q Do you remember who was driving?

A Chargualaf.

Q Okay. What happened?

A We were just driving, and that was it.

Q Okay. And did you ever stop anywhere?

A No.

Q Do you remember, did you ever go to an apartment with Randy Chargualaf and Kaelauni?

A Yes.

Q Okay. Can you tell us about that?

A We went to the hotel. I mean, to the -- to the apartment, and --

Q Do you remember where the apartment was?

A Down in Tumon.

Q Okay.

A And we ended up just getting down, and we walked to the -- to the door, and we just asked to use the phone.

Q Okay. Now who's "we"? Who's the people who asked to use the phone?

A I and Kaelauni.

Q Okay.

A Don.

Q Now when you went to the apartment, do you know where Randy Chargualaf was?

A He was in the car.

Q What happened next?

A He -- and we asked to use the phone, and that's when Randy came in.

Q Now did you just walk in, or did you knock on the door, or --

A We knocked on the door.

Q And who answered the door?

A The lady.

Q Do you remember what the lady looked like?

A Short.

Q Okay.

A White complected.

Q Okay. And she answered the door, and let you in?

A Yes.

Q And then what happened?

A And I used the phone, and I just know that I was in the room with Kaelauni.

Q And what happened next?

A And we ended up heading out of the apartment.

Q Okay. You left the apartment?

A Yes.

Q Now you told us a few minutes ago that Randy came in the apartment too?

A Yes.

Q Whose idea was it to go into the apartment?

A It was actually all of ours.

Q Okay. Can you tell us about that? Can you explain what you mean by that?

A We all decided. We didn't pick out what place, we didn't pick out what -- what -- what we were doing. Actually we were just thinking of money.

Q Okay. What were you planning to do when you got to the apartment?

A Going in and using the phone.

Q Why did you three want to go to the apartment?

A To get money.

Q Have you ever heard the word "macking"?

A Yes.

Q Okay. What does "macking" mean?

A Like stealing, like robbing.

Q Did you ever tell anyone that your idea -- or the idea was to go macking?

A Yes, I did say that.

Q Okay. Is that what you were planning on doing?

A Yes.

Q Did you ever hear Randy Chargualaf, the defendant, did you ever hear him use that word?

A No.

Q Okay. So you three were at the apartment, and what happened after you asked the lady to use the phone?

A I went in and -- because she let us in, so I went in --

Q I'm sorry, I didn't hear you.

A She went in. Actually she called us in, so me and Kaelauni went in. Me and Don, we both went in, and I was using the phone. My back was turned against him, so I could not see what was going on behind me.

Q Okay.

A And then I -- me and Kaelauni went into a room,

one of the rooms.

Q And do you remember what the room looked like?

A It was -- there was no bed. It was just, like, boxes.

Q Okay. If I showed you some pictures, do you think you might be able to identify?

A Yes.

MR. FISHER: Okay.

Your Honor, if I may approach for the purpose of retrieving some photographs?

THE COURT: Yes.

Q BY MR. FISHER: Ms. Mendiola, I'm going to show you Prosecution Exhibit 18. Is that a picture there?

A (No audible response.)

Q Can you have a look at it?

A No.

Q Okay. Then let me show you Prosecution Exhibit 16. Is that a picture of a livingroom?

A Yes.

Q Okay. Do you recognize that livingroom?

A Yes.

Q Okay. Is that the room of the lady?

A That's where I used the phone.

Q Okay. That's where you used the phone?

A (No audible response.)

Q Okay. Thank you.

So you'd asked to use the phone, and you said that you and Kaelauni went into a room?

A Yes.

Q Okay. What happened next?

A I just noticed I was in the room with Kaelauni.

Q What were you doing?

A Looking around.

Q Do you remember what you were looking for?

A Money.

Q If you found money, did you want to take the money?

A Yes.

Q Did you find any?

A No.

Q Where was Randy when you and Kaelauni were in the room?

A I -- At that moment, when me and Kaelauni was in the room, I did not remember where he was at that time.

Q Okay. What happened next?

A And me and Kaelauni headed out the door, because her husband was coming home.

Q Okay. Now did Kaelauni go with you?

A Yeah, she did.

Q I want to ask you some more questions about Randy

Chargualaf. When you were in the apartment, did you see him holding anything?

A Uhm, I -- I remember there was something in his hand, but I don't know what it was.

Q Okay. Could you describe what was in his hand?

A No, because I do wear glasses, and it's far. It's --

Q Do you remember writing a statement?

A Yes.

Q And do you remember writing that statement the twenty-first of July, 1997?

A Yes.

Q Is it not true that you stated in that statement that --

MR. TIMBLIN: Objection to the leading, and to impeaching his witness.

THE COURT: Rephrase your question.

MR. FISHER: Your Honor, I am intending to impeach this witness. I believe that she's departing.

THE COURT: Okay.

MR. FISHER: May I?

THE COURT: Yes.

MR. FISHER: Thank you.

THE COURT: In other words you consider her a hostile witness, or --

MR. FISHER: I would ask the Court to declare her a hostile witness, and allow me to (indiscernible).

THE COURT: Any objections, Mr. --

MR. TIMBLIN: I've not seen any indication of hostility, and she has indicated, has already testified to her willingness to testify truthfully.

THE COURT: Okay. I'll hold in abeyance that motion; however, if the defendant continues to, in your perception, the Court will reconsider it, okay?

MR. FISHER: Thank you.

Q You testified a few moments ago that you saw something in his hand, but you don't remember what it was?

A No.

Q What was he doing with this thing that was in his hand?

A He was just moving it around. I don't know what was it, but it could be a wallet, it could be something, but I don't remember. It was just something dark. It was happening too fast.

Q Okay. Was he waving it in any person's direction?

A His hand movement.

Q I'm sorry?

A His hand movement was moving around. That's all I remember.

Q Now when he was moving his hand around, was anyone in front of him?

A The lady.

Q Okay. Is that the lady that you were stealing from?

A Yes.

MR. TIMBLIN: Objection. She has not testified that she stole anything from this lady. It assumes a --

MR. FISHER: I'll rephrase it.

MR. TIMBLIN: -- fact not at issue.

THE COURT: Okay. Rephrase your question.

Q BY MR. FISHER: Is that the lady that you were intending, or hoping to steal from?

A Yes.

Q Okay. Now you stated that you and Kaelauni left the apartment?

A Yes.

Q Where did you go?

A We went out to the car.

Q Was anyone else with you and Kaelauni?

A No, it was only Kaelauni and I.

Q Did you ever see Randy Chargualaf again that night?

A Uhm, at the hotel. We went in the car, and we went to the hotel.

Q Okay. Did he drive the car?

A Yes.

Q Did he drive you and Kaelauni back to the hotel?

A Yes.

Q What happened at the hotel?

A Uhm, Kaelauni and I went through the purse, and --

Q Tell us about the purse?

A We were going through the purse, and all we found was just papers.

Q Where did you get the purse?

A From the lady's house. That was her purse.

Q Did the lady, did she give it to you?

A No.

Q Did you and Kaelauni take it?

A Uhm, I know I didn't have it. It must -- Kaelauni.

Q Now when you got back to the hotel, your testimony was you went through the purse?

A Yes.

Q Who was going through the purse?

A Kaelauni and I.

Q And do you remember if anyone was in the hotel with you?

A No.

Q Just -- Only you and Kaelauni?

A And Chargualaf.

Q Okay. He was in the hotel room with you?

A (No audible response.)

Q What happened next?

A And then we just went (indiscernible), and then we dropped Kaelauni back home.

Q Okay.

A And that's when we got pulled over.

Q Okay. Now when you got pulled over, who pulled you over?

A The policeman.

Q Was that the next day, or the same day?

A It was early in the morning.

Q Okay. After you had been to the lady's apartment?

A Yeah.

Q Okay. Ma'am, if you don't understand any of my questions, will you ask me to explain it?

A Yes.

Q Okay. I want to ask you about when you got pulled over. Who was driving the car, do you remember?

A Chargualaf.

Q What happened when you got pulled over?

A The cops asked us to get out of the vehicle so

they can search the car.

Q And did you do that?

A Yes, we did.

Q Before you got out of the vehicle, did a policeman come to the car?

A Yes.

Q What happened?

A He pulled us over, and Randy was asking what did he pull us over for, and he said because our windshield is cracked and our license plate is expired, and he told us to step out of the vehicle, and Randy asked him, "For what? Isn't it because of the car windshield is cracked, and the license plate," and the cop said, "Can you just step out, because I need to search your vehicle."

Q And what happened?

A And when we got out of the car, they searched the vehicle.

Q Now before you got out of the car, did you get out of the car?

A Yes, I did.

Q Did Randy Chargualaf get out of the car?

A Yes.

Q Tell us about how Randy got out of the car?

A Uhm, he opened the door?

Q Who's "he"?

A Chargualaf.

Q Describe that, please?

A He got out. He opened the car door, right?

Q Uh-huh.

A What are you talking about: how?

Q If you could just describe that. Did anything strange happen?

A Just his movements. He was moving around.

Q Okay. Now do you know whether or not Mr. Chargualaf had anything in his hands at the time?

A No.

Q Okay. You don't know?

A No.

MR. FISHER: Your Honor, if I may I'd like to have an exhibit marked, please?

THE COURT: Yes.

(People's Exhibit 31 marked for identification.)

MR. FISHER: Now Ms. Mendiola, did you write this statement about the events of the twentieth and twenty-first of 1997?

A Yes.

MR. FISHER: With the Court's permission I would approach the witness with what has been marked People's 31 for identification?

THE COURT: Yes.

MR. TIMBLIN: Renew my objection to any reference to this.

THE COURT: Which reference was that?

MR. TIMBLIN: Well, to the statement.

THE COURT: What's the purpose of your objection?

MR. TIMBLIN: Again, essentially impeaching his witness.

MR. FISHER: Your Honor, any party may impeach a witness.

THE COURT: Okay. Overruled.

Go ahead, Mr. Fisher.

MR. FISHER: Thank you, Your Honor.

Q Would you look at that, People's 31 for identification, and I think there are four pages there. Have you seen that before?

A Yes, I have. I'm the one that wrote it.

Q Okay. And when did you write it?

A The twenty-first.

Q Okay. And if I can, I'll just go ahead and retrieve that from you.

Now you stated that you're the one who wrote this?

A Yes.

Q Then you signed it?

A Yes.

Q Is it not true, miss, that this statement contains the phrase, "The above is true and correct to the best of my knowledge and belief"?

A Yes. And --

Q And -- Go ahead.

A I -- I forgot what I was going to say.

Q When you wrote this statement, did you intend to tall the truth?

A Yes.

Q Okay. Is it not a fact, ma'am, that you stated on the twenty-first of July that Randy said, "'Hey, let's go macking.' Macking means robbing people or, like, stealing"?

A Everything happened so fast. I was just helped to write that.

Q On June 21 --

MR. TIMBLIN: I couldn't hear her (indiscernible).

THE COURT: What was your statement, miss?

THE WITNESS: I was helped to write that statement.

MR. TIMBLIN: Helped to write --

Q BY MR. FISHER: Who helped you to write the statement?

A One of the police officers.

Q When?

A On that day.

Q What's the police officer's name?

A I don't remember.

Q Describe the police officer.

A I don't remember.

Q Male or female?

A I don't remember.

Q Is it not a fact, ma'am -- I'll repeat my question -- that on the twenty-first of July, 1997, you wrote, "Randy said, 'Hey, let's go macking.' Macking means robbing people or, like, stealing"?

MR. TIMBLIN: Objection. Asked and answered.

MR. FISHER: She has not answered the question, Your Honor.

MR. TIMBLIN: I believe she said she doesn't recall making the statement.

MR. FISHER: Your Honor, I object to counsel --

THE COURT: Okay. I'll overrule the objections.

Q BY MR. FISHER: Did you or did you not state, on the twenty-first of July, 1997, "Randy said, 'Hey, let's go macking.' Macking means robbing people or, like stealing"?

A If that's what I wrote, yes.

Q Did you write that?

A Yes.

Q Is it not a fact, ma'am, that you said, "I took

the phone from the lady, and was pretending to dial. I didn't know Randy had already come in with his gun until I saw him pass me with her. Randy was pointing the gun at the lady, and bringing her in the room"?

A If those are what I wrote, yes, but I told you --

Q Did you write that?

A I did write it.

Q Did you not write, "Randy had the money," on July 21, 1997?

A Yes.

Q Referring to the twenty-first, as well as your statement, did you not say that on the twenty-first, "A cop pulled us over"?

A Yes.

Q Did you not say on the twenty-first of June, 1997, "Randy had the gun"?

A Not say, but wrote.

Q Did you write that?

A Yes.

Q Did you not write, "The cop asked him to step out. Randy acted as if the door was broken"?

A Yes.

Q Did you not write on that date, "But it wasn't"?

A Yes.

Q Did you not write on the twenty-first, "He was

actually trying to put the gun in his pants"?

A Yes.

Q Did you not write on the twenty-first, "He opened the door and got out"?

A Yes.

Q Did you not write on the twenty-first, "He put the gun down next to both of us"?

A Yes.

Q Did you not write on the twenty-first, "That's when the other two cops came, Officer Santo Tomas and another"?

A Yes.

Q And did you not write that that's when they searched the vehicle?

A Yes.

Q Did you not write that "Officer Santo Tomas questioned me of the gun"?

A Yes.

Q And that you told him who owned it?

A Yes.

Q Did you not review this statement before you signed it?

A Yes.

Q And did you not, on each page, read where it says, "The correct is true to the best of my knowledge"?

A Yes.

Q Ms. Mendiola, on the twenty-first of July, 1997, did you speak to a police officer of the Guam Police Department named Grino, Mercy Grino?

A I don't remember.

Q Do you remember talking to any police officer?

A Yes.

Q Do you remember telling, not writing, but telling the police officer that you had all agreed to go and rob, or steal from someone?

A Yes.

Q Did you not tell a police officer, not write, but tell a police officer that Mr. Chargualaf drove to the apartments which were located behind the Acanta mall in Tumon?

A Not the direction, but I did say he was the driver.

Q Did you not tell the police on the twenty-first that Mr. Chargualaf entered after you and Kaelauni, pointing the gun at the woman?

A I don't understand.

Q Did you not tell the police, on the twenty-first of July, that Randy Chargualaf entered the apartment pointing the gun at the woman?

A I was explaining what I wrote down on the

statement.

Q Did you not tell the police that a purse that was taken from that woman was thrown into a garbage can outside the Golden Motel?

A I didn't, no.

Q You didn't say that?

A I didn't say that.

Q Did you not tell the police that the purse was still in the large garbage bin, and that the coin purse was taken by Kaelauni?

A The what?

Q Did you not tell the police on the twenty-first of July --

A Uh-huh?

Q -- that the purse was still in the large garbage bin?

A I didn't.

Q You deny saying that?

A Yes.

Q When's the last time you spoke to the defendant, Randy Chargualaf?

A Long time.

Q How long?

A Couple of months back.

Q So two months ago, or a couple of months you

spoke to him?

A Maybe like five months ago, or something. More than five.

Q Did you call him or did he call you?

A He called me.

Q How many times have you spoken to him since this took place?

A Like ten.

Q Ten times?

A (Indiscernible.)

Q And he's called you ten times?

A Between five and ten.

MR. FISHER: May I have just a moment, Your Honor?

THE COURT: Yes.

(Brief pause.)

MR. FISHER: Your Honor, may counsel approach?

THE COURT: Yes.

*(Conference at bench:)*

THE COURT: (Indiscernible.)

MR. FISHER: I'm sorry?

THE COURT: Do you want Ms. Sukola present?

MR. FISHER: If it's all right with Mr. Timblin.

MR. TIMBLIN: I'm sorry, what?

MR. FISHER: (Indiscernible) -- Anita?

MR. TIMBLIN: I don't understand your --

MR. FISHER: Do you want Anita to be here?

MR. TIMBLIN: Oh, I have no objection one way or the other.

MR. FISHER: Anita.

(Brief pause.)

MR. TIMBLIN: I would object to any further coaching of her, though. I mean, she still hasn't finished her testimony. I would object to it. Could we have this stopped?

THE COURT: Okay.

MR. FISHER: Okay.

(Brief pause.)

MR. FISHER: I don't have any further questions of this witness, Your Honor. We had a deal with her to tell the truth. I was just forced to impeach her. I feel that she has testified untruthfully. She has indicated to Ms. Mendiola, prior to her beginning her testimony, that she would in fact testify truthfully. She's departed significantly from two prior statements. I believe she's lied on the stand, that's why I was forced to impeach her.

After I finished the statement I went and I told her counsel, Ms. Sukola, that, you know, we had a deal, and in my estimation this witness has blown it, and I asked Ms. Sukola if she would like the opportunity to talk to her client, and that's why I asked the Court if we could

approach.

MR. TIMBLIN: Okay. Well, I'm going to object at this point to any talking, coaching, whatever. I mean, she said what she said. I mean, she hasn't, you know, finished testifying, and --

THE COURT: Okay. I'll sustain the objection.

MR. FISHER: Okay.

MR. TIMBLIN: Okay.

THE COURT: Okay. So we'll start with the cross.

*(End bench conference.)*

MR. FISHER: Your Honor, I have no further questions.

THE COURT: Okay. Mr. Timblin, any cross-examination?

MR. TIMBLIN: Yes, Your Honor. Thank you.

*Cross-Examination*

*by Mr. Timblin:*

Q Ms. Mendiola, what you told Mr. Fisher today is what you actually remember as what happened two years ago?

A Yes.

Q Is that correct?

A (No audible response.)

Q Okay. And so it's your testimony, basically, that you and Kaelauni went into this lady's house, stole her purse, and left?

A Yes.

Q Okay. And you testified, you told Mr. Fisher

earlier that you agreed to testify truthfully; is that correct?

A Yes.

Q Okay. And as a result of this, okay, you entered into what you called a "guilty paper"?

A Yes.

Q Okay. And did you understand that you yourself is charged with a more serious crime, right, a serious robbery charge?

A I don't --

Q Or do you understand?

A I don't understand.

Q You don't understand. Okay.

You indicated that Mr. Fisher read you a statement that you wrote. You said that you had some "help."

A Yes.

Q What do you mean by "help," ma'am -- or miss?

A Uhm, I was -- everything was happening so fast. I was talking to the police officers, and I was telling them I didn't know how to write it, so some of the sentence they'll fill it out for me and, there, I would write it.

Q Okay. So in other words the police officer told you what to write?

MR. FISHER: Objection. Misstates the answer.

THE COURT: Rephrase your question.

MR. TIMBLIN: (Indiscernible.)

Q You said the police officer helped you. How did the police officer help you?

A I would tell them that I didn't know how to write it, and they would say -- they would tell me, "Look, this is what you said," and -- and I will tell them that, "Something like that, but it's not exactly," and then they'll tell me, "Just write this one down."

Q Okay. So you were writing it?

A Yes.

Q But you were writing what the police officer told you to write?

A Yes.

Q You mentioned about being pulled over by the police officer the next day. Remember that?

A Yes.

Q Okay. And all you remember is that you got pulled over and Randy got out of the car?

A Yes.

Q Did the police officer say anything about, you know, wanting to search the car?

A They just told us to get out of the vehicle, and Randy asked them, "For what," and he said he was going to search the vehicle.

Q Okay. Did the police officer ask Randy for permission to search the vehicle? Did he say, "May we search the vehicle," or did he say just, "Get out"?

A They told us to get out.

Q Okay. Did you ever hear --

A Permission?

Q Pardon?

A Permission?

Q Yeah. Did Randy give permission, if you know?

A No.

Q He didn't?

A (No audible response.)

MR. TIMBLIN: No further questions.

THE COURT: On redirect, Mr. Fisher.

MR. FISHER: Yes, sir.

Redirect Examination

by Mr. Fisher:

Q You three entered the apartment to steal?

A Yes.

Q And that includes the defendant?

A Yes.

Q You stated that a police officer told you what to write, then you wrote it down?

A Uh-huh.

Q Is that correct?

A Yes.

Q I have some questions to ask you about People's 31 for identification.

You've already testified -- What are your initials? What's your first name?

A Candelaria.

Q What's your last name?

A Mendiola.

Q What are your initials?

A CM.

Q I'm going to go through People's 31 for identification with you. Looking at the first line, do you see where it starts, "Randy had"? Do you see that, those two words, "Randy had"?

A No.

Q Okay. If I can, I'll just point it out to you. Do you see that word? Do you see these two words, "Randy had"?

A Yes.

Q Do you see your initials above those words?

A Yes.

Q Who wrote your initials there?

A I.

Q Okay. So you wrote it?

A (No audible response.)

Q Does that mean that you read that line?

A I was told that for everything that I scratch out, to put CM.

Q Do you see something scratched out next to "Randy had"?

A No.

Q Okay. So why did you put CM?

A I don't know.

Q Okay. But is that your initials?

A Yeah.

Q Okay. Now could you turn to the first page of your statement? There's a 46 written in the bottom right corner.

And that's Discovery page 46, Mr. Timblin.

Do you see that?

A Yes.

Q Do you see the words, "At nine o'clock" on the first line?

A Yes.

Q Do you see your initials?

A Yes.

Q Okay. And are those initials CM?

A Yes.

Q Right above your initials, do you see these words, "After being advised and understanding my

constitutional rights, I am giving the following statement freely and voluntarily"?

A Yes.

Q And then did you put your initials after that?

A Yes.

Q And would you go to the next page, please?

A (No audible response.)

Q Do you see your initials? And I'd like you to look at the fifth line. The words read, "Went knocking on each door."

A Yes.

Q Do you see your initials?

A Uh-huh.

Q Does that mean that you read that line?

A I read it.

Q Did you read it after you wrote it and put your initials next to it?

A Because of the mistake.

Q Okay. So did you scratch it out and put your initials?

A Yes.

Q Do you see your initials anywhere else on that page?

A Above it.

Q Anywhere below it?

A Yeah.

Q Okay. Turn to the next page, please. Do you see your initials anywhere written there?

A The top.

Q Okay. Would you look at the rest of the page, please? Do you see your initials anywhere else on the page?

A Yes.

Q So did you get to read your statement after you wrote it?

A Yes.

Q Now who is the police officer -- You can't remember who this police officer was who helped you and told you what to write?

A No.

Q Cannot describe?

A (No audible response.)

Q Don't know if it's a man or a woman?

A (No audible response.)

Q Okay. Now that was just about two years ago?

A Yes.

MR. FISHER: Your Honor, I have no further questions of the witness.

THE COURT: On recross, Mr. Timblin?

MR. TIMBLIN: Yes, Your Honor.

Recross-Examination

by Mr. Timblin:

Q Ms. Mendiola, you talked to Mr. Fisher about having calls from Randy in the last five months?

A Yeah.

Q Was that something about your brother being arrested, or something like that?

A Yeah, some of the questions. Some of it was about how was I doing.

Q Yeah?

A It was never about the incident.

Q He never said anything about -- to talk about the incident, or suggest you say anything about it?

A No.

MR. TIMBLIN: No further questions.

THE COURT: Any other questions, Mr. Fisher?

MR. FISHER: No, Your Honor. We would ask that this witness be kept at the courthouse (indiscernible). Thank you.

THE COURT: Okay. The defendant will be kept in the courthouse until this afternoon?

MR. FISHER: Yes, please.

THE COURT: Ms. Mendiola, you may step down. Thank you very much.

MR. TIMBLIN: Your Honor, may we approach?

THE COURT: Yes.

(Conference at bench:)

THE COURT: Yes?

MR. TIMBLIN: As far as her being kept in the courthouse, I guess that's neither here nor there, but I would certainly ask for an order that she not be in any way browbeaten, or in any way coerced into coming back and --

What's your plan, I guess. What do you --

MR. FISHER: Well, I don't know. I've still got some more of the case to put on. I may need to recall her. She's a witness. She's under subpoena.

MR. TIMBLIN: Okay. We just don't want her --

THE COURT: (Indiscernible) -- there be no communications.

MR. FISHER: No communications?

THE COURT: At least not with you, with her lawyer.

MR. FISHER: If I want to, can I communicate through Anita, to her?

THE COURT: About what?

MR. FISHER: Well, I don't know. If she decides that she wants to change her mind, and tell the truth --

MR. TIMBLIN: Well, that's the whole thing. I think at this point any change of mind is going to be clearly because somebody leaned on her, and --

MR. FISHER: But you're allowed to cross-examination

her on that.

MR. TIMBLIN: Well, if you --

MR. FISHER: If we do that.

MR. TIMBLIN: (Indiscernible.)

THE COURT: You can always ask her, "Has anybody talked to you not to change your mind."

MR. TIMBLIN: Okay. Anyway. I just (indiscernible) -- record. I think nobody -- there should be no communication until she's finally dismissed.

MR. FISHER: I'm sorry, Your Honor, she's my witness. I think that I should be allowed to speak to any --

THE COURT: Yeah, (indiscernible) -- speak to your witnesses.

You're allowed to cross-examine.

I think I'm going to recess until 2:00. Do you have anymore --

MR. FISHER: Can I put on one more witness? I can put on a short one.

THE COURT: Okay. One short one.

MR. FISHER: At this time I'd like to move her statement into evidence. It's not being offered for the truth of the matter, it would be only to show that she perjured herself on the stand.

MR. TIMBLIN: On that basis I have no objection.

THE COURT: Okay. (Indiscernible.)

MR. TIMBLIN: I am --

MR. FISHER: (Indiscernible.)

THE COURT: (Indiscernible.)

MR. FISHER: Okay.

MR. TIMBLIN: I am going to ask for an instruction, though, (indiscernible) why this thing is being admitted, you know, for impeachment purposes.

THE COURT: (Indiscernible) -- instruction?

MR. TIMBLIN: Oh, sure. I (indiscernible).

THE COURT: For tomorrow?

MR. TIMBLIN: Yeah.

*(End bench conference.)*

MR. FISHER: Your Honor, at this time the People would move People's 31 for identification into evidence, and ask that the words "for identification" be stricken. That's the statement of the last witness.

THE COURT: Which exhibit number? That's Ms. Mendiola's statement?

MR. FISHER: Yes, sir. Number 31.

THE COURT: Okay. No objections, Mr. Timblin?

MR. TIMBLIN: For the purposes that we discussed, I have no objection, (indiscernible).

THE COURT: Okay. So ordered.

*(People's Exhibit 31 admitted into evidence.)*

THE COURT: And you'll prepare that instruction for the Court, right?

MR. TIMBLIN: (No audible response.)

THE COURT: Okay. Your next witness, Mr. Fisher.

MR. FISHER: Yes, Your Honor. Your Honor, the People call Mr. Von Uribe of the Guam Police Department, its records section.

(Brief pause.)

MR. FISHER: Your Honor, while we're waiting for the witness, can I retrieve some exhibits?

THE COURT: Yes.

(Pause.)

THE CLERK: Raise your right hand.

*Silvano Uribe,*

*called as a witness by the People,*

*having been first duly sworn, testified on his oath as follows:*

THE CLERK: Please be seated and state your full name.

THE WITNESS: My name is Silvano Uribe.

THE COURT: Okay. You may be seated.

Mr. Fisher?

MR. FISHER: Thank you.

\\\

\\\

\\\

\\\

Direct Examination

by Mr. Fisher:

Q Sir, where are you currently employed?

A I'm employed with the Guam Police Department Records Section.

Q Can you tell the jury what you do at records section?

A I'm in charge with the firearms unit.

Q And the firearms unit of the records division, what does it do?

A We keep track of all the firearms registered to all the individuals who own firearms, and we also issue firearms' ID cards so they can possess these weapons.

Q Are you required to do that as part of your duties with the Guam Police Department?

A Yes, sir.

Q Do you have a duty to maintain the records of firearms' IDs, and a duty to maintain records of gun registration?

A Yes, sir.

Q Is there a business duty of the Guam Police Department to keep those records accurately?

A Yes, sir.

Q And is there a duty of the Guam Police Department to keep records of firearms' IDs, and gun registration in

the course of your business?

A Yes, sir.

Q And do you know, based on your personal knowledge, whether the Guam Police Department does so?

A Yes, sir.

Q Sir, are you familiar, based on your position with records department, firearms unit, whether or not people residing here on Guam are required, if they wanted a handgun, to get a firearms ID?

A Yes, sir, they are required to have a firearms ID.

Q If you have a firearms ID, and you want to get a gun, do you know whether or not you have to get it registered?

A Yes. All weapons have to be registered.

Q Sir, did you speak to either myself or a representative of the office of the attorney general about records relating to Mr. Randy Chargualaf?

A Yes, sir.

Q Sir, did we ask you to search for a firearms' ID card for Mr. Randy Chargualaf?

A Yes, sir.

Q And can you tell us what the result of your search was?

A The search came up negative. He has no firearms'

ID, and he has no weapons registered to him.

Q Okay. So my next question was going to be did we ask you also to see if he's got any guns registered to him?

A Yes, sir.

Q And you did that?

A Yes, sir. There was no weapons registered to Mr. Chargualaf.

Q If an individual on Guam wants to carry a gun in their jacket, or hidden someplace in their car, or whatever, do you need to get any sort of special permit?

A Yeah. It's called a Concealed Firearms ID, and that one's issued mainly by the chief of police -- only by the chief of police.

Q And are records of concealed firearms IDs kept by the Guam Police Department?

A Yes, sir.

Q Are they kept in the normal course of your business?

A Yes, sir.

Q And is the Guam Police Department Records Section required to keep these?

A Yes, sir.

Q Are they kept in your division?

A Yes, yes.

Q In the course of your search, did you ever see a

concealed firearms ID, or identification issued to Mr. Randy Chargualaf?

A No.

Q How long have you been with the Guam Police Department, sir?

A I've been with the Guam Police Department for -- going on five years.

Q And how long have you been in the records division?

A Going on three years now.

Q Have you always been in the firearms section?

A No. At first I started with the public service counter, then I went to reports unit, and for the past six months I've been with the firearms unit.

Q Okay. In the records division, are those just the police records that the police officers on the street generate?

A Police officers, conservation, port authority police, airport police. Any law enforcement agency.

Q All right. Sir, I'm going to show you what's been marked 26 for identification, and 28 for identification. Could you have a look at those, please?

A (No audible response.)

Q Sir, could you tell us, have you ever seen a form like that before?

A Yes, sir.

Q All right. Now I'm also going to go ahead and show you 27 for identification. Could you have a look at that? Could you tell us what those three exhibits are?

A They're custody receipts.

Q Do you recognize that form?

A Yes, sir.

Q Who uses that?

A Our property unit.

Q Is there anybody besides your property unit who would fill -- or who fills out the form?

A The property unit, the armory, and sometimes crime lab.

Q Do you know whether or not police officers with the Guam Police Department ever fill out any part of that?

A Yeah. They're the ones who additionally give the information, and sometimes they do fill it out.

Q Is that form produced -- when it's blank, is it -- is it made and passed out by the Guam Police Department?

A Yeah, it's a stack. You just tear off the sheet, and you fill it out.

Q Is it an official form of the Guam Police Department?

A Yes, sir.

Q Is it used, to your knowledge, and based on your experience, in the normal course of the business of the Guam Police Department?

A Yes, sir. Whenever evidence is taken into custody, or any property, it has to be logged in.

Q Based on your experience and your position, are members of the Guam Police Department under any business duty, or under any duty to put the information there accurately?

A Yes, sir.

Q And is that information then kept in the normal course of the business of the Guam Police Department?

A Yes, sir.

Q And once again that is a Guam Police Department form?

A Yes, sir.

Q Where is it kept?

A At the records section with the main report.

MR. FISHER: Thank you, sir.

Your Honor, at this time the People would move Prosecution 25 -- or excuse me -- 26, 27, and 28 for identification into evidence, and ask that the words "For identification," be stricken.

THE COURT: Any objections, Mr. Timblin?

MR. TIMBLIN: No objection.

THE COURT: There being no objection, so ordered.

*(People's Exhibits 26, 27, and 28 admitted into evidence.)*

MR. FISHER: Thank you.

Officer, I have no other questions.

THE COURT: Okay. Mr. Timblin, any questions?

MR. TIMBLIN: No questions of this witness.

THE COURT: Okay. Officer Uribe, you may step down. Thank you very much.

I guess we'll take a luncheon break. No objections from both counsels. Okay.

We'll recess until two o'clock, okay? Court stands adjourned.

THE BAILIFF: All rise.

*(At this point in proceedings the luncheon recess was taken; the above mentioned trial to resume at the hour of two o'clock p.m.)*

THE BAILIFF: The Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena III presiding. Draw near and give your attention and you shall be heard. God save Guam and this honorable Court.

Please be seated.

THE COURT: Okay. CF317-97, People of Guam vs. Randy Ignacio Chargualaf. Just for the record all 12 jurors and two alternates are present. Good afternoon to all of you.

JUROR: Good afternoon.

JUROR: Good afternoon.

THE COURT: Mr. Fisher's present, representing the People, and the defendant is present with his lawyer, Mr. Timblin.

Your next witness, Mr. Fisher?

MR. FISHER: Your Honor, the People recall Officer Mercy Grino.

(Brief pause.)

MR. FISHER: Your Honor, if I can, I'm going to retrieve People's 31?

THE COURT: Yes.

MR. FISHER: And that is the statement of Candelaria Mendiola.

(Brief pause.)

THE COURT: Be seated, Officer.

I'd just like to remind you, Officer Grino, that you're still under oath, okay?

THE WITNESS: Yes, sir.

THE COURT: You may proceed, Mr. Fisher.

MR. FISHER: Thank you, sir.

*Mercy Grino,*

*recalled as a witness by the People, having been previously sworn, further testified on her oath as follows:*

\\\

Direct Examination

by Mr. Fisher:

Q Officer Grino, you took -- or witnessed a statement by Candelaria Mendiola?

A Yes, sir.

Q And I have what's been marked People's 31, and I'm going to show that to you. I'd ask you to identify that?

A This is the statement Ms. Mendiola wrote out that day.

Q Okay. Did you witness her making the statement?

A Yes, sir.

Q Could you describe for the jury where the statement was taken?

A This was taken at Tamuning Precinct in the "admin" office.

Q And could you describe the admin office for the jury?

A It's in a separate room from the briefing area.

Q How did you take that statement from her?

A Excuse me?

Q How did you take that from her?

A Oh.

Q Did you give her a piece of paper and say, "Write," or --

A I gave her the statement form, and I informed her that -- to write her name on the top, and also to -- to go ahead and write down what she informed me.

Q Okay. Prior to doing so do you recall whether or not you read or gave to her what's known as her Miranda warnings?

A Yes, sir.

MR. FISHER: Your Honor, may I approach for the purpose of having this marked as People's 32 next in order?

THE COURT: Yes.

MR. FISHER: For identification.

*(People's Exhibit 32 marked for identification.)*

MR. FISHER: And, Your Honor, I have what's been marked People's 32 for identification, which I'm showing Mr. Timblin. I have made some of my own writing right here, and I will submit a clean form to the Court.

Q Officer Grino, I'm showing you what's been marked Prosecution Exhibit 32 for identification. Could you tell us what that is?

A This is the written statement form that I presented to Ms. Mendiola.

Q Did Ms. Mendiola appear to understand the rights that you gave her?

A Yes, sir.

Q Okay. Did she agree to make a statement afterwards?

A Yes, sir.

Q Now did you speak to her then?

A Yes, sir.

Q Okay. And when you spoke to her, did you make a police report about what it was she said?

A Yes, sir.

Q Did you bring the police report with you?

A Yes, sir.

Q I have a couple of questions. Did or did not Ms. Mendiola tell you that the purse had been thrown into the garbage can outside of the motel?

A Yes, sir.

Q She did tell you that?

A Yes, sir.

Q Did you record that in your police report?

A Yes, I did, sir.

Q Okay. Did Ms. Mendiola tell you, or did she not tell you that she had stated the purse was still in the large garbage bin, and that the coin purse was taken by Kaelauni to her home?

A Yes, sir

Q And so she did tell you that?

A Yes, sir.

Q Focusing, ma'am, on Ms. Mendiola's written statement, did you at anytime direct her what to write?

A She asked me at one point what she should write, and I informed her that she should write what she had told me earlier.

Q Did you at anytime suggest to her, or tell her to put in a detail, or anything like that?

A We reviewed her statement once, and I had to remind her once or twice about something she told me which wasn't on the statement form.

Q And when that happened what, if anything, did she do?

A She -- she was hesitant, but I don't -- She was hesitant, and then she went ahead and wrote it.

Q Did you force her to write that?

A No, sir.

Q If she didn't want to write it, would you have forced her?

A No, sir.

Q Are the words that she put in her statement, are those her own?

A Yes, sir.

Q Did you promise her anything if she'd write the statement?

A No, sir.

Q Do you recall whether or not she had an opportunity to review her statement?

A Yes, she did, sir.

Q Are you aware that a Ms. Noboyo Certeza is a victim in this case?

A Yes. She was -- she arrived at the precinct and we, Ms. Mendiola and I, were seated in the admin office, and Ms. Candelaria was the one who pointed out who she was.

Q Okay. Did you know her before that?

A I handled a case with her prior, but prior to that, no.

Q But Candelaria Mendiola pointed her out to you?

A Yes, sir.

Q Did you know the details of Ms. Certeza's statement when you spoke to Candelaria Mendiola?

A No, sir.

Q What about Don Mendiola, did you know the details of his statement?

A No, sir.

Q Do you know why Candelaria Mendiola pointed out Noboyo Certeza to you?

A She stated that that was the female they met in the apartment.

Q And you didn't know any of the details of her statement prior to talking to Candelaria?

A No, sir.

MR. FISHER: Thank you. I have no further questions.

THE COURT: Mr. Timblin, on cross-examination.

Cross-Examination

by Mr. Timblin:

Q Officer, looking at -- do you have the exhibit in front of you, the statement that Ms. Candelaria made?

A Yes, sir.

Q Okay. And do you notice the time the statement began?

A She stated --

Q No, no, the time. The time noted on the statement. July 21; is there a time in front of it?

A Yes. She put down 2:00 p.m.

Q Okay. And then going to the last page, it appears that she's signed off on it, it looks like 3:10 p.m.

A Yes, sir.

Q Do you see that? Okay. So was she -- spent this hour and ten minutes writing, or was she talking to you and asking you about maybe what you -- ask you any help in preparing this?

A Well, she was just writing, sir.

Q It took an hour and ten minutes to write these four pages?

A Yes, sir.

MR. TIMBLIN: Okay.

No further questions.

MR. FISHER: Just one follow-up, sir.

THE COURT: Mr. Fisher?

Redirect Examination

by Mr. Fisher:

Q Where did she write the statement, ma'am?

A In the admin office of the Tamuning Precinct.

Q Okay. The Tamuning Precinct. Is Tamuning located here on Guam?

A Yes, sir.

MR. FISHER: Thank you.

No further questions, Your Honor.

THE COURT: Any other questions, Mr. Timblin?

MR. TIMBLIN: No, Your Honor.

THE COURT: Okay. Officer Grino, you may step down, thank you.

Can she be excused now?

MR. FISHER: Yes, Your Honor.

THE COURT: You don't need her for anything Mr. --

MR. TIMBLIN: No.

THE COURT: Okay. You're excused now.

THE WITNESS: Thank you, sir.

THE COURT: Your next witness, Mr. Fisher.

MR. FISHER: Yes, sir. The People call John Tyquiengco, Guam Police Department.

(Brief pause.)

THE CLERK: Raise your right hand.

*John Soriano Tyquiengco,*
*called as a witness by the People,*
*having been first duly sworn, testified on his oath as follows:*

THE CLERK: Please be seated and state your full name.

THE WITNESS: John Soriano Tyquiengco.

THE COURT: You may proceed, Mr. Fisher.

MR. FISHER: Thank you, Your Honor.

*Direct Examination*

*by Mr. Fisher:*

Q Sir, where are you currently assigned?

A I'm the firearms examiner at the crime laboratory.

Q Is that with the Guam Police Department?

A Yes, it is, sir.

Q How long have you been with the crime laboratory, sir?

A Almost ten years.

Q What are your duties as a -- is it a firearms section?

A Yes, sir.

Q Okay. What are your duties?

A I am the firearms examiner. I deal mainly with the forensics aspects of firearms identification. My primary job there is to determine if a particular bullet, or a cartridge, or powder was fired from a particular firearm. I also am responsible for function-checking a firearms, distance determination, trajectory, serial number restoration, and writing up reports to my findings.

Q What is "function-checking"?

A That's where we determine whether or not the safeties are working on a firearm, and whether or not a firearm is capable of discharging a cartridge.

Q Sir, do you yourself own any guns?

A Yes, I do.

Q Have you ever received any training on the use of guns?

A Yes, I have.

Q Have you, sir, ever received any training in the testing of firearms?

A Yes, I have.

Q Including function-checking?

A Yes, sir.

Q And could you just briefly describe --

A The science, the forensic science that I'm dealing with, there is actually no formal education for it. A lot of this training is passed on through on-the-job

training. I've had the opportunity to work with the firearms examiner that was with the police department for the previous 18 years, and I assumed his position in 1993, and that was Frank Tenorio, who was a -- who is a retired police captain. And I also went off island to Marion (spelled phonetically) County, where I again worked with firearms examiners, three of them, who had vast amount of experience in firearms identification.

Q And in the course of your service with the Guam Police Department, have you in fact conducted tests on firearms?

A Yes, I have.

Q Could you make an estimate of how many?

A Over 300.

Q Sir, have you ever been qualified in a court of law as an expert in forensic firearm testing?

A Yes, I have.

Q Here in the Superior Court?

A Yes, sir.

Q Could you estimate how many times you have been so qualified?

A About 26 times.

MR. FISHER: Thank you, sir.

Your Honor, at this time the People tender Officer Tyquiengco as an expert in the field of forensic

firearm testing.

THE COURT: Any object --

MR. TIMBLIN: No, (indiscernible).

THE COURT: Okay. So ordered.

Q BY MR. FISHER: Sir, did you conduct a test on a firearm relative to this case?

A Yes, sir.

MR. FISHER: Your Honor, may I retrieve People's One?

THE COURT: (No audible response.)

MR. FISHER: Thank you.

Q Officer Tyquiengco, I'm going to show you what's been marked Prosecution Exhibit 1. Could you have a look at that, please?

(Brief pause.)

Q BY MR. FISHER: Sir, have you conducted tests on that -- well, what is that you're holding?

A This is a Smith & Wesson nine millimeter pistol, semi-automatic.

Q Have you conducted any tests on that Smith & Wesson?

A Yes, I --

Q -- (indiscernible)?

A Yes, I did.

Q What sort of tests did you conduct?

A Initially I did a function check to see if this

gun is capable of firing, and whether or not the safeties are working. Then there was an additional request for fingerprint analysis, to see if there were any latent prints on it, and an attempt to try to restore the serial number that was obliterated from it.

Q Okay. What were the results of your tests, sir?

A I used Super Glue fuming for the fingerprints. I wasn't able to recover any. We used etching solution to try to restore the serial number; I was not able to do that, and then I loaded three cartridges, nine millimeter, in this firearm, and fired it three times to determine whether it could or could not fire, and it did.

Q It could fire?

A Yes.

Q I wanted to ask you about -- You said that you tried some sort of etching for the --

A Yes. It's an etching solution that's made up by the criminalists that are in our lab, and then we take this etching solution and etch it on the surface to try to restore the serial number.

Q Sir, in your experience, where is the serial number on that gun, where would it have been?

A On this particular model it would have been the area here that you see that's shaved off, or it looks kind of "chrome-ish" here.

MR. FISHER: Okay.

And, Your Honor, for the record the officer is pointing to an area that is lighter in color on the left side of the gun, looking down the barrel.

THE WITNESS: Yes.

Q BY MR. FISHER: Correct?

A (No audible response.)

Q Okay. In your experience, sir, as an expert in forensic firearms testing, do serial numbers on guns fade over time?

A No.

Q Do they sometimes wear off after numerous -- using it a lot?

A No.

Q Do you have an opinion, sir, on how these serial numbers disappear from guns?

A Well, there's several ways that it could be -- it could have been removed. In this particular one it was grinded off to -- it was -- some type of grinding wheel was used to remove it.

Q Were you able to tell that from your examination?

A Actually because I've experienced seeing people punching it out, actually using a punch to -- to hammer on the serial number, they've also used drills, actually a drill bit, and drilled into the serial number, and then

grinding, and then probably just sanding the surface off, but this -- in this particular instance, it was grinded down to the point where I was unable to retrieve the serial number.

Q Sir, based on your experience as a police officer, and based on your experience in the field of forensic firearm testing, do you know of any reason a person might not want a serial number on a gun?

A Maybe so it won't be traced.

MR. FISHER: All right. Thank you very much, sir.

Your Honor, I have no further questions.

THE COURT: Mr. Timblin, on cross.

Cross-Examination

by Mr. Timblin:

Q Officer Tyquiengco, do you recall writing a report on your testing?

A Yes, sir.

Q Okay. And according to your report, it says you received that gun with two nine millimeter cartridges; is that correct?

A Yes, sir.

Q Of the three cartridges that you did fire, were any of these two that were with the gun, were they fired, or other cartridges fired?

A Well, other -- mine, from the lab standard

ammunition.

Q Okay.

A They weren't -- they weren't used.

Q Okay. So we don't know -- you don't know for sure whether those two cartridges that were found in the gun were live, or whatever?

A They were live. They were live cartridges.

Q No, but did you try to fire it to see if it did fire?

A No.

Q Okay. And you also did check for any fingerprints on the gun, and you found none?

A That's correct.

MR. TIMBLIN: No further questions.

THE COURT: No other questions, Mr. Fisher?

MR. FISHER: Your Honor, can I retrieve 1A for identification?

THE COURT: Yes.

MR. FISHER: I've retrieved 1A for identification; (indiscernible) show to Mr. Timblin.

(Brief pause.)

MR. FISHER: And if I could approach the witness, Your Honor?

THE COURT: Yes.

\\\

Redirect Examination

by Mr. Fisher:

Q Sir, I'm showing you 1A for identification. I just ask if you recognize that?

A Yes, I do.

Q What is that?

A This is the magazine for the weapon, Exhibit 1, and these are the cartridges that I -- that came with --

Q Okay. Looking at those cartridges are you able to tell that they're live or --

A Yes.

Q -- operable?

A Yes.

Q Okay. And that's what came with the gun?

A Yes.

MR. FISHER: All right. Sir, I have no further questions.

Your Honor, at this time we would offer 1A for identification into evidence.

THE COURT: Any objections, Mr. Timblin?

MR. TIMBLIN: (No audible response.)

THE COURT: There being no objections, so ordered.

(People's Exhibit 1A admitted into evidence.)

THE COURT: Any other questions of the witness?

 MR. TIMBLIN: No, Your Honor.

THE COURT: Okay. Officer Tyquiengco, you may step down. Thank you very much.

THE WITNESS: Thank you, sir.

MR. FISHER: Your Honor, may counsel approach?

*(Conference at bench:)*

THE COURT: Yes?

MR. FISHER: We're done. That's my last witness.

THE COURT: (Indiscernible.)

MR. TIMBLIN: I guess, you know -- pardon?

THE COURT: Your witness?

MR. TIMBLIN: Yeah, I want to maybe just call -- is Mr. Certeza out there, still?

MR. FISHER: No, huh-uh.

MR. TIMBLIN: Oh, okay. Well, he was subpoena- --

MR. FISHER: Yeah, he's under subpoena.

MR. TIMBLIN: Right, yeah.

THE COURT: He should be here.

MR. FISHER: Well --

MR. TIMBLIN: Uhm --

MR. FISHER: He's not here.

MR. TIMBLIN: If we could -- I was hoping maybe to just put one before we -- while the jury's still here, put him on real quick and get him -- everything wrapped up.

THE COURT: Yeah, so we can --

MR. FISHER: I bet I could --

THE COURT: You're going to make some motions, right?

MR. TIMBLIN: Yeah. I thought I'd do that after we put him on, but --

MR. FISHER: I bet we could get him down here in a half hour, judge.

MR. TIMBLIN: Your Honor, maybe just do the motions, I guess, then, and --

THE COURT: Okay.

MR. FISHER: Do you want me to try and get him down (indiscernible)?

THE COURT: Yes, please. (Indiscernible.)

MR. FISHER: (Indiscernible.)

*(End bench conference.)*

THE COURT: Any other witnesses, Mr. Fisher?

MR. FISHER: No, Your Honor. The People rest.

THE COURT: Okay. The People now has rested, so the Court will ask Mr. Timblin if he wishes to present any witnesses at this time.

But do you want to take a recess at this --

MR. TIMBLIN: I do have a motion, Your Honor.

THE COURT: Okay.

MR. TIMBLIN: (Indiscernible.)

THE COURT: I'll excuse the jury for about 20 minutes, okay. The jury is excused.

THE BAILIFF: All rise for the jury.

(Brief pause.)

THE BAILIFF: You may be seated.

THE COURT: Okay. I think the defense counsel plans to call Mr. Certeza.

MR. FISHER: Yes, Your Honor.

THE COURT: Okay. You said you can contact him, within 30 minutes he'll be here?

MR. FISHER: I've asked -- he lives close by, and we've had some luck in getting him down here pretty quick, but I've asked Mr. Duarte to go and telephone him.

THE COURT: Okay.

MR. FISHER: Hopefully, he's at home, and not at work, in which case we think we can get him down here.

THE COURT: Okay. Mr. Timblin, would you like to make motions at this time?

MR. TIMBLIN: Yes, Your Honor. The government having rested, we would move for judgment of acquittal as to all counts based on the failure of the government to provide evidence in which the jury could find Mr. Chargualaf guilty beyond a reasonable doubt, and I would also like to especially direct this motion to the charges, the fifth charge and sixth charge, which talk about the possession of a firearm on July 21, '97, without a firearm's ID card, and the possession without -- of a concealed weapon without --

basically a concealed weapon, period.

First of all as to the concealed weapon charge, the only evidence presented as to what happened that day comes from the three police officers and of course Candy Mendiola. She said absolutely nothing about a gun whatsoever. The only evidence was that these three police officers saw a gun laying on the sidewalk next to a car that happened to be Mr. Chargualaf's car, but there is nobody to say that he possessed it inside the car, that he hid it anywhere in the car.

Obviously the only way they could have done it was through the testimony of Candy Mendiola. Her statement was in evidence, but of course that's simply to impeach her, it's not substantive evidence, so basically as to this charge, simply the evidence is that he was stopped for a traffic offense, and at some point the police officers found a gun next to his car. It was clearly not concealed. It wasn't even on him, or in his car, and there's nothing to put it in the car.

As to the possession of the firearm, obviously there's no element of concealment, so that's not an issue. But basically, again, nobody saw him possess this gun. It simply was found next to his car. There was no substantive evidence showing how it got there, where they took it out.

The testimony from Officer Dawson was that maybe

he (indiscernible) -- you see, he was standing, like, a foot behind him. I just don't think there's any way, you know, that they could (indiscernible) from this that he somehow must have gotten a gun, or stuck a gun, or pulled a gun out of there and stuck it in his pants when he was standing next to them. That's just pure speculation. And again they don't have Candy Mendiola to back that up.

Also the very fact that, you know, the -- I think it's almost incredible that Officer Dawson says he didn't pat Mr. Chargualaf down when he came out of the car. If he had, that obviously would have settled it one way or the other. But it was testified that, I think by Officer Dawson, and certainly by Officer Grino, that Officer Dawson asked Officer Grino to pat-down Candy Mendiola, who's female, about five foot, maybe 90 pounds. This was before they found the gun, and before all hell broke loose, and yet somehow he says he didn't feel the need to pat-down Mr. Chargualaf. I find it utterly incredible.

But in any event it's simply all they have is the gun laying on the ground next to his car. Now it's -- (indiscernible) -- but that's just utter speculation, and I would ask, specifically for the fifth and sixth charge, for sure that the Government has failed, and we ask for a judgment of acquittal.

THE COURT: How about as to the other charges?

MR. TIMBLIN: I would just rest on that.

THE COURT: Okay.

Mr. Fisher?

MR. FISHER: Yes, thank you, Your Honor.

May it please the Court, clearly I think Mr. Timblin has hit on a charge that is -- if any of them are difficult for Your Honor, that might be the one. As to the robbery, whether or not it took place, I think we have presented ample evidence that it took place and here's the person who did it, and, sir, that goes for the conspiracy as well.

The robbery by complicity, we have proved all the elements -- excuse me, I think that's conspiracy to commit the robbery. We've proved the elements, and that's surely much more than is necessary to go before the jury, and that would go for the, I guess the third charge, which is the conspiracy, and the fourth charge, and that also goes for the fifth charge, because what we have alleged is that on July 20, in Guam, the defendant in this case possessed a firearm, specifically a semiautomatic.

MR. TIMBLIN: (Indiscernible), Your Honor, but I'm looking at the indictment, and it is -- the twentieth is crossed out, and 21 is written in, and there's an initial there. I apologize for interrupting, but this is clearly 21.

THE COURT: Yes, it is 21.

MR. FISHER: Well, okay, on the twenty-first, but we've also stated, "On or about the twenty-first," so we think that (indiscernible) -- the twentieth is clearly embraced by the twenty-first as well.

What we have shown is that on or about the twenty-first, this individual was seen with the gun, and we know that that is the case because we've had ample evidence that he was seen with the gun. And I'll just start with Candelaria Mendiola.

On the twentieth she states that this individual was waving or holding something. She wasn't sure what the object was, but it was a wallet. So that's clearly evidence from Candelaria Mendiola, and we would submit to this Court, you know, basically (indiscernible) -- flipped on us on the stand.

But she did say that this guy was in the apartment waving something around. That's to (indiscernible) be about, which is embraced, we believe, by the charge. And then of course we have the victim in this case saying it was a gun, and it was pointed at her. And we've also got Don Mendiola, sir, testifying that it was a gun that he was holding. We believe that in looking at the evidence, just as to the fifth charge in the light most favorable to the Government, it is sufficient to go to the

jury.

As to the sixth charge, what we do have with that, and I have to differ with Mr. Timblin a little bit, we do have evidence that he in fact had that gun, and the standard, as this Court knows, is in the light most favorable to the government, giving all the benefit of the doubt to the government as to the evidence and what any rational juror could suppose from them.

We have Officer Dawson testifying that he pulls up, does a routine traffic stop, and then you've got this kind of jerking around with the door, and he sees the guy bending up -- the defendant bending up the flap on the door panel on the Nissan Sentra, and reaching into it.

So from that any rational juror could assume that he was essentially up to something, in that case, and we do know for a fact, we've got photographic evidence that the gun was discovered there, and it was discovered basically at, according to Officer Santo Tomas, at his feet where the defendant as well as Candy was staring. So that, or actually from that a rational juror could conclude that this defendant had knowledge of what it was that Officer Santo Tomas was standing near.

We also know from Officer Santo Tomas' testimony, and the testimony of Officer Dawson, and I think Officer Grino as well, that they were walking around in that area.

So this defendant had ample opportunity to place that gun there, and any rational juror, looking at that evidence in the light most favorable to us, could conclude that Randy Chargualaf placed the gun there.

From that the next question, we submit to the Court is, "Well, where did the gun come from?" We know that Randy Chargualaf had stepped out of the car, and we know that Randy Chargualaf was seen digging in that door panel. And a rational juror could conclude that it was held there, which, Your Honor, brings me to the testimony of Candy Mendiola.

Candy Mendiola's statement, which I think came in as People's 31, is submitted for impeachment, and therefore we clearly concede that it does not come in substantively; however when I questioned Candy Mendiola as she was on the stand, I asked her I think on two occasions whether or not she meant to tell the truth when she made that statement, both the written statement and the oral statement, and she conceded that she did. And then I asked her, "Did you not tell the police this," "Did you not write this?" and each time I asked her the question, except for those two instances that I recall with Officer Grino, about throwing the purse in the trash receptacle at the Golden Motel, she said, "Yes, I did."

The fact that she said, "Yes, I did tell them

that," and the fact that she said that she meant to tell the truth, a rational juror can conclude that that was in fact the truth about the matter.

One other statement that Officer Grino made that did not draw objection from defense counsel was Officer Grino on the stand said that Candy Mendiola said, I think the words were, "That's Randy's gun," or "Did you get the gun from Randy," I believe were the words that came out form Officer Grino. And it did not draw an objection, therefore, that comes in substantively. That is evidence that Randy actually had the gun.

And we think, sir, that looking at the evidence in the light most favorable to the government, that all these charges should be submitted to the jury for their deliberation.

Thank you.

THE COURT: Mr. Timblin?

MR. TIMBLIN: Your Honor, first of all as to the lack of objection, I already previously objected to statements made by co-defense that were mentioned by the police. I was overruled on the bases these were statements against the penal interest, so I didn't see any point in belaboring the point; (indiscernible) made a ruling on it, so I think I did make it clear that I was objecting to all statements of co-defendants as far as any substantive effect.

Secondly, as far as what she said about the statement, the statement is still not substantive evidence. She did state that everything she said today was from memory, and that's all she remembered, and finally, it was just as likely that if anybody had the gun it was Candelaria Mendiola, because she had this pouch that Officer Dawson saw, she had walked out of the car, she'd walked around, according to him, in front of the car, he had lost sight of her while he was dealing with Mr. Chargualaf, and she could just as well be the one to put it there as anybody else.

Again we're just into flat out speculation, and again I apologize if I didn't object enough times, but I don't want to belabor the point where I made the point that I think that any statement by co-defendants is hearsay, and if you accept his rationale that anything they say is against penal interest, then it makes further objection pointless, so (indiscernible).

THE COURT: Do you have anything else to say, Mr. Fisher?

MR. FISHER: Your Honor, just that it's not so simple. The defense counsel could theoretically, being in trial, say, "Your Honor, I will object to all evidence which could be considered objectionable and inadmissible," and hope for that to be a broad blanket that covers everything.

I can recall, I think, two statements that we offered over objection as statements against penal interest, and I think one was from Kaelauni: "I was with Randy," or "I was with the" -- and I think the second statement was, "I was with the other two that night." So those were statements that we offered as non-hearsay and admissible because of the fact that they are statements against penal interest.

But Officer Grino offered a statement of Candelaria Mendiola. The statement was to the effect, "That's Randy's gun." Now that is a statement which I'm not sure I can make an argument is against penal interest, but the point is it didn't draw an objection, so it came in, and it is substantive.

And we don't merely rely just on that one statement to say that charges five and charges six should go to the jury, Your Honor, but we think that that is admissible evidence. It's already in. It is evidence from which a rational juror can conclude that he was harboring or concealing a weapon that day.

Thank you, Your Honor.

THE COURT: Okay. The Court will deny the motions then, defense counsel's motions.

When will Mr. Certeza show up?

MR. DUARTE: Your Honor, I spoke to the wife, and she

informed me that he's a tour-bus operator, therefore he's not able to be contacted through her, and that right now, presently he's at Cocos Island, and he has to be on stand-by there to transport those tourists back to their location of where he picked them up at, so she's not able to just readily call him in, and get him back up here, you know, anytime this afternoon. She's relying solely on his schedule to come back up, and then at that time she will inform him that Mr. Timblin's trying to contact him.

THE COURT: Okay. Why don't we just meet tomorrow then, because by the time we contact him it will be too late.

MR. FISHER: (Indiscernible.)

THE COURT: Okay. One-thirty, okay, and then I'll expect both counsels for jury instructions at nine o'clock, okay.

MR. FISHER: Certainly.

THE COURT: Okay. Bring in the jury, and we'll excuse them for the day.

Anymore witnesses?

MR. FISHER: No, sir.

Your Honor, depending on what it is that Mr. Certeza says, we may be calling one rebuttal witness, and that would be Attorney Mark Williams.

THE COURT: Okay.

(Pause.)

THE BAILIFF: All rise for the jurors.

(Brief pause.)

THE BAILIFF: Please be seated.

THE COURT: Okay. The government has rested, and so I'll give the opportunity tomorrow for the defense, to see if they wish to present any witnesses to this Court, and at that time then, we'll have closing statements, closing arguments from both counsels, the Court will give you your instructions, and then you will deliberate in your verdict. Okay?

So the Court will adjourn for the day. I'll ask all of you to please come in at 1:30 tomorrow afternoon, okay.

And again I'd like to admonish you that you're not supposed to discuss this case with anyone; not read any news reports about this case. If anybody should try to approach you about this case, please let me know immediately; not to do any independent research on your own, and of course keep an open mind until you've heard all evidence in this case, arguments from both counsels, the instructions of this Court, and of course the views of your fellow jurors.

The court then is adjourned until 1:30.

THE BAILIFF: All rise for the jury.

 (Pause.)

THE BAILIFF: You may be seated.

THE COURT: Okay. You've gotten the sample jury instructions?

We gave them to everybody? Did you give the attorneys, already, the two copies?

MR. FISHER: Not yet, Your Honor.

MR. TIMBLIN: No, I haven't.

THE COURT: And then the verdict forms are in there.

UNIDENTIFIABLE SPEAKER: I need a copy of it. I didn't get those yet. I need a copy of the complaint. (Indiscernible.)

THE COURT: We will give you a copy of the verdict forms tomorrow so you can look at it as well.

Okay. If you need to, because Mr. Timblin has indicated to the Court that he's going to have at least one or two instructions of his own, so please have your instructions ready, so that if we affirm your motion to accept it, then we'll have it ready to be copied and --

Okay. So nine o'clock, and (indiscernible) very informal, and then --

UNIDENTIFIABLE SPEAKER: Your Honor?

THE COURT: -- any objections we'll get together, okay?

MR. TIMBLIN: Okay.

MR. FISHER: Okay.

MR. TIMBLIN: Thank you, Your Honor.

THE COURT: Court stands adjourned.

UNIDENTIFIABLE SPEAKER: (Indiscernible.)

THE BAILIFF: All rise.

**END DAY TWO OF JURY TRIAL ON CF317-97, 11/4/99**

# Index

## PEOPLE'S WITNESSES

| Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MERCY GRINO | 3 | 9 | 14 | 18 |
| (Recalled) | 88 | 93 | 94 | -- |
| DON A. MENDIOLA | 20 | 34 | -- | -- |
| CANDELARIA MENDIOLA | 40 | 67 | 70 | 75 |
| SILVANO URIBE | 80 | -- | -- | -- |
| JOHN S. TYQUIENGCO | 95 | 101 | 103 | -- |

## DEFENSE WITNESSES

| | | | | |
|---|---|---|---|---|
| (None.) | | | | |

## PEOPLE'S EXHIBITS

| Number | Description | Marked | Admitted |
|---|---|---|---|
| 1A | Cartridge | -- | 103 |
| 3 | Coin Purse | -- | 32 |
| 26 | Custody Receipt | -- | 86 |
| 27 | Custody Receipt | -- | 86 |
| 28 | Custody Receipt | -- | 86 |
| 31 | C. Mendiola Statement | 57 | 78 |
| 32 | Written Statement Form | 89 | -- |

## DEFENSE EXHIBITS

| Number | Description | Marked | Admitted |
|---|---|---|---|
| | (None.) | | |
| | | | |

# *Transcriber's Certificate*

I, CARMELITA G. TENORIO, do hereby certify that the foregoing pages one through 119, inclusive, comprise the true and correct transcript of the second day of jury trial proceedings had in Criminal Case No. CF0317-97, PEOPLE OF GUAM vs. RANDY IGNACIO CHARGUALAF, heard on November 4, 1999, recorded on Tape Numbers T99-1779, 1780, and 1871; and transcribed to the best of my knowledge and ability.

DATED this 17th day of July, 2000.

CARMELITA T. TENORIO



FILED
SUPERIOR COURT
OF GUAM
2006 AUG 17 AM 8:09
CLERK OF COURT
BY:

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **PEOPLE OF GUAM,**<br>**Plaintiff,**<br>**versus**<br>**RANDY I. CHARGUALAF,**<br>**Defendant.** | **SUPERIOR COURT CASE NO: CF0317-97**<br><br>**CONTINUED JURY TRIAL [Excerpt of Trial; Day 3]**<br><br>**November 8, 1999** |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**BEFORE:**

**THE HONORABLE ALBERTO C. LAMORENA III**
**PRESIDING JUDGE, SUPERIOR COURT OF GUAM**

**A P P E A R A N C E S:**

**For the People:**

**THOMAS J. FISHER, Esquire**
**OFFICE OF THE ATTORNEY GENERAL**
**Hagåtña, Guam**

**For the Defendant:**

**TERRENCE TIMBLIN, Esquire**
**Hagåtña, Guam**

COPY

*Jeanette B. Roberto, Court Transcriber, Superior Court of Guam*

**[Excerpt of Trial Begins Consisting of Closing Arguments and Jury Instructions.]**

THE BAILIFF: The Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena III presiding.

Draw near and give your attention, you shall be heard. God save Guam and this Honorable Court.

Please be seated.

THE COURT: Okay. You've heard arguments -- I mean, evidence now presented in this case. You will now hear the arguments of both Counsels.

Mr. Fisher?

MR. ERIC FISHER: Thank you very much, Your Honor.

May it please the Court, Counsel?

Good morning, ladies and gentlemen. Before I get started, I'd like to just thank each and every one of you for listening so attentively through the trial. I know that it's taken a week of your time going through this thing, and the People appreciate it, and I know that Mr. Timblin does as well.

I want to talk to you about the evidence that's been presented in this case. And, of course, as you know, this is a case involving robbery and the possession of a handgun and theft. And the thing that occurred to me when

I was getting ready to speak to you was that when we all stood up and we did our opening statements telling you what we thought the evidence was going to present, Defendant, through Counsel, told us that there were some things that we just can't argue about, and I ... and I agree with Mr. Timblin. Mrs. Certeza was robbed on July 20th. Three people came into her house. Don Mendiola was involved and so was Candelaria Mendiola. No question about it. So there are some facts that I submit to you that we all agree on, and those facts are these three; that Mrs. Certeza was robbed, those two people -- those three people came into her house; that Candelaria was involved and that Don was involved. These two, we all agree, did it. There is another fact that I think -- that I submit to you has been proved beyond a reasonable doubt and that is that the Defendant did it. And I'm going ... I'm going to talk about the evidence that's been presented to you and I'm going to go through some of the evidence and submit to you why I think or why we think that beyond a reasonable doubt he was involved in this robbery.

Now, after Mr. Timblin and I speak to you, the Judge will instruct you, and I want to talk about some of the instructions that he's going to go through as well. But after I speak, Mr. Timblin will speak, and then I stand up again and I have what's called rebuttal, and

Case 1:05-cv-00014 Document 16-13 Filed 08/18/2006 Page 3 of 23

that's the time that I argue to you why what Mr. Timblin said is not ... is not quite the way that we would submit this case to you. And the reason that we get that is that it's not because it's unfair or anything like that, it's simply because, as the Judge told you a few minutes ago, the People have the burden of proof that we have to meet to you reasonable doubt, and that is fair -- it's very fair, and that is a very good thing. That is a protection for each and every single one of us in this room, and it is a protection for Mr. Chargualaf. It is for that reason that I get to talk to you twice. And you'll hear about reasonable doubt, and you'll also get to read the instructions for yourself, so it's about a, what? -- A three paragraph instruction, and in the middle paragraph, you actually get the definition of reasonable doubt. It's not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence, leaves the mind of the trier of fact -- that is you -- the trier of fact in that condition that he cannot say he feels an abiding conviction of moral certainty of the truth of the charge. And that is what -- that is how reasonable doubt is defined.

///

I've underlined this part here, "*because it is after the entire comparison and consideration of all the evidence.*" And that is why I think the Defendant will join me in this as well -- we ask that you look carefully at all of the evidence when you go back to make your decision later on this morning.

That is reasonable doubt. It's our burden and that's fair, and that's why I'm going to stand up again and talk to you after Mr. Timblin has done the same thing.

Before I move onto the other instructions, when I began, I talked about the three facts we all agree on and that is Mrs. Certeza was robbed. And one of the reasons I think that we all agree on that is because Mrs. Certeza said she was robbed, and Don Mendiola said she was robbed, and Candelaria Mendiola said she was robbed. So everybody agrees on that. Everyone agreed on that. The next fact that came up was that Candelaria Mendiola did it. Everyone agreed on that, too. Mrs. Certeza identified Candelaria as one of the people doing it. Candelaria admitted -- she admitted a little bit of what she did but she did admit that she, together with the Defendant, went into the house to steal and rob, and also Don Mendiola agreed to it. And the same thing is true when you think about whether or not Don Mendiola was involved in this. And, of course, he was as well.

Mrs. Certeza id'd him as being involved in the robbery. Don admitted on the stand that he was involved in the robbery, and Candelaria said that she was involved in the robbery with Don Mendiola. So everybody agreed on those facts. And the other thing, when we came to that fourth point I had down here, is that all three of them agreed that the Defendant was involved as well. So we've got three identifications of him being involved. And I submit to you we have statements by him that indicate that he was involved and we have physical evidence tying him to the robbery.

When the Defendant's Counsel gets up to speak to you, he may argue to you, "Well, we did have the ID's, but every single one of the people that the Government brought up to talk to you is damaged in some way." For example, he may say that if you think about Nobuyo Certeza, you can't really trust her identification because she was in it for money. He may say about Don Mendiola, "You can't really trust his identification because he was in it trying to cut a good deal with the Government. He didn't want to end up a long time in jail so he came up here and said what the Government wanted him to say." And he may say the same thing about Candelaria Mendiola, therefore, if you have three damaged witnesses, don't believe any of them. And it is true when somebody -- and now I'm just

Case 1:05-cv-00014 Document 16-13 Filed 08/18/2006 Page 6 of 23

talking about Candelaria and Don -- it is true that when a witness makes an agreement with the Government, Judge Lamorena will instruct you later on that you need to look at ... you need to look at that testimony carefully. And you'll see this instruction for you to read back there. You need to think about that testimony because Candelaria Mendiola was arrested for this, and as you know she pled guilty. Nobody wants to go to jail. So, Candelaria, maybe she got up here and lied to you, same thing with Don, because they don't want to go to jail, so that's why you get this instruction. But we submit to you that the deal with these people was not, "Get up on the stand and make up a bunch of stuff and lie," the deal, as you heard from the evidence was that they were to get on the stand and tell us the truth. And in a few minutes, I'm going to talk about Nobuyo Certeza's testimony, I'm also going to talk about Don Mendiola's testimony, and I will also talk to you about Candelaria's testimony. But it's true, these people were in here with a plea agreement.

You will see another instruction, and it's just a basic instruction on the credibility of witnesses. Who should you believe when people get up on the stand? And you'll see, together with this instruction, about six different points that the judge will tell you about that could help you to decide -- and it's of course your

decision -- help you to decide whether or not you're going to believe someone.

Was the witness able to see or hear or know the things about which that witness testified? Was Nobuyo Certeza in her apartment that night able to see that three people came in the door? Was she able to hear what was going on? And we submit to you that, yes, she certainly was. And the evidence that she was able to do so is in front of you. She gave three descriptions of an individual -- of individuals who had come into her house -- and, again, this has been checked, it is not loaded -- and she gave one description of a person -- she's a seven month pregnant woman at the time -- who points a gun at her, demands money, and tells her to bend over, and described that person very well for a person who's got a gun in their face in the short time when they're suffering the trauma of having their house broken into by these people, yet she described that person as a local male having a mustache with dark hair. But it's true, she didn't describe the tattoos that Mr. Timblin had the Defendant point out to us. We submit to you that it may not be easy to get every detail when a gun is pointed at you and somebody is demanding money, but she did give details that match this individual, and that individual is the Defendant, Randy Chargualaf. And you may think that

it -- Well, it occurred to me that it would be kind of a coincidence, if she was able to get all those details and it matches the Defendant but the Defendant is not the one who did it even though Candelaria testified he was, even though Don Mendiola testified he was the one, that would be some coincidence. And also described -- and you saw Candelaria the other day when she was on the stand -- she also described this person as being a teenager. Well, you saw her size and you heard how soft her voice was, this person, Candelaria, matches her description -- didn't match it perfectly probably, but it matches it. And here's Don Mendiola, and she described Don as a female. And as you heard, Don Mendiola also goes by the name of Keilani and is a cross-dresser. She described this person as -- let's see, it's either a *haole* or Caucasian or light-skinned, something like that. And you saw Don, Don's got fairly light skin. Those descriptions match and they match very well. And all of them agreed to certain facts in the case; that they came in there, that Ms. Certeza noticed that these people had come in with the shoes on and she didn't like that. Mrs. Certeza had the ability to see and did see, had the ability to hear and did hear. Mrs. Certeza described very well who it was who had robbed her.

///

How well was the witness able to recall and describe those things? We're talking about Mrs. Certeza here. You know, of course we had coming into evidence this letter that she had written to Attorney Mark Williams stating that she didn't want to testify anymore and she wanted $5,000 or $8,000.00. This letter is dated March 29th, 1998, months -- months after this occurred. And this letter is dated 25 March 1998. And you'll get to read these when you get back in the jury room. And that is also dated months after this event happened to her. But twenty minutes after she was robbed at gunpoint by Randy Chargualaf, she described the same event to Officer Nueva. Same thing that she told you on the stand, twenty minutes after she was robbed by this guy, she gave the statement to Officer Nueva. So her statement doesn't change. There's no evidence that her statement changes. The only thing she said is she'd like some money out of the case and she doesn't want to testify. And I submit to you, and as you heard her say, that -- she's got a good reason for not wanting to testify, because she was depressed at the time, and she's still depressed even today as a result of having someone break into the one place on earth that she has the right to feel secure and safe, and having that gun pointed at her, she didn't want

///

to testify. She had to come up here and relive the entire incident for you 'cause that's what he did to her.

Could she describe what happened to her? Absolutely. Absolutely.

What was her manner while testifying? I submit to you that as she sat and talked to you, that it was clear by what she was saying, her candor, her willingness to answer any and all questions that she was in fact telling the truth.

Did she have an outcome in this case or any bias or prejudice? Well, she did ask for the money. There's no evidence that she ever got any money. And I suppose she does have an interest in this case, and that interest in this case is getting it done with, then maybe she can start to put herself back together after this horrendous crime.

How reasonable was the witness's testimony considered in light of all the other evidence in the case? It sure -- It matched all the other evidence in the case.

Was the witness's testimony contradicted by what that witness had said or done at another time? No, there was no contradiction. There might have been, you know, some little differences. Maybe a fifteen minute difference here or fifteen minute difference there. It's 1999, this crime took place in 1997 and none of us are

perfect, none of us can remember everything for this extended period of time. I'd submit to you that her statement -- and you can even compare it against Don Mendiola's statement to you. You could compare that against Candelaria Mendiola's statement to you on the stand, and it matches. She was telling the truth. And we submit to you further that when you go through this checklist and think about it, I submit to you that you will find that she was in fact telling you the truth and she id'd this Defendant as the person who did that to her.

Don Mendiola testified for you. Don Mendiola, was he able to see, hear or know about the things? Of course, he was involved in it.

How well was the witness able to recall and describe those things? His statement matched Nobuyo Certeza's. He remember what had happened that evening.

What was his manner while testifying? We submit to you that you will decide that when he testified and you compare it to all the evidence, you will conclude that he too was telling the truth.

Did he have an interest in this? Well, remember I talked about the plea agreement, and you should consider that the deal is to tell the truth. And when you compare what he said with all the other evidence in the case, we

///

submit that you will find that he was in fact telling the truth.

Was his testimony contradicted by what the witness had said or done at another time? I don't think that you will ... you will find any evidence that it was contradicted by anyone.

And then that brings us to the third person in this case and that's Candelaria Mendiola. Candelaria promised to tell you the truth when she got on the stand. And you may recall she was one of the last people I called. And she got on the stand -- she was the one who was wearing the orange jumpsuit. And she got on the stand and she admitted to you certain things but then said she couldn't remember or denied other things. But what she did admit to you was that she was involved in this, that three people got together and thought about what they were going to do, and then all of three of them go in and rob Ms. Certeza, and she's one of them, and Don Mendiola is one of them, and then this individual, Randy, is the third person. Then she says she got in the house and then she couldn't recall whether or not Randy had anything in her (sic) hand, maybe he was waving around a wallet or something like that. She, too, was involved in the plea agreement, and I would submit to you that something happened to her on that stand and that she did not tell

you the full truth. And that's why I asked the Judge to allow us to admit -- and you'll hear an instruction about this -- her statement that was given the day ... the day she was arrested. This statement will show that in certain things, certain respects, for example, he was waving the wallet around, she lied to you on the stand. But she did tell you the truth about those things that she thought, "Well, they probably aren't going to damage the Defendant all that much." Remember, he's called her ten times -- ten times leading up to this trial.

You will also hear instructions as to the particular elements of the offense. And what was it that we had proved beyond a reasonable doubt? What was our burden in this case? Well, the People have to prove that Randy Chargualaf, while in the course of committing a theft -- when a purse is missing, a coin purse is missing, $120.00 at least in an envelope marked with Taitague Sales is missing -- he was armed with or displayed what appeared to be a deadly weapon.

Now, I'm going to jump around a little bit. But here is a deadly weapon. We heard that from the Guam Police Department Crime Lab, it works, it's a deadly weapon, it's a firearm. And Ms. Certeza had a gun pointed at her, and when Don -- or, excuse me -- when Randy and Candelaria were arrested in front of Paul's Plaza,

Candelaria said, "That's Randy's gun," and Don said this is the gun he used that night. He had the firearm. This is the very same firearm that was pointed at Mrs. Certeza stomach while he demanded money from her.

Was he armed? Yes. Did this happen on July 20th and was it in the territory of Guam? Yes. -- On or about July 20th.

The possession or use of a deadly weapon. It is a crime to commit -- It's a crime to carry a deadly weapon and threaten somebody with it or just use it when you are committing another felony.

Did he possess and use a deadly weapon? All the evidence is, yes, he did. He's identified with the gun. The gun that was used in the robbery was identified with him. Candelaria said right there at the scene, "That's Don's gun," and Don Mendiola, when he got on the stand said, "Yeah, that's the gun." He did possess and use a deadly weapon when he was robbing that lady.

Now, it is also a crime -- and you'll hear this from the Judge -- if you hook up with somebody and you decide that you're going to rob a place, you're gonna -- you know, rob the Payless or whatever. It's a crime to make that decision with somebody and then start to act out what it was you were going to do. That's also a crime. So the question is, did he agree with one or more persons

to carry out a crime? Candelaria ... Candelaria and Don Borja testified -- and I'm going to call him Don Mendiola, did testify before you that they did in fact agree. They did in fact agree that they were going to carry out this crime.

Did they do anything? Did they do anything at all to start this crime in motion? Sure they did. For one thing, they walked into the apartment. They were in the process of carrying out that crime. What did they agree to do? Whose idea was it? Well, Candelaria herself said that it was everybody's idea. "We all got together and all three of us discussed and agreed about "macking", I think is the word she used, and they all agreed to go out and do that. Then I think it was Don who told us that, "No, it was Randy's idea on how to do it." But whoever's idea it was on how to do it it was all their idea together to go ahead and rob Mrs. Certeza.

Did anybody perform what the law calls an "overt act"? And all that is is if you just make an agreement and you just start to do it, it's just called an overt act. Did anyone do it? Sure. They went in the apartment. They drove to the place, but they did go into the apartment.

Did this happen on or about July 20th? Yes. And was it within the territory of Guam? Yes. And, at the

time that they came to the agreement, did Randy Chargualaf intend to carry out this -- did he intend to carry out or assist or promote in the conduct which constituted such a crime, which is the robbery? Well, he drove them to the place. And we had testimony from both Kandi and Don that they all agreed to it, or as Don says, he was -- "It was his idea." And those two went in the apartment first asking for help from Mrs. Certeza and then he comes bursting through the door with the gun demanding money. He intended to engage in that act. It was no accident.

He's also charged with misdemeanor theft because whenever you commit a crime, you might be liable for it. So, if you commit one big crime and then in the course of doing the big crime you do a little crime, you can get punished for both of them because the law demands that you not break it. He stole money -- robbed ... robbed money from Mrs. Certeza in the Taitague Sales envelope. Uncontradicted evidence that it had approximately $120.00 in it, and that's between $50 -- between $50 and $500, so it's misdemeanor theft to have done so.

Now, what about the firearms ID? We submit to you that it was proved beyond a reasonable doubt that this individual was possessing that firearm -- Now if you want to have a gun on Guam, you're going to have to get a firearms identification card. You must have one. And the

records of the Guam Police Department were searched. And where do you keep -- Where does the Government keep their firearms ID cards? They keep them at Guam Police Department, the records of them. And all the records were searched and nothing. He didn't have one. Well, on Guam it is illegal to carry a concealed firearm. But if you want to carry a concealed firearm, you have to get permission to do so. And just like the firearms identification card, the Guam Police Department records were searched for this concealed firearms permit and it did not exist, and that too is a crime.

There are a number of things which have tied Randy to this crime which show, we submit, beyond a reasonable doubt, that he is guilty. We've got the witness identifications, as you heard, we have three people just without hesitation, without question in their mind, identifying him as one of the robbers. -- Three people. Then we also have Randy's own statements. When he was arrested for this crime, he was brought down to the Koban, and Officer Dawson is with him and then Officer Cress is with him. And Officer Cress says to him before he's heard any details of the crime, "We caught the third person who was involved," and then Dawson says, "Who? The faggot?" and then Cress says, words to the effect, "Knock it off. Watch your language." He's nodding in agreement

and then they say, "What's her name?" and he says, "Kaelani." Nobody has told him who this third person is. -- Noone had told him who the third person is, yet he identified the third person before he had ever heard about it. He identified the person who was involved in the robbery. How could he do this? The only way he could do it is if he himself were involved. So he hangs himself with his own statement. And that isn't the only one. That is not the only statement that he gave to the police because the purse that they walked out with is the very same purse that we were told by Candelaria didn't contain anything but papers, and of course -- but -- this is a -- I'm probably jumping ahead of myself just a little bit, but, you know, this is the purse that was found at the -- in the trash behind the Golden Motel where Randy was staying with Kandi, and there wasn't any money in the purse. And when he was asked at the police station, without having any knowledge of what was in the purse, according to him, without being told was in the purse or what wasn't in the purse, he was asked, "Was there any money in it?" and then he said, "No." And right at that moment, Randy figured out he had hung himself again 'cause how can he know whether or not there's $100,000 in the purse or zero in the purse unless he looked in the purse. And he knew that and he caught himself and then he got

that funny look on his face and said, "Oh, I don't know." It's too late, the cat is out of the bag. He's already admitted in two different ways that he was involved in this robbery. He knew who the third person involved was and he also knew there was no money in the purse.

When Candelaria Mendiola was arrested at Paul's Plaza, she had this credit card that belongs to Nobuyo Certeza on her. So here is a piece of evidence which directly tied Candelaria to the crime. And who is Candelaria with when she is arrested? She's with Randy Chargualaf. Who's Candelaria living with at the time she is arrested when she has Nobuyo Certeza's credit card? She's living with Randy Chargualaf. And where are they living? They're living at the Golden Motel. And Officer Dawson, as you heard, when he was searching the car, he found their key to the Golden Motel and asked Randy if we could search the place and got permission to search the place. So they are staying at the Golden Motel. And then we hear from Candelaria that, "The purse you're looking for is in the trash behind the Golden Motel." And they go, and sure enough, they find it. They find Nobuyo Certeza's -- it's another piece of evidence that in addition to him being involved in perpetrating this robbery, it is more evidence that Candelaria was telling the truth at that time because there's Nobuyo Certeza's

Japanese driver's license and there's her passport. She identified all of this to you. And that is connected with the Defendant. And then of course there's that change purse that Don Mendiola identified as the other thing that had been taken from them. But in addition to that, there's a piece of evidence which directly ties Randy Chargualaf to this robbery and that is the envelope with "Taitague Sales" written on it. Now that envelope, according to the evidence that we had, if you can imagine that this is ... this is the envelope, it was laying face down -- and we'll just abbreviate Taitague Sales -- it was laying face down and Mrs. Certeza comes into the Police Koban and Officer Dawson is there with it, and she's identifying things and she says that's -- words to the effect, "That's my money. That's the envelope with the money in it. She says it has "Taitague Sales" on it and she can't even see that, but when it's turned over, "Taitague Sales" is on it. And where did that envelope come from? It came from his pocket. A direct link, a direct chain between that robbery and the Defendant. And we heard just this morning -- just this morning another piece of evidence, and that came from Mr. Certeza that he observed that while she identified that envelope. A direct link between Candelaria and the robbery, between Don and robbery, and Randy and the robbery.

Now, there is other evidence. We've got the physical evidence and we've got the identification evidence, and we also have, for example, that Don, when he was arrested, blurts out to the police officers -- and this is the morning after the robbery takes place -- he blurts out to the police officers, "I was with those two." This is before anybody's got together and trying to cook up stories or anything, but he says that morning, "I was with those two. I was with Randy and Kandi." And that goes to Don's credibility as well when he testified at the stand because that's consistent -- that morning -- it's consistent with what he said on the stand and that was before he ever entered into a plea agreement with the Government, that was the day after the crime he identified this man as being one of the robbers.

Further evidence. Ben Certeza got up this morning right here on the stand and described for you what it was that happened when his wife was down there. Positive identification. She had some hesitation at first. This is the morning after the robbery, state of excitement, state of shock. But when she shut her eyes and calmed down and thought about it, she identified him as the robber. It would be, we submit to you, a heck of a coincidence for her to have wrongly identified him, yet he is the same person who's involved because Candelaria says

he's involved, because Don says he's involved. And by his own statements, he has said that he is involved in this.

Ladies and gentlemen, a few moments ago, we were talking to you about Mrs. Certeza. That lady, as I said, was in the one place on the entire face of the earth that she is allowed to be safe, and because she was a nice woman, because Don and Kandi said they needed help, because Don and Kandi wanted to use the telephone, she opened the door to something that I submit to you has changed her life forever. She opened the door to Randy Chargualaf holding that semiautomatic pistol at her and demanding money. Randy was linked to this crime by the evidence presented to you, directly linked by the evidence presented to you. He is linked to this crime by Don's statement to the police, linked to the this even by Candelaria's statement to the police, and linked to this crime by his own statement. On July 21st, 1997 when Officer Dawson and Officer Santo Tomas pulled them over at Paul's Plaza, and he was trying to hide that gun away, he pretended that the door didn't work and slamming it, when Officer Dawson helped him to open the door. That is the very same gun he used and pointed at Mrs. Certeza. He had that gun, and with all the other crimes that we are alleging, it's back to the firearms issue.

///

He's guilty of these crimes, and we've asked -- and I appreciate the fact that you have sat here through these number of days and listened to all of the evidence and listened to me speak to you for, I guess, about thirty minutes now.

We will ask you to go back into that jury room and go through this evidence, and then we're going to ask that you come out and tell him that a person's home really is a castle, that you may not, under any -- (indiscernible) -- set of circumstances point a gun at an individual in their own house and demand money. We'll ask you to find him guilty of each and every single one of these charges.

Thank you very much. I'll be talking to you again in a few minutes because it's our -- as I said, it's our burden. And now Mr. Timblin has (indiscernible - inaudible) --

Thank you very much.

THE COURT: Okay. Thank you, Mr. Fisher.

Okay. Mr. Timblin, would you like to give your closing arguments at this time to the jury?

MR. TIMBLIN: Thank you, Your Honor.

Ladies and gentlemen, Mr. Fisher has a habit of anticipating me, and, first of all, he anticipated me in my -- I'll just say thanks for your attention in this case

Case 1:05-cv-00014 Document 16-14 Filed 08/18/2006 Page 1 of 23

and your service on this jury. He has also anticipated me away probably giving about half of my closing argument, which, I guess, I should thank him for it. But the reasons he brought these things up is because -- not because I wasn't going to say them because they are in fact important, that's why I'm going to repeat them to you. If it were just a question of -- if he gets anybody to say on the witness stand, "Well, I got robbed, he did it," and that's enough, then of course it would be very simple for you, but it's never -- especially in criminal law, never quite that simple.

Now, as Mr. Fisher pointed out, he gets to speak before I do and after I do, and again that's because he has the burden of proof. That means that Mr. Chargualaf doesn't have to testify, it means that we don't have to -- didn't have to call any witness -- we called one -- that means that even if I had sat there and slept through this whole trial, you would still have to decide whether or not Mr. Fisher has met his burden of proof beyond a reasonable doubt. And if he has not, then you must return a verdict not guilty. That's what the law requires. And as he said, it is proof beyond a reasonable doubt -- maybe is not good enough, more likely than not is not good enough, but proof beyond a reasonable doubt, and Judge Lamorena will instruct you in more detail as to what that means.

And for the reasons I'm going to point out to you, I submit that there is reasonable doubt as to every one of these charges and that you should return a verdict of not guilty.

Now, like Mr. Fisher, I'm going to have to jump around a little bit because the -- while there is five separate charges, certain things have run through the Indictment in more than one charge. I'd like to take those issues one at a time and the first thing I'd like to talk to you about is Government's Exhibit 1 which, as we now see is a firearm.

Now, this shows up in the First Charge 'cause it says that on July 20th, he was armed with and displayed what appeared to be a deadly weapon. It shows up in the Special Allegation, he was -- unlawfully possessed a deadly weapon. It shows up in the Fourth Charge, it says he possessed on July 21st, 1997 a semiautomatic pistol, and the Fifth Charge, he carried a semiautomatic pistol basically concealed. Now, what we know basically about this gun -- well, first of all, (indiscernible) -- talking about two different things here; one is July 21st -- July 20th, '97 and then July 21st -- the 20th being, of course, the robbery.

Basically all we know about this gun is that it showed up in the parking lot of Paul's Plaza on July 21st.

As to what happened on July 20th, as Mr. Fisher very helpfully pointed out, we do have a statement from Mrs. Certeza that she saw something that looked like a gun, but she didn't describe it and she was not even asked to identify that this particular gun was ... was there.

Don Mendiola mentioned a gun. Same thing. He didn't know what -- you know, he didn't describe (inaudible - indiscernible) -- a gun, he didn't say, "That is the gun that was used." And, of course, Candelaria Mendiola made no mention of a gun at all -- (indiscernible; coughing in background) -- July 20th, 1997.

Now if you find reasonable doubt that this gun was present, or any weapon, I guess, was present that day, then you have to find Mr. Chargualaf not guilty as to the First Charge, Second Degree Robbery, although you could find him guilty of a lesser -- what's called a lesser-included charge of Third Degree Robbery, which of course you'll hear about -- more about lesser-included offenses when Judge Lamorena instructs you, and he'll give you the elements of the third degree robbery. And, of course, there's the Special Allegation charge. If there was no gun, then there was no gun and that has to be not guilty, too.

///

Now the second issue again with respect to Exhibit 1 is did Mr. Chargualaf possessed this on July 21st, the day he was stopped by Officer Dawson? Well, what do we know about this again? We know it was not in Mr. Chargualaf's possession, it was laying on the ground. Not only that, but it was laying in plain sight on the ground ... on the curb and clearly not concealed, which means basically that he cannot be found guilty of carrying a concealed weapon on July 21st, 1997, which was the date that he was charged for doing this.

Now, Mr. Fisher told you during his opening statement that Candelaria Mendiola was going to tie all this up by testifying, "Well, okay, the gun was in the car. Randy was fumbling with the door panel and he stuck it under his shirt, and then took it out." But, of course, did you hear her say that? I didn't hear her say it and you didn't either. Mr. Fisher than referred Kandi to a statement that she made on July 21st but this was offered for a specific purpose and only that is to impeach Candelaria Mendiola. Basically, impeach means to imply or to show that she's a liar. Judge Lamorena will instruct you that the context, that you may not -- that you may only consider this statement for the purposes of determining if Candelaria Mendiola is a liar. You may not consider this for evidence of the truth of what is said in

that statement. So there is simply no evidence as to -- other than the testimony of Officer Dawson that Mr. Chargualaf was fumbling around with the door panel and that somehow -- we were asked to speculate that somehow this got from there in the car to her. Again, there's simply no evidence. The sad part about this is that we could have known for sure one way or the other whether or not Mr. Chargualaf possessed this gun on July 21st, if Officer Dawson had simply handed it back. It's a pretty big piece of metal, all he had to do is say (indiscernible) and it's there or it's not. But I'm going to ask you to see if this makes any sense to you. Officer Dawson testifies that the sees this Nissan Sentra on Marine Drive, he notices that there is a cracked windshield and a missing front license plate. These are unquestionably violations of the Guam Vehicle Code. He pulls the car over, he asks Mr. Chargualaf for his license and registration. Mr. Chargualaf produces a valid license and a valid registration that matches up to the car he was driving. Now you would think that in the ordinary course of events, the Officer would simply write a ticket for these offenses and send him on his way? But that doesn't happen. Officer Dawson says that he's become suspicious, that maybe this guy is carrying drugs or weapons in his car on basically no evidence whatsoever, but he's

suspicious, and because he is suspicious he becomes concerned for his safety, and because he's concerned for his safety, he calls for backup and along comes Officer Grino and Officer Santo Tomas. Then you may recall that when Officer Grino arrives, Officer Dawson asks her to patdown Kandi Mendiola. We're talking about a female who is roughly maybe five feet, maybe 90 pounds. He asked Officer Grino to pat her down for weapons because he's concerned for everybody's safety, yet somehow he never quite gets around to patting down Mr. Chargualaf. Does that make sense? That's pretty critical. And please don't forget the testimony of Officer Santo Tomas that Mr. Chargualaf wasn't even wearing a shirt. If he wasn't wearing a shirt, where was he going to hide a gun? If anybody had a chance to remove that gun out of the car, if it was in the car at all, it was Candelaria Mendiola, and she had -- if you may recall her testimony about a black pouch -- or kind of like a waist pouch. Officer Dawson testified he thought this was strange because, well, she left her purse there but she took this pouch. Then Officer Dawson also testified also testified that he watched her get out of the car, she walked around front and by the passenger's side. All the time this was going on, he lost sight of her because he was busy searching the car and dealing with Mr. Chargualaf. If anybody could

Case 1:05-cv-00014 Document 16-14 Filed 08/18/2006 Page 7 of 23

have put the gun, if it was in the car at all, it was her. So, if you find reasonable doubt that Mr. Chargualaf possessed this particular gun on July 21st, then he certainly cannot be found guilty of possessing a firearm without an identification card or a concealed weapon because of course (indiscernible) conceal it first of all because he never possessed the weapon at all.

The second point that runs through these charges is the issue of a theft as to the First Charge in the Indictment it says, "In the course of committing theft." And in the Third Charge, it says that "Randy Chargualaf unlawfully took the property of another." One question I have for you, ladies and gentlemen, is where is the money? You've heard testimony about the police recovering a credit card, a purse, passport, and other items. You saw -- There's pictures of them there. They took pictures of them and they gave these items back to Mrs. Certeza. She identified the photographs. However, we heard a lot of talk about this envelope that says "Taitague Sales" on it, that it had about $120.00 in it. I asked Mrs. Certeza, "Did you get that back?"

"No." I asked Officer Dawson, "Did you take the money?" he said, "No, I didn't (inaudible) any money, I gave it to Officer Santo Tomas." I asked Officer Santo Tomas, "Did you confiscate the money?"

Case 1:05-cv-00014 Document 16-14 Filed 08/18/2006 Page 8 of 23

"Yes, I did."

"What did you do with it?"

"Oh, I took it (inaudible) I put it in for evidence at Guam Police Department."

So that's where the custody is, but somehow you won't see, among all this evidence -- exhibits you're going to be able to look at, you're not going to find any envelope marked "Taitague Sales", all you -- or $120.00, all we've got is a piece of paper folded by Mr. Fisher with, I guess, a T.S. or whatever he wrote on it, but no money.

So, if you find there's reasonable doubt that a theft was committed, then you have to find Mr. Chargualaf not guilty as to either second or third degree robbery for lack of the theft taking place at all. And, of course, as to the theft charge itself, same thing; no theft, no charge.

Next, they need to consider of course, again, keeping in mind where the burden of proof is, the credibility of the Government's witnesses. As Mr. Fisher very ably pointed out as to Nobuyo Certeza, she was very nervous, scared to death, but somehow -- and I'll repeat it again -- she says this gun is next to her stomach with a man wearing a short sleeve shirt -- and we'll talk about this some more later -- but somehow misses those tattoos,

or doesn't see tattoos, shall we say. So, if she missed those tattoos -- missed tattoos or not see tattoos, could she really identify the person holding the gun?

She also testified a lot -- for quite a -- or a while during this incident, the person who did the robbery made her bend down to the floor, she didn't see what was going on. In fact, there was testimony about (inaudible - indiscernible) in the case, that she was hoping somehow to -- that maybe $8,000.00 and that'll resolve the thing. And, of course, Judge Lamorena will instruct you that her interest in the case is something you must keep in mind when you consider her credibility.

But, I guess, what really I find interesting though is this, quote-unquote. "identification procedure". You may recall I asked Mrs. Certeza if she had any idea what a line-up was, and she did not. She's Japanese. She probably haven't see too many American police shows, I think, most she (inaudible - indiscernible) -- You know what a line-up is. This is one of the standard procedures for doing identification in criminal cases. What do you do? Well, you take Mr. Chargualaf, you put him in a room, you find five or six other males of roughly his age, build, whatever, and line them up, put him anywhere in there and say to Mrs. Certeza, "Can you pick him out of this line-up?" And, you know, if she had, then maybe you

have a real legitimate identification. But that didn't happen; okay? So maybe that was too much trouble. What's another way to do this? Okay, well, there's what's called the ... the photo spread. You take this mug shot and add to this mug shot five or six other mug shots of, again, males roughly his age and build, and you shuffle them together and put them on the table and you ask Mrs. Certeza, "Can you pick out Randy Chargualaf or whoever robbed you from this stack of pictures?" If she did, then again maybe you have something resembling a reliable identification, but that wasn't done either. What we have is Mr. Chargualaf sitting at the Police Koban by himself, they walk in -- Mr. and Mrs. Certeza walk in to look at their property. Mr. Certeza -- you heard him say he's pretty mad about this, and he goes to Officer Cress and says, "Officer Cress, is that the son of a bitch that did this?" and Officer Cress very helpfully says, "Oh, yes, he sure did." I mean, you might as well tag him, you know? Could have more obviously put a sign around his neck saying, "I committed the robbery yesterday."

Again, this is -- I do feel the utmost sympathy for Mrs. Certeza, but you also have to keep in mind, what does this do about the reliability; her nervousness, her fear, her depression? What does this say about the

///

reliability of her testimony? -- Not her sincerity, just reliability.

As to the second eye witness, Don Mendiola, as Mr. Fisher pointed out, his motive for testifying is -- and what he told me in cross-examination is -- he doesn't want to go to jail. Now, Mr. Fisher did point out one of two instructions we're going to ask you to consider very carefully. The first one again is regarding the testimony of accomplices called. Judge Lamorena will be giving you that. And the last paragraph says, "*The testimony of an accomplice ought to be viewed with caution. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight in which you found it entitled after examining it with care and caution in light of all of the evidence in the case.*"

Now, the instruction after this reads as follows, it's called Plea Agreement from Witness, "*The testimony of a witness who entered into a plea agreement with the Government must be considered with more caution than the testimony of other witnesses. In this case, the People called as its witnesses more than one person,*" that is Candelaria Mendiola, Don Mendiola, "*with whom the People has entered into a plea agreement. Such plea bargaining, as it's called, has been approved as lawful and proper and is expressly provided for in the rules of*

*this Court. However, a witness who hopes to gain more favorable treatment in his own case may have a reason to make a false statement because he wants to strike a good bargain with the Government. So while a witness at that time may be entirely truthful while testifying, you should consider his testimony with more caution than the testimony of other witnesses."*

Everything I just said applies, of course, to Candelaria Mendiola. I'm not going to repeat it. In any event, all she was basically has testified to was that she and Mister -- she and Don Mendiola went into the apartment, allegedly with Mr. Chargualaf, and that she and Don Mendiola took a purse. No testimony of Mr. Chargualaf doing anything or taking anything. And, of course, we've also had not only problems with Candelaria Mendiola, but of course we had evidence that she even lied about that, which, of course, is why Mr. Fisher offered the statement (inaudible - indiscernible) --

I also want to talk about the police witnesses. Now, as to the three eye- -- three, quote-unquote, "eyewitnesses" as to July 20th, this is something fairly dramatic for all of them. They -- As to Mrs. Certeza, presumably it's the first and hopefully the last time in her life she will be robbed (inaudible - indiscernible) -- And as to the Mendiolas, well, they got arrested, they got

charged, and Kandi's in jail right now. Maybe they're gonna be -- this is going to concentrate their mind on this point too, but the police witnesses, keep in mind that this case is over two years old. The police officers go through -- you know, dozens, hundreds, thousands of arrests, confrontations on the street, all the time -- you know, (inaudible - indiscernible) this is just one more. You saw it from the evidence that, you know, the lapse of time had taken its toll on the memories of the police officers because, again, this is just one more (inaudible - indiscernible) --

There was quite a bit of discrepancy about where was this gun. Well, Officer Dawson said that the gun was -- here's the Sentra, here's the stall right in front of it and he said the gun was right here. Officer Santo Tomas said, "Well, no, it wasn't here. It was either here on one side or here on the other side," I'm not sure which one he meant, but it wasn't here. And, of course, Officer Grino, she has no idea where it was. She recalls it was there, but she couldn't tell you where exactly.

And, again, getting into credibility, let's talk about the police bulletin. You may recall that both Officer -- or Officer Santo Tomas testified that he had -- that on July 21st he was aware of this bulletin. And Officer Dawson testified that Officer Santo Tomas told him

about it, so then they say that they got all suspicious because, "Well, Kandi and Mr. Chargualaf matched the description." Well, what does this description say? It says -- well, first of all, it talks about (1) a female; (2) female, and (3) a male, but there are somehow -- there's only a male and a female involved here. It refers to the male as Guamanian, thirty-plus years, five foot eight, medium build, mustache, black hair, black baseball cap, light green shirt. Well, was there any baseball cap worn that day by Officer (sic) Chargualaf. No. No mention of it. What about a light green shirt? Well, let's see, Officer Dawson said he didn't remember what color the shirt was and, of course, Officer Santo Tomas said he didn't have a shirt on at all. Does that match? And I would note, of course, that when Mr. Chargualaf was arrested that day wearing what he was wearing, his clothing could have all been -- would have -- could have all been confiscated and brought in before you as evidence to say, "This is the shirt he was wearing that day." But, again, you look at these exhibits, it's not there and so don't know for sure what color shirt he was wearing. Basically, you had a male Guamanian and a female Guamanian riding in a car together. They could have matched the descriptions of dozens or hundreds of Chamorro couples on the island.

Now, actually, I believe you will have mentioned on a -- a black baseball cap that was offered into evidence, accepted into evidence but, again, if you listened and remember very carefully, there's no mention of any by Mrs. Certeza of any baseball cap.

We'll also note that as to Exhibit 1, the gun was examined for fingerprints, no fingerprints found. Nothing that could match Mr. Chargualaf.

One other thing that Mr. Fisher, I think, harped on was this business about the, quote-unquote, "faggot" statement. Don Mendiola testified that he had known Randy before this incident, a couple of weeks at least. He also testified that he, at the time, was dressing -- or cross-dressing as a female. That is just a fact of life that certain politically incorrect people who refer to such people as "faggots". But all Mr. Chargualaf knew that day was he got arrested along with Candelaria Mendiola. And if there's any mention about a faggot, well, he knew about Don Mendiola, and he knew that Kandi and Don Mendiola knew each other, and so he says, "Who? The faggot?" Well, that's just (inaudible - indiscernible) -- of the robbery.

Now there's one other count, which is basically the conspiracy, that is that -- Again, it doesn't have to be shown anything happened other than that they agreed to commit an offense and they started (inaudible -

indiscernible) that they took some steps toward completing it. Again, you have to find beyond a reasonable doubt that Mr. Chargualaf participated in this agreement and that somebody took some step toward -- towards the agreement (inaudible) to participate at all (inaudible) not guilty.

Ladies and gentlemen, one of the reasons it's kind of standard procedure that Mr. Fisher got up and gave about half my closing arguments is that it's kind of a standard ... standard strategy, I guess, to anticipate the weak points of your case, get them out, and to say, you know, "Well, you know, this is it, but so what?" Reasons that is is to minimize problems. In other words, if I get up and tell you about it first, that must mean it isn't very important. Well, it is important. That's why I guess I'm repeating it. I could have just probably said, "Yeah, what he said," and sat down, but I didn't because these are important and it must be proof beyond a reasonable doubt and, like I said, maybe the things I've cleared up, maybe neither one by itself is enough to establish reasonable doubt in your mind but if you start adding these things up, like the -- like I said, you got three ... three, quote-unquote, "eyewitnesses", they're all damaged goods, that Mr. Fisher more or less acknowledged. We had problems with memory, we had

problems with motivation, we had problems with discrepancies, we had evidence that probably you should have seen but didn't. And we submit that after you've considered all of this, and that everything that you see and everything Mr. Fisher said, I said (inaudible - indiscernible) -- you'll find reasonable doubt as to all charges and you'll enter a decision of not guilty.

On behalf of Mr. Chargualaf and myself, thank you for your attention and good luck.

THE COURT: Okay. Thank you, Mr. Timblin.

As you know, the Government has the responsibility of proving the Defendant guilty beyond a reasonable doubt, so the Court will give the opportunity for Mr. Fisher to give a rebuttal closing.

Okay. Mr. Fisher?

MR. FISHER: Thank you, Your Honor.

Okay, I'm back.

The gun. This is the gun -- This isn't just some gun that appears in Paul's Plaza. The reason we know that is because it was identified. -- It was identified. The gun that came from Paul's Plaza, it was identified by Don as being the gun that was used in the robbery. It wasn't just -- as Mr. Timblin would have you believe -- some random gun that just appeared in the Plaza. Does this appear that maybe perhaps somebody came by and just

dropped it out of a purse or out of the back of your pants or whatever? No, it was placed here near the very area -- the very area where his car is parked. And I think, and I submit to you, that you will determine that this was placed there and it was placed there by an individual who had a reason to place it there, it was placed there by a person who was close enough to do it, and that's the Defendant. And I submit to you that that is precisely exactly the gun that he used when he robbed Nobuyo Certeza. It was not a miracle that this gun just made its way from Tumon all the way over to Paul's Plaza. It was brought there by an individual and that individual placed it there at the curb. And who's the person who had the gun? The Defendant. How do we know that? Because he was identified with that very same gun. It's not just a series of miraculous coincidences. Candelaria said at the scene long before there was a plea agreement entered -- long before, she said at the scene, "That's Randy's gun." The very same time the cops were finding the gun, she says that's his gun. We pick up the gun, the gun is presented to you, it's his gun. That gun did not travel miles by miracle and suddenly appear in this incredible coincidence at the very person who robbed the individual and is accused of robbing the individual with the gun and suddenly there's a gun by him. That gun was transported

and brought in that area by Randy. He didn't want to get caught with it.

The circumstantial evidence other than that was the fact that he was fiddling with that door, as Officer Dawson said. The door, which was working fine, which Officer Dawson could open, for some reason, he needs to slam it shut. What's he doing when he lifts up the paneling on that door? What's he fiddling around with back there? Why is he so nervous? I submit to you it's because he had a gun and he needed to get rid of it. He was busted. Too bad for him. Too bad for him and the other cracked windshield. Too bad for him that he didn't have a front license plate on his car but he was busted and he needed to get his way out of it and that's what he tried to do, by depositing that gun.

Candelaria's statement that was brought before you. Candelaria, it's true, this statement is submitted to you because Candelaria lied to you on the stand about what happened -- not all of it, again, as I've said, but some of it, and she told us on the stand that she got to look at this statement after she wrote it, you'll see her initials all through that statement and you'll see her acknowledgment that the above statement is true and correct to the best of my knowledge and she admitted that

///

she was trying to tell the truth when she wrote that statement.

And just a few other things. Nobuyo Certeza. What -- Another amazing coincidence the Defendant would have you believe when he was talking about Nobuyo's identification about him; isn't it a coincidence that he just happened to have the victim's money? He didn't do it, but he just happens to have the victim's money. He didn't do it, but the person he's living with at the Golden Motel just happens to have the victim's credit cards. He didn't do it, but his friend just happens to have the victim's coin purse. He doesn't do it, but the purse is found outside the hotel where he is staying. All these amazing coincidences.

And then the Defendant says, "Well, why didn't the police do the line-up?" When do you do a line-up? You do a line-up when you're not sure. What's the point of doing a line-up when Nobuyo Certeza comes in there hours after this happens and id's him, "That's the one." You don't need a line-up, he's the one. -- And he is identified by two other people as being the one; his coconspirators, his fellow robbers id'd him as the one who did the crime. There's no reason for a line-up.

And, now, if it wasn't the Defendant, if it wasn't Randy Chargualaf who did this, then Nobuyo Certeza

Case 1:05-cv-00014 Document 16-14 Filed 08/18/2006 Page 21 of 23

would not have identified him as being the robber in the case. And, again, he knows -- you know, I think that the -- I submit to you that there was mis-characterization of the evidence that you heard about that statement as Mr. Timblin characterized it as "the faggot statement". That's not what happened. There was evidence that came out and the evidence that came out was one officer to another, "We caught the third person."

"We caught the third person."

"Who? The faggot?"

"Watch your mouth." And then he is asked, "What's her name?" Not, "How many gay people do you know on Guam?" He said, "What's her name?" referring to the third person involved in this crime and he pops out with Kaelani. How does he know who the third person unless he's involved? How does he know that person is (indiscernible) unless he's involved? He may sit before you and regret the fact that he was running his mouth down there, but he did it, and it's too late, the cat's out of the bag. You can't put it back together again. He was involved in the crime. He was identified by three people. Identified on the stand by a number of these people that he did it. He's caught with the goods and he makes these terrible admissions that he was involved. He did it, beyond a reasonable doubt. The man who stuck that gun at

Nobuyo Certeza in her house and has caused this pain from that day forward to right now, sits before you and I would ask you to find him guilty.

Thank you very much, ladies and gentlemen. Thank you.

THE COURT: Okay. Thank you very much, Mr. Fisher.

Can I have both Counsels come to the side?

*[Side Bar Conference held.]*

THE COURT: Just two slight (inaudible - indiscernible) -- I think my law clerk forgot to eliminate this one.

MR. TIMBLIN: I'm sorry?

THE COURT: So we'll just ... we'll just -- This one.

MR. TIMBLIN: Oh. Defendant --

THE COURT: So I'll just black it out; okay?

MR. TIMBLIN: Sure.

MR. FISHER: Okay.

THE COURT: And then the other one, 3H, I think we put both numbers down but I think the only one that was admitted into evidence was 31; right? So I'm going to just do that.

MR. FISHER: Okay.

THE COURT: Okay? No objections?

MR. TIMBLIN: No.

MR. FISHER: No objection.

THE COURT: Okay, good.

*[Side Bar Conference ends.]*

THE COURT: Ladies and gentlemen, you're about to enter your final duty, which is to decide the fact issues in this case. Before you do that, I will now instruct you as to the law. You must pay close attention to me and I'll try to go as slow as I can and be as clear as possible.

I told you at the very start of this trial that your principle function during the taking of this testimony would be to listen carefully and observe each witness who testified. It has been obvious to me and both Counsels that you have faithfully discharged that duty. Your interest never flagged and it's evidence that you followed the testimony with very close attention. I ask you to give me the same careful attention as I instruct you as to the law.

You have now heard all the evidence in this case, as well as the arguments of both Counsels. My duty at this point is to instruct you as to the law. It is your duty to accept these instructions of law and apply them to the facts as you determine them to be. Just as it has been my duty to preside over the trial and decide what

Case 1:05-cv-00014 Document 16-15 Filed 08/18/2006 Page 1 of 40

testimony and evidence is relevant under the law for your consideration.

On these legal matters, you must take the law as I give it to you. If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow. You should not single out any instructions as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned about the wisdom of any rule that I state. Regardless of your opinion as you may have as to what the law may be or ought to be, it would violate your sworn duty to base a verdict upon any other view of the law than that which I give to you.

Your final role now is to pass and decide the fact issues in this case. You, the members of his jury, are the sole exclusive judges of the facts. You pass upon the weight of the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the testimony, and you draw whatever reasonable inference you decide to draw from the facts as you have determined them to be.

I shall later discuss what you have to pass upon the credibility or believability of the witnesses. In

determining the facts, you must rely upon your own recollection of the evidence.

What the lawyers have said in their opening statements and their closing arguments, in their objections or in their questions is not evidence. In this connection, you should bear in mind that a question put to a witness is never evidence, it is only the answer which is evidence. Nor is anything -- [clears throat] -- excuse me -- Nor is anything I may have said during the trial or may say during these instructions with respect to a fact matter to be taken as substitution for your own independent recollection. What I say to you is not evidence.

The evidence before you consists of the answers given to you by the witnesses, the testimony that you gave as you recall it, and the exhibits that were received into evidence. The evidence does not include questions, only the answers are questions. But you may not consider any answer that I directed you to disregard or that I directed struck from the record. Do not consider such answers. You may also consider the stipulations of the parties as evidence.

Since you are the sole exclusive judges of the facts, I do not mean to indicate my opinion as to the facts or what the verdict should be. The rulings that

I've made during this trial are not any indication of my views of what your decision should be as to whether or not the guilt of the defendant has been proven beyond a reasonable doubt. As to the facts, you are the exclusive judges. You are to perform the duty of finding the facts without prejudice as to any party.

You are to perform the duty of finding the facts without bias or prejudice as to any party. You are to perform your duty in an attitude of complete fairness and impartiality. The case is important to the People of Guam for the enforcement of criminal laws is a matter of prime concern to our community. Equally, it is important to the defendant who is charged with a very serious crime.

The fact that the prosecution is brought by the name of the People of the Territory of Guam entitles them to no greater consideration than that accorded to any other party in a litigation. By the same token, it is entitled to no less consideration. All parties, whether they are the People or individuals, stand as equals at the bar of justice.

The law presumes a defendant to be innocent. Thus, a defendant, although accused, begins a trial with a clean slate with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charges against

the accused. So the presumption of innocence alone is sufficient to acquit a defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case.

It is not required that the Government prove guilt beyond all possible doubt, the test is one of reasonable doubt. Reasonable doubt is defined as follows:

It is not mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the mind of the trier of fact in that condition that he cannot say he feels an abiding conviction to a moral certainty of the truth of the charge.

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture. The burden is always on the Prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to the defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. So the jury, after careful and impartial consideration of all the facts in this case has

///

a reasonable doubt that the defendant is guilty of the charge, it must acquit.

If the jury views the evidence in the case as reasonably permitting either of two conclusions; one of innocence, the other of guilty, the jury, of course, should adopt a conclusion of innocence.

The purpose of the Court's instructions is to provide you with the applicable laws so that you may arrive at a just and lawful verdict.

Whether some instructions apply would depend upon what you find to the facts. Disregard any instructions which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given, that I am expressing an opinion as to the facts.

In determining the facts, the jury is reminded that before each member was accepted and sworn to act as jurors, or was asked questions concerning competency, qualifications, fairness and freedom from prejudice and bias. On the faith of those answers, the juror was accepted by the parties, therefore, those answers are as binding on each of the jurors now as they were then and should remain so until the jury is discharged from consideration in this case.

///

I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling that I have made to intimate or suggest what you should find to be the facts or that I believe or disbelieve a witness. If anything I have done or seemed to so indicate, you will disregard and form your own conclusions.

The question of possible punishment of the defendant is of no concern to the jury and should not in any sense enter or influence your deliberations. The duty of imposing sentence rests exclusively upon this Court. Your function is to weigh the evidence in the case and determine whether or not the defendant is guilty beyond a reasonable doubt solely upon the basis of such evidence. Under your oath as jurors, you cannot allow a consideration of the punishment which may be imposed upon the defendant if he is convicted to influence your verdict in any way or in any sense enter into your deliberations.

You must decide all the questions of fact in this case from the evidence received in this trial and not from any other source. You must not make any independent investigations of the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, you must not on your own visit the

///

Case 1:05-cv-00014 Document 16-15 Filed 08/18/2006 Page 7 of 40

scene, conduct experiments or consult reference works or persons for additional information.

You must not discuss this case with any other person except a fellow juror, and you must not discuss the case with a fellow juror until the case is submitted to you for your decision and only when all the jurors are present in the jury room.

It is the duty of the attorneys for each side of the case to objection when the other side offers testimony or other evidence which the attorney believes is not properly admissible. Counsel has the right and duty to ask the Court to make a ruling under the law and to request conferences at side bar out of the hearing of the jury. All of these questions of law must be decided by the Court. You should not show any prejudice against any attorney or his client because the attorney objected to the admissibility of evidence or asked for a conference out of the hearing of the jury, or asked the Court for a ruling of the law. As I already indicated, my ruling of the admissibility of evidence does not indicate any opinion about the weight or effect of such evidence. You are the sole judges of the credibility of all the witnesses and the weight and effect of all the evidence.

Neither side is required to call all witnesses -- to call as witnesses all persons who may have been

present at the time of the events disclosed by the evidence or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence.

With these preliminary instructions in mind, let us now turn to the charges against the defendant as contained in the Indictment.

I remind you the Indictment itself is not evidence, it merely describes the charges made against the defendant. It is an accusation. It may not be considered by you as evidence of the guilt of the defendant.

In reaching your determination of whether the People has proven the defendant guilty beyond a reasonable doubt, you must consider all the evidence introduced or lack of evidence.

When, as in this case, it is alleged that the crime charged was committed on or about a certain date, if the jury finds the crime was committed, it is not necessary that proof show that it was committed on that precise date. It is sufficient if the proof shows that the crime was committed on or about that date.

Your verdict must be based solely upon the evidence developed at trial or lack of evidence. It would be improper for you to consider in reaching your decision as to whether the Government sustained it's burden of

proof, any personal feelings you may have on the defendant's race, religion, national origin, sex, or age. All persons are entitled to the presumption of innocence and the Government has the same burden of proof.

It would be equally improper for you to allow any feelings you might have about the nature of the crime charged to interfere with your decision making process. To repeat, your verdict must be based exclusively upon the evidence or the lack of evidence in this case.

You'll be going to the jury room to begin your deliberations. The exhibits and these jury instructions and a copy of the Indictment will be sent to you in the jury room. If you want any of the testimony read, that can also be done, but please remember it is not always easy to locate what you may want, so be as specific as you possible can in requesting portions of testimony which you may want to hear. Your request for testimony, in fact, any communications with this Court should be made to me in writing, signed by your Foreperson and given to one of the marshals. I will respond to any questions or requests as promptly as possible either in writing or by having you return to the courtroom so I can speak to you in person. In any event, do not tell me or anyone else how the jury stands on the issue of the defendant's guilt until after a unanimous verdict is reached.

There are two types of verdicts which you may properly use in deciding whether or not the defendant is guilty or not guilty. One type of evidence is called direct evidence. Direct evidence is where a witness may testify as to what he said, heard or observed. In other words, when a witness testifies about what is known to him of his own knowledge by virtue of his own senses; what he sees, feels, touches or hears, that is called direct evidence.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts. There's a simple example of circumstantial evidence which is often used in this courthouse. Assume that when you came to the court today this morning, the sun was shining and it was a nice day. Assume that you cannot look outside. As you were sitting here, someone walked in with an umbrella which was dripping wet. Somebody else then walked in with a raincoat which was also dripping wet. Now you cannot look outside of this courtroom and you cannot see whether or not it is raining so you have no direct evidence of that fact. But on the combination of facts, which I've asked you to assume, it will be reasonable and logical for you to conclude that it had been raining outside. That is all there is to circumstantial evidence. You infer on the basis of reason and experience and commonsense from an

established fact of the existence or nonexistence of some other fact.

Circumstantial evidence is of no less value than direct evidence for it is a general rule of law that makes no distinction between direct and circumstantial evidence, but simply requires that before convicting a defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in this case.

Also, if the circumstantial evidence as to any particular count is susceptible to two reasonable interpretations; one which points to the defendant's guilt, and the other to his innocence, you must adopt the interpretation which points to the defendant's innocence and reject the interpretation which points to his guilt.

If on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

Government's Exhibit 31 was admitted for the limited purpose of impeaching the credibility of the witness, Candelaria Mendiola, and not for the purpose of proving the truth of the matter stated in this exhibit. You are instructed that you must not consider such evidence for any other purpose except the limited purpose for which it was admitted.

Case 1:05-cv-00014 Document 16-15 Filed 08/18/2006 Page 12 of 40

The law does not compel a defendant in a criminal case to take the witness stand and to testify, and no presumption of guilt must be raised, and no inference of any kind may be drawn from the failure to the defendant to testify.

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

You have heard that the defendant made certain statements. It is for you to decide, (1) whether the defendant made the statement; and (2) if so, how much weight to give them. In making these decisions, you should consider all the evidence about the statement, including the circumstances under which the defendant may have made them.

In deciding what the facts are, you may consider all the evidence. In doing this, you must decide which testimony to believe or not to believe. You may disbelieve all or any part of any witness's testimony. In making the decision, you may take into account a number of factors including the following:

(1) Was the witness able to see or hear or know the things about which the witness testified?

(2) How well the witness was able to recall and describe those things?

(3)  What was the witness's manner while he was testifying?

(4)  Did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in this case?

(5)  How reasonable was the witness's testimony considered in the light of the evidence in this case?

(6)  Was the witness's testimony contradicted by what the witness had said or done at another time, or by testimony of other witnesses or by other evidence?

In deciding whether or not to believe a witness, keep in mind that people sometimes forget.  You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and you may depend on whether it had to do with an important fact or a small detail.

The weight of the evidence presented by each side does not necessarily depend upon the number of witnesses testifying on the other side.  You must consider all the evidence in this case and you may decide that the testimony of a smaller number of witnesses on one side may have greater weight than that of a larger number on the other side.

///

You have heard the testimony of a law enforcement official. The fact that a witness may be employed by the Government of Guam as a law enforcement official does not mean that his testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of any ordinary witness. At the same time, it is quite legitimate for the defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his testimony may be colored by a personal or professional interest in the outcome of the case. It is your decision after reviewing all the evidence whether to accept the testimony of the law enforcement witness and to give the testimony whatever weight, if any, you find it deserves.

In connection with your evaluation of the credibility of the witnesses, you should specifically consider evidence of resentment or anger, which some government witnesses may have towards the defendant. Evidence that a witness is biased, prejudiced or hostile towards the defendant requires you to view the witness's testimony with caution, do it with care and subject to close and searching scrutiny.

An accomplice is a person who is subject to prosecution for an identical offense charged against the defendant on trial by reason of aiding and abetting, or by

being a member of a criminal conspiracy. A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such a defendant with the commission of the offense. To corroborate the testimony of an accomplice, there must be evidence of some act or fact related to the crime which, if believed by itself and without any aide of interpretation or direction from testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. However, it is not necessary that the evidence of the corroboration be sufficient in itself to establish every element of the crime or that it corroborate every fact to which the accomplice testifies.

In determining whether or not the accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. If there is no such independent evidence which tends to connect the defendant with the commission of the crime, the testimony of the accomplice is not corroborated. If there is independent evidence which you believe, then the testimony of the accomplice is corroborated. The corroboration of the testimony of an

accomplice may not be supplied by the testimony of any or all of his accomplices but must come from other evidence.

If the crime of robbery with a special allegation, theft, conspiracy to commit robbery, possession of a firearm without an identification card, or possession of a firearm was committed by anyone, the witness's, Candelaria Mendiola and Don Mendiola were an accomplice as a matter of law and their testimony is subject to the rule requiring cooperation.

The testimony of an accomplice ought to be viewed with caution. This does not mean that you may arbitrarily disregard such testimony, but should give it the weight to which you find it to be entitled after examining it with care and caution in light of all the evidence in this case.

The testimony of a witness who enters into a plea agreement with the Government must be considered with more caution than the testimony of other witnesses. In this case, the People has called as witnesses more than one person whom the Government has entered a plea agreement. Such plea agreement, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court. However, a witness who hopes to gain more favorable attention or treatment in his own case may have a reason to make false statements

because he wants to strike a good bargain with the Government. So while a witness of that kind may be entirely truthful when testifying, you should consider his testimony with more caution than the testimony of other witnesses.

One of the most important issues in this case is the identification of the defendant as the perpetrator of the crimes. The government has the burden of proving identity beyond a reasonable doubt. It is not essential that a witness himself be free from doubt as to the correctness of his identification of the defendant. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you can convict him. If you are not convicted -- I'm sorry. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

Identification testimony is an expression of belief on the part of the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and, later, to make a reliable identification of the offender.

Let me repeat, the burden is on the Prosecution to prove every element of the crime charged, including the

identity of the defendant as the offender. Therefore, if, after examining all of the evidence, you find that a crime was committed, but you have a reasonable doubt about whether it was the defendant who committed that crime, you must find him not guilty.

You have heard the testimony from expert witnesses. An expert is allowed to express his opinion on those matters about which he has special knowledge and training. Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision as to the facts.

In weighing the expert's testimony, you may consider the expert's qualifications, his opinions, his reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept this witness's testimony merely because he is an expert. Nor should you substitute it for your own reason, judgement and commonsense. The determination of the facts rests upon you exclusively.

///

"Intentionally" Defined. A person acts intentionally, or with intent, with respect to his conduct or to a result therefore when it is his conscious purpose to engage in the conduct or cause that result.

"Knowingly" Defined. A person acts knowingly, or with knowledge, with respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

"Recklessly" Defined. A person acts recklessly, or is reckless, with respect to attendant circumstances or the result of his conduct when he acts in awareness of a substantial risk that the circumstances exist or that his conduct will cause the result and his disregard is unjustifiable and constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation.

"Conspiracy" Defined. A person is guilty of conspiracy to commit a crime if: (a) He agrees with one or more other persons that he or one of them will engage in conduct which constitutes such crime; (b) he does so with the intention of engaging in, promoting or assisting in the conduct which constitutes such crime; and (c) he or

one of them performs an overt act in pursuance of the agreement.

"Second Degree Robbery" Defined. A person is guilty of robbery in the second degree if, in the course of committing a theft, he is armed with or displays what appears to be a deadly weapon.

"Theft of Property" Defined. A person is guilty of theft if he unlawfully takes or obtains or exercises control over movable property of another with intent to deprive him thereof.

"Act" Defined. An act occurs in the course of committing a theft if it occurs in an attempt to commit theft or in flight after the attempt or commission.

"Deprive" Defined. Deprive means to withhold property of another permanently, or for so extended a period of time as to appropriate a major portion of its economic value, or with intent to restore only upon payment of reward or other compensation; or to abandon the property under circumstances amounting to reckless exposure to loss.

"Movable Property" Defined. Movable property means the property, the location of which can be changed, including things growing on, or affixed to, or found in land; and documents, although the rights represented thereby have no physical location.

"Obtain" Defined. Obtain means: (a) in relation to property, to bring about a transfer or purported transfer of legal interest in the property, whether to the obtainer or another; or (b) in relation to labor or service, to secure performance thereof.

"Property" Defined. Property means anything of value, including real estate, tangible or intangible personal property, contract rights, choses in action and other interests or claims to wealth, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power, or trade secrets.

"Property of Another" Defined. Property of another includes property in which any person other than the defendant has an interest, which the defendant is not privileged in infringe, regardless of the fact that the defendant also has an interest in the property, and regardless of the fact that the other person might be precluded from civil recovery because the property was used in an unlawful transaction or was subject to forfeiture as contraband.

"Deadly Weapon" Defined. Deadly weapon means any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or intended to be used is known to the

///

defendant to be capable of producing death or serious bodily injury.

"Possession" Defined. A person has possession of something if the person knows of its presence and has physical control of it, or has the power or intention to control it.

"Concealment" Defined. Concealment means that although there may be some notice of its presence, the item is not visible through ordinary observation.

Consider Each Charge Separately. A separate crime of offense is charged in each charge of the Indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the accused guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offenses charged.

If the definition of an offense prescribes a culpable mental state but does not specify the conduct, attendant circumstances or the result to which it applies, the prescribed culpable mental state shall apply to each such material fact -- element. I'm sorry.

If the definition of a crime prescribes criminal negligence as the culpable mental state, it is also established if a person acts intentionally, knowingly or recklessly. When recklessness suffices to establish a

culpable mental state, it is also established if a person acts intentionally or knowingly.

Knowledge that conduct constitutes an offense or knowledge of the existence, meaning or application of the statute defining an offense, is not an element of an offense unless the statute clearly so provides.

Knowledge and intent involve the state of a person's mind. It has often been said to juries that the state of one's mind is a fact as much as the state of one's digestion. Accordingly, this is a fact that you are called upon to decide.

Medical science has not yet devised an instrument which can record what was in a person's mind in the distant past. Rarely is direct proof available to establish the state of one's mind. This may be inferred from what he says or does: his words, his actions, and his conduct, or as of the time of the occurrence of certain events.

The intent with which an act is done is often more clearly and conclusively shown by the act itself, or by a series of acts, than by words or explanations of the act uttered long after its occurrence. Accordingly, intent and knowledge are usually establishes -- I'm sorry. Accordingly, intent and knowledge are usually established by surrounding facts and circumstances as of

the time the acts in question occurred, or the events took place, and the reasonable inference to be drawn from them.

Conviction of Lesser-Included Offenses. If you are satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, -- I'm sorry. Take that back.

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of such lesser crime.

The crime of third degree robbery is a lesser to second degree. The crime of misdemeanor theft is a lesser to third degree theft. The crime of petty theft is a lesser to misdemeanor theft.

Okay. The Essential Elements of Conspiracy.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Agreed with one or more persons; namely Candelaria Mendiola or Don B. Mendiola;

2. And that he/she or one of them will engage in conduct which constitutes the crime of robbery;

3. And at the time, Randy I. Chargualaf agreed, he intended to engage, promote or assist in the conduct which constituted such crime; and

4. One of them performed an overt act in pursuance of that agreement;

5. On or about July 20, 1997;

6. Within the Territory of Guam.

The Essential Elements of Second Degree Robbery.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. While in the course of committing a theft;

2. Was armed with or displayed what appeared to be a deadly weapon;

3. On or about July 20, 1997;

4. Within the territory of Guam.

The Essential Elements of Third Degree Robbery.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. In the course of committing a theft;

2. Threatened Mrs. Certeza with, or put her in fear of imminent use of force against the other with the intent to compel acquiescence to the taking of or escaping with property of Mrs. Certeza;

3. On or about July 20, 1997;

4. Within the Territory of Guam.

The Essential Elements of Misdemeanor Theft.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Unlawfully took or obtained or exercised unlawful control over;

2. The movable property of Nobuyo Certeza -- Mrs. Certeza;

3. The value of the property being greater than $50.00 but less than or equal to $500,

4. With the intent to deprive her thereof;

5. On or about July 20, 1997,

6. Within the Territory of Guam.

The Essential Elements of Petty Theft.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Unlawfully took or obtained unlawful control of;

2. The movable property of Mrs. Certeza;

3. The value of the property being less than or equal to $50.00;

4. With the intent to deprive her thereof;

5. On or about July 20, 1997;

6. Within the Territory of Guam.

Okay. The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Did knowingly and unlawfully;

2. Possess or use a deadly weapon;

3. In the commission of a felony, that is, robbery;

4. On or about July 20, 1997;

5. Within the territory of Guam.

The Essential Elements of Possession and Use of a Firearm.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Did knowingly and unlawfully;

2. Purchase, possess, own, use, carry, or acquire a firearm;

3. Without an applicable identification card;

4. On or about July 21, 1997;

5. Within the Territory of Guam.

Okay. I take it back. On instruction number 7G, it should be July 20th; okay? Okay? So on jury instruction 7G it should be -- on the fourth element, "on or about July 20th, 1997."

///

On the Essential Elements of Possession of a Concealed Weapon or Firearm, the People must prove beyond a reasonable doubt, the defendant, Randy I. Chargualaf:

1. Did knowingly and unlawfully;
2. Carry a concealed firearm;
3. Without the requisite identification card;
4. On or about July 21, 1997;
5. Within the territory of Guam.

The verdict forms must represent the considered judgement of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another, and to deliberate with a view of reaching an agreement, if you can without violence to your individual judgement. Each of you must decide the case for himself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Case 1:05-cv-00014 Document 16-15 Filed 08/18/2006 Page 29 of 40

Remember at all times you are not partisans. You are the judges -- judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Do not disclose to anyone outside the jury, not even to me or any members of my staff, either orally or in writing, how you are divided numerically in your balloting as to the guilt or innocence of any defendant, or as to any of the crimes charged, or any finding required thereof, until I specifically direct otherwise.

You shall now retire and select one of your own to act as a foreperson. He or she will preside over your deliberations.

In order to reach your verdict, all twelve jurors must agree to the decision. As soon as all of you have agreed upon a verdict, so that each may state truthfully that the verdicts expresses his or her vote, have them dated and signed by your foreperson and then return with them to this courtroom.

Okay? Who are the Marshals?

MR. TIMBLIN: Your Honor, I we can approach the bench?

THE COURT: Yes.

*[Side Bar Conference begins.]*

///

MR. TIMBLIN: I recognize that Mr. Fisher's on or about argument, I'm pretty sure that the Indictment -- you were correct the first time about the possession without an ID when you said July 20th -- 21st in which --

THE COURT: Which one?

MR. TIMBLIN: This is 7G.

THE COURT: Okay. I'll correct it again.

MR. TIMBLIN: It should be July 21st on the first one because that's what, of course, the Indictment says.

THE COURT: July 21st?

MR. FISHER: Yeah.

MR. TIMBLIN: If you can (indiscernible) --

THE COURT: On 7G? Which one; 7G or 7H?

MR. TIMBLIN: Okay. Well, as to 7G, first you said the twenty-first, which is correct, then you changed it to the twentieth.

THE COURT: Okay.

MR. TIMBLIN: And then you -- instead of citing the twentieth, you said ... you said -- then you read the twentieth, but it should be the twenty-first. Both should be the twenty-first.

MR. FISHER: Right. Hey, did we -- did --?

THE COURT: I read the twenty-first.

///

MR. FISHER: Yeah, then he had corrected himself as to the possession and use as to the robbery.

MR. TIMBLIN: I thought you ... I thought you changed the twenty-first, which is on here to the twentieth.

THE COURT: Yeah. But I (inaudible) to the twenty-first; right?

MR. FISHER: That was for the possession and use on the robbery.

THE COURT: On the Special Allegation?

MR. FISHER: Right. When you went back and you said, "I take that back."

THE COURT: Right. But I'll read it again. Okay?

MR. TIMBLIN: Okay. Any what I'm saying is to as to the ID and the concealment, I think it should be the twenty-first.

THE COURT: Okay. I'll read it back. But 7H is (inaudible - indiscernible) --

MR. TIMBLIN: We changed that. I'm pretty sure -- I believe -- I'm pretty sure he's changed it.

THE COURT: But 7I and 7H are okay?

MR. TIMBLIN: Yeah.

THE COURT: Okay. So I'll read it again. It should be July 21st.

MR. FISHER: I might have fallen asleep or something there, but did you give the on or about instruction?

THE COURT: Yeah.

MR. FISHER: You did?

MR. TIMBLIN: He did, yeah.

MR. FISHER: Okay. Then --

MR. TIMBLIN: I'm just trying to track the Indictment that's all. 3D?

MR. FISHER: 3D? Okay.

*[Brief pause.]*

MR. FISHER: Okay. I noticed in 1C that you read this, "You may also consider the stipulations of the parties."

THE COURT: (Indiscernible - inaudible) --

MR. FISHER: I don't think we --

MR. TIMBLIN: There being none --

THE COURT: You know there's always instructions that you may not --

MR. FISHER: Okay.

THE COURT: There may be some instructions you don't have to follow if there's no basis for it.

MR. FISHER: Okay. And then this instruction that's going to be given to the jury, it says, "Don Borja."

MR. TIMBLIN: Yeah. You said Mendiola but this does say "Borja". You're right.

MR. FISHER: Which --

MR. TIMBLIN: Don Borja or Don --

MR. FISHER: During the -- I've been referring to him as Mendiola but --

MR. TIMBLIN: (Inaudible - indiscernible) -- I mean, it's probably confusing. But he did say "Mendiola" and it said "Borja."

THE COURT: Yeah. Don Borja Mendiola. You're right.

MR. TIMBLIN: Yeah.

THE COURT: Okay. I'll re-read that part.

MR. TIMBLIN: What you read was -- you said "Mendiola" but it says in the jury instruction "Borja".

MR. FISHER: Yeah.

THE COURT: I think it's just that one part; right?

MR. FISHER: Yeah. Because the Indictment says, "Don Allen Borja Mendiola".

THE COURT: Okay. I'll just -- for clarification, I'll read that again. Which instruction is that?

MR. FISHER: That was 7B.

THE COURT: Conspiracy?

Case 1:05-cv-00014 Document 16-15 Filed 08/18/2006 Page 34 of 40

MR. FISHER: 7 Bravo, Your Honor.

THE COURT: Okay. May I borrow your pen?

MR. FISHER: Certainly.

THE COURT: Okay. I'll read those two instructions (inaudible - indiscernible) --

*[Pause in proceedings.]*

THE COURT: Okay.

MR. FISHER: Okay. Candelaria is the real woman.

THE COURT: Hmm?

MR. FISHER: Kaelani is Don.

THE COURT: Yeah, but this is Kandi.

MR. FISHER: Oh, Kandi. Okay. Sorry.

THE COURT: Okay? I'll read those two just for clarification. So, I'll just read 7B and 7H; right?

MR. FISHER: Certainly.

THE COURT: Okay.

*[Side Bar Conference ends.]*

THE COURT: Okay. The attorneys have asked me, just for clarification read to you jury instruction number 7B again. It should read as follows:

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

///

///

1. Agreed with one or more persons; namely Candelaria Quidachay Mendiola, also known as "Kandi" or Don Allen Borja Mendiola, also known as "Kaelani";

2. And that he/she or one of them will engage in conduct which constitutes the crime of robbery;

3. At the time, Randy I. Chargualaf agreed, he intended to engage, promote or assist in the conduct which constituted such crime; and

4. One of them performed an overt act in pursuance of that agreement;

5. On or about July 20, 1997;

6. Within the Territory of Guam.

I'll read another instruction just for clarification. On 7G; correct? 7G?

MR. TIMBLIN: 7F and -- I'm sorry. Yeah; 7G. Excuse me. I'm sorry.

THE COURT: Okay. The Essential Elements of Possession and Use of a Deadly Weapon as a Special Allegation to the Charge of Robbery.

The People must prove beyond a reasonable doubt that the defendant, Randy I. Chargualaf:

1. Did knowingly and unlawfully;

2. Possess or use a deadly weapon;

///

3. In the commission of a felony, that is, robbery;

4. On or about July 21, 1997;

5. Within the Territory of Guam.

Okay? So those are the changes.

(Addressing the Clerk:) Who are the two (indiscernible - inaudible; microphone is not in close proximity to the Court.)

THE CLERK: Tona Cruz and Joe Cruz.

(Addressing the Marshals:) Raise your right hand.

And Ralph.

THE COURT: Ralph?

THE CLERK: Ralph Charfauros.

THE COURT: (Inaudible - indiscernible) --

**THE MARSHALS ARE SWORN**

THE CLERK: Do you solemnly swear that you will truly keep every person sworn in this jury in some private and convenient place and will not suffer any person to speak to them nor speak to them yourself, without leave of the Court, except to ask them if they have agreed upon a verdict, or until they be discharged by the Court, so help you God?

MARSHALS: I do.

THE COURT: Before I excuse the jury to deliberate on the verdict, I'd like to thank and excuse the two alternates.

Thank you very much. You've been very attentive through the whole process. Unfortunately you can't (inaudible) deliberation, but the Court would like to thank and excuse you for your cooperation and attentiveness.

*[Alternate Jurors are excused.]*

THE COURT: The Court then will ask that the jury deliberate on the verdict and that we will give you copies of the Indictment, copies of the jury instructions and a copy of the verdict forms so that you can vote on it, and of course, all the exhibits as well. Okay?

The jury now is excused to deliberate on the verdict in this case.

THE MARSHAL: All rise for the jury.

*[Pause while the jurors exit the courtroom.]*

THE MARSHAL: Be seated.

THE COURT: Okay. The Court will be in recess then. With the attorneys, if you have your telephone numbers, you want to give it to Evelyn? If you have a beeper or a cell phone number, can you please give it to Evelyn so that we'll contact you as soon as the jury either reaches a verdict or if they have any questions in this case.

MR. FISHER: Certainly.

Judge, do you want -- I have a question about the evidence going back to the jury. We've got a gun here and we've also got bullets. You want to send the bullets back --?

THE COURT: No, because the bullets were never part of the evidence.

MR. FISHER: Oh, no. They were admitted, sir.

THE COURT: Okay.

MR. FISHER: Do you want to send them back together?

THE COURT: Sure.

MR. FISHER: Okay.

MR. TIMBLIN: I have no objection, Your Honor.

THE COURT: We've done it before, so --

MR. FISHER: Okay. I just didn't know if the Court had a safety issue --

THE COURT: Okay. The court stands adjourned.

THE MARSHAL: All rise.

**** Whereupon the proceedings concluded. ****

# CERTIFICATE

I, Jeanette B. Roberto, do hereby certify that the foregoing pages, one through eighty-six (86) inclusive, comprise the true and correct transcript of the Continued Jury Trial (Day 3; Excerpt), heard in the following case:

Superior Court Case No. CF0317-97

*PEOPLE OF GUAM, Plaintiff*

*versus*

*RANDY I. CHARGUALAF, Defendant.*

heard before the Honorable Judge Alberto C. Lamorena III, on November 8, 1999, recorded on Tape Numbers T99-1872 and T99-1873.

This transcript of was prepared by me to the best of my knowledge, skill and ability.

Dated this 15th day of August, 2006.

JEANETTE B. ROBERTO




SUPERIOR COURT OF GUAM
MINUTE ENTRY

TAPE NO: 99-1872 | PAGE NO: 1 | COURT CONVENED AT: 8:30 X AM _ PM | DATE: 11 08 1999

PRESENT: JUDGE: ALBERTO C . LAMORENA III , Presiding Judge
CLERK: EVELYN C. SANTOS

CASE NUMBER: CF0317-97 | CASE TITLE: PEOPLE OF THE TERRITORY OF GUAM VS. RANDY I CHARGUALAF *

COUNSEL PRESENT:
PLAINTIFF: T. Fisher
DEFENDANT: T. Zenkler

PROCEEDINGS: Jury Trial Day (3)

| LOG NUMBER | DESCRIPTION |
|---|---|
| 2894 | -Case Called Deft present w/atty. |
| 2900 | 12 jurors present 2 alternates present. |
| | Ct - instruct jurors. |
| 3004 | Benjamin T. Cortez sworn in. |
| 3060 | D/A - direct exam B. Cortez. |
| 3208 | P/A = cross exam B. Cortez. |
| 3285 | D/A = defense rest. |
| 3301 | P/A = no rebuttle witness. |
| 3308 | Ct = 15 min recess |
| 3320 | Ct - back in session |
| 3370 | P/A = closing arguements. |
| 6603 | D/A = closing arguement |
| 99-1873 | D/A - cont. closing arguement |
| 1575 | Ct - address jurors. |
| 1585 | P/A - rebuttle closing arguement. |
| 2025 | Ct - side bar. |
| | Matter continued to: , 1999 At: am/pm |
| 2075 | Ct = jury Instructions. 5010 sworn marshals |
| 4860 | Ct - deliberate instruction report. |

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagatna, Guam

AUG 17 2006

Benny Q. Cruz
Deputy Clerk, Superior Court of Guam

FILED
[illegible] COURT

2[illegible] JUL 17 PM 2:56

[illegible] M. BORLAS
CLERK OF COURT
BY:

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **PEOPLE OF GUAM**<br><br>Plaintiff-Appellee,<br><br>vs.<br><br>**RANDY IGNACIO CHARGUALAF,**<br><br>Defendant-Appellant. | Supreme Court Case **No. CRA00-002**<br><br>Superior Court Case **No. CF0317-97**<br><br>**Excerpt of Trial - Day 3**<br><br>November 8, 1999<br><br>**VOLUME IV of IV** |

**BEFORE:**

*The Honorable Alberto C. Lamorena, III*
Judge, Superior Court of Guam

**APPEARANCES:**

**For the People:**

*Thomas J. Fisher, Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
Prosecution Division
Hagåtña, Guam

**For the Defendant:**

*Terrence E. Timblin, Attorney at Law*
Hagåtña , Guam

*Priscilla Castro Torres*
*Court Transcriber, Superior Court of Guam*



**EXCERPT OF TRIAL BEGINS**

**THE BAILIFF:** All rise. The Superior Court of Guam is now in session. The Honorable Alberto C. Lamorena III presiding. Draw near and give your attention and you shall be heard. God save Guam and this Honorable Court. Please be seated.

**THE COURT: CF0317-97, People of Guam vs. Randy Ignacio Chargualaf**. Just for the record, all twelve Jurors are present, two Alternates. Good morning to all the Jurors.

**THE JURY:** Good morning, Your Honor.

**THE COURT:** Mr. Fisher, who is representing the People, present. Mr. Timblin is present with the Defendant. Okay, you've heard the evidence presented by the Attorney General, the Prosecution. As I instructed you earlier, the burden of proof in a criminal case is beyond a reasonable doubt. That means the Government, represented by the Attorney General's Office, must prove that burden of proving Mr. Chargualaf guilty beyond a reasonable doubt of the charges contained in the Indictment that I read to you earlier. That burden never shifts.

In other words, the Defendant is never required to prove his innocence. Only the Government is required to prove his guilt. So, therefore, the Defendant is never required to produce any evidence to you. Okay? But, however, you cannot hold him accountable against that. So, when you deliberate in the Jury, and the Defendant fails to produce any evidence or does not produce any evidence to you, you cannot use that as a basis to find him guilty. You must only use the evidence presented by the Attorney General's Office represented again through the People by Mr. Fisher, the Prosecution, enough evidence to find him -- you must (indiscernible) enough evidence to find him guilty beyond a reasonable doubt and

you cannot hold it against the Defendant if he does not wish to produce any evidence to you.

However, the Defendant has the option to produce any evidence to you if they so wish. And so the Court now will afford Mr. Timblin the opportunity, if he wishes, to present the evidence to the Jury at this time.

**MR. TIMBLIN:** Thank you, Your Honor. The Defense will call Mr. Benjamin Certeza.

(Pause for Witness to be called)

(Witness Assumes Stand)

*Benjamin Franklin Toves Certeza*

*called as a witness by The People, after having been first duly sworn, testified on his oath as follows:*

**THE CLERK:** Please be seated and state your full name.

**THE WITNESS:** My name is Benjamin Franklin Toves Certeza.

**THE COURT:** Okay, Mr. Timblin, you may proceed.

**MR. TIMBLIN:** Thank you, Your Honor.

*Direct Examination*

*by Mr. Timblin:*

**Q** Mr. Certeza, you are the husband of Noboyo Certeza, the lady who testified here last week?

**A** Yes, sir.

**Q** And were you and Mrs. Certeza residing at 105 Kitacho Apartments in Tumon back on July 20th of 1997?

**A** Yes, sir.

**Q** And on the evening of -- directing your attention to the evening of that

Case 1:05-cv-00014 Document 16-16 Filed 08/18/2006 Page 4 of 10

date, did you become aware that your wife had been the victim of a robbery that evening?

**A** Yes, sir.

**Q** And directing your attention to the following day -- July 21st -- did you have occasion to go with your wife to, I believe, the GPD koban located, I guess, next to the Dai Ichi Hotel?

**A** Palace Hotel, sir.

**Q** Palace Hotel? Oh, excuse me. Palace Hotel. Excuse me.

**A** Yes, sir.

**Q** And what was the purpose of your going there?

**A** The purpose of that was that I received a phone call that "*Would you be kind enough to come down to the koban to identify some items?*" And so, we proceeded.

**Q** I see. And did you recover some items that belonged to your wife at the time?

**A** Yes, sir.

**Q** All right. Now, at the time that you were there, did you happen to see the Defendant, Randy Chargualaf?

**A** Yes, sir.

**Q** He was present at the koban?

**A** Yes, sir. He was sitting.

**Q** Where was he sitting, if you recall?

**A** He was actually sitting in front of the evidence.

**Q** I see. Was anybody else next to him or just him?

**A** No, sir. Only himself.

Case 1:05-cv-00014 Document 16-16 Filed 08/18/2006 Page 5 of 10

Q And was there an Officer Kress of the Guam Police Department there also?

A Yes, sir.

Q Did you have a conversation with Officer Kress about Mr. Chargualaf?

A I did.

Q And could you relate to us what that conversation was, sir?

A As we arrived there--

Q What?

A --I asked Officer Kress -- of course, I was a little bit mad -- and I said *"Was that the son of a bitch?"* And Kress had said *"Yes"*.

Q And was your wife present when you said this?

A Yes. My wife was with me.

Q And was Mr. Chargualaf clearly visible to both of you?

A Yes, sir.

**MR. TIMBLIN:** Thank you. No further questions.

**THE WITNESS:** Thank you.

**THE COURT:** Mr. Fisher, any questions on cross?

**MR. FISHER:** Yes, thank you, Your Honor.

*Cross-Examination*

*by Mr. Fisher:*

Q Sir, you stated that the Defendant was in front of the evidence?

A Yes, sir.

Q Sir, isn't it true that he was also seated in front of an envelope that your wife had put money in?

A Yes, sir. The envelope that was in front of him was a Taitague Bus

Sales logo.

**Q** Okay. And, sir, were you aware that that Taitague Bus Sales envelope with your wife's money was taken from the Defendant?

**A** Yes, sir.

**Q** Sir, were you able to observe your wife identify the Defendant as the person who had robbed her?

**A** Yes, sir. At the first time, my wife was a little bit nervous; shaking; crying.

**Q** Sir, isn't it true that after that, she was certain that it was the Defendant who had robbed her?

**A** Yes, sir.

**Q** Thank you, sir.

**MR. FISHER:** I have no questions.

**THE COURT:** Any other questions on redirect?

**MR. TIMBLIN:** No further questions, Your Honor.

**THE COURT:** Okay, Mr. Certeza, you may step down.

**THE WITNESS:** Thank you.

(Witness is Excused)

**MR. TIMBLIN:** Your Honor, with that, the Defense rests.

**THE COURT:** Okay. Thank you, Mr. Timblin. Since the People have the burden of proving the Defendant guilty beyond a reasonable doubt, the Court will give Mr. Fisher a chance to issue rebuttal witnesses if you wish to do so.

**MR. FISHER:** Your Honor, we have no rebuttal witnesses.

///

///

Case 1:05-cv-00014 Document 16-16 Filed 08/18/2006 Page 7 of 10

**THE COURT:** Okay. What we'll do is, we'll take a five-minute recess. I'll give now both attorneys an opportunity to give you closing arguments in this case. I will then give you instructions as to the law and then you will deliberate on the verdict in this case. The Court will give a five-minute recess. Okay?

**THE BAILIFF:** All rise.

(Court Stands in Recess - Off the Record)

**EXCERPT OF TRIAL ENDS**

CRA00-002/CF0317-97 8

| I N D E X | | | | |
|---|---|---|---|---|
| | | | | |
| **WITNESSES** | **DIRECT** Page | **CROSS** Page | **REDIRECT** Page | **RECROSS** Page |
| **BENJAMIN FRANKLIN TOVES CERTEZA** | | | | |
| By: Mr. Timblin | 3 | | | |
| By: Mr. Fisher | | 5 | | --- |
| | | | | |

November 8, 1999 ❖ Priscilla Castro Torres, Court Transcriber ❖

# CERTIFICATE

I, PRISCILLA C. TORRES, do hereby certify that the foregoing pages one through nine (9) inclusive, comprise the true and correct Transcript on Appeal of the **Excerpt of Jury Trial - Day 3** proceedings had in:

**PEOPLE OF GUAM vs. RANDY IGNACIO CHARGUALAF**

**CF0317-97**

before The Honorable Alberto C. Lamorena III on November 8, 1999; recorded on Tape Number T99-1872; and transcribed by me to the best of my knowledge and ability.

DATED this 14th day of July, 2000.

Priscilla C. Torres

Priscilla C. Torres

  

MINUTE ENTRY

TAPE NO: 99-1825 | PAGE NO: 1 | COURT CONVENED AT: 8:30 X AM _ PM | DATE: 11 09 1999

PRESENT: JUDGE: ALBERTO C . LAMORENA III , Presiding Judge
CLERK: EVELYN C. SANTOS

CASE NUMBER: CF0317-97

CASE TITLE: PEOPLE OF THE TERRITORY OF GUAM VS. RANDY I CHARGUALAF *

COUNSEL PRESENT:
PLAINTIFF: T. Fisher
DEFENDANT: T. Tomlin

PROCEEDINGS: Verdict

| LOG NUMBER | DESCRIPTION |
|---|---|
| 125 | -Case Called |
| | deft present |
| | Verdict reached. |
| 175 | 12 juror present. |
| | Verdict reached |
| | verdict read. |
| 310 | polling of jurors. |
| 320 | ct - verdict read |
| | o/A = waive 21 days. PSI ordered |
| 360 | 12/22/99 sent. |
| | Matter continued to: , 1999 At: am/pm |

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagatna, Guam

AUG 17 2006

Benny O. Cruz
Deputy Clerk, Superior Court of Guam

246

FILED
SUPERIOR COURT
OF GUAM

2006 AUG 10 AM 10: 45

CLERK OF COURT

BY: ____________

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM, | SUPERIOR COURT CASE NO: CF317-97 |
| vs. | TRANSCRIPT OF PROCEEDINGS |
| RANDY IGNACIO CHARGUALAF, et al., | Verdict |
| Defendants. | November 9, 1999 |

Before: THE HONORABLE ALBERTO C. LAMORENA, III
Presiding Judge, Superior Court of Guam
Hagåtña, Guam

APPEARANCES:

For the People:
Office of the Attorney General
By: Thomas Fisher, Assistant Attorney General
Hagåtña, Guam

For the Defendant :
Terrence Timblin, Esquire
Hagåtña, Guam

COPY

THE COURT: Okay, will the Defendant rise to hear his verdict?

THE CLERK: Ladies and gentlemen of the Jury, listen to your verdict as it stands before you.

For the charge of robbery as a second degree felony, we, the Jury, find the Defendant, Randy Ignacio Chargualaf, guilty.

For the charge of robbery as a third degree felony...

For the charge of possession and use of a deadly weapon, we, the Jury, find the Defendant, Randy Ignacio Chargualaf, guilty.

For the charge of conspiracy to commit robbery as a second degree felony, we, the Jury, find the Defendant, Randy I. Chargualaf, guilty.

For the charge of theft as a misdemeanor, we, the Jury, find the Defendant, Randy I. Chargualaf, guilty.

For the charge of possession of a firearm without an identification, as a felony, we, the Jury, find the Defendant, Randy I. Chargualaf, not guilty.

For the charge of possession of a concealed firearm, as a felony, we, the Jury, find the Defendant, Randy I. Chargualaf, not guilty.

THE COURT: Okay. You may be seated.

You want the jury polled, Mr. Timblin?

MR. TIMBLIN: Yes, Your Honor.

THE COURT: (To the Clerk) Okay, just poll them one by one.

THE CLERK: Juror Number 1, is that your verdict as read?

THE JUROR: Yes.

THE CLERK: Juror Number 2?

THE JUROR: Yes.

THE CLERK: Juror Number 3?

THE JUROR: Yes.

THE CLERK: Juror Number 4?

THE JUROR: (Inaudible response).

THE CLERK: Juror Number 5?

THE JUROR: Yes.

THE CLERK: Juror Number 6?

THE JUROR: Yes.

THE CLERK: Juror Number 7?

THE JUROR: Yes.

THE CLERK: Juror Number 8?

THE JUROR: Yes.

THE CLERK: Juror Number 9?

THE JUROR: Yes.

THE CLERK: Juror Number 10?

THE JUROR: Yes.

THE CLERK: Juror Number 11?

THE JUROR: Yes.

THE CLERK: And Juror Number 12?

THE JUROR: Yes.

THE CLERK: It's unanimous, Your Honor.

THE COURT: Okay, the Jury's verdict is unanimous, having been polled. Again, I'd like to thank the Jury for taking the time out to serve on this Jury.

Dankulo na Si Yu'us Ma'ase on behalf of this Court and the People of Guam, and we'll excuse you. Thank you very much.

THE BAILIFF: All rise for the Jury.

(Jury dismissed)

THE COURT: Okay. Are you requesting for a presentence report, Mr. Timblin?

MR. TIMBLIN: Yes, Your Honor.

THE COURT: Are you waiving your 21 days, or...?

MR. TIMBLIN: I don't see any point in -- Yes, we waive it.

THE COURT: Okay, waive it. Okay, the Court then will set a sentencing hearing for December 23rd, at 11:00 o'clock.

The Probation Officers will be asked to prepare presentence report. (Indiscernible) sentencing, the Defendant will be asked to sit with the Probation Officers to provide information for that report. You may have your

lawyer present if you so wish. Copies of the presentence report will be given to both the defendant and his counsel prior to the sentencing and at the time of the sentencing hearing, the Court will give the opportunity to both the Defendant and his counsel will speak on behalf of the Defendant.

I would like to remind you, Mr. Chargualaf, that you have a right to appeal this case to the Supreme Court. Okay?

THE DEFENDANT: (Whispers) Yes.

THE COURT: And we'll set a sentencing hearing, then, for December 23rd, at 11:00 o'clock. Okay?

The Court stands adjourned.

*** * WHEREUPON PROCEEDINGS CONCLUDED * ***

CF0317-97/11-1-99/mbp

C E R T I F I C A T E

I, MARY BENAVENTE PANGELINAN, do hereby certify that the foregoing pages one through six, inclusive, comprise the true and correct transcript of the Jury Selection proceedings had in Criminal Case No. **CF0317-97, People of Guam versus Randy Ignacio Chargualaf**, heard on November 9, 1999, recorded on Tape Nos. T99-1875; and transcribed to the best of my knowledge, skills and ability.

DATED this 10th day of August, 2006.

MARY BENAVENTE PANGELINAN

CF0317-97/11-1-99/mbp