# DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| RANDY IGNACIO CHARGUALAF, | Civil Case No. 05-00014 |
| Petitioner, | |
| vs. | **ORDER** |
| ROBERT D. CAMACHO, Director of Corrections, Government of Guam, and | Re: Petitioner's Motion for Relief Pursuant to 28 U.S.C. § 2254 |
| THE ATTORNEY GENERAL OF GUAM, | |
| Respondents. | |

Petitioner Randy Ignacio Chargualaf ("Chargualaf") is a prisoner of the Territory of Guam, proceeding with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court deems the matter appropriate for decision without oral argument. FED.R. CIV. P. 78. After considering the submissions and a thorough review of the record, the court finds no basis for the relief requested and **DENIES** Chargualaf's motion.

## BACKGROUND[1]

On July 20, 1997, Nobuyo Certeza ("Certeza") was robbed at gunpoint in her home by three individuals. The robbers took an envelope containing cash and Certeza's purse containing her wallet, credit card and coin purse. The following day Guam police officers stopped a vehicle driven by Chargualaf. During the course of the traffic stop, police recovered a handgun.[2] Chargualaf and his passenger were arrested and subsequently

---

[1] The majority of the background information, except where indicated to the contrary, is taken from (1) the opinion of the Supreme Court of Guam in *People v. Chargualaf*, 2001 Guam 01 (January 16, 2001) and (2) the order of the Supreme Court of Guam in *Chargualaf v. Camacho*, Case No. WHC04-001, a copy of which is found in Docket No. 2-7 at 7-18.

[2] This handgun was later identified as the gun used in the Certeza robbery.

identified as two of the perpetrators of the Certeza robbery. An envelope containing cash was recovered from Chargualaf's person and was subsequently identified as belonging to Certeza. On July 31, 1997, Chargualaf was indicted in connection with the robbery of Certeza.

Thereafter, five successive attorneys were appointed to represent Chargualaf.[3] Trial counsel prepared and argued numerous pre-trial motions before the court on Chargualaf's behalf.[4] Following the trial court's denial of the motions to dismiss and suppress evidence, Chargualaf and counsel had a series of disagreements about how the motions were argued and over the witnesses that were not called to testify at the hearings. As a result of his dissatisfaction, Chargualaf requested that trial counsel file a motion to withdraw. The court addressed this motion during the course of two separate hearings on May 6 and 10, 1999. During these hearings, the court noted that Chargualaf had already been appointed four prior attorneys and that the current disagreements were tactical in nature. The court gave Chargualaf an opportunity to explain the reasons for his request for new counsel. Chargualaf did not provide any additional information other than to state that he did not trust trial counsel. The court denied the motion. See Transcript of May 6, 1999, Docket No. 2-3 at 19-22.

After the court denied his request, Chargualaf sent a letter to trial counsel threatening to file an ethics complaint against him. He also requested reconsideration of the trial court's denial of counsel's client-demanded motion to withdraw in an *ex parte* letter to the court.

---

[3] The Superior Court of Guam record reflects that five attorneys were appointed for the period of time between July 23, 1997, and March 18, 1999. Attorney Terry Timblin ("trial counsel") ultimately defended Chargualaf at trial and represented him on direct appeal.

[4] The motions were as follows:
    a. Motion to Dismiss and Motion to Suppress Evidence - *See* Docket No. 10-7 at 8-14 and Transcript of April 13, 1999 Hrg. Docket Nos. 10-8, 10-9 and 10-10.
    b. Motion to Compel Discovery and Motion to Suppress Other Crimes, Wrongs and Bad Acts- *See* Transcript of May 10, 1999, Docket No. 2-3 at 31-40.
    c. Motion to Suppress Identification - *See* Transcript of May 14, 1999, Docket No. 10-10.
    d. Motion *in Limine* - *See* Transcript of November 1, 1999, Docket No.10-15 at 4-6.

The court addressed Chargualaf's request on May 10, 1999. The court denied the motion but indicated the issue would be revisited if the Guam Bar Ethics Committee proceeded with Chargualaf's complaint. *See* Transcript of May 10, 1999, Docket No. 2-3 at 27-30. Chargualaf never filed an ethics complaint. *See* Decision and Order of February 27, 2004, Docket No. 2-6 at 25.

For the remainder of the case, no additional problems or concerns were raised. At the conclusion of the trial, the jury returned guilty verdicts on the charges of Second Degree Robbery, Special Allegation of Possession and Use of a Deadly Weapon, Conspiracy to Commit Second Degree Robbery, and Theft.[5] *See* 9 GCA §§ 13.30; 40.20(a)(3), (b); 43.20(a)(3), (b), (c); 43.30(a). Chargualaf was sentenced to thirty-five years incarceration. *See* Judgment, Docket No. 10-12 at 21-23.

Chargualaf appealed the conviction; however, he did not raise the issue contesting the trial court's denial of his request for substitution of counsel.[6] Instead, his appeal asserted "(1) the trial court erred in denying Chargualaf's motions to suppress evidence . . . ; (2) the trial court erred when it refused to exclude the identification testimony of the victim; and (3) the convictions should be overturned because the jury returned an inconsistent verdict." *See* Chargualaf, 2001 Guam at 1. The Supreme Court of Guam affirmed Chargualaf's convictions.

Chargualaf then retained new counsel and filed a petition for writ of habeas corpus in the Superior Court of Guam. The trial court denied his petition, as did the Supreme Court of Guam. *See* Docket Nos. 2-6 at 23-25 and 2-7 at 1-3; 7-18. A petition for rehearing in the Supreme Court of Guam was also denied. *See* Docket No. 2-7 at 26-27. Chargualaf then filed this petition.

---

[5] Chargualaf was acquitted of the remaining charges involving possession of a firearm without an identification card and possession of a concealed firearm.

[6] Attorney Timblin was trial and appellate counsel. The court notes that Timblin also represented Chargualaf on appeal to the Ninth Circuit and assisted Chargualaf in preparing a *pro se* petition to the Supreme Court of the United States.

## ANALYSIS

***Standard of Review.*** Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer,* 537 U.S. 3, 7, 123 S. Ct. 362 (2002) (*citing Williams v. Taylor,* 529 U.S. 362, 405-406, 120 S. Ct. 1495 (2000)). Pursuant to the "unreasonable application" clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams,* 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade,* 538 U.S. 63, 123 S. Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a "firm conviction" that the state court was 'erroneous.'") The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza,* 297 F.3d 911, 918 (9th Cir. 2002).

***Ineffective Assistance of Counsel.*** Chargualaf claims he is entitled to relief because appellate counsel rendered ineffective assistance in failing to argue on appeal that the trial court erred in denying the motion to again substitute counsel. Chargualaf maintains that the trial court failed to conduct an adequate inquiry and improperly denied the motion, which

4

ultimately resulted in a violation of his right to effective assistance of trial counsel, as the conflict "was so great that it resulted in a total lack of communication preventing an adequate defense." *See* Petition, Docket No. 1 at 9.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey,* 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984); *Miller v. Keeney,* 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle,* 792 F.2d 846, 847 (9th Cir. 1986). Chargualaf must show that (1) appellate counsel's advice or actions fell below an objective standard of competence and (2) there is a reasonable probability that, but for counsel's unprofessional errors, Chargualaf would have prevailed on appeal. *Miller,* 882 F.2d at 1434 & n.9. Failure to show either of these prongs is sufficient to defeat Chargualaf's claim of ineffective assistance. Accordingly, it is not necessary for the court to discuss both components set forth in *Strickland* "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Pizzuto v. Arave,* 280 F.3d 949, 955 (9th Cir. 2002)(quoting *Strickland,* 466 U.S. at 697.) Following the guidance of these established legal standards, the court turns directly to the second prong of the *Strickland* test.

For Chargualaf to satisfy the prejudice prong of *Strickland,* the court must conclude there is a "reasonable probability" that Chargualaf would have prevailed on direct appeal concerning the denial of his motion to withdraw/substitute counsel. In deciding if there is a "reasonable probability" that Chargualaf would have prevailed on appeal, this court will address (1) whether the trial court's denial of the motion to withdraw/substitute was in error and (2) whether the trial court's denial of the motion resulted in a violation Chargualaf's Sixth Amendment right to counsel.

***Trial Court's Denial of Motion to Substitute was Proper.*** Chargualaf asserts that his case required substitution of counsel due to trial counsel's alleged deficient acts and refusal to bring certain motions or call certain witnesses during pre-trial proceedings.

Ninth Circuit precedent indicates that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the

5

reasons for the defendant's dissatisfaction. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc). However, the inquiry need only be as comprehensive as the circumstances reasonably permit. *King v. Rowland,* 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry was not necessary). Failure to adequately inquire into a defendant's dissatisfaction with counsel is not *per se* prejudicial, it must result in the constructive denial of counsel. *Schell*, 218 F.3d at 1026-7 ("the basic question is simply whether the conflict between [petitioner] and his attorney prevented effective assistance of counsel.")

The Supreme Court of Guam, in its habeas review, utilized the three-factor test outlined in *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir. 1997), to determine whether the trial court abused its discretion in denying the motion to appoint substitute counsel in this case. This test requires that the court consider (1) the adequacy of the lower court's inquiry into the defendant's complaint; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of the motion and the extent of resulting inconvenience or delay.

When considering the adequacy of the trial court's inquiry, the Supreme Court of Guam noted that the trial court allowed Chargualaf the opportunity to explain with specificity the alleged problems he was experiencing with his attorney. Chargualaf, however, chose not to respond to the court's requests for clarification of his written correspondence. The Supreme Court of Guam expressly found that under the circumstances as they existed ("where there was a pattern of substituting attorneys based on claims of distrust"), the trial court's inquiry "was as extensive as can reasonably be expected and one which was fully adequate." *See* Docket No. 2-7 at 15.

After reviewing the extent of the purported conflict, the Supreme Court of Guam held that Chargualaf had failed to demonstrate an irreconcilable conflict with trial counsel, and that any breakdown in communication was created by Chargualaf's behavior. In reaching this conclusion the court stressed that Chargualaf's "bare claim" that he did not trust counsel-

--the same claim he made against three of his four previous attorneys[7]---fell short of demonstrating an irreconcilable conflict, noting that the main origin of the conflict "centered around defense and litigation tactics." *Id.* at 16.

As to the timeliness of the motion, the Supreme Court of Guam acknowledged that the issue was not expressly addressed by the trial court. However, upon review, the Supreme Court found a "strong" inference that the motion was brought solely for the purposes of delay. *See* Order, Docket No. 2-7 at 15-18. In support of this finding the court indicated that delay of the trial was inevitable should Attorney Timblin be replaced, and that four other attorneys had already been substituted, resulting in the pre-trial proceedings being drawn out eighteen months. Accordingly, the Guam Supreme Court determined no error occurred at the trial court level. Likewise, it found that even if Chargualaf had raised the withdrawal/substitution of counsel issue on direct appeal, there was no likelihood that he would have been successful.

After an extensive, independent review of the entire record in this matter, this court agrees with the assessment and findings of the Supreme Court of Guam. The trial court made an adequate inquiry into Chargualaf's complaints, including offering both Chargualaf and his counsel the opportunity to supplement the pleadings already on file. The trial court resolved the matter on the merits before proceeding with the case.

Chargualaf indicated simply that he "didn't trust" counsel but when asked by the court to expound on this statement, he did not respond. Review of the affidavit submitted by Timblin and the letters Chargualaf sent to the court *ex parte* reveal two concerns arising out of the hearing on the motion to suppress (1) counsel's refusal to call officer Santo Tomas as a witness; and (2) counsel's refusal to call co-defendant Mendiola as a witness.

Chargualaf was unhappy that Timblin, during the hearing on the motion to suppress involving the traffic stop, did not call police officer Santo Tomas to "establish a contradiction

---

[7]

The court is aware that Chargualaf's fourth counsel, Mantanona, made the request to withdraw, and not Chargualaf. However, the basis of Mantanona's request was the same (a breakdown in communication based upon Chargualaf's distrust, disagreement with counsel's litigation decisions, and *ex parte* contacts with the court) making it unreasonably difficult for him to represent Chargualaf.

7

between his version of events and that of Officer Dawson in that [O]fficer Santo Tomas had drawn a connection between the Bulletin about the previous day's robbery and Defendant and . . . [his passenger] while [O]fficer Dawson had not." *See* Affidavit of Timblin, Docket No. 2-3 at 1-3. In his affidavit, Attorney indicates that he attempted to explain to Chargualaf that he did not call Santo Tomas because he did not believe such a contradiction existed since "both officers indicated that [O]fficer Santo Tomas informed [O]fficer Dawson of the perceived connection at the scene of the stop." *Id.*[8]

Chargualaf also disagreed with counsel's decision not to call Mendiola "to contradict [O]fficer Dawson's testimony that . . . [Chargualaf] consented to the search of the vehicle." Timblin, in preparation for the motion, explained to Chargualaf that in his opinion "the best and probably only means of [successfully] contradicting officer Dawson was for [Chargualaf] to testify himself that he had not consented. [Chargualaf] declined to do so, stating that he felt that the assertion that any consent was vitiated by an illegal detention was sufficient." Timblin further indicated that at no time did Chargualaf ever inform him that Mendiola would testify to lack of consent, nor was there any indication of the same in the discovery. *Id.* at 3.

It is clear from this record that Chargualaf's conflicts with his trial counsel arose from their differences of opinion involving strategic matters. Such differences do not require substitution. *Schell*, 218 F.3d at 1026 & n.8 (9th Cir. 2000)(en banc) ((quoting *Brookhart v. Janis*, 384 U.S. 1, 8 (1966) ("[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or explicit disapproval")).

This court believes that any breakdown of communication was prompted by

---

[8]

Attorney Timblin's belief turned out to be accurate. At trial, in response to questions by Attorney Timblin, Officer Dawson testified that he did not make the connection that Chargualaf fitted the description on the wanted flier until Officer Santo Tomas pointed it out to him. *See* Trial Transcript, Docket No. 16-7 at 3. Likewise, Officer Santo Tomas testified that when he realized that Chargualaf and his passenger fit the description of two of the robbers in the flier, he informed Officer Dawson. *Id.* at 26-27.

8

Chargualaf's own antics and disagreements with Timblin's strategic decisions. It is apparent upon this court's evaluation of Chargualaf's history with three of the four counsel appointed prior to Timblin, that Chargualaf repeatedly engaged in obstreperous behavior with each counsel appointed so as to delay the inevitable: a trial. Conflict of the defendant's own making does not amount to a constructive denial of the defendant's Sixth Amendment right to counsel. *See Schell,* 218 F.3d at 1026.

Chargualaf's first counsel, Attorney William Bischoff,[9] moved to withdraw because Chargualaf "has expressed his extreme dissatisfaction with my [Bischoff's] representation of him and . . . has asked that new counsel be appointed him. Our attorney-client relationship has deteriorated to the point that I can no longer effectively represent defendant Chargualaf, as we have a lack of communication." *See* Motion to Withdraw, Docket No. 10-2 at 6.

Attorney Mark Williams,[10] Chargualaf's second court appointed counsel, spent approximately nine months diligently working on Chargualaf's case.[11] During this time motions to suppress, to compel discovery, and to hire an investigator were filed on Chargualaf's behalf. *See* Docket No. 10-2 at 10, 17-18; 10-3 at 11-13. Ultimately, Williams also filed a motion to withdraw citing a "conflict of interest." *See* Docket No. 10-13 at 14-17. The basis of the conflict as articulated by Williams was because Chargualaf:

> has continuously made harassing phone calls to counsel involving obscene and personal threats, has expressed the intent to file ethical complaints against counsel, desires to represent himself in these proceedings, refuses to accept the advice or recommendations of counsel, and despite admonishment by counsel, persists in making ex parte communications with the court. Therefore, the attorney-client relationship between [Chargualaf] and counsel has deteriorated to such a point that effective communication with counsel is no longer possible nor desired.

---

[9] Attorney Bischoff was defendant's appointed counsel from the magistrate's hearing on July 22, 1997, through August 25, 1997.

[10] Attorney Williams was appointed counsel from August 25, 1997 through May 5, 1998.

[11] Examination of the vouchers submitted by Williams indicate that 42.89 hours were billed for meetings with Chargualaf, investigation, court hearings, and motion and trial preparation. *See* Docket Nos. 10-2 at 11-16; 10-3 at 1-4, 20-22. Vouchers submitted by the investigator hired by Williams reveal an additional 68.5 hours spent on investigation in Chargualaf's case. *See* Docket Nos. 10-2 at 19-21; 10-3 at 5-6; 10-4 at 1-3.

9

*Id.* at 16.

The court again appointed counsel, Alexander Gorman.[12] Attorney Gorman was allowed to withdraw shortly after being appointed, apparently for reasons that had nothing to do with Chargualaf.[13]

A fourth attorney, Rawlen Mantanona, was appointed to represent Chargualaf.[14] Mantanona zealously represented Chargualaf for nearly six months, during which time he also retained an investigator, met with Chargualaf on numerous occasions, filed several additional motions,[15] and appeared in court on Chargualaf's behalf.[16] As with prior counsel, defendant's behavior also compelled Mantanona to file a motion to withdraw. In his written motion,[17] and in a hearing before the court, counsel indicated that Chargualaf was "constantly second-guessing...[counsel] on what issues to raise and...what issues to argue or how to argue these issues ...[he] questions my ability on how to manage this case...he is constantly trying to

---

[12] Gorman represented Chargualaf from May 5, 1998, through August 21, 1998.

[13] As reasons supporting his motion to withdraw, counsel cited "severe financial difficulties" with his practice and the belief that undertaking the defense of Chargualaf would pose a "financial burden" on his solo practice. *See* Docket No. 10-4 at 13-15.

[14] Mantanona represented Chargualaf from August 21, 1998, through March 18, 1999.

[15] These motions included:
1. Motion to suppress 404(b) evidence, Docket No. 10-5 at 9-18;
2. Motion to suppress in-court identification, Docket No. 10-5 at 19-25;
3. Motion to dismiss and suppress evidence, Docket No. 10-6 at 1-14;
4. Motion to compel discovery, Docket No. 10-6 at 15-19.

[16] Review of Mantanona's vouchers submitted to the court reveals that he spent 73.03 hours preparing Chargualaf's case. *See* Docket Nos. 10-4 at 21-25; 10-6 at 20-22; 10-12 at 10-12, 15-17; 10-13 at 15-17. The retained investigator contributed an additional 7.25 hours working the case in preparation for trial. *See* Docket No. 10-12 at 13-14.

[17] *See* Docket Nos. 10-6 at 25-29; 10-7 at 1-4.

make me do things that I can't do and that is, that are improper." Docket No. 2-3 at 11-12. Mantanona describes Chargualaf as "obstinate" and continually trying to "infringe on strategic decisions that are the domain of counsel." *Id.* at 11-13. Chargualaf had continued to contact the court *ex parte* despite prior admonishments by counsel. Mantanona evinced a belief that Chargualaf did not trust him, and was calling his office daily trying to converse with counsel as if Chargualaf were a fellow attorney. *Id.* at 15. In sum, Mantanona maintained that Chargualaf's behavior made it "unreasonably difficult" for him to provide effective representation. *Id.* Mantanona was permitted to withdraw and Timblin was appointed.

While Chargualaf's relationship with Timblin may have been strained initially, it did not rise to the level of an irreconcilable conflict requiring yet another substitution of counsel. Chargualaf presented no evidence to further explain the source of the alleged strain on his relationship with counsel and any breakdown in communication appears to have been the result of Chargualaf's persistent recalcitrance and/or tactical disagreements.

***Trial Court's Denial of Motion Did Not Result in a Sixth Amendment Violation.***
Even if the trial court had not conducted an adequate inquiry into Chargualaf's requests for substitute counsel, this court concludes he was not denied his Sixth Amendment right to counsel. The principal issue for the court to address in federal habeas review is whether the trial court's denial of a motion for substitution of counsel:

> ... actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.

*Schell*, 218 F.3d at 1026.

The review of this record reflects that trial counsel provided effective assistance to Chargualaf, and thus met the standard required by the Sixth Amendment. He did a thorough job of challenging the prosecution's case against Chargualaf through argument of pre-trial motions, cross-examination of witnesses at trial, and by a competent closing argument to the jury on behalf of his client. *See* Trial Transcript, Docket Nos. 16-2 through 16-17. In fact, counsel was successfully able to secure acquittals on two of the charges against Chargualaf at trial. Finally, when called to testify before the Superior Court regarding Chargualaf's local

11

habeas corpus petition, counsel affirmed that he was able to effectively represent Chargualaf and there were no irreconcilable differences or problems after the May 10, 1999 hearing. *See* Transcript of December 5, 2003 ("Writ Hrg."); Docket No. 2-1 at 39-40. There is no indication whatsoever in the record that counsel's performance was negatively influenced by Chargualaf's actions. He was prepared for trial and skillfully represented Chargualaf. A conflict which causes problems in some areas of the attorney-client relationship but which ultimately has no significant impact on counsel's representation before the court does not rise to the level of ineffective assistance of counsel. *See Cuyler v. Sullivan,* 446 U.S. 335, 348-350, 100 S.Ct. 1708 (1980); *see also United States v. Mett,* 65 F.3d 1531, 1535 (9th Cir. 1995).

Moreover, under the circumstances presented here, the vast majority of Chargualaf's apparent complaints regarding his counsel were mere differences of opinion over strategy (i.e. which witnesses to call or which motions to file), none of which serve as proper grounds for appointing substitute counsel.[18] Chargualaf has not shown that the relationship with his defense counsel was so conflicted as to violate his Sixth Amendment right to adequate counsel.[19] Although Chargualaf shows that he and counsel had disagreements over pre-trial tactics and that they did not generally get along with one another, Chargualaf does not demonstrate that his Sixth Amendment rights were violated by the trial court's denial of his

---

[18] *See United States v. Robinson,* 913 F.2d 712, 716 (9th Cir. 1990) (no error in failing to offer defendant substitute counsel where the crux of the problem was defendant's anger at his attorney's refusal to raise defenses to the charges which the attorney considered frivolous); *see also United States v. Padilla,* 819 F.2d 952, 956 (10th Cir. 1987) (finding that defendant's complaints that his appointed counsel refused to structure a defense as he directed did not constitute good cause for substitution of counsel.)

[19] The court notes that the record actually supports the contrary. Trial counsel's billing summary reflects 21 conversations (totaling 19.2 billable hours) between Chargualaf and counsel after the court's last denial of the motion on May 10, 1999, through his sentencing on February 1, 2000. During that time no further mention of any problems was brought to the court's attention. In fact, counsel continued to represent Chargualaf upon appeal without any further mention of conflicts. Further, this court notes that trial counsel negotiated a plea agreement in another case involving Chargualaf subsequent to the trial, where Chargualaf affirmed his satisfaction with counsel. *See* Transcript of Change of Plea in Case No. CM1544-98, Docket No. 10-17 at 15.

12

motions to substitute counsel. *See Morris v. Slappy,* 461 U.S. 1, 13-14 (1983) (holding that Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between a defendant and counsel). Chargualaf's claimed difficulties with his counsel did not rise to the level of constructive denial of counsel and, in any event, were of his own making.[20]

Because Chargualaf did not suffer a constructive denial of counsel, he must demonstrate prejudice under *Strickland. Schell*, 218 F.3d at 1028. Chargualaf has made no such showing with respect to trial counsel. As previously mentioned, notwithstanding Chargualaf's reluctance to proceed with his appointed counsel, a review of the Guam Superior Court record reflects that counsel was able to present a professional and adequate defense to the charges against Chargualaf. In fact, Chargualaf does not raise a claim of ineffective assistance of trial counsel before this court, nor does he challenge any particular aspect of his trial counsel's performance during the course of the trial.[21]

## CONCLUSION

The failure of appellate counsel to raise the alleged error by the trial court did not amount to ineffective assistance of appellate counsel under *Strickland*. In any event, Chargualaf has failed to show he was denied his Sixth Amendment right to counsel. Moreover, in light of the available record, the court finds that Chargualaf has failed to carry his burden of demonstrating that the Guam Supreme Court's opinion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

---

[20] *See Schell*, 218 F.3d at 1026 ("[I]t may be the case, for example, that because the conflict was of [petitioner's] own making, or arose over decisions that are committed to the judgment of the attorney and not the client, in fact he actually received what the Sixth Amendment required in the case of an indigent defendant").

[21] In fact, Chargualaf concedes that he is not alleging ineffective assistance of trial counsel due to an irreconcilable conflict as a result of the failure to grant his motion to substitute counsel. *See* Writ Hrg. Docket No 2-1at 33.

13

the State Court proceeding." 28 U.S.C. § 2254(d). Accordingly, the court finds no basis for habeas corpus relief. Chargualaf's Petition for Writ of Habeas Corpus is **DENIED**.

**IT IS SO ORDERED** this 12th day of March, 2007.

                                                    */s/ Alex R. Munson*
                                                    **ALEX R. MUNSON**[*]
                                                    **United States District Judge**

---

[*] The Honorable Alex R. Munson, United States District Judge for the District of the Northern Mariana Islands, sitting by designation.

14